**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| INTRA-NATIONAL HOME CARE, LLC, and AMERICARE HOME HEALTHCARE SERVICES, LLC, | Civil Action No.   2:20-1545 |
| Plaintiffs | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF LABOR, EUGENE SCALIA, Secretary of the United States Department of Labor, in his official capacity; and CHERYL STANTON, Administrator of the Department of Labor's Wage and Hour Division, in her official capacity, | |
| Defendants | |

## <u>PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### <u>PARTIES</u>

1.     Plaintiffs Intra-National Home Care, LLC. ("Intra-National") and Americare Home Healthcare Services, LLC ("Americare") are third party agencies, which employ Direct Care Workers who provide in-home necessary companionship and assistance services to elderly and disabled persons in Pennsylvania, Ohio, Michigan and Iowa. Plaintiffs are limited liability companies headquartered at 1279 E. Dublin Granville Road, Columbus, Ohio 43229.

2.     Defendant Eugene Scalia is the Secretary of U.S. Department of Labor. Plaintiffs sue Secretary Scalia in his official capacity only.

3.     Defendant United States Department of Labor ("DOL") is a federal cabinet agency and an agency within the meaning of 5 U.S.C. § 552(f). The DOL conducts investigations of violations or potential violations by employers of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"), and seeks to hold employers liable for claims for back wages.

1

4.     Defendant Cheryl Stanton is the Administrator of the DOL's Wage and Hour Division. The FLSA authorizes the creation of a Wage and Hour Division under the direction of an Administrator. *See* 29 U.S.C. § 204. The Wage and Hour Division promulgated the sub-regulatory guidance at issue in this case. Plaintiffs sue Stanton in her official capacity only.

## INTRODUCTION

5.     Plaintiffs seek a declaration that their Direct Care Workers are exempt from FLSA minimum wage and overtime requirements under the Companionship Exemption and request an order enjoining the DOL from pursuing claims against them for back wages on behalf of the Direct Care Workers. Plaintiffs further seek a declaration that the States and privately owned Medicaid healthcare plans are joint employers of Direct Care Workers employed by Plaintiffs.

6.     The majority of Plaintiffs' Direct Care Workers provide in-home companionship services to elderly or disabled family or household members of low-income families in Pennsylvania, Ohio, Michigan and Iowa through those States' Medicaid Waiver Programs.

7.     Under the Medicaid Waiver Program, the federal government waives medical assistance rules intended for institutional care and allows States to use Medicaid reimbursement funds to provide care to elderly and disabled persons in their homes. State agencies administer the Medicaid Waiver Program by contracting with private intermediary entities, which determine the recipients' eligibility, create individual service plans, and approve the selection of Providers of in-home services. The Providers, which include third party agencies such as Plaintiffs, then hire, train, and manage the Direct Care Workers. The third party agencies pay the Direct Care Workers' wages, administrative costs, and the employer's share of FICA taxes from Medicaid reimbursement funds.

8.      The third party agencies operate for the benefit of the recipients of in-home services by processing the extensive paperwork necessary to receive Medicaid Waiver Program

funding for their Direct Care Workers. The Medicaid Waiver Program provides for a flat rate of hourly pay that does not pay any increased amount for overtime hours by the Direct Care Workers.

9.      From 1975 to 2015, third party agencies such as Plaintiffs relied upon the Companionship Exemption from FLSA minimum wage and overtime requirements in establishing their operations and pay practices. 29 U.S.C. § 213(a)(15). The clear language of the Companionship Exemption demonstrates that Congress intended for it to apply to Direct Care Workers, including those workers employed by third party agencies such as Plaintiffs. *See* 29 U.S.C. § 213(a)(15) Companionship Exemption.

10.     In 2013, the DOL arbitrarily proposed revising the regulation corresponding to the Companionship Exemption to preclude third party agencies from claiming the Companionship Exemption. The revised regulation came into effect in 2015, barring third party agencies, such as Plaintiffs, from claiming the Companionship Exemption, thus reversing four decades of interpretation and application and contradicting the clear language of the statute applying the Exemption to all employers.

11.     Under Defendant Secretary Scalia, the DOL has targeted third party agencies and used the revised regulation to unleash its full investigative and prosecutorial powers upon them, asserting claims for enormous amounts of back wages. If the DOL is successful in pursuing such claims, Plaintiffs will be unable to continue their business operations and an untold number of elderly and disabled care recipients will be forced into nursing homes or other institutions to find adequate care. However, under recent Supreme Court rulings, the revised regulation is invalid and the Companionship Exemption should once again be available to third party agencies.

12.     Beginning 1945, courts uniformly applied a narrow standard of interpretation to FLSA exemptions. *A. H. Phillips v. Walling*, 324 U.S. 490 (1945). In two rulings in 2016 and 2018,

3

however, the U. S. Supreme Court departed from this standard of interpretation and ruled, in *Encino Motorcars, LLC v. Navarro* that FLSA exemptions were instead to be "fairly interpreted." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 1134 (2016) ("*Encino Motorcars I*"); *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) ("*Encino Motorcars II*").

13.     In *Encino Motorcars II*, the Supreme Court found as follows:

> Because the FLSA gives no "textual indication" that its exemptions should be construed narrowly, "there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation."

*Encino Motorcars, LLC*, 138 S. Ct. at 1142.

