## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTRA-NATIONAL HOME CARE, LLC, and AMERICARE HOME HEALTHCARE SERVICES, LLC,<br><br>     Plaintiffs<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR, ET AL.,<br><br>     Defendants | Consolidated at Civil Action No.2:20-cv-1545 |
| AGEWELL HOME HELPERS, INC. d/b/a AGEWELL CAREGIVER SERVICE,,<br><br>     *Plaintiff*<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF LABOR, ET AL.,<br><br>Defendants | Civil Action No. 2:20-cv-1773 |

## PLAINTIFFS' AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

### PARTIES

1.      Plaintiffs, Intra-National Home Care, LLC ("Intra-National") and Americare Home Healthcare Services, LLC ("Americare"), are third party agencies, which process service and payroll documents for Direct Care Workers who provide in-home companionship and assistance services to elderly and disabled persons in Pennsylvania, Ohio, Michigan and Iowa. Plaintiffs are limited liability companies headquartered at 1279 E. Dublin Granville Road, Columbus, Ohio 43229.

2.      Plaintiff Agewell Home Helpers, Inc. ("Agewell") is a third party agency, which employs Direct Care Workers who provide in-home necessary companionship and assistance services to elderly and disabled persons in Pennsylvania. Plaintiff is a S-Corporation headquartered at 110 Munsey Avenue, Pittsburgh, PA 15227.

3.      At the time of the filing of this action, Defendant, Eugene Scalia is the Secretary of U.S. Department of Labor. Plaintiffs sue Scalia in his official capacity. Al Stewart has since replaced Defendant Secretary as the Secretary of the Department of Labor.

4.      Defendant, United States Department of Labor ("DOL") is a federal cabinet agency and an agency within the meaning of 5 U.S.C. §552(f). The DOL conducts investigations of violations or potential violations by employers of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and seeks to hold employers liable for claims for back wages.

5.      At the time of the filing of this action, Defendant, Cheryl Stanton is the Administrator of the DOL's Wage and Hour Division. The FLSA authorizes the creation of a Wage and Hour Division under the direction of an Administrator. *See* 29 U.S.C. § 204. The Wage and Hour Division promulgated the sub-regulatory guidance at issue in this case. Plaintiffs sue Stanton in her official capacity. The Administrator of the Wage and Hour Division position is currently vacant.

## **INTRODUCTION**

6.      Plaintiffs seek a declaration that the Direct Care Workers at issue in this action are exempt from FLSA minimum wage and overtime requirements under the Companionship Exemption (29 U.S.C. § 213(a)(15)) and the Live-In Exemption (29 U.S.C. § 213(b)(21)), respectively, of the FLSA and request an order enjoining the DOL from pursuing claims for back wages on behalf of the Direct Care Workers.

7.      Plaintiffs also seek a declaration that the revised regulation at issue in this action, 29 C.F.R. 552.109, effective January 1, 2015, is unlawful and unenforceable, including, but not limited to, as it was established in an unlawful, arbitrary, and capricious manner which violated the standards and requirements of the Administrative Procedure Act, 5 U.S.C. §702, and is inconsistent with the FLSA and its terms, provisions, and intents.

8.      Plaintiffs further seek a declaration that third party agencies are not employers of Direct Care Workers, but instead payroll administrators. In the alternative, Plaintiffs seek a declaration that the States and private companies with which the States contract for administration of the Medicaid Waiver Programs are joint employers of the Direct Care Workers.

9.      The majority of the Direct Care Workers referenced below provide in-home companionship services to elderly or disabled family or household members of low-income families in Pennsylvania, Ohio, Michigan and Iowa through those States' Medicaid Waiver Programs.

10.      Under the Medicaid Waiver Program, the federal government waives medical assistance rules intended for institutional care and allows States to use Medicaid reimbursement funds to provide care to elderly and disabled persons in their homes. State agencies administer the Medicaid Waiver Program by contracting with private intermediary entities, which determine the recipients' eligibility, create individual service plans, and approve Providers of in-home services. The Providers, which include third party agencies such as Plaintiffs, then engage, coordinate training, and complete payroll services for the Direct Care Workers. The third party agencies receive Medicaid reimbursement funds from which the agencies pay the Direct Care Workers' wages, administrative costs, and FICA taxes.

OMC\4812-2906-5695.v1-3/10/21

11.     Third party agencies operate for the benefit of the recipients of in-home services and State Medicaid Waiver Programs by processing the extensive paperwork necessary to receive Medicaid Waiver Program funding for the Direct Care Workers. The Medicaid Waiver Program provides for a flat rate of hourly pay and does not pay any increased amount for overtime hours on the part of Direct Care Workers.

12.     From 1975 to 2015, in establishing their operations and pay practices, third party agencies such as Plaintiffs relied upon the Companionship Exemption and Live-In Exemption from minimum wage and overtime obligations which might otherwise be applicable under the FLSA, especially regarding Direct Care Workers paid by the Medicaid Waiver Program. 29 U.S.C. § 213(a)(15); 29 U.S.C. § 213(b)(21).

13.     The language of these exemptions demonstrates that Congress intended for the exemptions to apply to Direct Care Workers, including those workers with whom third party agencies such as Plaintiffs coordinate. *See* 29 U.S.C. § 213(a)(15) Companionship Exemption; 29 U.S.C. § 213(b)(21) Live-In Exemption. In 2013, the DOL arbitrarily and capriciously proposed revising the regulation corresponding to these exemptions to preclude third party agencies from claiming the exemptions. The revised regulation came into effect January 1, 2015, thus reversing four decades of interpretation and application and contradicting both the language of the Companionship and Live-In Exemptions and the intent of Congress to encourage at-home care of the elderly and disabled.

14.     Under Defendant former Secretary Scalia, the DOL targeted third party agencies and used the revised regulation to unleash its full investigative and prosecutorial powers upon them, asserting claims for enormous amounts of back wages. The prosecutions have continued under the current administration. If the DOL is successful in pursuing such claims, third party agencies such

4

as Plaintiffs will be unable to continue their business operations and an untold number of elderly and disabled care recipients will be forced into nursing homes or other institutions to find adequate care.

15.    Under recent Supreme Court rulings, however, the revised regulation is invalid and unenforceable, and the Companionship and Live-In Exemptions should once again be available to third party agencies.

16.    Beginning in 1945, courts uniformly applied a *narrow* standard of interpretation to FLSA exemptions. *A. H. Phillips v. Walling*, 324 U.S. 490 (1945). However, in two rulings in 2016 and 2018, the U. S. Supreme Court departed from this standard of interpretation and held that FLSA exemptions were instead to be *fairly* interpreted. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 1134 (2016) ("*Encino Motorcars I*"); *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) ("*Encino Motorcards II*").

17.    In *Encino Motorcars II*, the Supreme Court expressly confirmed:

Because the FLSA gives no "textual indication" that its exemptions should be construed narrowly, "there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation."

*Encino Motorcars II*, 138 S. Ct. at 1142.