14.      Subsequently, numerous Courts of Appeal have followed *Encino Motorcars I & II* and fairly interpreted FLSA exemptions in various contexts, but none has examined the Companionship Exemption.

15.     *Encino Motorcars I & II* requires courts to fairly interpret the FLSA Companionship Exemption to apply to Direct Care Workers, and hold 29 C.F.R. § 552.109 to be invalid.

16.     In light of the mandate of *Encino Motorcars* that FLSA exemptions be fairly interpreted, Plaintiffs request the Court to enter a declaratory judgment acknowledging that Plaintiffs' Direct Care Workers are exempt under the Companionship Exemption of the FLSA and enter an order enjoining the DOL from further investigative and prosecutorial action.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

18.     Plaintiffs' request for declaratory and injunctive relief is consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

4

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs conduct business within the Western District of Pennsylvania, and substantial parts of the events giving rise to Plaintiffs' claims occurred and are continuing to occur within this judicial district.

## FACTS

### A.     The Establishment of Intra-National and Americare

20.     Plaintiffs are third party agencies that employ Direct Care Workers.

21.     Dilli Adhikari is the owner of Intra-National and Americare. Adhikari is a Bhutanese refugee and a naturalized U.S. citizen who immigrated to the United States in 2011 as part of the Bhutanese Refugee Resettlement Program.

22.     In the Bhutanese refugee population in the U.S., many elderly refugees do not speak English and are in need of extensive personal care and assistance with their daily tasks. A number of them are also disabled. The Medicaid Waiver Program allows these elderly and disabled refugees to receive personal care from their family members in their family dwellings, rather than receive care by strangers in institutions.

23.     To provide care through the Medicaid Waiver Program, family members must complete and file the necessary paperwork with their state Medicare agency to become Direct Care Workers. This process can be quite arduous for Bhutanese refugees who do not speak much, if any, English and who do not know how to navigate the bureaucracy of the Medicaid Waiver Program.

24.     Adhikari saw a need to establish third party agencies to supply Direct Care Workers for their elderly or disabled Bhutanese family members. Accordingly, Adhikari founded Intra-National and Americare to provide such non-medical home care and companionship services.

25.     Intra-National has been in continuous operation since 2013 and Americare since 2015. Between them, Americare and Intra-National presently employ over three thousand Direct Care Workers.

26.     It has always been difficult for third party agencies such as Plaintiffs to find and retain qualified and dependable Direct Care Workers, and the COVID-19 pandemic has only exacerbated this problem. [1]

**B.     The Medicaid Waiver Programs in Pennsylvania and Ohio**

27.     Pennsylvania and Ohio both participate in the Medicaid Waiver Program, through the Pennsylvania Department of Human Services [2] and the Ohio Department of Medicaid, respectively.[3] The State Medicaid Agencies in Ohio and Pennsylvania retain authority over the administration and implementation of the Waiver Program.

28.     Under the Medicaid Waiver Program, the care recipient completes an application for Home and Community-Based Services that is specific to their needs, such as for aging for sixty and over ("the Aging Waiver") or for a disability.[4]

29.     State agencies administer the Medicaid Waivers in accordance with all applicable laws and regulations; maintain oversight of contracted functions; ensure that waiver services are provided by qualified enrolled Medicaid Assistance Providers; and administer waiver services to

---

[1] *See* Britt Salay, Home Health Care Businesses Struggle To Find Workers During Pandemic, Aug. 30, 2020, https://www.wane.com/news/local-news/home-health-care-businesses-struggle-to-find-workers-during-pandemic/.

[2] *See* Pennsylvania's Department of Human Services website: https://www.dhs.pa.gov/about/DHS-Information/Pages/Waiver-Information.aspx.

[3]     *See* Ohio's Department of Medicaid website: https://medicaid.ohio.gov/FOR-OHIOANS/Programs/HCBS-Waivers.

[4]     *See* Application for a § 1915(c) Home and Community-Based Services Waiver, https://www.dhs.pa.gov/Services/Disabilities-Aging/Documents/Alternatives_to_Nursing%20Homes/1915c-%20HCBS%20Waiver.pdf

care recipients who meet program eligibility requirements. *See* Application for a § 1915(c) Home and Community-Based Services Waiver.[5]

30.     The care recipients then choose a Medicaid health plan, called Community HealthChoices. The health plan then develops and retains exclusive control over care assessments and creates individual service plans for care recipients.[6] In Ohio, analogous state entities referred to as Managed Care Plans create and manage the care recipients' individual service plans.[7]

31.     In Pennsylvania, the Community HealthChoices are AmeriHealth Caritas, PA Health & Wellness, Keystone First CHC, and UPMC CHC. In Ohio, the Managed Care Plans are Buckeye Health Plan, Care Source, Molina Healthcare, Paramount Advantage, and United Healthcare Community Plan.

32.     Hence, the Pennsylvania Waiver Program is organized and structured as follows:

---

[5] *See* Application for a § 1915(c) Home and Community Based Services Waiver, https://www.dhs.pa.gov/Services/Disabilities-Aging/Documents/Alternatives_to_Nursing%20Homes/Consolidated%20Waiver%20Amendment%20October%201%202019.pdf.

[6] *See* Community HealthChoices Questions and Answer Document, http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/document/c_274784.pdf

[7] *See* https://medicaid.ohio.gov/FOR-OHIOANS/Programs/Managed-Care-for-Ohioans.