18.     Subsequently, numerous Courts of Appeal have followed *Encino Motorcars II* and fairly interpreted FLSA exemptions in various contexts, but none of their decisions addressed the particular Companionship and Live-In Exemptions.

19.    The Supreme Court's holdings in *Encino Motorcars I* and *Encino Motorcars II* require courts to fairly interpret the Companionship and Live-In Exemptions to apply to Direct Care Workers, and cause 29 C.F.R. § 552.109 to be invalid and unenforceable.

20.    In light of the mandate of *Encino Motorcars II* that FLSA exemptions be fairly construed and interpreted, Plaintiffs request the Court to enter a declaratory judgment holding that

the noted Direct Care Workers are exempt under the Companionship and Live-In Exemptions of the FLSA and enjoining the DOL from further investigative and prosecutorial action.

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 2201(a). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act.

22.     Plaintiffs' request for declaratory and injunctive relief is consistent with 5 U.S.C. §§ 705 and 706, and authorized by 28 U.S.C. §§ 2201 and 2202.

23.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs conduct business within the Western District of Pennsylvania, and substantial parts of the events giving rise to Plaintiffs' claims occurred and are continuing to occur within this judicial district.

## <u>FACTS</u>

### A. **The Establishment of Intra-National and Americare**

24.     Plaintiffs are third party agencies that register and conduct payroll services regarding Direct Care Workers.

25.     Dilli Adhikari ("Adhikari") is the owner of Intra-National and Americare and is a Bhutanese refugee and naturalized U.S. citizen who immigrated to the United States in 2011 as part of the Bhutanese Refugee Resettlement Program.

26.     In the Bhutanese refugee population in the U.S., many elderly refugees do not speak English and are in need of assistance with their daily tasks and activities. A number of them are also disabled. The Medicaid Waiver Program allows these elderly and disabled refugees to receive personal care from their family members in their homes, rather than receive care from strangers in institutions.

6

27.     To provide care through the Medicaid Waiver Program, family members must complete and file the necessary paperwork with their state Medicaid agency to become Direct Care Workers and collect payment for hours worked as a Direct Care Worker. This process can be quite arduous for Bhutanese refugees who do not speak much, if any, English and who do not know how to navigate the bureaucracy of the Medicaid Waiver Program.

28.     Adhikari saw a need to establish third party agencies to perform the function as intermediary between the Direct Care Workers and the state Medicaid agencies. Accordingly, he founded Intra-National and Americare to complete the paperwork to register and perform payroll services for Direct Care Workers who provide such non-medical home care and companionship services.

29.     Intra-National has been in continuous operation since 2013, and Americare since 2015. Between them, Intra-National and Americare presently process payroll documents for over three thousand Direct Care Workers.

30.     Plaintiffs' Direct Care Workers provide care, fellowship, and protection services for the care recipients. The care activities do not exceed twenty percent of the total activities performed by the Direct Care Workers.

31.     Plaintiffs' business models and operations were developed by relying upon the Companionship Exemption and the Live-In Exemption, including to set competitive and sufficient hourly rates for Direct Care Workers that were adequately covered by the Medicaid Waiver Program reimbursement rate.

32.     It is difficult for third party agencies such as Plaintiffs to attract Direct Care Workers to perform the services, and the COVID-19 pandemic has only exacerbated this problem.[1]

**B.  The Establishment of Agwell Home Helpers, Inc.**

33.     Plaintiff is a third party agency that register and conduct payroll services regarding Direct Care Workers.

34.     Meena Gurung and Ravi Gurung are the owners of Agrewell, Bhutanese refugees, and naturalized U.S. citizens who immigrated to the United States as part of the Bhutanese Refugee Resettlement Program.

35.     In the Bhutanese refugee population in the U.S., many elderly refugees do not speak English and are in need of assistance with their daily tasks and activities. A number of them are also disabled. The Medicaid Waiver Program allows these elderly and disabled refugees to receive personal care from their family members in their homes, rather than receive care from strangers in institutions.

36.     To provide care through the Medicaid Waiver Program, family members must complete and file the necessary paperwork with their state Medicaid agency to become Direct Care Workers and collect payment for hours worked as a Direct Care Worker. This process can be quite arduous for Bhutanese refugees who do not speak much, if any, English and who do not know how to navigate the bureaucracy of the Medicaid Waiver Program.

37.     The Gurungs saw a need to establish a third party agency to supply Direct Care Workers for their elderly or disabled Bhutanese family members. Accordingly, the Gurungs founded Agewell to provide such non-medical home care and companionship services.

---

[1] *See* Britt Salay, Home Health Care Businesses Struggle To Find Workers During Pandemic, Aug. 30, 2020, https://www.wane.com/news/local-news/home-health-care-businesses-struggle-to-find-workers-during-pandemic/.

8

38.     Agewell has been in continuous operation since 2016.

39.     Plaintiff's Direct Care Workers provide care, fellowship, and protection services for the care recipients. The care activities do not exceed twenty percent of the total activities performed by the Direct Care Workers.

40.     Plaintiff's business models and operations were developed by relying upon the Companionship Exemption and the Live-In Exemption, including to set competitive and sufficient hourly rates for Direct Care Workers that were adequately covered by the Medicaid Waiver Program reimbursement rate.

41.     It is difficult for third party agencies such as Plaintiff to attract Direct Care Workers to perform the services, and the COVID-19 pandemic has only exacerbated this problem.[2]

**C.  The Medicaid Waiver Program in Pennsylvania and Ohio**

42.     Pennsylvania and Ohio each participate in the Medicaid Waiver Program, through the Pennsylvania Department of Human Services[3] and the Ohio Department of Medicaid[4], respectively. The State Medicaid Agencies in Pennsylvania and Ohio retain authority over the administration and implementation of the Waiver Program.

43.     Under the Medicaid Waiver Program, the care recipient completes an application for Home and Community-Based Services that is specific to his or her needs, such as for persons age sixty and over ("the Aging Waiver") or for a disability.[5]

---

[2] *See* Britt Salay, Home Health Care Businesses Struggle To Find Workers During Pandemic, Aug. 30, 2020, https://www.wane.com/news/local-news/home-health-care-businesses-struggle-to-find-workers-during-pandemic/.

[3] *See* Pennsylvania's Department of Human Services website: https://www.dhs.pa.gov/about/DHS-Information/Pages/Waiver-Information.aspx.

[4] *See* Ohio's Department of Medicaid website: https://medicaid.ohio.gov/FOR-OHIOANS/Programs/HCBS-Waivers.

[5] *See* Application for a § 1915(c) Home and Community-Based Services Waiver, https://www.dhs.pa.gov/Services/Disabilities-Aging/Documents/Alternatives_to_Nursing%20Homes/1915c-%20HCBS%20Waiver.pdf

44.     State agencies administer the Waivers in accordance with applicable laws and regulations; maintain oversight of contracted functions; ensure that waiver services are provided by qualified enrolled Medicaid Assistance Providers; and administer waiver services to care recipients who meet program eligibility requirements. *See* Application for a § 1915(c) Home and Community-Based Services Waiver.[6]

45.     The care recipients then choose a Medicaid health plan, called Community HealthChoices. The health plan then develops and retains exclusive control over care assessments and creates individual service plans for care recipients.[7] In Ohio, analogous state entities, called Managed Care Plans, create and manage the care recipients' individual service plans.