33.     The Ohio Medicaid Waiver Program is organized and structured as follows:



34.     The Community HealthChoices and Managed Care Plan entities work with care recipients and their medical providers to create the individual service plans, which describe the

8

waiver services, their projected frequency, the type of Provider for each service, and the amount to be paid per hour of service. The state Medicaid agency must approve the individual service plans.

35.     Third party agencies enroll as Medical Assistance Providers ("Providers"). The third party agencies then hire and train Direct Care Workers to be assigned to the care recipients. The third party agencies collect Direct Care Worker timesheets for payroll processing, review work reports for compliance with individual service plans, and complete the necessary paperwork to obtain the Medicaid funding to pay the Direct Care Workers.

36.     The individual service plans provide only a straight reimbursement rate per hour for services, and do not account for additional compensation for overtime hours.

## C.    The DOL's Position Under Secretary Scalia on the FLSA Companionship Exemption

37.     Under Defendant Secretary Scalia, the DOL has taken the position that when the Direct Care Workers are family members of the recipient, they will only be paid for the number of hours approved in the individual service plans. The DOL considers any work performed outside of the approved hours to be "of a familial nature" and therefore not compensable. *See* DOL Fact Sheet #79F.[8]

38.     The DOL's position is contrary to the fundamental purpose of the FLSA, which is to provide for compensation for all hours worked by workers.

39.      The DOL fails to recognize that there is a fundamental conflict between the Medicaid Waiver Program, as currently administered, and the FLSA. The FLSA requires payment of time-and-a-half for overtime hours if the employee does not fall under an exemption or

---

[8] https://www.dol.gov/agencies/whd/fact-sheets/79f-flsa-publicly-funded-programs.

exception. However, the Medicaid Waiver Program pays only a set hourly rate, which does not increase for overtime hours even when accounted for in the individual service plan.

40.     The Companionship Exemption permits third party agencies to operate off the thin margin between the Medicaid reimbursement rate and their employees' hourly pay rate of pay.

41.     The DOL simultaneously requires payment for all hours worked by the Direct Care Workers, including overtime, while arbitrarily precluding third party agencies from claiming the Companionship Exemption. The DOL has systematically targeted third party agencies under this approach and placed an enormous and unsustainable financial burden upon third party agencies, thereby endangering the essential purpose of the Waiver Program--to shift recipients away from institutional care.

**D.     History of the FLSA Companionship Exemption**

42.     In enacting the FLSA, Congress intended to establish a clear and expansive set of rules governing the employer-employee relationship. Since its inception, the FLSA has served to safeguard workers, particularly those in low-wage industries, by protecting them from minimum wage and overtime violations, late payment of wages, erroneous time and record-keeping practices, and retaliation. The FLSA mandates a minimum wage for employees, which has been set at $7.25 since August of 2009. 29 U.S.C. § 206, Minimum Wage.

43.     The FLSA establishes requirements for payment of overtime wages at a rate of one and one-half times the regular rate for hours worked by an employee in excess of 40 per week.  29 U.S.C. § 207(a), Maximum Hours.

44.     However, the FLSA also contains a number of exceptions to and exemptions from the imposition of overtime wages, including the Companionship Exemption. *See e.g.* 29 U.S.C. § 207; 29 U.S.C. § 213(a)(15).

10

45.     Enacted in 1974, the Companionship Exemption was established for domestic services employees:

> Any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care of themselves (as such terms are defined and delimited by regulations of the Secretary).

29 U.S.C. § 213(a)(15).

46.     In 1975, the DOL Wage and Hour Division Administrator determined that third party agencies, such as home care agencies, could avail themselves of the Companionship Exemption for domestic workers.

47.     The governing regulation provided that exempt companionship workers included those "who are employed by an employer or agency other than the family or household using their services." 29 C.F.R. § 552.109(a) (prior to 2015). Accordingly, third party agencies could claim the Companionship Exemption.

48.     Congress made unequivocally clear its intent for the Companionship Exemption to apply to third party agencies. Although several administrations attempted to revise or limit the Companionship Exemption, all such attempts have failed. None of various suggested changes or revisions made it past the comment phase and all were eventually withdrawn.

49.     In *Long Island Care at Home, Ltd. v. Coke*, 551 U. S. 158 (2007), the U. S. Supreme Court upheld the Companionship Exemption, its supporting regulations, and its application to third party agencies as consistent with Congressional intent underlying the FLSA. *Long Island Care at Home, Ltd.*, 551 U.S. 158.

50.     For 40 years—from 1975 until the enactment of the revised regulation in 2015— third party agencies utilized the Companionship Exemption and structured their businesses in reliance upon its availability.

11

**E.     The DOL's Failure to Recognize the Interplay Between the Medicaid Waiver Program and the Companionship Exemption and Reversal of Course**

51.     In order to attract and retain capable and reliable Direct Care Workers, Plaintiffs pay them an hourly rate of $10.00/hour or more. This hourly rate is well above minimum wage, provides sufficient funds for a living wage, and is fully covered by the Medicaid reimbursement rate. However, the Medicaid reimbursement rate is insufficient to fund time-and-a-half overtime premiums at this hourly rate.

52.     Plaintiffs and other third party agencies in the home care industry have reasonably relied upon the Companionship Exemption from overtime pay requirements in calculating pay rates and compensating their Direct Care Workers.