46.     In Pennsylvania, the Community HealthChoices are AmeriHealth Caritas, PA Health & Wellness, Keystone First CHC, and UPMC CHC. In Ohio, the Managed Care Plans are Buckeye Health Plan, Care Source, Molina Healthcare, Paramount Advantage, and United Healthcare Community Plan.

---

[6] *See* Application for a § 1915(c) Home and Community Based Services Waiver, https://www.dhs.pa.gov/Services/Disabilities-Aging/Documents/Alternatives_to_Nursing%20Homes/Consolidated%20Waiver%20Amendment%20October%201%202019.pdf.

[7] *See* Community HealthChoices Questions and Answer Document, http://www.healthchoices.pa.gov/cs/groups/webcontent/documents/document/c_274784.pdf
7 See https://medicaid.ohio.gov/FOR-OHIOANS/Programs/Managed-Care-for-Ohioans

OMC\4812-2906-5695.v1-3/10/21

47.     The Pennsylvania Waiver Program is organized and structured as follows:



48.     The Ohio Medicaid Waiver Program is organized and structured as follows:



49.     The Community HealthChoices or Managed Care Plan organization works with

care recipients and their medical providers to create the individual service plans, which describe

11

the waiver services, their projected frequency, the type of Provider for each service, and the amount to be paid per hour of service. The state Medicaid agency must approve the individual service plans. The State retains all authority over Direct Care Workers, including approval for hiring, termination, supervision over services, and hours worked.

50.     Third party agencies enroll as Medical Assistance Providers ("Providers"). The third party agencies then engage and coordinate training for Direct Care Workers to be assigned to the care recipients. The third party agencies collect Direct Care Worker timesheets for payroll processing, collect work reports for compliance with individual service plans, and complete the necessary paperwork to obtain the Medicaid funding to pay the Direct Care Workers.

51.     The state Medicaid agency sets a straight reimbursement rate per hour for services under the individual service plan and does not account for additional compensation for overtime hours.

52.     The third party agencies then set a competitive hourly rate of pay within the restrictions of the reimbursement rate to remain competitive with other third party agencies and provide a living wage to the Direct Care Workers.

### D.  The DOL's Position Under Secretary Scalia Regarding the Companionship and Live-In Exemptions

53.     Under Defendant Scalia, the DOL took the position that when the Direct Care Workers are family members of the care recipient, they will only be paid for the number of hours approved in the individual service plans. The DOL considers any work performed outside of the approved hours to be "of a familial nature" and therefore not compensable. *See* DOL Fact Sheet #79F.[8]

---

[8] https://www.dol.gov/agencies/whd/fact-sheets/79f-flsa-publicly-funded-programs.

54.     The DOL's position is contrary to one of the fundamental purposes of the FLSA, namely, to provide for compensation for all hours worked by workers.

55.      The DOL fails to recognize that there is a fundamental conflict between the Medicaid Waiver Program, as currently administered, and the FLSA. The FLSA requires payment of time-and-a-half for overtime hours if the employee does not fall under an exemption or exception. However, the Medicaid Waiver Program pays only a set hourly rate, which does not increase for overtime hours even when accounted for in the individual service plan.

56.     The Companionship and Live-In Exemptions permit third party agencies to operate off the thin margin between the Medicaid reimbursement rate and the Direct Care Workers' hourly rate of pay. The third party agencies must set a competitive and reasonable hourly rate within the constraints of the reimbursement to have Direct Care Workers continue to provide services.

57.     The DOL simultaneously requires payment for all hours worked by the Direct Care Workers, including overtime, while arbitrarily precluding third party agencies from claiming the Companionship and Live-In Exemptions. The DOL has systematically targeted third party agencies and placed an enormous and unsustainable financial burden upon them, thereby endangering the essential purpose of the Waiver Program, namely, to shift recipients away from institutional care and allow recipients to remain in their homes.

**E.  History of the FLSA Companionship and Live-In Exemptions**

58.     In enacting the FLSA, Congress intended to establish a clear and expansive set of rules governing the employer-employee relationship. Since its inception, the FLSA has served to safeguard workers, particularly those in low-wage industries, by protecting them from minimum wage and overtime violations, late payment of wages, erroneous time and record-keeping practices, and retaliation. The FLSA mandates a minimum wage for employees, which has been $7.25 since August of 2009. 29 U.S.C. § 206, Minimum Wage.

59.     The FLSA establishes requirements for payment of overtime wages, at a rate of one and one-half times the regular rate for hours worked by an employee in excess of 40 per week.  29 U.S.C. § 207(a), Maximum Hours.

60.     However, the FLSA also contains a number of exceptions to and exemptions from the imposition of overtime wages, including the Companionship and Live-In Exemptions. *See e.g.* 29 U.S.C. § 207; 29 U.S.C. § 213(a)(15); 29 U.S.C. § 213(b)(21).

61.     Enacted in 1974, the Companionship Exemption and Live-In Exemption were established for domestic services employees.

62.     The Companionship Exemption expressly applies to Direct Care Workers:

Any employee employed on a casual basis in domestic service employment to provide babysitting services or *any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care of themselves* (as such terms are defined and delimited by regulations of the Secretary).

29 U.S.C. § 213(a)(15) (emphasis added).

63.     The Live-In Exemption similarly applies to Direct Care Workers who live with the care recipient in his or her residence:

"**Maximum hour requirements.** The provisions of section 7 [29 USCS § 207] shall not apply with respect to—**(21)** *any employee who is employed in domestic service in a household and who resides in such household.*

29 U.S.C. § 219(b)(21) (emphasis added).

64.     In 1975, the DOL, through its Wage and Hour Division Administrator, confirmed that third party agencies, such as home care agencies, could avail themselves of the Companionship Exemption for domestic workers.

65.     The governing regulation provided that exempt companionship workers included those "who are employed by an employer or agency other than the family or household using their services." 29 C.F.R. § 552.109(a) (prior to 2015).

66.     Exempt live-in workers include those "who reside in the household where they are employed." 29 C.F.R. § 552.109(a). The regulation provided that exempt live-in domestic service employees included those "employed by an employer or agency other than the family." 29 C.F.R. 552,109(c).

67.     Accordingly, the Companionship Exemption and Live-In Exemption applied to third party agencies such as Plaintiffs.

68.     Congress made unequivocally clear its intent for the Companionship Exemption and Live-In Exemption to apply to third party agencies. While several administrations attempted to revise or limit the Companionship Exemption through proposed legislation, all such attempts failed. None of various suggested changes or revisions made it past the comment phase, and all were eventually withdrawn.

69.     In *Long Island Care at Home, Ltd. v. Coke*, 551 U. S. 158 (2007), the U. S. Supreme Court upheld the Companionship Exemption, its supporting regulations, and its application to third party agencies such as Plaintiffs as consistent with Congressional intent underlying the FLSA. *Long Island Care at Home, Ltd.*, 551 U.S. 158.