53.     However, in a reversal of nearly forty years of interpretation of the exemption, in 2013, the DOL promulgated 29 C.F.R. § 552.109, precluding third party agencies from claiming the Companionship Exemption.

54.     Since the appointment of Defendant Scalia as the Secretary of Labor in September 2019, the DOL has enforced 29 C.F.R. § 552.109 to unleash a prosecutorial campaign against Plaintiff and other third party agencies. The DOL seeks enormous amounts in overtime wages and penalties from Plaintiffs and other third party agencies, which they are simply unable to afford under current Medicaid reimbursement rates.

55.     The DOL is also seeking injunctions against these third party agencies, many of which are small family-owned businesses like Plaintiffs, and is seeking to hold their owners personally responsible for the asserted liabilities.

56.     The DOL's targeting of Intra-National and Americare, and other third party agencies threatens to put them out of business and could result in the decimation of the entire industry of home care providers. This would be greatly deleterious for the thousands of elderly

and disabled care recipients served by Plaintiffs and countless other recipients served by the industry.

57.     For the reasons more fully explained below, Plaintiffs request this Honorable Court to enter a declaratory judgment acknowledging that 29 C.F.R. § 552.109 is invalid and contrary to Congressional intent and that Plaintiffs' Direct Care Workers are exempt under the Companionship Exemption of the FLSA, and to enter an order enjoining the DOL from further investigative and prosecutorial action against them.

**F.     The DOL's Arbitrary and Capricious Attempt to Subvert the Purpose of the Companionship Exemption.**

      **a.     The DOL's revised regulation arbitrarily prohibits third party employers from utilizing the Companionship Exemption.**

58.     In 2013 the DOL proposed revisions to 29 C.F.R. § 552.109 purporting to eliminate the ability of third party agencies to claim the Companionship Exemption, which revisions were enacted in 2015.

59.     Under the revised regulation, care recipients can still assert the exemption, even if the Direct Care Workers are jointly employed by the individual and third party agencies. *See* 29 C.F.R. § 552.109(c). The revised regulation allows a care recipient to claim the Companionship Exemption and avoid minimum wage and overtime requirements if found to be a joint employer, leaving the third party agency to bear all liability under the FLSA. The revised regulation's selective application of the exemption is incongruous with the broad language of the Companionship Exemption and principles of joint and several liability applicable to joint employers.

60.     Prior to the 2015 enactment of these revisions, scholars direly predicted that denial of the exemption to third party agencies would create a crushing financial burden for overtime

payments, resulting from the agencies' reliance upon funding through the Medicaid Waiver Program that is insufficient to pay overtime rates for companionship work.[9]

61.     In 2014, a group of trade associations representing home care agencies filed a lawsuit challenging the revised regulations under the Administrative Procedures Act. *See Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014)[10]. The District Court in that case granted partial summary judgment in favor of the trade associations and held the revised regulations to be invalid. *Home Care Ass'n of Am.*, 76 F.Supp. 3d 138.

62.     On appeal, the Circuit Court of Appeals for the District of Columbia vacated and remanded the district court's decision under the two-step *Chevron* framework, based upon its determination that the revised regulations fell within the power of DOL to fill in the statutory gaps under step one of the *Chevron* framework. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1090 –93 (D.C. Cir. 2015).

63.     In upholding the revised regulations, the Court of Appeals relied heavily upon the then-existing requirement that it narrowly interpret FLSA exemptions, as had been established by the U. S. Supreme Court in *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945). *Id*. at 1093.

64.     The Court of Appeals stated that the exclusion of third party agencies from the exemption was appropriate based in part upon its assumption that many employees of the agencies are not live-in care workers, but rather, are hired, outside professionals. *Id*. at 1094. In reality, the

---

[9] *See* Emily Munson, *Help that Hurts: How DOL's Home Care Rule*, 13 Ind. Health L. Rev 433 (2016); Tatiana Oriakhi, *Home Care Workers, More than Just Companions: The Final Rule and the Fight for Home Care Stabilization*, 24 Elder L.J. 457 (2017).
[10]   A brief overview of the procedural history and rulings of this matter are discussed in a 2016 Indiana Health Law Review Article. *See* Emily Munson, *Help that Hurts: How DOL's Home Care Rule*, 13 Ind. Health L. Rev 433, 448 - 451 (2016).

contrary is true, as care recipients routinely prefer family members for their care.[11] Indeed, virtually all of Plaintiffs' Direct Care Workers are family members of care recipients.

65.     On these bases, the Court of Appeals found the revisions to be valid, and the revisions went into effect in 2015.

### b. The DOL has targeted third party employers for investigation and prosecution under the revised regulation.

66.     As predicted, the DOL's attempt to eliminate the Companionship Exemption has created inconsistencies in payment of overtime to Direct Care Workers and confusion over the availability of the exemption to third party agencies.

67.     Since the revised regulation went into effect and after the appointment of Defendant Scalia as Secretary, the DOL has increasingly audited and investigated home care agencies, resulting in the imposition on them of crippling amounts of back wages owed, additional liquidated damages, and legal fees. *See* Joyce Famakinwa, *Labor Department Cracks Down on Home Care Providers*, Home Health Care News (April 24, 2019), https://homehealthcarenews.com/2019/04/labor-department-cracks-down-on-home-care-providers/.