70.     In the *Long Island Care at Home, Ltd.* litigation, the DOL clearly and expressly confirmed its position that the Companionship Exemption applied to third party agencies such as Plaintiffs: "If Congress had wanted to exclude employees of third-party employers from the exemption, it easily could have done so by expressly including a limitation based upon employer status, as it has done with other FLSA exemptions." *See* Brief for the United States as Amicus Curiae Supporting Petitioners, *Long Island Care at Home, Ltd. v. Coke*, No. 06-593, p. 19.

71.     For 40 years—from 1975 until the enactment of the revised regulation in 2015— third party agencies claimed and relied upon the Companionship and Live-In Exemptions, and

structured their businesses in reliance upon the exemptions applying to them and their business operations.

**F.  The Interplay Between the Medicaid Waiver Program and the Companionship and Live-In Exemptions to FLSA Overtime Requirements**

72.     In order to attract capable and reliable Direct Care Workers and have them provide services, Plaintiffs set an hourly rate of $10.00/hour or more. This hourly rate is well above minimum wage, provides sufficient funds for a living wage, and is fully covered by the Medicaid reimbursement rate. However, the Medicaid reimbursement rate is insufficient to fund time-and-a-half overtime premiums at this hourly rate.

73.     For decades, Plaintiffs and other third party agencies in the home care industry have reasonably relied upon the Companionship Exemption and the Live-In Exemption from overtime pay requirements in calculating pay rates and compensation applicable to Direct Care Workers.

74.     However, in a reversal of nearly forty years of interpretation of the exemption, in 2013, the DOL unlawfully, arbitrarily, and capriciously promulgated 29 C.F.R. § 552.109, which purports to preclude third party agencies from claiming and relying on the Companionship and Live-In Exemptions.

75.     Since the appointment of Defendant Scalia as the Secretary of Labor in September 2019, the DOL has enforced 29 C.F.R. § 552.109 to unleash a prosecutorial campaign against Plaintiffs and other third party agencies. The DOL seeks enormous amounts in overtime wages and penalties, which they are simply unable to afford under the Medicaid reimbursement rates.

76.     The DOL is also seeking injunctions against these third party agencies, many of which are family-owned businesses like Plaintiffs, and is seeking to hold their owners personally responsible for the asserted liabilities.

77.     The DOL's targeting of Plaintiffs and other third party agencies threatens to put them out of business and decimate the entire industry of home care providers. This would greatly harm the thousands of elderly and disabled care recipients served by Plaintiffs and countless other recipients served by the industry.

78.     For the reasons more fully explained below, Plaintiffs request this Honorable Court to enter a declaratory judgment confirming that 29 C.F.R. § 552.109 is invalid, unenforceable, and contrary to Congressional intent, and that the referenced Direct Care Workers are exempt under the Companionship and Live-In Exemptions of the FLSA, and enter an order enjoining the DOL from further investigative and prosecutorial action.

## G.   The DOL's Arbitrary and Capricious Attempt to Subvert the Purposes of the Companionship and Live-In Exemptions

### i.   The DOL's revised regulation prohibits third party employers from utilizing the Companionship and Live-In Exemptions.

79.     In 2013, the DOL proposed revisions to 29 C.F.R. § 552.109 which purport to eliminate the ability of third party agencies to claim the Companionship and Live-In Exemptions. *See also* 78 FR 60454, 60455. The revised regulation became effective January 1, 2015.

80.     Under the revised regulation, the care recipients can still claim the exemptions, even if the Direct Care Workers are jointly employed by the recipient and a third party employer or agency.  *See* 29 C.F.R. § 552.109(a); 29 C.F.R. § 552.109(c). The revised regulation allows a care recipient to claim the Companionship Exemption or Live-In Exemption and avoid minimum wage and overtime requirements if found to be a joint employer, leaving the third party employer to bear all liability under the FLSA. The revised regulation's selective application of the exemptions is: contrary to the language of the Companionship Exemption and Live-In Exemption; beyond any authority granted to the DOL, including by Congress and/or the FLSA, or the

Administrative Procedure Act; and contrary to the principles of joint and several liability to joint employers.

81.     The DOL received more than 26,000 comments on the proposed revised regulation. *Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138, 142 (D.D.C. 2014). Several commenters expressed serious concern that the revised regulation would result in increased institutionalization of care recipients because the state programs would not adjust the reimbursement rate to account for the increased financial burdens under the new rule. 78 FR 60454, 60485 – 60486. In response, the DOL passed the burden onto the public entities to modify their policies and practices to "avoid discrimination or unjustified institutionalization." 78 FR 60454 at 60486.

82.     Similarly, the DOL disregarded the numerous comments which illustrated that third party agencies relied upon the exemptions to provide much needed care to the elderly and disabled with limited means to pay for these services. 78 FR 60454, 60459. The DOL disregarded these comments in stunning fashion and simply stated that the revisions would benefit both Direct Care Workers and care recipients. *Id*. at 60459 – 60460.

83.     Prior to the 2015 enactment of these revisions, scholars accurately predicted that denial of the Companionship Exemption to third party agencies would create a crushing financial burden for overtime payments, resulting from the agencies' reliance upon funding through the Medicaid Waiver Program that is insufficient to pay overtime rates for companionship work.[9]

84.     In 2014, a group of trade associations representing home care agencies filed a lawsuit challenging the revised regulations under the Administrative Procedure Act ("APA"). *See*

---

[9] *See* Emily Munson, *Help that Hurts: How DOL's Home Care Rule*, 13 Ind. Health L. Rev 433 (2016); Tatiana Oriakhi, *Home Care Workers, More than Just Companions: The Final Rule and the Fight for Home Care Stabilization*, 24 Elder L.J. 457 (2017).

*Home Care Ass'n of Am. v. Weil*, 76 F. Supp. 3d 138 (D.D.C. 2014)[10]. The District Court granted partial summary judgment in favor of the associations and held the revised regulations to be invalid because there was no basis to carve out third party agencies from claiming the Companionship Exemption. *Home Care Ass'n of Am.*, 76 F.Supp. 3d 138.

85.     The District Court correctly emphasized and highlighted that the DOL "amazingly decided to try to do administratively what others had failed to achieve in either the Judiciary or the Congress" and effectively eliminate the exemption through regulation. *Id.* at 142.

86.     On appeal, the Circuit Court of Appeals for the District of Columbia vacated and remanded the District Court's decision under the two-step *Chevron* framework, based upon its determination that the revised regulations fell within the power of the DOL to fill in the statutory gaps under step one of the *Chevron* framework. *Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1090 – 93 (D.C. Cir. 2015).

87.     In upholding the revised regulations, the Court of Appeals relied heavily upon the then-existing requirement that it narrowly interpret FLSA exemptions, as had been established by the U. S. Supreme Court in *A.H. Phillips, Inc. v. Walling*, *supra*, 324 U.S. 490. *Id.* at 1093.