68.     In 2020, the DOL filed at least five complaints against homecare agencies in federal district courts in Pennsylvania and Ohio seeking permanent injunctions for violations of the FLSA, unpaid wages, and liquidated damages. *See e.g. Scalia v. Ideal Homecare Agency, LLC, et al.*, Docket No. 2:20-CV-732-DSC (W.D. Pa.)(ECF 1); *Scalia v. Classic Healthcare Inc., et al.*, Docket No. 5:20-CV-701-JMG (E.D.Pa.) (ECF 1); *Scalia v. Loving Kindness Healthcare Systems, LLC, et al.*, 2:20-CV-1087-RJC (W.D.Pa.) (ECF 1); *Scalia v. Caring with Loving Hands, et al.*,

---

[11] *See* Emily Munson, *Help that Hurts: How DOL's Home Care Rule*, 13 Ind. Health L. Rev 433,469 (2016).

Docket No. 1:20-CV-1502 (N.D. Ohio) (ECF 1); *Scalia v. Complete Care Supported Living Agency, LLC, et al.*, Docket No. 1:20-CV-92-MWM (S.D. Ohio) (ECF 1).

69.    In these actions, the DOL has sought back wages, liquidated damages, and injunctions against the principals of these third party agencies in their personal capacity. If successful in obtaining the injunctions, the DOL may also pursue contempt charges for future violations by the principals, which could result in criminal charges against them. 29 U.S.C. § 216 Penalties.

**G.    Intra-National and Americare have Attempted to Comply with FLSA Requirements to the Best of Their Ability Following the Enactment of the Revised Regulations.**

70.    Third party agencies have struggled to find a viable way to operate and provide essential services while complying with FLSA minimum wage and overtime pay requirements. For example, some agencies have turned toward utilizing staffing agencies and hiring Direct Care Workers as independent contractors.

71.    Other agencies have attempted to calculate the base rate of pay in a manner to allow sufficient reimbursement to cover an overtime rate of pay for overtime hours. However, this method often results in an extremely low base rate of pay and is contrary to the stated purposes of the Companionship Exemption.

72.    Under Secretary Scalia, the DOL has intensively prosecuted home care agencies that attempted to hire independent contractors, seeking back wages and liquidated damages, and causing them to incur substantial legal expenses. *See e.g., Acosta v. Heart II Heart, LLC*, 2019 U.S. Dist. LEXIS 178260, 2019 WL 5197329 (W.D. Pa. Oct. 15, 2019) (granting summary judgment in favor of the DOL and finding the home health care company liable for failing to pay overtime premiums for Direct Care Workers hired as independent contractors).

16

73.     Plaintiffs Intra-National and Americare have not been immune from the struggles of attempting to operate their businesses and furnish essential services to an elderly and disabled population, while attempting to comply with the FLSA and pay their Direct Care Workers within the limitations of the Medicaid Waiver Program.

74.     Accordingly, Intra-National and Americare have attempted to restructure their Direct Care Worker's base rate to be dependent upon the number of hours they worked, in order to meet the minimum wage and the time-and-a-half overtime requirements within the amounts of Medicaid reimbursements they received.

75.     As described above, the States set the reimbursement rate for Medicaid Waiver services and third party agencies have no say or power in setting the reimbursement rate, which rate does not increase for overtime hours.

76.     Third party agencies, such as Plaintiffs, have the right to establish a regular rate of pay according to their business's needs and their workers' anticipated hours of work. The regular rate of pay is established by the amount of funds received through the Medicaid Waiver Program.

77.     Plaintiffs therefore restructured their Direct Care Workers' pay to ensure that they always received the agreed-upon base hourly rate for all hours worked, and not for any improper purposes. The pay rates remained the same and did not fluctuate or change with the hours unless the hours exceed those allowed for in the individual service plan, which only occurred on rare occasions. When the hours exceeded those allowed for in the individual service plan, the Plaintiffs would reduce the hourly rate to allow for payment of a time and-a-half overtime rate within the limitations of the Medicaid Waiver Program reimbursement rate.

78.     The DOL, however, erroneously deems such restructuring to be "a serious violation" of the FLSA, triggering actions for back pay, injunctions for withholding back pay, and application

17

of a three-year statute of limitations rather than two years; it further threatens punitive action against the principals of these third party agencies for potential future violations. The DOL's prosecution of the Plaintiffs, if successful, will result in their being unable to continue their business operations.

**H.      The DOL's Prosecution of Intra-National and Americare.**

79.      Beginning in February 2020, the DOL has made numerous requests for various documents, including payroll records and pay calculations, from various regional offices of Intra-National and Americare.

80.      The DOL has been auditing the records provided by Intra-National and Americare for its Pittsburgh, Columbus and Cincinnati locations. The DOL has also demanded records of other Intra-National and Americare locations in Ohio, Michigan and Iowa.

81.      Plaintiffs have a limited number of employees dedicated to the operation of the businesses. Despite their limited resources, Plaintiffs have been cooperating with the investigations, gathering the requested documents, and performing the calculations for their Direct Care Workers.

82.      If the DOL proceeds with a complaint against Plaintiffs for overtime violations, asserted damages may exceed $12,000,000. *See* 29 C.F.R. § 216 (Penalties). DOL will also seek injunctive relief against Plaintiffs' principals, which could result in contempt or criminal charges for future violations of any injunctions.