88.     The Court of Appeals stated that the exclusion of third party agencies from the exemption was appropriate based upon its erroneous assumption that many Direct Care Workers are not live-in care workers, but rather, are hired, outside professionals. *Id*. at 1094. In reality, the contrary is true, as care recipients routinely prefer family members for their care,[11] and indeed, virtually all of the Direct Care Workers at issue in this action are family members of the care recipients.

---

[10]  An overview of the procedural history and rulings re: the action are noted Emily Munson, *Help that Hurts: How DOL's Home Care Rule*, 13 Ind. Health L. Rev 433, 448 - 451 (2016).
[11]*Id*. at, 469.

89.     On these bases, the Court of Appeals found the revisions valid and the revised regulations went into effect in 2015.

### ii. The DOL has targeted third party agencies for investigation and prosecution under the revised regulation.

90.     As was predicted, the DOL's attempt to eliminate the Companionship and Live-In Exemptions has created inconsistencies in payment of overtime to Direct Care Workers and confusion regarding the availability of the exemptions to third party agencies.

91.     Contrary to the DOL's assertions made prior to enactment of the revised regulation, many states, including Pennsylvania and Ohio, have not adjusted their Medicaid Waiver Program reimbursement rates to account for overtime rates, and there are insufficient funds to provide for both a reasonable base rate of pay and a one-and-a-half overtime rate.

92.     Since the revised regulation went into effect and after the appointment of Defendant Scalia as Secretary, the DOL has increasingly audited and investigated home care agencies, resulting in the imposition on them of crippling amounts of back wages deemed to be owed, additional liquidated damages, and legal fees. *See* Joyce Famakinwa, *Labor Department Cracks Down on Home Care Providers*, Home Health Care News (April 24, 2019), https://homehealthcarenews.com/2019/04/labor-department-cracks-down-on-home-care-providers/.

93.     In 2020, the DOL filed at least five complaints against home care agencies in federal districts in Pennsylvania and Ohio, seeking permanent injunctions for alleged violations of the FSLA, unpaid wages, and liquidated damages. *See e.g. Scalia v. Ideal Homecare Agency, LLC, et al.*, Docket No. 2:20-CV-732-DSC (W.D. Pa.) (ECF 1); *Scalia v. Classic Healthcare Inc., et al.*, Docket No. 5:20-CV-701-JMG (E.D.Pa.) (ECF 1); *Scalia v. Loving Kindness Healthcare Systems, LLC, et al.*, Docket No. 2:20-CV-1087-RJC (W.D.Pa.) (ECF 1); *Scalia v. Caring with*

*Loving Hands, et al.*, Docket No. 1:20-CV-1502 (N.D. Ohio) (ECF 1); and *Scalia v. Complete Care Supported Living Agency, LLC, et al.*, Docket No. 1:20-CV-92-MWM (S.D. Ohio) (ECF 1).

94.      In those actions, the DOL has requested back wages, liquidated damages, and injunctions against the principals of third party agencies in their personal capacity. If successful in obtaining the injunctions, the DOL may also pursue contempt charges for alleged future violations by the principals, which could result in criminal charges against the them. 29 U.S.C. § 216 Penalties.

> **G.      Plaintiffs have Attempted to Comply with FLSA Requirements to the Best of Their Ability Since Enactment of the Revised Regulations**

95.      Following the 2015 enactment of the revised regulation, third party agencies have struggled to find a viable way to operate and provide essential services while complying with FLSA minimum wage and overtime pay requirements. For example, some agencies have turned to utilizing staffing agencies and hiring Direct Care Workers as independent contractors.

96.      Other agencies have attempted to calculate the base rate of pay in a manner to allow sufficient reimbursement to cover an overtime rate of pay for overtime hours. However, this method often results in a low base rate of pay and is contrary to the stated purposes of the Companionship and Live-In Exemptions.

97.      Plaintiffs have not been immune to the struggles of attempting to operate their businesses and furnish essential services to an elderly and disabled population, while complying with the FLSA and having the Direct Care Workers receive compensation within the limitations of the Medicaid Waiver Program.

98.      Accordingly, Plaintiffs have attempted to restructure the Direct Care Workers' base rate to be dependent upon the number of hours they worked, in order to meet the minimum wage

and the time-and-a-half overtime requirements within the amounts of Medicaid reimbursements received.

99.     As described above, the states set the reimbursement rate for Medicaid Waiver services and third party agencies such as Plaintiffs have no say or power in setting the reimbursement rate, which rate does not increase for overtime hours.

100.     Plaintiffs therefore restructured the rate of pay applicable to Direct Care Workers to ensure that they always received the agreed-upon base hourly rate for all hours worked, and not for any improper purposes. The pay rates remained the same and did not fluctuate or change with the hours unless the hours exceeded those allowed for in the individual service plan, which only occurred on rare occasions. When the hours exceeded those allowed for in the individual service plan, Plaintiffs would reduce the hourly rate to allow for payment of a time and-a-half overtime rate within the limitations of the Medicaid Waiver Program reimbursement rate.

101.     The DOL, however, erroneously deems such restructuring to be "a serious violation" of the FSLA, triggering actions for back pay, requests for injunctions for withholding back pay, and application of a three-year statute of limitations rather than a two-year statute. It further threatens punitive action against the principals of these third party agencies for potential future violations. The DOL's prosecution of Plaintiffs, if successful, will result in their being unable to continue their business operations.

102.     During the last five years, third party agencies have unsuccessfully tried to find a way to provide a sufficient base rate of pay for Direct Care Workers and comply with the revised regulation. The continued enforcement of the revised regulation will effectively eliminate all third party agencies.

## H.     The DOL's Prosecution of Plaintiffs

103.     The DOL has made numerous requests for various documents, including payroll records and pay calculations, from various regional offices of Intra-National, Americare, and Agewell.

104.     The DOL has been auditing the records provided by Intra-National and Americare for the Pittsburgh, Columbus and Cincinnati locations. The DOL has also demanded records of other Intra-National and Americare locations in Ohio, Michigan and Iowa.

105.     The DOL has been auditing the records provided by Agewell.

106.     Plaintiffs have a limited number of employees dedicated to the operation of their businesses. Despite their limited resources, Plaintiffs have been cooperating with the investigations, gathering the requested documents and performing the calculations applicable to the Direct Care Workers.

107.     If the DOL proceeds with a complaint against Plaintiffs for overtime violations, asserted damages may exceed $15 million. *See* 29 C.F.R. § 216 (Penalties). The DOL may also seek injunctive relief against the principals of Plaintiffs, which could result in contempt or criminal charges related to any future violations of any injunctions.

108.     On January 26, 2021, the DOL filed an enforcement Complaint against Plaintiff for overtime violations, asserted damages may exceed $387,444.00. *See* 29 C.F.R. § 216 (Penalties). The DOL may also seek injunctive relief against the principals of Plaintiff, which could result in contempt or criminal charges related to any future violations of any injunctions.

109.     The DOL's treatment of the Companionship and Live-In Exemptions as not applicable to Plaintiffs places a crippling financial burden upon them, which threatens their ability to continue to serve elderly and disabled care recipients.