83.      The DOL's treatment of the Companionship Exemption as inapplicable to Plaintiffs places a crippling financial burden upon them, which threatens their ability to continue to serve their elderly and disabled care recipients.

84.      The economic failure of third party agencies such as Plaintiffs would be catastrophic to elderly and disabled care recipients under the Medicaid Waiver Program.  It would

shift the burden of care to recipients themselves and the state agencies, affecting tens of thousands

of care recipients, and resulting in the displacement from employment of tens of thousands of

Direct Care Workers. It would also greatly compromise the recipients' ability to find suitable,

qualified, and enrolled Direct Care Workers to provide them with basic care.

I. **The Supreme Court's ruling that FLSA Exemptions Should be Fairly and Expansively Interpreted, which requires the Invalidation of 29 C.F.R. § 552.109.**

    a. **The U.S. Supreme Court has broadened rules for interpretation of FLSA exemptions by holding that exemptions must be fairly interpreted.**

85.    In 2016, in *Encino Motorcars, LLC. v. Navarro*, 136 S. Ct. 2117 (2016) ("*Encino I*") the U. S. Supreme Court invalidated a 2011 DOL rule that precipitously removed an overtime exemption from a class of automotive dealership employees, consisting of service advisors. The Supreme Court found that the DOL rule undermined significant reliance interests in the automotive industry by arbitrarily changing the treatment of the employees without an adequately reasoned explanation.

86.    Much like the Companionship Exemption as described above, the DOL had unaccountably modified and amended regulations supporting the applicable exemption. The DOL and courts had previously interpreted the exemption to include service advisors since at least 1973, but, in 2011, the DOL reversed course, with little explanation, and excluded service advisors from the exemption through the enactment of a new regulation. *Encino I*, 136 S.Ct. at 2122 – 24.

87.    In *Encino Motorcars I*, the Supreme Court held that the DOL failed to offer sufficient justification for its reversal of decades of regulatory interpretation and enforcement upon which the automotive industry had relied. *Encino Motorcars, LLC.*, 136 S. Ct. at 2126. The Supreme Court cited the negotiated compensation of service advisors in light of the exemption, the significant cost of the changes to achieve compliance with the new rule, and greatly enhanced

19

FLSA liability as considerable economic factors requiring invalidation of the 2011 rule. *Encino Motorcars, LLC.*, 136 S. Ct. at 2126.

88.    The Supreme Court remanded *Encino Motorcars* back to the Ninth Circuit to interpret the statute in the first instance without placing controlling weight on the 2011 regulation. *Id*. at 2127.

89.    In 2018, following the Ninth Circuit's second upholding of the rule, the case returned to the Supreme Court and it issued a further decision. *Encino Motorcars, LLC*, 138 S. Ct. 1134 (2018) (*Encino Motorcars II*).

90.    In *Encino Motorcars II*, the Supreme Court reversed course from its previous approach of interpreting FLSA exemptions narrowly, and instead held that a fair reading of the exemptions was required. *Encino Motorcars II*, 138 S. Ct. at 1142. In holding that the exemptions should be interpreted more broadly, the Court stated:

> [T]he FLSA has over two dozen exemptions in §213(b) alone, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement. See *id.*, at ___, 137 S. Ct. 1718, 198 L. Ed. 2d 177, 184 ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage"). We thus have no license to give the exemption anything but a fair reading. *Encino II*, 138 S. Ct. at 1142.

91.    The Court also found that a clear reading of the statute established the applicability of the automotive dealership exemption to service advisors because these employees were engaged in the type of work the statute specifically sought to exempt, even if not explicitly named within the statute. *Encino Motorcars II*, 138 S. Ct. at 1142-43.

92.    Following the decisions in *Encino I and II*, the Court of Appeals for the Third Circuit held that "employees' rights are not the only ones at issue and, in fact, are not always separate from and at odds with their employer's interests," and discussed the importance of predictability to businesses of the application and interpretation of the FLSA. *Sec'y U.S. Dep't of*

*Labor v. Bristol Excavating, Inc.*, 935 F.3d 122, 135 - 36 (3d Cir. 2019) (citing *Encino II*, 138 S. Ct. 1134). The Court of Appeals for the Eighth Circuit has also confirmed that the exemptions are as much a part of the FLSA as its overtime-pay requirements. *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047 n. 7 (8th Cir. 2020).

93.     Several other Courts of Appeals have also followed the U. S. Supreme Court and applied the fair interpretation standard to FLSA exemption cases. *See Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 – 29 (2nd Cir. 2020); *Hurlburt v. Black*, 925 F.3d 154, 164 (4th Cir. 2019); *Owens v. Neovia Logistics, LLC*, 2020 U.S. App. LEXIS 17421, *2 (5th Cir. 2020).

94.     The Court of Appeals for the Tenth Circuit has also applied the fair interpretation standard when ruling on a challenge to whether Colorado's state law Companionship Exemption applies to companions employed by third party agencies. *Jordan v. Maxim Healthcare Servs.*, 950 F.3d 724, 732-33 (10th Cir. 2020). The Court found that a fair reading of Colorado's Wage Order, the Colorado regulation related to the exemption, required that the exemption be applied to all companions regardless of their employer. *Jordan*, 950 F.3d 724.

95.     The DOL has also recently embraced and utilized the Supreme Court's expansive interpretation of exemptions in other cases. *See* DOL Opinion 2020-10 (applying a fair reading to the retail and service establishment exemption). It appears that to date, no court has reexamined the Companionship Exemption since the 2018 *Encino Motorcars II* decision.