110.    The economic failure of third party agencies such as Plaintiffs would be catastrophic to elderly and disabled care recipients under the Medicaid Waiver Program. It would shift the burden to care recipients themselves and the state agencies, affecting tens of thousands of care recipients and resulting in the displacement from employment of tens of thousands of Direct Care Workers. It would also greatly compromise the recipients' ability to find suitable, qualified, and enrolled Direct Care Workers to provide them with basic care.

I.    **The Supreme Court's ruling that FLSA Exemptions Should be Fairly Interpreted Requires the Court to Declare 29 C.F.R. § 552.109 to be invalid and unenforceable**

i.    **The U.S. Supreme Court has broadened rules for interpretation of FLSA exemptions by holding that exemptions are to be fairly interpreted.**

111.    In 2016, in *Encino Motorcars I*, *supra*, the U. S. Supreme Court invalidated a 2011 DOL rule that precipitously removed an overtime exemption from a class of automotive dealership employees, consisting of service advisors. The Supreme Court found that the DOL rule undermined significant reliance interests in the automotive industry, by arbitrarily changing the treatment of the employees without an adequately reasoned explanation.

112.    Much like the Companionship Exemption as described above, in the circumstances addressed in *Encino Motorcars I*, the DOL had unaccountably modified and amended regulations supporting the applicable exemption. The DOL and courts had previously, since at least 1973, interpreted the exemption to include service advisors, but in 2011, DOL reversed course, with little explanation, and excluded service advisors from the exemption through the enactment of a new regulation. *Encino Motorcars I*, 136 S.Ct. at 2122 – 24.

113.    In *Encino Motorcars I*, the Supreme Court held that the DOL failed to offer sufficient justification for its reversal of decades of regulatory interpretation and enforcement upon which the automotive industry had relied. 136 S. Ct. at 2126. The Supreme Court cited the

negotiated compensation of service advisors in light of the exemption, the significant cost of the changes to achieve compliance with the new rule, and greatly enhanced FLSA liability as considerable economic factors requiring invalidation of the 2011 rule. *Id.,* 136 S. Ct. at 2126.

114.    The Supreme Court remanded *Encino Motorcars I* to the Ninth Circuit Court of Appeals to interpret the statute in the first instance "without placing controlling weight on the 2011 regulation." *Id.* at 2127.

115.    In 2018, following the Ninth Circuit's second upholding of the rule, the case returned to the Supreme Court, which issued a second decision. *Encino Motorcars II*, 138 S. Ct. 1134.

116.    In *Encino Motorcars II*, the Supreme Court reversed course from the longstanding approach of interpreting FLSA exemptions narrowly, and instead held that a *fair* reading of the exemptions was required.  *Encino Motorcars II*, 138 S. Ct. at 1142. In holding that the exemptions should be interpreted more broadly, the Court stated:

> [T]he FLSA has over two dozen exemptions in §213(b) alone, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement. See *id.*, at ___, 137 S. Ct. 1718, 198 L. Ed. 2d 177, 184 ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage"). We thus have no license to give the exemption anything but a fair reading.

*Encino Motorcars II*, 138 S. Ct. at 1142.

117.    The Supreme Court also found that a clear reading of the statute established the applicability of the automotive dealership exemption to service advisors because the employees were engaged in the type of work the statute specifically sought to exempt, even if not explicitly named within the statute. *Encino Motorcars II,* 138 S. Ct. at 1142-43.

118.    Following the decisions in *Encino Motorcars I* and *Encino Motorcars II*, the Court of Appeals for the Third Circuit held that "'employees' rights are not the only ones at issue and,

in fact, are not always separate from and at odds with their employer's interests" and emphasized the importance of predictability to business of the application and interpretation of the FLSA. *Sec'y U.S. Dep't of Labor v. Bristol Excavating, Inc.*, 935 F.3d 122, 135 (3d Cir. 2019) (citing *Encino Motorcars II,* 138 S. Ct. 1134). In addition, the Court of Appeals of the Eighth Circuit confirmed, after *Encino Motorcars I* and *Encino Motorcars II*, that the exemptions are as much a part of the FLSA as the overtime-pay requirements. *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1047, n. 7 (8th Cir. 2020).

119.    Several other Courts of Appeals have also followed the U. S. Supreme Court and applied the fair interpretation standard to FLSA exemption cases. *See Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 – 29 (2nd Cir. 2020); *Hurlburt v. Black*, 925 F.3d 154, 164 (4th Cir. 2019); *Owens v. Neovia Logistics, LLC*, 2020 U.S. App. LEXIS 17421, *2 (5th Cir. 2020).

120.    The Court of Appeals for the Tenth Circuit also applied the fair interpretation standard in ruling on whether Colorado's state law Companionship Exemption applies to companions employed by third party agencies. *Jordan v. Maxim Healthcare Servs.*, 950 F.3d 724, 732-33 (10th Cir. 2020). The Court found that a fair reading of Colorado's Wage Order, the Colorado regulation related to the exemption, required that the exemption be applied to all companions regardless of their employer. *Jordan*, 950 F.3d 724.

121.    The DOL has also recently embraced and utilized the Supreme Court's broader interpretation of exemptions in other cases. *See* DOL Opinion 2020-10 (applying a fair reading to the retail and service establishment exemption to discuss the representative period for new employees).

122.     It appears that to date, no court has reexamined either the Companionship Exemption or the Live-In Exemption since the Supreme Court's 2018 decision in *Encino Motorcars II*.

ii.     **29 C.F.R. § 552.109 conflicts with a fair interpretation of 29 U.S.C. § 213(a)(15).**

123.     Under the fair interpretation requirement for exemptions established by the Supreme Court in *Encino Motorcars I* and *Encino Motorcars II*, Plaintiffs request this Honorable Court to fairly interpret the Companionship and Live-In Exemptions and confirm that they indeed apply to third party agencies such as Plaintiffs.

124.     Similar to its arbitrary regulatory revisions regarding the automotive dealership exemption revealed in *Encino Motorcars I* and *Encino Motorcars II*, the DOL has failed the home care industry with its unaccountable reversal of decades of interpretation of the Companionship and Live-In Exemptions.

125.     The DOL's attempt to preclude third party agencies from the Companionship and Live-In Exemptions is contrary to the terms, provisions, and intent of the FLSA and is beyond any authority granted to it, including by Congress and/or the FLSA or the Administrative Procedure Act. *See* 29 U.S.C. § 213(a)(15); 29 U.S.C. § 213(b)(21).

126.     When Congress intends an employer to be excluded from a statutory exemption, the language of the statute makes that exclusion clear. *See e.g.* 29 U.S.C. § 213(a)(3) (exemption for "any employee reemployed by an establishment which is amusement or recreational establishment, organized camp, or religious or non-profit education conference center"); 29 U.S.C. § 213(b)(3) (exemption for "any employee of a carrier by air"); 29 U.S.C. § 207(i) (exemption for "any employee of a retail or service establishment").

127.    Congress did not exclude any employers in the statutory language of the Companionship or Live-In Exemptions. Accordingly, if Congress had intended for third party agencies to be excluded from these exemptions, it would have explicitly so stated.