**b.      29 C.F.R. § 552.109 conflicts with a fair interpretation of 29 U.S.C. § 213(a)(15)**

96.     Under the fair interpretation requirement for exemptions established by the Supreme Court in *Encino Motorcars I* and *II*, Plaintiffs request this Court to fairly interpret the Companionship Exemption and confirm that it applies to third party agencies employing Direct Care Workers.

21

97.     Similar to its arbitrary regulatory revisions regarding the automotive dealership exemption addressed in *Encino I & II*, the DOL has failed the home care industry with its unaccountable reversal of decades of interpretation and enforcement of the Companionship Exemption.

98.      The DOL's attempt to preclude third party agencies from the Companionship Exemption is contrary to the plain language of the FLSA. *See* 29 U.S.C. § 213(a)(15).

99.     When Congress intends for an employer to be excluded from a statutory exemption, the language of the statute makes that exclusion clear. *See, e.g.* 29 U.S.C. § 213(a)(3) (exemption for "any employee reemployed by an establishment which is amusement or recreational establishment, organized camp, or religious or non-profit education conference center"); 29 U.S.C. § 213(b)(3) (exemption for "any employee of a carrier by air"); 29 U.S.C. § 207(i) (exemption for "any employee of a retail or service establishment").

100.    Congress did not exclude any employers in the statutory language of the Companionship Exemption. Accordingly, if Congress had intended for third party agencies to be excluded from relying upon the Companionship Exemption, it would have explicitly so stated.

101.    Congress intended to exempt companions and live-in workers to keep in-home services affordable for the elderly and disabled, regardless of their employer. *See Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004). *See also Long Island Care at Home Ltd. v. Coke*, Brief for the United States as *Amicus Curiae*, Docket No. 06-593 (U.S. 2007) (citing public statements of the Small Business Administration and the Department of Health and Human Services).

102.    The DOL's enactment of the 2013 revisions flies in the face of the explicit rejection by Congress of numerous attempts to exclude third party agencies from the Companionship

Exemption. *See* The Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong. 2007); "The Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273 (112th Cong. 2011); and "The Direct Care Workforce Empowerment Act of 2013," H.R. 5902 and S. 3696 (113th Cong. 2013).

103.    The DOL's about-face on the Companionship Exemption also disrupts decades of reliance upon it by third-party agencies, and threatens unsustainable liability and steep legal defense costs for agencies. It also wholly ignores the rising costs of in-home care. *See* Marsha Mercer, *Can You Afford a Home-Care Worker?*, AARP: Family Caregiving: Financial and Legal, Nov. 4, 2019, https://www.aarp.org/caregiving/financial-legal/info-2017/afford-a-homecare-worker.html.

104.    The method of payment for home care services--the Medicaid Waiver Program reimbursement--has not changed. Third party agencies are reimbursed at the same rate regardless of whether Direct Care Workers hours exceed or fall below 40 hours.

105.    The DOL's reversal on the Companionship Exemption frustrates its primary purpose, because the source of payment for home care services has not and will not change.

106.    The original purpose of the Companionship Exemption was to shift the elderly and disabled away from institutionalization in favor of in-home care. *See* 78 Fed. Reg. 60458. The DOL, however, now erroneously attempts to use that shift away from institutional care as a justification for reversing course on the applicability of the exemption to third party agencies. The DOL contends that the Home Care Workers have left the institutions to work vocationally at residences, without any evidence to support this assertion. *See* 78 Fed. Reg. 60455. The DOL acts as though it is unaware that the increasing numbers of in-home care workers are just as likely to

be family and household members caring for a large and increasing elderly segment of the population.

107. Additionally, the DOL ignores the economic reality that institutional workers care for many residents and patients at institutions that have adequate financial resources from multiple sources to pay overtime hours. To the contrary, the in-home worker typically cares for only one individual at a time, and only one source of payment for services is available to them.

108. The DOL also ignores differing circumstances from client to client. Intra-National and Americare's Direct Care Workers are family and household members who are paid for the assistance expected of them caring for disabled or elderly members of their own family. They are typically not "vocational employees" working outside of their home to care for others.

109. Thus, DOL's stance is contrary to the statutory language, the realities of the Medicaid Waiver Program and in-home care, and unnecessarily threatens to destroy Plaintiffs and other third party agencies.

**J.       Third Party Agencies and the State are Joint Employers.**

110. Courts and the DOL have long recognized that employees can be simultaneously employed by two or more employers, each of which are subject to joint liability under the FLSA. Holding joint employers jointly and severally liable enhances the ability of employees and enforcement agencies to recover unpaid wages, even if one of the businesses closes or becomes insolvent.

111. Joint employment liability is essential to ensuring that the FLSA continues to provide meaningful protections for workers and businesses. Joint employer liability prevents joint employers from reaping all the benefits of employment without assuming reciprocal burdens and responsibilities.

OMC\4843-5401-6205.v1-10/9/20

112.    For these reasons, joint employers can be jointly and severally liable for unpaid wages under the FLSA. 29 C.F.R. § 791.2(a).

113.    The FLSA prevents businesses or other employers from evading liability simply by discharging elements of their hiring and supervision responsibilities to third parties. Congress intended the definition of "employer" to be sufficiently broad to include entities that use intermediary employers to exercise control over employees or payment methods for employees.