128.    Congress intended to exempt companions and live-in workers to keep in-home services affordable for the elderly and disabled, regardless of their employer. *See Welding v. Bios Corp.*, 353 F.3d 1214, 1217 (10th Cir. 2004). *See also Long Island Care at Home Ltd. v. Coke*, Brief for the United States as *Amicus Curiae*, Docket No. 06-593 (U.S. 2007) (citing public statements of the Small Business Administration and the Department of Health and Human Services).

129.    The DOL's enactment of the revised regulation at issue in this action flies in the face of and contradicts the explicit rejection by Congress of numerous prior attempts to preclude third party agencies from claiming the Companionship Exemption. *See,* The Fair Home Health Care Act of 2007, H.R. 3582 and S. 2062 (110th Cong. 2007); "The Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273 (112th Cong. 2011); and "The Direct Care Workforce Empowerment Act of 2013," H.R. 5902 and S. 3696 (113th Cong. 2013). The revised regulation is contrary to and unreasonable under the broad language of the Companionship Exemption and Live-In Exemption and the Congressional intent of reducing institutionalization of the elderly and disabled.

130.    The DOL's about-face regarding the Companionship and Live-In Exemptions also disrupts decades of reliance by third party agencies and threatens unsustainable liability and steep legal defense costs for agencies. Furthermore, it wholly ignores the rising costs of in-home care. *See* Marsha Mercer, *Can You Afford a Home-Care Worker?*, AARP: Family Caregiving: Financial

and Legal, Nov. 4, 2019, https://www.aarp.org/caregiving/financial-legal/info-2017/afford-a-homecare-worker.html.

131.    The Medicaid Waiver Program reimbursement method of payment for home care services has not changed since 2015. Third party agencies are reimbursed at the same rate regardless whether Direct Care Workers' hours exceed or fall below 40 hours.

132.    The DOL's reversal on the Companionship and Live-In Exemptions frustrates the primary purposes of the exemptions - namely, to promote in-home care from family members - because the source of payment for those services has not and will not change. *See supra* Marsha Mercer, *Can You Afford a Home-Care Worker?*

133.    The original purpose of the Companionship and Live-In Exemptions was to shift the elderly and disabled away from institutionalization, in favor of in-home care. *See* 78 Fed. Reg. 60458.  The DOL, however, now erroneously attempts to use that shift away from institutional care as purported justification for reversing course on the applicability of the exemptions to third party agencies. The DOL contends that Direct Care Workers have left institutions to work vocationally at residences, without any evidence to support this assertion. *See* 78 Fed. Reg. 60455. The DOL acts as though it is unaware that the increasing numbers of in-home care workers are just as likely to be family and household members caring for a large and increasing elderly segment of the population.

134.    Additionally, the DOL ignores the economic reality that institutional workers care for many residents and patients at institutions that have adequate financial resources from multiple sources to pay overtime hours. To the contrary, the in-home worker typically cares for only one care recipient at a time, and only one source of payment for services is available to the Direct Care Worker.

135.    The DOL also ignores differing circumstances from client to client. The Direct Care Workers with whom Plaintiffs coordinate are family and household members paid for assistance expected of a family or household member in caring for disabled or elderly members of their family. These are typically not "vocational" employees working outside of their home to care for others.

136.    Thus, the DOL's stance is contrary to the statutory language of the FLSA and the realities of the Medicaid Waiver Program and in-home care, and unnecessarily threatens to destroy Plaintiffs and other third party agencies.

**J.  Under the Circumstances Applicable to this Action, Third Party Agencies such as Plaintiffs are Not Employers of Direct Care Workers for Purposes of the FLSA**

137.    FLSA Section 203(d) defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U. S. C §203(d).

138.    Under the circumstances applicable to this action, third party agencies such as Plaintiffs do not exercise the requisite amount of control over Direct Care Workers and their activities to qualify as employers under the FLSA definition of an employer.

139.    The state Medicaid agency and/or private companies that contract with the state Medicaid agency: create the care recipients' individual service plan; approve the Direct Care Worker; set the training requirements for the Direct Care Worker; set the reimbursement rate for the services; and review and approve the hours and services performed by the Direct Care Worker.

140.    The Direct Care Workers and the care recipient can stay together even if the Direct Care Worker and care recipient change third party agencies.

141.    Third party agencies such as Plaintiffs: ensure that the state-mandated training is completed by Direct Care Workers; collect reports and timesheets for submission to the State; and process Direct Care Worker payroll after the reimbursement is received from the State.

142.    As described above, the hourly pay rate to the Direct Care Worker is set by the state in accordance with the Medicaid reimbursement rate.

143.    Third party agencies are merely payroll administrators, and the states and/or the states' Medicaid agencies and private companies that contract with the States are the true and actual employers of the Direct Care Workers.

144.    Accordingly, Plaintiffs request this Honorable Court declare that under the circumstances applicable to this action, under the FLSA, Plaintiffs are not employers of the Direct Care Workers and therefore not liable under the FLSA for unpaid wages to the Direct Care Workers.

### K. In the Alternative, Third Party Agencies Such as Plaintiffs are Joint Employers of Direct Care Workers Along with the States and/or the Private Companies with Which the States Contract for Administration of the Medicaid Waiver Program

145.    Courts and the DOL have long recognized that employees can be simultaneously employed by two or more employers, each of which are subject to joint liability under the FLSA. Holding joint employers jointly and severally liable enhances the ability of employees and enforcement agencies to recover unpaid wages, even if one of the businesses closes or becomes insolvent.

146.    Joint employment liability is essential to ensuring that the FLSA continues to provide meaningful protections for workers and businesses. Joint employer liability prevents joint employers from reaping all the benefits of employment without assuming reciprocal burdens and responsibilities.

147.    For these reasons, joint employers can be jointly and severally liable for unpaid wages under the FLSA. 29 C.F.R. § 791.2(a).

148.    The FLSA prevents businesses or other employers from evading liability simply by discharging elements of their hiring and supervision responsibilities to third parties.

149.    The U.S. Supreme Court held in *In re Enter. Rent-A-Car Wage & Hour Empl. Practices Liti.*, 683 F.3d 462, 468 (2012), that "where two or more employers exert significant

31

control over the same employees - [whether] from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment - they constitute 'joint employers' under the FLSA." (Citing *N.L.R.B. v. Browning-Ferris Indus. of PA.*, 691 F. 2d 1117, 1124 (3d Cir. 1982)).

150.    In 2014, the DOL issued Administrator's Interpretation No. 2014-2, "Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act," which correctly states that "[w]hether an entity is an employer under the FLSA is governed by longstanding case law from the U.S. Supreme Court and other federal appellate courts interpreting the Act." U.S. Dep't of Labor, Wage and Hour Div., Opinion Letter on the Fair Labor Standards Act (FLSA), *Joint employment of home care workers in consumer-directed, Medicaid-funded programs by public entities under the Fair Labor Standards Act*, Administrator's Interpretation No. 2014-2, 2014 WL 2816951, at *2 (June 19, 2014) ("Administrator's Interpretation").