114.    The U.S. Supreme Court held in *In re Enter. Rent-A-Car Wage & Hour Empl. Practices Liti.*, 683 F.3d 462, 468 (2012), that "where two or more employers exert significant control over the same employees - [whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment - they constitute 'joint employers'" under the FLSA."  (Citing *N.L.R.B. v. Browning-Ferris Indus. of PA.*, 691 F. 2d 1117, 1124 (3d Cir. 1982)).

115.    In 2014, the DOL issued Administrator's Interpretation No. 2014-2, "Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act," which  correctly states that "[w]hether an entity is an employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court and other federal appellate courts interpreting the Act." U.S. Dep't of Labor, Wage and Hour Div., Opinion Letter on the Fair Labor Standards Act (FLSA), *Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act*, Administrator's Interpretation No. 2014-2, 2014 WL 2816951, at *2 (June 19, 2014) ("Home Care Administrator's Interpretation").

116.    The Home Care Administrator's Interpretation provided a list of commonly applied, illustrative factors relevant to determining whether a home care worker is "economically dependent" on a potential public-entity employer. *Id.* at *7-11.

117.    While the Home Care Administrator's Opinion was withdrawn on March 10, 2020, its basic premises hold true for the current system of Medicaid Waiver Programs.

118.    Third party agencies such as Plaintiffs are joint employers with their state contracted health plans. The healthcare plans retain control over who will provide the care, how much care is needed, and how that care is carried out. The plans also dictate the amounts paid for hours of service to the third party agencies, thereby substantially contributing to the decision of what to pay the Direct Care Workers for their work.

119.    The plans' control over these aspects of Direct Care Workers' ' employment confirms that they are joint employers with the  third party agencies that train, process the necessary Medicaid Waiver Program paperwork, process payroll for the Direct Care Workers , and supervise their performance.

Accordingly, the States and the privately owned Medicaid Health Plans should be declared jointly and severally liable for wages and overtime to companionship home care workers under the FLSA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Declaratory Relief

120.    Plaintiffs incorporate by reference the statements and allegations set forth in each of the preceding paragraphs of this Complaint.  Under the Administrative Procedure Act, a court must "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

26

121.    The current version of 29 C.F.R. § 552.109 conflicts with the statutory text, the statutory purpose, and judicial interpretation of the FLSA.

122.    Specifically, denial of the Companionship Exemption to third party agencies employers of Direct Care Workers conflicts with statutory text of the FLSA, the statutory purpose of the FLSA, and judicial interpretation of the FLSA under the *Encino I* and *II* decisions.

123.    The current version of § 552.109 is "not in accordance with the law" as required by the APA. 5 U.S.C. § 706(2)(A).

124.    Defendants' above-described misconduct causes ongoing harm to Plaintiffs and denies Plaintiffs the ability to utilize the Companionship Exemption.

125.    Plaintiffs therefore request this Honorable Court to declare 29 C.F.R. § 552.109 to be invalid.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief

126.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

127.    Under the FLSA, joint employers are jointly and severally liable for unpaid wages. *See* 29 C.F.R. § 791.2.

128.    Specifically, the States retain all authority over the creation and administration of the Medicaid Waiver Program, approve Providers of services, and set the reimbursement rate for the in-home services. The privately owned Medicaid healthcare plans create and administer the individual service plans, determine which services will be received, and the number of approved hours of services needed by the care recipients. This authority exercises great control over the Direct Care Workers working conditions, hours, and rate of pay.

129.    Due to this control and authority, the States and privately owned healthcare plans are joint employers of the Direct Care Workers and should be held jointly and severally liable for any and all violations of the FLSA by Plaintiffs for pay for Direct Care Workers.

130.    In its ongoing prosecutorial efforts against Plaintiffs, the DOL has failed to acknowledge the joint employer status of the States and privately owned healthcare plans.

131.    Plaintiffs therefore request this Honorable Court to declare that the States and privately owned Medicaid healthcare plans are joint employers of Direct Care Workers employed by Plaintiffs.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.    Declare that 29 C.F.R. § 552.109 does not accord with the law within the meaning of 5 U.S.C. § 706(2)(A);

2.    Vacate and set aside 29 C.F.R. § 552.109;

3.    Declare that Plaintiffs and similarly situated agencies may avail themselves of the Companionship Exemption from overtime requirements under 29 U.S.C. § 213(a)(15);

4.    Declare that the States and privately owned Medicaid healthcare plans are joint employers of Direct Care Workers employed by Plaintiffs and similarly situated agencies;

5.    Enjoin the DOL and all of its officers, employees, agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under 29 C.F.R. § 552.109 against Plaintiffs;

6.    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

7.    Grant other such relief as this Court may deem proper.

Respectfully submitted:

Dated: October 9, 2020

Bruce C. Fox, Esquire (Pa. ID No. 42576)
Allison N. Genard, Esquire (Pa. ID No. 311253)
OBERMAYER REBMANN
MAXWELL & HIPPEL LLP
500 Grant Street, Suite 5240
Pittsburgh, PA 15219
*bruce.fox@obermayer.com*
*Allison.genard@obermayer.com*

John R. Linkosky, Esq.
715 Washington Avenue
Carnegie, Pa. 15106
I.D, # 66011
linklaw@comcast.net

*Counsel for Plaintiffs*

29