151.    The Administrator's Interpretation provided a list of commonly applied, illustrative factors relevant to determining whether a home care worker is "economically dependent" on a potential public-entity employer. *Id.* at *7-11.

152.    While the Administrator's Opinion was withdrawn on March 10, 2020, its basic premises hold true for the current system of Medicaid Waiver Programs.

153.    If third party agencies such as Plaintiffs are held to be employers of Direct Care Workers, the court must find that Plaintiffs are joint employers along with the States and/or private companies with which the States contract to administer the Medicaid Waiver Program. The States and those private companies retain control over who will provide the care, how much care is needed, and how that care is carried out. They also dictate the amounts paid for hours of service to the third party

agencies, thereby substantially contributing to the decision of what to pay the Direct Care Workers for their work.

154.    The control by the States and those private companies over these aspects of Direct Care Workers' employment confirms that they are joint employers along with the third party agencies that confirm training of the Direct Care Workers, process the necessary Medicaid Waiver Program paperwork, and process payroll for the Direct Care Workers.

155.    Accordingly, Plaintiffs request, in the alternative, this Honorable Court declare the States and the referenced private companies with which the States contract are joint employers of the Direct Care Workers along with third party agencies and are jointly and severally liable for wages and overtime to Direct Care Workers under the FLSA.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Declaratory Relief**

156.    Plaintiffs incorporate by reference the statements and allegations set forth in each of the preceding paragraphs of this Amended Complaint.

157.    Under the APA, a court must "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The current version of 29 C.F.R. § 552.109 conflicts with the statutory text, the statutory purpose, and judicial interpretation of the FLSA and is beyond any authority granted to the DOL, including by Congress and/or the FLSA or the APA.

158.    Specifically, denial of the Companionship and Live-In Exemptions to third party agencies conflicts with statutory text of the FLSA, the statutory purpose of the FLSA, and judicial interpretation of the FLSA under the *Encino Motorcars I* and *Encino Motorcars II* decisions.

159.    Under the APA, 5 U.S.C. § 706(2)(A), the current version of § 552.109 is "not in accordance with the law".

33

160.     The DOL's actions as described above causes ongoing harm to Plaintiffs and wrongfully and unlawfully denies Plaintiffs the ability to claim the Companionship and Live-In Exemptions.

Plaintiffs therefore request this Honorable Court to declare 29 C.F.R. § 552.109 to be invalid and unenforceable.

## SECOND CLAIM FOR RELIEF

### Declaratory Relief

161.     Plaintiffs incorporate by reference the statements and allegations set forth in each of the preceding paragraphs of this Amended Complaint.

162.     Under the APA, a court must "set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A). The current version of 29 C.F.R. § 552.109 conflicts with the statutory text, the statutory purpose and judicial interpretation of the FLSA and is beyond any authority granted to the DOL, including by Congress and/or the FLSA or the APA.

163.     One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. That requirement is satisfied when the agency's explanation is clear enough that its path may reasonably be discerned. But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law.

164.     The current version of 29 C.F.R. § 552.109 is contrary to the stated purpose of the Companionship Exemption and the Live-In Exemption and acts as a complete reversal of more than four decades of regulation and enforcement.

165.     The current version of § 552.109 was enacted arbitrarily and capriciously because it disregarded the decades of reliance upon the exemptions for the success of the Medicaid Waiver Program and the establishment of third party agency employers to facilitate these services. The DOL did not provide adequate justification or explanation for these drastic changes to the regulations and the revised regulation is beyond any authority granted to the DOL, including by Congress and/or the FLSA or the Administrative Procedure Act.

166.     The DOL's actions as described above causes ongoing harm to Plaintiffs and wrongfully and unlawfully denies Plaintiffs the ability to claim the Companionship and Live-In Exemptions.

167.     Plaintiffs therefore request this Honorable Court to declare 29 C.F.R. § 552.109 to be invalid and unenforceable.

## THIRD CLAIM FOR RELIEF

### Declaratory Relief

168.     Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

169.     Employers must retain sufficient control over the alleged employees to be subject to the FLSA.

170.     Plaintiffs do not retain sufficient control over Direct Care Workers to qualify as employers under the FLSA. Plaintiffs do not: hire or assign the Direct Care Workers to the care recipients; establish or enforce the training requirements; establish or enforce the individual service plans; supervise the Direct Care Workers' performance of the services outlined in the individual service plans; or set the rate of reimbursement for the services provided by the Direct Care Worker.

171.     Plaintiffs only "hire" Direct Care Workers for the purposes of ensuring completion of state mandated training, collection of timesheets and reports to be submitted to the states, and processing of payroll for the Direct Care Workers.

172.    Specifically, the States retain all authority over the creation and administration of the Medicaid Waiver Program, approve Providers of services, and set the reimbursement rate for the in-home services. The private companies with which the States contract for administration of the Medicaid Waiver Programs create and administer the individual service plans, determine which services will be received, and determine the number of approved hours of services needed by the care recipients. This authority exercises great control over the Direct Care Workers' working conditions, hours, and rate of pay.

173.    Plaintiffs therefore request this Honorable Court declare that Plaintiffs are not employers of the Direct Care Workers under the FLSA and, accordingly, are not subject to the liability under the FLSA for unpaid wages.

### FOURTH CLAIM FOR RELIEF

### Declaratory Relief

174.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

175.    Plaintiffs request, in the alternative, that this Honorable Court declare that Plaintiffs are joint employers along with the States and the private companies with which the States contract for administration of the Medicaid Waiver Programs.

176.    Under the FLSA, joint employers are jointly and severally liable for unpaid wages. *See* 29 C.F.R. § 791.2.

177.    Due to this control and authority they exercise, as detailed above, the States and the private companies with which the States contract for administration of the Medicaid Waiver Programs are joint employers of the Direct Care Workers and should be held jointly and severally liable for any and all violations of the FLSA regarding pay applicable to Direct Care Workers.

178.    In its ongoing prosecutorial efforts against Plaintiffs, the DOL has failed to acknowledge the joint employer status of the States and the referenced private companies.

179.   Plaintiffs therefore request this Honorable Court to declare that the States and the referenced private companies are joint employers of the referenced Direct Care Workers.

Respectfully submitted,

Dated:  March 10, 2021                        *s/ Bruce C. Fox*
                                              Bruce C. Fox, Esquire (Pa. ID No. 42576)
                                              Allison N. Genard, Esquire (Pa. ID No. 311253)
                                              OBERMAYER REBMANN
                                              MAXWELL & HIPPEL LLP
                                              500 Grant Street, Suite 5240
                                              Pittsburgh, PA 15219
                                              *bruce.fox@obermayer.com*
                                              *Allison.genard@obermayer.com*

                                              John R. Linkosky, Esq.
                                              715 Washington Avenue
                                              Carnegie, Pa. 15106
                                              I.D. # 66011
                                              linklaw@comcast.net

                                              *Counsel for Plaintiffs*

OMC\4812-2906-5695.v1-3/10/21