# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTRA-NATIONAL HOME CARE, LLC, | No. 2:20-cv-01545-WSH |
| Plaintiff, | |
| v. | |
| U.S. DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |
| AGEWELL HOME HELPERS, INC., | No. 2:20-cv-01773-WSH |
| Plaintiff, | |
| v. | |
| U.S. DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |

## DEFENDANTS' APPENDIX

Addendums

A.  Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 (1974)

B.  Employment Standards Administration, U.S. Department of Labor, *Minimum Wage and Maximum Hours Standards under the Fair Labor Standards Act* (Jan. 19, 1973)

C.  Final Rule, *Application of the Fair Labor Standards Act to Domestic Service*, 78 Fed. Reg. 60454, 60577 (Oct. 1, 2013)

# **ADDENDUM  A**

PL 93–259, APRIL 8, 1974, 88 Stat 55

UNITED STATES PUBLIC LAWS

93rd Congress - Second Session

Convening January 21, 1974

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)

Additions and Deletions are not identified in this document.

PL 93–259 (S 2747)

APRIL 8, 1974

TO AMEND THE FAIR LABOR STANDARDS ACT OF 1938 TO INCREASE THE MINIMUM WAGE RATE UNDER THAT ACT, TO EXPAND THE COVERAGE OF THE ACT, AND FOR OTHER PURPOSES.

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES
OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED,

SHORT TITLE; REFERENCES TO ACT

SECTION 1. (A) THIS ACT MAY BE CITED AS THE "FAIR LABOR STANDARDS AMENDMENTS OF 1974". //298 USC 203 NOTE.//

(B) UNLESS OTHERWISE SPECIFIED, WHENEVER IN THIS ACT AN AMENDMENT OR REPEAL IS EXPRESSED IN TERMS OF AN AMENDMENT TO, OR REPEAL OF, A SECTION OR OTHER PROVISION, THE SECTION OR OTHER PROVISION AMENDED OR REPEALED IS A SECTION OR OTHER PROVISION OF THE FAIR LABOR STANDARDS ACT OF 1938 (29 U.S.C. 201—219). //52 STAT. 1060.//

INCREASE IN MINIMUM WAGE RATE FOR EMPLOYEES COVERED BEFORE 1966

SEC. 2. SECTION 6(A) (1) IS AMENDED TO READ AS FOLLOWS: //80 STAT. 838, 29 USC 206.//

"(1) NOT LESS THAN $2 AN HOUR DURING THE PERIOD ENDING DECENBER 31, 1974, NOT LESS THAN $2.10 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1975, AND NOT LESS THAN $2.30 AN HOUR AFTER DECEMBER 31, 1975, EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION;".

INCREASE IN MINUMUM WAGE RATE FOR NONAGRICULTURAL EMPLOYEES COVERED IN 1966 AND 1974

SEC. 3. SECTION 6(B) IS AMENDED (1) BY INSERTING ", TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, OR THE FAIR LABOR STANDARDS AMENDMENTS OF 1974" AFTER "1966", AND (2) BY STRIKING OUT PARAGRAPHS (1) THROUGH (5) AND INSERTING IN LIEU THEREOF THE FOLLOWING: //86 STAT. 373, 20 USC 1681.//

"(1) NOT LESS THAN $1.90 AN HOUR DURING THE PERIOD ENDING DECEMBER 31, 1974,
"(2) NOT LESS THAN $2 AN HOUR DUING THE YEAR BEGINNING JANUARY 1, 1975,
"(3) NOT LESS THAN $2.20 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1976, AND
"(4) NOT LESS THAN $2.30 AN HOUR AFTER DECEMBER 31, 1976."

INCREASE IN MINIMUM WAGE RATE FOR AGRICULTURAL EMPLOYEES

SEC. 4. SECTION 6(A) (5) IS AMENDED TO READ AS FOLLOWS:

"(5) IF SUCH EMPLOYED IN AGRICULTURE, NOT LESS THAN—,
  "(A) $1.60 AN HOUR DURING THE PERIOD ENDING DECEMBER 31, 1974.
  "(B) $1.80 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1975.
  "(C) $2 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1976,
  "(D) $2.20 AN HOUR DURING THE YEAR BEGINNING JANUARY 1, 1977, AND
  "(E) $2.30 AN HOUR AFTER DECEMBER 31, 1977."

INCREASE IN MINIMUM WAGE RATES FOR EMPLOYEES IN PUERTO RICO AND THE VIRGIN ISLANDS.

SEC. 5. (A) SECTION 5 IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION: //63 STAT. 911, 29 USC 205.//

"(E) THE PROVISIONS OF THIS SECTION, SECTION 6(C), AND SECTION 8 //63 STAT. 915; 75 STAT. 70. 29 USC 208.// SHALL NOT APPLY WITH RESPECT TO THE MINIMUM WAGE RATE OF ANY EMPLOYEE EMPLOYED IN PUERTO RICO OR THE VIRGIN ISLANDS (1) BY THE UNITED STATES OR BY THE GOVERNMENT OF THE VIRGIN ISLANDS, (2) BY AN ESTABLISHMENT WHICH IS A HOTEL, MOTEL, OR RESTAURANT, OR (3) BY ANY OTHER RETAIL OR SERVICE ESTABLISHMENT WHICH EMPLOYS SUCH EMPLOYEE PRIMARILY IN CONNECTION WITH THE PREPARATION OR OFFERING OF FOOD OR BEVERAGES FOR HUMAN CONSUMPTION, EITHER ON THE PREMISES, OR BY SUCH SERVICES AS CATERING, BANQUET, BOX LUNCH, OR CURB OR COUNTER SERVICE, TO THE PUBLIC, TO EMPLOYEES, OR TO MEMBERS OR GUESTS OF MEMBERS OF CLUBS. THE MINIMUM WAGE RATE OF SUCH AN EMPLOYEE SHALL BE DETERMINED UNDER THIS ACT IN THE SAME MANNER AS THE MINIMUM WAGE RATE FOR EMPLOYEES EMPLOYED IN A STATE OF THE UNITED STATES IS DETERMINED UNDER THIS ACT. AS USED IN THE PRECEDING SENTENCE, THE TERM 'STATE' DOES NOT INCLUDE A TERRITORY OR POSSESSION OF THE UNITED STATES.".

(B) EFFECTIVE ON THE DATE OF THE ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUBSECTION (C) OF SECTION 6 //80 STAT. 839, 29 USC 206.// IS AMENDED BY STRIKING OUT PARAGRAPHS (2), (3), AND (4) AND INSERTING IN LIEU THEREOF THE FOLLOWING:

"(2) EXCEPT AS PROVIDED IN PARAGRAPHS (4) AND (5), IN THE CASE OF ANY EMPLOYEE WHO IS COVERED BY SUCH A WAGE ORDER ON THE DATE OF ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974 AND TO WHOM THE RATE OR RATES PRESCRIBED BY SUBSECTION (A) OR (B) WOULD OTHERWISE APPLY, THE WAGE RATE APPLICABLE TO SUCH EMPLOYEE SHALL BE INCREASED AS FOLLOWS:

"(A) EFFECTIVE ON THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, THE WAGE ORDER RATE APPLICABLE TO SUCH EMPLOYEE ON THE DAY BEFORE SUCH DATE SHALL—

  "(I) IF SUCH RATE IS UNDER $1.40 AN HOUR, BE INCREASED BY $0.12 AN HOUR, AND
  "(II) IF SUCH RATE IS $1.40 OR MORE AN HOUR, BE INCREASED BY $0.15 AN HOUR.

"(B) EFFECTIVE ON THE FIRST DAY OF THE SECOND AND EACH SUBSEQUENT YEAR AFTER SUCH DATE, THE HIGHEST WAGE ORDER RATE APPLICABLE TO SUCH EMPLOYEES ON THE DATE BEFORE SUCH FIST DAY SHALL—

  "(I) IF SUCH RATE IS UNDER $1.40 AN HOUR, BE INCREASED BY $0.12 AN HOUR, AND
  "(II) IF SUCH RATE IS $1.40 OR MORE AN HOUR, BE INCREASED BY $0.15 AN HOUR.

IN THE CASE OF ANY EMPLOYEE EMPLOYED IN AGRICULTURE WHO IS COVERED BY A WAGE ORDER ISSUED BY THE SECRETARY PURSUANT TO THE RECOMMENDATIONS OF A SPECIAL INDUSTRY COMMITTEE APPOINTED PURSUANT TO SECTION 5, //ANTE, P. 56// TO WHOM THE RATE OR RATES PRESCRIBED BY SUBSECTION (A) (5) WOULD OTHERWISE APPLY, AND WHOSE HOURLY WAGE IS INCREASED ABOVE THE WAGE RATE PRESCRIBED BY SUCH WAGE ORDER BY A SUBSIDY (OR INCOME SUPPLEMENT) PAID, IN WHOLE

OR IN PART, BY THE GOVERNMENT OF PUERTO RICO, THE INCREASES PRESCRIBED BY THIS PARAGRAPH SHALL BE APPLIED TO THE SUM OF THE WAGE RATE IN EFFECT UNDER SUCH WAGE ORDER AND THE AMOUNT BY WHICH THE EMPLOYEE'S HOURLY WAGE RATE IS INCREASED BY THE SUBSIDY (OR INCOME SUPPLEMENT) ABOVE THE WAGE RATE IN EFFECT UNDER SUCH WAGE ORDER.

"(3) IN THE CASE OF ANY EMPLOYEE EMPLOYED IN PUERTO RICO OR THE VIRGIN ISLANDS TO WHOM THIS SECTION IS MADE APPLICABLE BY THE AMENDMENTS MADE TO THIS ACT BY THE FAIR LABOR STANDARDS AMENDMENT OF 1974, THE SECRETARY SHALL, AS SOON AS PRACTICABLE AFTER THE DATE OF ENACTMENT OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, APPOINT A SPECIAL INDUSTRY COMMITTEE IN ACCORDANCE WITH SECTION 5 TO RECOMMEND THE HIGHEST MINIMUM WAGE RATE OR RATES, WHICH SHALL BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE MINIMUM WAGE RATE IN EFFECT UNDER SUBSECTION (B) OR $1.00 AN HOUR, WHICHEVER IS GREATER, TO BE APPLICABLE TO SUCH EMPLOYEE IN LIEU OF THE RATE OR RATES PRESCRIBED BY SUBSECTION (B). THE RATE RECOMMENDED BY THE SPECIAL INDUSTRY COMMITTEE SHALL (A) BE EFFECTIVE WITH RESPECT TO SUCH EMPLOYEE UPON THE EFFECTIVE DATE OF THE WAGE ORDER ISSUED PURSUANT TO SUCH RECOMMENDATION, BUT NOT BEFORE SIXTY DAYS AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, AND (B) EXCEPT IN THE CASE OF EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO OR ANY POLITICAL SUBDIVISION THEREOF, BE INCREASED IN ACCORDANCE WITH PARAGRAPH (2) (B).

"(4) (A) NOTWITHSTANDING PARAGRAPH (2) (A) OR (3), THE WAGE RATE OF ANY EMPLOYEE IN PUERTO RICO OR THE VIRGIN ISLANDS WHICH IS SUBJECT TO PARAGRAPH (2) (A) OR (3) OF THIS SUBSECTION, SHALL, ON THE EFFECTIVE DATE OF THE WAGE INCREASE UNDER PARAGRAPH (2)(A) OR OF THE WAGE RATE RECOMMENDED UNDER PARAGRAPH (3), AS THE CASE MAY BE, BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE RATE UNDER SUBSECTION (A) OR (B) OR $1.00, WHICHEVER IS HIGHER. "(B) NOTWITHSTANDING PARAGRAPH (2)(B), THE WAGE RATE OF ANY EMPLOYEE IN PUERTO RICO OR THE VIRGIN ISLANDS WHICH IS SUBJECT TO PARAGRAPH (2)( B), SHALL, ON AND AFTER THE EFFECTIVE DATE OF THE FIRST WAGE INCREASE UNDER PARAGRAPH (2)(B), BE NOT LESS THAN 60 PER CENTUM OF THE OTHERWISE APPLICABLE RATE UNDER SUBSECTION (A) OR (B) OR $1.00, WHICHEVER IS HIGHER.

"(5) IF THE WAGE RATE OF AN EMPLOYEE IS TO BE INCREASED UNDER THIS SUBSECTION TO A WAGE RATE WHICH EQUALS OR IS GREATER THAN THE WAGE RATE UNDER SUBSECTION (A) OR (B) WHICH, BUT FOR PARAGRAPH (1) OF THIS SUBSECTION, WOULD BE APPLICABLE TO SUCH EMPLOYEE, THIS SUBSECTION SHALL BE INAPPLICABLE TO SUCH EMPLOYEE AND THE APPLICABLE RATE UNDER SUCH SUBSECTION SHALL APPLY TO SUCH EMPLOYEE.

"(6) EACH MINIMUM WAGE RATE PRESCRIBED BY OR UNDER PARAGRAPH (2) OR (3) SHALL BE IN EFFECT UNLESS SUCH MINIMUM WAGE RATE HAS BEEN SUPERSEDED BY A WAGE ORDER (ISSUED BY THE SECRETARY PURSUANT TO THE RECOMMENDATION OF A SPECIAL INDUSTRY COMMITTEE CONVENED UNDER SECTION 8) FIXING A HIGHER MINIMUM WAGE RATE."

(C)(1) THE LAST SENTENCE OF SECTION 8(B) //63 STAT. 915; 69 STAT. 711, 29 USC 208.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END THEREOF AND INSERTING IN LIEU THEREOF A SEMICOLON . AND THE FOLLOWING: "EXCEPT THAT THE COMMITTEE SHALL RECOMMEND TO THE SECRETARY THE MINIMUM WAGE RATE PRESCRIBED IN SECTION 6(A) OR 6(B), //ANTE, P. 55.// WHICH WOULD BE APPLICABLE BUT FOR SECTION 6(C), //ANTE, P. 56.// UNLESS THERE IS SUBSTANTIAL DOCUMENTARY EVIDENCE, INCLUDING PERTINENT UNABRIDGED PROFIT AND LOSS STATEMENTS AND BALANCE SHEETS FOR A REPRESENTATIVE PERIOD OF YEARS OR IN THE CASE OF EMPLOYEES OF PUBLIC AGENCIES OTHER APPROPRIATE INFORMATION, IN THE RECORD WHICH ESTABLISHES THAT THE INDUSTRY, OR A PREDOMINANT PORTION THEREOF, IS UNABLE TO PAY THAT WAGE."

(2) THE THIRD SENTENCE OF SECTION 10(A) //69 STAT. 712F 72 STAT. 948, 29 USC 210.// IS AMENDED BY INSERTING AFTER "MODIFY" THE FOLLOWING: "(INCLUDING PROVISION FOR THE PAYMENT OF AN APPROPRIATE MINIMUM WAGE RATE)".

(D) SECTION 8 //75 STAT. 70.// IS AMENDED (1) BY STRIKING OUR "THE MINIMUM WAGE PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A) IN EACH SUCH INDUSTRY" IN THE FIRST SENTENCE OF SUBSECTION (A) AND INSERTING IN LIEU THEREOF "THE MINIMUM WAGE RATE WHICH WOULD APPLY IN EACH INDUSTRY UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A) BUT FOR SECTION 6(C)", (2) BY STRIKING OUT "THE MINIMUM WAGE RATE PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A)" IN THE LAST SENTENCE OF SUBSECTION (A) AND INSERTING IN LIEU THEREOF "THE OTHERWISE APPLICABLE MINIMUM WAGE RATE IN EFFECT UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A)", AND (3) BY STRIKING OUT "PRESCRIBED IN PARAGRAPH (1) OF SECTION 6(A)", IN SUBSECTION (C) AND INSERTING IN LIEU THEREOF "IN EFFECT UNDER PARAGRAPH (1) OR (5) OF SECTION 6(A) (AS THE CASE MAY BE)".

FEDERAL AND STATE EMPLOYEES

SEC. 6. (A) (1) SECTION 3(D) IS AMENDED TO READ AS FOLLOWS: /52 STAT. 1060; 80 STAT. 830, 29 USC 203.//

"(D) 'EMPLOYER' INCLUDES ANY PERSON ACTING DIRECTLY OR INDIRECTLY IN THE INTEREST OF AN EMPLOYER IN RELATION TO AN EMPLOYEE AND INCLUDES A PUBLIC AGENCY, BUT DOES NOT INCLUDE ANY LABOR ORGANIZATION (OTHER THAN WHEN ACTING AS AN EMPLOYER) OR ANYONE ACTING IN THE CAPACITY OF OFFICER OR AGENT OF SUCH LABOR ORGANIZATION."

"(2) SECTION 3(E) IS AMENDED TO READ AS FOLLOWS:

"(E)(1) EXCEPT AS PROVIDED IN PARAGRAPHS (2) AND (3), THE TERM 'EMPLOYEE' MEANS ANY INDIVIDUAL EMPLOYED BY AN EMPLOYER.

"(2) IN THE CASE OF AN INDIVIDUAL EMPLOYED BY A PUBLIC AGENCY, SUCH TERM MEANS—,

"(A) ANY INDIVIDUAL EMPLOYED BY THE GOVERNMENT OF THE UNITED STATES—,

"(I) AS A CIVILIAN IN THE MILITARY DEPARTMENTS (AS DEFINED IN SECTION 102 OF TITLE 5, UNITED STATES CODE). //80 STAT. 378.//

"(II) IN ANY EXECUTIVE AGENCY (AS DEFINED IN SECTION 105 OF SUCH TITLE),

"(III) IN ANY UNIT OF THE LEGISLATIVE OR JUDICIAL BRANCH OF THE GOVERNMENT WHICH HAS POSITIONS IN THE COMPETITIVE SERVICE,

"(IV) IN A NONAPPROPRIATED FUND INSTRUMENTALITY UNDER THE JURISDICTION OF THE ARMED FORCES, OR

"(V) IN THE LIBRARY OF CONGRESS;

"(B) ANY INDIVIDUAL EMPLOYED BY THE UNITED STATES POSTAL SERVICE OR THE POSTAL RATE COMMISSION; AND

"(C) ANY INDIVIDUAL EMPLOYED BY A STATE, POLITICAL SUBDIVISION OF A STATE, OR AN INTERSTATE GOVERNMENTAL AGENCY, OTHER THAN SUCH AN INDIVIDUAL—,

"(I) WHO IS NOT SUBJECT TO THE CIVIL SERVICE LAWS OF THE STATE, POLITICAL SUBDIVISION, OR AGENCY WHICH EMPLOYS HIM; AND

"(II) WHO—,

"(I) HOLDS A PUBLIC ELECTIVE OFFICE OF THAT STATE, POLITICAL SUBDIVISION, OR AGENCY,

"(II) IS SELECTED BY THE HOLDER OF SUCH AN OFFICE TO BE A MEMBER OF HIS PERSONAL STAFF,

"(III) IS APPOINTED BY SUCH AN OFFICEHOLDER TO SERVE ON A POLICYMAKING LEVEL, OR

"(IV) WHO IS AN IMMEDIATE ADVISER TO SUCH AN OFFICEHOLDER WITH RESPECT TO THE CONSTITUTIONAL OR LEGAL POWERS OF HIS OFFICE.

"(3) FOR PURPOSES OF SUBSECTION (U), SUCH TERM DOES NOT INCLUDE ANY INDIVIDUAL EMPLOYED BY AN EMPLOYER ENGAGED IN AGRICULTURE IF SUCH INDIVIDUAL IS THE PARENT, SPOUSE, CHILD, OR OTHER MEMBER OF THE EMPLOYER'S IMMEDIATE FAMILY."

"(3) SECTION 3(H) IS AMENDED TO READ AS FOLLOWS: //52 STAT. 1060.// "(H) 'INDUSTRY' MEANS A TRADE, BUSINESS, INDUSTRY, OR OTHER ACTIVITY, OR BRANCH OR GROUP THEREOF, IN WHICH INDIVIDUALS ARE GAINFULLY EMPLOYED.".

(4) SECTION 3(R) //75 STAT. 65; 86 STAT. 375.// IS AMENDED BY INSERTING "OR" AT THE END OF PARAGRAPH (2) AND BY INSERTING AFTER THAT PARAGRAPH THE FOLLOWING NEW PARAGRAPH:

"(3) IN CONNECTION WITH THE ACTIVITIES OF A PUBLIC AGENCY,".

(5) SECTION 3(S) IS AMENDED— //80 STAT. 831; 86 STAT. 375.//

(A) BY STRIKING OUT IN THE MATTER PRECEDING PARAGRAPH (1) "INCLUDING EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS" AND INSERTING IN LIEU THEREOF "EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS OR MATERIALS",

(B) BY STRIKING OUT "OR" AT THE END OF PARAGRAPH (3), //80 STAT. 831, 26 USC 203.//

(C) BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (4) AND INSERTING IN LIEU THEREOF "; OR",

(D) BY ADDING AFTER PARAGRAPH (4) THE FOLLOWING NEW PARAGRAPH:

(5) IS AN ACTIVITY OF A PUBLIC AGENCY.", AND

(E) BY ADDING AFTER THE LAST SENTENCE THE FOLLOWING NEW SENTENCE: "THE EMPLOYEES OF AN ENTERPRISE WHICH IS A PUBLIC AGENCY SHALL FOR PURPOSES OF THIS SUBSECTION BE DEEMED TO BE EMPLOYEES ENGAGED IN COMMERCE, OR IN THE PRODUCTION OF GOODS FOR COMMERCE, OR EMPLOYEES HANDLING, SELLING, OR OTHERWISE WORKING ON GOODS OR MATERIALS THAT HAVE BEEN MOVED IN OR PRODUCED FOR COMMERCE.".

(6) SECTION 3 IS AMENDED BY ADDING AFTER SUBSECTION (W) THE FOLLOWING: //52 STAT. 1060; 80 STAT. 832.//

"NX) 'PUBLIC AGENCY' MEANS THE GOVERNMENT OF THE UNITED STATES; THE GOVERNMENT OF A STATE OR POLITICAL SUBDIVISION THEREOF; ANY AGENCY OF THE UNITED STATES (INCLUDING THE UNITED STATES POSTAL SERVICE AND POSTAL RATE COMMISSION), A STATE, OR A POLITICAL SUBDIVISION OF A STATE; OR ANY INTERSTATE GOVERNMENTAL AGENCY.".

(B) SECTION 4 //75 STAT. 66, 29 USC 204.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(F) THE SECRETARY IS AUTHORIZED TO ENTER INTO AN AGREEMENT WITH THE LIBRARIAN OF CONGRESS WITH RESPECT TO INDIVIDUALS EMPLOYED IN THE LIBRARY OF CONGRESS TO PROVIDE FOR THE CARRYING OUT OF THE SECRETARY'S FUNCTIONS UNDER THIS ACT WITH RESPECT TO SUCH INDIVIDUALS. NOTWITHSTANDING ANY OTHER PROVISION OF THIS ACT, OR ANY OTHER LAW, THE CIVIL SERVICE COMMISSION IS AUTHORIZED TO ADMINISTER THE PROVISIONS OF THIS ACT WITH RESPECT TO ANY INDIVIDUAL EMPLOYED BY THE UNITED STATES (OTHER THAN AN INDIVIDUAL EMPLOYED IN THE LIBRARY OF CONGRESS, UNITED STATES POSTAL SERVICE, POSTAL RATE COMMISSION, OR THE TENNESSEE VALLEY AUTHORITY). NOTHING IN THIS SUBSECTION SHALL BE CONSTRUED TO AFFECT THE RIGHT OF AN EMPLOYEE TO BRING AN ACTION FOR UNPAID MINIMUM WAGES, OR UNPAID OVERTIME COMPENSATION, AND LIQUIDATED DAMAGES UNDER SECTION 16(B) OF THIS ACT.". //29 USC 216.//

(C)(1)(A) EFFECTIVE JANUARY 1, 1975, SECTION 7 IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION: //52 STAT. 1063; 80 STAT. 842, 29 USC 207.//

"(K) NO PUBLIC AGENCY SHALL BE DEEMED TO HAVE VIOLATED SUBSECTION (A) WITH RESPECT TO THE EMPLOYMENT OF ANY EMPLOYEE IN FIRE PROTECTION ACTIVITIES OR ANY EMPLOYEE IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS) IF—

"(1) IN A WORK PERIOD OF 28 CONSECUTIVE DAYS THE EMPLOYEE RECEIVES FOR TOURS OF DUTY WHICH IN THE AGGREGATE EXCEED 240 HOURS; OR

"(2) IN THE CASE OF SUCH AN EMPLOYEE TO WHOM A WORK PERIOD OF AT LEAST 7 BUT LESS THAN 28 DAYS APPLIES, IN HIS WORK PERIOD THE EMPLOYEE RECEIVES FOR TOURS OF DUTY WHICH IN THE AGGREGATE EXCEED A NUMBER OF HOURS WHICH BEARS THE SAME RATIO TO THE NUMBER OF CONSECUTIVE DAYS IN HIS WORK PERIOD AS 240 HOURS BEARS TO 28 DAYS,

COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED."

(B) EFFECTIVE JANUARY 1, 1976, SECTION 7(K) IS AMENDED BY STRIKING OUT "240 HOURS" EACH PLACE IT OCCURS AND INSERTING IN LIEU THEREOF "232 HOURS".

(C) EFFECTIVE JANUARY 1, 1977, SUCH SECTION IS AMENDED BY STRIKING OUT "232 HOURS" EACH PLACE IT OCCURS AND INSERTING IN LIEU THEREOF "216 HOURS".

(D) EFFECTIVE JANUARY 1, 1978, SUCH SECTION IS AMENDED— //ANTE, P. 60.//

(I) BY STRIKING OUT "EXCEED 216 HOURS" IN PARAGRAPH (1) AND INSERTING IN LIEU THEREOF "EXCEED THE LESSER OF (A) 216 HOURS, OR (B) THE AVERAGE NUMBER OF HOURS (AS DETERMINED BY THE SECRETARY PURSUANT TO SECTION 6(C)(3) OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974) IN TOURS OF DUTY OF EMPLOYEES ENGAGED IN SUCH ACTIVITIES IN WORK PERIODS OF 28 CONSECUTIVE DAYS IN CALENDAR YEAR 1975"; AND

(II) BY STRIKING OUT "AS 216 HOURS BEARS TO 28 DAYS" IN PARAGRAPH (2) AND INSERTING IN LIEU THEREOF "AS 216 HOURS (OR IF LOWER, THE NUMBER OF HOURS REFERRED TO IN CLAUSE (B) OF PARAGRAPH (1) BEARS TO 28 DAYS".

(2)(A) SECTION 13(B) //75 STAT. 71; 80 STAT. 837. 29 USC 213.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (19) AND INSERTING IN LIEU THEREOF"; OR" AND BY ADDING AFTER THAT PARAGRAPH THE FOLLOWING NEW PARAGRAPH:

L"(20) ANY EMPLOYEE OF A PUBLIC AGENCY WHO IS EMPLOYED IN FIRE PROTECTION OR LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS);".

(B) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(20) IS AMENDED TO READ AS FOLLOWS:

"(20) ANY EMPLOYEE OF A PUBLIC AGENCY WHO IN ANY WORKWEEK IS EMPLOYED IN FIRE PROTECTION ACTIVITIES OR ANY EMPLOYEE OF A PUBLIC AGENCY WHO IN ANY WORKWEEK IS EMPLOYED IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS), IF THE PUBLIC AGENCY EMPLOYS DURING THE WORKWEEK LESS THAN 5 EMPLOYEES IN FIRE PROTECTION OR LAW ENFORCEMENT ACITVITIES, AS THE CASE MAY BE; OR".

(3) THE SECRETARY OF LABOR SHALL IN THE CALENDAR YEAR BEGINNING JANUARY 1, 1976, CONDUCT (A) A STUDY OF THE AVERAGE NUMBER OF HOURS IN TOURS OF DUTY IN WORK PERIODS IN THE PRECEDING CALENDAR YEAR OF EMPLOYEES (OTHER THAN EMPLOYEES EXEMPT FROM SECTION 7 OF THE FAIR LABOR STANDARDS ACT OF 1938 BY SECTION 13(B)(20) OF SUCH ACT) OF PUBLIC AGENCIES WHO ARE EMPLOYED IN FIRE PROTECTION ACTIVITIES, AND (B) A STUDY OF THE AVERAGE NUMBER OF HOURS IN TOURS OF DUTY IN WORK PERIODS IN THE PRECEDING CALENDAR YEAR OF EMPLOYEES (OTHER THAN EMPLOYEES EXEMPT FROM SECTION 7 OF THE FAIR LABOR STANDARDS ACT OF 1938 BY SECTION 13(B)(20) OF SUCH ACT) OF PUBLIC AGENCIES WHO ARE EMPLOYED IN LAW ENFORCEMENT ACTIVITIES (INCLUDING SECURITY PERSONNEL IN CORRECTIONAL INSTITUTIONS). THE SECRETARY SHALL PUBLISH THE RESULTS OF EACH SUCH STUDY IN THE FEDERAL REGISTER. //29 USC 213 NOTE.//

(D)(1) THE SECOND SENTENCE OF SECTION 16(B) //52 STAT. 1069; 75 STAT. 74, 29 USC 216.// IS AMENDED TO READ AS FOLLOWS: "ACTION TO RECOVER SUCH LIABILITY MAY BE MAINTAINED AGAINST ANY EMPLOYER (INCLUDING A PUBLIC AGENCY) IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION BY ANY ONE OR MORE EMPLOYEES FOR AND IN BEHALF OF HIMSELF OR THEMSELVES AND OTHER EMPLOYEES SIMILARLY SITUATED.".

(2)(A) SECTION 6 OF THE PORTAL–TO–PORTAL PAY ACT OF 1947 //61 STAT. 87, 29 USC 255.// IS AMENDED BY STRIKING OUT THE PERIOD AT THE END OF PARAGRAPH (C) AND BY INSERTING IN LIEU THEREOF A SEMICOLON AND BY ADDING AFTER SUCH PARAGRAPH THE FOLLOWING:

"(D) WITH RESPECT TO ANY CAUSE OF ACTION BROUGHT UNDER SECTION 16(B) OF THE FAIR LABOR STANDARDS ACT OF 1938 AGAINST A STATE OR A POLITICAL SUBDIVISION OF A STATE IN A DISTRICT COURT OF THE UNITED STATES ON OR BEFORE APRIL 18, 1973, THE RUNNING OF THE STATUTORY PERIODS OF LIMITATION SHALL BE DEEMED SUSPENDED DURING THE PERIOD BEGINNING WITH THE COMMENCEMENT OF ANY SUCH ACTION AND ENDING ONE HUNDRED AND EIGHTY DAYS AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, EXCEPT THAT SUCH SUSPENSION SHALL NOT BE

APPLICABLE IF IN SUCH ACTION JUDGMENT HAS BEEN ENTERED FOR THE DEFENDANT ON THE GROUNDS OTHER THAN STATE IMMUNITY FROM FEDERAL JURISDICTION.".

(B) SECTION 11 OF SUCH ACT //61 STAT. 89, 29 USC 260.// IS AMENDED BY STRIKING OUT "(B)" AFTER "SECTION 16".

## DOMESTIC SERVICE WORKERS

SEC. 7. (A) SECTION 2(A) //52 STAT. 1060; 63 STAT. 910. 29 USC 202.// IS AMENDED BY INSERTING AT THE END THE FOLLOWING NEW SENTENCE: "THAT CONGRESS FURTHER FINDS THAT THE EMPLOYMENT OF PERSONS IN DOMESTIC SERVICE IN HOUSEHOLDS AFFECTS COMMERCE."

(B)(1) SECTION 6 //80 STAT. 841. 29 USC 206.// IS AMENDED BY ADDING AFTER SUBSECTION (E) THE FOLLOWING NEW SUBSECTION:

"(F) ANY EMPLOYEE—,

"(1) WHO IN ANY WORKWEEK IS EMPLOYED IN DOMESTIC SERVICE IN A HOUSEHOLD SHALL BE PAID WAGES AT A RATE NOT LESS THAN THE WAGE RATE IN EFFECT UNDER SECTION 6(B) UNLESS SUCH EMPLOYEE'S CONPENSATION FOR SUCH SERVICE WOULD NOT BECAUSE OF SECTION 209(G) OF THE SOCIAL SECURITY ACT CONSTITUTE WAGES FOR THE PURPOSES OF TITLE II OF SUCH ACT, OR //64 STAT. 492; 68 STAT. 1078, 42 USC 409.//

"(2) WHO IN ANY WORKWEEK—,

"(A) IS EMPLOYED IN DOMESTIC SERVICE IN ONE OR MORE HOUSEHOLDS, AND

"(B) IS SO EMPLOYED FOR MORE THAN 8 HOURS IN THE AGGREGATE, SHALL BE PAID WAGES FOR SUCH EMPLOYMENT IN SUCH WORKWEEK AT A RATE NOT LESS THAN THE WAGE RATE IN EFFECT UNDER SECTION 6(B)." //ANTE, P. 55.//

(2) SECTION 7 IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 6(C) OF THIS ACT THE FOLLOWING NEW SUBSECTION: //ANTE. P. 60.//

"(1) NO EMPLOYER SHALL EMPLOY ANY EMPLOYEE IN DOMESTIC SERVICE IN ONE OR MORE HOUSEHOLDS FOR A WORKWEEK LONGER THAN FORTY HOURS UNLESS SUCH EMPLOYEE RECEIVES COMPENSATION FOR SUCH EMPLOYMENT IN ACCORDANCE WITH SUBSECTION (A)."

(3) SECTION 13(A) //72 STAT. 71; 80 STAT. 838, 29 USC 213.// IS AMENDED BY ADDING AT THE END THE FOLLOWING NEW PARAGRPAPH:

"(15) ANY EMPLOY EMPLOYED ON A CASUAL BASIS IN DOMESTIC SERVICE EMPLOYMENT TO PROVIDE BABYSITTING SERVICES OR ANY EMPLOYEE EMPLOYED IN DOMESTIC SERVICE EMPLOYMENT TO PROVIDE COMPANIONSHIP SERVICES FOR INDIVIDUALS WHO (BECAUSE OF AGE OR INFIRMITY) ARE UNABLE TO CARE FOR THEMSELVES (AS SUCH TERMS ARE DEFINED AND DELIMITED BY REGULATIONS OF THE SECRETARY)."

(4) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 6(C) THE FOLLOWING NEW PARAGRAPH: //ANTE. P. 61.//

"(21) ANY EMPLOYEE WHO IS EMPLOYED IN DOMESTIC SERVICE IN A HOUSEHOLD AND WHO RESIDES IN SUCH HOUSEHOLD; OR".

## RETAIL AND SERVICE ESTABLISHMENTS

SEC. 8. (A) EFFECTIVE JANUARY 1, 1975, SECTION 13(A)(2) //80 STAT. 833.// (RELATING TO EMPLOYEES OF RETAIL AND SERVICE ESTABLISHMENTS) IS AMENDED BY STRIKING OUT "$250,000" AND INSERTING IN LIEU THEREOF "$225,000.

(B) EFFECTIVE JANUARY 1, 1976, SUCH SECTION IS AMENDED BY STRIKING OUT "$225,000" AND INSERTING IN LIEU THEREOF "$200,000".

(C) EFFECTIVE JANUARY 1, 1977, SUCH SECTION IS AMENDED BY STRIKING OUT "OR SUCH ESTABLISHMENT HAS AN ANNUAL DOLLAR VOLUME OF SALES WHICH IS LESS THAN $200,000 (EXCLUSIVE OF EXCISE TAXES AT THE RETAIL LEVEL WHICH ARE SEPARATELY STATED)".

TOBACCO EMPLOYEES

SEC. 9. (A) SECTION 7 IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION ((B)(2) OF THIS ACT THE FOLLOWING:

"(M) FOR A PERIOD OR PERIODS OF NOT MORE THAN FOURTEEN WORKWEEKS IN THE AGGREGATE IN ANY CALENDAR YEAR, ANY EMPLOYER MAY EMPLOY ANY EMPLOYEE FOR A WORKWEEK IN EXCESS OF THAT SPECIFIED IN SUBSECTION (A) WITHOUT PAYING THE COMPENSATION FOR OVERTIME EMPLOYMENT PRESCRIBED IN SUCH SUBSECTION, IF SUCH EMPLOYEE—,
 "(1) IS EMPLOYED BY SUCH EMPLOYER—,
 "(A) TO PROVIDE SERVICES (INCLUDING STRIPPING AND GRADING) NECESSARY AND INCIDENTAL TO THE SALE AT AUCTION OF GREEN LEAF TOBACCO OF THPE 11, 12, 13, 14, 21, 22, 23, 24, 31, 35, 36, OR 37 (AS SUCH TYPES ARE DIFINED BY THE SECRETARY OF AGRICULTURE), OR IN AUCTION SALE, BUYING, HANDLING, STEMMING, REDRYING, PACKING, AND STORING OF SUCH TOBACCO,
 "(B) IN AUCTION SALE, BUYING, HANDLING, STRIPPING, SORTING, GRADING, SIZING, PACKING, OR STEMMING PRIOR TO PACKING, OF PERISHABLE CIGAR LEAF TOBACCO OF TYPE 41, 42, 43, 44, 45, 46, 51, 52, 53, 54, 55, 61, OR 62 (AS SUCH TYPES ARE DEFINED BY THE SECRETARY OF AGRICULTURE); AND
 "(2) RECEIVES FOR—,
 "(A) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF TEN HOURS IN ANY WORKDAY, AND
 "(B) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK, COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED.

AN EMPLOYER WHO RECEIVES AN EXEMPTION UNDER THIS SUBSECTION SHALL NOT BE ELIGIBLE FOR ANY OTHER EXEMPTION UNDER THIS SECTION.".
 (B)(1) SECTION 13(A) (14) IS REPEALED. //75 STAT. 71; 80 STAT. 838. 29 USC 213.//
 (2) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 7(B)(4) OF THIS ACT //ANTE. P. 62.// THE FOLLOWING NEW PARAGRAPH:
 "(22) ANY AGRICULTURAL EMPLOYEE EMPLOYED IN THE GROWING AND HARVESTING OF SHADE–GROWN TOBACCO WHO IS ENGAGED IN THE PROCESSING (INCLUDING, BUT NOT LIMITED TO, DRYING, CURING, FERMENTING, BULKING, REBULKING, SORTING, GRADING, AGING, AND BALING) OF SUCH TOBACCO, PRIOR TO THE STEMMING PROCESS, FOR USE AS CIGAR WRAPPER TOBACCO; OR".

TELEGRAPH AGENCY EMPLOYEES

SEC 10. (A) SECTION 13(A)(11) (RELATING TO TELEGRAPH AGENCY EMPLOYEES) IS REPEALED.

 (B)(1) SECTION 13(B) IS AMENDED BY ADDING AFTER THE PARAGRAPH ADDED BY SECTION 9(B)(2) OF THIS ACT THE FOLLOWING NEW PARAGRAPH:
 "(23) ANY EMPLOYEE OR PROPRIETOR IN A RETAIL OR SERVICE ESTABLISHMENT WHICH QUALIFIES AS AN EXEMPT RETAIL OR SERVICE ESTABLISHMENT UNDER PARAGRAPH (2) OF SUBSECTION (A) WITH RESPECT TO WHOM THE PROVISIONS OF SECTIONS 6 AND 7 //ANTE, PP. 55, 90.// WOULD NOT OTHERWISE APPLY, WHO IS ENGAGED IN HANDLING TELEGRAPHIC MESSAGES FOR THE PUBLIC UNDER AN AGNCY OR CONTRACT ARRANGEMENT WITH A TELEGRAPH COMPANY WHERE THE TELEGRAPH MESSAGE REVENUE OF SUCH AGENCY DOES NOT EXCEED $500 A MONTH, AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

(2) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(23) IS AMENDED BY STRIKING OUT "FORTY-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(3) EFFECTIVE TWO YEARS AFTER SUCH DATE, SECTION 13(B)(23) IS REPEALED. // ANTE, P. 63.//

SEAFOOD CANNING AND PROCESSING EMPLOYEES

SEC. 11. (A) SECTION 13(B)(4) //75 STAT. 71, 29 USC 213.// (RELATING TO FISH AND SEAFOOD PROCESSING EMPLOYEES) IS AMENDED BY INSERTING "WHO IS" AFTER "EMPLOYEE", AND BY INSERTING BEFORE THE SEMICOLON THE FOLLOWING: ", AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

(B) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(4) IS AMENDED BY STRIKING OUT "FORTH-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SECTION 13(B)(4) IS REPEALED.

NURSING HOME EMPLOYEES

SEC. 12. (A) SECTION 13(B)(8) //80 STAT. 833.// (INSOFAR AS IT RELATED TO NURSING HOME EMPLOYEES) IS AMENDED BY STRIKING OUT "ANY EMPLOYEE WHO (A) IS EMPLOYED BY AN ESTABLISHMENT WHICH IS AN INSTITUTION (OTHER THAN A HOSPITAL) PRIMARILY ENGAGED IN THE CARE OF THE SICK, THE AGED, OR THE MENTALLY ILL OR DEFECTIVE WHO RESIDE ON THE PREMISES" AND THE REMAINDER OF THAT PARAGRAPH.

(B) SECTION 7(J) //80 STAT. 842, 29 USC 207.// IS AMENDED BY INSERTING AFTER "A HOSPITAL" THE FOLLOWING: "OR AN ESTABLISHMENT WHICH IS AN INSTITUTION PRIMARILY ENGAGED IN THE CARE OF THE SICK, THE AGED, OR THE MENTALLY ILL OR DEFECTIVE WHO RESIDE ON THE PREMISES".

HOTEL, MOTEL, AND RESTAURANT EMPLOYEES AND TIPPED EMPLOYEES

SEC. 139 (A) SECTION 13(B)(8) (INSOFAR AS IT RELATES TO HOTEL, MOTEL, AND RESTAURANT EMPLOYEES) (AS AMENDED BY SECTION 12) IS AMENDED (1) BY STRIKING OUT "ANY EMPLOYEE" AND INSERTING IN LIEU THEREOF "(A) ANY EMPLOYEE (OTHER THAN AN EMPLOYEE OF A HOTEL OR MOTEL WHO PERFORMS MAID OR CUSTODIAL SERVICES) WHO IS", (2) BY INSERTING BEFORE THE SEMICOLON THE FOLLOWING: "AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED", AND (3) BY ADDING AFTER SUCH SECTION THE FOLLOWING:

"(B) ANY EMPLOYEE OF A HOTEL OR MOTEL WHO PERFORMS MAID OR CUSTODIAL SERVICES AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR.

(B) EFFECTIVE ONE YAR AFTERTHE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUBPARAGRAPHS (A) AND (B) OF SECTION 13( B)(8) ARE EACH AMENDED BY STRIKING OUT "FORTY-EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-SIX HOURS".

(C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUBPARAGRAPH (B) OF SECTION 13(B)(8) IS AMENDED BY STRIKING OUT "FORTY-SIX HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(D) EFFECTIVE THREE YEARS AFTER SUCH DATE, SUBPARAGRAPH (B) OF SECTION 13(B) (8) IS REPEALED AND SUCH SECTION IS AMENDED BY STRIKING OUT "(A)".

(E) THE LAST SENTENCE OF SECTION 3(M) //80 STAT. 830, 29 USC 203.// IS AMENDED TO READ AS FOLLOWS: "IN DETERMINING THE WAGE OF A TIPPED EMPLOYEE, THE AMOUNT PAID SUCH EMPLOYEE BY HIS

EMPLOYER SHALL BE DEEMED TO BE INCREASED ON ACCOUNT OF TIPS BY AN AMOUNT DETERMINED BY THE EMPLOYER, BUT NOT BY AN AMOUNT IN EXCESS OF 50 PER CENTUM OF THE APPLICABLE MINIMUM WAGE RATE, EXCEPT THAT THE AMOUNT OF THE INCREASE ON ACCOUNT OF TIPS DETERMINED BY THE EMPLOYER MAY NOT EXCEED THE VALUE OF TIPS ACTUALLY RECEIVED BY THE EMPLOYEE. THE PREVIOUS SENTENCE SHALL NOT APPLY WITH RESPECT TO ANY TIPPED EMPLOYEE UNLESS (1) SUCH EMPLOYEE HAS BEEN INFORMED BY THE EMPLOYER OF THE PROVISIONS OF THIS SUBSECTION, AND (2) ALL TIPS RECEIVED BY SUCH EMPLOYEE HAVE BEEN RETAINED BY THE EMPLOYEE, EXCEPT THAT THIS SUBSECTION SHALL NOT BE CONSTRUED TO PROHIBIT THE POOLING OF TIPS AMONG EMPLOYEES WHO CUSTOMARILY AND REGULARLY RECEIVE TIPS.".

## SALESMEN, PARTSMEN, AND MECHANICS

SEC. 14. SECTION 13(B)(10) //80 STAT. 836, 29 USC 213.// (RELATING TO SALESMEN, PARTSMEN, AND MECHANICS) IS AMENDED TO READ AS FOLLOWS:

 "(10)(A) ANY SALESMEN, PARTSMAN, OR MECHANIC PRIMARILY ENGAGED IN SELLING OR SERVICING AUTOMOBILES, TRUCKS, OR FARM IMPLEMENTS, IF HE IS EMPLOYED BY A NONMANUFACTURING ESTABLISHMENT PRIMARILY ENGAGED IN THE BUSINESS OF SELLING SUCH VEHICLES OR IMPLEMENTS TO ULTIMATE PURCHASERS; OR
 "(B) ANY SALESMAN PRIMARILY ENGAGED IN SELLING TRAILERS, BOATS, OR AIRCRAFT, IF HE IS EMPLOYED BY A NONMANUFACTURING ESTABLISHMENT PRIMARILY ENGAGED IN THE BUSINESS OF SELLING TRAILERS, BOATS, OR AIRCRAFT TO ULTIMATE PURCHASERS; OR".

## FOOD SERVICE ESTABLISHMENT EMPLOYEES

SEC. 15. (A) SECTION 13(B)(8) (RELATING TO FOOD SERVICE AND CATERING EMPLOYEES) IS AMENDED BY INSERTING IMMEDIATELY BEFORE THE SEMICOLON THE FOLLOWING: "AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

 (B) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUCH SECTION IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".
 (C) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

## BOWLING EMPLOYEES

SEC. 16. (A) EFFECTIVE ONE YEAR AFTER TEH EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SECTION 13(B)(19) (RELATING TO EMPLOYEES OF BOWLING ESTABLISHMENTS) IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

 (B) EFFECTIVE TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

## SUBSTITUTE PARENTS FOR INSTITUTIONALIZED CHILDREN

SEC. 17. SECTION 13(B) //ANTE, P. 63.// IS AMENDED BY INSERTING AFTER THE PARAGRAPH ADDED BY SECTION 10(B)(1) OF THIS ACT THE FOLLOWING NEW PARAGRAPH:

 "(24) ANY EMPLOYEE WHO IS EMPLOYED WITH HIS SPOUSE BY A NON–PROFIT EDUCATIONAL INSTITUTION TO SERVE AS THE PARENTS OF CHILDREN—,
 "(A) WHO ARE ORPHANS OR ONE OF WHOSE NATURAL PARENTS IS DECEASED, OR

"(B) WHO ARE ENROLLED IN SUCH INSTITUTION AND RESIDE IN RESIDENTIAL FACILITIES OF THE INSTITUTION, SHILE SUCH CHILDREN ARE IN RESIDENCE AT SUCH INSTITUTION, IF SUCH EMPLOYEE AND HIS SPOUSE RESIDE IN SUCH FACILITIES, RECEIVE, WITHOUT COST, BOARD AND LODGING FROM SUCH INSTITUTION, AND ARE TOGETHER COMPENSATED, ON A CASH BASIS, AT AN ANNUAL RATE OF NOT LESS THAN $10,000; OR".

### EMPLOYEES OF CONGLOMERATES

SEC. 18. SECTION 13 //52 STAT. 1067; 71 STAT. 514, 29 USC 213.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING:

"(G) THE EXEMPTION FROM SECTION 6 PROVIDED BY PARAGRAPHS (2) AND (6) OF SUBSECTION (A) OF THIS SECTION //ANTE, P. 55.// SHALL NOT APPLY WITH RESPECT TO ANY EMPLOYEE EMPLOYED BY AN ESTABLISHMENT (1) WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, ANOTHER ESTABLISHMENT THE ACTIVITIES OF WHICH ARE NOT RELATED FOR A COMMON BUSINESS PURPOSE TO, BUT MATERIALLY SUPPORT THE ACTIVITIES OF THE ESTABLISHMENT EMPLOYING SUCH EMPLOYEE; AND (2) WHOSE ANNUAL GROSS VOLUME OF SALES MADE OR BUSINESS DONE, WHEN COMBINED WITH THE ANNUAL GROSS VOLUME OF SALES MADE OR BUSINESS DONE BY EACH ESTABLISHMENT WHICH CONTROLS, IS CONTROLLED BY, OR IS UNDER COMMON CONTROL WITH, THE ESTABLISHMENT EMPLOYING SUCH EMPLOYEE, EXCEEDS $10,000,000 (EXCLUSIVE OF EXCISE TAXES AT THE RETAIL LEVEL WHICH ARE SEPARATELY STATED), EXCEPT THAT THE EXEMPTION FROM SECTION 6 PROVIDED BY PARAGRAPH (2) OF SUBSECTION (A) OF THIS SECTION SHALL APPLY WITH RESPECT TO ANY ESTABLISHMENT DESCRIBED IN THIS SUBSECTION WHICH HAS AN ANNUAL DOLLAR VOLUME OF SALES WHICH WOULD PERMIT IT TO QUALIFY FOR THE EXEMPTION PROVIDED IN PARAGRAPH (2) OF SUBSECTION (A) IF IT WERE IN AN ENTERPRISE DESCRIBED IN SECTION 3(S).".

### SEASONAL INDUSTRY EMPLOYEES

SEC. 19. (A) SECTION 7(C) AND 7(D) ARE EACH AMENDED— //80 STAT. 835, 29 USC 207.//

(1) BY STRIKING OUT "TEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "SEVEN WORKWEEKS", AND
(2) BY STRIKING OUT "FOURTEEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "TEN WORKWEEKS".
 (B) SECTION 7(C) IS AMENDED BY STRIKING OUT "FIFTY HOURS" AND INSERTING IN LIEU THEREOF "FORTY-EIGHT HOURS".
 (C) EFFECTIVE JANUARY 1, 1975, SECTIONS 7(C) AND 7(D) ARE EACH AMENDED—,
(1) BY STRIKING OUT "SEVEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "FIVE WORKWEEKS", AND
(2) BY STRIKING OUT "TEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "SEVEN WORKWEEKS".
 (D) EFFECTIVE JANUARY 1, 1976, SECTIONS 7(C) AND 7(D) ARE EACH AMENDED—,
(1) BY STRIKING OUT "FIVE WORKWEEKS" AND INSERTING IN LIEU THEREOF "THREE WORKWEEKS", AND
(2) BY STRIKING OUT "SEVEN WORKWEEKS" AND INSERTING IN LIEU THEREOF "FIVE WORKWEEKS".
 (E) EFFECTIVE DECEMBER 31, 1976, SECTIONS 7(C) AND 7(D) ARE REPEALED.

### COTTON GINNING AND SUGAR PROCESSING EMPLOYEES

SEC. 20. (A) SECTION 13(B)(15) IS AMENDED TO READ AS FOLLOWS: //80 STAT. 835.//

"(15) ANY EMPLOYEE ENGAGED IN THE PROCESSING OF MAPLE SAP INTL SUGAR (OTHER THAN REFINED SUGAR) OR SYRUP; OR".
 (B)(1) SECTION 13(B) //ANTE. P. 65.// IS AMENDED BY ADDING AFTER PARAGRAPH (24) THE FOLLOWING NEW PARAGRAPH:

"(25) ANY EMPLOYEE WHO IS ENGAGED IN GINNING OF COTTON FOR MARKET IN ANY PLACE OF EMPLOYMENT LOCATED IN A COUNTY WHERE COTTON IS GROWN IN COMMERCIAL QUANTITIES AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF—

  "(A) SEVENTY–TWO HOURS IN ANY WORKWEEK FOR NOT MORE THAN SIX WORKWEEKS IN A YEAR,

  "(B) SIXTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN FOUR WORKWEEKS IN THAT YEAR,

  =(C) FIFTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

  "(D) FORTY–EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR, AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

(2) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(25) IS AMENDED— //ANTE, P. 66.//

  (A) BY STRIKING OUT "SEVENTY-TWO" AND INSERTING IN LIEU THEREOF "SIXTY–SIX";

  (B) BY STRIKING OUT "SIXTY-FOUR" AND INSERTING IN LIEU THEROF "SIXTY".

  (C) BY STRIKING OUT "FIFTY-FOUR" AND INSERTING IN LIEU THEREOF "FIFTY";

  (D) BY STRIKING OUT "AND" AT THE END OF SUBPARAGRAPH (C);

AND

  (E) BY STRIKING OUT "FORTY-EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR," AND INSERTING IN LIEU THEREOF THE FOLLOWING: "FORTY–SIX HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

  (E) FORTY–FOUR HOURS IN ANY OTHER WORKWEEK IN THAT YEAR",

  (3) EFFECTIVE JANUARY 1, 1976, SECTION 13(B)(25) IS AMENDED—

  (A) BY STRIKING OUT "SIXTY-SIX" IN SUBPARAGRAPH (A) AND INSERTING IN LIEU THEREOF "SIXTY";

  (B) BY STRIKING OUT "SIXTY" IN SUBPARAGRAPH (B) AND INSERTING IN LIEU THEREOF "FIFTY-SIX";

  (C) BY STRIKING OUT "FIFTY" AND INSERTING IN LIEU THEREOF "FORTY–EIGHT";

  (D) BY STRIKING OUT "FORTY-SIX" AND INSERTING IN LIEU THEREOF "FORTY–FOUR"; AND

  (E) BY STRIKING OUT "FORTY-FOUR" IN SUBPARAGRAPH (E) AND INSERTING IN LIEU THEREOF "FORTY".

  (C)(1) SECTION 13(B) //ANTE. P. 66.// IS AMENDED BY ADDING AFTER PARAGRAPH (25) THE FOLLOWING NEW PARAGRAPH:

"(26) ANY EMPLOYEE WHO IS ENGAGED IN THE PROCESSING OF SUGAR BEETS, SUGAR BEET MOLASSES, OR SUGARCANE INTO SUGAR (OTHER THAN REFINED SUGAR) OR SYRUP AND WHO RECEIVES COMPENSATION FOR EMPLOYMENT IN EXCESS OF—

  "(A) SEVENTY–TWO HOURS IN ANY WORKWEEK FOR NOT MORE THAN SIX WORKWEEKS IN A YEAR,

  "(B) SIXTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN FOUR WORKWEEKS IN THAT YEAR.

  "(C) FIFTY–FOUR HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

  (D) FORTY–EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR. AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED; OR".

  (2) EFFECTIVE JANUARY 1, 1975, SECTION 13(B)(26) IS AMENDED—

  (A) BY STRIKING OUT "SEVENTY-TWO" AND INSERTING IN LIEU THEREOF "SIXTY–SIX";

  (B) BY STRIKING OUT "SIXTY-FOUR" AND INSERTING IN LIEU THEREOF "SIXTY";

  (C) BY STRIKING OUT "FIFTY-FOUR" AND INSERTING IN LIEU THEREOF "FIFTY";

  (D) BY STRIKING OUT "AND" AT THE END OF SUBPARAGRAPH (C);

AND

  (E) BY STRIKING OUT "FORTY-EIGHT HOURS IN ANY OTHER WORKWEEK IN THAT YEAR," AND INSERTING IN LIEU THEREOF THE FOLLOWING: "FORTY–SIX HOURS IN ANY WORKWEEK FOR NOT MORE THAN TWO WORKWEEKS IN THAT YEAR, AND

  "(E) FORTY–FOUR HOURS IN ANY OTHER WORKWEEK IN THAT YEAR",

  (3) EFFECTIVE JANUARY 1, 1976, SECTION 13(B)(26) IS AMENDED— //ANTE, P. 67.//

  (A) BY STRIKING OUT "SISTY-SIX" IN SUBPARAGRAPH (A) AND INSERTING IN LIEU THEREOF "SIXTY";

(B) BY STRIKING OUT "SIXTY" IN SUBPARAGRAPH (B) AND INSERTING IN LIEU THEREOF "FIFTY-SIX";

(C) BY STRIKING OUT "FIFTY" AND INSERTING IN LIEU THEREOF "FORTY–EIGHT";

(D) BY STRIKING OUT "FORTY-SIX" AND INSERTING IN LIEU THEREOF "FORTY–FOUR"; AND

(E) BY STRIKING OUT "FORTY-FOUR" IN SUBPARAGRAPH (E) AND INSERTING IN LIEU THEREOF "FORTY".

### LOCAL TRANSIT EMPLOYEES

SEC. 21. (A) SECTION 7 //ANTE, P. 62.// IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 9(A) OF THIS ACT THE FOLLOWING NEW SUBSECTION:

"(N) IN THE CASE OF AN EMPLOYEE OF AN EMPLOYER ENGAGED IN THE BUSINESS OF OPERATING A STREET, SUBURBAN OR INTERURBAN ELECTRIC RAILWAY, OR LOCAL TROLLEY OR MOTORBUS CARRIER (REGARDLESS OF WHETHER OR NOT SUCH RAILWAY OR CARRIER IS PUBLIC OR PRIVATE OR OPERATED FOR PROFIT OR NOT FOR PROFIT), IN DETERMINING THE HOURS OF EMPLOYMENT OF SUCH AN EMPLOYEE TO WHICH THE RATE PRESCRIBED BY SUBSECTION (A) APPLIES THERE SHALL BE EXCLUDED THE HOURS SUCH EMPLOYEE WAS EMPLOYED IN CHARTER ACTICITIES BY SUCH EMPLOYER IF (1) THE EMPLOYEE'S EMPLOYMENT IN SUCH ACTIVITIES WAS PURSUANT TO AN AGREEMENT OR UNDERSTANDING WITH HIS EMPLOYER ARRIVED AT BEFORE ENGAGING IN SUCH EMPLOYMENT, AND (2) IF EMPLOYMENT IN SUCH ACTIVITIES IS NOT PART OF SUCH EMPLOYEE'S REGULAR EMPLOYMENT."

(B)(1) SECTION 13(B)(7) //80 STAT. 836, 29 USC 213.// (RELATING TO EMPLOYEES OF STREET, SUBURBAN OR INTERURBAN ELECTRIC RAILWAYS, OR LOCAL TROLLEY OR MOTORBUS CARRIERS) IS AMENDED BY STRIKING OUT ",IF THE RATES AND SERVICES OF SUCH RAILWAY OR CARRIER ARE SUBJECT TO REGULATION BY A STATE OR LOCAL AGENCY" AND INSERTING IN LIEU THEREOF THE FOLLOWING: "(REGARDLESS OF WHETHER OR NOT SUCH RAILWAY OR CARRIER IS PUBLIC OR PRIVATE OR OPERATED FOR PROFIT OR NOT FOR PROFIT), IF SUCH EMPLOYEE RECEIVED COMPENSATION FOR EMPLOYMENT IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED".

(2) EFFECTIVE ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974, SUCH SECTION IS AMENDED BY STRIKING OUT "FORTY–EIGHT HOURS" AND INSERTING IN LIEU THEREOF "FORTY-FOUR HOURS".

(3) EFFECTIV TWO YEARS AFTER SUCH DATE, SUCH SECTION IS REPEALED.

### COTTON AND SUGAR SERVICES EMPLOYEES

SEC. 22. SECTION 13 //ANTE, P. 66.// IS AMENDED BY ADDING AFTER THE SUBSECTION ADDED BY SECTION 18 THE FOLLOWING:

"(H) THE PROVISIONS OF SECTION 7 SHALL NOT APPLY FOR A PERIOD OR PERIODS OF NOT MORE THAN FOURTEEN WORKWEEKS IN THE AGGREGATE IN ANY CALENDAR YEAR TO ANY EMPLOYEE WHO—

"(1) IS EMPLOYED BY SUCH EMPLOYER—,

"(A) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE GINNING OF COTTON IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE GINNING OF COTTON;

"(B) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE RECEIVING, HANDLING, AND STORING OF RAW COTTON AND THE COMPRESSING OF RAW COTTON WHEN PERFORMED AT A COTTON WAREHOUSE OR COMPRESS–WAREHOUSE FACILITY, OTHER THAN ONE OPERATED IN CONJUNCTION WITH A COTTON MILL, PRIMARILY ENGAGED IN STORING AND COMPRESSING;

"(C) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE RECEIVING, HANDLING, STORING, AND PROCESSING OF COTTONSEED IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE RECEIVING, HANDLING, STORING, AND PROCESSING OF COTTONSEED; OR

"(D) EXCLUSIVELY TO PROVIDE SERVICES NECESSARY AND INCIDENTAL TO THE PROCESSING OF SUGAR CANE OR SUGAR BEETS IN AN ESTABLISHMENT PRIMARILY ENGAGED IN THE PROCESSING OF SUGAR CANE OR SUGAR BEETS; AND

"(2) RCEIVES FOR—,

"(A) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF TEN HOURS IN ANY WORKDAY, AND

"(B) SUCH EMPLOYMENT BY SUCH EMPLOYER WHICH IS IN EXCESS OF FORTY–EIGHT HOURS IN ANY WORKWEEK, COMPENSATION AT A RATE NOT LESS THAN ONE AND ONE–HALF TIMES THE REGULAR RATE AT WHICH HE IS EMPLOYED.

ANY EMPLOYER WHO RECEIVES AN EXEMPTION UNDER THIS SUBSECTION SHALL NOT BE ELIGIBLE FOR ANY OTHER EXEMPTION UNDER THIS SECTION OR SECTION 7.". //ANTE, P. 68.//

## OTHER EXEMPTIONS

SEC. 23. (A)(9) (RELATING TO MOTION PICTURE THEATER EMPLOYEES) IS REPEALED. // 80 STAT. 836, 29 USC 213.//

(2) SECTION 13(B) IS AMENDED BY ADDING PARAGRAPH (26) THE FOLLOWING NEW PARAGRAPH: //ANTE, P. 67.//

"(27) ANY EMPLOYEE EMPLOYED BY AN ESTABLISHMENT WHICH IS A MOTION PICTURE THEATER; OR".

(B)(1) SECTION 13(A)(13) (RELATING TO SMALL LOGGING CREWS) IS REPEALED. //75 STAT. 71; 80 STAT. 838.//

(2) SECTION 13(B) IS AMENDED BY ADDING AFTER PARAGRAPH (27) THE FOLLOWING NEW PARAGRAPH:

"(28) ANY EMPLOYEE EMPLOYED IN PLANTING OR TENDING TREES, CRUISING, SURVEYING, OR FELLING TIMBER, OR IN PREPARING OR TRANSPORTING LOGS OR OTHER FORESTRY PRODUCTS TO THE MILL, PROCESSING PLANT, RAILROAD, OR OTHER TRANSPORTATION TERMINAL, IF THE NUMBER OF EMPLOYEES EMPLOYED BY HIS EMPLOYER IN SUCH FORESTRY OR LUMBERING OPERATIONS DOES NOT EXCEED EIGHT.".

(C) SECTION 13(B)(2) (INSOFAR AS IT RELATES TO PIPELINE EMPLOYEES) IS AMENDED BY INSERTING AFTER "EMPLOYER" THE FOLLOWING: "ENGAGED IN THE OPERATION OF A COMMON CARRIER BY RAIL AND".

## EMPLOYMENT OF STUDENTS

SEC. 24. (A) SECTION 14 //80 STAT. 842, 29 USC 214.// IS AMENDED BY STRIKING OUT SUBSECTIONS (A), (B), AND (C) AND INSERTING IN LIEU THEREOF THE FOLLOWING:

"SEC. 14. (A) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY REGULATIONS OR BY ORDERS PROVIDE FOR THE EMPLOYMENT OF LEARNERS, OF APPRENTICES, AND OF MESSENGERSH EMPLOYED PRIMARILY IN DELIVERING LETTERS AND MESSAGES, UNDER SPECIAL CERTIFICATES ISSUED PURSUANT TO REGULATIONS OF THE SECRETARY, AT SUCH WAGES LOWER THAN THE MINIMUM WAGE APPLICABLE UNDER SECTION 6 //ANTE, P. 55.// AND SUBJECT TO SUCH LIMITATIONS AS TO TIME, NUMBER PROPORTION, AND LENGTH OF SERVICE AS THE SECRETARY SHALL PRESCRIBE.

"(B)(1)(A) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE, IN ACCORDANCE WITH SUBPARAGRAPH (B), FOR THE EMPLOYMENT, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION 6 OR NOT LESS THAN $1.60 AN HOUR, WHICHEVER IS THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), ANTE, P. 56.// AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION

6(C)), //80 STAT. 839, 29 USC 206.// OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) IN RETAIL OR SERVICE ESTABLISHMENTS.

"(B) EXCEPT AS PROVIDED IN PARAGRAPH (4)(B), DURING ANY MONTH IN WHICH FULL–TIME STUDENTS ARE TO BE EMPLOYED IN ANY RETAIL OR SERVICE ESTABLISHMENT UNDER CERTIFICATES ISSUED UNDER THIS SUBSECTION THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT MAY NOT EXCEED—

"(I) IN THE CASE OF A RETAIL OR SERVICE ESTABLISHMENT WHOSE EMPLOYEES (OTHER THAN EMPLOYEES ENGAGED IN COMMERCE OR IN THE PRODUCTION OF GOODS FOR COMMERCE) WERE COVERED BY THIS ACT BEFORE THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974—,

"(I) THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD,

"(II) THE MAXIMUM PROPORTION FOR ANY CORRESPONDING MONTH OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT APPLICABLE TO THE ISSUANCE OF CERTIFICATES UNDER THIS SECTION AT ANY TIME BEFORE THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974 FOR THE EMPLOYMENT OF STUDENTS BY SUCH EMPLOYER, OR

"(III) A PROPORTION EQUAL TO ONE–TENTH OF THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT, WHICHEVER IS GREATER;

"(II) IN THE CASE OF RETAIL OR SERVICE ESTABLISHMENT WHOSE EMPLOYEES (OTHER THAN EMPLOYEES ENGAGED IN COMMERCE OR IN THE PRODUCTION OF GOODS FOR COMMERCE) ARE COVERED FOR THE FIRST TIME ON OR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974—,

"(I) THE PROPORTION OF HOURS OF EMPLOYMENT OF STUDENTS IN SUCH ESTABLISHMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE TWELVE–MONTH PERIOD IMMEDIATELY PRIOR TO THE EFFECTIVE DATE OF SUCH AMENDMENTS,

"(II) THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT FOR THE CORRESPONDING MONTH OF THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD, OR

"(III) A PROPORTION EQUAL TO ONE–TENTH OF THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES IN SUCH ESTABLISHMENT, WHICHEVER IS GREATER; OR

(III) IN THE CASE OF A RETAIL OR SERVICE ESTABLISHMENT FOR WHICH RECORDS OF STUDENT HOURS WORKED ARE NOT AVAILABLE, THE PROPORTION OF STUDENT HOURS OF EMPLOYMENT TO THE TOTAL HOURS OF EMPLOYMENT OF ALL EMPLOYEES BASED ON THE PRACTICE DURING THE IMMEDIATELY PRECEDING TWELVE–MONTH PERIOD IN (I) SIMILAR ESTABLISHMENTS OF THE SAME EMPLOYER IN THE SAME GENERAL METROPOLITAN AREA IN WHICH SUCH ESTABLISHMENT IS LOCATED, (II) SIMILAR ESTABLISHMENTS OF THE SAME OR NEARBY COMMUNITIES IF SUCH ESTABLISHMENT IS NOT IN A METROPOLITAN AREA, OR (III) OTHER ESTABLISHMENTS OF THE SAME GENERAL CHARACTER OPERATING IN THE COMMUNITY OR THE NEAREST COMPARABLE COMMUNITY.

FOR PURPOSE OF CLAUSES (I), AND (III) OF THIS SUBPARAGRAPH, THE TERM 'STUDENT HOURS OF EMPLOYMENT' MEANS HOURS DURING WHICH STUDENTS ARE EMPLOYED IN A RETAIL OR SERVICE ESTABLISHMENT UNDER CERTIFICATES ISSUED UNDER THIS SUBSECTION.

"(2) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE FOR THE EMPLOYMENT, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(A)(5) //ANTE, P. 56.// OR NOT LESS THAN $1.30 AN HOUR WHICHEVER IS

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  15

THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(C)), //80 STAT. 839, 29 USC 206.// OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) IN ANY OCCUPATION IN AGRICULTURE.

 "(3) THE SECRETARY, TO THE EXTENT NECESSARY IN ORDER TO PREVENT CURTAILMENT OF OPPORTUNITIES FOR EMPLOYMENT, SHALL BY SPECIAL CERTIFICATE ISSUED UNDER A REGULATION OR ORDER PROVIDE FOR THE EMPLOYMENT BY AN INSTITUTION OF HIGHER EDUCATION, AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE OTHERWISE APPLICABLE WAGE RATE IN EFFECT UNDER SECTION 6 OR NOT LESS THAN $1.60 AN HOUR, WHICHEVER IS THE HIGHER (OR IN THE CASE OF EMPLOYMENT IN PUERTO RICO OR THE VIRGIN ISLANDS NOT DESCRIBED IN SECTION 5(E), AT A WAGE RATE NOT LESS THAN 85 PER CENTUM OF THE WAGE RATE IN EFFECT UNDER SECTION 6(C)), OF FULL–TIME STUDENTS (REGARDLESS OF AGE BUT IN COMPLIANCE WITH APPLICABLE CHILD LABOR LAWS) WHO ARE ENROLLED IN SUCH INSTITUTION. THE SECRETARY SHALL BY REGULATION PRESCRIBE STANDARDS AND REQUIREMENTS TO INSURE THAT THIS PARAGRAPH WILL NOT CREATE A SUBSTANTIAL PROBABILITY OF REDUCING THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE TO WHOM THE MINIMUM WAGE RATE AUTHORIZED BY THIS PARAGRAPH IS APPLICABLE.

 "(4)(A) A SPECIAL CERTIFICATE ISSUED UNDER PARAGRAPH (1), (2), OR (3) SHALL PROVIDE THAT THE STUDENT OR STUDENTS FOR WHOM IT IS ISSUED SHALL, EXCEPT DURING VACATION PERIODS, BE EMPLOYED ON A PART–TIME BASIS AND NOT IN EXCESS OF TWENTY HOURS IN ANY WORKWEEK.

 "(B) IF THE ISSUANCE OF A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR AN EMPLOYER WILL CAUSE THE NUMBER OF STUDENTS EMPLOYED BY SUCH EMPLOYER UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION TO EXCEED FOUR, THE SECRETARY MAY NOT ISSUE SUCH A SPECIAL CERTIFICATE FOR THE EMPLOYMENT OF A STUDENT BY SUCH EMPLOYER UNLESS THE SECRETARY FINDS EMPLOYMENT OF SUCH STUDENT WILL NOT CREATE A SUBSTANTIAL PROBABILITY OF REDUCING THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE EMPLOYED UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION. IF THE ISSUANCE OF A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR AN EMPLOYER WILL NOT CAUSE THE NUMBER OF STUDENTS EMPLOYED BY SUCH EMPLOYER UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION TO EXCEED FOUR—

 "(I) THE SECRETARY MAY ISSUE A SPECIAL CERTIFICATE UNDER PARAGRAPH (1) OR (2) FOR THE EMPLOYMENT OF A STUDENT BY SUCH EMPLOYER IF SUCH EMPLOYER CERTIFIES TO THE SECRETARY THAT THE EMPLOYMENT OF SUCH STUDENT WILL NOT REDUCE THE FULL–TIME EMPLOYMENT OPPORTUNITIES OF PERSONS OTHER THAN THOSE EMPLOYED UNDER SPECIAL CERTIFICATES ISSUED UNDER THIS SUBSECTION, AND

 "(II) IN THE CASE OF AN EMPLOYER WHICH IS A RETAIL OR SERVICE ESTABLISHMENT, SUBPARAGRAPH (B) OF PARAGRAPH (1) SHALL NOT APPLY WITH RESPECT TO THE ISSUANCE OF SPECIAL CERTIFICATES FOR SUCH EMPLOYER UNDER SUCH PARAGRAPH.

THE REQUIREMENT OF THIS SUBPARAGRAPH SHALL NOT APPLY IN THE CASE OF THE ISSUANCE OF SPECIAL CERTIFICATES UNDER PARAGRAPH (3) FOR THE EMPLOYMENT OF FULL–TIME STUDENTS BY INSTITUTIONS OF HIGHER EDUCAQTION; EXCEPT THAT IF THE SECRETARY DETERMINES THAT AN INSTITUTION OF HIGHER EDUCATION IS EMPLOYING STUDENTS UNDER CERTIFICATES ISSUED UNDER PARAGRAPH (3) BUT IN VIOLATION OF THE REQUIRMENTS OF THAT PARAGRAPH OR OF REGULATIONS ISSUED THEREUNDER, THE REQUIREMENTS OF THIS SUBPARAGRAPH SHALL APPLY WITH RESPECT TO THE ISSUANCE OF SPECIAL CERTIFICATES UNDER PARAGRAPH (3) FOR THE EMPLOYMENT OF STUDENTS BY SUCH INSTITUTION.

 "(C) NO SPECIAL CERTIFICATE MAY BE ISSUED UNDER THIS SUBSECTION UNLESS THE EMPLOYER FOR WHOM THE CERTIFICATE IS TO BE ISSUED PROVIDES EVIDENCE SATISFACTORY TO THE SECRETARY OF THE STUDENT STATUS OF THE EMPLOYEES TO BE EMPLOYED UNDER SUCH SPECIAL CERTIFICATE."

 (B) SECTION 14 //ANTE, P. 69.// SHALL NOT APPLY WITH RESPECT TO THE EMPLOYMENT BY ANY ELEMENTARY OR SECONDARY SCHOOL OF ITS STUDENTS IF SUCH EMPLOYMENT CONSTITUTES, AS DETERMINED UNDER REGULATIONS PRESCRIBED BY THE SECRETARY, AN INTEGRAL PART OF

THE REGULAR EDUCATION PROGRAM PROVIDED BY SUCH SCHOOL AND SUCH EMPLOYMENT IS IN ACCORDANCE WITH APPLICABLE CHILD LABOR LAWS."

(C) SECTION 4(D) //52 STAT. 1062; 69 STAT. 711, 29 USC 204.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SENTENCES: "SUCH REPORT SHALL ALSO INCLUDE A SUMMARY OF THE SPECIAL CERTIFICATES ISSUED UNDER SECTION 14(B)." // ANTE, P. 69.//

CHILD LABOR

SEC. 25. (A) SECTION 12 //52 STAT. 1067; 63 STAT. 917, 29 USC 212.// (RELATING TO CHILD LABOR) IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(D) IN ORDER TO CARRY OUT THE OBJECTIVES OF THIS SECTION, THE SECRETARY MAY BY REGULATION REQUIRE EMPLOYERS TO OBTAIN FROM ANY EMPLOYEE PROOF OF AGE."

(B) SECTION 13(C)(1) //80 STAT. 834, 29 USC 213.// (RELATING TO CHILD LABOR IN AGRICULTURE) IS AMENDED TO READ AS FOLLOWS:

"(C)(1) EXCEPT AS PROVIDED IN PARAGRAPH (2), THE PROVISIONS OF SECTION 12 RELATING TO CHILD LABOR SHALL NOT APPLY TO ANY EMPLOYEE EMPLOYED IN AGRICULTURE OUTSIDE OF SCHOOL HOURS FOR THE SCHOOL DISTRICT WHERE SUCH EMPLOYEE IS LIVING WHILE HE IS SO EMPLOYED, IF SUCH EMPLOYEE—,

"(A) IS LESS THAN TWELVE YEARS OF AGE AND (I) IS EMPLOYED BY HIS PARENT, OR BY A PERSON STANDING IN THE PLACE OF HIS PARENT, ON A FARM OWNED OR OPERATED BY SUCH PARENT OR PERSON, OR (II) IS EMPLOYED, WITH THE CONSENT OF HIS PARENT OR PERSON STANDING IN THE PLACE OF HIS PARENT, ON A FARM, NONE OF THE EMPLOYEES OF WHICH ARE (BECAUSE OF SECTION 13(A) (6)(A)) //80 STAT. 833.// REQUIRED TO BE PAID AT THE WAGE RATE PRESCRIBED BY SECTION 6(A)( 5), //ANTE, P. 56.//

"(B) IS TWELVE YEARS OR THIRTEEN YEARS OF AGE AND (I) SUCH EMPLOYMENT IS WITH THE CONSENT OF HIS PARENT OR PERSON STANDING IN THE PLACE OF HIS PARENT, OR (II) HIS PARENT OR SUCH PERSON IS EMPLOYED ON THE SAME FARM AS SUCH EMPLOYEE, OR

"(C) IS FOURTEEN YEARS OF AGE OR OLDER.".

(C) SECTION 16 //52 STAT. 1069; 71 STAT. 514, 29 USC 216.// IS AMENDED BY ADDING AT THE END THEREOF THE FOLLOWING NEW SUBSECTION:

"(E) ANY PERSON WHO VIOLATES THE PROVISIONS OF SECTION 12, RELATING TO CHILD LABOR, OR ANY REGULATION ISSUED UNDER THAT SECTION, SHALL BE SUBJECT TO A CIVIL PENALTY OF NOT TO EXCEED $1,000 FOR EACH SUCH VIOLATION. IN DETERMINING THE AMOUNT OF SUCH PENALTY, THE APPROPRIATENESS OF SUCH PENALTY TO THE SIZE OF THE BUSINESS OF THE PERSON CHARGED AND THE GRAVITY OF THE VIOLATION SHALL BE CONSIDERED. THE AMOUNT OF SUCH PENALTY, WHEN FINALLY DETERMINED, MAY BE—

"(1) DEDUCTED FROM ANY SUMS OWNG BY THE UNITED STATES TO THE PERSON CHARGED;

"(2) RECOVERED IN A CIVIL ACTION BROUGHT BY THE SECRETARY IN ANY COURT OF COMPETENT JURISDICTION, IN WHICH LITIGATION THE SECRETARY SHALL BE REPRESENTED BY THE SOLICITOR OF LABOR; OR

"(3) ORDERED BY THE COURT, IN AN ACTION BROUGHT FOR A VIOLATION OF SECTION 15(A) (4), //52 STAT. 1068, 29 USC 215.// TO BE PAID TO THE SECRETARY.

ANY ADMINISTRATIVE DETERMINATION BY THE SECRETARY OF THE AMOUNT OF SUCH PENALTY SHALL BE FINAL, UNLESS WITHIN FIFTEEN DAYS AFTER RECEIPT OF NOTICE THEREOF BY CERTIFIED MAIL THE PERSON CHARGED WITH THE VIOLATION TAKES EXCEPTION TO THE DETERMINATION THAT THE VIOLATIONS FOR WHICH THE PENALTY IS IMPOSED OCCURRED, IN WHICH EVENT FINAL DETERMINATION OF THE PENALTY SHALL BE MADE IN AN ADMINISTRATIVE PROCEEDING AFTER OPPORTUNITY FOR HEARING IN ACCORDANCE WITH SECTION 554 OF TITLE 5, UNITED STATES CODE, //80 STAT. 384.// AND REGULATIONS TO BE PROMULGATED BY THE SECRETARY, SUMS COLLECTED AS PENALTIES PURSUANT

TO THIS SECTION SHALL BE APPLIED TOWARD REIMBURSEMENT OF THE COSTS OF DETERMINING THE VIOLATIONS AND ASSESSING AND COLLECTING SUCH PENALTIES, IN ACCORDANCE WITH THE PROVISIONS OF SECTION 2 OF AN ACT ENTITLED 'AN ACT TO AUTHORIZE THE DEPARTMENT OF LABOR TO MAKE SPECIAL STATISTICAL STUDIES UPON PAYMENT OF THE COST THEREOF, AND FOR OTHER PURPOSES' (29 U.S.C. 9A)." //48 STAT. 582; 53 STAT. 581.//

## SUITS BY SECRETARY FOR BACK WAGES

SEC. 26. THE FIRST THREE SENTENCES OF SECTION 16(C) //63 STAT. 919; 80 STAT. 844, 29 USC 216./ ARE AMENDED TO READ AS FOLLOWS: "THE SECRETARY IS AUTHORIZED TO SUPERVISE THE PAYMENT OF THE UNPAID MINIMUM WAGES OR THE UNPAID OVERTIME COMPENSATION OWING TO ANY EMPLOYEE OR EMPLOYEES UNDER SECTION 6 OR 7 OF THIS ACT, //ANTE, PP. 55, 68.// AND THE AGREEMENT OF ANY EMPLOYEE TO ACCEPT SUCH PAYMENT SHALL UPON PAYMENT IN FULL CONSTITUTE A WAIVER BY SUCH EMPLOYEE OF ANY RIGHT HE MAY HAVE UNDER SUBSECTION (B) OF THIS SECTION TO SUCH UNPAID MINIMUM WAGES OR UNPAID OVERTIME COMPENSATION AND AN ADDITIONAL EQUAL AMOUNT AS LIQUIDATED DAMAGES. THE SECRETARY MAY BRING AN ACTION IN ANY COURT OF COMPETENT JURISDICTION TO RECOVER THE AMOUNT OF THE UNPAID MINIMUM WAGES OR OVERTIME COMPENSATION AND AN EQUAL AMOUNT AS LIQUIDATED DAMAGES. THE RIGHT PROVIDED BY SUBSECTION (B) TO BRING AN ACTION BY OR ON BAHALF OF ANY EMPLOYEE AND OF ANY EMPLOYEE TO BECOME A PARTY PLAINTIFF TO ANY SUCH ACTION SHALL TERMINATE UPON THE FILING OF A COMPLAINT BY THE SECRETARY IN AN ACTION UNDER THIS SUBSECTION IN WHICH A RECOVERY IS SOUGHT OF UNPAID MINIMUM WAGES OR UNPAID OVERTIME COMPENSATION UNDER SECTIONS 6 AND 7 OR LIQUIDATED OR OTHER DAMAGES PROVIDED BY THIS SUBSECTION OWING TO SUCH EMPLOYEE BY AN EMPLOYER LIABLE UNDER THE PROVISIONS OF SUBSECTION (B), UNLESS SUCH ACTION IS DISMISSED WITHOUT PREJUDICE ON MOTION OF THE SECRETARY.

## ECONOMIC EFFECTS STUDIES

SEC. 27. SECTION 4(D) IS AMENDED BY— //ANTE, P. 72.//

 (1) INSERTING "(1)" IMMEDIATELY AFTER "(D)",
 (2) INSERTING IN THE SECOND SENTENCE AFTER "MINIMUM WAGES" THE FOLLOWING: "AND OVERTIME COVERAGE"; AND
 (3) BY ADDING AT THE END THEREOF THE FOLLOWING NEW

## PARAGRAPHS:

 "(2) THE SECRETARY SHALL CONDUCT STUDIES ON THE JUSTIFICATION OR LACK THEREOF FOR EACH OF THE SPECIAL EXEMPTIONS SET FORTH IN SECTION 13 OF THIS ACT, //ANTE, P. 72.// AND THE EXTENT TO WHICH SUCH EXEMPTIONS APPLY TO EMPLOYEES OF ESTABLISHMENTS DESCRIBED IN SUBSECTION (G) OF SUCH SECTION //ANTE, P. 66.// AND THE ECONOMIC EFFECTS OF THE APPLICATION OF SUCH EXEMPTIONS TO SUCH EMPLOYEES. THE SECRETARY SHALL SUBMIT A REPORT OF HIS FINDINGS AND RECOMMENDATIONS TO THE CONGRESS WITH RESPECT TO THE STUDIES CONDUCTED UNDER THIS PARAGRAPH NOT LATER THAN JANUARY 1, 1976.
 "(3) THE SECRETARY SHALL CONDUCT A CONTINUING STUDY ON MEANS TO PREVENT CURTAILMENT OF EMPLOYMENT OPPORTUNITIES FOR MANPOWER GROUPS WHICH HAVE HAD HISTORICALLY HIGH INCIDENCES OF UNEMPLOYMENT (SUCH AS DISADVANTAGED MINORITIES, YOUTH, ELDERLY, AND SUCH OTHER GROUPS AS THE SECRETARY MAY DESIGNATE). THE FIRST REPORT OF THE RESULTS OF SUCH STUDY SHALL BE TRANSMITTED TO THE CONGRESS NOT LATER THAN ONE YEAR AFTER THE EFFECTIVE DATE OF THE FAIR LABOR STANDARDS AMENDMENTS OF 1974. SUBSEQUENT REPORTS ON SUCH STUDY SHALL BE TRANSMITTED TO THE CONGRESS AT TWO–YEAR INTERVALS AFTER SUCH EFFECTIVE DATE. EACH SUCH

REPORT SHALL INCLUDE SUGGESTIONS RESPECTING THE SECRETARY'S AUTHORITY UNDER SECTION 14 OF THIS ACT." //ANTE, P. 69.//

AGE DISCRIMINATION

SEC. 28(A)(1) THE FIRST SENTENCE OF SECTION 11(B) OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (29 U.S.C. 630(B) //81 STAT. 605.// IS AMENDED BY STRIKING OUT "TWENTY-FIVE" AND INSERTING IN LIEU THEREOF "TWENTY".

(2) THE SECOND SENTENCE OF SECTION 11(B) OF SUCH ACT IS AMENDED TO READ AS FOLLOWS: "THE TERM ALSO MEANS (1) ANY AGENT OF SUCH A PERSON, AND (2) A STATE OR POLITICAL SUBDIVISION OF A STATE AND ANY AGENCY OR INSTRUMENTALITY OF A STATE OR A POLITICAL SUBDIVISION OF A STATE, AND INY INTERSTATE AGENCY, BUT SUCH TERM DOES NOT INCLUDE THE UNITED STATES, OR A CORPORATION WHOLLY OWNED BY THE GOVERNMENT OF THE UNITED STATES.".

(3) SECTION 11(C) OF SUCH ACT IS AMENDED BY STRIKING OUT", OR AN AGENCY OF A STATE OR POLITICAL SUBDIVISION OF A STATE, EXCEPT THAT SUCH TERM SHALL INCLUDE THE UNITED STATES EMPLOYMENT SERVICE AND THE SYSTEM OF STATE AND LOCAL EMPLOYMENT SERVICES RECEIVING FEDERAL ASSISTANCE".

(4) SECTION 11(F) OF SUCH ACT IS AMENDED TO READ AS FOLLOWS:

"(F) THE TERM 'EMPLOYEE' MEANS AN INDIVIDUAL EMPLOYED BY ANY EMPLOYER EXCEPT THAT THE TERM 'EMPLOYEE' SHALL NOT INCLUDE ANY PERSON ELECTED TO PUBLIC OFFICE IN ANY STATE OR POLITICAL SUVDIVISION OF ANY STATE BY THE QUALIFIED VOTERS THEREOF, OR ANY PERSON CHOSEN BY SUCH OFFICER TO BE ON SUCH OFFICER'S PERSONAL STAFF, OR AN APPOINTEE ON THE POLICYMAKING LEVEL OR AN IMMEDIATE ADVISER WITH RESPECT TO THE EXERCISE OF THE CONSTITUTIONAL OR LEGAL POWERS OF THE OFFICE. THE EXEMENTION SET FORTH IN THE PRECEDING SECTENCE SHALL NOT INCLUDE EMPLOYEES SUBJECT TO THE CIVIL SERVICE LAWS OF A STATE GOVERNMENT, GOVERNMENTAL AGENCY, OR POLITICAL SUBDIVISION.".

(5) SECTION 16 OF SUCH ACT //29 USC 634.// IS AMENDED BY STRIKING OUT "$3,000,000" AND INSERTING IN LIEU THEREOF "$5,000,000".

(B)(1) THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 IS AMENDED BY REDESIGNATING SECTIONS 15 AND 16, AND ALL REFERENCES THERETO, AS SECTIONS 19 AND 19, RESPECTIVELY.

(2) THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 //29 USC 633.// IS FURTHER AMENDED BY ADDING IMMEDIATELY AFTER SECTION 14 THE FOLLOWING NEW SECTION:

"NONDISCRIMINATION ON ACCOUNT OF AGE IN FEDERAL GOVERNMENT EMPLOYMENT.

SEC. 15.(A) ALL PERSONEL ACTIONS AFFECTING EMPLOYEES OR APPLICANTS FOR EMPLOYMENT (EXCEPT WITH REGARD TO ALIENS EMPLOYED OUTSIDE THE LIMITS OF THE UNITED STATES) IN MILITARY DEPARTMENTS AS DEFINED IN SECTION 102 OF TITLE 5, UNITED STATES CODE, //80 STAT. 378.// IN EXECUTIVE AGENCIES AS DEFINED IN SECTION 105 OF TITLE 5, UNITED STATES CODE (INCLUDING EMPLOYEES AND APPLICANTS FOR EMPLOYMENT WHO ARE PAID FROM NONAPPROPRIATED FUNDS), IN THE UNITED STATES POSTAL SERVICE AND THE POSTAL RATE COMMISSION, IN THOSE UNITS IN THE GOVERNMENT OF THE DISTRICT OF COLUMBIA HAVING POSITIONS IN THE COMPETITIVE SERVICE, AND IN THOSE UNITS OF THE LEGISLATIVE AND JUDICIAL BRANCHES OF THE FEDERAL GOVERNMENT HAVING POSITIONS IN THE COMPETITIVE SERVICE, AND IN THE LIBRARY OF CONGRESS SHALL BE MADE FREE FROM ANY DISCRIMINATION BASED ON AGE. //29 USC 633A.//

"(B) EXCEPT AS OTHERWISE PROVIDED IN THIS SUBSECTION, THE CIVIL SERVICE COMMISSION IS AUTHORIZED TO ENFORCE THE PROVISIONS OF SUBSECTION (A) THROUGH APPROPRIATE REMEDIES, INCLUDINT REINSTATEMENT OR HIRING OF EMPLOYEES WITH OR WITHOUT BACKPAY, AS WILL EFFECTUATE THE POLICIES OF THIS SECTION. THE CIVIL SERVICE COMMISSION SHALL ISSUE SUCH RULES,

REGULATIONS, ORDERS AND INSTRUCTIONS AS IT DEEMS NECESSARY AND APPROPRIATE TO CARRY OUT ITS RESPONSIBILITIES UNDER THIS SECTION. THE CIVIL SERVICE COMMISSION SHALL—

"(1) BE RESPONSIBLE FOR THE REVIEW AND EVALUATION OF THE OPERATION OF ALL AGENCY PROGRAMS DESIGNED TO CARRY OUT THE POLICY OF THIS SECTION, PERIODICALLY OBTAINING AND PUBLISHING (ON AT LEAST A SEMIANNUAL BASIS) PROGRESS REPORTS FROM EACH DEPARTMENT, AGENCY, OR UNIT REFERRED TO IN SUBSECTION (A);

"(2) CONSULT WITH AND SOLICIT THE RECOMMENDATIONS OF INTERESTED INDIVIDUALS, GROUPS, AND ORGANIZATIONS RELATING TO NONDISCRIMINATION IN EMPLOYMENT ON ACCOUNT OF AGE; AND

"(3) PROVIDE FOR THE ACCEPTANCE AND PROCESSING OF COMPLAINTS OF DISCRIMINATION IN FEDERAL EMPLOYMENT ON ACCOUNT OF AGE.

THE HEAD OF EACH SUCH DEPARTMENT, AGENCY, OR UNIT SHALL COMPLY WITH SUCH RULES, REGULATIONS, ORDERS, AND INSTRUCTIONS OF THE CIVIL SERVICE COMMISSION WHICH SHALL INCLUDE A PROVISION THAT AN EMPLOYEE OR APPLICANT FOR EMPLOYMENT SHALL BE NOTIFIED OF ANY FINAL ACTION TAKEN ON ANY COMPLAINT OF DISCRIMINATION FILED BY HIM THEREUNDER. REASONABLE EXEMPTIONS TO THE PROVISIONS OF THIS SECTION MAY BE ESTABLISHED BY THE COMMISSION BUT ONLY WHEN THE COMMISSION HAS ESTABLISHED A MAXIMUM AGE REQUIREMENT ON THE BASIS OF A DETERMINATION THAT AGE IS A BONA FIDE OCCUPATIONAL QUALIFICATION NECESSARY TO THE PERFORMANCE OF THE DUTIES OF THE POSITION. WITH RESPECT TO EMPLOYMENT IN THE LIBRARY OF CONGRESS, AUTHORITIES GRANTED IN THIS SUBSECTION TO THE CIVIL SERVICE COMMISSION SHALL BE EXERCISED BY THE LIBRARIAN OF CONGRESS.

"(C) ANY PERSON AGGRIEVED MAY BRING A CIVIL ACTION IN ANY FEDERAL DISTRICT COURT OF COMPETENT JURISDICTION FOR SUCH LEGAL OR EQUITABLE RELIEF AS WILL EFFECTUATE THE PURPOSES OF THIS ACT.

"(D) WHEN THE INDIVIDUAL HAS NOT FILED A COMPLAINT CONCERNING AGE DISCRIMINATION WITH THE COMMISSION, NO CIVIL ACTION MAY BE COMMENCED BY ANY INDIVIDUAL UNDER THIS SECTION UNTIL THE INDIVIDUAL HAS GIVEN THE COMMISSION NOT LESS THAN THIRTY DAYS' NOTICE OF AN INTENT TO FILE SUCH ACTION. SUCH NOTICE SHALL BE FILED WITHIN ONE HUNDRED AND EIGHTY DAYS AFTER THE ALLEGED UNLAWFUL PRACTICE OCCURRED. UPON RECEIVING A NOTICE OF INTENT TO SUE, THE COMMISSION SHALL PROMPTLY NOTIFY ALL PERSONS NAMED THEREIN AS PROSPECTIVE DEFENDANTS IN THE ACTION AND TAKE ANY APPROPRIATE ACTION TO ASSURE THE ELIMINATION OF ANY UNLAWFUL PRACTICE.

"(E) NOTHING CONTAINED IN THIS SECTION SHALL RELIEVE ANY GOVERNMENT AGENCY OR OFFICIAL OF THE RESPONSIBILITY TO ASSURE NONDISCRIMINATION ON ACCOUT OF AGE IN EMPLOYMENT AS REQUIRED UNDER ANY PROVISION OF FEDERAL LAW."

EFFECTIVE

SEC. 29(A) EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED, THE AMENDMENTS MADE BY THIS ACT SHALL TAKE EFFECT ON MAY 1, 1974.

(B) NOTWITHSTANDING SUBSECTION (A), ON AND AFTER THE DATE OF THE ENACTMENT OF THIS ACT THE SECRETARY OF LABOR IS AUTHORIZED TO PRESCRIBE NECESSARY RULES, REGULATIONS, AND ORDERS WITH REGARD TO THE AMENDMENTS MADE BY THIS ACT.

LEGISLATIVE HISTORY:

HOUSE REPORTS: N/. 93—913 ACCOMPANYING H.R. 12435 (COMM. ON EDUCATION AND LABOR) AND NO. 93—953 (COMM. OF CONFERENCE).

SENATE REPORT NO. 93—690 (COMM. ON LABOR AND PUBLIC WELFARE).

CONGRESSIONAL RECORD, VOL 120 (1974):

FEB. 28, MAR. 5, 7, CONSIDERED AND PASSED SENATE.

MAR. 20, CONSIDERED AND PASSED HOUSE, AMENDED, IN LIEU OF H.R. 12435.

MAR. 28, CONSIDERED AND PASSED HOUSE, AMENDED, IN LIEU OF H.R. 12435.

MAR. 28, SENATE AND HOUSE AGREED TO CONFERENCE REPORT.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, VOL. 10, NO. 15:

APR. 8, PRESIDENTIAL STATEMENT.

Approved April 8, 1974.

PL 93–259, 1974 S 2747

# **ADDENDUM  B**

# Minimum Wage and Maximum Hours Standards Under the Fair Labor Standards Act

**U. S. Department of Labor**
Employment Standards Administration
Economic Effects Study
Submitted to Congress 1973



January 19, 1973

THE HONORABLE THE PRESIDENT OF THE SENATE
THE HONORABLE THE SPEAKER OF THE HOUSE OF REPRESENTATIVES

Sirs:

I have the honor to present herewith the January 1973
report pertaining to fair labor standards in employments
in and affecting interstate commerce, as required by
Section 4(d) of the Fair Labor Standards Act of 1938,
as amended.

Respectfully,

Secretary of Labor

Report to the
Ninety-Third Congress
by the
Secretary of Labor

## Contents

| | Page |
|---|---|
| STATEMENT OF THE SECRETARY------------------------------------------------- | 1 |
| | |
| CONGRESSIONAL ACTIVITIES TO AMEND THE FAIR LABOR STANDARDS ACT----------- | 3 |
| Legislation Enacted---------------------------------------------------- | 3 |
| Legislation Considered------------------------------------------------- | 3 |
| | |
| EQUAL PAY UNDER THE FAIR LABOR STANDARDS ACT----------------------------- | 7 |
| Administration and Enforcement----------------------------------------- | 7 |
| Education Admendments of 1972 - Title IX------------------------------- | 8 |
| | |
| ADMINISTRATION AND ENFORCEMENT OF THE FAIR LABOR STANDARDS ACT----------- | 11 |
| Achieving Voluntary Compliance by Informational Program | |
| and Conciliation------------------------------------------------------- | 11 |
| Investigation Program - New Approach, Less Paperwork------------------- | 12 |
| Litigation------------------------------------------------------------- | 14 |
| | |
| SPECIAL STUDIES--------------------------------------------------------- | 15 |
| Wages and Hours of Work of Nonsupervisory Employees in | |
| Selected Nonagricultural Industries------------------------------------ | 15 |
| Survey of Private Household Workers - Summary of Preliminary | |
| Findings--------------------------------------------------------------- | 27 |
| | |
| RECENT STUDIES OF THE FAIR LABOR STANDARDS ACT-------------------------- | 55 |
| Impact on Agricultural Workers----------------------------------------- | 56 |
| Impact on Youth-------------------------------------------------------- | 57 |
| Impact of the Overtime Premium----------------------------------------- | 62 |
| Impact on the Domestic Service Industry-------------------------------- | 62 |
| General Issues--------------------------------------------------------- | 64 |
| | |
| FUTURE STUDIES---------------------------------------------------------- | 69 |
| Studies in Process----------------------------------------------------- | 69 |
| Studies Currently Being Considered for Fiscal Years 1973-1974--------- | 70 |
| | |
| COVERAGE UNDER THE FAIR LABOR STANDARDS ACT----------------------------- | 73 |
| Minimum Wage----------------------------------------------------------- | 73 |
| Overtime--------------------------------------------------------------- | 73 |
| Exemptions from Minimum Wage and Overtime------------------------------ | 74 |

# LIST OF TABLES

Table Page

1. Straight-time average hourly earnings of nonsuper-
visory employees in selected manufacturing industries,
United States, May 1971------------------------------------ 21

2. Straight-time average hourly earnings of nonsuper-
visory employees in retail trade, excluding eating
and drinking places, by coverage status under the
Fair Labor Standards Act, United States and regions,
May 1971----------------------------------------------- 22

3. Straight-time average hourly earnings of nonsuper-
visory employees in selected service industries by
coverage status under the Fair Labor Standards Act,
United States, May 1971------------------------------------ 23

4. Percent distribution of nonsupervisory employees in
selected nonfarm industries by number of hours worked
in survey week, and by overtime coverage status under
the Fair Labor Standards Act, United States, May 1971---- 24

5. Numerical and percent distribution of private household
workers by occupational group, region and area, May
1971--------------------------------------------------- 33

6. Numerical and percent distribution of private household
workers (except babysitters with no housekeeping duties)
by race, sex, household status and age, United States,
South and non-South, May 1971----------------------------- 34

7. Numerical and percent distribution of babysitters with
no housekeeping duties by race, sex, household status
and age, United States, South and non-South, May 1971---- 36

8. Average hourly earnings of private household workers by
occupational group, race, sex, household status and
age, United States, South and non-South, May 1971-------- 38

9. Percent of private household workers (except baby-
sitters with no housekeeping duties) paid less than
specified hourly rates by race, sex and age, United
States, South and non-South, May 1971-------------------- 40

# LIST OF TABLES

Table                                                                          Page

10.  Percent of female private household workers
     (except babysitters with no housekeeping duties)
     paid less than specified hourly rates by household
     status and race, United States, South and non-
     South, May 1971------------------------------------          43

11.  Percent of babysitters with no housekeeping duties
     paid less than specified hourly rates by race and
     age, United States, May 1971--------------------------          45

12.  Percent increase in the weekly wage bill required to
     raise the wages of private household workers paid
     less than specified minimum hourly wage rates to
     those rates, by occupational group, United States,
     South and non-South, May 1971------------------------          46

13.  Percent distribution of private household workers
     (except babysitters with no housekeeping duties) by
     weekly hours of work, by race, sex and age, United
     States, South and non-South, May 1971----------------          47

14.  Percent distribution of female private household workers
     (except babysitters with no housekeeping duties) by
     weekly hours of work by household status, United States,
     South and non-South, May 1971------------------------          50

15.  Percent distribution of babysitters with no house-
     keeping duties by weekly hours of work, by race and age,
     United States, May 1971------------------------------          53

16.  Estimated number of employed wage and salary workers
     in the civilian labor force classified by their status
     under the minimum wage provisions of the Fair Labor
     Standards Act, by industry division, United States,
     September 1972---------------------------------------          75

# LIST OF TABLES

Table | Page

17. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by Region and State, September 1972----------------------------------------- 77

18. Estimated number of nonsupervisory employees subject to the minimum wage provisions of the Fair Labor Standards Act, by sex and race, September 1972-------- 81

19. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by industry division, United States, September 1972-------------------------------- 82

20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972----------------------------------------------- 84

21. Estimated number of nonsupervisory employees exempt from the minimum wage provisions or overtime pro- visions of the Fair Labor Standards Act by industry division, September 1972------------------------------ 88

Report to the
Ninety-Third Congress
by the
Secretary of Labor

Section 4(d) of the Fair Labor Standards Act requires the Secretary of Labor to present a report on his activities for the preceding year and an appraisal and evaluation of the minimum wages established by the Act.

During 1972 there were no increases in the level of the minimum wage and only small increases in the coverage of minimum wage provisions; however, the equal pay provisions of the FLSA were extended to some 15 million executive, administrative, professional and outside sales employees on July 1, 1972. Vigorous enforcement of the equal pay, child labor, overtime and minimum wage provisions of the Act was continued in 1972.

As authorized by the Act several special studies were made in 1972 which will provide basic data and aid in the determination of the future of the Act. The studies surveyed wages and hours worked in selected low wage industries as well as for private household workers, including babysitters. In addition, for the first time a chapter has been added which summarizes the studies completed by independent researchers outside of Government during 1971 and 1972. Some of the data used in these studies were originally generated by surveys initiated under Section 4(d) provisions of the FLSA.

The studies taken as a whole point out the great complexity involved in analyzing the various possible effects of the Act. Departmental studies are continuing on the characteristics of low wage workers in the clothing, retail trade, private household as well as other industries.

In 1972 an estimated 47 million nonsupervisory employees, three quarters of the employed nonsupervisory labor force, were covered by the minimum wage provisions of the Fair Labor Standards Act. The remaining noncovered workers are mainly employed in the public sector, small retail and service firms, and private households.

CONGRESSIONAL ACTIVITIES TO AMEND THE FAIR LABOR STANDARDS ACT

## Legislation Enacted

In an action independent of legislative recommendations from the Administration and of the labor subcommittees having jurisdiction in the House and Senate, the 92nd Congress passed and the President approved two changes in the application of the Fair Labor Standards Act. Title IX of the omnibus Education Amendments of 1972 approved by the President on June 23, 1972, and effective on July 1, contained a number of provisions establishing expanded prohibitions against sex discrimination, primarily in education, but in other segments of the economy as well.

One of the changes extended the minimum wage, overtime pay, and equal pay standards of the Fair Labor Standards Act to an estimated 150,000 nonsupervisory employees of preschool centers, public and private, profit and nonprofit.

One other provision made a very substantial change in the coverage of the equal pay standards of the Act by making the exemption for executive, administrative and professional personnel, outside salesmen, and school teachers inapplicable to the equal pay requirements of the Act.

## Legislation Considered

The Administration in the Spring of 1971 proposed amendments to the Fair Labor Standards Act. The proposals made by the Secretary of Labor in congressional testimony included two 20-cent increases in the nonfarm worker minimum wage to $2.00 an hour by 1974 and two 15-cent increases in the farmworker minimum wage on the same schedule with proportionate increases in Puerto Rico and the Virgin Islands.

A major feature of the recommendation was an overhaul of the application of the Act to teenagers. Instead of the certification program authorizing the employment of full-time students in retail and service establishments at 85 percent of the applicable minimum wage, an across-the-board rate of the greater of $1.60 an hour or 80 percent of the minimum would have applied to all youths under 18, full-time students under 20, and all 18 and 19-year olds during the first six months of their first job.

### House Action

In the House of Representatives, the major alternative to the Administration bill was H.R. 7130 introduced by Chairman Dent of the General Subcommittee on Labor. On September 17, 1971, the General Subcommittee on Labor approved a modified version of H.R. 7130. The

3

full Committee on Education and Labor reported a bill on November 17, 1971, which was similar to the subcommittee bill in most respects. On May 9, 1972, the House Committee on Rules reported the resolution making it the order of business of the House to take up the reported version of H.R. 7130. In addition, the Committee on Rules made it in order to consider H.R. 14104 as introduced by Congressmen Erlenborn, Fuqua, and Quie as a substitute to the committee bill. The House of Representatives began consideration of H.R. 7130 as reported by the Committee on Education and Labor on May 10, 1972.

The Committee bill provided minimum wage increases to $2.00 an hour for workers covered prior to the 1966 amendments and covered Federal workers, on January 1, 1972; to $1.80 an hour on January 1, 1972, and to $2.00 an hour one year later for nonfarm workers covered as a result of the 1966 amendments and the provisions of H.R. 7130; and to $1.50 and $1.70 an hour for farmworkers with the same timing as for newly covered nonfarm workers. There would have been proportionate increases in Puerto Rico and the Virgin Islands and mainland rate protection for employees of hotels, motels, and restaurants, food service workers, Federal employees and employees of the Virgin Islands government and employees of conglomerates.

Some expansion of coverage, primarily domestics and noncovered public employees, would have occurred and several of the overtime exemptions would have been repealed or modified. Among the other provisions of the bill was a title intended to deal with the problem of competition from foreign imports.

As provided in the resolution making the minimum wage the order of business of the House of Representatives, Congressman Erlenborn on May 11, 1972, offered H.R. 14104 as an amendment in the nature of a substitute for H.R. 7130. Several amendments to the H.R. 14104 substitute were adopted including a stretch-out of the minimum wage levels, modification of wage order procedures in Puerto Rico and the Virgin Islands, and retention of the $1.60 an hour rate in the Canal Zone. The House then voted to substitute H.R. 14104 for the committee bill by a vote of 217 to 191 and passed the Fair Labor Standards Act amendments by a vote of 330 to 78 on May 11, 1972.

The bill passed by the House of Representatives established the following new minimum wage rates in the Fair Labor Standards Act: A minimum wage of $1.80 an hour on the effective date and $2.00 an hour a year later for workers covered prior to the 1966 amendments and for covered Federal workers; a rate of $1.70 an hour on the effective date, $1.80 an hour a year later, and $2.00 an hour two years later for nonfarm workers covered as a result of the 1966 amendments; and a minimum wage of $1.50 an hour on the effective date and $1.70 an hour a year later for covered farmworkers.

4

In Puerto Rico and the Virgin Islands the wage order rates increased to at least 60 percent of the mainland rates, with the further exception that the mainland rates applied to employees of hotels, motels, and restaurants, food service workers in retail stores, and to employees of the Federal and Virgin Island governments. The $1.60 minimum wage remained unchanged in the Canal Zone.

Similar to the Administration's proposal, the bill provided a special youth rate of $1.60 an hour ($1.30 in agriculture) or 80 percent of the applicable minimum wage whichever is greater for workers under 18 years of age and full-time students under 21.

The House-passed bill provided no new coverage, but added three exemptions affecting workers involved in delivering shopping news materials, certain house-parents in orphanages, and certain seasonal personnel in retail and service establishments.

### Senate Action

The major alternative to the Administration bill in the Senate was S. 1861 introduced by Senator Williams. On April 19, 1972, the Senate Subcommittee on Labor reported an amended version of S. 1861 to the full Committee on Labor and Public Welfare. The full committee reported a revised version of the subcommittee bill on June 8, 1972. The Senate began consideration of the committee bill on July 17, 1972. As reported to the floor, S. 1861 provided substantial increases in the minimum wage and expansion of coverage under the Act.

As was the case in the House of Representatives, an amendment in the nature of a substitute to the committee bill was offered on the floor of the Senate. Proposed by Senators Dominick and Taft, the substitute amendment provided the same basic farm and nonfarm minimum wage rates approved by the House of Representatives, automatic increases in the wage order rates in Puerto Rico and the Virgin Islands, no change in the $1.60 rate in the Canal Zone, the major features of the Administration's youth rate proposal, no expansion of coverage of the Act, and some additions to the exemptions from the Act's requirements.

By a vote of 47 nays to 46 yeas the Senate defeated the Taft-Dominick substitute. After approving several modifications in the committee bill the Senate approved the minimum wage amendments by a vote of 65 yeas to 27 nays on July 20, 1972.

As passed by the Senate, the bill established increased minimums of $2.00 an hour on the effective date (60 days after enactment) and $2.20 an hour two years later for workers covered prior to the 1966 amendments. Minimum wages of $1.80 an hour on the effective date, $2.00 a year later, and $2.20 two years later applied to nonfarm workers covered by the 1966 amendments and workers covered by the bill.

The farmworker minimum would have increased to $1.60 an hour on the effective date, $1.80, $2.00, and $2.20 an hour each succeeding year.

The bill also established minimum wages of at least $1.00 an hour in Puerto Rico and the Virgin Islands with automatic annual increases of 20 cents an hour in wage order rates until the applicable mainland rates were reached. The mainland rates were applied to employees of hotels, motels, and restaurants, food service workers in other retail and service establishments, and public employees in Puerto Rico and the Virgin Islands. The current $1.60 an hour minimum was retained for one year in the Canal Zone after which the rate would have increased to $1.70. The special minimum wage rates for full-time students were extended to employees of educational institutions.

In addition to expanding the coverage to most public employees not already subject to the Act and to most domestic workers, the bill contained provisions to repeal or modify many of the exemptions from coverage under the Act. With respect to the minimum wage and overtime pay standards, the bill deleted exemptions for most chain store establishments and for farmworkers engaged in shade-grown tobacco processing operations. The bill also repealed the minimum wage exemptions but retained the overtime exemptions for small logging operations and for local seasonal hand harvest farmworkers. Several other exemptions would have been repealed or modified. Two new exemptions, very narrow in scope, were added.

## Efforts to Resolve House-Senate Differences

Once the Senate had approved the bill, it was up to the House to either concur in amendments made by the Senate or to request a conference with the Senate to resolve the differences between the bills. Two times, on August 1, 1972, by a vote of 198 nays to 190 yeas, and on October 3, 1972, by a vote of 196 nays to 188 yeas, the House refused to go to conference.

The basis for voting against a conference was the expectation that a majority of the House conferees would have been Congressmen who had voted against the Erlenborn substitute amendment--H.R. 14104-- when it was approved by the House. Thus, supporters of the substitute bill believed that the House conferees would not arrive at a compromise close enough to the House bill. Efforts to establish a satisfactory compromise informally bogged down on the question of the youth wage rate provision. The Congress adjourned on October 18, 1972, without enacting the amendments.

6

EQUAL PAY UNDER THE FAIR LABOR STANDARDS ACT

In June 1963, the Equal Pay Act was enacted as an amendment to
the Fair Labor Standards Act. With its enactment the long fought for
principle of equal pay for equal work, regardless of the sex of the
worker, became a requirement of law. And, while its protection from
discrimination in wages because of sex applies to both men and women,
it is the latter for whom its protection is most meaningful since
women far more often than men are the victims of such discrimination.
The elimination of sex-based wage discrimination through vigorous
enforcement of the Equal Pay Act is a priority goal of the Employment
Standards Administration.

## Administration and Enforcement

Because the Equal Pay Act was enacted as an amendment to the
minimum wage provisions of the Fair Labor Standards Act, its admin-
istration and enforcement benefited from the strong enforcement
provisions of that law and the experience of the Wage and Hour Division,
the agency within the Department responsible for its enforcement.
Since the generally effective date of the equal pay provisions in
June 1964 through the end of fiscal year 1972, investigations made by
the Division's staff have disclosed underpayments resulting from illegal
sex-based wage discrimination of almost $48 million owed to 112,979
employees. Of these totals over $14 million in underpayments to
29,022 employees were for fiscal year 1972, a level of violations similar
to that disclosed by investigations during the previous year. In terms
of both amount of underpayments and number of employees, the total of
fiscal years 1971 and 1972 findings was greater than that for the
previous six years of the law's enforcement. This reflects the
increasing effectiveness of the enforcement staff in this vital program
area.

In most instances employers correct violations disclosed by
investigations conducted by Wage and Hour Compliance Officers without
court action being necessary. In part, this is attributable to the
widespread recognition of the fact that administrative efforts to
secure voluntary compliance are supported by a vigorous litigation
program. Even so, it is necessary in some instances to initiate court
action in order to secure correction of violative pay practices. In
addition, with regard specifically to the enforcement of the equal pay
standard, there was initially and continues to be the need to establish
legal precedent for interpretative positions as to how the law applies.

During fiscal year 1972, the Department filed 156 suits in the
courts for enforcement of the equal pay standard. A measure of the
momentum attained in this critical phase of enforcement is apparent
from the fact that this number constitutes 35 percent of the total

number (443) of equal pay suits filed since the effective date of the law. Thus, a significant start has been made in building a body of law which will enable the protection of the equal pay standard to be applied uniformly and even more extensively. There is a continuing need, however, for appellate decisions to firmly establish both the basic principles applicable to the standard of equal pay for equal work and the application of these principles across the entire spectrum of covered occupations and industries. The investigative development of cases for these purposes and their prosecution through the courts can be extremely time consuming. The continued expenditure of resources for these ends at this time is essential, however, in order to establish a firm foundation upon which ultimate achievement of the objectives of this program may be based.

## Education Amendments of 1972 - Title IX

Although the enactment of the Equal Pay Act as an amendment to the minimum wage provisions of the Fair Labor Standards Act had the advantage of making strong enforcement remedies available, it had the disadvantage of exempting from the equal pay standard all those employees who were exempt from the Act's minimum wage provisions. Among these were an estimated 15 million executive, administrative, professional, and outside sales employees of whom about 4½ million are women.

An amendment to the Fair Labor Standards Act extending its equal pay provisions to these executive, administrative, professional, and outside sales employees was contained in the Education Amendments of 1972. It was signed into law by the President on June 23, 1972, and became effective on July 1, 1972. Because widespread publicity had not been given to the amendment during the legislative process, and because of the brief period following enactment until the effective date, it was recognized that the initial thrust of enforcement should be to inform those affected of their rights and responsibilities. Accordingly, a series of briefing conferences was conducted early in fiscal year 1973 in all major cities throughout the country. These briefings were open to the general public and the cooperation of all the media was utilized so that their subject and purpose would have the widest possible dissemination. In addition, invitations were individually addressed to business firms, trade and industry associations, labor organizations, women's groups, and others in each area who are directly affected by the law. Concurrent with the initiation of this broad scale information program, work was begun on the revision of publications and other materials containing interpretations and guidance for employers and labor organizations upon whom rests the obligations for compliance.

Through these information and educational activities every effort has and is being made to secure the widest possible degree of voluntary

compliance. These will not, however, replace the need for direct enforcement by means of investigation and litigation. Moreover, these direct enforcement actions will undoubtedly be even more time consuming and costly than has been the case to date with the equal pay standard. Enforcement of legislation in new areas is initially almost always relatively more costly due to the lack of precedent and the need to develop guidelines and assure uniformity of application. These factors are compounded in the application of the equal pay standard to jobs in the executive, administrative and professional categories. For example, it will be necessary to determine during investigations whether or not the statutory requirement that jobs must be substantially equal in terms of skill, effort, and responsibility is met when the essential characteristics of the jobs of the men and women being compared comprise such elements as degree of initiative, areas of substantive discretion, and levels of judgment exercised. Further, since employees at these levels often tend to have individualized duties and responsibilities, it will frequently be necessary to make detailed job analyses of numerous jobs in order to apply the law. For example, a situation in which a single woman engineer works with nine male engineers could require a detailed complex investigation of all ten jobs.

Since it was recognized that enforcement of the extended law would require increased sophistication and skill on the part of Compliance Officers in order to deal efficiently with the inherent complexities involved, plans were developed and initiated to provide advanced training to the entire enforcement staff during fiscal year 1973. In addition to policies and procedures relating to equal pay enforcement, the training also includes familiarization with other Federal EEO programs so that the Wage and Hour Division's continuing efforts to coordinate EEO enforcement at the site of employment might be strengthened.

## Achieving Voluntary Compliance by Informational Program and Conciliation

The Employment Standards Administration reorganized and strengthened its services in 1972 to improve the conditions of employment for some 47,000,000 employees working in some 2,000,000 establishments covered by the Fair Labor Standards Act. In response to a clearly indicated need to provide increased services to the public with limited resources, alternative methods other than full-scale investigations were devised and employed where appropriate in an attempt to achieve maximum compliance with the minimum wage, overtime, equal pay and child labor provisions of the Fair Labor Standards Act. The policy of servicing all complaints on a priority basis was continued. However, experience demonstrated that many complaints of violation could be handled quickly and effectively with correction of violations and payment of back wages without the need for time consuming, fact-finding investigations. The employment of conciliation techniques in informal conferences with employers, wherever appropriate, in resolving complaints involving only one or a small group of employees resulted in improved service to the complainant and more effective utilization of scarce resources. This is demonstrated by the fact that the backlog of complaints remaining unserviced at the end of fiscal year 1972 was 28 percent lower than that which existed at the end of fiscal year 1971. This despite the receipt of 38,913 complaints, an increase of approximately 3 percent over the number received the previous year. Complaint situations indicative of general violative practices or not satisfactorily resolved by conciliation techniques continued to be handled by fact-finding investigative procedures.

To assure that every covered worker enjoys the full protection of the Fair Labor Standards Act, the intensive educational and informational program to acquaint employees with their rights and employers with their responsibilities that was instituted several years ago continued in fiscal year 1972. Increased utilization of the CUE (Compliance Utilizing Education) program whereby grass roots efforts are made to acquaint businessmen with their obligations under the Act was promoted. This included speeches, seminars and training sessions with industry officials. Under this program, employers were encouraged to review their operations, under (our) general guidance and assistance, to correct any practices that were not in compliance, including payment of any back wages found due, and to report the results of such activities. Many employers participated in varying degrees in this voluntary compliance program. In addition, the Employment Standards Administration participated in over 38,000 contacts with employers, employment agencies, labor organizations and others which, on the basis of the information and advice provided, resulted in changes in employment practices to achieve compliance. Also in 1972, over one million inquiries and requests for information from the public (both employers and employees) about these laws were answered.

At the close of the fiscal year, the Fair Labor Standards Act was amended to extend equal pay protection to 15 million executive, adminis-trative, professional, and academic administrative personnel or teachers in elementary or secondary schools, and outside sales employees. At the same time, preschool facilities were brought under the minimum wage, overtime, equal pay and child labor provisions of the Act. A massive informational and educational program was initiated to inform those affected by these changes of their respective rights and responsibilities.

## Investigation Program - New Approach, Less Paperwork

In implementing the policy of greater decentralization, the Employment Standards Administration established a policy for delegating to the regional offices and field staff as much program planning, decision-making and action-taking responsibility as feasible in order to concentrate its resources on the more serious noncompliance problems. This decentralized program planning was designed to better identify those industries and areas where violations of the Fair Labor Standards Act affecting the greatest number of employees were most likely to be occurring, and to focus on top priorities, such as (1) the elimination of wage discrimination on the basis of sex, (2) the development of new job opportunities by enforcement of the overtime provisions in industries where the potential for encouraging employers to hire new workers in lieu of paying overtime was greatest, and (3) the improvement and protection of the earnings of low-wage workers. The activities of the field staff were focused on these areas so that the greatest number of people most in need of assistance were helped by our enforcement efforts. Compliance and enforcement procedures were modified to meet enforcement needs. The use of "flexible" investigation procedures--doing only what is essential to identify and resolve a violative situation with fewer hard and fast procedural steps to be followed--became standard. Many situations which in the past would have prompted full-scale investiga-tions were handled by this short cut procedure, informal conciliation-type actions or by other compliance activity tailored to meet local or individual enforcement needs. These changes were designed not only to make operations more efficient but also to reduce the burden on employers.

Investigations and conciliation-type actions in fiscal year 1972 disclosed almost $98 million in wages illegally withheld under the Fair Labor Standards Act from more than 500,000 employees. Included in this total were wage adjustments represented by the correction of minimum wage violations involving 231,100 employees; overtime violations involving 270,075 employees; and equal pay violations involving 29,022 employees. Conciliation-type actions resulted in wage adjustments represented by $2,905,533 in unpaid wages. Low-wage employees, as classified under standards established by the Bureau of Labor Statistics, continued to be helped the most. Thus, workers earning less than the hourly rate equivalent of the total annual budget necessary for the

## Wages and Hours of Work of Nonsupervisory Employees in Selected Nonagricultural Industries

To provide a body of information which will permit a more precise assessment of the economic implications of legislation to amend the Fair Labor Standards Act and a limited appraisal of the effects of the last phase of the 1966 amendments, the Bureau of Labor Statistics, at the request of the Employment Standards Administration, conducted a Nationwide survey of selected nonfarm industries for payroll periods in May 1971 and April 1972. This study will yield comparable two-period data on employment related standards affecting nonsupervisory employees and separate tabulations for youths for the April 1972 payroll period.

Since broad industry data frequently obscure the effect that a change in the minimum wage level may have on individual employee earnings, the survey focuses on industries where the anticipated impact of an increase in the minimum wage level would be higher than the average for all covered establishments. Consequently, the sample was selected to adequately represent industries with concentrations of lower wage workers including manufacturing industries in which hourly earnings were significantly lower than average as well as individual retail trade and service industries, the two economic sectors most directly affected by recent changes in the Federal wage standard (Appendix A).

A short summary of the data currently available is presented below. A full report, containing detailed statistical tables for both survey periods (May 1971, April 1972), will be published later in the year.

### Level of Earnings

Manufacturing - Average straight-time hourly earnings in the nine manufacturing industry groups surveyed in May 1971 ranged from $2.13 to $3.04, appreciably lower than the average straight-time earnings for all manufacturing for the same period, $3.43 an hour (Table 1 ). The marked difference in the proportions of nonsupervisory employees whose hourly earnings approximated the $1.60 minimum wage level in these industries compared with the proportion in all manufacturing1/ one year earlier illustrates how critical the Federal wage standard is to workers in certain industries. In May 1970, a fraction of one percent of the nonsupervisory employees in manufacturing

---

1/ Wages and Hours of Work of Nonsupervisory Employees in All Private Nonfarm Industries by Coverage Status Under the Fair Labor Standards Act, U.S. Department of Labor, Employment Standards Administration, 1972.

15

were at the $1.60 minimum wage interval. By comparison, minimum wage workers comprised not less than 2 percent of the work force in any one of the nine manufacturing industries included in the May 1971 survey and as high as 20 percent of the workers in men's, youths', and boys' furnishings, and allied garments industry.

Any increase in the minimum wage will be of particular significance in the apparel industry (SIC 23) where 12 percent of the 1.3 million workers were paid less than $1.65 an hour in May 1971. Establishments in the South employed six out of every seven apparel workers whose hourly earnings appear to be closely related to the current Federal minimum wage standard.

Retail Trade, excluding eating and drinking places - This industry group provides the clearest perspective of the effect of differences in coverage under the Act on wage structures in establishments with common characteristics. The exclusion of eating and drinking places eliminates to a large extent the wage distortion that may have been caused by the inclusion of tipped employees whose hourly wage may legally be adjusted to reflect an allowance of up to 50 percent of the minimum wage for tips actually received.

In general, earnings in retail trade paralleled the pattern evident in most other industries, with the South and smaller communities accounting for the highest proportion of low-wage workers (Table 2 ). However, the $1.60 wage standard was an important wage determinant in each region, and most minimum wage workers were employed in the larger communities.

Nationwide, the proportion of workers clustered at the $1.60 minimum wage interval in establishments first covered by the Federal wage standard in 1966--15 percent--was almost double that in establishments subject to the Act since 1961--8 percent. In noncovered establishments--those with gross annual sales below $250,000--almost a third of the work force were paid less than the minimum applicable to covered retail trade employees.

Hourly straight-time cash wages in May 1971 averaged $2.68 in retail establishments covered prior to the 1966 amendments, $2.80 in those first covered by the 1966 amendments, and $2.13 in establishments not covered by the Federal standard.

Service-producing industries - Differences in average hourly earnings in the service industries studied partially reflected the large variation in the proportion of employees clustered at the $1.60 minimum wage interval (Table 3 ).

In industries covered since 1966 this proportion ranged from 15 percent in educational institutions to just under one-third in both laundries and cleaning services and covered hotels, motels, and other lodging places. In banks and other credit agencies which have been subject to the minimum wage provisions since 1938, only 3 percent of the nonsupervisory work force were paid less than $1.65 an hour. Thus, the average hourly cash wages of nonsupervisory employees in laundries and covered hotels and motels were roughly equivalent, $2.06 and $2.10 respectively, while hourly earnings averaged $2.65 in educational institutions and $2.82 in banks and other credit agencies.

A similar pattern was evident in the noncovered segment, that is, average hourly earnings were lowest ($1.69) in noncovered hotels and motels where over half the employees were paid less than $1.65 an hour and highest in amusement and recreation services ($2.42) where one-fourth of the workers received equally low wages.

## Wage-Bill Impact of Higher Minimum Rates

The comparatively low wages in effect in many of the covered establishments among the selected nonfarm industries surveyed in May 1971, indicate that the higher minimum wage levels proposed under the different versions of H.R. 7130 passed by the House and Senate would have resulted in direct wage increases for a substantial proportion of their nonsupervisory work force. Wage increases related to a change in the minimum wage level as gauged by the survey, however, would be moderated by increases in the general wage level between the survey date (May 1971) and the effective date of new legislation.

While some low wage workers throughout the Nation would be affected by an upward revision in the Federal wage standard, preliminary data for the May 1971 payroll period disclose that covered establishments in the South consistently accounted for the highest proportion of workers paid at or near the current $1.60 minimum. The relatively greater impact of the Federal minimum on wage structures in the South is influenced to some extent by the fact that (1) unionized establishments which generally have higher average wage levels than nonunion establishments are less prevalent in the South and (2) a higher proportion of nonsupervisory workers in the South are employed in covered establishments in nonmetropolitan areas which in each region are characterized by lower wage levels than establishments located in metropolitan areas.

The wage increases required by proposed minimum wage levels of $1.80, $2.00 and $2.20 in the lower wage manufacturing industries surveyed are affected not only by the significant number of workers clustered at the $1.60 minimum but also the sizeable proportion of

workers at each 20-cent wage interval above that level. For example, in the two major manufacturing industry groups surveyed--apparel and related products and leather and leather products--nonsupervisory employees who were paid more than the statutory minimum but less than $2.20 an hour comprised about two-fifths of each industry group's work force.

In covered retail trade establishments, excluding eating and drinking places, successive 20-cent increases in the basic minimum wage rate from $1.60 to $2.20 an hour would require wage increases for an estimated 1.6 million nonsupervisory employees paid less than $2.20 an hour in May 1971. Somewhat more than a third of these 1.6 million workers, or 567,000, were paid at the current $1.60 Federal minimum wage level during the survey week.

The higher minimum wage levels discussed will also have a pronounced effect on the wage structure in educational institutions, laundries and cleaning services as well as in hotels and motels with $250,000 or more in annual receipts. Aside from those workers currently at the bottom of the wage ladder in these three service industries, 10 percent of their nonsupervisory employees were paid within 20-cents of the Federal wage standard. And an equally significant number were grouped in the twenty-cent hourly wage intervals between $1.80, $2.00 and $2.20.

### Hours Worked

Average weekly hours worked by nonsupervisory employees in the selected nonfarm industry groups surveyed in May 1971 varied substantially. In manufacturing industries the average workweek ranged from 35.4 hours in the handbags and personal leather goods industry to 42.2 hours in establishments manufacturing veneer and plywood. In the service industries differences were even more pronounced, with the lowest average workweek reported in motion picture theaters--23.2 hours--and the highest in banks and other credit agencies--36.7 hours. Average weekly hours of nonsupervisory employees in retail establishments covered by the overtime provisions and those working in establishments not covered by the premium pay standard were quite close--32.3 hours and 33.7 hours respectively (Table 4 ).

There were also marked differences between the manufacturing, service, and retail trade sectors in the proportion of nonsupervisory employees who worked full-time, that is 35 or more hours a week, and those who worked part-time, particularly those employed less than 15 hours a week. In each of the manufacturing industry groups over two-thirds of the workers were on full-time schedules and only 4 percent or less worked fewer than 15 hours a week. By contrast, in all but banks and other credit agencies, two-fifths or more of the nonsupervisory

workers in the service industries surveyed worked part-time, that is less than 35 hours a week, and a substantial proportion worked under 15 hours during the May 1971 payroll period. In retail trade, just under one-third of the employees worked more than 15 hours but less than 35 hours a week, and one of every eight worked less than 15 hours a week.

With the exception of educational institutions, a significant proportion of nonsupervisory employees worked more than 40 hours a week in all of the surveyed industries subject to the overtime provisions. In industries which have been subject to a 40-hour standard since 1940, the proportion of nonsupervisory employees working more than 40 hours ranged from one out of every nine workers in banks and other credit agencies to over one-half of the nonsupervisory work force in veneer and plywood establishments. In covered retail trade establishments and laundries and cleaning services, which have been subject to the 40-hour standard since February 1, 1969, one out of every six nonsupervisory employee worked more than 40 hours in the survey week.

## APPENDIX A

| SIC | Industry |
|---|---|
| 23 | Apparel and related products |
| 232 | Men's and boys' furnishings |
| 2432 | Veneer and plywood |
| 2441-2442 | Nailed and wired boxes and shook |
| 31 | Leather and leather products |
| 314 | Footwear, except rubber |
| 317 | Handbags and personal leather goods |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified |
| 394 | Toys, amusement, sporting, and athletic goods |
| 52-57 and 59 | Retail trade, except eating and drinking places |
| 60-61 | Banks and other credit agencies |
| 70 | Hotels, motels, and other lodging places |
| 721 | Laundries and cleaning services |
| 783 | Motion picture theaters |
| 79 | Amusement and recreation services, except motion pictures |
| 821, 822 | Educational institutions |

Table 1. Straight-time average hourly earnings of nonsupervisory employees in selected manufacturing industries, United States, May 1971

| SIC | Industry | Number of employees :(in thousands): | Average hourly earnings | Percent of employees paid hourly wages below | | | | | | |
|-----|----------|-----------------|----------|:$1.65|:$1.70|:$1.80|:$1.90|:$2.00|:$2.10|:$2.20|
| 23 | Apparel and related products | 1,295.5 | $2.39 | 12 | 15 | 22 | 29 | 35 | 43 | 51 |
| 232 | Men's and boys' furnishings | 364.0 | 2.13 | 20 | 24 | 34 | 42 | 50 | 58 | 66 |
| 2432 | Veneer and plywood | 72.8 | 3.04 | 3 | 4 | 9 | 14 | 17 | 21 | 25 |
| 2441- | | | | | | | | | | |
| 2442 | Nailed and wired boxes and shook | 23.7 | 2.28 | 7 | 11 | 25 | 39 | 47 | 56 | 60 |
| 31 | Leather and leather products | 295.1 | 2.45 | 6 | 9 | 15 | 23 | 30 | 40 | 47 |
| 314 | Footwear, except rubber | 199.7 | 2.42 | 7 | 9 | 16 | 25 | 32 | 40 | 48 |
| 317 | Handbags and personal leather goods | 31.7 | 2.44 | 3 | 5 | 10 | 18 | 26 | 38 | 50 |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified | 212.7 | 3.04 | 2 | 2 | 4 | 8 | 11 | 16 | 21 |
| 394 | Toys, amusement, sporting, and athletic goods | 102.5 | 2.52 | 4 | 5 | 8 | 15 | 23 | 33 | 42 |

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

Table 2. Straight-time average hourly earnings of nonsupervisory employees in
retail trade, excluding eating and drinking places, by coverage
status under the Fair Labor Standards Act,
United States and regions, May 1971

| Coverage classification and region | Number of employees (in thousands) | Average hourly earnings | Percent of employees paid hourly wages below | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | $1.65 | $1.70 | $1.80 | $1.90 | $2.00 | $2.10 | $2.20 |
| **Covered prior to 1966** | | | | | | | | | |
| United States | 3,789.0 | $2.68 | 8 | 9 | 16 | 25 | 31 | 38 | 43 |
| Metropolitan | 3,203.1 | 2.74 | 6 | 8 | 14 | 22 | 28 | 35 | 40 |
| Nonmetropolitan | 585.9 | 2.32 | 14 | 17 | 29 | 39 | 46 | 55 | 59 |
| Northeast | 980.6 | 2.57 | 5 | 6 | 11 | 21 | 28 | 36 | 43 |
| South | 1,006.5 | 2.53 | 12 | 15 | 23 | 33 | 38 | 46 | 50 |
| North Central | 1,174.6 | 2.62 | 8 | 9 | 18 | 26 | 32 | 39 | 44 |
| West | 627.3 | 3.21 | 5 | 6 | 11 | 16 | 19 | 25 | 28 |
| **Covered by the 1966 amendments** | | | | | | | | | |
| United States | 1,768.5 | 2.80 | 15 | 17 | 24 | 30 | 33 | 41 | 44 |
| Metropolitan | 1,123.2 | 2.95 | 11 | 14 | 20 | 24 | 27 | 36 | 40 |
| Nonmetropolitan | 645.3 | 2.54 | 21 | 23 | 32 | 39 | 42 | 50 | 53 |
| Northeast | 411.0 | 3.00 | 7 | 9 | 13 | 20 | 23 | 32 | 36 |
| South | 557.5 | 2.47 | 24 | 26 | 35 | 41 | 45 | 52 | 55 |
| North Central | 518.3 | 2.77 | 14 | 17 | 25 | 31 | 33 | 43 | 47 |
| West | 281.8 | 3.21 | 8 | 11 | 17 | 20 | 22 | 29 | 32 |
| **Noncovered** | | | | | | | | | |
| United States | 2,030.1 | 2.13 | 31 | 36 | 43 | 51 | 54 | 65 | 67 |
| Metropolitan | 1,266.3 | 2.23 | 25 | 29 | 37 | 45 | 48 | 61 | 64 |
| Nonmetropolitan | 763.9 | 1.96 | 42 | 47 | 53 | 62 | 64 | 72 | 74 |
| Northeast | 462.3 | 2.33 | 13 | 15 | 21 | 36 | 39 | 54 | 57 |
| South | 685.9 | 1.88 | 48 | 52 | 59 | 66 | 69 | 76 | 79 |
| North Central | 522.8 | 2.10 | 35 | 40 | 48 | 53 | 56 | 66 | 67 |
| West | 359.2 | 2.39 | 18 | 26 | 33 | 40 | 44 | 56 | 59 |

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

Table 3. Straight-time average hourly earnings of nonsupervisory employees
in selected service industries by coverage status under the
Fair Labor Standards Act, United States, May 1971

| SIC | Minimum wage coverage classification and industry | Number of employees :(in thousands) | Average : hourly : earnings | Percent of employees paid hourly wages below | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | below $1.65 | :$1.70 | :$1.80 | :$1.90 | :$2.00 | :$2.10 | :$2.20 |
| | Covered prior to 1966 | | | | | | | | | |
| 60-61 | Banks and other credit agencies | 1,170.4 | $2.82 | 3 | 3 | 6 | 9 | 13 | 19 | 26 |
| | Covered by the 1966 amendments | | | | | | | | | |
| 70 | Hotels, motels, and other lodging places | 459.6 | 2.10 | 32 | 38 | 47 | 53 | 57 | 64 | 67 |
| 721 | Laundries and cleaning services | 437.4 | 2.06 | 30 | 35 | 44 | 53 | 59 | 70 | 74 |
| 821, 822 | Educational institutions 1/ | 2,307.2 | 2.65 | 15 | 18 | 24 | 29 | 33 | 39 | 42 |
| | Noncovered | | | | | | | | | |
| 70 | Hotels, motels, and other lodging places | 239.6 | 1.69 | 55 | 61 | 69 | 77 | 80 | 87 | 89 |
| 783 | Motion picture theaters | 150.5 | 1.99 | 44 | 46 | 49 | 55 | 56 | 81 | 82 |
| 79 | Amusement and recreation services, except motion pictures | 299.1 | 2.42 | 23 | 27 | 38 | 44 | 46 | 58 | 60 |

1/ SIC 821, 822 and equivalent parts of 9282 and 9382 (elementary and secondary schools, and colleges and universities; Private, State and local combined).

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

23

Table 4. Percent distribution of nonsupervisory employees in selected nonfarm
industries by number of hours worked in survey week, and by
overtime coverage status under the Fair Labor Standards
Act, United States, May 1971

| SIC | Overtime coverage classification and industry | Average weekly hours | Percent of employees working | | | |
| | | | Under 15 hours | 15 and under 35 hours | 35 to 40 hours | Over 40 hours |
|---|---|---|---|---|---|---|
| | Covered by overtime provisions | | | Manufacturing | | |
| 23 | Apparel and related products | 35.5 | 4 | 28 | 52 | 16 |
| 232 | Men's and boys' furnishings | 37.0 | 2 | 24 | 58 | 16 |
| 2432 | Veneer and plywood | 42.2 | 2 | 10 | 37 | 51 |
| 2441-2442 | Nailed and wired boxes and shook | 39.1 | 3 | 18 | 42 | 37 |
| 31 | Leather and leather products | 36.1 | 3 | 24 | 52 | 21 |
| 314 | Footwear, except rubber | 36.7 | 3 | 25 | 49 | 23 |
| 317 | Handbags and personal leather goods | 35.4 | 3 | 23 | 61 | 12 |
| 3674, 3679 | Semiconductors and electronic components, not elsewhere classified | 39.3 | 1 | 14 | 65 | 20 |
| 394 | Toys, amusement, sporting, and athletic goods | 38.1 | 2 | 18 | 62 | 19 |

24

Table 4. Percent distribution of nonsupervisory employees in selected nonfarm industries by number of hours worked in survey week, and by overtime coverage status under the Fair Labor Standards Act, United States, May 1971 (Concluded)

| SIC | Overtime coverage classification and industry | Average weekly hours | Under 15 hours | 15 and under 35 hours | 35 to 40 hours | Over 40 hours |
|---|---|---|---|---|---|---|
| | Covered by overtime provisions | Services | | | | |
| 60-61 | Banks and other credit agencies | 36.7 | 3 | 13 | 73 | 11 |
| 721 | Laundries and cleaning services | 33.7 | 7 | 33 | 42 | 18 |
| 821, 822 | Educational institutions 1/ | 29.4 | 17 | 30 | 48 | 5 |
| | Not covered by overtime provisions | | | | | |
| 70 | Hotels, motels, and other lodging places | 33.0 | 13 | 31 | 33 | 23 |
| 783 | Motion picture theaters | 23.2 | 27 | 58 | 11 | 4 |
| 79 | Amusement and recreation services, except motion pictures | 27.7 | 27 | 30 | 24 | 19 |
| | | Retail trade, except eating and drinking places | | | | |
| 52-57 and 59 | Establishments covered by overtime provisions | 32.3 | 12 | 32 | 39 | 17 |
| | Establishments not covered by overtime provisions | 33.7 | 12 | 30 | 42 | 16 |

1/ SIC 821, 822 and equivalent parts of 9282 and 9382 (elementary and secondary schools, and colleges and universities; Private, State and local combined).

Note: Because of rounding, sums of individual items may not equal totals.

Source: Survey conducted by the Bureau of Labor Statistics for the Employment Standards Administration.

## Survey of Private Household Workers - Summary of Preliminary Findings

At the request of the Employment Standards Administration, the Bureau of the Census conducted a nationwide survey to provide data on wages, weekly hours of work and fringe benefits (including perquisites) for private household workers, one of the larger remaining segments of the private economy excluded from the protection of the Fair Labor Standards Act. These data permit an evaluation of the implications of extending FLSA coverage to household service workers, as proposed by bills introduced in the Ninety-Second Congress.

The survey data were collected by the Bureau of the Census as a part of the May 1971 supplement to the Current Population Survey. For survey purposes, a private household worker was defined as anyone working for wages, including pay-in-kind, in or about a private residence who was employed by (1) a member of the household occupying that residence or (2) a household service business 1/ whose services had been requested by a member of the household occupying that residence. Craftsmen such as plumbers and carpenters, self-employed people such as registered nurses and related household members performing household work were excluded from the survey.

A summarization of the data currently available from the study is contained in the following sections. It should be noted that these data are preliminary and subject to revision. A complete report containing detailed statistical tables will be published later in the year.

### Employment

In May 1971, a total of 2.4 million persons were employed as private household workers (Table 5 ). Excluding babysitters with no housekeeping duties, the work force totaled 1.8 million. (To facilitate description, the category "household workers except babysitters with no housekeeping duties" will be used interchangeably with the term "domestic workers.")

---

1/ Employees of a household service business are presently covered by the FLSA if the business is a part of an enterprise under Section 3(s) of the Act. The exemption for employees of a retail or service establishment is generally inapplicable to such employees.

Nearly three-fifths of the domestic workers and seven-tenths of the babysitters were located in metropolitan areas. Two out of five domestic workers, but only one out of five babysitters, were employed in the South. 1/

The vast majority of the private household workers were employed directly by a member of a household. In both the South and non-South, no more than two percent of the workers within the scope of the survey were in the employ of a household service business.

Workforce Characteristics

Private household workers except babysitters with no housekeeping duties - Nationwide, females comprised three-fourths of the domestic workforce (Table 6 ); the proportion was somewhat larger in the South than in the rest of the country--82 percent compared to 71 percent.

Sixty-three percent of all domestic workers were white; the proportion was only 34 percent in the South as contrasted with 82 percent in the non-South.

Workers under 20 years of age comprised a third of the domestic workforce. Only a fourth of the domestic workers were 20 to 44 years of age, a third were 45 to 64 years old and a tenth were 65 years of age or older. Teen-age workers were more prevalent in the non-South than in the South, accounting for 42 percent and 17 percent of the respective workforces.

Three out of ten domestic workers were heads of households, the bulk of whom were females. A much larger proportion of the females of Negro and other races 2/ than white females were heads of households--

1/ The South is comprised of the District of Columbia and the following States: Alabama, Arkansas, Delaware, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia and West Virginia.
2/ For ease of discussion, the classification "Negro and other races," which includes persons of all races other than white, will be referred to as Negro.

38 percent compared to 22 percent. Likewise, a larger proportion of Negro than white females were wives of household heads—41 percent compared to 26 percent.

| Race and household status | United States | Percent distribution of female domestics South | Non-South |
|---|---|---|---|
| White | 100 | 100 | 100 |
| Head of household | 22 | 27 | 21 |
| Wife of head | 26 | 33 | 24 |
| Other | 52 | 40 | 55 |
| Negro and other races | 100 | 100 | 100 |
| Head of household | 38 | 38 | 39 |
| Wife of head | 41 | 43 | 36 |
| Other | 21 | 19 | 25 |

Babysitters with no housekeeping duties - The babysitter work-force consisted almost entirely of young white females. Of the 561,000 babysitters, nine-tenths were white females and over four-fifths were under 20 years of age (50 percent under 16 years of age and 33 percent 16 to 19 years of age). Only 15 percent of all babysitters were household heads or wives of household heads (Table 7).

Average Hourly Earnings

Private household workers except babysitters with no housekeeping duties - In May 1971, domestic workers averaged $1.34 an hour in cash wages (Table 8). Workers in the South averaged $1.21 an hour, 21 cents below the average in the rest of the country.

Nationwide, Negro domestics averaged $1.36 an hour in cash wages, 4 cents more than white domestics. Intra-regional differences were more significant. Average earnings of Negro workers exceeded the average for whites by 30 percent in the non-South, but were 5 percent below the average for whites in the South. In both regions, however, Negro females in each of the three "household status" classifications for which data were tabulated had higher average hourly earnings than their white counter-parts.

Babysitters with no housekeeping duties - Cash wages of babysitters averaged $ .72 an hour in May 1971. The average hourly cash wage of white babysitters exceeded that for their Negro counterparts by nine cents.

Distribution of Workers by Straight-time Hourly Earnings

Private household workers except babysitters with no housekeeping duties - Nationwide, 31 percent of the domestic workers were paid cash wages of less than $ .70 an hour; 48 percent were paid less than $1.00 an hour, and 68 percent were paid less than $1.50 an hour (Table 9 ). The concentration of low-wage workers was greater in the South than in the rest of the country.

The nationwide wage structures for white and Negro domestics were roughly similar; the largest variation was at the low-end of the wage scale--under $ .70 an hour--where the concentration of whites (34 percent) exceeded that for Negroes by eight percentage points. Wage structure differences were much more pronounced within geographic areas, particularly in the non-South where, for example, 49 percent of the whites but only 16 percent of the Negro workers earned less than $1.00 an hour.

There was a substantial difference between the earnings distributions of white female domestics and Negro female domestics. Forty-four percent of the white females earned less than $ .70 an hour and 59 percent earned less than $1.00 an hour; in contrast, the proportions of Negro females with such earnings were 28 percent and 47 percent, respectively. At higher wage levels, differences in the concentration narrowed.

A further classification of female workers by household status shows that lower earnings for whites was not characteristic of female heads of households or wives of heads. For both of these categories, a larger proportion of Negroes than whites were clustered at the low-end of the wage scale. In the "other" classification, however, white females were heavily concentrated in the lower earnings intervals--65 percent under $ .70 an hour and 80 percent under $1.00 an hour (Table 10 ). Of the relatively fewer Negro females in the "other" category, the proportion with such wages were 38 percent and 57 percent, respectively.

Low cash wages were more prevalent among teen-age domestic workers than any other age groups. For example, two out of five teenagers earned less than $ .70 an hour, but only one out of four in the age groups 20 to 44, 45 to 64, and 65 and over had such earnings.

Babysitters with no housekeeping duties - Over seven-tenths of the babysitters earned less than $ .70 an hour, and over nine-tenths earned less than $1.00 an hour (Table 11 ). Babysitters 20 years of age and older were only slightly better off, earnings-wise, than their younger counterparts.

Impact of Various Minimum Wage Rates

Private household workers except babysitters with no housekeeping duties - As indicated by the earnings distributions, the extension of the minimum wage provisions of the FLSA to domestic workers would have a very large impact on wage bill costs. To raise the cash wages of workers paid less than $1.00 an hour in May 1971 to that level would have required an estimated 16 percent increase in the weekly wage bill. Weekly wage bill increases associated with minimum wage levels of $1.30, $1.50 and $2.00 an hour were 30, 41 and 74 percent, respectively. (See Table 12 for wage bill impacts of other intermediate hourly rates.) In the South, where the impact of a minimum wage would be greatest, the estimated weekly wage bill increases for minimum hourly rates between $1.00 to $2.00 ranged from 17 percent to 91 percent.

Since the impact estimates are based solely on cash wages paid in May 1971 and exclude the value of any perquisites (free meals, lodging, transportation, etc.), some of which may be credited toward meeting a minimum wage established under the FLSA, they tend to maximize the wage bill increases associated with various minimum hourly wage rates. Nevertheless, the estimates indicate that the impact on wage bill costs resulting from an extension of minimum wage coverage to domestic workers will be greater than the wage bill impacts associated with previous extensions of FLSA coverage.

Babysitters with no housekeeping duties - Based on the May 1971 survey data, an estimated 62 percent increase in the weekly wage bill would be required to raise the cash wages of babysitters paid less than $1.00 an hour to that level. A minimum wage level of $1.30 an hour would require a doubling and $2.00 an hour a trebling of the weekly wage bill.

Distribution of Private Household Workers by Weekly Hours of Work

Private household workers except babysitters with no housekeeping duties - For the Nation as a whole, 53 percent of the domestic workers worked short workweeks (less than 15 hours) during the May 1971 survey week, more than a third worked from 15 to 40 hours, and nearly a tenth worked over 40 hours (Table 13 ). A greater proportion of domestic workers in the non-South than in the South worked short workweeks-- 60 percent compared to 43 percent and the proportion working over 40 hours a week was greater in the South (12 percent) than in the rest of the country (7 percent). When teenagers are excluded, however, regional differences in the distribution of workers by hours of work are small.

Weekly hours of work varied significantly among domestic workers classified by selected characteristics such as age, sex and household status. For example, well over four-fifths of the teenagers compared with less than two-fifths of the workers 20 years of age and over

worked less than 15 hours during the survey week. On the other hand, workweeks in excess of 40 hours were more common among workers aged 65 and over than any other age group. The classification of females by household status showed that only 4 percent of the females who were wives of household heads worked in excess of 40 hours while the proportions of females in the "head of household" and "other" classifications working such hours were 12 percent and 16 percent, respectively (Table 14 ); in the latter two classifications, a larger proportion of the white than Negro females worked over 40 hours during the survey week.

Babysitters with no housekeeping duties - More than nine-tenths of the babysitters under 20 years of age worked less than 15 hours a week compared with half of the 20 years and older group (Table 15 ). None of the teenage babysitters and only 15 percent of the 20 years and older group worked over 40 hours during the survey week.

Table 5. Numerical and percent distribution of private household workers by occupational group, region and area, May 1971

(Numbers in thousands)

| Region and area | Private household workers | | | | | |
| | Total | | Except babysitters with no house-keeping duties | | Babysitters with no housekeeping duties | |
| | Number | Percent | Number | Percent | Number | Percent |
|---|---|---|---|---|---|---|
| United States | 2,376 | 100.0 | 1,815 | 100.0 | 561 | 100.0 |
| Metropolitan areas | 1,438 | 60.5 | 1,054 | 58.1 | 385 | 68.6 |
| Nonmetropolitan areas | 938 | 39.5 | 761 | 41.9 | 176 | 31.4 |
| South | 813 | 34.2 | 709 | 39.1 | 104 | 18.5 |
| Metropolitan areas | 395 | 16.6 | 320 | 17.6 | 75 | 13.4 |
| Nonmetropolitan areas | 418 | 17.6 | 389 | 21.4 | 29 | 5.2 |
| Non-South | 1,563 | 65.8 | 1,106 | 60.9 | 458 | 81.6 |
| Metropolitan areas | 1,043 | 43.9 | 733 | 40.4 | 310 | 55.3 |
| Nonmetropolitan areas | 520 | 21.9 | 372 | 20.5 | 147 | 26.2 |

Note: Data are preliminary. Due to rounding, details may not add to totals.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

33

Table 6.  Numerical and percent distribution of private household workers (except babysitters with no
housekeeping duties) by race, sex, household status and age,
United States, South and non-South, May 1971

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 1,815 | 100.0 | 709 | 100.0 | 1,106 | 100.0 |
| Race, sex and household status | | | | | | |
| White | 1,148 | 63.3 | 239 | 33.7 | 908 | 82.1 |
| Male | 390 | 21.5 | 85 | 12.0 | 305 | 27.6 |
| Head of household | 78 | 4.3 | 23 | 3.2 | 55 | 5.0 |
| Other | 313 | 17.2 | 62 | 8.7 | 250 | 22.6 |
| Female | 757 | 41.7 | 154 | 21.7 | 603 | 54.5 |
| Head of household | 167 | 9.2 | 42 | 5.9 | 124 | 11.2 |
| Wife of head | 197 | 10.9 | 50 | 7.1 | 148 | 13.4 |
| Other | 393 | 21.7 | 62 | 8.7 | 331 | 29.9 |
| Negro and other races | 667 | 36.7 | 470 | 66.3 | 197 | 17.8 |
| Male | 57 | 3.1 | 39 | 5.5 | 18 | 1.6 |
| Head of household | 40 | 2.2 | 24 | 3.4 | 15 | 1.4 |
| Other | 18 | 1.0 | 15 | 2.1 | 3 | .3 |
| Female | 610 | 33.6 | 431 | 60.8 | 179 | 16.2 |
| Head of household | 232 | 12.8 | 162 | 22.8 | 70 | 6.3 |
| Wife of head | 249 | 13.7 | 184 | 26.0 | 65 | 5.9 |
| Other | 129 | 7.1 | 84 | 11.8 | 45 | 4.1 |

34

Table 6. Numerical and percent distribution of private household workers (except babysitters with no housekeeping duties) by race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Age** | | | | | | |
| Under 16 years | 295 | 16.3 | 58 | 8.2 | 237 | 21.4 |
| 16-19 years | 296 | 16.3 | 64 | 9.0 | 232 | 21.0 |
| 20 years and over | 1,223 | 67.4 | 587 | 82.8 | 636 | 57.5 |
| 20-44 years | 431 | 23.7 | 200 | 28.2 | 231 | 20.9 |
| 45-64 years | 616 | 33.9 | 315 | 44.4 | 300 | 27.1 |
| 65 years and over | 177 | 9.8 | 72 | 10.2 | 105 | 9.5 |

35

Note: Data are preliminary. Due to rounding, details may not add to totals.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 7. Numerical and percent distribution of babysitters with no housekeeping duties by race, sex, household status and age, United States, South and non-South, May 1971

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Total | 561 | 100.0 | 104 | 100.0 | 458 | 100.0 |
| **Race, sex and household status** | | | | | | |
| White | 539 | 96.1 | 96 | 92.3 | 443 | 96.7 |
| Male | 31 | 5.5 | 3 | 2.9 | 28 | 6.1 |
| Head of household | 2 | .4 | - | - | 2 | .4 |
| Other | 29 | 5.2 | 3 | 2.9 | 27 | 5.9 |
| Female | 508 | 90.6 | 93 | 89.4 | 415 | 90.6 |
| Head of household | 26 | 4.6 | 6 | 5.8 | 20 | 4.4 |
| Wife of head | 45 | 8.0 | 6 | 5.8 | 39 | 8.5 |
| Other | 437 | 77.9 | 81 | 77.9 | 356 | 77.7 |
| Negro and other races | 22 | 3.9 | 8 | 7.7 | 15 | 3.3 |
| Male | - | - | - | - | - | - |
| Head of household | - | - | - | - | - | - |
| Other | - | - | - | - | - | - |
| Female | 22 | 3.9 | 8 | 7.7 | 15 | 3.3 |
| Head of household | 9 | 1.6 | 4 | 3.8 | 4 | .9 |
| Wife of head | 4 | .7 | 1 | 1.0 | 2 | .4 |
| Other | 10 | 1.8 | 2 | 1.9 | 8 | 1.7 |

36

Table 7. Numerical and percent distribution of babysitters with no housekeeping duties by race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

(Numbers in thousands)

| Characteristic | United States | | South | | Non-South | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| **Age** | | | | | | |
| Under 16 years | 278 | 49.6 | | | | |
| 16-19 years | 185 | 33.0 | (Data not available) | | | |
| 20 years and over | 98 | 17.5 | | | | |
| 20-44 years | 57 | 10.2 | | | | |
| 45-64 years | 24 | 4.3 | | | | |
| 65 years and over | 17 | 3.0 | | | | |

37

Note: Data are preliminary. Due to rounding, details may not add to totals.
Dash (-) indicates no workers reported.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 8. Average hourly earnings of private household workers by occupational group, race, sex, household status and age, United States, South and non-South, May 1971

| Characteristic | Private household workers | | | |
|---|---|---|---|---|
| | Except babysitters with no housekeeping duties | | | Babysitters with no housekeeping duties |
| | United States | South | Non-South | United States |
| Total | $1.34 | $1.21 | $1.42 | $ .72 |
| **Race, sex and household status** | | | | |
| White | 1.32 | 1.25 | 1.35 | .72 |
| Male | 1.65 | 1.82 | 1.60 | NA |
| Female | 1.16 | .93 | 1.21 | NA |
| Head of household | 1.34 | .99 | 1.46 | NA |
| Wife of head | 1.60 | 1.10 | 1.77 | NA |
| Other | .86 | .76 | .87 | NA |
| Negro and other races | 1.36 | 1.19 | 1.75 | .63 |
| Male | 1.47 | 1.40 | 1.62 | NA |
| Female | 1.35 | 1.17 | 1.77 | NA |
| Head of household | 1.33 | 1.18 | 1.69 | NA |
| Wife of head | 1.43 | 1.17 | 2.16 | NA |
| Other | 1.22 | 1.17 | 1.30 | NA |

38

Table 8. Average hourly earnings of private household workers by occupational group, race, sex, household status and age, United States, South and non-South, May 1971 (Concluded)

| Characteristic | Private household workers | | | |
| | Except babysitters with no housekeeping duties | | | Babysitters with no housekeeping duties |
| | United States | South | Non-South | United States |
|---|---|---|---|---|
| **Age** | | | | |
| Under 16 years | $1.15 | $1.37 | $1.10 | $ .71 |
| 16 years and over | 1.37 | 1.20 | 1.51 | .73 |
| 16-19 years | 1.22 | 1.36 | 1.19 | .76 |
| 20 years and over | 1.41 | 1.18 | 1.62 | .67 |
| 20-44 years | 1.54 | 1.34 | 1.70 | .65 |
| 45-64 years | 1.37 | 1.10 | 1.65 | .56 |
| 65 years and over | 1.22 | 1.03 | 1.35 | .88 |

39

Note: Data are preliminary.

NA - Not available.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 9. Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by race, sex and age, United States, South and non-South, May 1971

| Characteristic | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | Percent with earnings not reported |
|---|---|---|---|---|---|
| | | Percent paid cash wages below [1] | | | |
| | | | United States | | |
| Total | 31.1 | 48.2 | 67.7 | 87.3 | 2.1 |
| Race and sex | | | | | |
| White | 33.9 | 50.0 | 67.5 | 85.5 | 1.9 |
| Male | 14.2 | 32.8 | 52.6 | 76.2 | 3.2 |
| Female | 44.1 | 58.9 | 75.2 | 90.2 | 1.1 |
| Negro and other races [2] | 26.2 | 45.1 | 68.0 | 86.6 | 2.5 |
| Female | 27.7 | 46.5 | 69.2 | 87.1 | 2.2 |
| Age | | | | | |
| Under 16 years | 39.5 | 60.5 | 77.0 | 87.5 | 2.9 |
| 16-19 years | 40.7 | 57.6 | 70.9 | 88.5 | 1.6 |
| 20 years and over | 26.7 | 43.0 | 64.7 | 84.8 | 2.0 |
| 20-44 years | 25.9 | 42.1 | 60.9 | 80.5 | 1.7 |
| 45-64 years | 26.9 | 42.5 | 64.7 | 85.6 | 2.8 |
| 65 years and over | 27.7 | 47.0 | 74.1 | 92.7 | - |

See footnotes at end of table.

65

Table 9. Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by race, sex and age, United States, South and non-South, May 1971 (Continued)

| Characteristic | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
|---|---|---|---|---|---|
| | | | South | | |
| Total | 31.5 | 55.7 | 77.6 | 89.7 | 2.1 |
| Race and sex | | | | | |
| White 2/ | 31.1 | 52.8 | 72.1 | 85.1 | 1.9 |
| Female | 42.7 | 68.7 | 88.4 | 95.2 | 1.0 |
| Negro and other races 2/ | 31.7 | 57.3 | 80.4 | 92.1 | 2.2 |
| Female | 34.0 | 59.0 | 81.8 | 92.3 | 2.1 |
| Age 2/ | | | | | |
| 20 years and over | 31.6 | 56.2 | 80.4 | 91.9 | 1.8 |
| 20-44 years | 28.3 | 52.5 | 75.8 | 88.2 | 1.5 |
| 45-64 years | 34.0 | 56.9 | 81.7 | 93.3 | 2.4 |

See footnotes at end of table.

41

Table 9. Percent of private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by race, sex and age, United States, South and non-South, May 1971 (Concluded)

| Characteristic | Percent paid cash wages below 1/ | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | Non-South | | | | |
| Total | 30.8 | 43.4 | 61.4 | 83.4 | 2.1 |
| Race and sex | | | | | |
| White | 34.6 | 49.3 | 66.3 | 85.5 | 1.8 |
| Male | 15.3 | 35.3 | 55.4 | 78.9 | 3.1 |
| Female | 44.4 | 56.4 | 71.9 | 88.9 | 1.2 |
| Negro and other races 2/ | 13.1 | 16.3 | 38.7 | 73.5 | 3.1 |
| Female | 12.8 | 16.3 | 39.0 | 74.5 | 2.5 |
| Age | | | | | |
| Under 16 years | 42.8 | 63.5 | 80.5 | 90.0 | 2.3 |
| 16-19 years | 42.3 | 57.4 | 72.3 | 90.5 | 1.4 |
| 20 years and over | 22.1 | 30.8 | 50.3 | 78.3 | 2.2 |
| 20-44 years | 23.7 | 33.0 | 48.0 | 73.9 | 1.8 |
| 45-64 years | 19.6 | 27.5 | 46.8 | 77.5 | 3.3 |
| 65 years and over | 25.9 | 35.6 | 65.3 | 90.4 | - |

42

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.

2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 10. Percent of <u>female</u> private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by household status and race, United States, South and non-South, May 1971

| Household status and race | Percent paid cash wages below [1] | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | | | United States | | |
| Head of household | 27.8 | 44.8 | 68.2 | 89.1 | 2.3 |
| White | 26.0 | 44.8 | 64.6 | 92.1 | - |
| Negro and other races | 29.1 | 44.8 | 70.8 | 86.9 | 3.9 |
| Wife of head | 19.7 | 36.2 | 60.8 | 82.8 | 1.6 |
| White | 17.9 | 28.3 | 54.2 | 77.2 | 2.9 |
| Negro and other races | 21.0 | 42.5 | 66.0 | 87.2 | .6 |
| Other | 58.2 | 74.6 | 86.0 | 93.7 | 1.1 |
| White | 64.8 | 80.4 | 90.3 | 95.9 | .7 |
| Negro and other races | 38.1 | 57.1 | 72.7 | 87.0 | 2.4 |
| | | | South | | |
| Head of household [2] | 39.2 | 60.3 | 83.7 | 91.0 | 3.7 |
| Negro and other races | 38.8 | 57.9 | 82.2 | 90.5 | 4.7 |
| Wife of head [2] | 25.0 | 54.1 | 79.8 | 93.8 | .7 |
| Negro and other races | 26.0 | 55.1 | 79.8 | 94.5 | - |
| Other [2] | 50.2 | 75.4 | 89.3 | 94.8 | 1.0 |

43

See footnotes at end of table.

Table 10. Percent of female private household workers (except babysitters with no housekeeping duties) paid less than specified hourly rates by household status and race, United States, South and non-South, May 1971
(Concluded)

| Household status and race | Percent paid cash wages below [1/] | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $ .70 an hour | $1.00 an hour | $1.50 an hour | $2.00 an hour | |
| | | | Non-South | | |
| Head of household 2/ | 15.8 | 28.5 | 51.8 | 87.1 | 0.8 |
| White | 21.0 | 36.4 | 56.1 | 91.9 | - |
| Wife of head 2/ | 13.8 | 16.6 | 39.9 | 70.6 | 2.7 |
| White | 16.9 | 20.8 | 45.7 | 72.4 | 2.9 |
| Other 2/ | 61.4 | 74.3 | 84.7 | 93.3 | 1.2 |
| White | 65.5 | 79.9 | 89.5 | 95.2 | .8 |

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.
2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 11. Percent of babysitters with no housekeeping duties paid less than specified hourly rates by race and age, United States, May 1971

| Characteristic | Percent paid cash wages below 1/ | | | | Percent with earnings not reported |
|---|---|---|---|---|---|
| | $.70 an hour | $.80 an hour | $.90 an hour | $1.00 an hour | |
| Total | 71.9 | 77.3 | 77.8 | 91.7 | 1.5 |
| Race 2/ | | | | | |
| White | 72.1 | 77.4 | 78.0 | 91.6 | 1.5 |
| Age | | | | | |
| Under 16 years | 76.2 | 81.7 | 82.2 | 92.5 | 1.3 |
| 16-19 years | 69.5 | 74.9 | 75.8 | 92.6 | 1.8 |
| 20 years and over 2/ | 62.2 | 67.3 | 67.3 | 87.8 | 2.0 |

1/ Employees who were employed during the survey week at varying hourly rates were tabulated on the basis of their lowest rate during the week.

2/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

45

Table 12. Percent increase in the weekly wage bill required to raise the wages of private household workers paid less than specified minimum hourly wage rates to those rates, by occupational group, United States, South and non-South, May 1971

| Specified hourly rate | United States — Private household workers | | | South — Private household workers | | | Non-South — Private household workers | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties | Total | Except baby-sitters with no house-keeping duties | Baby-sitters with no house-keeping duties |
| $1.00 | 19 | 16 | 62 | 19 | 17 | 52 | 20 | 15 | 65 |
| 1.10 | 24 | 20 | 77 | 24 | 23 | 64 | 25 | 18 | 80 |
| 1.20 | 30 | 25 | 92 | 31 | 29 | 76 | 29 | 22 | 96 |
| 1.30 | 36 | 30 | 107 | 37 | 35 | 89 | 34 | 26 | 111 |
| 1.40 | 42 | 35 | 121 | 45 | 42 | 101 | 40 | 30 | 127 |
| 1.50 | 48 | 41 | 136 | 52 | 50 | 113 | 45 | 35 | 142 |
| 1.60 | 55 | 47 | 152 | 60 | 58 | 127 | 51 | 39 | 158 |
| 1.70 | 62 | 53 | 167 | 69 | 66 | 141 | 58 | 45 | 174 |
| 1.80 | 69 | 60 | 182 | 77 | 74 | 155 | 64 | 50 | 189 |
| 1.90 | 77 | 67 | 198 | 86 | 82 | 169 | 71 | 56 | 205 |
| 2.00 | 84 | 74 | 213 | 94 | 91 | 183 | 78 | 62 | 221 |
| Percent of workers not reported | 3 | 3 | 8 | 2 | 2 | 12 | 3 | 3 | 7 |

Note: Data are preliminary. The percent of wage impact is calculated by dividing the wage increase required to raise the wages of employees paid less than specified rates to those rates by the total wage bill of all employees before the change. For employees who worked in more than one household during the survey week at varying hourly earnings rates, the wage impact was calculated on the basis of the actual number of hours worked at each rate.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

Table 13. Percent distribution of private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by race, sex and age, United States, South and non-South, May 1971

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| | | | United States | | |
| Total | 52.9 | 23.9 | 11.8 | 9.0 | 2.0 |
| Race and sex | | | | | |
| White | 62.2 | 18.7 | 8.2 | 9.3 | 1.4 |
| Male | 86.0 | 8.0 | 2.5 | 2.5 | .8 |
| Female | 49.9 | 24.1 | 11.1 | 13.8 | 1.7 |
| Negro and other races 1/ | 37.0 | 33.0 | 18.1 | 8.4 | 3.1 |
| Female | 34.7 | 34.8 | 18.7 | 8.8 | 2.7 |
| Age | | | | | |
| Under 16 years | 89.8 | 6.6 | 1.0 | .9 | 1.5 |
| 16-19 years | 81.2 | 9.5 | 4.2 | 4.3 | .4 |
| 20 years and over | 37.2 | 31.6 | 16.3 | 12.1 | 2.5 |
| 20-44 years | 38.6 | 29.7 | 18.8 | 12.0 | .6 |
| 45-64 years | 35.4 | 33.5 | 16.3 | 10.5 | 3.9 |
| 65 years and over | 39.9 | 29.6 | 10.2 | 17.5 | 2.4 |

See footnote at end of table.

47

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| | | | South | | |
| Total | 42.5 | 28.2 | 14.9 | 11.9 | 2.1 |
| Race and sex | | | | | |
| White 1/ | 52.3 | 19.6 | 9.0 | 16.3 | 2.5 |
| Female | 33.7 | 28.7 | 11.9 | 22.5 | 2.8 |
| Negro and other races 1/ | 37.5 | 32.6 | 17.9 | 9.8 | 1.9 |
| Female | 34.8 | 34.9 | 17.9 | 10.2 | 1.8 |
| Age 1/ | | | | | |
| 20 years and over | 34.7 | 33.2 | 17.2 | 12.7 | 1.8 |
| 20-44 years | 34.2 | 37.0 | 16.2 | 12.4 | - |
| 45-64 years | 31.7 | 33.4 | 18.8 | 12.3 | 3.5 |

See footnote at end of table.

48

Table 13. Percent distribution of private household workers (except babysitters with no
housekeeping duties) by weekly hours of work, by race, sex and age,
United States, South and non-South, May 1971 (Concluded)

| Characteristic | Percent working weekly hours of- | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| | | | Non-South | | |
| Total | 59.6 | 21.2 | 9.9 | 7.1 | 1.9 |
| Race and sex | | | | | |
| White | 64.8 | 18.4 | 8.0 | 7.4 | 1.1 |
| Male | 86.0 | 9.3 | 2.1 | 1.8 | .5 |
| Female | 54.1 | 23.0 | 10.9 | 10.3 | 1.4 |
| Negro and other races 1/ | 35.8 | 33.9 | 18.7 | 5.4 | 5.9 |
| Female | 34.4 | 34.6 | 20.6 | 5.2 | 4.9 |
| Age | | | | | |
| Under 16 years | 89.7 | 7.7 | 1.2 | .5 | .6 |
| 16-19 years | 84.1 | 10.5 | 3.4 | 1.9 | - |
| 20 years and over | 39.5 | 30.1 | 15.5 | 11.4 | 3.2 |
| 20-44 years | 42.4 | 23.4 | 21.1 | 12.6 | 1.1 |
| 45-64 years | 39.2 | 33.6 | 13.7 | 8.8 | 4.4 |
| 65 years and over | 33.5 | 35.2 | 8.3 | 18.7 | 4.1 |

1/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

69

Table 14.  Percent distribution of female private household workers (except babysitters with no
housekeeping duties) by weekly hours of work, by household status,
United States, South and non-South, May 1971

| Household status and race | Percent working weekly hours of – | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| United States | | | | | |
| Head of household | 35.5 | 33.3 | 15.7 | 12.4 | 2.8 |
| White | 34.1 | 34.2 | 11.8 | 17.0 | 2.6 |
| Negro and other races | 36.5 | 32.7 | 18.6 | 9.1 | 3.0 |
| Wife of head | 43.5 | 38.0 | 12.7 | 4.4 | 1.2 |
| White | 50.5 | 36.6 | 9.1 | 2.8 | .7 |
| Negro and other races | 37.9 | 39.1 | 15.6 | 5.6 | 1.5 |
| Other | 48.7 | 17.8 | 15.1 | 15.6 | 2.5 |
| White | 56.3 | 13.6 | 11.9 | 16.0 | 1.8 |
| Negro and other races | 25.5 | 30.5 | 24.9 | 10.3 | 4.6 |

50

Table 14. Percent distribution of _female_ private household workers (except babysitters with no housekeeping duties) by weekly hours of work, by household status, United States, South and non-South, May 1971 (Continued)

| Household status and race | Percent working weekly hours of - | | | | Percent with hours not reported |
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
|---|---|---|---|---|---|
| **South** | | | | | |
| Head of household 1/ | 31.7 | 31.8 | 16.9 | 15.3 | 4.0 |
| Negro and other races | 35.4 | 31.1 | 17.7 | 12.1 | 3.3 |
| Wife of head 1/ | 36.1 | 40.7 | 15.7 | 6.8 | .4 |
| Negro and other races | 35.3 | 40.5 | 17.0 | 6.3 | .6 |
| Other 1/ | 36.1 | 23.4 | 16.4 | 21.8 | 2.0 |

See footnote at end of table.

Table 14.   Percent distribution of female private household workers (except babysitters with no
housekeeping duties) by weekly hours of work, by household status,
United States, South and non-South, May 1971 (Concluded)

| Household status and race | Percent working weekly hours of - | | | | Percent with hours not reported |
|---|---|---|---|---|---|
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| | Non-South | | | | |
| Head of household 1/ | 39.4 | 34.9 | 14.5 | 9.4 | 1.5 |
| White | 39.8 | 34.1 | 11.1 | 13.6 | 1.2 |
| Wife of head 1/ | 51.6 | 35.1 | 9.4 | 1.8 | 2.0 |
| White | 54.5 | 35.0 | 8.4 | .9 | 1.0 |
| Other 1/ | 53.7 | 15.6 | 14.6 | 13.1 | 2.7 |
| White | 59.3 | 13.4 | 12.0 | 13.3 | 1.7 |

1/  Insufficient data to warrant presentation of greater detail.

Note:  Data are preliminary.

Source:  Survey conducted by the Bureau of the Census for the Employment Standards Administration.

52

Table 15. Percent distribution of babysitters with no housekeeping duties by weekly
hours of work, by race and age, United States, May 1971

| Item | Percent working weekly hours of- | | | | Percent with hours not reported |
| | Under 15 | 15 and under 35 | 35 through 40 | Over 40 | |
| --- | --- | --- | --- | --- | --- |
| Total | 83.9 | 10.9 | 2.2 | 2.5 | 0.3 |
| Race 1/<br>White | 85.0 | 10.2 | 2.2 | 2.4 | .4 |
| Age<br>Under 16 years | 90.6 | 8.6 | - | - | .7 |
| 16-19 years | 93.0 | 5.4 | 1.6 | - | - |
| 20 years and over 1/ | 48.0 | 28.6 | 10.2 | 15.3 | - |

53

1/ Insufficient data to warrant presentation of greater detail.

Note: Data are preliminary. Dash (-) indicates no workers reported.

Source: Survey conducted by the Bureau of the Census for the Employment Standards Administration.

This Chapter reviews several recent attempts to provide empirical answers to questions raised by government regulation of hours and wages. Because of the extensive research into this issue, this Chapter limits itself to those studies which were published in scholarly sources during 1971 and 1972. 2/ Naturally this excludes many important studies.

The analysis of Federal wage and hour legislation is a multi-faceted issue involving such questions as whether minimum wage increases raise the income of the poor, whether these increases reduce employment or retard its growth, whether increases in the minimum wage create pressures for wage increases among workers earning higher wages, whether maximum hours standards create new jobs, and whether minimum wage increases or extensions of coverage generate upward price movements. Careful empirical analysis is needed to determine not only whether a particular effect exists but also how large that effect is. In the following pages, the attempts of various researchers to obtain answers to some of these issues are reported. Of course, all the effects--both beneficial and harmful-- of the Fair Labor Standards Act must be studied and measured.

The first section summarizes two studies on the impact of minimum wage legislation in the agricultural sector. The second summarizes three studies which attempt to isolate the effect of minimum wage laws on youth. The third and fourth sections treat in succession the over-time provision and the implications of extending coverage to the domestic service industry. The final section reviews some miscellaneous studies relevant to government regulation of hours and wages.

---

1/ This Chapter provides an abbreviated summary of recent research in this area. It is not meant to be an endorsement of either the research methods used or the conclusions reached and no state-ment in this chapter should be interpreted as representing Depart-ment of Labor policy.

2/ Two exceptions were made to this rule. The Hashimoto and Mincer study, which will be published early in 1973, was included because of its direct relevance to the other two studies on youth. The Mattila study, although yet unpublished, was included because it was specially commissioned by the Department of Labor.

## Impact on Agricultural Workers

The 1966 amendments to the Fair Labor Standards Act extended coverage of the minimum wage provision to certain farmworkers. This section reviews two recent studies of the impact of this change on the agricultural economy.

### Lianos

Lianos / 10 / attempted to estimate the demand for agricultural labor over the period 1950 through 1969 and to determine what factors influence that demand. In particular, he tried to learn whether there was a shift in demand in 1966 in anticipation of the agricultural minimum wage. For this purpose, he experimented with three different theories of demand. The statistical analysis was limited to selected southern states because the overwhelming majority of farmworkers affected by the minimum wage lived in that area.

He concluded that the agricultural minimum wage reduced employment on southern farms. These results are statistically significant whether the analysis is conducted in terms of total farm employment or the employment of hired farmworkers.

The difference between total employment and hired workers is the number of family workers. Lianos conducted his analysis in terms of both variables because he believed that the phrasing of the man-day test encourages farmers to substitute the labor of family members for that of hired labor. 1/ Such substitution might remove a farm and all of its workers from FLSA coverage. Moveover, family workers can be paid less than the minimum wage and thus less than hired workers. His results which indicate that the minimum wage affected total employment suggest that this substitution did not ameliorate the employment impact of minimum wage coverage. The author was unable to determine how much substitution occurred in an effort to circumvent the man-day test.

### Gardner

Gardner / 6 / attempted to determine whether extending coverage to agriculture affected the level of employment and wages in agriculture. In addition, he investigated the impact of changes in the nonagricultural minimum wage on employment and earnings in agriculture. Prior to 1967, agriculture was a noncovered sector.

---

1/ For farmworkers to be covered by the FLSA they must work on farms that employed more than 500 man-days of hired labor during any quarter of the preceding calendar year. Neither family workers nor local hand harvest workers paid on a piece rate basis, who were employed in agriculture for less than 13 weeks during the preceding calendar year, are included in computing the number of man-days of employment.

Gardner hypothesized that an increase in the nonagricultural minimum wage would reduce nonagricultural employment, causing the displaced to seek work in agriculture. This could result in lower agricultural wages and higher agricultural employment.

The results indicate that extending coverage to agriculture raised the wage level in agriculture and diminished agricultural employment. An attempt was made to compare the gains and losses. Estimates by Gardner suggest that the percentage increase in wages was less than the percentage decline in employment, that is, the total farm wage income was reduced. There was no statistically significant effect on either agricultural employment or wages from changes in the nonagricultural minimum wage. Gardner interpreted this as an indication that other sectors served to absorb displacement.

## Impact on Youth

There are two reasons for studying the impact of the Fair Labor Standards Act on youth separately from its effects on the total labor force. Youth have special labor force problems which the FLSA could either ease or complicate. These include high unemployment rates, the need to find jobs compatible with school attendance, and the difficulty of establishing a full-time work career upon leaving school. Secondly, some researchers believe that, if minimum wage laws do reduce employment, this effect will be heavily concentrated among teenagers.

### Moore

Moore $\overline{/\ 12\ /}$ tried to measure how much impact increases in the minimum wage have on teenage unemployment rates. In his study four subgroups of the teenage population were analyzed separately: males 16-19, females 16-19, whites 16-19, and nonwhites 16-19. In all four cases Moore observed that increases in either the level or the coverage of the minimum wage lead to increases in the unemployment rate.

His results also suggest that a higher minimum and increased coverage adversely affect not only the unskilled and inexperienced but also those who suffer from discrimination in the labor market. The percentage point increase in the unemployment rate corresponding to an increase in either the level or the coverage of the minimum wage was higher for nonwhites than for whites and for females than for males.

When the same analysis was applied to males 20-24, it was found that the level of the minimum wage does not seem to have any impact on the unemployment rate while an increase in coverage is associated with a reduction in the unemployment rate for this group.

## Hashimoto and Mincer

Hashimoto and Mincer $\overline{/\ 7\ /}$ divided the labor force into 10 groups: white teenagers (16-19), nonwhite teenagers (16-19), white males (20-24), nonwhite males (20-24), white males (25-64), nonwhite males (25-64), white males (65 +), nonwhite males (65 +), white females (20 +), nonwhite females (20 +). For each group, they estimate how minimum wage changes affect the ratio of both employment and labor force to the population of that group. Using these estimates, they calculate the impact on the unemployment rate for each group.

The empirical results indicate that a higher minimum wage or expanded coverage lead to reduced labor force participation for both white and nonwhite teenagers. The reduction for nonwhites is greater than that for whites. There are indications of reduced employment for both white and nonwhite teenagers. The impact on nonwhites is larger but only the impact on whites is statistically significant. 1/ The calculated unemployment effect for both groups indicates that an increase in the minimum wage leads to an increase in the unemployment rate.

For males (20-24) the results are similar. Increased minimum wages have a detrimental impact on labor force participation and the employment to population ratio for both whites and non-whites. Again the impact on nonwhites is greater than on whites. The calculated unemployment rate shows an adverse effect on both groups.

It is somewhat surprising to see that a higher minimum wage results in a lower participation rate for all four groups. Hashimoto and Mincer believe these results to be reasonable on theoretical grounds. They suggest that the added difficulty of finding employment more than offsets the lure of higher wages. As a result of minimum wage increases they believe that teenagers and young men experience greater job finding problems and react to those problems by withdrawing from the market.

For males (25-64) changes in the minimum wage have no statistically significant effect. For white males (65 +) and white females (20 +), higher minimum wages lead to a reduced labor

---

1/ At the 0.05 level.

force and lower employment. There are no other statistically significant results among the remaining groups.

Besides calculating the unemployment rate effect, Hashimoto and Mincer also tried to observe this effect directly. Unlike Moore, they were unable to find statistically significant unemployment rate effects for teenagers. The most striking difference between their approach and that of Moore is the inclusion by Hashimoto and Mincer of a time-trend variable to explain fluctuations in the unemployment rate. From the late 1950's the teenage population grew sharply as a result of the post-World War II baby boom. The time trend variable would adjust to some extent for the impact of this demographic change on teenage unemployment experience. Moore experimented with a time trend variable for the non-white teenager group and noted that its inclusion would not have altered his results significantly for that particular group. However, he does not report similar experimentation in the case of the other groups.

### Kosters and Welch

A different analytical technique was developed in a third study (Kosters and Welch $/ 8 /$). The previous studies focused on whether changes in the minimum wage affect the level of employment or unemployment. In order to make this determination, it was necessary to identify all the other factors which affect employment and unemployment and remove their influence. To avoid this difficulty, Kosters and Welch restrict their attention to how employment changes are accomplished rather than trying to explain why the employment changes occur. Their technique is based on the distinction between the trend growth and cyclical changes in employment. As the nation's population grows and its economy expands, employment should increase in a smooth fashion, that is, at a steady rate. This pattern of constant growth is frequently interrupted by shifts in business activity and other factors. Statisticians describe this phenomenon as cyclical fluctuations around a persistent trend.

Kosters and Welch were interested in learning first, whether these cyclical fluctuations have a more pronounced impact on certain groups within the labor force, and secondly, whether this pattern of impact has been affected by minimum wage legislation. In their terminology the trend is referred to as normal employment and the cyclical fluctuations as transitional employment. Ten groups were studied: adults (20 +), teenagers (16-19), adult white males, adult white females, adult nonwhite males, adult nonwhite females, teenage white males, teenage white females, teenage nonwhite males, and teenage nonwhite females.

A simple description of this perspective is that firms divide their workers into two categories according to their value to the firm. Those with special skills or extensive work experience will be carefully hoarded because they are difficult to replace. Those with few skills and little experience will be let go whenever demand slackens because they can easily be replaced once business improves.

Kosters and Welch found that teenagers participate in transitional employment out of proportion to their participation in the labor force and that they are underrepresented in normal employment growth. An identical conclusion holds for any subgroup of teenagers. The opposite results were obtained for all adult subgroups except nonwhite males whose share in transitional employment is larger than their share in normal employment. Kosters and Welch also found that increases in the minimum wage (either a higher level or greater coverage) further reduce the teenage share of normal employment and increase the teenage share of transitional employment. This is true for each race-sex subgroup. The impact on adults is less clear. The adult white male share of both normal employment and transitional employment increases with increases in the minimum wage. The adult white female share of normal employment also increases; but the behavior of that group's share of transitional employment shows no clear change. There were no statistically significant changes in the shares of either adult nonwhite males or adult nonwhite females.

An interesting feature of the Kosters and Welch study is the contrast between the detrimental employment impact on teenagers and the favorable effects experienced by certain adult groups. The favorable impact observed for adult white males and adult white females must be interpreted within the analytical framework used by Kosters and Welch. The emphasis on shifting employment shares assumes a tradeoff, i.e., that there will be both gainers and losers in terms of employment shares. Therefore, it is only natural that the loss suffered in the teenagers' share will be offset by gains in the share of some adult groups. Whether adults are better off in terms of number of jobs held depends also on whether the absolute level of normal employment has increased, remained constant, or decreased. If minimum wage increases reduce the absolute level of employment, it is possible that adults could have fewer "normal employment" jobs even though their share of such jobs has increased.

* * * * *

The results reported above focus on a possible detrimental effect of minimum wage legislation—the reduction of youth employment opportunities. The authors of these three studies were concerned primarily with measuring this impact and therefore did not investigate possible beneficial effects. For example, no attempt was made to determine, as Gardner had done with regard to agriculture, whether the increase in wages would lead to higher youth income despite the decline in employment opportunities.

Unfortunately, it was not possible to review earlier work on these questions. For a listing and brief description of most of the previous research, the reader should consult (1) Chapter II of Youth Unemployment and Minimum Wages / 14 / and (2) Juanita Krep's "Youth Unemployment and Minimum Wages: Some Further Questions" / 9 /. In general, there is less unanimity among the earlier studies.

The Department's own study / 14 /, published in 1970, found mixed results as regards the effects of minimum wage legislation. There was statistically significant evidence that minimum wage increases are associated with higher employment among nonwhite males 18-19, but lower employment for certain classes of white teenagers. The only statistically significant unemployment results were for nonwhite males where the evidence indicated that lower unemployment ratios are associated with minimum wage increases.

## Impact of the Overtime Premium

One objective of Federal maximum hours legislation is to expand employment opportunities. By increasing the cost of overtime work, maximum hours legislation may induce employers to hire more workers and reduce the number of hours in the average workweek. Recent research by Ehrenberg / 3, 4, 5 / investigates whether the overtime premium actually has this effect.

### Ehrenberg

Ehrenberg believes that there may be certain incentives which encourage employers to work their present labor force longer hours on a regular basis rather than hire new workers. New workers must be trained and this implies an initial period of low productivity plus special training costs. Moreover, many labor costs are unrelated to the number of hours worked. These often include most of the standard fringe benefits: holidays, paid vacations, insurance plans, pensions, etc. The extra costs of working several existing employees overtime may be less than the fixed costs involved in hiring a new worker.

By analyzing firm behavior within 24 industries, Ehrenberg tested whether the ratio of fixed-labor-costs relative to the overtime premium affects employers' decisions regarding overtime and new hires. In 18 of those industries, there was statistically significant evidence that as fixed-labor-costs increase relative to premium pay the average number of overtime hours per man increased.

On the basis of these results Ehrenberg estimated the impact of changing the premium rate from time-and-a-half to double-time. Assuming that the reduction in overtime is matched by new employment, the increase in employment in most industries ranges from 1 to 3 percent. Ehrenberg noted that these estimates were on the high side because no adjustments were made for the capital-labor substitution or the decline in product demand which could result from the higher labor costs. Ehrenberg further qualifies these estimates by noting that technical constraints, particularly in manufacturing industries, may cause many firms not to adjust their employment level immediately.

## Impact on the Domestic Service Industry

One of the major areas not covered by the Fair Labor Standards Act is the domestic service industry. Naturally any extension of coverage to this sector will require the careful consideration of many factors. Two of these are the potential effects on employment and the potential effects on income. A recent study by Mattila investigated these questions.

Mattila

Mattila $\underline{/\ 11\ /}$ attempted to quantify the impact on the demand for maids if coverage under the Fair Labor Standards Act is extended to domestic workers. He developed estimates of the demand function for maids using simultaneous regression techniques. These estimates were based on cross-section 1960 data for 40 Standard Metropolitan Statistical Areas (SMSA's). Data for some of the variables utilized were not available for about half of the SMSA's, necessitating the development of estimates.

The demand equation derived indicated that (1) a one percent increase in the wages of maids reduces the number of maids demanded by 2.4 percent, (2) a one percent increase in family income or female labor force participation rates increases demand by a corresponding amount and (3) a one percent increase in the cost of substitutes for maids increases demand by 2.2 percent. The author cautions that these elasticities are based on his own intuitive and theoretical judgments in combination with the information derived from the regressions and are "highly subjective and should be subject to further evaluation."

In order to predict the impact on demand for maids associated with a given minimum wage, it was also necessary to estimate the wage distribution for maids. This was done by adjusting the 1967 wage data for female domestics aged 30-44 obtained in the Longitudinal Labor Market Survey. $\underline{6/}$ (The author concluded that the median hourly wage for maids was approximately \$1.40 in 1971.) Using the estimated 1971 wage distribution and the estimated wage elasticity of demand for the South (-1.9), it was predicted that a minimum wage of \$1.00 an hour, if put into effect in 1971, would have reduced demand for maids by 7 percent. Minimum wage rates of \$1.20, \$1.40, \$1.60 and \$1.80 an hour would have reduced demand by 15, 28, 40, and 55 percent, respectively. With regard to these estimates, the author notes that while the possibility of lay-offs exists "it is more reasonable to suppose that household response to higher costs would lead to a reduction in hours per day and days of work rather than to the more extreme response of firing maids." The predictions were qualified for two reasons. First, the estimates assume that a minimum wage will be compiled with and enforced. Second, the effects of a minimum wage will be eroded over time by inflation, increases in real income, and increased female participation in the labor force.

In summarizing his findings, the author concludes that "if a minimum wage is to be extended to cover domestics, it $\underline{/\ should\ /}$ be set initially at relatively low levels and then increased only gradually as in past cases when other low income groups were newly covered."

---

$\underline{1/}$ Center for Human Resource Research, The Ohio State University.

## General Issues

This section will review two unrelated studies. The first attempts to determine whether minimum wage laws have altered the growth rate of employment in nonmetropolitan areas. The second discusses earlier research into the impact of state minimum wage laws.

### Tideman

Wages are generally higher in metropolitan areas than in nonmetropolitan areas. Therefore, the impact of an increase in the minimum wage should be greater in nonmetropolitan areas.

Tideman $\underline{/\ 13\ /}$ tried to measure the employment impact on a nonmetropolitan area. The best data available covered the non-metropolitan sections of New Jersey and Pennsylvania. Tideman found that minimum wage increases, either Federal or State, resulted in statistically significant but minor reductions in employment for these areas.

Because Tideman did not perform a similar analysis for the metropolitan areas of New Jersey and Pennsylvania, it is impossible to determine whether the impact of the minimum wage is relatively stronger in nonmetropolitan areas.

### White and Jones

The White and Jones study $\underline{/\ 15\ /}$ addressed the question of whether state minimum wage laws have an impact on state unemployment rates. In 1969 Campbell and Campbell $\underline{/\ 1\ /}$ had observed that, as a group, states with minimum wage laws have higher unemployment rates than states without such laws. 1/ After considering alternate explanations, Campbell and Campbell had concluded that the observed differences are the results of state minimum wage laws. However, they noted that the impact attributable to state laws alone is relatively minor.

White and Jones questioned the Campbell and Campbell findings. Their main criticism involved the data used. Since there is no series of area unemployment rates comparable to the national series, cross-area comparisons must be based on estimates prepared from unemployment insurance data. White and Jones suggest that the estimation technique may systematically bias these estimates in such a manner that states

---

1/ Their analysis was actually based on the unemployment rate for major local labor markets and not on the unemployment rate for the entire state. Bimonthly data from 1950 to 1965 were analyzed.

with state minimum wage laws appear to have higher unemployment rates when this is not true. White and Jones mention several factors which might produce this effect but do not attempt to isolate and measure the possible bias. A twenty city comparison of the area estimates based on the unemployment insurance data with local unemployment rates compiled by the Census Bureau for 1967 and 1968 shows that significant differences can occur. The authors also call attention to the fact that when Campbell and Campbell confined their analysis to the years 1950 and 1960 and used Census data, the difference between the two groups of states narrowed. Campbell and Campbell $/\ 2\ /$ acknowledge the possible data limitations but maintain that the series is still useful for this purpose.

White and Jones show that states with state minimum wage laws actually had a higher rate of employment growth than those without state minimum wage laws in 9 of the 15 years from 1960-65. The authors note, however, that they have not adjusted for other factors besides the existence of state minimum wage laws which could account for this difference.

# BIBLIOGRAPHY

1. Campbell, Colin D. and Campbell, Rosemary G. "State Minimum Wage Laws as a Cause of Unemployment," Southern Economic Journal, XXXV, (April 1969).

2. _____. Reply to White and Jones, Southern Economic Journal, XXXVII, (January 1971).

3. Ehrenberg, Ronald G. Fringe Benefits and Overtime Behavior, D.C. Heath and Co. (Lexington, Mass. 1971).

4. _____. "Heterogeneous Labor, the Internal Labor Market, and the Dynamics of the Employment-Hours Decision," Journal of Economic Theory, III(1), (March 1971).

5. _____. "The Impact of the Overtime Premium on Employment and Hours in U.S. Industry," Western Economic Journal, IX, (June 1971).

6. Gardner, Bruce. "Minimum Wages and the Farm Labor Market," American Journal of Agricultural Economics, (August 1972).

7. Hashimoto, Masanori and Mincer, Jacob. "Employment and Unemployment Effects of Minimum Wages," The NBER Survey of Research into Poverty Labor Markets, National Bureau of Economic Research (New York, forthcoming).

8. Kosters, Marvin and Welch, Finis. "The Effects of Minimum Wages on the Distribution of Changes in Aggregate Employment," American Economic Review, LXII, (June 1972).

9. Kreps, Juanita. "Youth Unemployment and Minimum Wages: Some Further Questions," Nebraska Journal of Economics and Business, X(1), (Winter 1971).

10. Lianos, Theodore P. "Impact of Minimum Wages Upon the Level and the Composition of Agricultural Employment," American Journal of Agricultural Economics, (August 1972).

11. Mattila, J. Peter. The Impact of Extending Minimum Wages to Private Household Workers, Ohio State University Research Foundation Report, (October 1971).

## Studies In Process

Demographic Characteristics of Nonsupervisory Employees in the Work Clothing Industry - This is a pilot study to test the feasibility of collecting employee characteristics data partly from the employer and, with the employer's assistance, from his employees. The survey field-work has been completed and data are currently being tabulated. The study will provide nationwide data on characteristics such as age, sex, race, education, wage earner status, hourly earnings (for a payroll period in March 1972) and annual earnings of nonsupervisory workers in a low-wage industry. Besides providing a picture of the socio-economic position of these workers, this information will be useful in evaluating the significance of the Federal minimum wage and assessing the potential impact of an increase in the minimum wage on the work force of the work clothing industry.

Wages and Hours of Work in Selected Nonagricultural Industries - This study will yield comparable data for payroll periods in May 1971 and April 1972 on minimum wage and maximum hours standards as they affect employees in selected low-wage manufacturing, retail trade, finance, insurance and real estate, and service industries. For both the May 1971 and the April 1972 surveys, data were collected on hourly earnings, weekly hours of work, aggregate hours, existence of union-management agreements, establishment provisions for premium pay for daily overtime, and scheduled hours per day and days per week. Since the provisions of the FLSA are applicable only to hotels and motels and retail trade establishments with gross annual sales of $250,000 or more, the data for these groups will be tabulated separately for establishments which meet this sales test as well as for those which do not. For manufacturing and retail trade, tabulations will be prepared for the United States, four broad regions, and metropolitan and nonmetropolitan areas. For the other industries, the data will be tabulated for the United States and the South, by metropolitan and nonmetropolitan areas. Additionally, the April 1972 survey will provide separate tabulations for youths employed in gasoline service stations and drug stores. The information obtained from these two surveys will permit an assessment of the economic impact of proposed changes in the minimum wage and maximum hours standards under the FLSA. Preliminary findings for the May 1971 payroll period can be found in the Special Studies section of this report.

Private Household Workers - This study will provide information on the economic position of private household workers, one of the larger remaining segments of the private economy excluded from the protection

of the Fair Labor Standards Act. Data on wages, weekly hours of work, and fringe benefits (including perquisites) were collected as a part of the May 1971 supplement to the Current Population Survey. These data will permit assessments of the economic position of household workers and the implications of extending the provisions of the FLSA to them. The study will also provide some of the demographic characteristics of household workers such as age, sex, race and position in family unit. The initial findings of the study are summarized in the Special Studies section of this report.

## Studies Currently Being Considered For Fiscal Years 1973 - 1974

Triennial Employer Survey - This triennial survey is an attempt to gather empirical information on a variety of subjects related to the Employment Standards Administration's program areas and interests. The initial survey, as tentatively planned, will be conducted in two parts. The first part will provide general information on: (1) the prevalence of wage garnishments and wage assignments; (2) overtime premium pay practices; (3) maternity leave policies; (4) involuntary retirement; (5) the demographic characteristics of the private nonagricultural nonsupervisory workforce; and (6) employer attitudes as they relate to premium pay for overtime and a youth minimum wage. The second part of the survey, to be fielded a year later, will provide quantitative data on wages and hours of work for all private nonagricultural nonsupervisory employees by region and by major industrial group.

Sheltered Workshops - Section 14(d) of the FLSA authorizes the Secretary of Labor to issue special certificates for the employment of handicapped workers in sheltered workshops at wages not less than 50 percent of the statutory hourly minimum and which are commensurate with those paid nonhandicapped workers in the industry in the vicinity for essentially the same type, quality, and quantity of work. In addition, rates below the 50 percent floor are permitted for certain handicapped workers. A primary goal of this study is to provide an evaluation of sheltered workshops operating under the provisions of the FLSA in terms of the benefits derived by individual clients. The initial phase of the study, involving the construction of an appropriate questionnaire, is still under consideration by various government agencies. It is expected, however, that data will be obtained on: (1) policies, practices, and programs of sheltered workshops; (2) prevalence of supplementary benefits; (3) wage "floor" criteria currently in effect for handicapped persons in sheltered workshops; (4) wage changes since 1968; (5) the "Work Activities Center" concept established by the 1966 Amendments to the Fair Labor Standards Act; and (6) the total number of sheltered workshops and the total number of clients, by type of disability, served in these workshops.

Overtime Standards - The Fair Labor Standards Act, the Public Contracts Act, and the Contract Work Hours and Safety Standards Act set maximum hours standards and provide for the payment of premium rates for hours worked in excess of these standards. The primary thrust of these

laws is to protect the worker from the detrimental effects of long hours and to provide an incentive for employers to hire more workers rather than to schedule overtime hours. The purpose of this study, if undertaken, is to provide an assessment of the impact of statutory hours standards and premium overtime rates on employer decisions to either hire additional workers or schedule overtime hours.

Wage Garnishment and Wage Assignment - The Federal wage garnishment law restricts the amount of an employee's disposable earnings that can be garnisheed and protects the employee from discharge because of garnishment due to any one indebtedness. The Congress, in passing this law, felt that unrestricted garnishment of a workers earnings would increase bankruptcies, encourage predatory credit policies, and result in possible loss of employment to the debtor. A study will be undertaken to provide information on the prevalence of wage garnishments and wage assignments for the private nonagricultural nonsupervisory work force. Data will also be compiled on the number of employees who were discharged because their wages were garnisheed more than once. Additionally, information is being collected on the extent to which State laws and regulations protect employees from wage garnishment.

Sex Discrimination - In occupations for which a structure of job classifications determines the pay received for specified "skill" levels and the path of advancement within an occupation, it is not uncommon to find women concentrated in the lowest paid classifications. To provide data needed to appraise such differences, an in-depth survey will be undertaken of the particular types of operative jobs which are held by both men and women in one or two specific industries. The study will provide information on whether differences in occupational classifications between men and women within the same occupation can be explained by skill differences, seniority, or other company practices. The study will also attempt to isolate those factors that determine movement to higher classifications within an occupation.

## Minimum Wage

There were a total of 83.3 million employed persons in September 1972. Of these, 7.3 million were self-employed and 1.0 million represented unpaid family workers, leaving a net of 75.0 million employed wage and salary workers. However, because some employees hold down more than one job and because of some slight discrepancies between estimates prepared from household interviews and those prepared from establishment records, the total number of wage and salary workers on establishment payrolls in September 1972 was estimated at 77.3 million.

The estimated 47.0 million nonsupervisory employees covered by the minimum wage provisions of the Fair Labor Standards Act in September 1972 represented nearly three-fourths of the employed non-supervisory workforce. With the exception of hired farmworkers, the Federal minimum wage standard currently applicable to these workers is $1.60 an hour. For the 485,000 hired farmworkers first covered by the 1966 amendments the minimum wage is $1.30 an hour, the rate that has been in effect since February 1969 (Table 16 ).

Nonsupervisory employees in the public sector accounted for 5.0 million of the 16.9 million nonsupervisory workers not covered by the minimum wage provisions of the Fair Labor Standards Act. Of the 11.9 million noncovered nonsupervisory workers in the private sector, almost three-fifths--6.8 million--were employed in retail and service establishments and a substantial number--2.1 million-- were employed as private household service workers.

The extension of coverage incorporated in the 1966 amendments was relatively more important for women than for men and for Negro workers than for white workers. Prior to the 1966 amendments, less than one-half of all female nonsupervisory workers were covered, compared to almost three-fourths currently covered--only 2 percentage-points below the coverage ratio for men. While the proportion of covered Negro nonsupervisory workers increased substantially as a result of the 1966 amendments--from 41 percent to 60 percent--their ratio of coverage is still much lower than that for Whites (Table 18 ).

## Overtime

Approximately 40.5 million wage and salary workers, or about two-thirds of the employed nonsupervisory workforce are covered by the overtime provisions of the Fair Labor Standards Act, that is, they are required to be paid time and one-half their regular rate of pay for all hours worked beyond 40 a week. While the 1966 amendments increased the number of employees covered by the overtime

provisions, many of the "newly covered" workers were employed in
restaurants, hotels and motels, and agriculture, industries
specifically exempt from the overtime provisions (Table 19 ).

## Exemptions from Minimum Wage and Overtime

Over 8.4 million nonsupervisory employees were exempt from
both the minimum wage and overtime provisions of the Fair Labor
Standards Act and an additional 6.5 million were exempt from only
its overtime provisions. Nearly half of the employees exempt from
both the minimum wage and overtime provisions in the private sector
were employed in retail trade and 19 percent in the services and
transportation, communication and utilities (Table 21 ).

74

Table 16. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by industry division, United States, September 1972 (Concluded)

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA | | | Number of non-supervisory employees not subject to the minimum wage provisions of the FLSA |
| | Exempt under section 13(a)(1) of FLSA[1] | | | Non-supervisory employees excluding outside salesmen | | | | |
| | Total | Executive, administrative, and professional personnel | Out-side sales-men | | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
|---|---|---|---|---|---|---|---|---|
| Services (excluding domestic service)[4] | 12,482 | 3,315 | 25 | 9,142 | 6,465 | 2,466 | 3,999 | 2,702 |
| Domestic service | 2,063 | - | - | 2,063 | - | - | - | 2,063 |
| Public sector | 13,553 | 5,070 | - | 8,483 | 3,453 | - | 3,453 | 5,030 |
| Federal government | 2,627 | 294 | - | 2,333 | 636 | - | 636 | 1,697 |
| State and local government[4] | 10,926 | 4,776 | - | 6,150 | 2,817 | - | 2,817 | 3,333 |

1/ Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

3/ Estimates for agriculture relate to May 1972.

4/ Estimates for educational services relate to October 1972.

Table 17.   Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by Region and State, September 1972

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen 1/ | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA 4/ | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments 2/ | Subject as a result of the 1966 amendments | |
| United States | 77,340 | 63,889 | 46,950 | 35,159 | 11,791 | 16,939 |
| Domestic workers | 2,063 | 2,063 | - | - | - | 2,063 |
| ATLANTA | 11,161 | 9,239 | 7,020 | 5,268 | 1,752 | 2,219 |
| Alabama | 1,084 | 890 | 657 | 501 | 156 | 233 |
| Florida | 2,404 | 1,969 | 1,476 | 976 | 500 | 493 |
| Georgia | 1,663 | 1,369 | 1,039 | 801 | 238 | 330 |
| Kentucky | 1,012 | 838 | 626 | 456 | 170 | 212 |
| Mississippi | 674 | 557 | 396 | 293 | 103 | 161 |
| North Carolina | 1,913 | 1,609 | 1,278 | 1,025 | 253 | 331 |
| South Carolina | 936 | 780 | 600 | 477 | 123 | 180 |
| Tennessee | 1,475 | 1,227 | 948 | 739 | 209 | 279 |
| BOSTON | 4,679 | 3,863 | 3,003 | 2,285 | 718 | 860 |
| Connecticut | 1,207 | 1,007 | 810 | 639 | 171 | 197 |
| Maine | 348 | 286 | 219 | 159 | 60 | 67 |
| Massachusetts | 2,313 | 1,903 | 1,466 | 1,106 | 360 | 437 |
| New Hampshire | 289 | 238 | 179 | 136 | 43 | 59 |
| Rhode Island | 359 | 296 | 233 | 179 | 54 | 63 |
| Vermont | 163 | 133 | 96 | 66 | 30 | 37 |

77

Table 17. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>minimum wage</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972
(Continued)                                    (in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA[1] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
| CHICAGO | 16,706 | 13,846 | 10,894 | 8,466 | 2,428 | 2,952 |
| Illinois | 4,469 | 3,704 | 2,935 | 2,307 | 628 | 769 |
| Indiana | 1,956 | 1,634 | 1,310 | 1,034 | 276 | 324 |
| Michigan | 3,158 | 2,614 | 2,081 | 1,610 | 471 | 533 |
| Minnesota | 1,418 | 1,164 | 872 | 641 | 231 | 292 |
| Ohio | 4,047 | 3,362 | 2,660 | 2,098 | 562 | 702 |
| Wisconsin | 1,658 | 1,368 | 1,036 | 776 | 260 | 332 |
| DALLAS | 6,926 | 5,673 | 4,170 | 2,995 | 1,175 | 1,503 |
| Arkansas | 652 | 546 | 371 | 268 | 103 | 175 |
| Louisiana | 1,124 | 919 | 678 | 497 | 181 | 241 |
| New Mexico | 331 | 263 | 182 | 118 | 64 | 81 |
| Oklahoma | 840 | 679 | 496 | 334 | 162 | 183 |
| Texas | 3,979 | 3,266 | 2,443 | 1,778 | 665 | 823 |
| DENVER | 1,975 | 1,588 | 1,094 | 722 | 372 | 494 |
| Colorado | 845 | 684 | 502 | 345 | 157 | 182 |
| Montana | 228 | 185 | 115 | 73 | 42 | 70 |
| North Dakota | 191 | 152 | 93 | 53 | 40 | 59 |
| South Dakota | 191 | 151 | 91 | 55 | 36 | 60 |
| Utah | 392 | 313 | 227 | 152 | 75 | 86 |
| Wyoming | 128 | 103 | 66 | 44 | 22 | 37 |

78

Table 17.  Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the minimum wage provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1/] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA [1/] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments [2/] | Subject as a result of the 1966 amendments | |
| KANSAS CITY | 3,960 | 3,240 | 2,372 | 1,722 | 650 | 868 |
| Iowa | 969 | 795 | 566 | 400 | 166 | 229 |
| Kansas | 728 | 589 | 415 | 289 | 126 | 174 |
| Missouri | 1,721 | 1,415 | 1,078 | 818 | 260 | 337 |
| Nebraska | 542 | 441 | 313 | 215 | 98 | 128 |
| NEW YORK | 9,889 | 8,088 | 6,176 | 4,805 | 1,371 | 1,912 |
| New Jersey | 2,710 | 2,246 | 1,720 | 1,383 | 337 | 526 |
| New York | 7,179 | 5,842 | 4,456 | 3,422 | 1,034 | 1,386 |
| PHILADELPHIA | 8,830 | 7,216 | 5,454 | 4,108 | 1,346 | 1,762 |
| Delaware | 225 | 187 | 146 | 113 | 33 | 41 |
| District of Columbia | 582 | 427 | 237 | 145 | 92 | 190 |
| Maryland | 1,449 | 1,172 | 842 | 611 | 231 | 330 |
| Pennsylvania | 4,363 | 3,620 | 2,861 | 2,242 | 619 | 759 |
| Virginia | 1,664 | 1,356 | 1,017 | 728 | 289 | 339 |
| West Virginia | 547 | 454 | 351 | 269 | 82 | 103 |

79

Table 17. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the **minimum wage** provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Concluded)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA [1] | | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments [2] | Subject as a result of the 1966 amendments | |
| SAN FRANCISCO | 8,785 | 7,148 | 5,379 | 3,801 | 1,578 | 1,769 |
| Arizona | 688 | 562 | 410 | 286 | 124 | 152 |
| California | 7,532 | 6,137 | 4,635 | 3,320 | 1,315 | 1,502 |
| Hawaii | 327 | 263 | 201 | 111 | 90 | 62 |
| Nevada | 238 | 186 | 133 | 84 | 49 | 53 |
| SEATTLE | 2,366 | 1,925 | 1,388 | 987 | 401 | 537 |
| Alaska | 106 | 83 | 58 | 39 | 19 | 25 |
| Idaho | 251 | 205 | 138 | 94 | 44 | 67 |
| Oregon | 825 | 677 | 491 | 362 | 129 | 186 |
| Washington | 1,184 | 960 | 701 | 492 | 209 | 259 |

1/ Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity, (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesmen. . .

2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

8

Table 18. Estimated number of nonsupervisory employees subject to the minimum wage provisions of the Fair Labor Standards Act, by sex and race, September 1972

(in thousands)

| Sex and race | Total number of nonsupervisory employees 1/ :Total | Number of nonsupervisory employees subject to the minimum wage provisions of the FLSA | | Number of nonsupervisory employees not subject to the minimum wage provisions of the FLSA |
|---|---|---|---|---|
| | | Subject prior to the 1966 amendments 2/ | Subject as a result of the 1966 amendments | |
| Total | 63,889 | 46,950 | 35,159 | 11,791 | 16,939 |
| White | 55,487 | 41,887 | 31,670 | 10,217 | 13,600 |
| Negro and other races | 8,402 | 5,063 | 3,489 | 1,574 | 3,339 |
| Negro | 7,799 | 4,687 | 3,244 | 1,443 | 3,112 |
| Male | 39,248 | 29,134 | 23,679 | 5,455 | 10,114 |
| White | 34,686 | 25,751 | 21,074 | 4,677 | 8,935 |
| Negro and other races | 4,562 | 3,383 | 2,605 | 778 | 1,179 |
| Negro | 4,203 | 3,148 | 2,446 | 702 | 1,055 |
| Female | 24,641 | 17,816 | 11,480 | 6,336 | 6,825 |
| White | 20,801 | 16,136 | 10,596 | 5,540 | 4,665 |
| Negro and other races | 3,840 | 1,680 | 884 | 796 | 2,160 |
| Negro | 3,596 | 1,539 | 798 | 741 | 2,057 |

1/ All employees are included except academic administrative personnel and teachers in elementary and secondary schools and executive, administrative, and professional employees in all other activities.
2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

Table 19. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by industry division, United States, September 1972

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provisions of the FLSA |
|---|---|---|---|---|---|---|---|---|
| | Total | Exempt under section 13(a)(1) of FLSA[1] | | Non-supervisory employees excluding salesmen | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
| | | Executive, administrative, and professional personnel | Out-side sales-men | | | | | |
| All industries | 77,340 | 13,451 | 2,069 | 61,820 | 40,489 | 32,312 | 8,177 | 23,400 |
| Private sector | 63,787 | 8,381 | 2,069 | 53,337 | 37,181 | 32,312 | 4,869 | 18,225 |
| Agriculture[3] | 1,267 | 68 | - | 1,199 | - | - | - | 1,199 |
| Mining | 613 | 66 | - | 547 | 531 | 531 | - | 16 |
| Contract construction | 3,785 | 304 | 2 | 3,479 | 3,424 | 2,832 | 592 | 57 |
| Manufacturing | 19,298 | 1,942 | 459 | 16,897 | 16,145 | 16,113 | 32 | 1,211 |
| Transportation, communications, utilities | 4,548 | 468 | 9 | 4,071 | 2,398 | 2,362 | 36 | 1,682 |
| Wholesale trade | 3,962 | 575 | 804 | 2,583 | 2,350 | 2,268 | 82 | 1,037 |
| Retail trade | 11,812 | 1,081 | 102 | 10,629 | 4,713 | 3,407 | 1,306 | 6,018 |
| Finance, insurance, real estate | 3,957 | 562 | 668 | 2,727 | 2,576 | 2,487 | 89 | 819 |

See footnotes at end of table.

Table 19. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by industry division, United States, September 1972 (Concluded)

(in thousands)

| Industry division | Number of employed wage and salary workers in the civilian labor force | | | | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of non-supervisory employees not subject to the overtime provisions of the FLSA |
|---|---|---|---|---|---|---|---|---|
| | Total | Exempt under section 13(a)(1) of FLSA[1] | | Non-supervisory employees excluding outside salesmen | Total | Subject prior to the 1966 amendments[2] | Subject as a result of the 1966 amendments | |
| | | Executive, administrative, and professional personnel | Out-side men | | | | | |
| Services (excluding domestic service)[4] | 12,482 | 3,315 | 25 | 9,142 | 5,044 | 2,312 | 2,732 | 4,123 |
| Domestic service | 2,063 | - | - | 2,063 | - | - | - | 2,063 |
| Public sector | 13,553 | 5,070 | - | 8,483 | 3,308 | - | 3,308 | 5,175 |
| Federal government | 2,627 | 294 | - | 2,333 | 636 | - | 636 | 1,697 5/ |
| State and local government[4] | 10,926 | 4,776 | - | 6,150 | 2,672 | - | 2,672 | 3,478 |

1/ Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

3/ Estimates for agriculture relate to May 1972.

4/ Estimates for education relate to October 1972.

5/ Federal employees, not covered by the overtime provisions of the Fair Labor Standards Act, who are under the General Schedule of salary rates are paid 1 1/2 times the employee's regular rate from Grade 1 through the first step of Grade 10.

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments[2] | |
| United States | 77,340 | 63,889 | 40,489 | 32,312 | 8,177 | 23,400 |
| Domestic workers | 2,063 | 2,063 | - | - | - | 2,063 |
| ATLANTA | 11,161 | 9,239 | 6,052 | 4,831 | 1,221 | 3,187 |
| Alabama | 1,084 | 890 | 582 | 466 | 116 | 308 |
| Florida | 2,404 | 1,969 | 1,141 | 852 | 289 | 828 |
| Georgia | 1,663 | 1,369 | 906 | 729 | 177 | 463 |
| Kentucky | 1,012 | 838 | 540 | 415 | 125 | 298 |
| Mississippi | 674 | 557 | 347 | 273 | 74 | 210 |
| North Carolina | 1,913 | 1,609 | 1,152 | 960 | 192 | 457 |
| South Carolina | 936 | 780 | 545 | 450 | 95 | 235 |
| Tennessee | 1,475 | 1,227 | 839 | 686 | 153 | 388 |
| BOSTON | 4,679 | 3,863 | 2,651 | 2,150 | 501 | 1,212 |
| Connecticut | 1,207 | 1,007 | 729 | 609 | 120 | 278 |
| Maine | 348 | 286 | 187 | 143 | 44 | 99 |
| Massachusetts | 2,313 | 1,903 | 1,281 | 1,037 | 244 | 622 |
| New Hampshire | 289 | 238 | 160 | 129 | 31 | 78 |
| Rhode Island | 359 | 296 | 211 | 170 | 41 | 85 |
| Vermont | 163 | 133 | 83 | 62 | 21 | 50 |

84

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the overtime compensation provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1/] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments[2/] | |
| CHICAGO | 16,706 | 13,846 | 9,536 | 7,835 | 1,701 | 4,310 |
| Illinois | 4,469 | 3,704 | 2,560 | 2,118 | 442 | 1,144 |
| Indiana | 1,956 | 1,634 | 1,162 | 965 | 197 | 472 |
| Michigan | 3,158 | 2,614 | 1,855 | 1,517 | 338 | 759 |
| Minnesota | 1,418 | 1,164 | 729 | 577 | 152 | 435 |
| Ohio | 4,047 | 3,362 | 2,342 | 1,947 | 395 | 1,020 |
| Wisconsin | 1,658 | 1,368 | 888 | 711 | 177 | 480 |
| DALLAS | 6,926 | 5,673 | 3,526 | 2,715 | 811 | 2,147 |
| Arkansas | 652 | 546 | 307 | 242 | 65 | 239 |
| Louisiana | 1,124 | 919 | 574 | 443 | 131 | 345 |
| New Mexico | 331 | 263 | 156 | 107 | 49 | 107 |
| Oklahoma | 840 | 679 | 418 | 303 | 115 | 261 |
| Texas | 3,979 | 3,266 | 2,071 | 1,620 | 451 | 1,195 |
| DENVER | 1,975 | 1,588 | 898 | 633 | 265 | 690 |
| Colorado | 845 | 684 | 418 | 310 | 108 | 266 |
| Montana | 228 | 185 | 89 | 60 | 29 | 96 |
| North Dakota | 191 | 152 | 71 | 44 | 27 | 81 |
| South Dakota | 191 | 151 | 74 | 48 | 26 | 77 |
| Utah | 392 | 313 | 195 | 135 | 60 | 118 |
| Wyoming | 128 | 103 | 51 | 36 | 15 | 52 |

85

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>overtime compensation</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Continued)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen [1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments [2] | |
| KANSAS CITY | 3,960 | 3,240 | 1,996 | 1,545 | 451 | 1,244 |
| Iowa | 969 | 795 | 473 | 362 | 111 | 322 |
| Kansas | 728 | 589 | 344 | 255 | 89 | 245 |
| Missouri | 1,721 | 1,415 | 926 | 740 | 186 | 489 |
| Nebraska | 542 | 441 | 253 | 188 | 65 | 188 |
| NEW YORK | 9,889 | 8,088 | 5,465 | 4,470 | 995 | 2,623 |
| New Jersey | 2,710 | 2,246 | 1,532 | 1,287 | 245 | 714 |
| New York | 7,179 | 5,842 | 3,933 | 3,183 | 750 | 1,909 |
| PHILADELPHIA | 8,830 | 7,216 | 4,818 | 3,810 | 1,008 | 2,398 |
| Delaware | 225 | 187 | 129 | 105 | 24 | 58 |
| District of Columbia | 582 | 427 | 207 | 135 | 72 | 220 |
| Maryland | 1,449 | 1,172 | 730 | 558 | 172 | 442 |
| Pennsylvania | 4,363 | 3,620 | 2,557 | 2,106 | 451 | 1,063 |
| Virginia | 1,664 | 1,356 | 883 | 660 | 223 | 473 |
| West Virginia | 547 | 454 | 312 | 246 | 66 | 142 |

Table 20. Estimated number of employed wage and salary workers in the civilian labor force classified by their status under the <u>overtime compensation</u> provisions of the Fair Labor Standards Act, by Region and State, September 1972 (Concluded)

(in thousands)

| Region and State | Employed wage and salary workers in the civilian labor force | Nonsupervisory employees including outside salesmen[1] | Number of nonsupervisory employees subject to the overtime compensation provisions of the FLSA | | | Number of nonsupervisory employees not subject to the overtime compensation provision of the FLSA |
|---|---|---|---|---|---|---|
| | | | Total | Subject prior to the 1966 amendments | Subject as a result of the 1966 amendments[2] | |
| SAN FRANCISCO | 8,785 | 7,148 | 4,405 | 3,458 | 947 | 2,743 |
| Arizona | 688 | 562 | 347 | 264 | 83 | 215 |
| California | 7,532 | 6,137 | 3,821 | 3,021 | 800 | 2,316 |
| Hawaii | 327 | 263 | 138 | 95 | 43 | 125 |
| Nevada | 238 | 186 | 99 | 78 | 21 | 87 |
| SEATTLE | 2,366 | 1,925 | 1,142 | 865 | 277 | 783 |
| Alaska | 106 | 83 | 48 | 32 | 16 | 35 |
| Idaho | 251 | 205 | 101 | 73 | 28 | 104 |
| Oregon | 825 | 677 | 412 | 324 | 88 | 265 |
| Washington | 1,184 | 960 | 581 | 436 | 145 | 379 |

1/ Section 13(a)(1) exempts from the minimum wage and overtime provisions of the Fair Labor Standards Act "any employee employed in a bona fide executive, administrative, or professional capacity, (including any employee employed in the capacity of academic administrative personnel, or teacher in elementary or secondary schools), or in the capacity of outside salesman. . ."

2/ Relates to currently employed workers who would have been subject under criteria in effect prior to the 1966 amendments.

Table 21. Estimated number of nonsupervisory employees exempt from
the minimum wage provisions or the overtime provisions of
the Fair Labor Standards Act by industry division,
September 1972

(in thousands)

| Industry division | Estimated number of nonsupervisory employees in categories in which minimum wage exemptions apply | Estimated number of nonsupervisory employees in categories in which only overtime exemptions apply |
|---|---|---|
| All industries | 8,412 | 6,461 |
| Private sector | 8,412 | 6,316 |
| Agriculture | 714 | 485 |
| Mining | - | 11 |
| Contract construction | 19 | 38 |
| Manufacturing | 517 | 643 |
| Transportation, communications, utilities | 10 | 1,593 |
| Wholesale trade | 804 | 226 |
| Retail trade | 4,120 | 1,898 |
| Finance, insurance, real estate | 668 | 1 |
| Services, (excluding domestic service) | 1,561 | 1,421 |
| Public sector | - | 145 |
| Federal government | - | - |
| State and local government | - | 145 |

Note:  Details may not add to totals due to rounding.

88

# ADDENDUM  C

## DEPARTMENT OF LABOR

### Wage and Hour Division

### 29 CFR Part 552

**RIN 1235–AA05**

### Application of the Fair Labor Standards Act to Domestic Service

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** In 1974, Congress extended the protections of the Fair Labor Standards Act (FLSA or the Act) to "domestic service" employees, but it exempted from the Act's minimum wage and overtime provisions domestic service employees who provide "companionship services" to elderly people or people with illnesses, injuries, or disabilities who require assistance in caring for themselves, and it exempted from the Act's overtime provision domestic service employees who reside in the household in which they provide services. This Final Rule revises the Department's 1975 regulations implementing these amendments to the Act to better reflect Congressional intent given the changes to the home care industry and workforce since that time. Most significantly, the Department is revising the definition of "companionship services" to clarify and narrow the duties that fall within the term; in addition third party employers, such as home care agencies, will not be able to claim either of the exemptions. The major effect of this Final Rule is that more domestic service workers will be protected by the FLSA's minimum wage, overtime, and recordkeeping provisions.

**DATES:** This regulation is effective January 1, 2015.

**FOR FURTHER INFORMATION CONTACT:** Mary Ziegler, Director, Division of Regulations, Legislation, and Interpretation, U.S. Department of Labor, Wage and Hour Division, 200 Constitution Avenue NW., Room S–3502, FP Building, Washington, DC 20210; telephone: (202) 693–0406 (this is not a toll-free number). Copies of this Final Rule may be obtained in alternative formats (Large Print, Braille, Audio Tape, or Disc), upon request, by calling (202) 693–0675 (not a toll-free number). TTY/TTD callers may dial toll-free (877) 889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of the agency's current regulations may be directed to the nearest Wage and Hour Division (WHD) District Office. Please visit *http://www.dol.gov/whd* for more information and resources about the laws administered and enforced by WHD. Information and compliance assistance materials specific to this Final Rule can be found at: *www.dol.gov/whd/homecare.* You may also call the WHD's toll-free help line at (866) 4US–WAGE ((866)487–9243) between 8:00 a.m. and 5:00 p.m. in your local time zone..

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
III. Summary of Comments on Changes to FLSA Domestic Service Regulations
  A. Section 552.3 (Domestic Service Employment)
  B. Section 552.6 (Companionship Services)
  C. Section 552.102 (Live-In Domestic Service Employees) and Section 552.110 (Recordkeeping Requirements)
  D. Section 552.109 (Third Party Employment)
  E. Other Comments
IV. Effective Date
V. Paperwork Reduction Act
VI. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)
VII. Final Regulatory Flexibility Analysis
VIII. Unfunded Mandates Reform Act
IX. Executive Order 13132 (Federalism)
X. Executive Order 13175 (Indian Tribal Governments)
XI. Effects on Families
XII. Executive Order 13045 (Protection of Children)
XIII. Environmental Impact Assessment
XIV. Executive Order 13211 (Energy Supply)
XV. Executive Order 12630 (Constitutionally Protected Property Rights)
XVI. Executive Order 12988 (Civil Justice Reform Analysis)
List of Subjects in 29 CFR part 552
Signature
Amendments to Regulatory Text

## I. Executive Summary

### Purpose of the Regulatory Action

Prior to 1974, the FLSA's minimum wage and overtime compensation provisions did not protect domestic service workers unless those workers were employed by enterprises covered by the Act (generally those that had at least a certain annual dollar threshold in business, *see* 29 U.S.C. 203(s)). Congress amended the FLSA in 1974 to extend coverage to all domestic service workers, including those employed by private households or companies too small to be covered by the Act. See Fair Labor Standards Amendments of 1974, Public Law 93–259 § 7, 88 Stat. 55, 62 (1974). At the same time, Congress created an exemption from the minimum wage and overtime compensation requirements for domestic service workers who provide companionship services and an exemption from the Act's overtime compensation requirement for domestic service workers who reside in the households in which they provide services, i.e., live-in domestic service workers. *Id.;* 29 U.S.C. 13(a)(15), 13(b)(21).[1] The new statutory text explicitly granted the Department the authority to define the terms "domestic service employment" and "companionship services." *See* 29 U.S.C. 213(a)(15).

The legislative history of the 1974 amendments explains that the changes were intended to expand the coverage of the FLSA to include all employees whose vocation was domestic service, but to exempt from coverage casual babysitters and individuals who provided companionship services. The "companionship services" exemption was to apply to "elder sitters" whose primary responsibility was to watch over an elderly person or person with an illness, injury, or disability in the same manner that a babysitter watches over children. *See* 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973) (statement of Sen. Williams). The companionship services exemption was not intended to exclude "trained personnel such as nurses, whether registered or practical," from the protections of the Act. *See* Senate Report No. 93–690, 93rd Cong., 2d Sess., p. 20 (1974); House Report No. 93–913, 93rd Cong., 2d Sess., p. 36 (1974).

In 1975, the Department promulgated regulations implementing the companionship services and live-in domestic service employee exemptions. *See* 40 FR 7404 (Feb. 20, 1975); 29 CFR part 552. These regulations defined companionship services as "fellowship, care, and protection," which included "household work . . . such as meal preparation, bed making, washing of clothes, and other similar services" and could include general household work not exceeding "20 percent of the total weekly hours worked." 29 CFR 552.6. Additionally, the 1975 regulations permitted third party employers, or employers of home care workers other than the individuals receiving care or their families or households, to claim both the companionship services and

---

[1] Congress simultaneously also created an exemption from the Act's minimum wage and overtime requirements for domestic service employees "employed on a casual basis . . . to provide babysitting services." 29 U.S.C. 213(a)(15). This rulemaking does not make, nor did the proposal it follows suggest, changes to the Department's regulations regarding the babysitting exemption.

live-in domestic service employee exemptions. 29 CFR 552.109. These regulations have remained substantially unchanged since they were promulgated.

The home care industry, however, has undergone dramatic expansion and transformation in the past several decades. The Department uses the term home care industry to include providers of home care services, and the term "home care services" to describe services performed by workers in private homes and whose job titles include home health aide, personal care attendant, homemaker, companion, and others.

In the 1970s, many individuals with significant care needs were served in institutional settings rather than in their homes and their communities. Since that time, there has been a growing demand for long-term home care for persons of all ages, largely due to the rising cost of traditional institutional care and, in response to the disability civil rights movement, the availability of federal funding assistance for home care, reflecting the nation's commitment to accommodate the desire of individuals to remain in their homes and communities. As more individuals receive services at home rather than in nursing homes or other institutions, workers who provide home care services, referred to as "direct care workers" in this Final Rule but employed under titles including certified nursing assistants, home health aides, personal care aides, and caregivers, perform increasingly skilled duties. Today, direct care workers are for the most part not the elder sitters that Congress envisioned when it enacted the companionship services exemption in 1974, but are instead professional caregivers.

Despite this professionalization of home care work, many direct care workers employed by individuals and third-parties have been excluded from the minimum wage and overtime protections of the FLSA under the companionship services exemption, which courts have read broadly to encompass essentially all workers providing services in the home to elderly people or people with illnesses, injuries, or disabilities regardless of the skill the duties performed require. The earnings of these workers remain among the lowest in the service industry, impeding efforts to improve both jobs and care. The Department believes that the lack of FLSA protections harms direct care workers, who depend on wages for their livelihood and that of their families, as well as the individuals receiving services and their families, who depend on a professional, trained workforce to provide high-quality services.

Because the 1975 regulations define companionship services and address third-party employment in a manner that, given the changes to the home care services industry, the home care services workforce, and the scope of home care services provided, no longer aligns with Congress's intent when it extended FLSA protections to domestic service employees, the Department is modifying the relevant regulatory provisions in 29 CFR part 552. These changes are intended to clarify and narrow the scope of duties that fall within the definition of companionship services in order to limit the application of the exemption. The Department intends for the exemption to apply to those direct care workers who are performing "elder sitting" rather than the professionalized workforce for whom home care is a vocation. In addition, by prohibiting employers of direct care workers other than the individual receiving services or his or her family or household from claiming the companionship services or live-in domestic service employment exemptions, the Department is giving effect to Congress's intent in 1974 to expand coverage to domestic service employees rather than to restrict coverage for a category of workers already covered.

*Summary of the Major Provisions of the Final Rule*

This Final Rule makes changes to several sections of 29 CFR part 552, the Department's regulations concerning domestic service employment.

The Department is slightly revising the definition of "domestic service employment" in § 552.3 to clarify the language and modernize the list of examples of professions that fall within this category.

This Final Rule also updates the definition of "companionship services" in § 552.6 in order to restrict the term to encompass only workers who are providing the sorts of limited, non-professional services Congress envisioned when creating the exemption. Specifically, paragraph (a), which uses more modern language than appears in the 1974 amendments or 1975 regulations, provides that "companionship services" means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. It also defines "fellowship" as engaging the person in social, physical, and mental activities and "protection" as being present with the person in his or her home, or to accompany the person when outside of the home, to monitor the person's safety and well-being. Paragraph (b) provides that the term "companionship services" also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. It defines "care" as assistance with activities of daily living and instrumental activities of daily living. Paragraph (c) provides that the term "companionship services" does not include general domestic services performed primarily for the benefit of other members of the household. Paragraph (d) provides that the term "companionship services" does not include the performance of medically related services, and it explains that the determination of whether the services performed are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants, regardless of the actual training or occupational title of the individual providing the services.

In order to better ensure that live-in domestic service employees are compensated for all hours worked, the Department is also changing the language in §§ 552.102 and .110 to require the keeping of actual records of the hours worked by such employees.

The Department is revising § 552.109, the regulatory provision regarding domestic service employees employed by third-party employers, or employers other than the individual receiving services or his or her family or household. To better ensure that the domestic service employees to whom Congress intended to extend FLSA protections in fact enjoy those protections, the new regulatory text precludes third party employers (*e.g.,* home care agencies) from claiming the exemption for companionship services or live-in domestic service employees.

**Effective Date**

These changes will become effective on January 1, 2015. The Department believes that this extended effective date takes into account the complexity of the federal and state systems that are a significant source of funding for home care work and the needs of the diverse parties affected by this Final Rule (including consumers, their families, home care agencies, direct care workers, and local, state and federal Medicaid

programs) by providing such parties, programs and systems time to adjust.

*Costs and Benefits*

The Table below illustrates the potential scale of projected transfers, costs, and net benefits of the revisions to the FLSA regulations addressing domestic service employment. The primary effect shown in the Table is the transfer of income from home care agencies (and payers because a portion of costs will likely be passed through via price increases) to direct care workers, due to more workers being protected under the FLSA; the Department projects an average annualized transfer of $321.8 million in the medium-impact scenario (using a 7 percent real discount rate). These income transfers result from the narrowing of the companionship services exemption, specifically: payment for time spent by direct care workers traveling between individuals

receiving services (consumers) for the same employer, and payment of an overtime premium when hours worked exceed 40 hours per week. Transfers resulting from the requirement to pay the minimum wage are expected to be zero because current wage data suggests that few affected workers, if any, are currently paid less than the federal minimum wage per hour.

The Department projects that the average annualized direct costs for regulatory familiarization, hiring new workers, and the deadweight loss due to the potential allocative inefficiency resulting from the rule will average $6.8 million per year over a 10-year period. In perspective, regulatory familiarization, hiring new workers, and the deadweight loss represents about 0.007 percent of industry revenue, while the disemployment impact of the rule affects about 0.06 percent of direct care workers. The relatively small deadweight loss occurs because both the

demand for and supply of home care services appear to be inelastic in the largest component of this market, in which public payers reimburse for home care; thus, the equilibrium quantity of home care services is not very responsive to the changes in price.

The Department also expects the rule will reduce the high turnover rate among direct care workers, along with its associated employment costs to agencies, a key quantifiable benefit of the Final Rule. Because overtime compensation, hiring costs, and reduction in turnover depend on how employers choose to comply with the rule, the Department estimated a range of impacts based on three adjustment scenarios; the table below presents the intermediate scenario—"Overtime Scenario 2"—which is, along with a complete discussion of the data sources, methods, and results of this analysis, presented in Section VI, Executive Orders 12866 and 13563.

TABLE—SUMMARY OF IMPACT OF CHANGES TO FLSA COMPANIONSHIP SERVICES EXEMPTION

| Impact | Year 1 ($ mil.) | Future years ($ mil.) | | Average annualized value ($ mil.) [a] | |
|---|---|---|---|---|---|
| | | | | 3% Real rate | 7% Real rate |
| **Total Transfers** | | | | | |
| Minimum wages [b] + Travel wages + Overtime Scenario 2 ..................... | $210.2 | $240.9 | $468.3 | $330.6 | $321.8 |
| *(Lower bound—upper bound)* ........................................................ | ($104–$281) | ($119–$627) | | ($159–$442) | |
| **Total Cost of Regulations** [e] | | | | | |
| Regulatory Familiarization + Hiring Costs [c] + Deadweight Loss ............ | $20.7 | $4.2 | $5.1 | $6.5 | $6.8 |
| *(Lower bound—upper bound)* ........................................................ | ($19–$21) | ($4–$5) | | ($6–$7) | |
| Disemployment (number of workers) ..................................................... | 812 | 885 | 1,477 | 1,144 [d] | |
| **Net Benefits** | | | | | |
| Overtime Scenario 2 [c] ......................................................................... | $9.4 | $20.5 | $15.5 | $17.1 | $17.1 |
| *(Lower bound—upper bound)* ........................................................ | ($–4–20) | ($3–$31) | | ($4–$27) | |

[a] These costs represent a range over the nine year span. Costs are lowest in Year 2 and highest in Year 10 so these two values are reported.
[b] 2011 statistics on wages indicate that few affected workers, if any, are currently paid below the minimum wage (i.e. in no state is the 10th percentile wage below $7.25 per hour). See the Bureau of Labor Statistics Occupational Employment Statistics (OES), 2011 state estimates. Available at: *http://stats.bls.gov/oes/*.
[c] Based on overtime hours needed to be covered under Overtime Scenario 2.
[d] Simple average over 10 years.
[e] Excludes paperwork burden, estimated in Section V.

Not included in the table is the opportunity cost of managerial time spent adjusting worker schedules to reduce or avoid overtime hours and travel time. The Department expects these costs to be relatively small because employers, particularly home care agencies, already manage the schedules of nonexempt home care employees and therefore have systems in place to facilitate scheduling workers.

Also unquantified is the potential impact on direct care workers resulting from employers making such schedule changes.

The costs, benefits and transfer effects of the Final Rule depend on the actions of employers, decision-makers within federal and state programs that provide funding for home care services, consumers, and workers. Depending upon whether employers choose to

continue current work practices, rearrange worker schedules, or hire new workers, the costs, benefits and transfers will vary. The Department notes that the delayed effective date of this Final Rule creates a transition period during which all entities potentially impacted by this rule have the opportunity to review existing policies and practices and make necessary adjustments for compliance with this Final Rule. We believe this

transition period mitigates short-term impacts for the regulated community, relative to a regulatory alternative in which compliance is required immediately upon finalization. The Department will work closely with stakeholders and the Department of Health and Human Services to provide additional guidance and technical assistance during the period before the rule becomes effective, in order to ensure a transition that minimizes potential disruption in services and supports the progress that has allowed elderly people and persons with disabilities to remain in their homes and participate in their communities.

## II. Background

### A. What the FLSA Provides

The FLSA requires, among other things, that all covered employees receive minimum wage and overtime compensation, subject to various exemptions. The FLSA as originally enacted only covered domestic service workers if they worked for a covered enterprise, i.e., an agency or business subject to the FLSA or were an individual engaged in interstate commerce, an unlikely occurrence. Thus, prior to 1974, domestic service workers employed by covered businesses to provide cooking, cleaning, or caregiving tasks in private homes were entitled to the Act's minimum wage and overtime compensation provisions. In 1974, Congress extended FLSA coverage to "domestic service" employees employed in private households. *See* 29 U.S.C. 202(a), 206(f), 207(l). Domestic service workers include, for example, employees employed as cooks, butlers, valets, maids, housekeepers, governesses, janitors, laundresses, caretakers, handymen, gardeners, and family chauffeurs. Senate Report No. 93–690, 93rd Cong., 2d Sess. p. 20 (1974). Thus, workers performing domestic tasks, such as cooking, cleaning, doing laundry, driving, and general housekeeping, and employed in private homes, either by households or by third party employers, are protected by the basic minimum wage and overtime protections of the FLSA.

Congressional committee reports state the reasons for extending the minimum wage and overtime protections to domestic service employees were "so compelling and generally recognized as to make it hardly necessary to cite them." Senate Report No. 93–690, p. 18. The reports also state that private household work had been one of the least attractive fields of employment because wages were low, work hours

were highly irregular, and non-wage benefits were few. *Id.* The U.S. House of Representatives Committee on Education and Labor stated its expectation "that extending minimum wage and overtime protection to domestic service workers will not only raise the wages of these workers but will improve the sorry image of household employment . . . Including domestic workers under the protection of the Act should help to raise the status and dignity of this work." House Report No. 93–913, 93rd Cong., 2d Sess., pp. 33–34 (1974). During a debate on the amendments, one Senator referred to the importance of "the dignity and respect that ought to come with honest work" and the low wages that left many domestic service employees unable to rise out of poverty. *See* 119 Cong. Rec. S24773, S24799–80 (daily ed. July 19, 1973) (statement of Sen. Williams).

When Congress extended FLSA protections to domestic service employees, however, it created two exemptions within that category. First, it exempted from both the minimum wage and overtime compensation requirements of the Act casual babysitters and "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. 213(a)(15). Second, it exempted from the overtime pay requirement "any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. 213(b)(21).

The legislative history explains:

It is the intent of the committee to include within the coverage of the Act all employees whose vocation is domestic service. However, the exemption reflects the intent of the committee to exclude from coverage . . . companions for individuals who are unable because of age and infirmity to care for themselves. But it is not intended that trained personnel such as nurses, whether registered or practical, shall be excluded. People who will be employed in the excluded categories are not regular bread-winners or responsible for their families' support. The fact that persons performing . . . services as companions do some incidental household work does not keep them from being . . . companions for purposes of this exclusion.

Senate Report No. 93–690, p. 20; House Report No. 93–913, pp. 36. In addition, Senator Williams, Chairman of the Senate Subcommittee on Labor and the Senate floor manager of the 1974 amendments to the FLSA, described individuals who provided companionship services as "elder

sitters" whose primary responsibility was "to be there and to watch" over an elderly person or person with an illness, injury, or disability in the same manner that a babysitter watches over children, "not to do household work." 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973). He explained that the category of workers to which the term refers includes "a neighbor" who "comes in and sits with" "an aged father, an aged mother, an infirm father, an infirm mother." *Id.* Senator Williams further noted that "if the individual is [in the home] for the actual purpose of being . . . a companion," any work that is "purely incidental" would not mean the exemption did not apply. *Id.* Examples of such incidental work in the legislative history were "making lunch" or, in the babysitting context, "throwing a diaper into the washing machine." *Id.*

### B. Regulatory History

On February 20, 1975, the Department issued regulations at 29 CFR part 552 implementing the domestic service employment provisions. *See* 40 FR 7404. Subpart A of the rule defined and delimited the terms "domestic service employment," "employee employed on a casual basis in domestic service employment to provide babysitting services," and "employment to provide companionship services to individuals who (because of age or infirmity) are unable to care for themselves." Subpart B of the rule set forth statements of general policy and interpretation concerning the application of the FLSA to domestic service employees including live-in domestic service employees. Section 552.6 defined companionship services as "fellowship, care, and protection," which included "household work . . . such as meal preparation, bed making, washing of clothes, and other similar services" and could include general household work not exceeding "20 percent of the total weekly hours worked." Section 552.109 provided that third party employers could claim the companionship services exemption or live-in domestic service employee exemption.

On December 30, 1993, the Department published a Notice of Proposed Rulemaking (NPRM) in the **Federal Register**, inviting public comments on a proposal to revise 29 CFR 552.109 to clarify that, in order for the exemptions under § 13(a)(15) and § 13(b)(21) of the FLSA to apply, employees engaged in companionship services and live-in domestic service who are employed by a third party employer or agency must be "jointly" employed by the individual, family, or household using their services. Other

minor updating and technical corrections were included in the proposal. *See* 58 FR 69310. On September 8, 1995, the Department published a Final Rule revising the regulations to incorporate changes required by the recently enacted changes to Title II of the Social Security Act and making other updating and technical revisions. *See* 60 FR 46766. That same day, the Department published a proposed rule re-opening and extending the comment period on the proposed changes to § 552.109 concerning third party employment. *See* 60 FR 46797. The Department did not finalize this proposed change.

On January 19, 2001, the Department published an NPRM to amend the regulations to revise the definition of "companionship services" to more closely adhere to Congressional intent. The Department also sought to clarify the criteria used to determine whether employees qualify as trained personnel and to amend the regulations concerning third party employment. On April 23, 2001, the Department published a proposed rule re-opening and extending the comment period on the January 2001 proposed rule. *See* 66 FR 20411. This rulemaking was eventually withdrawn and terminated on April 8, 2002. *See* 67 FR 16668.

On December 27, 2011, the Department published an NPRM inviting public comments for a period of sixty (60) days on proposed changes to the exemptions for employees performing companionship services and live-in domestic service employees. *See* 76 FR 81190. The proposed changes were based on the Department's experience, including its previous rulemaking efforts, a thorough review of the legislative history, meetings with stakeholders, as well as additional research conducted concerning the changes in the demand for home care services, the home care industry, and the home care services workforce. On February 24, 2012, the Department extended the period for filing written comments. *See* 77 FR 11021. On March 13, 2012, the Department again extended the period for filing written comments with a final comment closing date of March 21, 2012. *See* 77 FR 14688. This Final Rule is the result of consideration of the comments received in response to the December 27, 2011 NPRM.

*C. Need for Rulemaking*

Since the Department published its regulations implementing the 1974 amendments to the FLSA, the home care industry has undergone dramatic transformation. In the 1970s,

individuals who had significant care needs went into institutional settings. Over time, however, our nation has come to recognize the importance of providing services in private homes and other community-based settings and of supporting individuals in remaining in their homes and communities. This shift is in part a result of the rising cost of traditional institutional care, and has been made possible in significant part by the availability of government funding assistance for home care under Medicare and Medicaid.[2] The growing demand for long-term home care services is also due to the significant increase in the percentage of elderly people in the United States.[3] The Supreme Court's decision in *Olmstead* v. *L.C.*, 527 U.S. 581 (1999), which held that it is a violation of the Americans with Disabilities Act for public entities to fail to provide services to persons with disabilities in the most integrated setting appropriate, further solidified our country's commitment to decreasing institutionalization and has also influenced this important trend.

This shift is reflected in the increasing number of agencies and workers engaged in home care. The number of Medicare-certified home care agencies increased from 2,242 in 1975 to 7,747 in 1999 and by the end of 2009, had grown to 10,581.[4] There has been a similar increase in the employment of home health aides and personal care aides in the private homes of individuals in need of assistance with basic daily living or health maintenance activities. The number of workers in these jobs tripled between 1988 and 2001; by 2001 there were 560,190 workers employed as home health aides and 408,360 workers

employed as personal care aides.[5] Between 2001 and 2011, home health aide employment increased 65 percent to 924,650 and personal care aide employment doubled, increasing to 820,600.[6]

Furthermore, as services for elderly people and people with illnesses, injuries, or disabilities who require assistance in caring for themselves (referred to in this Final Rule as consumers) have increasingly been provided in individuals' homes rather than in nursing homes or other institutions, the duties performed in homes have changed as well. Most direct care workers are employed to do more than simply sit with and watch over the individuals for whom they work. They assist consumers with activities of daily living and instrumental activities of daily living, such as bathing, dressing, housework, or preparing meals. They often also provide medical care, such as managing the consumer's medications or performing tracheostomy care, that was previously almost exclusively provided in hospitals, nursing homes, or other institutional settings and by trained nurses. This work is far more skilled and professional than that of someone performing "elder sitting." Although some direct care workers today still perform the services Congress contemplated, *i.e.,* sit with and watch over individuals in their homes, most do much more.

Yet the growth in demand for home care and the professionalization of the home care workforce have not resulted in growth in earnings for direct care workers. The earnings of employees in the home health aide and personal care aide categories remain among the lowest in the service industry. Studies have shown that the low income of direct care workers continues to impede efforts to improve both the circumstances of the workers and the quality of the services they provide.[7] Covering direct care workers under the Act is, thus, an important step in ensuring that the home care industry attracts and retains qualified workers that the sector will need in the future.

These low wages are at least in part the result of the application of the companionship services exemption to a wide range of direct care workers who then may not be paid minimum wage

---

[2] Public funds pay the overwhelming majority of the cost for providing home care services. Medicare payments represent over 40 percent of the industry's total revenues; other payment sources include Medicaid, insurance plans, and direct pay. The National Association for Home Care and Hospice (NAHC) reports, based on data from the Centers for Medicare and Medicaid Services (CMS), state that Medicare and Medicaid together paid roughly two-thirds of the funds paid to freestanding agencies (41 and 24 percent, respectively). Centers for Medicare and Medicaid Services (CMS), Office of the Actuary, National Health Care Expenditures Historical and Projections: 1965–2016. State and local governments account for 15 percent of revenues, while private health insurance accounts for eight percent. Out-of-pocket funds account for 10 percent of agency revenues. *http://www.bls.gov/oes/current/oes399021.htm.*

[3] *See* Shrestha, Laura, *The Changing Demographic Profile of the United States,* Congressional Research Service p. 13–14 (2006).

[4] *See* The National Association for Home Care & Hospice (NAHC), *Basic Statistics About Homecare: Updated 2010,* (2010). Available at: *http://web.archive.org/web/20120515112644/http://nahc.org/facts/10HC_Stats.pdf.*

[5] Bureau of Labor Statistics' (BLS), Occupational Employment Statistics (OES).

[6] *http://www.bls.gov/oes/current/oes399021.htm.*

[7] *See* Brannon, Diane, et al., "Job Perceptions and Intent to Leave Among Direct Care Workers: Evidence From the Better Jobs Better Care Demonstrations" *The Gerontologist,* 47, 6, p. 820–829 (2007).

for all hours worked and likely do not receive overtime wages for hours worked over forty in a workweek. In some instances, employers may be improperly claiming the exemption as to employees whose work falls outside the existing definition of companionship services in 29 CFR 552.6. In many others, however, employers are relying on the Department's 1975 regulation, which was written at a time when the scope of direct care work was much more limited and neither Congress nor the Department predicted the developments in home care services that were to come.

Courts have interpreted the current regulation broadly such that the companionship services exemption has expanded along with the home care industry and workforce; based on this expansive reading of the current regulation, essentially any services provided for an elderly person or person with an illness, injury, or disability in the person's private home constitute companionship services for which minimum wage and overtime need not be paid. *See, e.g., Sayler* v. *Ohio Bureau of Workers' Comp.,* 83 F.3d 784, 787 (6th Cir. 1996) (holding that a worker who "helps [an adult with a serious back injury] dress, gives him his medication, helps him bathe, assists him in getting around their home, and cleans his bedclothes when he loses control of his bowels" is providing companionship services under § 552.6); *McCune* v. *Or. Senior Servs. Div.,* 894 F.2d 1107, 1108–09 (9th Cir. 1990) (accepting that "full-time, live-in attendants for elderly and infirm individuals unable to care for themselves" who perform "cleaning, cooking, and hygiene and medical care" for those individuals were providing companionship services because under the current regulation, "the recipients of these services [are] the determinative factor in applying the [companionship services] exception"); *Fowler* v. *Incor,* 279 F. App'x 590, 596 (10th Cir. 2008) (noting that "[c]are related to the individual" that falls within the current definition of companionship services "has been expanded to include more frequent vacuuming and dusting for a client with allergies, mopping and sweeping for clients who crawl on the floor, and habilitation training, which often includes training the client to do housework, cooking, and attending to person hygiene"); *Cook* v. *Diana Hays and Options, Inc.,* 212 F. App'x 295, 296–97 (5th Cir. 2006) (holding that a direct care worker "employed by . . . a non-profit corporation that provides home health care" who "provided

simple physical therapy, prepared [consumers'] meals, assisted with [consumers'] eating, baths, bed-making, and teeth brushing, completed housework . . . and accompanied them on walks, to doctor visits, to Mass, and to the grocery store" was exempt from the FLSA under the companionship services exemption as defined in current § 552.6). Furthermore, courts have narrowly construed the regulation's exclusion of "trained personnel" from companionship services such that direct care workers providing medical care, including certified nursing assistants and often home health aides, are not protected by the FLSA. *See, e.g., McCune,* 894 F.2d at 1110–11 (holding that certified nursing assistants were not "trained personnel" excluded from the regulatory definition of companionship services because, unlike registered nurses and licensed practical nurses, certified nursing assistants in that case received only 60 hours of training); *Cox* v. *Acme Health Servs., Inc.,* 55 F.3d 1304, 1309–10 (7th Cir. 1995) (holding that a home health aide who had completed 75 hours of required training and "performed patient care" including "administering complete bed baths, position and turning patients in bed, tube-feeding, the taking and recording of vital signs, bowel and bladder training, changing and cleaning patients' catheters, administering enemas, range-of-motion exercise training, speech training, and inserting non-medicated suppositories" did not qualify as "trained personnel" and therefore provided "companionship services" as defined in the Department's regulations).

In this Final Rule, the Department is exercising its authority to amend the domestic service employment regulations to clarify and narrow the set of employees as to whom the companionship services and live-in domestic service employee exemptions may be claimed. *See Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 165 (2007) (discussing the gaps in the FLSA, including "the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services'" that Congress "entrusted the agency to work out" (citing 29 U.S.C. 213(a)(15))). These limits are meant to ensure that these exemptions are applied only to the extent Congress intended in enacting the 1974 amendments.

Furthermore, because of the Department's revisions to these regulations, as home-based services continue to expand, employers will have clear guidance about the need to afford most direct care workers the

protections of the FLSA, and the continued growth of home-based services will occur based on a realistic understanding of the professional nature of the home care workforce. Specifically, as explained in detail in this preamble, only direct care workers who primarily provide fellowship and protection are providing companionship services. Direct care workers who are employed by third party employers, such as private home care agencies, are the type of professional workers whose vocation merits minimum wage and overtime protections. Direct care workers who provide medically related services, such as certified nursing assistants, are doing work that calls for more skill and effort than that encompassed by the term "companionship services." The Department believes that based on these principles, most direct care workers acting as home health aides, and many whose title is personal care assistant, will be entitled to minimum wage and overtime. These workers are due the respect and dignity that accompanies the protections of the FLSA.

The Department recognizes that this Final Rule will have an impact on individuals and families who rely on direct care workers for crucial assistance with day-to-day living and community participation. Throughout the rulemaking process, the Department has carefully considered the effects of the rule on consumers and has taken into account the perspective of elderly people and people with illnesses, injuries, and disabilities, as well as workers, employers, public agencies, and others. The Department has responded to comments from members of those groups and organizations representing them throughout this Final Rule. In particular, this preamble explains that the Department does not believe, as some commenters have suggested, that the rule will interfere with the growth of home- and community-based caregiving programs and thereby lead to increased institutionalization. Furthermore, the preamble explains that many states require the payment of minimum wage and often overtime to direct care workers, and the detrimental effects on the home care industry some commenters predict have not occurred in those states. To the contrary, the Department believes that ensuring minimum wage and overtime compensation will not only benefit direct care workers but also consumers because supporting and stabilizing the direct care workforce will result in better qualified employees, lower

turnover, and a higher quality of care. Furthermore, as described in detail throughout this preamble, the Department has modified the proposed regulations in response to comments to make the rule easier for the regulated community to understand and apply.

## III. Summary of Comments on Changes to the FLSA Domestic Service Regulations

More than 26,000 individuals commented on the Department's Notice of Proposed Rulemaking. Comments were received from a broad array of constituencies, including direct care workers, consumers of home care services, small business owners and employers, worker advocacy groups and unions, employer and industry advocacy groups, law firms, Members of Congress, state government agencies, federal government agencies, professional associations, the disability community, and other interested members of the public. Several organizations attached the views of some of their individual members: National Partnership for Women and Families (8,733 individual comments), Progressive Jewish Alliance and Jewish Funds for Justice (687 individual comments), and Interfaith Worker Justice (500 individual comments), for example. Other organizations submitted a comment and attached membership signatures, such as the National Women's Law Center (Center) (3,392 signatures). Additional comments submitted after the comment period closed are not considered part of the official record and were not considered. All comments timely received may be viewed on the *www.regulations.gov* Web site, docket ID WHD–2011–0003.

Many comments received in response to the NPRM are: (1) Very general statements of support or opposition; (2) personal anecdotes that do not address a specific aspect of the proposed changes; (3) comments that are beyond the scope or authority of the proposed regulations; or (4) identical or nearly identical "form letters" sent in response to comment initiatives sponsored by various constituent groups. The remaining comments reflect a wide variety of views on the merits of particular sections of the proposed regulations. Many include substantive analyses and arguments in support of or in opposition to the proposed regulations. The substantive comments received on the proposed regulations are discussed below, together with the Department's response to those comments and a section-by-section discussion of the changes that have been made in the final regulatory text.

### Terminology

Several commenters indicated that terms used by the Department in the NPRM were inconsistent with industry use and may be misinterpreted. Commenters themselves used a number of different terms in referring to the industry, the workers potentially impacted by the proposed rule, and the individuals receiving services from workers potentially impacted by the proposed rule. The Department has made an effort to modify its use of language where possible in the Final Rule except when quoting the statute, legislative history, case law, or when quoting a commenter. For example, the Department notes that the terms "aged" and "infirmity" appear in the current regulatory text due to the language Congress used in the statutory exemption. *See* 29 U.S.C. 213(a)(15). However, where possible throughout the preamble discussion, the Department instead uses the term "consumers" or "elderly people or people with illnesses, injuries, or disabilities" when discussing those who receive home care services, including companionship services. When discussing the workers who may be impacted by the Final Rule, the Department instead uses the term "direct care worker" to encompass the occupational categories of these domestic service workers and the terms used by commenters, such as home health aides, personal care aides, attendants, direct support professionals, and family caregivers. Finally, in this Final Rule, the Department uses the term "home care" to reflect the broader industry rather than home health care which specifically covers medical assistance performed by certified personnel.

### Section-by-Section Analysis of Final Regulations

A. Section 552.3 (Domestic Service Employment)

Section 552.3, which defines domestic service employment, currently reads, "[a]s used in section 13(a)(15) of the Act, the term *domestic service employment* refers to services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed." Section 552.3 also provides an illustrative list of various occupations which are considered "domestic service employment."

In the NPRM, the Department proposed to update and clarify the definition of domestic service employment in § 552.3. Specifically, the Department proposed to remove the qualifying introductory language "as used in section 13(a)(15) of the Act" because section 13(a)(15) refers to the Act's exemption for those employed to provide babysitting services on a casual basis and those performing companionship services. The definition of domestic service employment has a broader context than just the exemption found in 13(a)(15). The Department also proposed to remove the phrase "of the person by whom he or she is employed" from the definition because the Department believes this phrase may be confusing and misread as impermissibly narrowing coverage of domestic service employees under the Act. In addition, the Department proposed to delete the more outdated occupations listed in § 552.3, such as "governesses," "footmen," and "grooms," and to include more modern occupations, such as "nannies," "home health aides," and "personal care aides." The Department also proposed to include babysitters and companions on the list of domestic service workers. For the reasons stated below, this provision is adopted without change in the Final Rule. An additional conforming change has also been made to § 552.101(a).

Several organizations wrote to support the proposed changes, commenting that the proposed revised language would add clarity, thus reducing confusion among workers and employers. For example, the Equal Justice Center (EJC) lauded the Department's deletion of the introductory language referencing section 13(a)(15) of the Act, noting that "the introductory language of section 552.3 . . . created a definitional inconsistency by exempting a group of workers Congress intended to include. The proposed deletion of this language effects clarity and serves as a recognition of the broad spectrum of occupations within the home Congress intended to protect."

Other organizations supported the Department's proposal to remove the language specifying that domestic service work be performed in the home of the person by whom he or she is employed. The Center stated that the removal of the language "will prevent confusion that could lead to narrower coverage of domestic service employees under the FLSA. This is particularly important given the high percentage of home care workers employed by third parties or agencies." Similarly, the American Federation of State, County and Municipal Employees (AFSCME) supported the Department's revised definition, stating, "removal of the definitional interpretation potentially limiting such work to a private home of

the employer aptly adjusts the law to existing workplace realities.

Commenters also voiced support for the Department's proposal to update the list of occupations that fall within the definition of domestic service employment. The EJC supported the Department's change to the list of illustrative occupations, explaining that, the revision "limits litigation of coverage by guiding the Courts through modern and more accessible terminology that denotes the occupations that Congress intended to cover since 1974." This organization also commended the Department's addition of home health aides and personal care aides in the regulation, reflecting the prominence of the occupations in the burgeoning home care industry. *See also* American Civil Liberties Union (ACLU); PHI; and Susan Flanagan.

Few comments were received in opposition to the proposed definition. Those that opposed the proposed changes did so generally, such as the Texas Association for Home Care and Hospice, which commented that the definition should not be amended to include companions, home health aides, or personal care aides. Additionally, AARP, although generally supportive of the changes, recommended adding language to the regulation stating that a job title does not control legal status.

The Department has carefully considered all the comments regarding the proposed change to the definition of "domestic service employment" and has decided to adopt the regulation as proposed. The Department is making a conforming change to § 552.101(a) by deleting the phrase "of the employer," so that the definition of "domestic service employment" is consistent with § 552.3. The Department believes that updating and clarifying this definition by deleting the limiting language "as used in section 13(a)(15) of the Act" reflects the legislative history, which is to extend FLSA coverage to all domestic employees whose "vocation" was domestic service. The Department also believes that deleting the phrase "of the person by whom he or she is employed" from the definition is more consistent with the legislative history. As discussed in the NPRM, this language has been part of the regulations since first implemented in 1975; however, the Department believes the definition may be confusing and may be misread as impermissibly narrowing coverage of domestic service employees under the FLSA. The Senate Committee responsible for the 1974 amendments looked at regulations issued under the Social Security Act for defining

domestic service. The Department borrowed this language from the Social Security regulations without discussion or elaboration, and has consistently maintained that the phrase is an extraneous vestige. *See Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 169–70 (2007). This phrasing is not applicable to the realities of domestic service employment today, in which many employees are employed, either solely or jointly, by an entity other than the person in whose home the services are performed. Removal of this extraneous language more accurately reflects Congressional intent and clarifies coverage of these workers. 76 FR 81192.

*Private Home*

The Department also received a few comments concerning what constitutes a "private home." The ACLU noted that a private home is distinguishable from a building that an employer rents out to strangers. One individual stated that the Department's definition of private home is too restrictive and does not extend to Independent Living or Assisted Living communities. This individual suggested that such residences should be considered the private home of the elderly individuals because they live there, the living arrangements are not temporary, and the individual's furniture, pictures, and personal files remain in the residence.

As explained above, in order to qualify as a domestic service employee, an employee's work must be performed in or about a "private home." §§ 552.3, 552.101. The Department did not propose any changes to the definition of "private home," and nothing in this Final Rule is altering the determination of whether work is being performed in or about a private home. Nonetheless, because this is a threshold question for determining whether an employer is entitled to claim the companionship services exemption, the Department is offering a summary of the definition of "private home" under existing law.

Under the Department's regulations, a private home may be a fixed place of abode or a temporary dwelling. § 552.101(a). "A separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home." *Id.* However, "[e]mployees employed in dwelling places which are primarily rooming or boarding houses are not considered domestic service employees. The places where they work are not private homes but commercial or business establishments." § 552.101(b).

The Senate Report also discusses the term "private home," noting that "the domestic service must be performed in a private home which is a fixed place of abode of an individual or family." S. Rep. No. 93–690, at 20 (1974). The Senate Report notes that "[a] separate and distinct dwelling maintained by an individual or family in an apartment house or hotel may constitute a private home. However, a dwelling house used primarily as a boarding or lodging house for the purpose of supplying such services to the public, as a business enterprise, is not a private home." *Id.*

Several courts have addressed whether home care services were performed in a private home. In *Welding* v. *Bios Corp.,* 353 F.3d 1214 (10th Cir. 2004), the Tenth Circuit Court of Appeals analyzed whether a business providing services to individuals with developmental disabilities was entitled to rely on the companionship services exemption in paying its employees. The court explained that to claim the exemption, the business must establish that the services were provided in a private home. In assessing whether the residences at issue were private homes, the court described six factors (discussed below) to consider. *Id.* at 1219–20; *see Johnston* v. *Volunteers of Am., Inc.,* 213 F.3d 559, 562 (10th Cir. 2000) (explaining that the employer bears the burden of proving its employees fit within the companionship exemption). The court noted that the "key inquiries are who has ultimate management control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services." *Id.* at 1219.

The first factor calls for considering whether the client lived in the living unit before he or she received any services. If the person did not live in the home before becoming a client, and if the person would not live in the home if he or she were not receiving services, then the living unit would not be considered a private home. *Id.*

The second factor analyzes who owns the living unit; the court noted that "[o]wnership is significant because it evidences control." 353 F.3d at 1219. If the living unit is owned by the client or the client's family, this is an indication that the services are performed in a private home. *Id.* However, if the living unit is owned by a service provider, this is an indication that the services are not performed in a private home. *Id.* If the client or the client's family leases the unit directly from the owner, the court concluded that this is some indication that it is a private home. *Id.; see Terwilliger* v. *Home of Hope, Inc.,* 21 F.

Supp. 2d 1294, 1299 (N.D. Okla. 1998) (holding that services were performed in a private home when the clients owned or leased the residences from a third party and the service provider had no legal interest in the residence). If the service provider leases the unit, the court concluded that this is some indication that it is not a private home. 353 F.3d at 1219; *Madison* v. *Res. for Human Dev., Inc.,* 233 F.3d 175, 179 (3d Cir. 2000) (holding that residences are not private homes when clients selected residences from provider-approved list and service provider leased the residences and subleased them to clients).

The third factor looks to who manages and maintains the residence, *i.e.,* who provides the essentials that the client needs to live there, such as paying the mortgage or rent, utilities, food, and house wares. The court explained that "[i]f many of the essentials of daily living are provided for by the client or the client's family, that weighs strongly in favor of it being a private home. If they are provided for by the service provider, that weighs strongly in favor of it not being a private home." 353 F.3d at 1220.

The fourth factor is whether the client would be allowed to live in the unit if the client were not receiving services from the service provider. 353 F.3d at 1220. If the client would be allowed to live in the unit without contracting for services, then this factor would weigh in favor of it being a private home. *Id.; Madison,* 233 F.3d at 183 (concluding that it is not a private home if clients could not remain in the residence if they terminated their relationship with the service provider).

The fifth factor considers the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit. 353 F.3d at 1220. "If the cost/value of the services is incidental to the other living expenses, that weighs in favor it being a private home." *Id.*

The sixth factor addresses whether the service provider uses any part of the residence for the provider's own business purposes. 353 F.3d at 1220. The court concluded that if the service provider uses any part of the residence for its own business purpose, then this fact weighs in favor of it not being a private home. *Id.; see Johnston,* 213 F.3d at 565 (concluding that a residence is not a private home when the service provider had an office in the home for employees). If, however, the service provider does not use any part of the residence for its own business purpose, then this factor weighs in favor of it being a private home. 353 F.3d at 1220.

Other courts have looked at additional factors, emphasizing that all relevant factors must be considered. Those factors include: whether significant public funding is involved; who determines who lives together in the home; whether residents live together for treatment purposes as part of an overall care program; the number of residents; whether the clients can come and go freely; whether the employer or the client acquires the furniture; who has access to the home; and whether the provider is a for profit or not for profit entity. *See, e.g., Johnston,* 213 F.3d at 563–65; *Linn* v. *Developmental Services of Tulsa, Inc.,* 891 F. Supp. 574 (N.D. Okla. 1995); *Lott* v. *Rigby,* 746 F. Supp. 1084 (N.D. Ga. 1990).

Several courts have addressed the question of whether particular group residences of individuals in need of care are private homes. For example, the Tenth Circuit Court of Appeals held in *Johnston* v. *Volunteers of America, Inc.,* 213 F.3d 559 (10th Cir. 2000), that a business that provides care services to individuals with developmental disabilities in a supported living program did not meet its burden of proof to show that services were provided in a private home when the residents were placed outside the family home with strangers who also needed services and without the full-time, live-in care of a relative. *Id.* at 565. The court also relied on the facts that the clients' diets and daily activities were controlled by the business' employees and not a family member, and that the business could appropriate a room to use as an office. *Id.* Similarly, in *Madison* v. *Resources for Human Development, Inc.,* 233 F.3d 175 (3d Cir. 2000), the Third Circuit held that a non-profit corporation that provides supported living arrangements for adults with disabilities was not providing services in a private home. *Id.* at 184. In support of this holding, the court noted that the clients do not have a possessory interest in the homes; they sublease the property from the corporation, and they may only remain in the home to the extent they maintain a continued relationship with the corporation. *Id.* at 183. The court also relied on the fact that the clients do not have full control over who may access the home and that the clients did not have unfettered freedom in their day-to-day conduct. *Id.*

Following the analysis provided for in the case law, the Department has recognized that whether a living arrangement qualifies as a private home is a fact-specific inquiry. *See* Wage and Hour Opinion Letter, 2001 WL 1558952 (Feb. 9, 2001); Wage and Hour

Opinion Letter, FLSA 2006–13NA (June 23, 2006). In evaluating whether a residence is a private home, the Department considers the six factors identified by the Tenth Circuit in *Welding* as well as the other factors identified in *Johnston, Linn* and *Lott. See* Wage and Hour Opinion Letter, FLSA 2006–13NA (June 23, 2006). The Department has made clear that the fact that the home is the sole residence of the individual is not enough to make it a private home under the FLSA. *See* Wage and Hour Opinion Letter, FLSA 2006–13NA (June 23, 2006), at 2; *see also Lott,* 746 F. Supp. at 1087 (concluding that the fact that the home was the client's sole residence was not enough to make it a private home). For example, in an opinion letter, the Department concluded that "adult homes" designed for individuals who are in need of assistance with certain day-to-day functions, such as meal preparation, housekeeping, and medications, were not private homes. *See* Wage and Hour Opinion Letter, FLSA 2001–14, 2001 WL 1869966, at 1 (May 14, 2001). The Department's conclusion was based on the fact that the clients are placed in a residence outside the family home and without the full-time live-in care of a relative. *Id.* at 2. The clients are housed in a residence with others who are also in need of long-term residential care. *Id.* Moreover, facility employees, and not a family member, control the client's diets and daily activities (to some degree). The Department also considered that the adult homes may select the clients who will share the same residence and can set up two residents per room, although the client has the right to request a private room for a higher fee. *Id.* Finally, despite the client's participation in the upkeep of the home, the service provider is ultimately responsible for the maintenance of the residence. *Id.*

However, in another case, the Department concluded that supported living services provided to consumers were performed in a private home. *See* Wage and Hour Opinion Letter, 1999 WL 1002387, at 2 (Apr. 8, 1999). In support of this conclusion, the Department noted that neither the public agency nor the private agency that provides the services determines where a client will live or with whom. *Id.* Rather, the client or the client's guardian makes these decisions and he or she is responsible for leasing the residence and paying the rent as well as for furnishing it to suit the individual's tastes and resources. *Id.* The Department also noted that the client typically lives alone or with only one roommate, and

that the private agency has no financial interest in the client's housing as it does not own or lease any of the housing.

As explained above, determining whether a particular living unit is a private home requires a fact-intensive analysis. Generally, such an inquiry exists along a continuum: on one end, a home owned and occupied for many years by an elderly individual would be a private home; on the other end of the continuum, a typical nursing home would not be considered a private home under the regulations. This Final Rule does not alter this inquiry in any way; rather, the analysis to determine whether an employee is working in a "private home" remains unchanged. Thus, employees who are working in a location that is not a private home were never properly classified as domestic service employees under the current regulations, and employers were not and are not entitled to claim the companionship services or live-in worker exemptions for such employees.

## B. Section 552.6 (Companionship Services)

Current § 552.6 defines the term "companionship services" as "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs." In the NPRM, the Department stated its intention to modernize and clarify what is encompassed within the definition of fellowship, care, and protection. Specifically, the Department proposed to divide § 552.6 into four paragraphs. Proposed paragraph (a) defined "companionship services" as "the provision of fellowship and protection" and described the duties and activities that fall within the meaning of those terms. Proposed paragraph (b) described the "intimate personal care services" that could be part of companionship services if provided "incidental" to fellowship and protection. Proposed paragraph (c) excluded from companionship services household work benefitting members of the household other than the consumer. Proposed paragraph (d) provided that companionship services do not include medical care of the type described.

The Final Rule maintains the general organizational structure of this section as proposed but modifies the proposed regulatory text as described below.

As an initial note, in this Final Rule, the Department has modified proposed § 552.6 by deleting the terms "aged," "advanced age," "infirm," "infirmity," and "physical or mental infirmity" in the title and regulatory text of this section. Where a descriptor is needed, the Department has substituted "elderly person or person with an illness, injury, or disability." In addition, the Department has replaced in the regulatory text the phrase "unable to care for themselves" with "requires assistance in caring for himself or herself." Although the language being replaced is derived from FLSA section 13(a)(15) and the existing regulations at § 552.6, the Department recognizes that such language is outdated and does not reflect contemporary views regarding the elderly and people with disabilities. The Department therefore has modified the text in the Final Rule and has made conforming changes to the title and text of § 552.106, which repeats the language from § 552.6. In addition, throughout this preamble, the Department has sought to use updated language, except when quoting from the statute, the legislative history, the current or proposed regulations, or comments submitted in response to the NPRM. By modernizing this language, the Department does not in any way intend to change the intent of Congress with respect to those who use companionship services.

## Section 552.6(a) (Fellowship and Protection)

Proposed § 552.6(a) defined "companionship services" as "the provision of fellowship and protection" for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The proposed language further defined the term "fellowship" to mean "to engage the person in social, physical, and mental activities, including conversation, reading, games, crafts, walks, errands, appointments, and social events" and the term "protection" to mean "to be present with the person in their home or to accompany the person when outside of the home to monitor the person's safety and well-being." The Department adopts paragraph (a) essentially as proposed, with the slight modifications described below.

Comments from employees, employee advocacy groups and labor organizations generally supported the proposed revision of paragraph (a), agreeing with the Department that the definition more accurately reflected Congress's intent that the companionship exemption be akin to "elder sitting." *See, e.g.,* Golden Gate University School of Law, Women's Employment Rights Clinic; Center on Wisconsin Strategy (COWS); National Employment Law Project (NELP); *see also* comments of several individual direct care workers stating that their work is not "at all" like elder sitting. Specifically, these individuals and organizations noted that Congress clearly wished to include under the protections of the Act employees for whom domestic work was a vocation, while allowing a narrow exemption for more casual arrangements. The Service Employees International Union (SEIU) explained that this distinction should turn on whether "such tasks and duties are of a nature more typically performed by a worker engaged in his or her livelihood or rather, on a less formal basis, by a non-breadwinner." *See* SEIU; *see also* AFSCME, American Federation of Labor–Congress of International Organizations (AFL–CIO). In addition, Senator Harkin, joined by 18 other Senators, affirmed the Department's assessment of the legislative history, explaining that "by the term 'companion' Congress meant someone who sits with an elderly or infirm person."

Some non-profit advocacy organizations such as AARP, the National Council on Aging, and the National Consumers League (NCL) also supported the revised definition. These organizations noted that the revised definition would be helpful in clarifying what duties would be considered exempt "companionship services" and that the Department correctly identified "fellowship" and "protection" as the primary duties of an exempt companion. Similarly, the EJC stated that the definition would provide clarity, "thereby assisting attorneys and courts to more readily find coverage by effectively categorizing an employee's work as either domestic or companionship services."

Several employers, employer organizations and some associations opposed the proposed § 552.6(a), stating that its focus on fellowship and protection was inconsistent with legislative intent. Some of these commenters stated that the scope of the proposed definition is too restrictive, and "goes too far conceptually in relating companionship to baby or elder 'sitting'." *See* National Association of State Directors of Developmental Disabilities Services (NASDDDS). In addition, although the American Network of Community Options and Resources (ANCOR), among others, concurred that the focus of companionship services should be fellowship and protection, it also requested that "most assistance with dressing, grooming, meal preparation, feeding, and driving" be included as part of fellowship and protection.

Commenters also sought further guidance from the Department concerning the scope of the companionship services definition. For example, the National Resource Center for Participant-Directed Services (NRCPDS) requested clarification regarding the use of the "and" in the phrase "fellowship and protection" because it suggests that it may be insufficient to provide either fellowship or protection alone, in the absence of the other. Additionally, many industry commenters were concerned that the Department's proposal excised the term "care" from the definitions of companionship services. These comments are discussed in greater detail below, in the subsection addressing § 552.6(b).

After carefully considering the comments concerning its proposed definition of "companionship services," the Department has decided to adopt proposed § 552.6(a) with modifications. For the reasons described above, the Final Rule deletes the words "for a person, who, because of advanced age or physical or mental infirmity, is unable to care for themselves" found in the first sentence of proposed § 552.6(a) and uses instead "for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself." In addition, the adopted regulatory text defining fellowship and protection has been slightly edited for clarity; these minor adjustments to wording and punctuation do not change the meaning of the regulation as proposed. The second and third sentences of § 552.6(a) read: "The provision of *fellowship* means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of *protection* means to be present with the person in his or her home, or to accompany the person when outside of the home, to monitor the person's safety and well-being."

The Department believes this definition of companionship services is appropriate based on the legislative history of the 1974 FLSA amendments and dictionary definitions of relevant terms. The legislative history indicates that Congress intended to remove from the FLSA's minimum wage and overtime compensation protections only those domestic service workers for whom domestic service was not their vocation and whose actual purpose was to provide casual babysitting or companionship services. The legislative history describes a companion as someone who "sits with [an elderly

person]," provides "constant attendance," and renders services similar to a babysitter, *i.e.*, "someone to be there and watch an older person," or an "elder sitter." *See* 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973).

Dictionary definitions are also instructive in understanding the scope of an exempt companion's duties. The dictionary defines companionship as the "relationship of companions; fellowship," and the term "companion" is defined as a "person who associates with or accompanies another or others; associate; comrade." *See* Webster's New World Dictionary, p. 288 (2d College Ed. 1972). It further defines "fellowship" as including "a mutual sharing, as of experience, activity, interest, etc." *Id.* at 514. These definitions demonstrate that a companion is someone in the home primarily to watch over and care for the elderly person or person with an illness, injury, or disability.

For these reasons, the Department believes it is appropriate for "companionship services" to be primarily focused on the provision of fellowship and protection, and that this focus is consistent with the general principle that coverage under the FLSA is broadly construed so as to give effect to its remedial purposes, and exemptions are narrowly interpreted and limited in application to those who clearly are within the terms and spirit of the exemption. *See, e.g., A.H. Phillips, Inc.* v. *Walling*, 324 U.S. 490, 493 (1945). Examples of activities that fall within fellowship and protection may include: watching television together; visiting with friends and neighbors; taking walks; playing cards, or engaging in hobbies. For the reasons explained below, the Department's definition of "companionship services" also allows for certain "care" activities, as defined in § 552.6(b), to be performed attendant to and in conjunction with fellowship and protection, as long as those activities comprise no more than 20 percent of the direct care worker's time working for a particular person in a particular workweek.

In response to commenters who requested clarification as to the Department's use of the phrase "fellowship and protection," it is the Department's intent that the great majority of duties performed by a direct care worker whose duties meet the definition of companionship services will encompass both fellowship and protection, and that a caregiver would be hired to perform both duties. However, a direct care worker may, at times, perform certain tasks that require either fellowship or protection, such as

sitting with a consumer while the individual naps (in which case, only protection would be provided) and still meet the definition of performing companionship services. The Department notes that this type of activity would not prevent application of the exemption, because the worker would be available to provide fellowship services when the consumer awakens.

Section 552.6(b) (Care)

Proposed § 552.6(b) provided that "[t]he term 'companionship services' may include intimate personal care services that are incidental to the provision of fellowship and protection for the aged or infirm person." The proposed regulatory text further provided that these intimate personal care services "must be performed attendant to and in conjunction with fellowship and protection of the individual" and "must not exceed 20 percent of the total hours worked in the workweek" in order to fall within the definition of companionship services. Proposed § 552.6(b) next provided an illustrative, detailed list of intimate personal care services: (1) Dressing, (2) grooming, (3) toileting, (4) driving, (5) feeding, (6) laundry, and (7) bathing. Each listed intimate personal care service was preceded by the term "occasional" in the proposal. The Department explained in the preamble to the proposed rule that it was allowing for some work incidental to the fellowship and protection that primarily constitutes companionship services because the legislative history indicated that Congress contemplated that a direct care worker providing companionship services might perform tasks such as "making lunch for the infirm person" and "some incidental household work." *See* 119 Cong. Rec. at S24801; *see also* 76 FR 81193.

After a careful review of the comments, and for the reasons explained in greater detail below, the Department has retained the fundamental purpose of proposed paragraph (b)—to define certain services that, if provided to a limited extent and incidentally to the fellowship and protection that are the core duties of an exempt companion, do not defeat the exemption—but has modified the proposed regulatory text in order to make the additional services an exempt companion may perform easier for the regulated community to understand. Section 552.6(b) now reads: "The term *companionship services* also includes the provision of care if the care is provided attendant to and in conjunction with the provision of

fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of *care* means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).''

*Care*

Several commenters expressed concern that the proposed definition of companionship services did not sufficiently emphasize the provision of "care." For example, BrightStar Healthcare of Baltimore City/County ("BrightStar") and the Texas Association for Home Care and Hospice, among others, noted that the plain language of the statutory exemption used the term "care," and that the legislative history also indicated a desire by Congress to have "care" encompassed in the definition. BrightStar asserted that "it is clear from the legislative history that 'care' for those who are 'unable to care for themselves' is an integral part of what was contemplated in creating the companionship exemption." Congressman Lee Terry agreed that the Department's proposed definition "is altering the focus of the exemption in a way that Congress neither intended nor envisioned."

The Department does not disagree with commenters who wrote that "care" should be explicitly included in the regulatory definition of companionship services. Indeed, the proposal did not remove "care" from the regulatory definition of companionship services; rather, although proposed paragraph (a) did not use the word care, the Department sought in paragraph (b) to define and delimit the type of care that falls within the exemption. In the Final Rule, § 552.6(b) uses the term "care" rather than "intimate personal care services" to make more explicit that care remains part of companionship services.

*Activities of Daily Living and Instrumental Activities of Daily Living*

The Department received thousands of comments concerning the proposed list of intimate personal care services. These comments demonstrated problems raised by the proposed list, and the Department has modified this Final Rule accordingly. Specifically,

upon consideration of these comments, the Final Rule describes the provision of care as assistance with activities of daily living (ADLs) and instrumental activities of daily living (IADLs), with examples of each type of task, rather than using the term "intimate personal care services" and providing a detailed list of activities that fall into that category.

Many commenters supported the proposed list of intimate personal care services. For example, AFSCME and AARP agreed that the definition of companionship services should be narrowed and that only true "fellowship and protection" services, accompanied by personal care or household services that are incidental to those companionship services, should be exempt from the FLSA. Care Group, Inc., a provider of in-home medical services registered in the State of California, and NELP, among others, supported the Department's proposal but urged the Department to make the list of incidental services exclusive rather than illustrative.

In contrast, employers and other groups, such as the Texas Association for Home Care and Hospice and Americans for Limited Government (ALG), generally expressed the view that personal care should not be limited to "incidental" activities because the exemption explicitly states that consumers receiving services are "unable to care for themselves"; these commenters suggested that whatever "care" the consumer needs should be included as part of unrestricted companionship services. *See also* The Virginia Association for Home Care and Hospice. The Visiting Nurse Associations of America (VNAA) expressed the view that the federal government should defer to existing state and local regulations concerning permissible duties. Similarly, California Association for Health Services at Home (CAHSAH) pointed to state guidance that makes clear that a companion must be allowed to perform all duties a client needs to remain independent.

Commenters also addressed the specific care tasks that the Department had included in the proposed list individually. In response to the Department's proposal to allow assistance with toileting as an incidental personal care service, the National Council on Aging, NELP, and Workforce Solutions expressed concern about potential injury to workers associated with this task. These commenters recommended the Department not include assistance with services such as toileting and activities that require positioning and mobility transfer

assistance. *See also* The Workplace Project. The Legal Aid Society encouraged the Department to consider that tasks such as toileting, assistance with mobility, transfers, positioning, use of toileting equipment and changing diapers for persons with dementia are not casual activities but require training to be performed in a manner that is safe for the worker and the consumer. They suggested that if such activities constitute part of the regular work performed, the worker should not be exempt. Direct Care Alliance (DCA) stated that the permissible exempt duties should not include those that require physical strength or specialized training. Women's Employment Rights Clinic suggested that allowing an exempt companion to assist with toileting should only be permitted when exigent circumstances arise. They indicated that this activity requires training or experience that a companion, as intended by Congress, would not have.

Several commenters offered their views on the task of driving the consumer to appointments, errands, and social events as an incidental personal care service. ANCOR stated that driving to social events should not be included among the "personal care services" in the 20 percent limitation, indicating that "many people with disabilities enjoy drives and times away from home and we do not believe this should be limited." The Texas Association for Home Care and Hospice and PHI both expressed the view that this section should include not only driving but also "accompanying" the consumer. They noted that other modes of transportation may be utilized by the consumer. Women's Employment Rights Clinic agreed with the Department's proposal to include occasionally driving a consumer to appointments, errands, and social events as part of incidental personal care services defined in § 552.6(b).

A number of comments were received on the proposed provision concerning meal preparation. The Connecticut Association for Home Care and Hospice expressed concern about the requirement that the client must consume the food in the direct care worker's presence in order to maintain the exemption. It pointed out that the proposal failed to take into account the possibility that the consumer may not eat all of the food prepared and would create an untenable situation whereby the consumer is forced to eat on an imposed schedule rather than as his or her appetite dictates. Others, like ALG, asserted that the proposal would force a direct care worker to dispose of leftover

food rather than to store it to be eaten later. Some commenters, including Women's Employment Rights Clinic, specifically supported the Department's qualification that any food prepared must be eaten in the presence of the direct care worker in order for the meal preparation to be part of companionship services. They indicated that this would ensure that preparing meals for and feeding the consumer remained attendant to and in conjunction with providing fellowship and protection.

Several commenters objected to including laundry in the list of personal care services. For example, Caring Across Generations and DAMAYAN Migrant Workers Association (DAMAYAN) both indicated that "laundry is neither absolutely necessary for an elderly or infirm person during the companion worker's shift nor does it arise out of exigent circumstances that justify including 'occasional bathing' in proposed § 552.6(b)(7). Laundry services fall under the type of household services performed by housekeepers or laundresses and thus should be excluded." Others, such as the Latino Union of Chicago, similarly commented that "an individual or family hiring a companion worker could just as easily hire a housekeeper or laundress to regularly launder clothes."

With respect to bathing, some commenters supported the proposal's limitation on bathing duties to "exigent circumstances." For example, Women's Employment Rights Clinic indicated that they thought the limitation to exigent circumstances was appropriate as this duty is one which requires the lifting, touching, and moving of a frail individual, and this normally requires increased training and experience.

The Department continues to believe Congress intended fellowship and protection to be the primary focus of an employee exempt under the companionship services exemption but that flexibility to provide some tasks incidental to fellowship and protection is appropriate. In light of the comments received concerning the proposed list of intimate personal care services, however, the Department has not adopted the regulatory text as proposed. Instead, section 552.6(b) now states, in relevant part: "The provision of *care* means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of

medications, and arranging medical care)."

As reflected in the comments, the Department now believes that the proposed list of intimate personal care services raised more questions than it answered. *See, e.g.,* ALG (stating that the list of proposed intimate personal care services created "practical problems," such as prohibiting an exempt companion from operating a vacuum cleaner). The Department also agrees with commenters that the list was too specific and not flexible enough in its approach. The Department is persuaded by the view expressed by commenters such as the State of Washington's Department of Social and Health Services, that the "use of 'intimate personal care services' should be updated to reflect current service categories: activities of daily living and instrumental activities of daily living" and thus has modified the Final Rule to reflect this change. Therefore, in lieu of describing the permissible care services an exempt companion may perform as "intimate personal care services," the Department instead has adopted the commonly used industry terms "activities of daily living" (ADLs) and "instrumental activities of daily living" (IADLs) to describe which services are allowed as part of "care" under the exemption. *See* 76 FR 81212. The Department has also replaced the detailed list of activities that appeared in proposed paragraph (b) with simple, illustrative lists of services that are commonly viewed as activities of daily living and instrumental activities of daily living. The Department intends that any additional tasks not explicitly named in the regulatory text but that fit easily within the spirit of the enumerated duties also qualify as ADLs or IADLs.

The Department believes that by replacing the proposed detailed list of intimate personal care services with the more commonly used industry phrases "activities of daily living" and "instrumental activities of daily living," transition to the new regulation will be simplified. The State of Tennessee and the National Association of Medicaid Directors (NAMD) indicated that home health aides and personal care attendants are focused primarily on providing hands-on care and assistance with ADLs that enable that consumer to continue living safely in the community. The Virginia Association for Home Care and Hospice expressed the view that individuals need assistance with their ADLs and IADLs to live independently, and that these activities should be part of the incidental duties. Additionally,

hundreds of comments received from workers referenced these terms as a sort of shorthand for describing the work commonly performed by direct care workers. Furthermore, Medicaid and Medicare programs also use these terms to describe direct care work. As noted by commenters such as NELP and PHI, Medicaid instructs that assistance with ADLs and IADLs "is the core focus of home care services provided under Medicaid." Accordingly, the Department believes the regulated community is already familiar with these concepts and they will be easy for consumers, workers, and employers alike to understand.

The Department also believes that by broadening the base of services that a direct care worker may perform and still qualify for the companionship services exemption, consumers will have more of the immediate needs met that support them in living independently in their communities. Among the comments was a letter writing campaign by several hundred workers that requested that companionship services only include fellowship and protection, "thereby excluding workers who assist clients with activities of daily living or instrumental activities of daily living." The Department is persuaded, however, by other comments that emphasized the critical importance of including an allowance for ADLs and IADLs in order for certain consumers to continue to live independently. *See, e.g.,* Scott Ehrsam, owner of a home care business; DCA.

The Department notes that the intimate personal care services proposed in the NPRM are encompassed within the categories of "activities of daily living" and "instrumental activities of daily living" adopted in the Final Rule. The Department emphasizes, however, the provision of such services only falls within the definition of companionship services if it is performed attendant to and in conjunction with the fellowship and protection provided to the consumer and if it does not exceed 20 percent of the total work hours of the direct care worker for any particular consumer in any particular workweek, as discussed in greater detail below.

This Final Rule provides flexibility within the bounds of Congressional intent. The FLSA grants the Secretary of Labor broad authority to define and delimit the scope of the exemption for companionship services. *See* 29 U.S.C. 213(a)(15). The Department believes its definition of the types of services that may be performed within the meaning of "provision of care" in the Final Rule is reasonable and consistent with Congressional intent that all other work

performed by an exempt companion must be incidental to the companion's primary purpose "to watch over an elderly or infirm person in the same manner that a babysitter watches over children." 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973).

*Twenty Percent Limitation*

The Department also received a significant number of comments addressing the 20 percent limitation on the provision of care. Some commenters believed the cap was too high. *See, e.g.,* Women's Employment Rights Clinic; EJC. The EJC emphasized that 20 percent is a significant portion of the workweek and a lower percentage would better effectuate the goal of ensuring that the care tasks are truly incidental. Other commenters, however, thought the cap was too low. *See, e.g.,* The Westchester Consulting Group. Senior Helpers, among others, expressed doubt that the listed tasks could be accomplished in 20 percent of the direct care worker's workweek and expressed concern that seniors would be hurried through eating meals or forced to cancel appointments due to the amount of time allotted. Commenters including NCL and Workforce Solutions were concerned that the 20 percent cap would be difficult to administer. A few commenters expressed concern over the cost of monitoring the 20 percent limitation. The State of Oregon indicated that the 20 percent limitation should be eliminated, suggesting that the limitation should not be based upon tasks performed but rather should be based upon for whom the service is performed. CAHSAH asserted that the duties that fall under the 20 percent cap should be unrelated to the care of the client.

Some commenters suggested alternative methods for calculating hours worked performing incidental care duties. The National Council on Aging, Workforce Solutions, NELP, and others supported elimination of the 20 percent cap and replacing it with a two-step assessment. They suggested requiring an initial assessment to determine whether the worker had been hired primarily to perform the duties of fellowship and protection and whether the worker was in fact performing those duties. If the worker was not primarily performing those duties, the subsequent listings of permissible exempt activities would not be considered. If the worker were found to be hired primarily to provide fellowship and protection, then a second step review of the listed services would be conducted to confirm that the services were performed occasionally and incidental to the provision of fellowship and protection, and not as a regular part of the duties performed.

Organizations like DAMAYAN, The Workplace Project, and Houston Interfaith Worker Justice also proposed eliminating the 20 percent limitation and replacing it with a different test comprised of two steps: (1) If a direct care worker visits a client greater than three times per week and (2) performs any of the listed incidental tasks for any amount of time in greater than 50 percent of the visits, then the direct care worker would not fall within the companionship services exemption.

Finally, NCL and PHI suggested that the Department modify the cap on incidental activities across a workweek to one that prohibits a worker from spending more than 20 percent of work time performing care tasks per individual client per workweek.

The Department has carefully considered the variety of suggestions offered by commenters with respect to this issue, and it adopts the 20 percent limitation on care services essentially as proposed, although it has modified the text to explicitly state that the provision of care is limited to no more than 20 percent of the hours worked per workweek per consumer. The Department's view is that failing to provide such a limitation would ignore Congressional intent that making meals and doing laundry would be incidental to the exempt companion's primary purpose of watching over the consumer. *See* 119 Cong. Rec. S24773, S24801 (daily ed. July 19, 1973). Indeed, during a Senate floor exchange, Senators Williams and Burdick indicated that "one may even require throwing some diapers in the automatic washing machine for the baby. This would be incidental to the main purpose of employment." *See* 119 Cong. Rec. at S24801. However, the Department also recognizes that a limited allowance for selected tasks, performed attendant to and in conjunction with fellowship and protection, is necessary as a matter of practicality. The Department believes that this 20 percent threshold, which is based on the proportion of total hours worked per workweek, will provide consumers and direct care workers with a needed flexibility in their day-to-day activities. As described below, in adopting the 20 percent figure, the Department is utilizing a long-established threshold that has been used in a variety of regulations, including current § 552.6. Employers are, thus, familiar with this type of time limitation, mitigating concerns that the 20 percent threshold would be difficult and costly to administer. In addition, the Department views section 552.6(b) of the Final Rule as a compromise designed to expand the base of allowable care while accommodating the concerns expressed about workplace safety for both the direct care worker and the consumer, as such a limitation restricts the amount of time spent engaged in these activities.

As the Department indicated in the preamble to the proposed regulation, the home care industry has undergone a dramatic transformation since the Department published the implementing regulations in 1975. In the 1970s, many individuals with significant care needs were served in institutional settings rather than in their homes and their communities, Since that time, there has been a growing demand for long-term home care for persons of all ages, largely due to the rising cost of institutional care, the impact of the disability civil rights movement, and the availability of funding assistance for home care under Medicaid, reflecting our nation's commitment to accommodate the desire of individuals to remain in their homes and communities. As the demand for long-term home care has grown, so has the complexity of duties performed in the home by the direct care worker. It is the Department's view that the focus of the companionship services exemption should remain on fellowship, protection, and care as defined in paragraph (b). Based on the wide scope of comments received detailing the extent of the services provided by direct care workers, the Department is aware that there is a significant continuum with respect to the services consumers require. The Department is not stating that all workers providing "care," as defined in paragraph (b), will be able to accomplish the required care in 20 percent of their workweek. Rather, the Department is concluding that, if the care that is being provided attendant to and in conjunction with the provision of fellowship and protection requires more time than 20 percent of the workweek, then the worker is being called upon to provide services that are outside of the scope of the companionship services exemption. In such cases, minimum wage and overtime pay protections attach.

The Department believes that a 20 percent limitation for providing this care, coupled with a primary focus on the provision of fellowship and protection, is appropriate for a worker who is not entitled to the minimum wage and overtime compensation protections. The Department notes that a 20 percent limitation has been

implemented in this regulation for 38 years (concerning the provision of general household work), as well as in other regulations in this chapter such as § 552.5, Casual Basis (work that is incidental does not exceed 20 percent of hours worked in babysitting assignment); § 552.104(c), Babysitting services performed on a casual basis (babysitter who devotes more than 20 percent of time to household work is not exempt), as well as in other chapters addressing employee work hours in other enforcement contexts (e.g., §§ 786.100, 786.150, 786.200 (nonexempt work will be considered substantial if it occupies more than 20 percent of the time worked by the employee during the workweek)). *See also* §§ 553.212, 783.37, 784.116, 788.17, and 793.21.

As previously noted, a suggested two-step test was offered by some as a substitute for the 20 percent limitation on intimate personal care services. The suggested test was comprised of examining those direct care workers who visit a client more than three times a week, and if so, making a determination whether the direct care worker has performed any of the incidental personal care services for any amount of time in greater than 50 percent of the visits. In such cases, the organizations suggested that the direct care worker should not fall within the companionship services exemption. The Department declines to adopt the recommended test. The Department believes that this option would have a negative effect on continuity of care, an issue many commenters raised as a significant concern. *See, e.g.,* National Association of Area Agencies on Aging, New York State Association of Health Care Providers, Avalon Home Care, the National Association of States United for Aging and Disabilities (NASUAD); *see also* Testimony of Marie Woodard before the U.S. House of Representatives Committee on Education and the Workforce, Subcommittee on Workforce Protection (March 20, 2012). This two-step proposal would create an incentive to ensure that a particular direct care worker only visits a consumer no more than three times per week. As the National Association of Area Agencies on Aging points out in its comment, ''providing fundamental labor protections of minimum wage and overtime will help reduce turnover, improve continuity of care and help lower costs.'' The Department agrees with commenters who indicated that providing fundamental labor protections such as minimum wage and overtime compensation will improve continuity

of care and wants to avoid offsetting those improvements to continuity of care by implementing a test that would create an incentive to use a direct care worker no more than three times per workweek.

Finally, the Department has incorporated the suggestion of NCL and PHI by modifying the Final Rule text to explicitly state that the 20 percent limitation applies to the tasks a worker performs per individual consumer. Further, as proposed, the 20 percent limitation also applies to total hours worked per workweek. The inclusion of the 20 percent limitation on a per consumer basis is intended to assist consumers and direct care workers in determining whether the worker meets the companionship services exemption in any given workweek. Many direct care workers provide services to more than one consumer in a workweek, and the proposed text did not account for the reality that a consumer would not typically know what percentage of time the direct care worker spent performing assistance with ADLs and IADLs for any other consumer. For example, if a direct care worker is employed for five mornings a week for consumer A and employed for four afternoons a week for consumer B, consumer B would have no way of knowing how much of the total workweek had been spent providing care to consumer A. The Department has therefore revised the text to specify that the 20 percent limitation applies to the work performed each workweek for a single consumer. Therefore, in determining whether to claim the companionship services exemption, a consumer need only consider the amount of care he or she has received during the workweek, not any services the direct care worker has provided to other consumers. The Department notes that this question only arises as to individuals, families, and households who employ direct care workers, because, as explained in the section of this preamble regarding third party employment, under the Final Rule, a third party employer of a direct care worker is not permitted to claim the companionship services exemption regardless of the duties performed.

Section 552.6(c) (Domestic Services Primarily for Other Members of the Household)

Current § 552.6 permits the companionship services exemption to apply to a worker who spends up to 20 percent of his or her time performing general household work which is unrelated to the care of the person receiving services. In the NPRM, the Department proposed to revise the

current regulation by adding paragraph (c), which stated that ''work benefitting other members of the household, such as general housekeeping, making meals for other members of the household or laundering clothes worn or linens used by other members of the household'' would not fall within the definition of incidental intimate personal care duties that may constitute part of companionship services. Proposed paragraph (c) also provided that ''household services performed by, or ordinarily performed by, employees such as cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use, are not 'companionship services' unless they are performed only incidental to the provision of fellowship and protection as described in paragraph (b) of this section.'' For the reasons explained below, in the Final Rule, the Department adopts a significantly simplified version of the proposed text.

The Department received few comments on the issue of household work. Women's Employment Rights Clinic expressed support for the ''Department's effort to draw a clear line between the duties of a companion and the duties of domestic service workers such as maids, cooks and laundresses,'' writing ''that general household services such as window washing, vacuuming and dusting, should not fall under the duties of a companion.'' Advocacy organizations, such as ALG and NRCPDS, expressed concern that a direct care worker's performance of household work for the consumer would not be included within the 20 percent allowance for intimate personal care services listed in paragraph (b) of this section if the work includes a prohibited task, such as vacuuming. *See also* Lynn Berberich, Joni Fritz, and Georgetown University Law Center students. AARP agreed with the Department that ''providing general household services such as cooking a meal or doing laundry for the whole family, which significantly benefit all household members, should not be exempt.'' However, AARP requested that the Department provide examples as to what household work is considered incidental and therefore part of companionship services. AARP asked, ''[i]f some tuna salad is left over after the individual receiving companionship services has eaten lunch, and another member of the household eats this left over tuna salad,

would this be considered general household work, thereby denying the companionship exemption for the week?"

After carefully considering the comments, the Department has decided to revise proposed paragraph (c) to avoid ambiguity and eliminate redundancy in light of the revisions to paragraph (b). Specifically, § 552.6(c) of the Final Rule provides, in its entirety: "The term *companionship services* does not include domestic services performed primarily for the benefit of other members of the household." This text much more simply and clearly conveys the Department's meaning, which is that companionship services are services provided specifically for the individual who requires assistance in caring for himself or herself rather than for other members of that individual's household. This limit to the definition of companionship services is consistent with Congress's central purpose in 1974 of extending FLSA coverage to domestic service workers such as maids, cooks, and housekeepers and excluding from that coverage only direct care workers who provide primarily fellowship and protection.

The Department intends to exclude from companionship services any general domestic services unrelated to care of the consumer as defined in paragraph (b) of this section. The determination of whether a particular task constitutes the provision of care or is instead a service performed primarily for the benefit of others in the household is based on a common sense assessment of the facts at issue. For example, in response to the question posed by AARP, if a person other than the consumer eats the leftover tuna salad, but the direct care worker prepared the meal for the consumer as opposed to for other members of the household, the meal preparation would constitute the provision of care that, if done attendant to and in conjunction with fellowship and protection and if within the 20 percent limitation on care, is part of companionship services. An exempt companion may also vacuum up food that the consumer drops, or wash a soiled blouse for the consumer; such activities are part of the care discussed in paragraph (b). Additionally, light housework, such as dusting a bedroom the consumer shares with another, that only tangentially benefits others living in the household may constitute care if performed attendant to and in conjunction with the provision of fellowship and protection of the consumer and within the 20 percent limitation. However, washing only the laundry of other members of the household or cooking meals for an entire family is excluded from companionship services under the Final Rule. To provide an additional example: if a direct care worker performs fellowship and protection for the consumer Monday through Thursday, but spends Friday exclusively performing light housework for the household as a whole, then the exemption is lost for the workweek, because the direct care worker cannot perform general household services for the entire household and still maintain the companionship services exemption during that workweek.

Section 552.6(d) (Medically Related Services)

The legislative history of the 1974 amendments makes clear that Congress did not intend the companionship services exemption to apply to domestic service employees who perform medical services, and the Department believed in 1975, as it does today, that the provision of medical care constitutes work that is not companionship services. Accordingly, under current § 552.6, companionship services do not include services provided for an elderly person or person with an illness, injury, or disability that "require and are performed by trained personnel, such as a registered or practical nurse." In the NPRM, the Department proposed to revise § 552.6(d) to describe the medical care that is typically provided by trained personnel by offering examples of particular medical services rather than by naming occupations. Based on consideration of the comments received and for purposes of simplicity and clarity, the Department has decided not to adopt the text as proposed, but has instead adopted text closer to that which appears in current § 552.6. For the reasons explained below, § 552.6(d) now excludes from companionship services "medically related services," defined as services that "typically require and are performed by trained personnel such as registered nurses, licensed practical nurses, or certified nursing assistants." This section further provides that the determination of whether services are medically related "is not based on the actual training or occupational title of the individual providing the services," so in many cases, direct care workers outside these named categories, particularly home health aides, will be excluded from the companionship services exemption under paragraph (d).

Proposed § 552.6(d) provided that "[t]he term 'companionship services' does not include medical care (that is typically provided by personnel with specialized training) for the person, including, but not limited to, catheter and ostomy care, wound care, injections, blood and blood pressure testing, turning and repositioning, determining the need for medication, tube feeding, and physical therapy." It further provided that "reminding the aged or infirm person of a medical appointment or a predetermined medicinal schedule" was part of intimate personal care services as that phrase was defined in proposed § 552.6(b). The NPRM's preamble discussion of § 552.6(d) set forth the Department's rationale for its proposed change to the regulatory text. 76 FR 81195. The Department explained that in addition to care provided by registered nurses and licensed practical nurses, the types of tasks performed by certified nursing assistants and sometimes personal care aides or home health aides were the sort of medically related services typically provided by personnel with specialized training. *Id.* The preamble listed examples of such services, including medication management, the taking of vital signs (pulse, respiration, blood sugar screening, and temperature), and assistance with physical therapy. *Id.* In addition to providing this explanation of its position, the Department sought comment on whether the proposal appropriately reflected the medical care tasks performed by home health aides and personal care aides that require training as well as whether the regulation should include additional examples of minor health-related actions that could be part of companionship services, such as helping an elderly person take over-the-counter medication. *Id.*

Comments from labor organizations, non-profit and civil rights organizations, and worker advocacy groups generally supported the proposal to exclude from the definition of companionship services medical care that requires specialized training. *See, e.g.,* AARP, AFSCME, the Center, ACLU, Jobs with Justice, SEIU. Even the many employers and employer representatives who were critical of proposed § 552.6(d) recognized that medical care is beyond the scope of the companionship services exemption. *See, e.g.,* Husch Blackwell (agreeing with the Department that direct care workers who change feeding tubes, perform injections, or provide ostomy care do not qualify for the companionship services exemption but asserting that because current § 552.6 already excludes nurses from the exemption, there was no need to revise the regulation), BrightStar franchisees

(same), Senior Helpers (stating that home health aides who perform "medical tasks like checking vital signs, changing bandages, giving injections or providing feeding tube or ostomy care" are not providing companionship services but asserting that the Department should withdraw the NPRM).

Some commenters made suggestions regarding specific occupations. One individual commenter suggested that the Department "expand the meaning of trained personnel to include Certified Nursing Assistants and other health care providers who have State certification." PHI and the AFL–CIO urged the Department to state that personal care aides and home health aides are not companions. PHI reasoned that personal care aides and home health aides are trained personnel rather than exempt companions because they provide medically related and personal care tasks that require specialized training, noting that home health aides are required, if paid with federal funds, to receive at least 75 hours of initial training, including at least 16 hours of supervised practical training, and 12 hours per year of continuing training. NAMD, on the other hand, wrote that unlicensed direct care workers such as home health aides and personal care aides should not be treated in the same manner as registered or licensed practical nurses.

The Department also received comments regarding specific medical services. Some commenters wrote that particular tasks should fall outside the definition of companionship services. For example, AFSCME believed that "treating bed sores and monitoring physical manifestations of health conditions like diabetes or seizure disorders" are "medical or quasi-medical services" that should be excluded from the definition of companionship services. Women's Employment Rights Clinic urged the Department to add toileting and bathing to the medically related tasks named in § 552.6(d).

Other commenters wrote that certain tasks should fall within the definition of companionship services. For example, BrightStar franchisees wrote that because "specialized medical training is not necessary to take an individual's temperature with a regular home thermometer, or to provide them with hand lotion for 'routine skin care,' or to go on walks or do exercises together as recommended by a physical therapist," those tasks should not be excluded from companionship services. *See also* ANCOR (suggesting that these tasks be considered part of intimate personal

care activities in proposed § 552.6(b)). NASDDDS wrote that tasks including wound care, injections, blood pressure testing, and turning and repositioning are routinely performed by family members and friends and thus are not necessarily associated with the type of professional caregiving that should be covered by the FLSA. The Oregon Department of Human Services, without providing specifics, recommended that the types of personal and medical services that a direct care worker may perform while still qualifying for the companionship services exemption be expanded.

The Department also received comments regarding the tasks it had identified as intimate personal care services rather than medically related services. For example, ANCOR and Pennsylvania Advocacy and Resources for Autism and Intellectual Disabilities stated that reminding the consumer of medical appointments or a predetermined medicinal schedule should be part of fellowship and protection in proposed § 552.6(a) because these duties are not "intimate personal care services" described in proposed § 552.6(b). AFSCME suggested that the Final Rule distinguish "between infrequent reminders provided by a person engaged in fellowship or protection and those duties of a more medical nature required to serve the infirm and provided by vocational home care workers." AARP and Connecticut Association for Home Care & Hospice, among others, stated that applying a bandage to a minor wound and assisting with taking over-the-counter medication should be part of companionship services.

Finally, NRCPDS requested clarification regarding whether an agency administering a consumer-directed program may require a companion to undergo first aid or cardiopulmonary resuscitation (CPR) training without jeopardizing the applicability of the exemption, urging the Department to explain that training requirements that are limited and generally non-medical in nature should not disqualify a worker from the companionship services exemption.

The Department continues to believe it is crucial to exclude from companionship services the provision of services that are medical in nature because the individuals who perform those services are doing work that is far beyond the scope of "elder sitting." In light of the comments received, however, the Department has not adopted the regulatory text as proposed. Instead, § 552.6(d) now states: "The term 'companionship services' does not

include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services." The Final Rule thus makes two substantive changes to the current rule's treatment of trained personnel, which excludes from companionship services those "services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse." 29 CFR 552.6. First, the Final Rule adds certified nursing assistants as an example of "trained personnel" who perform medically related services. Second, the Final Rule clarifies that whether the individual who performs medical tasks received training is irrelevant to the determination of whether the tasks are medically related.[8]

The Department is revising § 552.6(d) differently than proposed in the NPRM because it believes an explanation of what constitutes medically related services is simpler and easier for the regulated community to understand when framed by occupation than when described with a list of tasks. The comments received in response to the proposal highlight that direct care workers perform numerous tasks that fall on both sides of the line between medical care and other services that fall within the meaning of "care" as described in § 552.6(b). The diversity of opinions commenters expressed regarding which tasks should be part of companionship services and which

---

[8] The Final Rule also makes two non-substantive changes to the current rule. First, it refers to "licensed practical nurses" instead of "practical nurse[s]." (The term "registered nurses" is identical to that used in the current rule.) This modification is meant only to update the regulation to use the more commonly used title for the occupation. Second, unlike the current and proposed rules, the Final Rule does not include a sentence stating that medical care performed in or about a private home, though not companionship services, is nevertheless within the category of domestic service employment. *See* 29 CFR 552.6; 76 FR 81244. Such work plainly falls within the definition of domestic services employment set out in § 552.3, and nurses, home health aides, and personal care aides are included in that provision's list of employees whose work may constitute domestic service employment. The Department has therefore determined that a sentence reiterating the point was redundant and thus unnecessary. This deviation from the current rule and proposed regulatory text is not meant to indicate that the Department believes the statements were incorrect or that the Department has changed its position on this point.

should not fall within the definition of that term revealed that an illustrative list of medically related services would not provide clarity to the regulated community. And as any list of such services would necessarily be illustrative; it would be nearly impossible, as well as beyond the scope of the Department's expertise, to name or describe all medically related services.

The Department believes that the alternative approach of defining medically related services outside the definition of companionship services as those that should be and typically are performed by workers who have completed specialized training offers better guidance to the regulated community. Naming a small number of occupations to illustrate the general sets of duties in question is simpler and more concise than referring to various particular medical tasks. Furthermore, the regulation that has been in place since 1974 used this approach, so the regulated community is already familiar with it. The more significant deviation from the existing text contained in the proposed rule was not necessary to achieve the Department's goal of ensuring that all direct care workers who perform medically related services that constitute work other than companionship services are provided the protections of the FLSA.

The decision to add certified nursing assistants (CNAs) to the list of examples of "trained personnel" is based on the legislative history of section 13(a)(15) of the Act as well as the training and work of CNAs. The House and Senate Reports addressing the 1974 amendments state that "it is not intended that trained personnel such as nurses, whether registered or practical, shall be excluded" from the protections of the FLSA under the companionship services exemption. House Report No. 93–913, p. 36; Senate Report No. 93–690, p. 20. The Department's current regulations are modeled on this language and reflect that without doubt, registered nurses and licensed practical nurses working in private homes do not provide companionship services. But Congress did not mean this list to be exclusive; the Reports say that trained personnel "such as" nurses are not exempt from the FLSA. *Id.* It is plain from these words and the surrounding language in the House and Senate Reports that "trained personnel" are a category of those "employees whose vocation is domestic service" and thus are not exempt from the FLSA's protections. *Id.* Therefore, the Department's expressly delegated authority to define companionship

services includes the ability to exclude from the term's meaning medically related occupations or other medically related work beyond, to a reasonable extent, those named in the Reports.

Based on the training and duties of CNAs, the Department believes CNAs are properly considered outside the scope of the companionship services exemption. In 1987, Congress established federal requirements for certification of nursing assistants,[9] and many states have requirements that exceed these federal minimums.[10] Specifically, by federal law, CNAs (referred to in federal regulations as "nurse aide[s]") must receive at least 75 hours of training, including a minimum of 16 hours of clinical training, 42 CFR 483.152(a), and as of 2009, thirty states mandated between 80 to 180 hours of training.[11] The training curriculum for CNAs must include, among other things, "basic nursing tasks" (*e.g.,* taking and recording vital signs), "personal care skills" (*e.g.,* skin care, transfers, positioning, and turning), and "basic restorative skills" (*e.g.,* maintenance of range of motion, care and use of prosthetic and orthotic devices). 42 CFR 483.152(b). In addition, all CNAs must pass a competency examination that includes a written or oral examination and skills demonstration. 42 CFR 483.154. Each state must maintain a registry of CNAs that contains the names of the individuals who have fulfilled these requirements. 42 CFR 483.156. The standardization of the CNA training curriculum, the competency exam requirement, and the existence of state registries tracking and confirming certification are all evidence of the professionalization of this category of workers. It is the Department's view that CNAs are the sort of "trained personnel" who provide direct care services as a vocation and thus are entitled to the protections of the FLSA.[12]

Furthermore, CNAs perform many tasks that are indisputably medical services, which constitute the sort of professional, skilled duties that are outside the scope of companionship services. Although the particular duties of CNAs vary by state, CNAs' core duties include administering medications or treatments, applying clean dressings, observing patients to detect symptoms that may require medical attention, and recording vital signs,[13] and typical additional duties include administering medications or treatments such as catheterizations, enemas, suppositories, and massages as directed by a physician or a registered nurse; turning and repositioning bedridden patients; and helping patients who are paralyzed or have restricted mobility perform exercises.[14] Additionally, CNAs often use equipment such as blood pressure units, medical thermometers, stethoscopes, bladder ultrasounds, glucose monitors, and urinary catheterization kits. It is the Department's view that these tasks constitute the sort of work that falls appropriately within FLSA protection.

Many of the duties of today's CNAs are similar to, or even more technical than, tasks LPNs performed in the 1970s, when Congress created the companionship services exemption with the explicit notion that LPNs were outside its scope. At that time, LPNs took and recorded temperature and blood pressure, changed dressings, administered prescribed medications, and helped with bathing or other personal hygiene; in private homes, they often assisted with meal preparation and facilitated comfort in addition to providing nursing care.[15] In contrast to today's CNAs, in the 1970s, "nursing aides" did not receive pre-employment training and did not provide services that required the technical training nurses received.[16] This shift in the field of nursing provides additional support for the Department's conclusion that

[9] Nursing Home Reform Act, Subtitle C of Title IV of the Omnibus Budget Reconciliation Act of 1987, Public Law 11–203, § 4201–4214. *http://assets.aarp.org/rgcenter/il/2006_08_cna.pdf.*

[10] *http://phinational.org/sites/phinational.org/files/clearinghouse/state-nurse-aide-training-requirements-2009.pdf.*

[11] *Id.*

[12] This change to the regulation makes obsolete but does not conflict with a court opinion holding that CNAs were not categorically excluded from the companionship services exemption under the current regulation. Specifically, in *McCune v. Oregon Senior Services Division,* 894 F.2d 1107 (9th Cir. 1990), the Ninth Circuit held—based on its reading of the current regulation— that CNAs were not the type of "trained personnel" who provide services that are not companionship services because the training for CNAs was not comparable to that required for RNs or LPNs. *Id.* at 1110–11. The Final Rule now makes clear, for the reasons

explained, that the amount and type of training CNAs must receive is sufficiently significant to merit treatment as providing medically related, rather than companionship, services.

[13] O'NET, SOC 31–1014.00 (2012), *http://www.onetonline.org/link/summary/31-1014.00.*

[14] *See, e.g., http://www.maine.gov/boardofnursing/OLD%20WEBSITE/CNA%20BAsic%20Curriculum%2010-2008.pdf; https://www.flrules.org/gateway/ruleno.asp?id=64B9-15.002; http://www.in.gov/isdh/files/rescare.pdf; http://www.dphhs.mt.gov/cna/SkillsChecklist.pdf; http://www.utahcna.com/forms/UTcandidatehandbook.pdf; http://www.oregon.gov/OSBN/pdfs/publications/cnabooklet.pdf.*

[15] U.S. Department of Labor, Bureau of Labor Statistics, Occupational Outlook Handbook, 1974–75 Edition (1974).

[16] *Id.*

Congress's original intent in creating the companionship services exemption is best fulfilled by adding CNAs to the illustrative list of trained personnel.

The Department does not accept the suggestion of some commenters that it add home health aides (HHAs) and personal care aides (PCAs) to its illustrative list of trained personnel. The work of practitioners of those occupations does not necessarily include medically related services. Although Federal regulations require that HHAs complete a minimum of 75 hours of training and must pass a competency evaluation, these requirements are distinguishable from those for CNAs: the topics the training must address are more limited than those CNAs must study, the evaluation requirements are less stringent than for CNAs, and states need not maintain registries of HHAs. *Compare* 42 CFR 484.36(a), (b) *with* 42 CFR 483.152(a), (b); 42 CFR 483.156. PCAs are not subject to any federal standards for training and certification, nor are there state registries of PCAs. In addition, one of the core duties of an HHA is to "entertain, converse with, or read aloud to patients to keep them mentally healthy and alert," [17] and one of the core duties of a personal care aide is to provide companionship.[18] Other duties of HHAs and PCAs often include grooming, dressing, and meal preparation. Therefore, HHAs and PCAs typically do not have the medical training CNAs receive, those titles are not associated with an official licensing system that allows their clear identification as trained personnel, and any particular HHA or PCA may perform only fellowship and protection and assistance with ADLs and IADLs. If in the future the same sort of professionalization that has occurred in the nursing assistance field extends to HHAs or PCAs such that either or both of those occupations require the training and perform the duties of CNAs today, or if some future category of worker arises that performs such skilled duties, however, it is the Department's intent that such fields could properly be considered "trained personnel."

The Department wishes to note two important caveats regarding its decision not to include HHAs or PCAs in its list of trained personnel. First, the list of occupations in the regulatory text is not exclusive. If a state or employer refers to a direct care worker by a title other than RN, LPN, or CNA, but his or her

training requirements and services performed are roughly equivalent to or exceed those of any of these occupations, that worker does not qualify for the companionship services exemption. For example, according to PHI, twelve states require HHAs to be trained and credentialed as CNAs. Where a worker is a CNA and provides medically related services, regardless of any other job title he or she may hold, he or she is excluded from the companionship services exemption. *See* 29 CFR 541.2; FOH 22a04; Wage and Hour Fact Sheet #17A: Exemption for Executive, Administrative, Professional, Computer, and Outside Sales Employees Under the Fair Labor Standards Act (all explaining that job titles do not determine exempt status under the FLSA). Second, as explained below, any HHA or PCA who performs medically related services does not qualify for the companionship services exemption. Based on the Department's understanding of the typical duties of these workers, the Department believes that many HHAs will for this reason not be subject to the exemption and therefore will be entitled to the protections of the FLSA. Of course, in addition, any HHA or PCA who is engaged in the provision of care during more than 20 percent of his or her hours worked for a particular consumer in a given workweek also does not qualify for the companionship services exemption. Furthermore, as explained in the section of this Final Rule regarding § 552.109, any third party that employs an HHA or PCA who works in a private home will not be permitted to claim the companionship services exemption. Given these limitations on the companionship services exemption, and the services HHAs and PCAs often provide, it is likely that almost all HHAs and many PCAs will not be exempt under the Act. Because almost all of these workers are providing home care as a vocation, the Department believes this is the appropriate result under the statute.

The second difference between the current and newly adopted regulatory text—that medically related services are those that typically require training, not only those performed by a person who actually has the training—is primarily based on the FLSA's fundamental premise that the tasks performed rather than the job title or credentials of the person performing them determines coverage under the Act. As explained elsewhere in this Final Rule, in enacting the 1974 amendments, Congress intended to exclude from FLSA coverage the work of individuals whose

services did not constitute a vocation; it did not exclude domestic service employees who happened not to have training. The Department believes that any direct care worker who performs medical tasks that nurses or nursing assistants are trained to perform is the sort of employee whose work should be compensated pursuant to the requirements of the FLSA.[19]

Medically related services are not within the scope of companionship services whether the person performing them is registered, licensed, or certified to do so or not. Procedures performed may be invasive, sterile, or otherwise require the exercise of medical judgment; examples include but are not limited to catheter care, turning and repositioning, ostomy care, tube feeding, treating bruising or bedsores, and physical therapy. Regardless of actual training, these tasks require skill and effort far beyond what is called for by the provision of fellowship and protection, such as activities like reading, walks, and playing cards. They are also outside the category of assistance with instrumental activities of daily living (IADLs), which may fall under the provision of care described in § 522.6(b). The text of § 552.6(b) notes that IADLs include assisting a consumer with the physical taking of medications or arranging a consumer's medical appointments; minor health-related tasks such as helping a consumer put in eye drops, applying a band-aid to a minor cut, or calling a doctor's office to schedule an appointment are distinguishable from the medically related services RNs, LPNs, and CNAs are trained to and do perform. Furthermore, focusing on the tasks assigned to, rather than the actual training or occupational title of, the direct care worker avoids disincentivizing employers from hiring workers who are not adequately prepared for the duties they are assigned in order to avoid minimum wage and overtime requirements. This outcome, which becomes increasingly significant as services shift from institutions to

[17] O'NET, SOC 31–1011.00, *http://www.onetonline.org/link/details/31-1011.00*.

[18] O'NET, SOC 39–9021.00, *http://www.onetonline.org/link/details/39-9021.00*.

[19] The Department notes that the Final Rule's instruction not to look to the actual training of the person providing services calls for a shift in the way courts approach challenges to the assertion of the companionship services exemption. Courts have read the Department's current regulation to mean that direct care workers without the extensive training RNs and LPNs receive are not excluded from the exemption regardless of the services they provide. *See, e.g.,* Cox v. Acme Health Servs., 55 F.3d 1304, 1310 (7th Cir. 1995); *McCune* v. *Or. Senior Servs. Div.,* 894 F.2d 1107, 1110–11 (9th Cir. 1990). The Final Rule, which for the reasons explained reflects a reasonable reading of the statutory provision the Department has express authority to interpret, calls instead for a focus on the tasks performed.

homes, is not beneficial to workers or to consumers.

Finally, the Department notes that the purpose of § 552.6(d) is to exclude from the companionship services exemption those direct care workers who perform medically related tasks on more than isolated, emergency occasions. A direct care worker who provides companionship services but reacts to an unanticipated, urgent situation by, for example, performing cardiopulmonary resuscitation (CPR), performing the Heimlich maneuver, or using an epinephrine auto-injector is not excluded from the exemption. Furthermore, in response to NRCPDS's question regarding first aid or CPR training, the Department notes that such training is not equivalent to that which an RN, LPN, or CNA receives, and therefore a worker who has been taught these skills would not automatically be excluded from the companionship services exemption.

### C. Section 552.102 (Live-in Domestic Service Employees) and Section 552.110 (Recordkeeping Requirements)

#### Live-in Domestic Service Employees

Section 13(b)(21) of the FLSA exempts from the overtime provision "any employee who is employed in domestic service in a household and who resides in such household." 29 U.S.C. 213(b)(21). The Department's current regulation at § 552.102(a) provides that domestic service employees who reside in the household where they are employed are not entitled to overtime compensation. Section 552.102(a) also provides that domestic service workers who reside in the household of their employer are entitled to at least the minimum wage for all hours worked (unless they meet the companionship services exemption). Domestic service employees who reside in the household where they are employed are referred to as "live-in domestic service employees."

Under § 552.102(a), the Department allows the employer and live-in domestic service employee to enter into a voluntary agreement that excludes from hours worked the amount of the employee's sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits.[20] In order for periods of free time (other than those relating to meals and sleeping) to be excluded from hours worked, the periods must be of sufficient duration to enable the

employee to make effective use of the time. § 552.102(a). Section 552.102(a) makes clear that if the sleep time, meal time, or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked.

The Department allows for such an agreement because it recognizes that live-in employees are typically not working all of the time that they are on the premises and that, ordinarily, the employees may engage in normal private pursuits, such as sleeping, eating, and other periods of time when they are completely relieved from duty. *See also* § 785.23. However, current § 552.102(a) makes clear that live-in domestic service employees must be paid for all hours worked even when an agreement excludes certain hours. As an example, assume an employer and live-in domestic service employee enter into a voluntary agreement that excludes from hours worked the time between 11:00 p.m. and 7:00 a.m. for the purposes of sleeping. If the employee is required to perform any work during those hours, for example, the employee is required to assist the individual with going to the bathroom, or is required to periodically turn or reposition the individual, the employer is then required to pay the employee for the time spent performing work activities despite an agreement that typically designates those hours as non-working time. The proposed rule did nothing to change this obligation.

In the NPRM, the Department proposed changes to the recordkeeping requirement for live-in domestic service employees. Under proposed § 552.102(b), the Department would no longer allow the employer of a live-in domestic employee to use the agreement as the basis to establish the actual hours of work in lieu of maintaining an actual record of such hours. Proposed § 552.102(b) would require the parties to enter into a new agreement whenever there is a significant deviation from the existing agreement. Additionally, in the proposed changes to § 552.110(b), the Department would no longer permit an employer to maintain a copy of the agreement as a substitution for recording actual hours worked by the live-in domestic service employee. Instead, the Department would require the employer to maintain a copy of the agreement as well as records showing the exact number of hours worked by the live-in domestic service employees and pay employees for all hours actually worked. As more fully explained in the Recordkeeping Requirement section below, the Department is adopting the proposed recordkeeping requirements

with minor modifications, as discussed in the preamble to §§ 552.102, 552.110.

#### Live-in Situations

The Department received several comments requesting clarification on the definition of a live-in domestic service employee. For example, Women's Employment Rights Clinic stated that it is critical that the regulations include a definition of a live-in domestic service employee because live-in domestic service workers remain exempt from overtime, and that the Department should provide clarification of the definition of a "live-in" so households and workers clearly understand when overtime must be paid. Women's Employment Rights Clinic suggested that the Department adopt the following definition: "A live-in employee is one who (1) resides on the employer's premises on a permanent basis or for extended periods of time and (2) for whom the employer makes adequate lodging available seven days per week." Women's Employment Rights Clinic stated that this definition will help draw a needed distinction between workers on several consecutive 24-hour shifts and live-in employees, as well as a distinction between short-term assignments and assignments for extended periods of time that might appropriately be deemed live-in situations. The Legal Aid Society of NY also requested that the Department clarify the definition of live-in domestic service employee and make clear that the definition does not include a worker who spends only one night per week at a residence or must pay any part of the rent or mortgage or other expenses for upkeep of another residence.

In addition, the Department received comments questioning the continued use and viability of the overtime exemption for live-in domestic service employees. Students from the Georgetown University Law Center stated that the Department should eliminate the live-in domestic service employee exemption, suggesting that it is directly contrary to the Department's stated goals in the NPRM. The students urged the Department to provide overtime protections to live-in employees. On the other hand, one individual who hires direct care workers to provide services for his father requested that the Department not eliminate the live-in domestic service employee exemption.

Because the live-in domestic service employee exemption is statutorily created, the Department cannot eliminate the exemption as suggested by Georgetown Law students. Only Congress could eliminate the overtime

---

[20] This requirement is nearly identical to the requirement found in § 785.23.

exemption for such workers. Moreover, the Department did not propose any changes to the definition of live-in domestic service employee or otherwise discuss the requirements for meeting the live-in domestic service exemption in the NPRM. It is the Department's intention to continue to apply its existing definition of live-in domestic service employees. Under the Department's existing regulations and interpretations, an employee will be considered to be a live-in domestic service employee under § 552.102 if the employee: (1) Meets the definition of domestic service employment under § 552.3 and provides services in a "private home" pursuant to § 552.101; and (2) resides on his or her employer's premises on a "permanent basis" or for "extended periods of time." *See also* § 785.23; FOH § 31b20.

Employees who work and sleep on the employer's premises seven days per week and therefore have no home of their own other than the one provided by the employer under the employment agreement are considered to "permanently reside" on the employer's premises. *See* Wage and Hour Opinion Letter FLSA–2004–7 (July 27, 2004). Further, in accordance with the Department's existing policy, employees who work and sleep on the employer's premises for five days a week (120 hours or more) are considered to reside on the employer's premises for "extended periods of time." *See* FOH § 31b20. If less than 120 hours per week is spent working and sleeping on the employer's premises, five consecutive days or nights would also qualify as residing on the premises for extended periods of time. *Id.* For example, employees who reside on the employer's premises five consecutive days from 9:00 a.m. Monday until 5:00 p.m. Friday (sleeping four straight nights on the premises) would be considered to reside on the employer's premises for an extended period of time. Similarly, employees who reside on an employer's premises five consecutive nights from 9:00 p.m. Monday until 9:00 a.m. Saturday would also be considered to reside on their employer's premises for an extended period of time. *Id.*

Employees who work only temporarily, for example, for only a short period of time such as two weeks, for the given household are not considered live-in domestic service workers, because residing on the premises of such household implies more than temporary activity. In addition, employees who work 24-hour shifts but are not residing on the employer's premises "permanently" or for "extended periods of time" as

defined above are not considered live-in domestic service workers and, thus, the employers are not entitled to the overtime exemption. The Department received many comments from employers and advocacy groups that serve persons with disabilities that appeared to confuse the issue of "live-in" care with 24-hour care. *See, e.g.,* Bureau of TennCare, NASDDDS, Cena Hampden, Scott Witt, and Gary Webb. For example, one individual suggested that her mother received "live-in" care when the employee worked only a 16-hour shift. The Department received several comments noting that the home care industry's use of the term "live-in" is different than the Department's use. Specifically, John Gilliland Law Firm stated that "the term 'live-in' is used differently within the home care industry than how it is used by the Wage and Hour Division." The law firm noted that the home care industry uses the term "live-in" to refer to 24-hour assignments, often several consecutive assignments, where the client's location is not the employee's residence, and the Wage and Hour Division refers to "live-in" employees as those residing on the client's premises. Similarly, Women's Employment Rights Clinic noted that, based on their experience representing home care workers, employees who work several consecutive 24-hour shifts are often confused with live-in employees.

The fact that an individual may need 24-hour care does not make every employee who provides services to that individual a live-in domestic service employee. Rather, only those employees who are providing domestic services in a private home and are residing on the employer's premises "permanently" or for "extended periods of time" are considered live-in domestic service employees exempt from the overtime requirements of the FLSA. Employees who work 24-hour shifts but are not live-in domestic service employees must be paid at least minimum wage and overtime for all hours worked unless they are otherwise exempt under the companionship services exemption. (*See* Hours Worked section for a discussion of when sleep time is not hours worked.)

The Department received a few comments that argued that allowing employers to maintain an agreement under § 552.102(a) conflicts with the simultaneous requirement that an employer must maintain precise records of hours worked under proposed § 552.102(b). For example, The Workplace Project stated that allowing an agreement of hours worked will create confusion and will undermine

the requirement that employers track actual hours worked. As a result, The Workplace Project recommended that the Department eliminate § 552.102(a) that allows employers of live-in domestic service workers to enter into an agreement. On the other hand, one individual requested that the Department continue to allow employers and employees to use agreements for live-in domestic service employees. California Foundation for Independent Living Centers (CFILC) also suggested that the Department should allow employers and employees to "enter into mutually agreeable and non-coercive employment agreements to work compensated hours at a set hourly wage or monthly salary without triggering overtime compensation." CFILC stated that the agreements could guarantee the live-in domestic service employee breaks, meal periods, and 8 hours of uninterrupted sleep, and the agreements could be renegotiated to account for any changes that might arise.

The Department disagrees with the comments that suggested that continuing to allow employers and live-in domestic service employees to enter into mutually agreeable agreements is inconsistent with the recordkeeping requirements for live-in domestic service employees. The Department's regulation allows the employer and live-in employee to enter into a voluntary agreement that excludes from hours worked the amount of the employee's sleeping time, meal time and other periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. *See* §§ 552.102(a), 785.23. The Department's regulation also allows employers and live-in employees to enter into such voluntary agreements (*see, infra,* Hours Worked section) because the Department recognizes that live-in employees are not necessarily working all the time that they are on the employer's premises. When an employee resides on the employer's premises it is in the employee's and the employer's interest to reach an agreement on the employee's work schedule so each may understand when the employee is expected to be working and when the employee is not expected to be working and is completely relieved from duty. The Department will accept any reasonable agreement of the parties, taking into consideration all of the pertinent facts. Despite allowing for voluntary agreements, however, the Department has always required that employers pay live-in domestic service

employees at least the minimum wage for all hours worked and that when sleep time, bona fide meal periods, and bona fide off-duty time are interrupted then employees must be compensated for such time regardless of whether an agreement typically designates those hours as non-working time. Under the new recordkeeping requirements for live-in domestic service employees (more fully addressed below), the Department simply requires the employer to maintain a copy of the agreement as well as records showing the exact number of hours worked by live-in domestic service employees and pay live-in domestic service employees for all hours actually worked. The requirement to record hours actually worked is no different than that required for other employers under the FLSA.

The Department also received comments reflecting the belief that the proposed rule required live-in employees to be paid for all 24 hours, or comments that were otherwise confused about the pay requirements for live-in and 24-hour shift workers. For example, a Senior Helper franchise owner believed that the Department's proposed rule required that domestic service employees scheduled for 24-hour shifts or deemed live-ins must be paid for the entire 24-hour period even when the employee is not working. The owner suggested that such an outcome would be unfair and that the rule should be redrafted and modeled after New Jersey law, which, based upon his description, requires that live-in employees be compensated for at least eight hours each day when the hours worked are irregular and intermittent. Another employer also believed that the Department's proposed rule required that agencies pay live-in employees for all 24 hours that they are on the clients' premises even if the employees receive six to eight hours of uninterrupted sleep. This employer suggested that this would double the cost to the clients. Several employers suggested that employees who live in or work 24-hour shifts should not be paid overtime because they are not working all the time. In addition, a few employers suggested that live-in or sleep-over employees should not be paid based on an hourly rate; rather, the employer should be allowed to pay the employee based on a flat overnight rate.

The Department's existing regulations regarding when employees must be compensated for sleep time, meal periods, or off-duty time are discussed in the Hours Worked section of this Final Rule. The definition of hours worked and the basis for taking any

deductions outlined in that section apply to live-in domestic service employees and must be followed. Generally, when an employee resides on the employer's premises permanently or for extended periods of time, all of the time spent on the premises is not necessarily working time. The Department recognizes that such an employee may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from work duties. For a live-in domestic service employee, such as a live-in roommate, the employer and employee may voluntarily agree to exclude sleep time of not more than eight hours if (1) adequate sleeping facilities are furnished by the employer, and (2) the employee's time spent sleeping is uninterrupted. § 785.22–.23. In addition, meal periods may be excluded if the employee is completely relieved of duty for the purpose of eating a meal, and off-duty periods may be excluded if the employee is completely relieved from duty and is free to use the time effectively for his or her own purposes. §§ 785.16, 785.19. However, an employee who is required to remain on call on the employer's premises or so close thereto that he or she cannot use the time effectively for his or her own purposes is considered to be working while on call and must be compensated for such time. § 785.17.

Concerning whether employers may pay an hourly rate or a flat overnight or daily rate to a live-in employee, the Department notes that the FLSA is flexible regarding the type of rate paid and only requires that employers pay the live-in domestic service employee at least the minimum wage for all hours worked, in accordance with our longstanding rule. For example, an employer may have an agreement to pay a live-in employee $125 per day, which exceeds the minimum wage required for 16 hours of work (compensable time), if the employee receives eight hours of uninterrupted sleep time off.

The Department also received several comments requesting clarification on the application and impact of the companionship services and live-in domestic service employee exemptions to shared living or roommate arrangements. The Department received many comments from advocacy groups that represent persons with disabilities, such as the NASDDDS, and third party employers, such as Community Vision, requesting that the Department clarify the wage and hour requirements on live-in arrangements provided under Medicaid-funded Home and

Community-Based Services (HCBS) programs.

Specifically, NASDDDS described shared living services as "an arrangement in which an individual, a couple or a family in the community share life's experiences with a person with a disability." Shared living arrangements may also be known as mentor, host family or family home, foster care or family care, supported living, paid roommate, housemate, and life sharing. Under a shared living program, consumers typically live in the home of an individual, couple, or family where they will receive care and support services based on their individual needs. NASDDDS stated that shared living providers receive compensation typically from a third party provider agency or directly from the state's Medicaid program. NASDDDS requested that the Department conclude that shared living providers meet the definition of performing companionship services under the proposed rule and thus that those providers are not entitled to minimum wage and overtime compensation.

NASDDDS also discussed Medicaid services described as "host families." NASDDDS described a "host family" as a family that accepts the responsibilities for caring for one to three individuals with developmental disabilities. The host family helps the individual participate in family and community activities, and ensures that the individual's health and medical needs are met. Such services may include assistance with basic personal care and grooming, including bathing and toileting; assistance with administering medication or performing other health care activities; assistance with housekeeping and personal laundry; etc. NASDDDS noted that the provider typically must comply with state licensure or certification regulations. NASDDDS further noted that the provider is usually paid a flat monthly rate to meet the individual's support needs and the payment will typically be based on the intensity and difficulty of care. The provider may also be paid for room and board. NASDDDS suggested that the Department work with CMS and stakeholders to develop a greater understanding of the programs and financial structures for Medicaid HCBS waiver programs. One individual suggested that such living arrangements should fall under the Department's foster care exemption or should be exempt from the requirements under § 785.23.

Moreover, Arkansas Department of Human Services noted that many

individuals who receive supported living services under HCBS waivers rely on roommates or live-in scenarios where the individuals receive services in their own home or in that of a family member. Community Vision and other third party providers described live-in roommates as "a major component of the support system of an individual with significant disabilities who live independently in their own home." Home Care & Hospice stated that live-in roommate arrangements include college students with Medicaid paid "roommates" who also attend college or individuals who work and take a caregiver to work with them, but who need an overnight live-in roommate to address intermittent needs. Home Care & Hospice was concerned that the Department's proposed regulations would put these programs at risk. Community Vision stated that live-in roommates are available in the rare case of an emergency or for infrequent support needs and that these individuals receive free or reduced rent and utilities in exchange for being a roommate who on occasion can provide support to the individual at night; the type of services provided by live-in roommates was not discussed. Community Vision requested that the exemptions from minimum wage and overtime continue for live-in roommates. It asserted that minimum wage and overtime pay would make the live-in roommates fiscally unsupportable for agencies and their clients, resulting in increased institutionalization of their clients with disabilities and a loss of housing for their employees.

The Department also received several comments that discussed the application of the companionship services and live-in domestic service employee exemptions to paid family caregivers. *See, e.g.,* Joni Fritz, ANCOR, and NASDDDS. Paid family caregivers are described as family members of an aging person or an individual with a disability who provide care and receive some income to provide support for their family member, and who—without pay—could not provide the needed support. *See* Joni Fritz. Some states have established payment systems under Medicaid that will pay a family member to provide intimate care and medically related support.[21] AARP noted that some HCBS waiver programs allow the individual to hire family caregivers to provide services and may permit them

to provide more than 40 hours of assistance per week, assistance that is vital to keeping their loved one at home and out of an institution. AARP noted that family caregivers frequently live with the person for whom he or she provides services. AARP was concerned that requiring the payment of overtime in these cases, merely because public authorities or fiscal intermediaries are involved in making these programs possible, could prevent family caregivers from providing more than 40 hours a week in paid care and impact the ability of the individual to remain at home. In addition, AARP noted that the situation of a family caregiver who lives with the person for whom they provide services is analogous to the overtime exemption for live-in domestic service workers. AARP suggested that the Department not require the payment of overtime if: (1) The individual is receiving HCBS under a publicly financed consumer-directed program; (2) a third party such as a public authority or a fiscal intermediary is involved; and (3) a family caregiver who lives with the consumer is being paid under the consumer-directed program to provide services for the individual.

It appears that under these varied shared living arrangements, the live-in domestic service workers are living on the same premises with the consumer and would easily be able to meet the "permanently reside" or "extended periods of time" requirements and would therefore be exempt from overtime requirements. There is a question, however, whether the consumer is receiving services in a "private home." As the determination whether domestic services are provided in a private home is fact-specific and is to be made on a case-by-case basis, the Department cannot state categorically whether a particular type of living arrangement involves work performed in a private home. In evaluating whether a residence is a private home (*see, supra,* private home discussion), the Department considers the six factors identified by the Tenth Circuit in *Welding* as well as the other factors identified in *Johnston, Linn,* and *Lott. See* Wage and Hour Opinion Letter, FLSA 2006–13NA (June 23, 2006).

The Department cannot address all shared living arrangements raised in the comments because the circumstances are different under countless factual scenarios. However, the Department is providing, as an example, the following guidance regarding how these established rules will likely apply under the most commonly raised shared living arrangement—live-in roommates. In the live-in roommate arrangement, the

consumers appear to be living in their own home and a roommate moved in to the consumer's home in order to provide services on an as needed basis. It also appears that the person receiving services owns the home or leases the home from an independent third party. There is nothing in the comments to suggest that the state or agency providing the services maintains the residences or otherwise provides the essentials of daily living, such as paying the mortgage or rent, utilities, food, and house wares. Rather, either the service provider pays rent or the individual receiving services provides free lodging as part of the remuneration due the live-in roommate for providing services. The cost/value of the services does not appear to be substantial based on the comments that suggested that live-in roommates provide only intermittent or infrequent care services. Thus, the costs of the services provided appear to be a small portion of the total costs of maintaining the living unit. In addition, there is nothing to suggest that the service provider uses any part of the residence for its own business purposes. It also appears that the consumer hires the roommate and determines who will live in his or her home and is free to come and go as he or she pleases. Therefore, live-in roommate arrangements appear to be performed in a private home, and thus, the live-in domestic service employee overtime exemption will likely be available to the individual, family, or household using the worker's services. Any slight change in the specific facts of this scenario, however, may lead to a different result. However, as more fully discussed in the third party employment section below, the live-in domestic service employee exemption will not be available to a third party employer of the live-in roommate. Moreover, to the extent the live-in roommate meets the duties test for the companionship services exemption as outlined above (*see, supra,* companionship services section), the companionship exemption will likely also be available to the individual, family, or household using the worker's services. The overtime exemption for a live-in domestic service employee is a separate exemption available even when an employee does not meet the Department's duties test in the companionship services exemption. For example, an individual, household or family member employing a live-in nurse or a live-in direct care worker who provides cooking, driving, and cleaning services for more than 20 percent of the weekly hours worked, may still claim the live-in domestic

---

[21] In some instances a family member may also be paid for time spent performing some housekeeping services in addition to the medical and personal care services provided.

service employee exemption from overtime; if there is a third party employer involved, however, then the third party employer would be responsible for overtime compensation.

For many of the same reasons discussed above, the Department believes that in most circumstances a paid family caregiver is providing services in a private home. In the circumstances where the paid family caregiver lives with the consumer, the overtime exemption will be available to the individual, family, or household. If employed, jointly or solely, by a third party, the paid family caregiver would be entitled to overtime compensation for all hours worked over 40 from the third party employer subject to the analysis described later in this preamble discussing paid family and household caregivers. However, as noted above, not all time spent on the premises is necessarily considered hours worked and there may be circumstances where the third party will not be considered a joint employer of the paid family caregiver because the third party is not engaged in the factors that indicate an employer-employee relationship exists (*see, infra,* joint employment section).

The Department recognizes that people living with disabilities continue to explore innovative ways of eliminating segregation and promoting inclusion particularly through the provision of services and supports in home- and community-based settings. The Department appreciates that a number of commenters who care about the viability of such arrangements raised questions and concerns about the impact of the proposed rule on such arrangements, and the Department supports the progress that has allowed elderly people and persons with disabilities to remain in their homes and participate in their communities. As noted above, in the most common scenario described by commenters, the live-in roommate situation, depending on all of the facts of the arrangement, the roommate may be exempt from the overtime compensation requirements under the live-in domestic service employee exemption, and, depending on the roommate's duties, could also qualify for the companionship services exemption. In either case, the longstanding FLSA hours worked principles would apply, and time that is not work time under those principles would not have to be compensated.

The Department also recognizes that it is possible that certain shared living arrangements may fall within the Department's exception for foster care parents, provided specific criteria are met. *See* FOH § 10b29. In contrast to

shared living arrangements that are not foster care situations, individuals in foster care programs are typically wards of the state; the state controls where the individuals will live, with whom they will live, the care and services that will be provided, and the length of the stays. For example, in Wage and Hour Opinion Letter WH–298, the WHD concluded that where a husband and wife agree to become foster parents on a voluntary basis and take a child into their home to be raised as one of their own, the employer-employee relationship would not exist between the parents and the state where the payment is primarily a reimbursement of expenses for rearing the child. *See* 1974 WL 38737 (Nov. 13, 1974). Of course, the Department recognizes that there is a continuum of shared living arrangements and a factual determination with respect to FLSA coverage must be made on a case-by-case basis.

As stated throughout this rule, the Department believes that the positions taken in the Final Rule are more consistent with the legislative intent of the companionship services and live-in exemptions and that protecting domestic service workers under the Act will help ensure that the home care industry attracts and retains qualified, professional workers that the sector will need in the future.

*Recordkeeping Requirements*

In the NPRM, the Department proposed to revise the recordkeeping requirements applicable to live-in domestic service employees, in order to ensure that employers maintain an accurate record of hours worked by such workers and pay for all hours worked in accordance with the FLSA. Section 13(b)(21) of the Act provides an overtime exemption for live-in domestic service employees; however, such workers remain subject to the FLSA minimum wage protections. Current § 552.102 allows the employer and employee to enter into an agreement that excludes from hours worked sleeping time, meal time, and other periods of complete freedom from duty when the employee may either leave the premises or stay on the premises for purely personal pursuits, if the time is sufficient to be used effectively. Paragraph 552.102(a) makes clear that if the free time is interrupted by a call to duty, the interruption must be counted as hours worked. Current § 552.102(b) allows an employer and employee who have such an agreement to rely on it to establish the employee's hours of work in lieu of maintaining precise records of the hours actually worked. The

employer is to maintain a copy of the agreement and indicate that the employee's work time generally coincides with the agreement. If there is a significant deviation from the agreement, a separate record should be kept or a new agreement should be reached.

The Department expressed concern in the NPRM that not all hours worked by a live-in domestic service employee are actually captured by such an agreement, which may result in a minimum wage violation. The Department stated that the current regulations do not provide a sufficient basis to determine whether the employee has in fact received at least the minimum wage for all hours worked. Therefore, the NPRM proposed to revise § 552.102(b) to no longer allow the employer of a live-in domestic service employee to use the agreement as the basis to establish the actual hours of work in lieu of maintaining an actual record of such hours. Instead, the proposal required the employer to keep a record of the actual hours worked. Consequently, the language suggesting that a separate record of hours worked be kept when there is a significant deviation from the agreement was proposed to be deleted, and proposed § 552.102(b) required entering into a new written agreement whenever there is a significant deviation from the existing agreement.

The Department also proposed to amend § 552.110 with respect to the records that must be kept for live-in domestic service employees. Current § 552.110(b) provides that records of actual hours worked are not required for live-in domestic service employees; instead, the employer may maintain a copy of the agreement referred to in § 552.102. It also states, however, that this more limited recordkeeping requirement does not apply to third party employers. No records are required for casual babysitters. Current paragraph 552.110(c) permits, when a domestic service employee works a fixed schedule, the employer to use the schedule that the employee normally works and either provide some notation that such hours were actually worked or, when more or less hours are actually worked, show the exact number of hours worked. Current § 552.110(d) permits an employer to require the domestic service employee to record the hours worked and submit the record to the employer.

Because of the concern that all hours worked are not being fully captured, the Department proposed in § 552.110(b) to no longer permit an employer to maintain a copy of the agreement as a substitution for recording actual hours

worked by the live-in domestic service employee. Instead, the NPRM proposed that the employer maintain a copy of the agreement and maintain records showing the exact number of hours worked by the live-in domestic service employee. Proposed § 552.110(b) expressly stated that the provisions of § 516.2(c), pertaining to fixed-schedule employees, do not apply to live-in domestic service employees, which meant that employers would no longer be permitted to maintain a simplified set of records for such employees. As a result, a conforming change was proposed in § 552.110(c), based on the Department's belief that the frequency of schedule changes for live-in domestic service employees simply makes reliance on a fixed schedule, with exceptions noted, too unreliable to ensure an accurate record of hours worked by these employees. In addition, because the proposed changes to third party employment in § 552.109 made moot the reference in § 552.110(b) to third party employers, it was removed from proposed § 552.110(b). The NPRM also proposed to revise § 552.110(d) to make clear that the employer of the live-in domestic service employee could not require the live-in domestic service employee to record the hours worked and submit the record to the employer, while employers of other domestic service employees could continue to require the domestic service employee to record and submit their record of hours worked. The proposal required the employer to be responsible for making, keeping, and preserving records of hours worked and ensuring their accuracy. Finally, the Department proposed to move the sentence stating that records are not required for casual babysitters, as defined by § 552.5, to a stand-alone paragraph at § 552.110(e).

The Department received a number of comments on the proposed recordkeeping requirements, discussed below. Based on comments indicating that the proposed change prohibiting employers from requiring live-in domestic service employees to record and submit their hours could create significant difficulties, particularly for those employers who have Alzheimer's disease, dementia or developmental disabilities, the Department modified the Final Rule to allow an employer to require the live-in domestic service employee to record the hours worked and submit the record to the employer. The Final Rule adopts the other changes as proposed.

The Department also received a number of comments that stated that the requirement for employers to keep a record of actual hours worked would

cause problems. For example, several employers and their representatives, including CAHSAH, stated that it is unlikely that individual employers would be aware of the requirement or be able to comply with it, and that it would place an undue burden on an elderly employer receiving services to have to comply with recordkeeping requirements. AARP similarly stated that consumers who are ill or have cognitive impairments and need live-in long-term services and supports may not be able to monitor a worker's hours effectively or to keep proper records. Therefore, while AARP stated its belief that third party agencies could fulfill the requirement to record hours, it sought an adjustment where the individual or family directly hires the employee; AARP suggested allowing the agreement to control unless deviations are noted and allowing the employer to require the employee to record and submit hours. Other employers also expressed concern about the ability of consumers with Alzheimer's disease, dementia, or other disabilities to track hours, and they stated their preference for continuing to use a predetermined schedule agreement or requiring the employee to track hours. *See, e.g.,* North Shore Senior Services, Gentle Home Services, Harrison Enterprises, Inc., and Bright Star Healthcare of Baltimore. Home care companies and their representatives expressed concern about the additional paperwork burdens, stating that a household employer with a live-in domestic service worker would need to install a time clock, and that it would be difficult for employers to track sleep time versus awake time, or to track time spent taking a break versus helping the client. *See, e.g.,* VNAA, Visiting Nurse Service of New York (VNSNY), Angels Senior Home Solutions, Connecticut Ass'n for Home Care & Hospice, Arizona Ass'n of Providers for People with Disabilities, New York State Ass'n of Health Care Providers, and Home Care Ass'n of NY State. They indicated that the requirement will be burdensome to implement, particularly when consumers wake up frequently during the night and need assistance, because care workers will have to keep records of what time the person woke up, what help was needed, and how long their assistance was provided. They expressed concern that, because live-in domestic service workers are generally unsupervised, their third party employers have little ability to monitor or audit their records of meal and sleep periods versus work hours to determine their accuracy. One company, Elder Bridge, believed that using an electronic

time management system was not feasible because such systems cannot account for the unpredictable down time of employees; therefore, the company suggested that caregivers should be allowed to document their break time manually in their care notes. A trade association, Home Care Alliance of Massachusetts, stated it had no objection to recording the exact number of hours worked, but it expressed confusion about how it would know that exact number if it could not require live-in domestic service employees to record their hours (*see* Harrison Enterprises, Inc.). An employee agreed, believing that employee-based reports would be more accurate. A Georgetown University Law Center student commented that recording deviations from an agreement was no more difficult than recording every hour as it happened and could be more accurate.

On the other hand, the Department received a number of comments that emphasized the importance of the changes in the proposed recordkeeping requirements for live-in domestic service workers. For example, National Council of La Raza stated that some care workers work more than 60 hours in a week, and that bolstering the recordkeeping requirements "is an excellent first step in ensuring that these hardworking caregivers are accurately compensated for time on the job." The ACLU supported the change, stating that "[i]t is common that live-in workers are required to work more than the hours they have contracted to perform." Professor Valerie Francisco similarly stated that her research shows that employers of live-in domestic workers do not keep accurate records of hours worked. Numerous commenters, including NELP, Workforce Solutions Cameron, COWS, and DCA, agreed, stating that the current rule's tolerance for use of an agreement has resulted in underpayments for time worked by live-in workers, who are isolated and may fear retaliation if they complain. NELP noted that "experts estimate that one-third of the victims of labor trafficking are domestic workers." Other groups such as AFSCME, Women's Employment Rights Clinic and the Center, noted that the revised regulations will more effectively ensure that hours are properly recorded and that workers receive at least the minimum wage for all hours worked. The Center for Economic and Policy Research stated that the difficulties that arise in capturing live-in hours worked "are not qualitatively different from monitoring issues that arise in other contexts."

The Legal Aid Society, The Workplace Project, Care Group, Inc., the Brazilian Immigrant Center and DAMAYAN, asserted that live-in domestic workers are subject to exploitation and that requiring employers to track hours will help to create a fair environment. However, several of these advocacy groups viewed the requirement to track hours as inconsistent with the ability to obtain an agreement with the worker to exclude sleep time and other periods of complete freedom; they thought that such agreements only create confusion and undermine the requirement to track hours. Other individuals emphasized they wanted to ensure that employers of live-in domestic service workers keep records of the employees' rate of pay, total wages, and deductions, and they noted that employers can keep such records using technology like computers, smartphones, etc. Several consumers stated that they have always kept records of hours worked and wages paid and that it is easy to do. Finally, several commenters, including Care Group, Inc., National Domestic Workers Alliance, and The Workplace Project, suggested that the regulatory requirement to have a record of the employee's Social Security Number should also permit the use of an Individual Taxpayer Identification Number (ITIN).

In light of the comments indicating that it would be very difficult for many consumers of live-in services to monitor and record hours worked accurately, especially those who have Alzheimer's disease, dementia, or other conditions affecting memory, concentration, or cognitive ability, the Department has modified § 552.110(d) of the Final Rule to remove the proposed rule's restriction on employers of live-in domestic service employees being able to require such workers to record their hours worked and submit that record to the employer, thus, expanding the application of the current rule to all employers of domestic service employees.[22] Of course, even though employers may require their employees to create and submit time records, employers cannot delegate their responsibility for maintaining accurate records of the employee's hours and for paying at least the minimum wage for all hours worked. *See* § 552.102(a). *See, e.g., Kuebel* v. *Black & Decker, Inc.,* 643 F3d 352, 363 (2nd Cir. 2011) (employer's duty to maintain accurate records non-delegable); *Caserta* v. *Home Lines Agency, Inc.,* 273 F.2d 943, 946 (2nd

Cir. 1959) (rejecting as inconsistent with the FLSA an employer's contention that its employee was precluded from claiming overtime not shown on his own timesheets, because an employer cannot transfer its statutory burdens of accurate recordkeeping, and of appropriate payment, to the employee). The Department modified the Final Rule because it agrees that employees are, in many situations, the individuals with the best knowledge of when they were working, and they may have the best ability to track those hours.

With regard to the comments suggesting that the Department continue to allow the use of a reasonable agreement reflecting the expected schedule to establish a live-in domestic service employee's hours of work, the Department does not agree that such a system is appropriate. First, as stated in the NPRM, the Department is concerned that not all hours actually worked are captured by such an agreement. Live-in domestic service employees, including those employed to provide care for the elderly or individuals with disabilities, have inherently variable schedules due to the often unpredictable needs of their employers. Therefore, reliance on the system in the current regulations does not provide a sufficient basis to determine whether the employee has in fact received at least the minimum wage for all hours worked. As the comments from employee representatives emphasized, live-in domestic service workers are in a vulnerable position due to their isolation, and many fear retaliation if they complain. Further, numerous commenters stated that live-in domestic service employees work more hours than they have contracted to perform. While some employer representatives expressed concern that tracking hours would be burdensome, others—such as the Home Care Alliance of Massachusetts and individuals who said they have tracked hours for their employees—stated they had no objection to this requirement. AARP stated that third party employers should be able to fulfill the requirement. The Department notes that, under current § 552.110(b), the simplified recordkeeping system does not apply to third party employers.

The Department believes that the modification made in the Final Rule allowing employers to require employees to record and submit their hours will further simplify the process. The Department notes that there is no need for an electronic time management system. *See* 29 CFR 516.1(a). Some employers might choose to develop their own recordkeeping forms that, for example, might require the employee to

identify what tasks were performed and the hours spent in various activities; some employers might simply require employees to keep notes by hand of their hours worked; and some employers might decide to record the hours themselves. But whatever method is used, the Department believes that recording the actual hours worked will result in more accuracy than the current system of simply relying upon an agreement established months or years in the past. The recording of actual hours therefore will be, as many commenters stated, an effective tool to ensure that workers receive at least the minimum wage for all hours worked.

Several employee representatives expressed the view that the requirement to track actual hours worked was inconsistent with the ability under § 552.102(a) to have an employer-employee agreement to exclude sleep time, meal time and other periods of complete freedom from all duties. As discussed above, there is no inconsistency between these two provisions. The Department recognizes that live-in domestic service employees are not necessarily working all the hours that they are on the employer's premises and the regulations require that to exclude such time requires an agreement between the employer and employee. Therefore, the parties may agree to exclude sleep, meal and certain other relief periods from hours worked. *See* § 552.102(a). Nevertheless, all hours actually worked must be compensated, such as where the normal sleeping period or the normal meal period is interrupted by a call to duty. *Id.* The Final Rule simply clarifies that, although the parties may have an agreement that sets forth the parties' expectations regarding the normal schedule of work time, and they may agree to exclude sleep, meal and other relief periods from hours worked, that agreement does not control the compensation due each week; rather, records must be kept of the actual hours worked in order to ensure that the employee is properly compensated for all hours worked.

Finally, several commenters stated that the reference to Social Security Numbers in § 552.102(a) should include, as an alternative, an Individual Taxpayer Identification Number (ITIN); they also wanted to ensure that employers of live-in domestic service workers also keep records of rate of pay, total wages paid and deductions made. An ITIN is a tax processing number issued by the Internal Revenue Service (IRS). IRS issues ITINs to individuals who are required to have a U.S. taxpayer identification number for tax reporting

---

[22] The Department also made minor edits to § 552.110(b) and (d) to improve clarity.

or filing requirements but who do not have, and are not eligible to obtain, a Social Security Number. ITINs are issued regardless of immigration status, because both resident and nonresident aliens may have a U.S. filing or reporting requirement under the Internal Revenue Code. *See http://www.irs.gov/individuals/article/0,,id=96287,00.html.* The Department did not propose any changes to § 552.110(a), which simply mentions Social Security Numbers in its summary of the recordkeeping requirements in 29 CFR part 516 (*see, e.g.,* § 516.2, which also only mentions Social Security Numbers). The Department therefore does not think it is necessary to include this minor suggested change in the Final Rule, as it does not believe the failure to mention ITINs will cause any confusion. The recordkeeping requirements in § 516.2(a) and § 552.110(a) already require employers of nonexempt employees to maintain records such as hours worked each workweek, total wages paid, total additions to or deductions from wages and the basis therefore (such as board and/or lodging), and the regular hourly rate of pay when overtime compensation is due. Therefore, no further changes to the regulations in § 552.110 are necessary or appropriate.

## D. Section 552.109 (Third Party Employment)

Section 552.109 addresses whether a third party employer, the term the Department uses to refer to an employer of a direct care worker other than the individual receiving services or his or her family or household, may claim the FLSA exemptions specific to the domestic service employment context. Current § 552.109(a) permits third party employers to claim the companionship services exemption from minimum wage and overtime pay established by § 13(a)(15) of the Act; current § 552.109(c) permits third party employers to claim the live-in domestic service employee exemption from overtime pay established by § 13(b)(21) of the Act. (Section 552.109(b) addresses third party employment in the context of casual babysitting, which is not a topic within the scope of this rulemaking.) In the NPRM, the Department proposed to exercise its expressly delegated rulemaking authority and bring the regulation in line with the legislative intent and the realities of the home care industry by revising current paragraphs (a) and (c) to prohibit third party employers from claiming these exemptions. Under the proposed regulation, only an individual, family, or household would be

permitted to claim the exemptions in §§ 13(a)(15) and 13(b)(21) of the FLSA. In other words, where a direct care worker is employed by a third party, the individual, family or household using the worker's services could claim the exemptions, but the third party employer would be required to pay the worker at least the federal minimum wage for all hours worked and overtime pay at one and one-half the employee's regular rate for all hours worked over 40 in a workweek. For the reasons explained below, the Department is adopting § 552.109 as proposed.

Many commenters, including employees, labor organizations, worker-advocacy organizations, and consumer representatives, expressed strong support for the proposed change to § 552.109. *See, e.g.,* the Center; SEIU Healthcare Illinois Indiana; AFSCME; Legal Aid Society. The National Consumer Voice for Quality Long-Term Care explained that "[e]ven though some individuals who hire their own workers may end up paying more under the proposed rules, consumers and advocates in our network believe that providing minimum wage, overtime, and pay for travel time for these crucial health care workers is the right thing to do." AARP noted that it "strongly agrees" with denying the exemptions to third party agencies and asserted that "requiring all home care and home health care agencies to pay minimum wage and overtime to their employees is a centrally important component of the NPRM."

Numerous commenters agreed with the Department's assertion that the proposed changes were consistent with Congressional intent. *See, e.g.,* PHI, NELP, and EJC. A comment signed by Senator Harkin and 18 other Senators stated that "[a] close look at the legislative history of the 1974 changes establishes that Congress clearly intended to include today's home care workforce within the FLSA's protections." PHI argued that "employment by a home care agency strongly suggests that the worker is providing home care services as a vocation and is a regular bread-winner responsible for the support of her family. Such a formal employment arrangement is inconsistent with the teenage babysitters and casual companions for the elderly that Congress intended to exclude."

Additionally, many advocacy groups and others agreed with the Department's statements in the NPRM concerning the increased professionalization and standardization of the home care workforce. *See, e.g.,* DCA, Bruce Vladeck, NELP. The Westchester

Consulting Group noted that third party employers "are in the trade and business of providing services to the public and experience financial profit and loss" while household employers are purchasing companionship services "for their personal use to address their specific support needs." Similarly, PHI argued that one of the companionship services exemption's "main goals" was to "limit application of [the] FLSA to workers whose vocation is domestic service (that is, not occasional babysitters and companions)" and this concern is not "relevant to agency-employed home care workers." The Legal Aid Society explained that "the proposed regulations appropriately recognize that this work is not the kind of casual neighborly assistance that Congress had in mind when it created the companionship services exemption. Rather, these workers are professional caregivers, who work long hours for agencies that are businesses, whether for-profit or not-for-profit." Additionally, the ACLU and others observed that many members of this workforce, such as home health aides and personal care assistants, are now often subject to training requirements and competency evaluations.

Employers and employer associations, however, generally opposed the proposed revision of § 552.109. *See, e.g.,* CAHSAH, 24Hr Home Care, ResCare Home Care, NASDDDS, Texas Association for Home Care & Hospice, Inc. Many of these commenters asserted the proposal is contrary to Congress's intent as well as the Department's longstanding interpretation of the companionship services exemption. BrightStar franchisees, among others, argued that the use of the words "any employee" in §§ 13(a)(15) and 13(b)(21) of the Act demonstrates that Congress intended for the exemptions to apply based upon the activities of the employee rather than the identity of the employer. BrightStar franchisees wrote that "floor debate included several statements related to concerns about the ability of working families to afford companionship services for their loved ones and keep them out of institutionalized nursing home care." A comment signed by Senator Alexander and 13 other Senators stated that the "statute and history clearly demonstrate that Congress intended to provide a broad exemption from the FLSA minimum wage and overtime requirements for all domestic workers providing companionship services." Husch Blackwell further commented that "Congress is certainly well aware of the exemption's application over these

last several decades, and has not taken action upon this issue during that time. Its failure to do so is clear evidence that the regulations as they currently stand appropriately state Congressional intent.'' *See also* Chamber of Commerce. CAHSAH and the National Association of Home Care & Hospice (NAHC), among others, questioned the propriety of the Department's shift in position as to this issue, especially since it defended the current regulation in *Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158 (2007). Additionally, NRCPDS asserted that ''wages should be determined based upon the value of the tasks performed'' and that the ''idea that the same tasks are valued differently based solely upon the identity of the employer seems unjustifiable.''

Employers and employer representatives also asserted that the proposed revision to § 552.109 would be harmful to direct care workers because raising the cost of services provided through home care agencies would incentivize employment through informal channels rather than through such agencies. The Virginia Association for Home Care and Hospice stated that the proposed change would ''encourage workers to leave agencies and be hired directly by the client,'' and in this ''underground economy,'' taxes would not be withheld, Social Security would not be paid, and workers' compensation insurance would not be provided. See also CAHSAH. VNAA asserted that by discouraging joint employment, the proposed change could undermine Medicaid's efforts to expand the use of consumer-directed programs, which rely on agencies to assist consumers who are not capable of being solely responsible for managing a direct care worker's employment.

Numerous commenters sought clarification as to which employers would be considered ''third party employers'' and how the proposed revisions would affect various types of consumer-directed programs and other arrangements that have developed to provide home care—including registries, ''agency with choice'' programs, and ''employer of record'' or fiscal intermediary situations—in which third parties have roles such as handling tax and insurance compliance. *See, e.g.,* Private Care Association; Jim Small; ANCOR. Comments from these various types of entities requested guidance from the Department as to whether direct care workers under their particular programs could qualify for either exemption under the Final Rule. Additionally, several advocacy groups expressed confusion regarding whether the Department's proposed revision

would hold consumers or their families jointly and severally liable for wages owed pursuant to the FLSA. For example, AARP noted that it ''strongly opposes the proposal to impose joint and several liability for FLSA compliance on consumers when the worker is supplied and employed by a third party employer such as an agency. When agencies are involved, they should be considered the sole employer.'' *See also* The National Consumer Voice for Long-Term Care.

The Department has carefully considered comments submitted regarding the proposed revisions to § 552.109(a) and (c) and has decided to adopt the regulation as proposed. The rulemaking record includes views from a broad and comprehensive array of interested parties: Academics studying this issue, advocates for the individuals who need home care services, home care agencies that currently claim the companionship services exemption, labor unions, associations representing direct care workers, and representatives of the disability community. As explained in the NPRM and for the reasons discussed below, the Department believes that the revised regulation is consistent with Congress's intent when it created these exemptions and reflects the dramatic transformation of the home care industry since this regulation was first promulgated in 1975.

As an initial matter, the Department observes that it is exercising its expressly delegated rulemaking authority in promulgating this rule. In creating the companionship services exemption, Congress ''left a gap for the agency to fill'' as to the meaning and scope of the exemption at section 13(a)(15), explicitly giving the Secretary authority to define and delimit the boundaries of the exemption. *Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44 (1984); *see Nat'l Cable & Telecomm Ass'n.* v. *Brand X Internet Servs.,* 545 U.S. 967, 980 (2005) (''Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.''). When Congress expressly delegates authority to the agency ''to elucidate a specific provision of the statute by regulation,'' any regulations promulgated pursuant to that grant of power and after notice and comment are to be given ''controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'' *Chevron,* 467 U.S. at 844; *see Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158, 165–68 (2007); *Gonzales* v. *Oregon,* 546 U.S. 243, 255–256 (2006) (*Chevron* deference is warranted ''when

it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority'' (internal quotation marks omitted)).

Accordingly, the Department is now adopting a revised regulation that is, as many commenters agreed, consistent with Congress's intent to provide the protections of the FLSA to domestic workers while providing narrow exemptions for workers performing companionship services and live-in domestic service workers. Prior to 1974, domestic service employees who worked for a placement agency that met the annual earnings threshold for FLSA enterprise coverage, but were assigned to work in someone's home, were covered by the FLSA. 39 FR 35385. However, the Department's 1975 regulations, by allowing those covered enterprises to claim the exemption denied those employees the Act's minimum wage and overtime protections. This Final Rule reverses this ''roll back''.

The legislative history makes clear that in passing the 1974 amendments to the Act, Congress intended to extend FLSA coverage to all employees whose ''vocation'' was domestic service, but to exempt from coverage casual babysitters and companions who were not regular breadwinners or responsible for their families' support. *See* House Report No. 93–913, p. 36. Indeed, it is apparent from the legislative history that the 1974 amendments were intended only to expand coverage to include more workers, and were not intended to roll back coverage for employees of third parties who already had FLSA protections (as employees of covered enterprises). The focus of the floor debate concerned the *extension* of coverage to categories of domestic workers who were not already covered by the FLSA, specifically, those employed by an individual or small company rather than by a covered enterprise. *See, e.g.,* 119 Cong. Rec. at S24800 (''coverage of domestic employees is a vital step in the direction of insuring that *all* workers affecting interstate commerce are protected by the Fair Labor Standards Act''); *see also* Senate Report No. 93–690 at p. 20 (''The goal of the Amendments embodied in the committee bill is to update the level of the minimum wage and to continue the task initiated in 1961—and further implemented in 1966 and 1972—to *extend* the basic protection of the Fair Labor Standards Act to additional workers and to reduce to the extent

practicable at this time the remaining exemptions." (emphasis added)).[23]

Further, there is no indication that Congress considered limiting enterprise coverage for third party employers providing domestic services. The only expressions of concern by opponents of the amendment related to the new recordkeeping burdens on private households. *See, e.g.,* 119 Cong. Rec. 18,155 (statement of Rep. Harrington); 119 Cong. Rec. 24,797 (statement of Sen. Dominick). Recognizing this intended expansion of the Act, the exemptions excluding employees from coverage must therefore be defined narrowly in the regulations to achieve the law's purpose of extending coverage broadly. This is consistent with the general principle that coverage under the FLSA is broadly construed so as to give effect to its remedial purposes, and exemptions are narrowly interpreted and limited in application to those who clearly are within the terms and spirit of the exemption. *See, e.g., A.H. Phillips, Inc.* v. *Walling,* 324 U.S. 490, 493 (1945). The Department is not persuaded by comments contending that because section 13(a)(15) has never been amended, the prior regulations were therefore consistent with Congressional intent. *See, e.g.,* Husch Blackwell; U.S. Chamber of Commerce. As the Supreme Court has observed, Congressional inaction "is a notoriously poor indication of [C]ongressional intent." *Schweiker* v. *Chilicky,* 487 U.S. 412, 440 (1988); *see also Minor* v. *Bostwick Labs, Inc.,* 669 F.3d 428, 436 (4th Cir. 2012). Therefore, the Department now acknowledges that the regulatory roll back of coverage for workers employed in private homes by covered enterprises that resulted from the 1975 version of § 552.109 was not in accord with Congress's purpose of expanding coverage.

By excluding direct care workers employed by third party covered enterprises from FLSA coverage, the Department's 1975 regulations created an inequity that has increased over time. As the home care workforce has grown, the impact of the Department's roll back, which is inconsistent with the 1974 amendments, has become even more magnified. As noted by many commenters, today, few direct care

workers are the "elder sitters" envisioned by Congress when enacting the exemption. *See* 119 Cong. Rec. at S24801. Instead, direct care workers employed by third parties are the sorts of domestic service employees Congress specifically intended the FLSA to cover: Their work is a vocation. *See* Senate Report No. 93–690, p. 20; House Report No. 93–913, pp. 36. For example, a direct care worker who has sought out work through a private home care agency is engaged in a formal, professional occupation and he or she may well be the primary "bread-winner" for his or her family. Thus, it is the Department's position that employees providing home care services who are employed by third parties should have the same minimum wage and overtime protections that other domestic service and other workers enjoy.

Significantly, the Supreme Court explicitly affirmed the Department's authority to address the issue of third party employment in the domestic service context in *Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158 (2007). The Supreme Court acknowledged that the statutory text and legislative history do not provide an explicit answer to the "third party employment question." *Id.* at 168. Rather, the Court explained that the FLSA leaves gaps as to the scope and definition of statutory terms such as "domestic service employment" and "companionship services," and it provides the Department with the power to fill those gaps. *Id.* at 167. In particular, the Court stated its belief that "Congress intended its broad grant of definitional authority to the Department to include the authority to answer" questions including "[s]hould the FLSA cover *all* companionship workers paid by third parties? Or should the FLSA cover some such companionship workers, perhaps those working for some (say, large but not small) private agencies . . .? How should one weigh the need for a simple, uniform application of the exemption against the fact that some (but not all) third-party employees were previously covered?" *Id.* at 167–68. Further, when the Department fills statutory gaps with any reasonable interpretation, and in accordance with other applicable requirements, the courts accept the result as legally binding and entitled to deference. *Id.* The Supreme Court explicitly recognized that the Department may interpret its "regulations differently at different times in their history," and may make changes to its position, provided that the change creates no unfair surprise. *Id.*

at 170–71. The Court also recognized that when the Department utilizes notice-and-comment rulemaking in an attempt to codify a new regulation, as it has done with this Final Rule, such rulemaking makes surprise unlikely. *Id.* at 170.

Although the commenters who noted that the Department is changing its position as to the proper treatment of third party employers in § 552.109 are correct, such a change is not only permissible, but also reasonable. The Department did argue in *Coke,* as well as in Wage and Hour Advisory Memorandum ("WHAM") 2005–1 (Dec. 1, 2005) (found at *http://www.dol.gov/ whd/FieldBulletins/index.htm*), that the third party regulation as written in 1975 was the Department's best reading of these statutory exemptions. In the past, however, the Department erroneously focused on the phrase "any employee," instead of focusing on the purpose and objective behind the 1974 amendments, which was to expand minimum wage and overtime protections to workers employed in private households that did not otherwise meet the FLSA coverage requirements. The Supreme Court has "stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *U.S. Nat'l Bank of Oregon* v. *Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 455 (1993) (internal quotation marks omitted). Moreover, in view of the Supreme Court's conclusion that the text of the FLSA does not expressly answer the third party employment question, the statutory phrase "any employee" cannot, standing alone, answer the question definitively. Moreover, the WHAM failed to consider the industry changes that have taken place over the decades since the statutory amendment was enacted. After considering the purpose and objectives of the amendments as a whole, reviewing the legislative history, and evaluating the state of the home care industry, the Department believes that the companionship services exemption was not intended to apply to third party employers.

In addition, the Department does not believe commenters' concerns about the harmful effect of the change to § 552.109 are warranted because the Department did not identify or receive any information suggesting that such effects have occurred in the 15 states that already provide minimum wage and overtime protections to all or most third party-employed home care workers who may otherwise fall under the federal companionship services exemption.

---

[23] Several comments focused on statements made during floor debate concerning the cost of care and preventing nursing home placement. *See* BrightStar Care of Tucson; Visiting Nurse Service of New York. However, the Department notes that the floor debate cited by these commenters took place in 1972 on earlier domestic service legislation not containing the exemption that was considered by a different Congress than the one enacting the 1974 amendments. *See, e.g.,* 118 Cong. Rec. 24715 (July 20, 1972).

These states are Colorado, Hawaii, Illinois,[24] Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New York, Pennsylvania, Washington, and Wisconsin. In addition, Maine extends minimum wage and overtime protections to all companions employed by for-profit agencies. Some, but not all, privately employed home care workers in California are exempt from overtime requirements as "personal attendants;" all receive at least the minimum wage. Five more states (Arizona, Nebraska, North Dakota, Ohio, and South Dakota) and the District of Columbia provide minimum wage coverage to home care workers, including companions, employed by third parties. Significantly, several of the states, such as Colorado and Michigan, have instituted these protections in the last several years. The existence of these state protections diminishes the force of objections regarding the feasibility and expense of prohibiting third parties from claiming the companionship services and live-in domestic service worker exemptions. Indeed, the comments received did not point to any reliable data indicating that state minimum wage or overtime laws had led to increased institutionalization or stagnant growth in the home care industry in any state. Rather, the Michigan Olmstead Coalition reported "we have seen no evidence that access to or the quality of home care services are diminished by the extension of minimum wage and overtime protection to home care aides in this state almost six years ago." PHI noted that the growth of home care establishments in Michigan "is actually higher in the period after implementing wage and hour protections than before—41 percent compared to 32 percent." *See* PHI; *see also* Workforce Solutions ("There is no data showing that states with minimum wage and overtime protections for home care workers have higher rates of institutionalization."). Indeed, as summarized by AARP, there is no strong correlation between states that have minimum wage and overtime protections with expenditures on HCBS versus institutionalized care.

Moreover, the Department does not believe that this rule will create or significantly expand an underground economy where workers hired directly by a consumer or a third party are not treated as employees and thus are not paid proper wages, income and FICA

taxes are not withheld, and unemployment and worker's compensation insurance are not provided. Although difficult to predict, the Department anticipates that rather than significantly expanding any underground economy, this rule will bring more workers under the FLSA's protections, which in turn will create a more stable workforce by equalizing wage protections with other health care workers and reducing turnover. A more stable home care workforce also dilutes arguments that continuity of care would be negatively affected by the rule. This industry is currently marked by high turnover, which can be very disruptive to consumers. The Department believes that consumers would benefit from reduced turnover among direct care workers and the accompanying improvement in quality of care.

*Joint Employment*

The Department wishes to clarify how the third party regulation may apply in evaluating instances of joint employment, what constitutes a "third party employer," independent contractors, and joint and several liability. Direct care workers and consumers explained that a variety of care arrangements have been developed in order to provide home care, many involving potential joint employment relationships. The Department notes that this regulation does not change any of the Department's regulations or guidance concerning the employment relationship and joint employment. In evaluating what constitutes a "third party employer," a "third party" will be considered any entity that is not the individual, member of the family, or household retaining the services. However, what entity constitutes an "employer" is governed by long-standing case law from the U.S. Supreme Court and other federal appellate courts interpreting the language of the FLSA and applying the "economic realities" test discussed in greater detail below.

As the Department has previously explained, a single individual may be considered an employee of more than one employer under the FLSA. *See* 29 CFR Part 791. Joint employment is employment by one employer that is not completely disassociated from employment by other employers. Whether joint employment exists is to be determined based upon all the facts of the particular case. As an example, an individual who hires a direct care worker or live-in domestic service worker to provide services pursuant to a Medicaid-funded consumer directed program may be a joint employer with

the state agency that administers the program. Generally, where a joint employment relationship exists, "all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act." § 791.2(a). However, under the revised regulation, in joint employment situations the individual, member of the family or household employing the direct care worker or live-in domestic service worker will be able to claim an exemption provided that the employee meets the duties requirements for the companionship services exemption or the residence requirements for a "live-in" domestic service worker exemption. The third party employer will not be able to claim that exemption.

Determinations about the existence of an employment or joint employment relationship are made by examining all the facts in a particular case and assessing the "economic realities" of the work relationship. *See, e.g., Goldberg* v. *Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33 (1961). Factors to consider may include whether an employer has the power to direct, control, or supervise the worker(s) or the work performed; whether an employer has the power to hire or fire, modify the employment conditions or determine the pay rates or the methods of wage payment for the worker(s); the degree of permanency and duration of the relationship; where the work is performed and whether the tasks performed require special skills; whether the work performed is an integral part of the overall business operation; whether an employer undertakes responsibilities in relation to the worker(s) which are commonly performed by employers; whose equipment is used; and who performs payroll and similar functions. An economic realities test does not depend on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp.* v. *McComb,* 331 U.S. 722, 730 (1947). In the past, the Department has applied this economic realities principle when it promulgated regulations to clarify the definition of "joint employment" under the Migrant and Seasonal Agricultural Worker Protection Act, 29 CFR 500.20(h), and the Family and Medical Leave Act, 29 CFR 825.106, both of which incorporate the FLSA definition of "employ."

To illustrate how a home care services scenario may be assessed utilizing the economic realities test, consider the following example:

*Example:* Mary contacts her state government about receiving home care services. The state has a "self-direction program" that allows Mary to hire a direct

---

[24] In Illinois, 30,000 workers in the Home Services Program under the Illinois Department of Human Services are considered jointly employed by the state and the consumer and do not receive overtime pay.

care worker through an entity that has contracted with the state to serve as the "fiscal/employer agent" for program participants who employ direct care workers. The "fiscal/employer agent" performs tasks similar to those that commercial payroll agents perform for businesses, such as maintaining records, issuing payments, addressing tax withholdings, and ensuring that workers' compensation insurance is maintained for the worker, but is not involved in any way in the daily supervision, scheduling, or direction of the employee. Mary has complete budget authority over how to allocate the funds she receives under the Medicaid self-direction program, negotiates the wage rate with the direct care worker, is wholly responsible for day-to-day duty assignments, and has the sole power to hire and fire her direct care worker.

In the above scenario, the fiscal/employer agent is likely not an employer of the direct care worker, and the consumer is likely the sole employer. The fiscal/employer agent has no power to hire or fire, direct, control, or supervise the worker and cannot modify the pay rate or modify the employment conditions. The work is not performed on the fiscal/employer agent's premises, and the fiscal/employer agent has provided no tools or materials required for the tasks performed. However, any change in the specific facts of this scenario, such as if direct care workers are required to obtain approval from the fiscal/employer agent in order to arrive late or be absent from work or if the fiscal/employer agent sets the direct care workers' specific hours worked, may lead to a different conclusion regarding the employer status of the fiscal/employer agent.

The decision on joint employment would likely be different under the following scenario:

*Example:* Mary contacts her state government about receiving home care services. The state has a "public authority model" under which the state or county agency exercises control over the direct care workers' conditions of employment by deciding the method of payment, reviewing worker time sheets and determining what tasks each worker may perform. The agency also exercises control over the wage rate either by setting the wage rate.

In the above scenario, the state or county agency is likely an employer of the direct care workers under the FLSA. *See, e.g., Bonnette* v. *California Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir. 1983). The state or county agency directs, controls, and supervises the workers, and can modify the pay rate and other employment conditions such as the number of hours worked and the tasks performed. In addition, the agency may be an employer of the direct care workers even if a private

third party agency is also found to be an employer; such joint employment arrangements would result in the state or county agency and the private third party agency being jointly and severally liable for the direct care workers' wages.

It is critical to note that this fact-specific economic realities test will be applied to all situations when assessing an employment relationship or potential joint employment, regardless of the name used by the third party (*e.g.,* "fiscal/employer agent," "Agency with Choice," "fiscal intermediary," "employer of record") or worker (*e.g.,* "registry worker," "independent provider," "independent contractor"). As the Department has repeatedly noted, with respect to exemption status, job titles are not determinative. *See, e.g.,* § 541.2; FOH 22a04; Wage and Hour Fact Sheet #17A: Executive, Administrative, Professional, Computer and Outside Sales Employees Under the Fair Labor Standards Act. This principle holds true for determining employment status as well.

With regard to potential misclassification of employees as independent contractors or other non-employees, the Department will continue its efforts to combat such misclassification. As the Department has explained, there is no single test for determining whether an individual is an independent contractor or an employee for purposes of the FLSA. Rather, a number of factors must be considered, including the extent to which the services rendered are an integral part of the principal's business; the permanency of the relationship; the amount of the alleged contractor's investment in facilities and equipment; the nature and degree of control exerted by the principal; the alleged contractor's opportunities for profit and loss; the amount of initiative or judgment required for the success of the contractor; and the degree of independent business organization and operation. *See, e.g., Donovan* v. *Sureway Cleaners,* 656 F.2d 1368, 1370 (9th Cir. 1981).

To further illustrate the economic realities test, consider this example:

*Example:* ABC Company advertises as a "registry" that provides potential direct care workers. The registry conducts a background screening and verifies credentials of potential workers, and assists clients by locating direct care workers who may be able to meet a client's needs. ABC Company informs Ann, a direct care worker, of the opportunity to work for a potential client. If Ann is interested in the opportunity, she is responsible for contacting the client for more information. Ann is not obligated to pursue this or any other opportunity presented, and she is not prohibited from registering with

other referral services or from working directly with clients independent of ABC Company. The registry does not provide any equipment to Ann, and does not supervise or monitor any work Ann performs. ABC Company has no power to terminate Ann's employment with a client. ABC Company processes Ann's payroll checks according to information provided by clients, but does not set the pay rate.

In this scenario, Ann is likely not an employee of ABC Company. There is no permanency in the relationship between the registry and Ann. The registry does not provide any equipment or facilities, exercises no control over daily activities, and has no power to hire or fire. Ann is able to accept as many or as few clients as she wishes. The client sets the rate of pay and negotiates directly with Ann about which services will be provided. However, this does not mean that every "registry" will not be an employer. Rather, a fact-specific assessment must be conducted. Indeed, the Department has found registries to be employers under different facts. *See, e.g.,* Wage and Hour Opinion Letter, 1975 WL 40973 (July 31, 1975) (finding a nursing registry to be an employer when the registry maintained a log of assignments showing the shifts worked, established the rate which would be charged, and exercised control over the nurse's behavior and the work schedule).

Some of the comments demonstrated confusion about when a family or household employing a direct care worker may be jointly and severally liable for wages owed. *See, e.g.,* AARP; National Consumer Voice for Long-Term Care. The NPRM stated that "if the employee fails to qualify as an exempt companion, such as if the employee performs incidental duties that exceed the 20 percent tolerance allowed under the proposed § 552.6(b), or the employee provides medical care for which training is a prerequisite, the individual, family or household member cannot assert the exemption and is jointly and severally liable for the violation." 76 FR 81198. There appeared to be a misperception that joint and several liability would attach in any joint employment relationship. However, as stated in the NPRM, an individual, family, or household would be jointly and severally liable for a violation *only* in instances when an employee fails to meet the "duties" requirement for the companionship services exemption or the residence requirements for the live-in domestic service worker exemption. This rulemaking is not altering the state of the law under such circumstances; if a domestic service employee is not providing companionship services or

does not meet the residence requirements for the live-in domestic service worker exemption, then the family and any third party employer are both responsible for complying with the FLSA's minimum wage, overtime, and recordkeeping requirements.[25] For example, under both the current regulations and this Final Rule, if a family and an agency jointly employ a home care worker, and that worker is required to spend 50 percent of her time cleaning the house, that worker is not exempt under the companionship services exemption and the family and the third party are jointly and severally liable for any back wages due. However, under this Final Rule, in those situations where an employee satisfies the duties test for the companionship services exemption, the individual, family or household member may claim the exemption, but the third party joint employer cannot. In those instances, the family or household member would not be subject to joint and several liability.

Similarly, under the Final Rule, if a family and an agency jointly employ a live-in domestic service employee, the family would be able to claim the overtime pay exemption under § 13(b)(21), but the third party employer could not. If there is overtime pay due,[26] the third party employer would be liable for overtime pay; however, the family would not be subject to joint and several liability, provided the worker satisfies the live-in worker requirements (namely, resides in the home the requisite amount of time).

Finally, the revised regulation refers to "the individual or member of the family or household" who employs the direct care worker or live-in domestic worker. It is the Department's intent that the phrase "member of the family or household" be construed broadly, and no specific familial relationship is necessary. For example, a "member of the family or household" may include an individual who is a child, niece, guardian or authorized representative, housemate, or person acting *in loco parentis* to the individual needing companionship or live-in services.

The Department will work closely with stakeholders and the Department of Health and Human Services to provide additional guidance and

technical assistance during the period before the rule becomes effective, in order to ensure a transition that minimizes potential disruption in services and supports the progress that has allowed elderly people and persons with disabilities to remain in their homes and participate in their communities.

### E. Other Comments

As noted in various sections of this preamble, the Department received a number of comments raising concerns about topics that are related to this rulemaking but are not within the scope of the revisions to the regulatory text. These issues are discussed below. First, the Department addresses comments expressing concern that the rulemaking will cause increased institutionalization. Second, the Department addresses comments raising questions about paid family caregivers. Finally, the Department responds to commenters' questions regarding FLSA principles that are relevant in determining the hours for which a non-exempt direct care worker must be paid but which are not changed by this Final Rule.

### Community Integration and Olmstead

The Department received several comments from groups that advocate for persons with disabilities and employers that raised concerns that requiring the payment of minimum wage and overtime to direct care workers would increase the cost of home and community based services (HCBS) funded under Medicaid, which in turn would result in a reduction of services under those programs and increased institutionalization of the elderly or persons with disabilities. *See, e.g.,* ADAPT, National Disability Leadership Alliance (NDLA), Toolworks, Inc., National Council on Aging, and VNSNY. Specifically, ADAPT expressed concern that Medicaid reimbursement rates under HCBS programs will not increase to account for the additional costs for personal care services as a result of the Department's proposed rule, resulting in individuals going without essential assistance and eventually being forced into facilities. As a result, ADAPT asserted that the Department's proposed rule would promote institutionalization of such individuals.

These views were shared by NDLA, which stated that the Department's proposal would promote institutionalization because it would increase the cost of HCBS programs without a concurrent increase in Medicaid reimbursement rates or the

Medicaid caps for available funding. As a result, NDLA expressed concern that persons with disabilities "will be left with the choice of forgoing needed assistance or subjecting themselves to unwanted institutionalization and loss of community connection." In addition, VNSNY, without providing specifics, stated that the Department's proposed rule would be "inconsistent with the efforts undertaken around the country by public agencies to comply with the Supreme Court's decision in *Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581 (1999)."

The Michigan Olmstead Coalition similarly stated that under the Americans with Disabilities Act (ADA) and the U.S. Supreme Court's decision in *Olmstead,* "governmental policies must now support and promote inclusion, not segregation, of people living with disabilities" and that "[p]eople who need long-term supports and services should not be forced to receive those services in institutions rather than their own homes and apartments." However, the Michigan Olmstead Coalition stated that many direct care workers do the same work as workers in nursing homes and both should receive minimum wage and overtime protections. "Without similar workplace compensation protections applied to institutions and home care, the home care industry faces another governmental policy that creates a disadvantage relative to nursing homes." In addition, the Michigan Olmstead Coalition stated that without minimum wage and overtime protections for direct care workers, "nursing homes are better able to attract and retain staff creating additional burdens or competitive challenges on home care agencies." The Michigan Olmstead Coalition asserted that the proposal "will help end another 'institutional bias' that favors nursing homes."

Citing *Olmstead,* the SEIU similarly stated that the Department's proposed rule was unlikely to result in increased institutionalization of individuals because "there has been a decisive policy shift toward home- and community-based long-term care in this country that is extremely unlikely to be reversed." The SEIU noted that it is "difficult to imagine" that publicly funded programs would reverse course from home and community based services to institutionalization simply because "labor standards are brought up to those prevailing virtually everywhere else." The SEIU also noted that one of the reasons for the shift to home and community based services is due to the substantial cost savings associated with

---

[25] The Department notes that it is a good practice for individuals, family members or household members to keep a record of work performed in the household whether or not the individual, family or household member is an employer of the person performing the work.

[26] When an employee resides on his or her employer's premises, not all of the time spent on the premises is considered working time. *See* the Hours Worked section of this preamble for guidance on determining compensable hours worked.

non-institutional care. SEIU explained that these cost savings are not "simply a difference in hourly labor costs, as is demonstrated by the fact that many of the states that are leaders in 'rebalancing' away from institutions are also leaders in setting adequate homecare labor standards." The advantages of home and community based services include that the services can be tailored to each individual's level of need and home and community based services do not include the overhead costs of maintaining a care facility.

The Department in no way meant to convey in the proposal that some increased levels of institutionalization would be considered acceptable. The Department fully supports the ADA's and *Olmstead's* requirement that government programs provide needed services and care in the most integrated setting appropriate to an individual, and recognizes the important role that home and community based services have played in making that possible. The Department agrees with the Michigan Olmstead Coalition's assertion that protecting direct care workers under the FLSA will benefit home and community based services by ensuring that the home care industry can attract and retain qualified workers, which will improve overall quality of care. As discussed in more detail below, in order to comply with the ADA and *Olmstead,* public entities must have in place an individualized process—available to any person whose service hours would be reduced as a result of the Final Rule—to examine if the service reduction would place the person at serious risk of institutionalization and, if so, what additional or alternative services would allow the individual to remain in the community.

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. 12101(b)(1). Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. 12101(a)(2). For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities under Title II of the ADA:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. 12132.

Pursuant to Congressional authority, the Attorney General issued regulations implementing Title II of the ADA, which are based on regulations issued under section 504 of the Rehabilitation Act of 1973. *See* 42 U.S.C. 12134(a); 28 CFR 35.190(a); Executive Order 12250, 45 FR 72995 (1980), *reprinted in* 42 U.S.C. 2000d–1. The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR 35.130(d). The preamble discussion to Title II explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR part 35, app. A (2010) (addressing § 35.130); *see also* Statement of the Dep't of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead* v. *L.C.,* at 2 (June 22, 2011) (Olmstead Enforcement Statement), *available at http://www.ada.gov/olmstead/q&a_olmstead.htm.* Moreover, "integrated settings" are described as "those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities." Olmstead Enforcement Statement, at 3.

Giving deference to the Attorney General's regulations and interpretation of the ADA, the Supreme Court in *Olmstead* v. *L.C.,* 527 U.S. 581 (1999), held that Title II prohibits the unjustified segregation of individuals with disabilities. *Id.* at 597–98. The Supreme Court concluded that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate; (b) the affected persons do not oppose community-based treatment; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity. *Id.* at 607. The Court explained that this holding "reflects two evident judgments." *Id.* at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic

independence, educational advancement, and cultural enrichment." *Id.* at 601.

The Department of Justice has issued guidance further clarifying the scope of a public entity's *Olmstead* obligations. Public entities may be in violation of the ADA's integration requirement when they: (1) Directly or indirectly operate facilities and/or programs that segregate individuals with disabilities; (2) finance the segregation of individuals with disabilities in private facilities; or (3) through planning service system design, funding choices, or service implementation practices, promote or rely upon the segregation of individuals with disabilities in private facilities or programs. Olmstead Enforcement Statement, at 3. "[B]udget cuts can violate the ADA and *Olmstead* when significant funding cuts to community services creates a risk of institutionalization or segregation." *Id.* at 5. If budget cuts require the elimination or reduction of community services for individuals who would be at serious risk for institutionalization without such services, such cuts or reductions in services can violate the ADA's integration requirement. *Id.* at 6. Institutionalization need not be imminent or inevitable for a violation of the ADA's integration mandate to be found. *See M.R.* v. *Dreyfus,* 663 F.3d 1100, 1116–17 (9th Cir. 2011); *accord Pashby* v. *Delia,* 709 F.3d 307, 322 (4th Cir. 2013). Rather, an *Olmstead* violation can result when a public entity fails to provide community services or cuts services that "will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." Olmstead Enforcement Statement, at 5.

To comply with the ADA's integration requirement, public entities must reasonably modify their policies, procedures or practices when necessary to avoid discrimination or unjustified institutionalization. 28 CFR 35.130(b)(7); *accord Pashby,* 709 F.3d at 322. The obligation to make reasonable modifications may be excused only where a public entity demonstrates that the modifications would "fundamentally alter" the programs or services at issue. *Id.; see also Olmstead,* 527 U.S. at 604–07. "A 'fundamental alteration' requires the public entity to prove 'that, in the allocation of available resources, immediate relief for plaintiffs would be inequitable, given the responsibility the State [or local government] has taken for the care and treatment of a large and diverse population of persons with disabilities.'" Olmstead Enforcement Statement, at 6 (citing *Olmstead,* 527

U.S. at 604). DOJ has further indicated that in order to raise a fundamental alteration defense, a public entity must show that it has developed a comprehensive, effectively working *Olmstead* plan and is implementing that plan accordingly. *Id.* at 7.

Several appellate courts have concluded that a fundamental alteration defense based solely on budgetary concerns is insufficient. *See, e.g., Pashby,* 709 F.3d at 323–24; *M.R.,* 663 F.3d at 1118–19; *Pa. Prot. & Advocacy, Inc.* v. *Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 380 (3d Cir. 2005); *Radaszewski* v. *Maram,* 383 F.3d 599, 614 (7th Cir. 2004); *Fisher* v. *Oklahoma,* 335 F.3d 1175, 1181 (10th Cir. 2003). "Even in times of budgetary constraints, public entities can often reasonably modify their programs by re-allocating funding from expensive segregated settings to cost effective integrated settings." Olmstead Enforcement Statement, at 7.

As previously noted, a public entity has an affirmative obligation to ensure its compliance with the ADA's integration mandate and take necessary steps to ensure its policies do not place individuals at risk of institutionalization. *See, e.g., Fisher,* 335 F.3d at 1181–84. The Department of Justice (DOJ) and the Office for Civil Rights (OCR) at the Department of Health and Human Services have taken the position that in order to comply with the ADA and the Supreme Court's decision in *Olmstead,* public entities must have in place an individualized process—available to any person whose service hours would be reduced as a result of the Final Rule—to examine if the service reduction would place the person at serious risk of institutionalization and, if so, what additional or alternative services would allow the individual to remain in the community. *See* October 22, 2012 Letter from DOJ and OCR *available at http://www.ada.gov/olmstead/olmstead_cases_list2.htm#mr.* It will be important for public entities to work closely with advocates and persons with disabilities to ensure that these processes address critical elements for determining whether a person is at risk and that persons with disabilities are aware of these processes.

For these reasons, the Department agrees with those commenters who argued that the proposed rule will further the goals of *Olmstead* and will not create needless institutionalization. However, we will monitor implementation of the rule and its impact on consumers.

*Family or Household Care Providers*

Paid Family or Household Members in Certain Medicaid-Funded and Certain Other Publicly Funded Programs Offering Home Care Services

The Department received a number of comments discussing the potential impact of the proposed rule on paid family care providers. *See, e.g.,* Joni Fritz, ANCOR, ADAPT and the National Council on Independent Living, NASDDDS, Foothills Gateway, Inc. Arrangements in which a family member of the consumer is paid to provide home care services arise in certain Medicaid-funded and certain other publicly funded programs that allow the consumer (or the consumer's representative) to select and supervise the care provider, and further permit the consumer to choose a family member as a paid direct care worker. Family or household members may also be hired as paid direct care workers through other types of Medicaid-funded programs. The Department recognizes that consumers need not be homebound in order to qualify for home care services. Under these programs, the particular services to be provided and the number of hours of paid work are described in a written agreement, usually called a "plan of care," developed and approved by the program after an assessment of the services the consumer requires and the consumer's existing supports, such as unpaid assistance provided by family or household members.

Some commenters expressed concern that the services paid family care providers typically perform, such as household work, meal preparation, assistance with bathing and dressing, etc., would not fall within the definition of companionship services under the proposed rule. *See, e.g.,* National Association of States United for Aging and Disabilities, ANCOR, NASDDDS. If paid family care providers are not performing exempt companionship services under the FLSA, these commenters wrote, the services they provide would become more expensive, and consequently, the options for employing family members through Medicaid-funded programs or for more than 40 hours per week would be severely limited. *Id.* Additionally, Foothills Gateway, Inc., a non-profit agency that provides Medicaid-funded services to individuals with developmental disabilities in Colorado, expressed concern that if paid family care providers are entitled to minimum wage and overtime for all hours during which they provide services to the consumer, including those that were previously unpaid, the costs of care would far exceed those Medicaid will reimburse, making the paid family caregiving model unsustainable.

The Department is aware of and sensitive to the importance and value of family caregiving to those in need of assistance in caring for themselves to avoid institutional care. It recognizes that paid family caregiving, in particular through certain Medicaid-funded and certain other publicly funded programs, is increasing across the country, and that such programs play a critical role in allowing individuals to remain in their homes. The Department also recognizes that some paid or unpaid caregivers who are not family but are household members, meaning they live with the person in need of care based on a close, personal relationship that existed before the caregiving began—for example, a domestic partner to whom the person is not married—are the equivalent of family caregivers.

The Department cannot adopt the suggestion of several commenters that the services paid family care providers typically perform be categorically considered exempt companionship services. Although as commenters stated, family care providers may often spend a significant amount of time providing assistance with ADLs and IADLs, the Department is defining companionship services to include only a limited amount of such assistance for the reasons described in the section of this Final Rule explaining the revisions to § 552.6. Furthermore, there is no basis in the FLSA for treating domestic service employees who are family members of their employers differently than other workers in that category. Congress explicitly exempts family members when it is its intention to do so. *See* 29 U.S.C. 203(e)(3); 203(s)(2); 213(c)(1)(A), (B). The provisions of the statute regarding domestic service and companionship services do not indicate intention to exempt family members. *See* 29 U.S.C. 206(f), 207(l), 213(a)(15).

*Interpretation of "Employ" With Regard to Family or Household Care Providers*

The Department recognizes the significance and unique nature of paid family and household caregiving in certain Medicaid-funded and certain other publicly funded programs as described above. In interpreting the economic realities test to determine when someone is employed (i.e., suffered or permitted to work, 29 U.S.C. 203(g)), the Department has determined that the FLSA does not necessarily require that once a family or household member is paid to provide some home care services, all care provided by that

family or household member is part of the employment relationship. In such programs, as described above, the Department will not consider a family or household member with a pre-existing close, personal relationship with the consumer, to be employed beyond a written agreement developed with the involvement and approval of the program and the consumer (or the consumer's representative), usually called a plan of care, that reasonably defines and limits the hours for which paid home care services will be provided. The determination of whether such an agreement is reasonable includes consideration of whether it would have included the same number of paid hours if the care provider had not been a family or household member of the consumer.

The Department believes this interpretation follows from the application of the FLSA "economic realities" test to the unique circumstances of home care provided by a family or household member. Ordinarily, a family or household member who provides unpaid home care to another family or household member would not be in an employment relationship with the recipient of the support. But under the FLSA, family members *can* be hired to be domestic service employees of other family members, in which case, unless a statutory exemption applies, they are entitled to minimum wage and overtime for hours worked. *See* 29 U.S.C. 206(f), 207(l) (requiring the payment of minimum wage and overtime compensation to "any employee engaged in domestic service" without creating any exception for family members); *Velez* v. *Sanchez*, 693 F.3d 308, 327–28 (2d Cir. 2012) (explaining that a familial relationship does not preclude the possibility that the economic realities of the situation show that an individual is a domestic service employee). The decision to select a family or household member as a paid direct care worker through a Medicaid-funded or certain other publicly funded program creates an employment relationship under the FLSA, and the services paid family or household care providers perform in those circumstances likely will not, because of the nature of the paid duties and possibly also the involvement of a third party employer, be exempt companionship services. Ordinarily, under the FLSA, including in the domestic service employment context, if an employment relationship exists, all hours worked by an employee for an employer, as defined at 29 CFR part 785

and § 552.102 and discussed elsewhere in this Final Rule, are compensable. But in the case of certain Medicaid-funded and certain other publicly funded programs, different considerations apply where a prior familial or household relationship exists which is separate and apart from the creation of any employment relationship and where the relevant paid services are the provision of home care services. Specifically, in the context of direct care services under a Medicaid-funded or certain other publicly funded home care program, the FLSA "economic realities" test does not require that the decision to select a family or household member as a paid direct care worker means that all care provided by that person is compensable. In other words, in these circumstances, the Department does not interpret the law as transforming, and does not intend anything in this Final Rule to transform, all care by a family or household member into compensable work.

For example, a familial relationship, but not an employment relationship, would exist where a father assists his adult, physically disabled son with activities of daily living in the evenings. If the son enrolled in a Medicaid-funded or certain other publicly funded program and the father decides to become his son's paid care provider under a program-approved plan of care that funds eight hours per day of services that consist of assistance with ADLs and IADLs, the father would then be in an employment relationship with his son (and perhaps the state-funded entity) for purposes of the FLSA. As explained in the sections of this Final Rule addressing § 552.6 and § 552.109, based on the nature of the paid services and possibly also the involvement of a third-party employer, the father's paid work would not fall under the companionship services exemption. If the relevant requirements (described below) are met, including that the hours of paid work described in a plan of care or similar document are reasonable as described above, the father's employment relationship with his son (and, if a joint employment relationship exists, the state or certain other publicly funded employer administering the program) extends only to the eight hours per day of paid work contemplated in the plan of care; the assistance he provides at other times is not part of that employment relationship (or those employment relationships) and therefore need not be paid.

The limits on the employment relationship between a consumer and a family or household care provider and a third-party entity and that care

provider arise from the application of the "economic realities" test, described in more detail in the section of this Final Rule discussing joint employment. Specifically, where a prior familial or prior household relationship exists separate and apart from any paid arrangement for home care services, the economic realities test applies differently to the two roles played by the family or household member. The Second Circuit has identified a number of useful factors for applying the economic realities test in the family domestic service employment context, calling for consideration of: "(1) The employer's ability to hire and fire the employee; (2) the method of recruiting or soliciting the employee; (3) the employer's ability to control the terms of employment, such as hours and duration; (4) the presence of employment records; (5) the expectations or promises of compensation; (6) the flow of benefits from the relationship; and (7) the history and nature of the parties' relationship aside from the domestic labor." *Velez*, 693 F.3d at 330. Based on an analysis of these factors in the special situation of paid family or household care providers, an employment relationship would exist only as defined and limited by a written agreement developed with the involvement and approval of a Medicaid-funded or similar publicly funded program, usually called a plan of care, that reasonably sets forth the number of hours for which paid home care services will be provided.

Under an analysis of the economic realities of the work compensated under a plan of care or similar written agreement, the consumer or the entity administering the Medicaid-funded or similar publicly funded home care program (or perhaps both) are employers of the family or household care provider. (Again, whether the entity administering a program is a third party employer of the care provider is determined as described in the section of this preamble discussing joint employment.) The consumer, and/or the entity, recruit and hire the family or household member to provide the services described in the plan of care, may fire the family or household member from the paid position, and control the number of hours of work and the type of work the family or household member must perform. There is a clear expectation and promise of compensation, and employment records must be kept in order to receive payment. During the hours for which a family or household care provider is

compensated under a plan of care, the care provider is obligated to perform the services he or she was hired to provide. In addition, a paid family or household care provider is not permitted to substitute someone else to receive payment from Medicaid for services provided pursuant to the plan of care without employer approval.

On the other hand, during the time when the family or household care provider may perform similar services beyond the hours that he or she has been hired to work under the plan of care, an analysis of the economic realities of the situation leads to the conclusion that the caregiver is not employed, and that the consumer and any entity administering the Medicaid-funded or similar publicly funded program are not employers. The family or household member has not been hired to perform this additional care, nor was he or she recruited for a paid position performing them. The family or household member has no expectation of compensation, nor has any been promised, and there will not be employment records regarding any unpaid services. During this time, the family or household member's activities are not restricted by an agreement to provide certain services, and the family or household member can choose to come and go from the home and have other family members or other people provide the supports. Importantly, the unpaid support stems from a prior familial or household relationship that is separate and apart from the initiation of any employment relationship.

The discussion above addresses only the unique circumstances that exist in the context of domestic service employment by paid family and household member caregivers. The Department believes this bifurcated analysis is warranted because of the special relationships between family and household members and the special environment of the home. It does not apply outside the home care service context; the Department views work for a family business, for example, as subject to the typical FLSA law and regulations regarding the employment relationship and hours worked. This analysis also does not generally apply to relationships that do not involve preexisting family ties or a preexisting shared household. Therefore, except as noted below, it would *not* apply to a direct care worker who did not have a family or a household relationship with the individual in need of services prior to the individual's need arising or the creation of the plan of care. In other words, a direct care worker who becomes so close to the consumer as to

be "like family," or a direct care worker who becomes part of the consumer's household when hired to be a live-in employee, does not have a bifurcated relationship with the consumer. In those circumstances, all services the direct care worker provides fall within the employment relationship between the consumer and worker and between any third party employer and the worker; therefore, if those direct care services do not fall under the companionship services exemption, they must be compensated as required under the FLSA. By contrast, if the consumer and caregiver enter into a new family relationship during the course of an employment relationship (e.g., through marriage or civil union), then, although the family relationship did not predate the employment relationship, the bifurcated analysis described above would apply.

Additionally, the discussion above applies to third party employers that administer or facilitate the administration of certain Medicaid-funded or certain other publicly funded home care programs. These entities may be public agencies that run such programs or private organizations that have been designated to play a role in the functioning of the programs. These entities may benefit from this unique analysis only because of the entanglement with the special relationships between family and household members that necessarily result from the selection of family and household members as paid care providers through certain Medicaid-funded or certain other publicly funded programs.

Furthermore, the Department emphasizes that under this bifurcated analysis, the employment relationship is limited to the paid hours contemplated in the plan of care or other written agreement developed and approved by certain Medicaid-funded or certain other publicly funded home care programs only if that agreement is reasonable. As noted above, a determination of reasonableness will take into account whether the plan of care would have included the same number of paid hours if the care provider had not been a family or household member of the consumer. In other words, a plan of care that reflects unequal treatment of a care provider because of his or her familial or household relationship with the consumer is not reasonable. For instance, the program may not reduce the number of paid hours in a plan of care because the selected care provider is a family or household member. For example, an older woman who can no

longer care for herself may enroll in a Medicaid-funded program. The program is administered by the county in which she lives and she has been assessed to need paid services for 30 hours per week beyond the existing unpaid assistance she receives from her daughter and other relatives. If the hours in the plan of care are reduced by the county to 15 hours per week because the woman's daughter is hired as the paid care provider, the paid hours in the plan of care do not reflect the economic reality of the employment relationship and therefore will not determine the number of hours that must be paid under the FLSA. In addition, a program may not require an increase in the hours of unpaid services performed by the family or household care provider in order to reduce the number of hours of paid services. *See* 42 CFR 441.540(b)(5) (mandating that as to certain types of Medicaid-funded home care programs, unpaid services provided by a family or household member "cannot supplant needed paid services unless the . . . unpaid [services] . . . are provided voluntarily to the individual in lieu of an attendant"); Final Rule, Medicaid Program; Community Choice First Option, Centers for Medicare and Medicaid Services, 77 FR 26828, 26864 (May 7, 2012) (explaining that unpaid services "should not be used to reduce the level of [paid] services provided to an individual unless the individual chooses to receive, and the identified person providing the support agrees to provide, these unpaid [services] to the individual in lieu of a paid attendant"). Although the Department distinguishes between an unpaid familial or household relationship and a paid employment relationship between family and household members, it does not condone or intend to overlook subterfuges that may seek to treat family members less equally. This interpretation may not be used in a manner that interferes with the ability of all direct care workers to enjoy the full protections of the FLSA.

The "economic realities" analysis also applies to certain private pay home care situations, such as those funded by long-term care insurance, where a family or household member is paid for home care services. Specifically, where a program permits the selection of a family or household member as a paid home care provider, if a familial or household relationship existed prior to and separate and apart from any employment relationship, use of the bifurcated application of the economic realities test would be appropriate. Application of the factors for applying

the economic realities test in the family domestic service employment context described earlier in this section could lead to the conclusion that some of the hours of caregiving are part of an employment relationship and some hours are part of a familial or household relationship. How the divide between the two relationships is determined may vary depending on the structure of each program but, as in certain Medicaid and certain other publicly funded programs described above, the Department would look to a written agreement that reasonably sets forth the number of hours for which paid home care services will be provided.

*FLSA "Hours Worked" Principles*

Although the Department did not propose any changes to its existing rules defining what are considered hours worked under the FLSA, many commenters asked how the hours worked principles under the FLSA apply to domestic service employment. For instance, many commenters raised questions about when domestic service employees are considered to be working even though some of their time is spent sleeping, traveling, eating, or engaging in personal pursuits. The Department emphasizes that its regulations regarding when employees must be compensated for sleep time, travel time, meal periods or on-call time were not a part of this rulemaking, and they are unchanged by this Final Rule. Domestic service employees who do not qualify for the companionship services exemption or the live-in domestic service employee exemption are subject to existing rules on how to calculate hours worked, like any other employee covered under the FLSA. To address commenters' questions, however, the Department is providing the following guidance regarding the Department's established rules on compensable hours worked.

The Department received several comments requesting clarification on when sleep time, meal periods, or other off-duty periods would be compensable as hours worked under the FLSA. For example, a direct care worker requested that the Department define hours worked and differentiate between sleep time and other periods when the employee is awake. Another individual wanted to know whether a direct care worker who is on the job for a 24-hour period must be paid overtime while sleeping, eating a meal, watching television or making a personal telephone call. Other commenters suggested that the Department make clear that the final rules on companionship services and live-in

domestic service employees do not alter the Department's longstanding regulations concerning the compensability of sleep time and meal periods.

The Department also received a number of comments expressing concerns about domestic service employees being paid for sleep time or meal periods. Several employers suggested that their direct care workers should not be paid overtime for sleep periods or for other periods when the employee is engaged in personal activities and is not actively working. *See, e.g.*, Husky Senior Care; Scott Shaw Enterprises; and Stephen McCollum. One individual, who was starting a home care business, stated that such companies should not be required to pay direct care workers for any time they are sleeping, eating, or attending to their own personal needs. Access Living stated that a direct care worker who stays overnight or is a live-in employee and assists the consumer by taking him or her to the bathroom or repositioning the client at night should only be paid for such activities and should not be compensated for the entire night or for periods when the direct care worker is asleep. Access Living requested clarification on the sleep time rules. VNAA stated that direct care workers who sleep over should not be paid overtime during periods when they are essentially "standing by" and not actively providing support services. VNAA urged the Department to provide greater flexibility in the rule for paying overtime to live-in or sleep-over employees.

Similarly, the Department received numerous comments from employers, non-profits, and advocacy organizations that serve persons with disabilities requesting that live-in roommates not be required to receive minimum wage and overtime pay for periods of sleep time. *See, e.g.*, Community Vision; TASH; Community Link; and Friends of Broomfield. Community Vision, a non-profit organization that provides support services for many adults with developmental disabilities, and many others stated that "[r]equiring live-in roommates to be paid for sleep time puts solid agreements between individuals with significant disabilities and their live-in roommates at grave risk, and unintentionally results in an unnecessary burden for all interested parties."

Both NELP and AARP recognized that the Department has regulations that address the compensability of waiting time, on-call time, and sleep time. AARP noted that for shifts of less than 24 hours, all hours are considered work

hours even though the employee may sleep and engage in other personal activities (see discussion below of off-duty hours). AARP further noted that for a shift of 24 hours or more, the parties may agree to exclude a sleep period of eight hours, unless the sleep is interrupted to such an extent that the employee cannot get five hours of sleep during the night. In addition, NELP noted that live-in domestic service employees and their employers are permitted to come to an agreement to exclude sleep time, time spent on meals and rest breaks, and other periods when the employee is completely relieved of duty.

AARP stated that "[s]ome slight modification [to the Department's rules] to account for the fact that both consumer and the worker may be asleep for most of the shift might make the new regulations more workable for both the employers and employees." AARP suggested that the Department allow employers to pay only the regular rate for sleep time even for overtime hours if the sleep time is largely uninterrupted or allow the parties to agree to an overnight flat rate of sufficient size to ensure that the worker is paid at least the minimum wage for all shift hours.

*Sleep Time*

While the Department carefully considered all of the comments received on when sleep time should be compensable, the Department notes that no changes were proposed to its longstanding interpretation regarding the compensability of sleep time discussed in 29 CFR 785.21–.23. The sleep time rules have been in effect for many decades and reflect case law, including Supreme Court decisions, that govern when time spent sleeping is work time. Under the Department's regulations, an employee who is required to be on duty for less than 24 hours is working even though he or she is permitted to sleep or engage in other personal activities when not busy. *See* § 785.21. Thus, an employee on duty for less than 24 hours, such as a security guard assigned to a hospital, would need to be paid for the entire period even though there may be times of inactivity when the employee may, for example, read a magazine. This general rule applies in the same way to domestic service employees who are on duty for less than 24 hours.

Where an employee is required to be on duty for 24 hours or more, the employer and employee may agree to exclude a bona fide meal period or a bona fide regularly scheduled sleeping period of not more than eight hours from the employee's hours worked

under certain conditions. *See* § 785.22. The conditions for the exclusion of such a sleeping period from hours worked are (1) that adequate sleeping facilities are furnished by the employer, and (2) that the employee's time spent sleeping is usually uninterrupted. When an employee must return to duty during a sleeping period, the length of the interruption must be counted as hours worked. If the interruptions are so frequent that the employee cannot get at least five hours of sleep during the scheduled sleeping period, the entire period must be counted as hours worked. *Id.; see also* Wage and Hour Opinion Letter, 1999 WL 1002352 (Jan. 7, 1999). Where no expressed or implied agreement exists between the employer and employee, sleeping time is compensable.

Where an employee resides on the employer's premises permanently or for extended periods of time, not all of the time spent on the premises is considered working time. *See* §§ 552.102, 785.23. Such an employee may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties where he or she may leave the premises for his or her own purposes. For a live-in domestic service employee, such as a live-in roommate, the employer and employee also may agree to exclude the amount of time spent during a bona fide meal period, sleep period and off-duty time. *See* §§ 552.102, 785.22, 785.23. However, if the meal periods, sleep time, or other periods of free time are interrupted by a call to duty, the interruption must be counted as hours worked. In these circumstances, the Department will accept any reasonable agreement of the parties taking into consideration all of the pertinent facts. However, as more fully discussed above, the employer must track and record all hours worked by domestic service employees, including live-in employees, and the employee must be compensated for all hours actually worked notwithstanding the existence of an agreement.

It is not necessary to create a special exemption for live-in roommates. Both AARP and NELP recognized the Department's longstanding position on when employees who work 24 hours or more or are live-in employees. The Department believes that its existing sleep time rules discussed above address the concerns raised in the comments regarding when sleep time must be compensated. The Department's longstanding rules make clear that live-in roommates need only be compensated for hours worked and

those hours exclude sleep time, meal-time, as well as other off-duty time if there is an agreement to exclude such time and the employees are not performing work.

The Department received a few comments expressing concern that if there is no express or implied agreement with respect to sleep time, all hours must be counted as work time. Under the existing sleep time rules, uninterrupted time spent sleeping need not be counted as work time so long as an agreement exists between the employer and employee. 29 CFR 785.22. Bright Star Healthcare of Baltimore, for example, expressed concern that it would not be allowed to enter into agreements with its current employees to exclude sleep time. Bright Star feared that it would be required to fire all of its employees before asking whether they will agree to enter into such arrangements voluntarily, and then rehire them on that condition. Bright Star stated that terminating current employees in order to enter into agreements to exclude sleep time would be a ridiculous hurdle for employers and employees, and would not be in the best interest of those parties.

The Department agrees that terminating employees and then requesting that they sign voluntary agreements to exclude sleep time would be a burdensome and unnecessary hurdle for employers and employees. Because many direct care workers may not have been previously subject to the sleep time rules due to application of the companionship services exemption, the Department recognizes that many employers may currently exclude sleep time, or wish to exclude sleep time, but do not have an agreement with their employees that would meet the regulatory requirements. The Department believes that sufficient time exists before the effective date of this Final Rule for the employer and employee to enter into an agreement to exclude a scheduled sleeping period of not more than 8 hours from the employee's hours worked (subject to the rules regarding interruptions to sleep described above) if adequate sleeping facilities are furnished by the employer and the employee's time spent sleeping usually is uninterrupted.

The general rule is where there was previously an express or implied agreement to exclude sleep time from compensable hours worked, the employee can unilaterally withdraw his or her consent, and the employer would then be required to compensate the employee for any future sleep time that may occur. *See* Wage and Hour Opinion Letter FLSA–1303, 1995 WL 1032483

(Apr. 7, 1995). While the employer may not terminate an employee for refusing to enter into an agreement or for otherwise withdrawing their consent, *see Cunningham* v. *Gibson County, Tenn.,* 108 F.3d 1376, 1997 WL 123750 (6th Cir. Mar. 18, 1997) (unpublished), the employer would not be required to agree to a continuation of the same terms and conditions of employment. The employer and employee are free to establish new conditions of employment such as rate of pay, hours of work, or reassignment. *See* Wage and Hour Opinion Letter FLSA–1303 (April 7, 1995). For example, if an employee refuses to enter into an agreement regarding the exclusion of sleep time, an employer might decide to assign that employee only to shifts of less than 24 hours.

With regard to AARP's suggestion that the Department allow employers to pay only the regular rate for sleep time even for overtime hours, assuming such time is otherwise compensable, the statute precludes the Department from adopting this proposal. Section 7 of the FLSA requires the employer to pay overtime compensation for hours worked over 40 in a workweek "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. 207(a). Thus, allowing the employer to pay the regular rate or straight time pay instead of time and one-half of the regular rate of pay for sleep time that is otherwise compensable during overtime hours would require amending the FLSA.

AARP also suggested that the Department allow the employee and employer to agree to a flat rate for overnight hours so long as the employee receives at least the FLSA minimum wage for all shift hours. The FLSA already allows an employer to pay an employee a flat rate for work performed during overnight hours so long as the employee's regular rate of pay during the workweek is at least the FLSA minimum wage and any overtime pay is calculated at not less than time and one-half of the regular rate of pay for all hours worked over 40 in a workweek. The employer may also pay a domestic service employee a per diem rate (i.e., a day rate) under the FLSA, provided the employee's regular rate of pay is at least the FLSA minimum wage for all hours worked during the workweek and overtime is paid at not less than time and one-half of the regular rate of pay for all hours worked over 40 in a workweek. § 778.112.

## Meal Periods

The Department carefully considered all of the comments received on

whether meal or eating periods should be compensable and reiterates that no changes were proposed to the Department's longstanding interpretation on the compensability of meal periods discussed in 29 CFR 785.19. An employer may exclude "bona fide meal periods" from a domestic service employee's hours worked. § 785.19. Bona fide meal periods are periods where the employee is completely relieved from duty for the purposes of eating a regular meal. *Id.* Meal periods are not considered hours worked if employees are completely relieved from their duties, are allowed to take their meals uninterrupted by the employer, and are provided sufficient time to eat their meal. It is not necessary that an employee be permitted to leave the premises during meal periods. *See* Wage and Hour Opinion Letter, FLSA 2004–7NA, 2004 WL 5303035 (Aug. 6, 2004).

Bona fide meal periods do not include coffee breaks or time for snacks; such short rest periods are compensable. Further, the employee is not relieved from duty if he or she is required to perform any duties while eating. For instance, a domestic service employee is not relieved from duty if he or she is eating with the consumer and is required to feed or otherwise assist that individual with eating. Generally, 30 minutes is considered sufficient time for a bona fide meal period; however, a shorter period may be sufficient under special circumstances. Section 31b23 of the Wage and Hour Field Operations Handbook (FOH) enumerates the factors considered on a case-by-case basis in determining whether a meal period of less than 30 minutes is bona fide including, for example, whether the employees have sufficient time to eat a regular meal, whether there are work-related interruptions to the meal period, and whether the employees have agreed to the shorter period. The FOH provides that periods less than 20 minutes will be specially scrutinized by Wage and Hour Investigators to ensure that the time is sufficient to eat a regular meal under the circumstances presented.

*Off-Duty Time*

While the Department did not receive any comments specifically addressing when employees are engaged in off-duty time, the Department is describing its current regulations in order to address any confusion about the definition of hours worked.

Under the Department's longstanding regulations, if an employee is completely relieved from duty and is free to use the time effectively for his or her own purposes, such time periods are

not hours worked. § 785.16. Typically, the employee must be told in advance that he or she may leave the premises and will not have to resume work until a definite time. Whether the time is long enough to enable the employee to use the time effectively for his or her own purposes depends upon all of the facts and circumstances of each case. For example, a domestic service employee who is completely relieved of his or her duties from 1:00 p.m. to 5:00 p.m. and chooses to watch television or run personal errands is not performing compensable work and need not be paid for these hours. However, an employee who is required to remain on call on the employer's premises or so close thereto that he or she cannot use the time effectively for his or her own purposes is working while on call and must be compensated for such time. In contrast, an employee who is not required to remain on the employer's premises but is merely required to leave word where he or she may be reached is not working while on call. § 785.17.

Further, an employer and a live-in domestic service employee may exclude by agreement periods of complete freedom from all duties when the employee may either leave the premises or stay on the premises for purely personal pursuits. § 552.102(a). These periods must be of sufficient duration to enable the employee to make effective use of the time. For example, a live-in direct care worker who assists her roommate in the morning for three hours, then goes to class at the local university, returns home to study, watches television, and does her own laundry before assisting the roommate for two hours in the evening, has only worked five hours; the hours spent engaged in personal pursuits are considered bona fide off-duty time and are not compensable hours worked.

*Rest and Waiting Periods*

As described above, the Department received a few comments suggesting that employees should not be paid unless actively engaged in providing services. The Department is not creating a special set of rules for determining compensable hours worked for domestic service employees, but will continue to determine work time in accordance with longstanding administrative and judicial interpretations of the FLSA. The FLSA generally requires compensation for "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place." *Anderson* v. *Mt. Clemens Pottery Co.,* 328 U.S. 680, 690–91 (1946); *see* § 785.7 (compensable time ordinarily includes all the time

during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place). Employers must typically pay for all time during the workday "whether or not the employee engages in work throughout all of that period." 29 CFR 790.6(b). For example, a nurse who must watch over an ill patient and be available to assist the individual is on duty and must be paid for this time. Thus, an employee who reads a book, knits, or works a puzzle while awaiting assignments is working during the period of inactivity, because the employee must be on the premises and could be summoned to work at any moment. In such cases, the employee is "engaged to wait." *See* § 785.14; *Skidmore* v. *Swift,* 323 U.S. 134 (1944).

As discussed above, there are exceptions to this principle for bona fide meal and sleep periods and off-duty time. However, rest periods of short duration, running from 5 to about 20 minutes, are counted as hours worked. *See* § 785.18; FOH § 31a01; *see also* Wage and Hour Opinion Letter, 1996 WL 1005233 (Dec. 2, 1996). Such periods promote the efficiency of the employee and are common in industry. Thus, when a domestic service employee—in the same manner as an office or hospital employee—takes a 10-minute rest break to drink coffee or make a phone call, such time must be counted as hours worked.

*Travel Time*

The Department also did not propose any changes to its longstanding travel time rules in the NPRM. Under the travel time rules, normal home-to-work travel is not compensable hours worked whether the employee works at a fixed location or at different job sites. § 785.36. On the other hand, travel time from job site to job site during the workday must be counted as hours worked. § 785.38. These existing rules apply to all employees, including domestic service employees, who are not otherwise exempt from the minimum wage and overtime requirements of the FLSA.

The Department received a number of comments about the requirement to pay direct care workers for travel time, exclusive of commuting time. Many worker advocacy organizations and individuals supported the requirement to pay direct care workers for travel time. *See, e.g.,* NELP and Worksafe. For example, the National Consumer Voice for Quality Long-Term Care and several individuals stated that direct care workers deserve FLSA protections, including compensation for travel time. Moreover, NELP recognized that the

"failure to pay for travel time suppresses workers' already low earnings and not infrequently drives their real hourly wages below the minimum wage." Worksafe similarly noted that when direct care workers are not paid for travel time, the employees are working more hours than they are paid for, which in turn drives down their wages and increases the length of their shifts. In addition, the IHS's Global Insight Survey (Survey) of home care franchisees concluded that 50 percent of the responding home care employers are already paying for the time spent by direct care workers traveling between clients. The Survey further found that many of these franchisees are paying for travel time between clients, even in states with no minimum wage and overtime requirements for these workers. The Department also received comments from employers stating that they were paying direct care workers for travel time. *See* Comfort Keepers and Home Care Partners. Further, AARP and Senator Tom Harkin and 18 other Senators stated that employers may be able to minimize travel costs through efficient scheduling.

Some third party employers as well as the Consumer Directed Personal Assistance Association of New York State (CDPAANYS) objected to added costs of paying employees for travel time between clients. For example, A–1 Health Care, Inc., a third party home care provider, indicated that over half of its employees spend an average of three hours per day traveling between clients for which they are not currently paid. This employer noted that if the Department's travel time rules applied to its employees, it would likely schedule these workers to avoid travel time. CDPAANYS suggested that because an employee working for two distinct employers, such as Macy's and the GAP, would not be compensated for travel time between the two jobs, a home care employee working for multiple clients of the same employer should not be compensated for time traveling between clients. CDPAANYS further speculated that the requirement to pay for travel time between clients may violate Medicaid or federal tax requirements, and other comments from advocacy groups that serve persons with disabilities and third party employers asked that the requirement to pay for travel time be re-evaluated because Medicaid may currently not pay for such time. *See, e.g.,* A–1 Health Care, Inc. and National Disability Leadership Alliance.

In addition, some employers, coalitions of employers, individuals with disabilities, and advocacy groups that serve persons with disabilities objected to compensation for travel time because they worried that potential increased costs may make travel for persons with disabilities who need the assistance of a direct care worker in order to travel—particularly overnight— for vacation or work, to visit family, or to attend conferences or medical appointments, cost-prohibitive. *See, e.g.,* S.T.E.P., California Foundation for Independent Living Centers (CFILC), and NDLA.

While the Department did not propose any changes to its longstanding travel time rules in the NPRM, all comments received concerning when direct care workers should be paid for travel time were considered. The general FLSA principles applicable to all employers on the compensability of travel time continue to be applicable under this rule and are discussed in §§ 785.33–.41.

Although the comment from CDPAANYS characterized time spent traveling between multiple clients of a single employer as "commuting time" for which compensation is not required, the Department has long distinguished between normal commuting time from home to work and travel time between worksites during the workday. *Compare* § 785.35, *with* § 785.38. CDPAANYS speculated that the requirement to pay for travel time between clients may violate federal tax requirements; however Internal Revenue Service regulations regarding the deductibility of the daily transportation expenses incurred by the individual during different commuting scenarios have no bearing on whether such commute time is compensable under the FLSA. IRS Publication 463 (2012). Under the Department's longstanding regulations, normal home-to-work travel is not hours worked regardless of whether the employee works at a fixed location or at different job sites. § 785.35; *see* Wage and Hour Opinion Letter, W–454, 1978 WL 51446 (Feb. 9, 1978). Thus, if a direct care worker travels to the first consumer site directly from home, and returns directly home from the final consumer site, this commuting travel time generally does not need to be paid. § 785.35; *see* Wage and Hour Opinion Letter, W–454, 1978 WL 51446 (Feb. 9, 1978). On the other hand, employees who travel to more than one worksite for an employer during the workday must be paid for travel time between each worksite. § 785.38; *see* Wage and Hour Opinion Letter, W–454, 1978 WL 51446 (Feb. 9, 1978). Travel that is "all in the day's work" must be compensated. § 785.38. For example, if a domestic service employee drives a consumer to a doctor's appointment or to the grocery store, that time is "all in the day's work" and must be compensated.

Thus, while an employee working for two different employers need not be compensated for time spent traveling between the two employers, an employee working for multiple consumers of a single employer must be compensated for the time spent traveling between those consumers because such travel is undertaken for the benefit of the employer. § 785.38. This Final Rule does nothing to alter this longstanding policy.

*Example:* Jeff is a direct care worker employed by a home care agency. At 8:00 a.m. he drives from his home to the home of his first client, Sue. Jeff arrives at Sue's home at 8:45 a.m. He works at Sue's home until 12:15 p.m. From 12:15 p.m. until 12:45 p.m., Jeff drives directly to the home of his second client, Gertrude. Jeff works for Gertrude until 4:45 p.m., the end of his shift. From 4:45 until 5:45 p.m. Jeff drives to his home. The home care agency must compensate Jeff for the time he spent driving from Sue's home to Gertrude's home. The agency need not compensate Jeff for the time spent traveling from his home to Sue's home in the morning or from Gertrude's home to his home at night because this time is spent in ordinary home-to-work commute.

Neither federal tax requirements nor Medicaid rules counsel a departure from normal FLSA travel rules for direct care workers. The FLSA requirement that employees be paid for time spent traveling between multiple clients of a single employer is longstanding and does not conflict with these laws. Though Medicaid may not provide reimbursement for time that an employee spends traveling between clients, nothing in the Medicaid law prevents a third party employer from paying for that time. Medicaid, however, may reimburse for the costs of travel, including the costs of overnight travel with an attendant when "necessary . . . to secure medical examinations and treatment for a recipient." 42 CFR 440.170. Likewise, whether travel expenses may be deducted for tax purposes has no bearing on whether time spent traveling between clients is hours worked under the FLSA.

Further, the Department agrees with commenters, such as AARP and Senator Harkin, who wrote that employers may be able to minimize some of the cost of travel between clients through scheduling and thus have some control over the amount of travel costs incurred. Indeed, A–1 Health Care, Inc. stated that it will likely adjust its workers' schedules to avoid paying for travel

time. This issue is more fully discussed in the economic analysis.

Of particular concern to individuals with disabilities, their advocates, and employers was the requirement to pay for travel time for periods of extended travel. The Department fully supports the right of individuals with disabilities to participate in their communities and to travel for various personal and work-related purposes. The comments received demonstrate that, while traveling, direct care workers provide valuable personal care and related services to ensure the comfort, safety, and health of individuals with disabilities. For example, one direct care worker commented:

I even traveled with my client after her stroke so she could visit her friends. This was much harder because we had to have oxygen, get a hospital bed, and had to make sure the hotels would accept a hospital bed. I also had to be sure to have all her medications so we wouldn't run out. I ordered all of her personal care items, too. On one occasion we arrived late at night at the hotel [, and] the hospital bed was not set up. My client was tired after nine hours of travel and we had to get the bed set up fairly quickly.

The Department considers all travel "that keeps an employee away from home overnight" to be a special class of "travel away from home." *See* § 785.39; *see also* Wage and Hour Opinion Letter (Dec. 14, 1979). "Travel away from home is clearly work time when it cuts across the employee's workday. The employee is simply substituting travel for other duties." § 785.39. Thus, if a direct care worker accompanies a consumer on travel away from home, the employee must be paid for all time spent traveling during the employee's normal work hours. On the other hand, the Department has adopted a non-enforcement policy for travel away from home as a passenger on an airplane, train, boat, bus or automobile if the travel occurs outside of the employee's normal work hours. § 785.39; *see* Wage and Hour Opinion Letter (Dec. 14, 1979). However, a direct care worker who is required to travel as a passenger with the consumer "as an assistant or helper" and is expected to perform services as needed is working even though traveling outside of the employee's regular work hours. *See* § 785.41.

*Example:* Steve, a direct care worker, ordinarily provides assistance to Beth on Monday–Friday from 8:00 a.m. to 5:00 p.m., his normal work hours. Steve agrees to provide home care services to Beth on a trip to Phoenix to visit her family for a week. Steve meets Beth at the airport at 11:00 a.m. on Sunday for a three hour flight. The time spent traveling is hours worked because it occurs during Steve's normal work hours of 8:00 a.m. to 5 p.m., even though the travel occurs on a Sunday, and Steve ordinarily works only Monday–Friday.

*Example:* Gina, a direct care worker, ordinarily works Monday–Friday from 8:00 a.m. to 5:00 p.m. providing services for Daren. Gina agrees to provide home care services on a weekend trip Daren takes to Tulsa for his college reunion. Gina meets Daren at the airport at 7:00 p.m. on Saturday and is expected to provide care services to Daren as needed throughout the four hour flight. During the flight, Gina is on duty for the entire trip and assists Daren with feeding and toileting and gives him an insulin shot; she spends the remainder of the flight time reading a book. Because Daren has asked Gina to accompany him on the flight to be on duty and assist or help as needed, Gina must be compensated for the entire flight, although she was able to spend some of the time reading. However, if Gina is completely relieved of duties for the entire flight and is able to use the time effectively for her own purposes, such as taking a nap or watching a movie, those hours would not be compensable.

Moreover, direct care workers must be compensated for all hours they work while traveling for the benefit of consumers in accordance with existing FLSA rules. *See* § 785.41 ("Any work which an employee is required to perform while traveling must, of course, be counted as hours worked."). However, it is clear that not all time spent while away on travel is hours worked under the FLSA, and there may be significant periods of time while on travel that a direct care worker is not providing services to an elderly person or individual with disabilities and is not "engaged to wait" and need not be compensated. For example, periods when the direct care worker is completely relieved from duty and which are long enough to enable the employee to use the time effectively for his or her own purposes are excluded from hours worked as off-duty time, as are bona fide meal and sleep periods, as discussed previously in this section. *See* Wage and Hour Opinion Letter (May 7, 1981).

*Example:* Horatio works as a direct care worker and accompanies his client, Jamie, to Washington, DC, where Jamie will attend a conference. In the morning, Horatio assists Jamie with toileting, bathing, and wound care. At 8:30 a.m., Horatio drives Jamie to the conference site, arriving at 9:00 a.m. From 9:00 a.m. until noon, Horatio is relieved of all duty and uses the time to go to a museum. At noon, Horatio meets Jamie at the site of the conference and resumes work. The time from 9:00 a.m. until noon is not hours worked under the FLSA, and Horatio need not be paid for that time.

As described above, not all time spent by an employee in travel is compensable hours work. Therefore, the Department believes that the comments received may overestimate the costs associated with overnight travel by a consumer with a direct care worker.

## IV. Effective Date

The Department has set an effective date for this Final Rule of January 1, 2015. As discussed below, the Department believes that this effective date takes into account the complexity of the federal and state systems that are a significant source of funding for home care work and the needs of the diverse parties affected by this Final Rule (including consumers, their families, home care agencies, direct care workers, and local, state and federal Medicaid programs) by providing such parties, programs and systems time to adjust.

A number of commenters requested an extended phase-in period in order to allow for systemic changes at the state and local levels, to ensure that there is no adverse impact on access to home care services, and to accommodate the hiring of new workers and scheduling changes for the existing workforce. *See, e.g.,* VNAA, DCA, AARP, and NRCPDS. Specifically, the AARP noted that the changes to the Department's regulations would be new to direct care workers and consumers, as well as many third party employers, state Medicaid programs, consumer-directed programs, and other publicly financed programs. "Because it may take some time for consumers and family caregivers to learn about what the changes would mean for them, take providers some time to prepare to comply (for instance by hiring additional staff), and take public programs some time to determine what the changes mean for them and implement them, AARP urges DOL to consider whether a reasonable transition period (e.g., a phase-in period or a grace period during which no penalties for noncompliance are assessed) might be advisable." *See* AARP; *see also* Small Business Administration's Office of Advocacy (Advocacy) (requesting a delayed effective date in order to "allow small businesses to change their business practices").

The length of time requested by commenters for any phase-in period varied significantly. For example, the VNAA requested an 18-month phase-in period "to allow agencies to undertake an orderly process for adding new workers and that an accurate assessment of the costs involved be provided." The Direct Care Alliance cited similar reasons for a phase-in period, but recommended a time period of only 90 days, "to allow time for consumers, workers and employers to make any adjustments that are necessary to comply with the overtime pay

requirements." *See also* PHI (requesting a 90-day phase-in period generally, and a 180-day phase-in period for publicly funded consumer-directed programs). Other commenters requested that the Final Rule become effective "immediately" or "without delay." *See, e.g.,* 9to5, National Association of Working Women; Catherine Joaquin, Filipino Advocates for Justice; individual family caregiver Annette Heldeca.

Several commenters explicitly noted the rule's potential impact on consumer-directed programs and requested an extended phase-in period "particularly for publicly-funded consumer-directed programs." *See, e.g.,* PHI. CDPAANYS asked that the Department carve out consumer-directed services from the scope of the regulations. In the alternative, CDPAANYS stated, "[b]arring this, we urge you to delay implementation so that the numerous technical issues that were raised can be reexamined and worked through individually. This will prevent long-term damage to [consumer-directed programs] that ha[ve] successfully improved the quality of life for millions of Americans." Similarly, Disability Rights California asked the Department to delay the implementation of the change of regulations for consumer-directed programs so that states, such as California, can review and assess the impact of this Final Rule. Noting that state and program administrators will need to update service codes and definitions and establish new operations and monitoring systems to comply with the new regulations, NRCPDS recommended a 12-month period of non-enforcement, in order to allow "states and program participants to identify solutions that minimize a negative impact on existing service delivery."

The Department believes that because this Final Rule will extend the FLSA's basic minimum wage, overtime and recordkeeping protections to more workers, the rule should become effective as quickly as practicable. This position is consistent with the broad goals of the FLSA, a remedial statute designed to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and the general well-being of workers." 29 U.S.C. 202(a). The statute requires that these corrections be made "as rapidly as practicable . . . without substantially curtailing employment or earning power." 29 U.S.C. 202(b). The Department has determined that the regulations issued in 1975 no longer reflect Congress's intent in enacting the 1974 FLSA amendments given the changes in the home care industry that have taken place in the past 38 years.

Because of the unique circumstances surrounding this rule, however, the Department believes that a January 1, 2015 effective date is most appropriate. Specifically, this extended effective date is reasonable due to the integral role played by complex federal and state systems that are a significant source of funding for home care work, and the needs of the diverse parties affected by this Final Rule. The Department recognizes that the multiple federal and state programs that often fund, administer, and oversee direct care for consumers will require a period of time to adjust to the new regulations. Federal, state, and local agencies, as well as private entities, may need to implement new protocols, apply for changes to their Medicaid programs, adjust funding streams, and legislatively address budgetary and programmatic changes. States will need time to work with the Department of Health and Human Services (HHS) to review consumer-directed programs, make any needed programmatic changes, and prepare any necessary budget allocations, in order to maintain the important and growing role that consumer-directed programs fulfill. State and local entities will also need to work with consumers and their families to ensure they understand any adjustments that may occur on the provision of services. Furthermore, employers will have to make many of the usual adjustments associated with revised FLSA regulations—such as scheduling changes, hiring and training additional workers, and modifying service agreements—in conjunction with any adjustments made by federal, state and local agencies under the new regulations. In view of the unique nature of the publicly funded programs that support a significant portion of home care, the Department believes an extended effective date allows time for the regulated community to avoid disruptions to home care services because of the restrictions of federal or state budget processes or the need to comply with the HHS process for modifying Medicaid programs. Although not all home care is funded by these complex public systems, the Department is setting a single effective date for the entire regulated community to avoid the administrative burdens for employers, confusion amongst employees, and complications for enforcement that would result from accepting some commenters' suggestion that the rule's effect be delayed only as it applies to consumer-directed programs.

Additionally, the Final Rule's impact falls on populations that depend on home care services to remain in their communities and the Department anticipates that this effective date will allow time for state budgets and other components of the public funding systems that support home care to adjust. The Department also recognizes that there will be individuals, families and households who as employers will have new obligations under this Final Rule; an extended effective date will allow families additional time to become familiar with their responsibilities under the FLSA and evaluate scheduling or staffing needs in order to comply with the regulations.

Thus, a January 1, 2015 effective date provides time for these systemic changes to take place, and for employers to fully implement the Final Rule. This effective date exceeds the 30-day minimum delayed effective date required under the Administrative Procedure Act, 5 U.S.C. 553(d), and the 60-day delayed effective date for "major rules" under the Congressional Review Act, 5 U.S.C. 801(a)(3)(A). Although the Department typically utilizes the legislatively required effective dates, as applicable, the Department has in the past, in response to comments, extended the effective date for a significant FLSA rule. For example, the 2004 update to 29 CFR part 541, the regulations that govern whether employees are executives, administrative personnel, professionals, outside sales or computer employees exempt from minimum wage and overtime requirements, adopted a delayed effective date of 120 days in response to public comments in that rulemaking, including one seeking a 180-day delayed effective date. *See* 69 FR 22126 (Apr. 23, 2004). For this Final Rule, the comments received concerning a proposed effective date ranged from a typical effective date to at least 18 months. The Department believes that an effective date of January 1, 2015, which falls well within the range suggested by commenters, is reasonable under these unique circumstances and responsive to the comments received from stakeholders, including employee and employer advocacy groups, as well as state agencies.

The Department will work closely with stakeholders and HHS to provide additional guidance and technical assistance during the period before the rule becomes effective, in order to ensure a successful transition for all involved parties.

## V. Paperwork Reduction Act

The Paperwork Reduction Act of 1995 (PRA), 44 U.S.C. 3501 *et seq.,* and its attendant regulations, 5 CFR part 1320, requires that the Department consider the impact of paperwork and other information collection burdens imposed on the public. Under the PRA, an agency may not collect or sponsor the collection of information, nor may it impose an information collection requirement unless it displays a currently valid Office of Management and Budget (OMB) control number. *See* 5 CFR 1320.8(b)(3)(vi).

The Office of Management and Budget (OMB) has assigned control number 1235–0018 to the FLSA information collections. In accordance with the PRA, the December 27, 2011 NPRM solicited comments on the FLSA information collections as they were proposed to be changed. 44 U.S.C. 3506(c)(2). The Department also submitted a contemporaneous request for OMB review of the proposed revisions to the FLSA information collections, in accordance with 44 U.S.C. 3507(d). On February 29, 2012, the OMB issued a notice that continued the previous approval of the FLSA information collections under the existing terms of clearance. The OMB asked the Department to resubmit the information collection request upon promulgation of the Final Rule and after considering public comments on the FLSA NPRM dated December 27, 2011. OMB has pre-approved the information collections and will take effect on the same date as this Final Rule.

*Circumstances Necessitating Collection:* The Fair Labor Standards Act (FLSA), 29 U.S.C. 201 et seq., sets the federal minimum wage, overtime pay, recordkeeping and youth employment standards of most general application. Section 11(c) of the FLSA requires all employers covered by the FLSA to make, keep, and preserve records or employees and of wages, hours, and other conditions and practices of employment. An FLSA covered employer must maintain the records for such period of time and make such reports as prescribed by regulations issued by the Secretary of Labor. The Department has promulgated regulations at 29 CFR part 516 to establish the basic FLSA recordkeeping requirements. The Department has also issued specific recordkeeping requirements in 29 CFR part 552 which is the subject of this collection. The Department has amended recordkeeping requirements in § 552.102 and § 552.110 regarding agreements for live-in domestic workers. The Department also

notes that the amendments to the definition of companionship services results in fewer employees being exempt from the minimum wage and overtime requirements of the FLSA.

*Public Comments:* In addition to soliciting comments on the substantive recordkeeping provisions discussed above, the Department sought public comments regarding the burdens imposed by information collections contained in the proposed rule. As previously discussed, the Department received some general comments offering support for change to the regulations addressing recordkeeping requirements. Organizations such as EJC, Jobs with Justice, DCA and others expressed support for the revised recordkeeping rules.

The Department also received some general comments voicing opposition to recordkeeping requirements. Organizations such as the Visiting Nurse Service of New York, and Home Care Association of New York State expressed concern about burdens associated with the new recordkeeping requirements identified in the NPRM.

The National Federation of Independent Business (NFIB), for instance, asserted that the Department estimated that paperwork and recordkeeping associated with the proposed rule would cost in excess of $22.5 million per year. They expressed their view that this is a substantial burden that will disproportionately impact small businesses. The Department seeks to clarify the estimated $22,580,605 cost listed in the NPRM; this amount reflected the cost associated with the entire information collection that is required of all employers in the United States that are subject to the FLSA minimum wage and overtime requirements. As noted below, the cost associated with the changes resulting from this Final Rule is estimated to be approximately $8.96 million. The PRA, in order to reduce redundancy, requires a federal agency to view any given information collection requirement of a rule in light of other existing information collections that might meet the same purpose. The regulations implementing the PRA also require an agency to notify the public of the full burden of an information collection, including the burden imposed by unchanged information collections. 5 CFR 1320.5(a)(1)(iv)(B)(5). The PRA discussion in a regulatory preamble, therefore, will often include burdens that are unaffected by changes to the rule. This differs from how the overall regulatory impact analysis is summarized. The regulatory impact analysis calculates the burden only for

the marginal changes of a rule. This rule addresses only employees who will newly be subject to the minimum wage and overtime requirements of the FLSA. The rulemaking also coincides with the periodic renewal required by the PRA of the entire information collection under the FLSA. The amount cited by NFIB reflects the estimated cost to the wider universe of all employers subject to the FLSA recordkeeping requirements, of which the overwhelming majority are not impacted by this rule but are included in the same information collection as other employers since the requirements are the same for those employers.

VNAA makes the general statement that the "rule does not accurately reflect costs" in recordkeeping. The organization indicates that the requirement to make, keep, and preserve a record showing the exact hours worked by each employee will increase recordkeeping responsibilities dramatically. The organization, however, does not provide alternate methodologies or explain how or why the recordkeeping requirements will impact their organization so significantly. Without alternative data, the Department believes it is appropriate to assign the same level of recordkeeping burden as experienced by other FLSA-covered employers to those employers that will newly be required to make, keep, and maintain records of hours worked and those employers that now must make, keep, and maintain records for previously exempt workers.

The National Association for Homecare & Hospice expressed concern that the Department of Labor fell short of the analysis required under the PRA but failed to identify in what way the methodology presented in the PRA section of the proposed rule did not address information collection requirements or burdens. Further, the commenter did not identify an alternative methodology with which to examine the burden associated with this rule.

In addition, the Department received a number of form letters that addressed the recordkeeping requirements. Some form letters made general comments in support of the recordkeeping requirements. Other form letters expressed concern about the additional costs associated with recordkeeping. No comments, however, directly addressed the methodology for estimating the public burdens under the PRA or offered alternative methods for calculating burden under the PRA. With respect to the concerns addressed about cost of recordkeeping regulations, the requirements to maintain records are no

different for the employers who are the subject of this rule than for other employers in the United States that are subject to the minimum wage and overtime pay requirements under the FLSA. Further, as noted in the economic analysis, most of the agencies that employ domestic workers have at least one employee who is already subject to FLSA recordkeeping requirements. As explained in the PRA materials submitted to OMB, the Department utilized a 1979 study of domestic service workers and assumed for purposes of the PRA that a similar percentage of the current domestic service worker population is employed in live-in service today. The Department estimates that the total costs to employers of the Final Rule's information collection requirements is approximately $8.96 million of the total of $29.78 million in information collection costs of all employers subject to the FLSA.

An agency may not conduct an information collection unless it has a currently valid OMB approval, and the Department submitted the identified information collection contained in the proposed rule to OMB for review in accordance with the PRA under Control Number 1235–0018. *See* 44 U.S.C. 3507(d); 5 CFR 1320.11. The Department has resubmitted the revised FLSA information collection to OMB for approval, and the Department intends to publish a notice announcing OMB's decision regarding this information collection request. A copy of the information collection request can be obtained at *http://www.reginfo.gov* or by contacting the Wage and Hour Division as shown in the **FOR FURTHER INFORMATION CONTACT** section of this preamble. A summary of the number of respondents, annual responses, burden hours and costs of all of the recordkeeping provisions of the FLSA follow.

OMB Control Number: 1235–0018.
Affected Public: Businesses or other for profit, Not-for-profit institutions
Total Respondents: 3,911,600 (272,000 affected by this Final Rule).
Total Annual Responses: 40,998,533 (710,240 from this Final Rule).
Estimated Burden Hours: 1,250,164 (376,008 from this Final Rule).
Estimated Time per Response: various, with an average of 1.8 minutes.
Frequency: various with an average of 10.54.
Total Burden Cost (capital/startup): 0.
Total Burden Costs (operation/maintenance): $29,778,906 ($3,755,997 from this Final Rule) ($8,956,511 in Year 1 from this Final Rule which drops

substantially in Year 2 due to decrease in regulatory familiarization).

## VI. Executive Orders 12866 (Regulatory Planning and Review) and 13563 (Improving Regulation and Regulatory Review)

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if the regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is economically significant within the meaning of Executive Order 12866, or a "major rule" under the Small Business Regulatory Flexibility Act. Therefore, the Office of Management and Budget has reviewed this rule. The Department believes that this rule will have a significant economic impact on a substantial number of small entities; therefore this Final Rule contains a final regulatory flexibility analysis.

### A. Regulatory Impact Analysis of the Revisions to the Companionship Regulations

#### Background

The provisions of the FLSA apply to all enterprises that have employees engaged in commerce or in the production of goods for commerce and have an annual gross volume of sales made or business done of at least $500,000 (exclusive of excise taxes at the retail level that are separately stated); or, are engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill who reside on the premises; a school for mentally or physically disabled or gifted children; a preschool, elementary or secondary school, or an institution of higher education (regardless whether such hospital, institution or school is public or private, or operated for profit or not); or, are engaged in an activity of a public agency.

There are two ways an employee may be covered by the provisions of the FLSA: (1) enterprise coverage, where any employee of an enterprise covered by the FLSA is covered by the provisions of the FLSA, and (2) individual coverage, where even if the enterprise is not covered, individual employees whose work engages the employee in interstate commerce or in

the production of goods for commerce or in domestic service is covered by the provisions of the FLSA. Covered employers are required by the provisions of the FLSA to: (1) pay employees who are covered and not exempt from the Act's requirements not less than the Federal minimum wage for all hours worked and overtime premium pay at a rate of not less than one and one-half times the employee's regular rate of pay for all hours worked over 40 in a workweek, and (2) make, keep, and preserve records of the persons employed by the employer and of the wages, hours, and other conditions and practices of employment.

In 1974, Congress expressly extended FLSA coverage to "domestic service" workers performing services of a household nature in private homes not previously subject to minimum wage and overtime requirements. While domestic service workers are covered by the FLSA even if they work for a private household and not a covered enterprise, Congress created an exemption from the minimum wage and overtime compensation requirements for casual babysitters and persons employed in "domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves," and an exemption from the overtime compensation requirement for live-in domestic service employees.[27]

#### Need for Regulation and Why the Department Is Considering Action

In 1974, Congress extended coverage of the FLSA to many domestic service employees performing services of a household nature in private homes not previously subject to minimum wage and overtime compensation requirements. Section 13(a)(15) of the Act exempts from its minimum wage and overtime compensation provisions domestic service employees employed "to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." Section 13(b)(21) of the FLSA exempts from the overtime compensation provision any employee employed "in domestic service in a household and who resides in such household."

The Department issued regulations in 1975 to implement these exemptions. Since the 1975 regulations were promulgated, the home care industry has evolved and expanded in response

[27] 29 U.S.C. 202(a), 206(f), 207(l), 213(a)(15), and 213(b)(21).

to the increasing size of the population in need of such servcs, the growing demand for home- and community-based care instead of institutional care for persons of all ages, and the availability of public funding assistance for such services through public payers (including Medicare, Medicaid, and other federal programs such as the Veterans Health Administration, and other state and local programs).[28] As the industry has expanded, so has the range of tasks performed by workers providing home care services. The range now includes assistance with activities of daily living (ADLs), instrumental activities of daily living (IADLs), and paramedical tasks (such as catheter hygiene or changing of aseptic dressings).[29] Public funding programs do not typically cover services such as social support, fellowship or protection.[30] According to the U.S. Department of Health and Human Services (HHS), "[s]imple companionship or custodial observation of an individual, absent hands-on or cueing assistance that is necessary and directly related to ADLs and IADLs, is not a Medicaid personal care service."[31]

The Department believes that the current application of the companionship services exemption in the home care industry is not consistent with the original Congressional intent. The scope of services provided to individuals in their homes has expanded beyond those provided in 1975 when the regulations were first promulgated. In addition, courts have interpreted the definition of "companionship services" to include a broad range of workers. For example, in *McCune* v. *Oregon Senior Services Division*, 894 F.2d 1107 (9th Cir. 1990), the Ninth Circuit held that certified nursing assistants were not "trained personnel" excluded from the regulatory definition of companionship services because, unlike registered nurses and licensed practical nurses, certified nursing assistants received only 60 hours of training. Comparably,

the Seventh Circuit in *Cox* v. *Acme Health Servs, Inc.*, 55 F.3d 1304 (7th Cir. 1995), held that a home health aide who completed 75 hours of required training did not qualify as "trained personnel" subject to the Act's minimum wage and overtime compensation provisions and instead performed "companionship services" within the meaning of the term as defined in the Department's regulations.

Therefore, in the NPRM the Department proposed to modify, and the Final Rule does modify, the definition of companionship services to exclude personnel who perform medically related services that typically require and are performed by trained personnel, and to provide a 20 percent tolerance for care (assistance with ADLs and IADLs). As a result, to qualify for the companionship services exemption, workers must spend at least 80 percent of their time in activities that constitute fellowship or protection. Those workers who provide services that exceed the 20 percent tolerance for the provision of care (assistance with ADLs and IADLs) must be paid in accordance with federal minimum wage and overtime requirements.

Objectives and Legal Basis for Rule

Section 13(a)(15) of the FLSA exempts from its minimum wage and overtime compensation provisions domestic service employees who perform companionship services. Due to significant changes in the home care industry over the last 38 years, workers who today provide home care services to individuals often are performing duties and working in circumstances that were not envisioned when the companionship services regulations were promulgated. During the 1970s when the exemption was enacted such work was generally performed in institutional settings and not in the service recipient's private home.

Section 13(b)(21) provides an exemption from the Act's overtime compensation requirements for live-in domestic service workers. The current regulations allow an employer of a live-in domestic service worker to maintain a copy of the agreement of hours to be worked and to indicate that the employee's work time generally coincides with that agreement, instead of requiring the employer to maintain an accurate record of hours actually worked by the live-in domestic service worker. The Department is concerned that not all hours worked are actually captured by such agreement and paid, which may result in a minimum wage violation. The current regulations do not provide a sufficient basis to determine

whether the employee has in fact received at least the minimum wage for all hours worked.

The Department has re-examined the regulations and determined that the regulations, as currently written, have expanded the scope of the companionship services exemption beyond those employees whom Congress intended to exempt when it enacted § 13(a)(15) of the Act, and do not provide a sufficient basis for determining whether live-in domestic service workers subject to § 13(b)(21) of the Act have been paid at least the minimum wage for all hours worked. Therefore, the Department's Final Rule amends the regulations to revise the definitions of "domestic service employment" and "companionship services," and to require employers of live-in domestic service workers to maintain an accurate record of hours worked by such employees. In addition, the Final Rule limits the scope of duties that may be performed under the companionship services exemption, and prohibits third party employers from claiming the exemption for employees performing companionship services. The Final Rule also prohibits third party employers from claiming the overtime compensation exemption for live-in domestic service employees. The effective date for this Final Rule is January 1, 2015.

Summary of Public Comments on the Preliminary Regulatory Impact Analysis

A number of commenters, including Americans for Limited Government, International Franchise Association (IFA), the Private Care Association (PCA), the Private Duty Home Care Association (PDHCA) and the National Private Duty Association (NPDA),[32] submitted comments on the economic analysis included in the proposed rule. The comments focused on seven major topics: the terminology used to describe the market; the number of affected workers; the characterization of the home care services market, including the number of overtime hours worked; the price elasticity of demand used in the dead-weight loss analysis; the quasi-fixed costs associated with worker turnover and hiring; the managerial costs of regulatory familiarization and scheduling; and possible scenarios for management of overtime compensation costs.

This section will describe each of these concerns raised in the comments,

---

[28] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid," p. 3, WHD–2011–0003–5683.

[29] Seavey and Marquand, 2011, p. 7. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[30] Seavey and Marquand, 2011, p. 8. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[31] Smith, G., O'Keefe, J., et al. (2000). Understanding Medicaid Home and Community Services: A Primer, George Washington University, Center for Health Policy Research.

[32] Since the submission of the comments the NPDA has changed its name to the Home Care Association of America. This Final Rule will refer to the organization as the NPDA.

the Department's analysis and response to the comment, and any revisions made to the economic analysis.

Terminology

Several commenters, including AARP, California Association for Health Services at Home, and private citizens such as Sue Ostrowski, Robert Melcher, and Laurie Edwards-Tate, noted that the terms used in the Department's economic analysis are not consistent with industry usage and may be misinterpreted. The Department agrees and has revised the language in the economic analysis to be more precise. Specifically, the analysis uses the following terms:

*"Home care:"* The economic impact analysis has been revised to refer to the broader "home care" industry rather than "home health care," which specifically covers medical assistance performed by certified personnel. Thus, the term home care industry includes the home health care industry. The current exemption has been applied to both types of services and, therefore, this Final Rule impacts both the home health care industry and the home care industry.

*"Direct care worker:"* The NPRM used a variety of terms to refer to the workers potentially affected by the rule change; commenters found this confusing. For example, AARP pointed out that the term "caregiver" is often used to refer specifically to "family caregivers" rather than other types of workers and recommended that the Department use the term "direct care worker" instead. Therefore the terminology has been refined to use direct care worker to refer to those workers who may be affected by the rule change because they may be currently treated as exempt companions. The term "direct care worker" will be used unless the Department is referring to a specific occupation (e.g., home health aide or personal care aide) as defined by our data sources or directly quoting from a comment.

*"Independent providers:"* Independent providers are direct care workers who may be hired directly by the consumer to provide home care services. Consumers may identify the direct care worker through a registry, referral service, advertising, or word of mouth. Employment arrangements may range from formal agreements with administrative, liability, and payroll services provided by a registry to informal agreements between the direct care worker and the consumer. Numerous commenters, including Members of Congress (Senator Lamar Alexander, Congressman Lee Terry),

employers (Matched Caregivers Continuous Care, Angels Senior Home Solutions), and members of the public (Brandi Johnson, Lauren Reynolds, A. Miller, Ryan Heideman, Kimberly Flair and others) made it clear that the term "grey market" was easily misinterpreted to mean possibly illegal arrangements. Although difficult to predict, the Department anticipates this rule will bring more workers under the FLSA's protections, which in turn will create a more stable workforce by equalizing wage protections with other health care workers and reducing turnover. The Department has no basis for estimating the percentage of such arrangements where proper income and payroll taxes are paid versus those where they are not. In light of this, the analysis has abandoned the term "grey market" and now refers solely to independent providers.

*"Consumer:"* Several commenters objected to the use of the terms "client," "patient," and "care recipient" to describe individuals who purchase home care services. In particular, AARP noted that the term "patient" is inappropriate because not all consumers of home care services are receiving medical care. To be consistent with the terminology in the field, the analysis now refers to all such individuals as "consumers."

Number of Affected Workers

The Department also received comments concerning the estimated number of affected workers in two particular states.

The Illinois Department of Human Services explained that "home health aide" and "personal care" employees are exempt under state law if they are jointly employed by the state (for the purposes of collective bargaining) and the consumer. These exempt employees are currently covered by a collective bargaining agreement that does not include overtime. Other direct care workers in the state are covered by both minimum wage and overtime compensation requirements. They note that for the 30,000 workers in the program "overtime pay, however, is not mandated by Illinois statute and has not been a benefit for these providers, as allowed by the exemption for FLSA, because of its cost to the state."

The Department incorporated the 30,000 jointly-employed Illinois workers into the overtime analysis. The Department estimates national-level transfer payments based on national-level averages of wages and hours worked, not for particular states or subgroups of workers within states. Although Illinois data indicates that

more than 12 percent of these 30,000 direct care workers exceed 40 hours, within any state or region, some direct care workers or groups of workers will exceed the national average while others will work less than the national average. At the national level, however, the average will accurately represent the burden of the rule despite this variance at the state and local level.

Finally, review of the data submitted by Illinois showed the data might not be completely reliable. For example, Illinois states that 10,000 HHAs and PCAs worked close to 3 million hours of overtime, and the cost of overtime compensation would exceed $32 million.[33] These figures suggest that the overtime compensation differential would be $10.67 per hour, which implies the underlying straight-time wage rate is approximately $21.34. However, the comment stated that the workers are paid $11.55 per hour or more. As a result of these ambiguities and inconsistencies, the Department chose to add these workers to the national overtime projection, but did not use Illinois' additional data.

A joint comment from the California Association of Counties (CSAC), County Welfare Directors Association of California (CWDA), California Association of Public Authorities for In-Home Supportive Services (CAPA), and California In-Home Supportive Services (IHSS) Consumers Alliance (CICA) points out that California provides overtime for some workers under the contract-agency mode, "but it is not the case for individual providers who are paid by the IHSS Program. Out of approximately 440,000 IHSS cases in California, less than 2,000 are under the contract mode and the vast majority of IHSS workers are individual providers." Further, out of the 380,000 IHSS direct care workers, "there are approximately 50,000 IHSS providers who routinely submit timesheets who work more than 40 hours a week." The comment further noted that a 1983 "landmark ruling established that IHSS providers were employees of the state and counties for the purposes of the minimum wage provisions of the FLSA".[34] Legal Aid Society-Employment Law Center and NELP also noted that most workers in California do not receive overtime. Based on the information received from the commenters, the Department adjusted the economic analysis to include California and add 380,000 IHSS workers to the analysis in the category of states not covered by

---

[33] State of Illinois DHS, WHD–2011–0003–7904.
[34] CSAC, CWDA, CAPA, and CICA. WHD–2011–0003–9420, pg. 2.

overtime provisions, as it appears that these workers were not included in BLS Occupational Employment Statistics data (as discussed in more detail in the Costs and Transfers section).

Characterization of the Home Care Services Market

The principal concerns about the definition of the home care market were related to the sources of funding used to pay for home care services, and the size of the non-medical, private pay market. More specifically, NPDA references the Navigant analysis of the NPRM which comments that the assessment of funding sources was made based on limited information, and that the private pay market is larger than estimated in the NPRM. Note, the industry describes this part of the home care market as both "private duty" and "private pay," using the terms synonymously.[35] For the purposes of this discussion, the Department uses the term "private pay" to refer to the market for non-medical services that are paid for privately (i.e., out-of-pocket payment or payment by long-term care insurance).

Several industry organizations (IFA, National Association for Home Care and Hospice (NAHC), PDHCA, and NPDA) administered two surveys in response to the NPRM that suggest the existence of a larger private pay market, but these surveys failed to provide any conclusive empirical evidence in support of this claim. These surveys were fielded to IFA members; the overall response rates were fairly low, and respondents self-selected into the survey. This can lead to selection bias; in other words, the respondents who chose to participate in the survey may be different from the overall population in a way that shifts the results of the survey. For example, the IFA members that responded to the survey may have been particularly motivated to participate due to campaigns to raise awareness of the NPRM in specific states, and that would lead the results to include a greater proportion of members from those states than a random sample would include. As a result, it is not clear if the results are representative of IFA members or the industry as a whole.

In response to the comments on the characterization of the home care market in the NPRM, the Department examined alternative data sources. The Department reviewed the nationally representative source Medical Expenditure Panel Survey (MEPS), published by the Department of Health and Human Services, Agency for Healthcare Research and Quality, which addresses the home care market. The MEPS is intended to capture the use of long-term non-medical care (e.g., companionship and homemaker services) and short-term acute medical home care.

MEPS data offered little in terms of support for the premise that a large private pay market for home care services exists. Private pay appears to be more frequently used with independent providers, whereas Medicare and Medicaid pay for the majority of agency services. The data also showed only a relatively small percentage of consumers pay out-of-pocket for agency care. Therefore, the assertion that the Department underestimated the impact of increased overall costs on the purchase of home care services is generally not warranted.

Closely related to the previous issue, commenters also pointed out that Medicare and Medicaid programs will cover only home health care, but not home care services. The Department believes it is appropriate to include Medicare and Medicaid as funding sources for services potentially impacted by this Final Rule.

Medicare provides eligible individuals with skilled nursing services when the services are provided on a part-time or intermittent basis. Skilled nursing services are provided either by a registered nurse or a licensed practical nurse. Home health aide services may be Medicare-covered when given on a part-time or intermittent basis if needed as support services for skilled nursing care. Home health aide services must be part of the care for the identified illness or injury. Medicare does not cover home health aide services unless the individual is also receiving skilled care such as nursing care or other physical therapy, occupational therapy, or speech-language pathology services from the home health agency. Medicare does not pay for personal care services when that is the only care the individual needs.[36] The Department does not have data regarding the extent to which Medicare-certified agencies have availed themselves of the current companionship services exemption for home health aide or other services they provide; however, to the extent that

such agencies have used the current exemption, the Department expects those agencies to be impacted by this Final Rule.

Medicaid is a federal-state partnership providing health coverage to identified populations, including seniors and persons with disabilities. States are required to cover home health benefits and may offer to cover personal care services, through Medicaid-funded programs. Such services may be provided through home and community-based services (HCBS) programs, including HCBS waivers, self-directed personal assistance services programs, Money Follows the Person programs and Community First Choice programs. The Department also expects this Final Rule to impact Medicaid-funded home health and personal care service providers.

A report by the Congressional Research Service states:

"Neither the Medicare nor the Medicaid program explicitly covers services termed 'companionship services'. However, to some extent these programs provide certain home care services to eligible beneficiaries through home health services (under Medicare and Medicaid) and personal care services (under Medicaid). Furthermore, federal statute, regulations, and guidance do not specify or regulate wage and employee benefit levels in Medicare (Title XVIII of the Social Security Act) or Medicaid (Title XVIX of the Social Security Act)." [37]

Medicare and Medicaid directly reimburse the service provider a specified dollar amount to cover a specified quantity of services or defined episode of care. The agency uses this revenue to pay the direct care worker's wages (which may include straight time, overtime, and benefits), as well as to cover other costs of doing business (such as overhead and administrative fees). Medicare and Medicaid rates do not explicitly cover agency overhead, nor do they dictate that the entire amount must go to the direct care worker's wages. Thus, agencies are able to use Medicare and Medicaid reimbursement to cover training and overtime costs.

Industry commenters (IFA, NAHC, NPDA, and PCA) stated that direct care workers work considerably more overtime than the impact analysis suggested, thereby underestimating the costs and impact of the rule. The centerpiece of this argument was the assertion that 24-hour care consumers

---

[35] See NPDA Web site, *http://www.privatedutyhomecare.org/sections/consumers/whatisprivate.php* (note: this Web site no longer exists, however, WHD has the archived version, which can be found at *http://web.archive.org/web/20120624032530/http://www.privatedutyhomecare.org/sections/consumers/whatisprivate.php*).

[36] Medicare and Home Health Care, pgs 8–10. Available at: *http://www.medicare.gov/Pubs/pdf/10969.pdf.*

[37] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid," WHD–2011–0003–5683.

are a principal component of the market and, because they prefer a single direct care worker, using multiple direct care workers to manage overtime costs may be difficult and result in reduced quality of care. These commenters asserted that paying overtime in this situation may make home care unaffordable, forcing consumers into nursing homes.

In these comments, industry groups appear to use the terms "24-hour care" and "live-in care" synonymously. These terms are not identical and make interpretation of at least some comments, statements, and reported survey results problematic. While 24-hour care implies a single direct care worker scheduled to cover a 24-hour period, the Department defines a "live-in" worker as one who resides on his or her employer's premises permanently or for an extended period of time (e.g., for at least five consecutive days or nights). Thus, while a live-in worker might provide 24-hour care, 24-hour care does not require a live-in direct care worker. The rules governing the determination of overtime differ significantly between the two types of direct care worker schedules, as will be discussed in more detail below. These differences may also have implications for projecting industry response to the rule.

For the NPRM, the Department calculated that 10 percent of affected direct care workers are employed 45 hours per week (5 hours of overtime), and an additional 2 percent are employed 52.5 hours per week (12.5 hours of overtime). These estimates are derived from the PHI analysis of National Home Health Aide Survey (NHHAS) and U.S. Census Bureau's Annual Social and Economic Supplement (ASEC) data on overtime worked in this industry. The NHHAS is a multistage probability sample survey sponsored by the Department of Health and Human Services' Office of the Assistant Secretary for Planning and Evaluation (ASPE) that was designed to provide nationally representative estimates of agency-employed direct care workers who assist with ADLs. The two-stage sampling process first randomly selected agencies with probability proportionate to size, then randomly sampled up to six direct care workers from each agency selected; a total of 3,377 workers were interviewed.[38]

As a result of comments on overtime estimates, the Department reviewed

hours worked by direct care workers as reported in the 2007 NHHAS. When calculating overtime directly instead of using estimates based on summaries reported in publicly available analyses of the NHHAS, the Department found that those direct care workers who work for a single employer more than 40 hours, but less than 50 hours per week, average 6.4 hours of overtime, while those who work for a single employer 50 hours or more per week average 21.0 hours of overtime per week. Therefore, the Department made appropriate changes, described below, in the analysis.

Price Elasticity

Price elasticity represents the percentage change in quantity demanded induced by a percentage point change in labor cost, *i.e.*, how responsive the home care services market is to changes in workers' wages. Price elasticity of demand for labor is composed of two separate effects: the substitution effect, driven by the change in the cost of labor relative to its substitutes holding output constant, and the scale effect, driven by making labor more expensive relative to agency budget. PCA suggested that the NPRM's deadweight loss analysis for home care services only included the substitution effect. The Department reviewed this assertion and found that it was accurate, *i.e.*, the cited elasticity does not incorporate the industry scale effects. PCA also provided an alternative estimate that used aggregated state-level data on the average wages and employment of home health aides and personal care aides for the period between 2001 and 2009. While PCA's econometric estimate suggested that demand is price elastic[39] (responsive to changes in price), their estimate's validity is questionable. For example, the estimate did not pass a basic set of robustness checks designed to control for state-level differences in variation. Accounting for these differences rendered PCA's estimate statistically indistinguishable from zero. The

Department attempted to use PCA's analysis with improved data and methods, but the analysis did not return a valid result.

In the absence of a reliable method to estimate the price elasticity of demand from existing data, the Department surveyed academic literature to find suitable substitutes. The Department accepts PCA's point that the market contains a private pay sector and a public-funds-reimbursed sector that might differ substantially in terms of consumer response to price changes. More specifically, the price elasticity of demand is considerably greater (in absolute terms) for consumers who pay for home care services predominantly out of pocket, though this segment is small relative to the overall home care market. Likewise, the Department believes that the demand for home care services reimbursed by a third party is highly inelastic.

The Department used the market for health care services, where the final consumer is only responsible for a relatively small fraction of the cost, to approximate the consumer response to changes in the price of home care services that are reimbursed by public funds. The RAND Health Insurance Experiment (HIE), which took place between 1974 and 1975 and covered 7,791 individuals in 6 U.S. cities, is still considered the "gold standard" in the estimation of demand for health care services because it remains to date the only large-scale study based on a randomized controlled trial. A study using HIE data estimated a −0.17 price elasticity of demand for outpatient medical care for those paying for 0 to 25 percent of care out-of-pocket.[40] Similar non-experimental studies return comparable price elasticity results.[41]

The Department used the market for non-reimbursed nursing home care, where there are often considerable out-of-pocket costs, to approximate consumer response in the private pay sector. Long-term home care and nursing homes can be considered substitutes in the sense that long-term

---

[38] Bercovitz, A, Moss, AJ, et al. (2010). Design and Operation of the National Home Health Aide Survey: 2007–2008. National Center for Health Statistics. *Vital Health Statistics.* 1(49). Available at: *http://www.cdc.gov/nchs/data/series/sr_01/sr01_ 049.pdf.*

[39] By convention, if the price elasticity of demand lies between 0 and  1.0, economists call demand "inelastic;" if the price elasticity of demand lies between  1.0 and  ∞, demand is "elastic." When demand is inelastic, a given change in supply, resulting from increased labor costs for example, will have relatively little impact on how much of the product or service is purchased, but will result in a relatively large increase in price. Conversely, if demand is elastic, then the equivalent change in supply will have a much larger impact on the quantity purchased, but a much smaller impact on price. Thus, the significance of PCA's estimated price elasticity of demand is that, if correct, it would result in a much larger decrease in home care services and a much larger deadweight loss as a result of the rule.

[40] Manning, W. et al. (1992). Health Insurance and the Demand for Medical Care: Evidence from a Randomized Experiment. *The American Economic Review,* 77(3), pp. 251–277.

[41] Mueller, C. and A. Monheit (1988). Insurance Coverage and the Demand for Dental Care: Results for Non-Aged White Adults, *Journal of Health Economics,* 7(1), pp. 59–72.

Smith, D. (1993). The Effects of Copayments and Generic Substitution on the Use and Costs of Prescription Drugs. *Inquiry,* 30(2), pp. 189–198.

Contoyannis, P. et al. (2005). Estimating the Price Elasticity of Expenditure for Prescription Drugs in the Presence of Non-Linear Price Schedules: An Illustration from Quebec, Canada, *Health Economics,* 14(9), pp. 909–923.

home care provides assistance with activities of daily living (ADLs) and instrumental activities of daily living (IADLs) to those who would be unable to live independently in the absence of support services. Many elderly individuals and people with disabilities, often given limited options, have entered facilities such as a nursing home or assisted living community where those services are provided along with room and board. Some home care appears to be priced accordingly; the Department's calculations of flat fee home care (i.e., 24-hour care) rates charged to consumers show they are quite similar to published average daily nursing home rates.[42]

The National Long Term Care Survey, a nationally representative sample of elderly persons with disabilities living in community-based and institutional settings, has served as the basis for multiple analyses of the demand for nursing home care. In 1993, a study of survey data estimated a price elasticity of the hazard of nursing home entry of −0.7, and another study from 1998 found that the price elasticity of demand for institutionalized care is −0.98. Estimates of the price elasticity of demand for nursing home care based on state-specific data range from −0.69 to −3.85.[43] Although the range of estimated elasticities is large, three of the four studies found elasticities in the range −0.69 to −0.98. Therefore the Department judged that a value of −1.0 best represented the overall evidence on the price elasticity of demand for

nursing home care, and thus the best proxy for private pay home care as well.

The use of proxies for the price elasticities of demand for reimbursed and unreimbursed home care services due to the lack of direct estimates creates uncertainty concerning their true value and the subsequent impacts of the rule on the market for these services. The numerical value of an elasticity is a function of the availability of reasonable substitutes for the product or service, amongst other things. Thus, to the extent that unpaid services provided by family members and/or the use of inferior quality caregivers are considered good substitutes for agency caregivers, the demand for reimbursed home care services might be more elastic than −0.17. Similarly, the extent to which a nursing home is an unacceptable substitute for unreimbursed home care services might make the demand for those services less elastic than −1.0.

Although both these statements concerning these elasticities may be true, the Department believes this will have relatively little effect on the results of the model. First, the specified elasticities create natural limits: although demand for reimbursed services might be larger than −0.17, it is unlikely to be larger than the demand for unreimbursed services, while the converse is true concerning the demand for unreimbursed services. Thus it is likely that the true values lie between −0.17 and −1.0. Second, if the demand for reimbursed home care services is more elastic, it will increase the impact of the rule (e.g., greater reduction in services utilized; larger deadweight loss); conversely, a less elastic demand for unreimbursed services will decrease the impact of the rule. Thus, if both statements are true, the impacts will be to some extent offsetting. Third, the total impact of the rule is essentially a weighted average of the two market components (reimbursed and unreimbursed home care services); increasing the elasticity of the reimbursed market segment and reducing it for the unreimbursed market segment is likely to result in a small change in the weighted average, and therefore would have a small effect on impacts.

In the NPRM, the Department stated that the overwhelming majority of home care (75 percent) is paid with public funds. Commenters such as NPDA, IFA, and the Small Business Administration's Office of Advocacy (Advocacy) expressed concern that the size of the non-medical, private pay market may be larger than the impact analysis suggests. More specifically,

they argued there are a large number of small home care businesses in the private pay sector that are not adequately reflected in the economic analysis.[44] The Department surveyed several academic and industry sources in an attempt to gain a better understanding of the private pay market. However, we find no representative, national-level data that suggests that there exists a larger private pay market for which the Final Rule does not account.

To reflect the findings discussed about the price elasticity of demand and the market share of the private pay sector, the Department agrees that it is necessary to revise the method it used to project the deadweight loss caused by the Final Rule. The Department calculated separately the impacts for the market in which care is primarily reimbursed through public funds, which accounts for 75 percent of all direct care workers, and has a price elasticity of demand of −0.17, and the private pay market, which accounts for 25 percent of all direct care workers, and has a price elasticity of demand of −1.0.

The changes that the Department made in response to PCA's comments concerning the price elasticity of demand for home care services had a relatively small effect on the results of the analysis. First, the price elasticity for reimbursed services (−0.17) used in the final analysis is of a very similar magnitude to that used in the NPRM (−0.15); indeed the conceptual basis for selecting reimbursed medical care as a proxy is the same concept used in the NPRM, although in practice the derivation of the NPRM value was flawed. Second, although we use a price elasticity of demand for private pay home care that is close to the value found by PCA (−1.0 compared to PCA's estimate of −1.18), again the impact of using this value in the final analysis is relatively small because it applies to only 25 percent of the total market for home care services.

Quasi-Fixed Costs

According to PCA, the quasi-fixed costs are non-trivial and may account for up to 19 percent of annual wages.[45] Quasi-fixed costs are those that change with the number of workers hired rather than with the number of hours worked. Examples include hiring costs, training costs, social insurance and other private benefits.

[42] See discussion of private pay pricing structure in the ''Tasks, Wages, and Hours'' section of the analysis; agencies charge approximately $250 per day for 24-hour care while the average private nursing home rate in 2011 was about $240 per day according to the MetLife market Survey of Long-term Care Costs. However, the IHS Global Insight survey, Economic Impact of Eliminating the FLSA Exemption for Companionship Services, 2012, WHD–2011–0003–8952, shows that less than 10 percent of consumers cared for by survey respondents receive 24-hour home care, while 65 percent require less than 40 hours of care per week. Thus, for the vast majority of consumers, home care is less expensive than institutional care, and for the 10 percent (or less) of consumers receiving 24-hour home care, the cost is about the same as institutional care.

[43] Headen, A. (1993). Economic Disability and Health Determinants of the Hazard of Nursing Home Entry, *Journal of Human Resources*, 28(1), pp. 81–110.

Rechovsky, J. (1998). The Roles of Medicaid and Economic Factors in the Demand for Nursing Home Care, *Health Services Research*, 33(4 Pt 1), pp. 787–813.

Knox, K., E. Blankmeyer and J. Stutzman. (2006). Private Pay Demand for Nursing Facilities in a Market with Excess Capacity. *Atlantic Economic Journal*. 34(1), pp. 75–83.

Mukamel and Spector (2002).The Competitive Nature of the Nursing Home Industry: Price Mark Ups and Demand Elasticities.'' *Applied Economics*, 34(4), pp. 413–420.

[44] Small Business Administration (SBA) Office of Advocacy, WHD–2011–0003–7756.

[45] William Dombi, WHD–2011–0003–9595, pg. 25.

The Department believes that although this figure might be accurate for the home care industry in general, it is too large for companionship services. Recruiting and training costs appear to be small for direct care workers. For example, evidence from the 2011 Annual Private Duty Home Care Benchmarking Study indicates that the median initial training is between 4 and 9 hours, and less than 25 percent of establishments provide more than 9 hours. In the same source, employee referrals and listings on the Internet were cited as the two most popular recruiting methods. In addition, reductions in employee turnover rates may result in lower net costs associated with hiring and turnover, as discussed below in an analysis of turnover and hiring costs. However, the Department accepts that hiring costs constitute a direct cost, rather than a transfer from employers to employees, and includes these costs in determining the impacts of the Final Rule.

Managerial Costs of Scheduling

NPDA and others argued that the NPRM underestimated the cost of regulatory familiarization and the managerial cost of scheduling complications due to overtime. The Department assumed industry would incur minimal regulatory familiarization costs because most of the affected firms already have employees covered by the FLSA. For example, the BLS National Employment Matrix data report for Home Health Care Services (62–1600) in 2010 includes over 200 occupations including nursing aides, therapists, and health practitioners who provide services other than companionship services to consumers in their homes.[46] Therefore, the Department believes most agencies will already be well acquainted with the minimum wage and overtime compensation requirements of the FLSA, and will only need to familiarize themselves with the regulations that apply to one distinct group of workers. The regulatory text is quite limited in scope and length, and because agencies are third party employers and will not be eligible to claim the exemption, the time required for familiarization will be quite limited. Furthermore, the Department expects that many firms will rely on guidance and educational materials from the Department and industry to familiarize themselves with changes to the rule. Similarly, the Department believes that most firms already employ staff entitled to overtime

compensation and must therefore manage these workers accordingly. In the NPRM, the Department requested information on the incremental time and cost of managing workers subject to the FLSA's overtime compensation requirement, but none was provided. In the absence of new evidence, the Department did not change its estimate.

Overtime Scenarios

Industry groups such as IFA and NPDA, and private citizens such as Martin Hayes, Henri Chazaud, and Melina Cowan expressed concern over the Department's handling of overtime. These comments typically focused on two aspects of overtime. First, many agencies stated they would engage in at least some form of overtime management to avoid paying for overtime. Second, while overtime management would typically involve scheduling additional direct care workers, industry group criticism also appears to rely on the implicit assumption that using multiple direct care workers is often not a realistic alternative because of the need for continuity of care.

However, continuity of care does not necessarily require a single direct care worker, but rather can involve a small group of direct care workers intimately familiar with the consumer and his or her needs. In this way care will not be disrupted if one of those direct care workers is no longer willing or able to provide the needed services. Moreover, although consumers may prefer single direct care workers, with an industry turnover rate apparently exceeding 40 percent, it is likely that many consumers already receive care from more than one worker or a combination of direct care workers and family members when other workers are unavailable. As previously discussed, 24-hour care is not necessarily synonymous with having a live-in direct care worker. Assuming at least two direct care workers are currently used to provide 24-hour care, 7 days per week, adding a third direct care worker may allow effective management of overtime while introducing relatively little disruption to continuity of care. For example, if one of the three direct care workers can get from 5 to 8 hours of non-compensable sleep time per 24-hour period, hours entitled to overtime compensation might vary from zero to 15 hours per week, compared to 18 to 46 overtime hours per week with two direct care workers.[47] Modifying work

patterns to increase the number of direct care workers (and therefore reduce the need for overtime compensation) does not preclude the industry from offering consumers the option to pay a higher rate in return for fewer direct care workers.

Survey results submitted by the NAHC[48] distinguished whether respondents are currently required to pay overtime, i.e., are located in "overtime states." These reports provide some support for the position that the rule will not be as onerous to the private pay market as claimed. For example, 15 to 20 percent of agencies that responded to the industry's surveys that operate in non-overtime states already pay overtime voluntarily. Moreover, firms operating in overtime and non-overtime states already have very similar characteristics. Firms operating in states requiring overtime compensation not only have a similar percentage of consumers receiving 24-hour care as firms operating in states without overtime compensation requirements, but actually have higher rates of overtime worked per employee than firms that do not have to pay the overtime wage differential.

In addition, firms in states without a state overtime compensation requirement anticipate considerably worse impacts than those actually experienced by firms in states with a state overtime compensation requirement. It is possible that state-specific conditions might result in different impacts in the states that have not yet implemented overtime compensation requirements than in those states that have already implemented such requirements. However, the 15 percent of survey respondents that voluntarily pay overtime compensation reported

---

[46] BLS National Employment Matrix, Home Health Care Services (62–1600) 2010. Available at: http://www.bls.gov/emp/ep_table_109.htm.

[47] With two direct care workers, one working three 24-hour shifts a week and the other working four 24-hour shifts a week, weekly overtime ranges

from 18 to 46 hours. Each day, 24-hours are spent on site but between 6 and 10 hours are not compensated (for bona fide sleep and meal periods), resulting in between 14 and 18 hours worked per day. For the worker employed three days, weekly hours are between 42 and 54 hours. The worker employed four days a week works between 56 and 72 hours. Overtime ranges from 18 ((42 − 40) + (56 − 40)) to 46 hours ((54 − 40) + (72 − 40)). With three direct care workers, each works two 24-hour shifts a week, and two of the three split the remaining day into two 12-hour shifts. This results in one direct care worker being on site 48 hours a week, but once sleeping and eating time is deducted (between 12 and 20 hours) this worker is paid for between 28 and 36 hours per week, resulting in no overtime. The other two workers have the same schedule, plus one 12-hour shift. Shifts less than 24 hours are not entitled to deducted sleep time, but 0.5–1 hour is assumed to be deducted for meal breaks. Therefore, these two workers will work between 39 and 47.5 hours a week, resulting in between no overtime and 15 hours of overtime per week.

[48] WHD–2011–0003–9496.

impacts similar to those reported by agencies that were required to pay overtime. For example, 86 percent of firms in non-overtime states report they intend to limit overtime, but only 62 percent of firms in overtime states and 60 percent of voluntary overtime compensation payers felt it necessary to do so. Likewise, 76 percent of firms in non-overtime states anticipate a significant increase in cost due to overtime requirements, but only 40 percent of firms in states that already require overtime compensation, and 34 percent of voluntary payers reported experiencing a significant increase in cost. Unfortunately, the term ''significant increase'' is not defined in the survey and therefore this experience cannot be used for projecting costs and impacts.

Empirical research has also found that employers are likely to respond to mandated overtime premiums by making adjustments so as to not absorb the entire cost of overtime.[49] For example, similar to the NAHC survey, the IFA survey found 95 percent of respondents in states where there are no overtime regulations stated they would eliminate all scheduled overtime hours, while two percent said they would reduce overtime hours and three percent said they would make no changes to current scheduling.[50] In view of the

research, employer comments and industry survey evidence, the Department believes employers responding to the Final Rule changes by paying for 100 percent or 0 percent of overtime are highly unlikely scenarios. Therefore, in the Final Rule the Department adjusted OT Scenario 1 to reflect 60 percent of overtime paid, OT Scenario 2 to reflect 40 percent of overtime paid, and OT Scenario 3 to reflect 10 percent of overtime paid. The latter two scenarios represent the more aggressive responses to the rule indicated in the industry surveys and comments. Based on the combination of two industry surveys, empirical research, and employer comments, the Department believes that OT Scenario 2 reflects the most likely impacts of the Final Rule, and therefore focuses on the results of that scenario in the following analysis.

Travel Time Compensation

Several industry groups, including IFA and PDHCA, expressed concern over the method used to estimate travel time between consumers, which under the revised rule must be compensated. The Department based its ratio of travel time compensation to overtime compensation on New York City's amicus brief for the U.S. Supreme Court case, *Long Island Care at Home, Ltd.* v. *Coke,* 551 U.S. 158 (2007). The Department received criticism that this ratio (travel time compensation as 19.2 percent of total overtime compensation) underestimated the true cost of travel time compensation. The estimate relies

on New York City data and, therefore, the geographic scope is limited; travel time compensation may be higher in other locations, such as remote rural areas. Additionally, since travel time compensation is proportional to estimated overtime compensation, the reliability of this estimate is dependent upon accurately estimated overtime compensation.

Although the Department requested additional data on travel time, commenters did not provide alternative methods or data to estimate travel time. The Department considered alternative sources, most notably the National Home Health Aid Survey (NHHAS).[51] The NHHAS is a nationally representative survey of agency-employed home health aides who assist with ADLs. The NHHAS reports travel time for the last day worked; however, attempts to estimate weekly and annual travel time from these data suffer from several limitations. These limitations include evident reporting error (such as reporting travel time between consumers when the respondent cares for a single consumer) and the lack of some data necessary to estimate cost (such as days worked per week). Due to lack of confidence in its estimate of travel time from NHHAS data and a lack of alternative data sources, the Department continues to rely on the ratio provided by New York City in its amicus brief for the Final Rule analysis. Moreover, although the Department revised the overtime scenarios for the Final Rule, the Department continues to project travel time based on the proposed rule's overtime scenario in which agencies compensate 100 percent of all overtime hours. Thus, travel time estimates in the Final Rule are conservative estimates which significantly overestimate the cost of travel time.

---

[49] Barkume, Anthony. (2010). The Structure of Labor Costs with Overtime Work in U.S. Jobs, *Industrial and Labor Relations Review,* 64(1), pp. 128–142.

[50] The IFA survey does not compare anticipated business responses in states without current overtime regulations with actual business responses in states with current overtime regulations. However, other responses provided in the IFA survey (WHD–2011–0003–8952) show similar patterns to the NAHC survey. First, respondents in states that require overtime do not differ substantially from those in states without such requirements in terms of customers receiving live-in care, customers receiving more than 40 hours of care per week, and average overtime worked per week by employees. Second, among respondents in states without current overtime regulations, 18 percent already pay overtime premiums and 50 percent already pay travel time voluntarily. Third, other questions demonstrate considerable

inconsistencies in their responses. For example, many respondents anticipate raising the rates charged to their customers; on average, the reported rate increases would be an amount in excess of that needed to offset the cost of any overtime pay incurred. However, if 95 percent of firms are eliminating all overtime, there will be little reason to increase fees. Thus, although the Department agrees that employers will likely respond so as not to absorb the entire cost of overtime, industry survey responses concerning the anticipated magnitude of this affect cannot be accepted at face value.

---

[51] United States Department of Health and Human Services. Centers for Disease Control and Prevention. National Center for Health Statistics. National Home Health Care Survey, 2007.

Summary of Impacts

Table 1 illustrates the potential scale of projected costs, transfer effects and other impacts of the revisions to the FLSA regulations implementing the companionship services exemption. The Department projects that the average annualized direct costs of the rule will total about $6.2 to $6.8 million per year over 10 years (depending on how firms handle overtime and additional hiring).[52] In addition to the direct cost to employers of the rule, there are also transfer effects resulting from the rule. The primary impacts shown in Table 1 are income transfers to direct care workers in the form of: Compensation for time spent traveling between consumers (average annualized value of $104.3 million per year); and payment of an overtime premium when hours worked exceed 40 hours per week. Because overtime compensation depends on how employers adjust scheduling to eliminate or reduce overtime hours, the Department considered three adjustment scenarios resulting in payment of: 60 percent of current overtime hours worked (OT Scenario 1, with an average annualized value of $326.3 million per year); 40 percent of current overtime hours worked (OT Scenario 2, with an average annualized value of $217.5 million per year); and 10 percent of current overtime hours worked (OT Scenario 3, with an average annualized value of

$54.4 million per year).[53] As discussed in the previous section, this represents a change from the overtime scenarios in the NPRM, which used payment of 100 percent, 50 percent, and 0 percent to represent possible adjustments. The Department revised these scenarios in response to the many comments, including comments from International Franchise Education Association, NPDA and private citizens, indicating agencies would respond to the rule by eliminating overtime from direct care worker schedules. While 100 percent payment of overtime remains a theoretical upper bound estimate, it is so unlikely that it loses validity in representing projections of how the market might adjust and the costs it might incur. Therefore, the Department selected payment of 60 percent of current overtime hours to represent the upper bound of overtime compensation (OT Scenario 1). Similarly, it would be more costly for agencies to completely eliminate overtime than pay at least some overtime when unavoidable, such as when the cost of hiring a new worker might exceed the cost of paying overtime. In addition, comments on the NPRM, such as the survey results submitted by NAHC, indicated some agencies already pay overtime in states with no overtime requirements. Thus, no overtime compensation seemed equally unlikely to occur, and the Department now uses OT Scenario 3, in

which agencies pay 10 percent of baseline overtime, for its lower bound overtime cost scenario.

Although the transfer of income to workers in the form of higher wages is not considered a cost of the rule from a societal perspective, higher wages do increase the cost of providing home care services, potentially resulting in the provision of fewer services. This potential reduction in the provision of services may cause market inefficiency if it raises marginal labor costs and if we consider the current labor market to be in a competitive equilibrium, and this allocative inefficiency is a cost from a societal perspective. On the other hand, marginal labor cost may rise by less than the amount of the wage change because higher wages for workers may result in lower turnover rates and reduced recruitment and training costs for firms. With a 7 percent real rate, the Department measures the range of average annualized deadweight loss attributable to this allocative inefficiency as $177,000 when 60 percent overtime compensation adjustment is assumed, $99,000 when 40 percent overtime compensation adjustment is assumed and $24,000 when a 10 percent adjustment in overtime compensation is assumed. In perspective, the deadweight loss represents approximately 0.0001 percent of industry revenue with an associated disemployment impact of 0.06 percent of workers under OT Scenario 2. The relatively small deadweight loss occurs because both the demand for and supply of home care services appear to be inelastic in the largest component of this market, in which public payers reimburse home care; thus, the equilibrium quantity of home care services is not very responsive to changes in price. Average annualized benefits from reduced turnover range from $10.1 million per year under OT Scenario 3 to $34.1 million per year under OT Scenario 1, with average annualized net benefits ranging from $3.9 million per year (Scenario 3) to $27.3 million per year (Scenario 1). Under OT Scenario 2, which the Department believes to be the most likely outcome, average annualized benefits total $23.9 million per year with average annualized net benefits of $17.1 million per year.

---

[52] As will be explained in further detail, the Department examined three scenarios on how firms adjust overtime hours worked in response to the overtime compensation premium requirement; within each of these overtime scenarios, we consider three benchmarks for reallocating overtime hours between new hires and current part time workers, for a total of 9 combinations of overtime and hiring decisions. However, to simplify the presentation, we include only three combinations of overtime adjustment and new hiring in the tables; these are: OT Scenario 1: 60 percent of current overtime hours are paid the overtime premium, and of the remaining 40 percent of overtime hours, 30 percent are allocated to new hires while 70 percent are redistributed to current part-time employees; OT Scenario 2: 40 percent of current overtime hours are paid the overtime premium, and of the remaining 60 percent of overtime hours, 20 percent are allocated to new hires while 80 percent are redistributed to current part-time employees; OT Scenario 3: 10 percent of current overtime hours are paid the overtime premium, and of the remaining 90 percent of overtime hours, 10 percent are allocated to new hires and 90 percent redistributed to current part-time employees. Under this combination of overtime and hiring decisions, OT Scenarios 1 and 2 incur the same hiring costs in year 1 as shown in Table 1.

[53] Estimated total overtime hours, and therefore total overtime wage premiums, are larger for the Final Rule than for the proposed rule. This results from four factors. First, the Department increased its estimate of average overtime worked for that fraction of direct care workers who work overtime (we now estimate 12 percent of workers average 8.8 hours of overtime per week instead of 6.3 hours per week as in the proposed rule). Second, the Department determined that 26,000 of California's agency-employed direct care workers that were considered entitled to overtime under the proposed rule are not, in fact, entitled to overtime compensation under state law. Third, the 380,000 direct care workers in California's In-Home Supportive Services (IHSS) program are also not generally entitled to overtime compensation; 50,000 of these workers routinely exceed 40 hours per week. Finally, 30,000 direct care workers considered jointly employed by the state of Illinois and the consumer are not currently entitled to overtime compensation. The total number of all overtime hours being worked by workers without overtime coverage is estimated to be 73.5 million hours. Thus estimated overtime costs increased substantially due to both an increase in the estimated number of overtime hours worked, and an increase in the number of those who work overtime.

TABLE 1—SUMMARY OF IMPACT OF CHANGES TO FLSA COMPANIONSHIP SERVICES EXEMPTION

| | Year 1 ($ mil.) | Future years ($ mil.) [a] | | Average annualized value ($ mil.) | |
|---|---|---|---|---|---|
| | | Year 2 | Year 10 | 3% Real rate | 7% Real rate |
| **Costs** [i] | | | | | |
| Regulatory Familiarization: | | | | | |
|     Agencies | $6.9 | $0.6 | $0.6 | $1.3 | $1.4 |
|     Families Hiring Self-Employed Workers | $5.4 | $2.8 | $3.6 | $3.4 | $3.5 |
| Hiring Costs [b]: | | | | | |
|     30% OT remaining in OT 1 | $8.4 | $0.8 | $0.8 | $1.6 | $1.8 |
|     20% OT remaining in OT 2 | $8.4 | $0.8 | $0.8 | $1.6 | $1.8 |
|     10% OT remaining in OT 3 | $6.3 | $0.6 | $0.6 | $1.2 | $1.3 |
| Total costs (30% of OT 1) | $20.6 | $4.2 | $5.0 | $6.4 | $6.7 |
| Total costs (20% of OT 2) | $20.6 | $4.2 | $5.0 | $6.4 | $6.7 |
| Total costs (10% of OT 3) | $18.6 | $4.0 | $4.8 | $6.0 | $6.2 |
| **Transfers** | | | | | |
| Minimum Wages (MW) [c]: | | | | | |
|     to Agency-Employed Workers | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
|     to Self-Employed Workers | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Travel Wages | $68.1 | $78.1 | $151.8 | $107.1 | $104.3 |
| Overtime Scenarios: | | | | | |
|     OT 1 [d] | $213.2 | $244.2 | $474.8 | $335.2 | $326.3 |
|     OT 2 [e] | $142.1 | $162.8 | $316.5 | $223.5 | $217.5 |
|     OT 3 [f] | $35.5 | $40.7 | $79.1 | $55.9 | $54.4 |
| **Total Transfers by Scenario** | | | | | |
| MW + Travel + OT 1 | $281.3 | $322.3 | $626.5 | $442.3 | $430.5 |
| MW + Travel + OT 2 | $210.2 | $240.9 | $468.3 | $330.6 | $321.8 |
| MW + Travel + OT 3 | $103.7 | $118.8 | $230.9 | $163.0 | $158.7 |
| **Deadweight Loss ($ millions)** | | | | | |
| MW + Travel + OT 1 | $0.116 | $0.132 | $0.257 | $0.182 | $0.177 |
| MW + Travel + OT 2 | $0.065 | $0.074 | $0.144 | $0.101 | $0.099 |
| MW + Travel + OT 3 | $0.016 | $0.018 | $0.035 | $0.025 | $0.024 |
| **Total Cost of Regulations** [g] | | | | | |
| RF + HC + DWL(OT 1) | $20.8 | $4.3 | $5.2 | $6.6 | $6.8 |
| RF + HC + DWL(OT 2) | $20.7 | $4.2 | $5.1 | $6.5 | $6.8 |
| RF + HC + DWL(OT 3) | $18.6 | $4.0 | $4.8 | $6.0 | $6.2 |
| **Disemployment (number of workers)** | | | | | |
| MW + Travel + OT 1 | 1,086 | 1,184 | 1,976 | 1,531 | (h) |
| MW + Travel + OT 2 | 812 | 885 | 1,477 | 1,144 | (h) |
| MW + Travel + OT 3 | 400 | 436 | 728 | 564 | (h) |
| **Benefits from Reduced Turnover** [b][g] | | | | | |
| OT 1 | $40.3 | $34.9 | $30.9 | $33.8 | $34.1 |
| OT 2 | $30.2 | $24.7 | $20.7 | $23.6 | $23.9 |
| OT 3 | $14.9 | $10.7 | $7.7 | $9.9 | $10.1 |
| **Net Benefits** [g] | | | | | |
| OT 1 | $19.6 | $30.6 | $25.7 | $27.3 | $27.3 |
| OT 2 | $9.4 | $20.5 | $15.5 | $17.1 | $17.1 |
| OT 3 | −$3.7 | $6.7 | $2.9 | $3.9 | $3.9 |

[a] These costs represent a range over the nine-year span. Costs are lowest in Year 2 and highest in Year 10 so these two values are reported.

[b] We use three scenarios under which agencies redistribute overtime hours to either current part-time workers or new hires to manage overtime costs: 40 percent of overtime hours are redistributed under OT Scenario 1, 60 percent under OT Scenario 2, and 90 percent under OT Scenario 3. Of this redistributed overtime, various percentages are redistributed to part-time workers and new hires: New hires constitute 30 percent of redistributed hours under OT Scenario 1 (12 percent of total overtime), 20 percent under OT Scenario 2 (12 percent of total), and 10 percent under OT Scenario 3 (9 percent of total).

[c] 2011 statistics on HHA and PCA wages indicate that few workers, if any, are currently paid below minimum wage (i.e., in no state is the 10th percentile wage below $7.25 per hour). See the BLS Occupational Employment Statistics, 2011 state estimates. Available at: http://stats.bls.gov/oes/.

[d] Of the total, about 31 percent (e.g., $66.6 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $20.0 million in Year 1) are included in the turnover and deadweight loss analyses.

ᵉ Of the total, about 31 percent (e.g., $44.4 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $13.3 million in Year 1) are included in the turnover and deadweight loss analyses.
ᶠ Of the total, about 31 percent (e.g., $11.1 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $3.3 million in Year 1) are included in the turnover and deadweight loss analyses.
ᵍ Results based on the combination of overtime scenario and hiring costs presented under Hiring Costs.
ʰ Annual average.
ⁱ Excludes paperwork burden, estimated in Section V.

Note that there are additional impacts that are not presented in this table because they could not be quantified; these include impacts such as the opportunity cost of managerial time to optimize worker schedules to reduce or avoid overtime hours or reduce travel time. The Department also acknowledges the potential costs to direct care workers who may receive fewer hours from their home care agency employers and therefore will have to search for and coordinate multiple jobs for an increased number of consumers. The Department anticipates that these impacts will likely in the long run be small compared to the impacts presented in Table 1. First, most impacted employers already employ workers subject to the FLSA and are familiar with scheduling such workers. Second, high industry turnover rates suggest that agencies frequently have openings and are looking to hire new workers. Furthermore, if most agencies respond to the rule by reducing overtime hours worked by current employees and hiring additional employees to work those hours, the number of job openings can be expected to increase. Thus, the Department expects direct care workers who lose hours at one agency will readily be able to find an opening at another agency. Likewise, the Department has not attempted to quantify potential benefits such as decreased injury rates, or transfers such as the change in reliance on public assistance.

Also not captured in Table 1 are the special circumstances surrounding entities that administer Medicaid-funded or other publicly funded programs that would, under the Final Rule, be subject to the provisions relating to third-party employers because they qualify as employers under the FLSA's economic realities test (as described in the section of this preamble discussing joint employment). For example, in the short run, continuation of direct care workers' current work schedules that exceed 40 hours per week may be infeasible for such entities, thus potentially resulting in reduced continuity of care for high-needs consumers. Other effects may also result from this Final Rule. Such consequences may be avoidable in the long run if Medicaid and other relevant programs adapt to allow overtime

billing. Further, as discussed elsewhere in this preamble, long-term continuity of care may improve as a result of this Final Rule due to both decreased turnover rates and reduced disruption, because another worker already familiar to the consumer is available as a substitute when the primary direct care worker is temporarily unavailable.

Regulatory Alternatives

The Department believes it has chosen the most effective option that updates and clarifies the Application of the Fair Labor Standards Act to Domestic Service Final Rule. Based on the commenters' suggestions, among the options considered by the Department but not described in the NPRM, the least restrictive option was taking no regulatory action. A more restrictive option was to add to the provisions being finalized a limit on the personal care services that can be performed. NELP and the National Council on Aging among others suggested that the Department require an initial assessment be conducted to determine if a direct care worker is performing primarily fellowship and protection for the consumer. They suggested that if it is found that the direct care worker is not engaged primarily in fellowship and protection, then the subsequent list of personal care services should not be considered at all and the worker should not be considered exempt. The National Council on Aging further expressed the view that toileting, bathing, driving, and tasks involving positioning and/or transfers be excluded from the list of permissible duties. ANCOR suggested that the list be made exclusive and include fewer tasks. The commenter added that the Department should consider providing an allowance for household work defined as no more than one hour in a seven day period. AFSCME expressed the view that those workers who regularly engage in mobility tasks should not be considered companions. The Department carefully considered such views in the development of this Final Rule. The Department ultimately settled on a broader set of permissible care services than initially proposed as well as less restrictive than options suggested by some of these commenters. The Department views inclusion of assistance with activities of daily living

and instrumental activities of daily living as a balanced approach that allows for some delivery of care services by the direct care worker under the companionship services exemption while at the same time recognizing and making an effort to address the health and safety concerns of direct care workers and consumers. Taking no regulatory action does not address the Department's concerns discussed above under Need for Regulation. The Department found the most restrictive option to be overly burdensome on business.

Pursuant to the OMB Circular A–4, the Department considered several other approaches to accomplish the objectives of the rule and minimize the economic impact on home care entities and other employers, including those suggested in comments on the NPRM as well as more traditional approaches.

Many commenters indicated a concern with the cost of overtime compensation and less of a concern with the FLSA's minimum wage provision. *See e.g.,* Henry Chazuad, ANCOR. One suggested alternative was to maintain the exemption from overtime compensation for third party employers of live-in workers, consistent with the laws in at least three states (Michigan, Nevada, and Washington). The Department recognizes that this approach would represent incremental progress towards narrowing the exemption for this set of workers and result in a very small economic impact on the industry from the Final Rule. However, the Department believes this approach is inconsistent with Congress's intent to provide FLSA protections to domestic service workers, while providing a narrow exemption for live-in domestic service workers. It is apparent from the legislative history that the 1974 amendments were intended to expand coverage to include more workers, and were not intended to roll back coverage for employees of third parties who already had FLSA protections as employees of covered enterprises. Moreover, this approach does not support the objectives of the rule or the purposes of the overtime requirements of the FLSA, one of which is to spread employment.

Another alternative suggested was to allow employers to exclude some nighttime hours from "hours worked" to

reduce the potential burden of overtime compensation to workers providing care on higher hour cases (12- or 24-hour shifts). For example, Minnesota and North Dakota state laws exclude up to eight hours from the overnight hours (from 10:00 p.m. to 9:00 a.m.) from the "hours worked" for purposes of minimum wage and overtime calculations. This Final Rule does not include revisions to the longstanding regulations applicable to all FLSA-covered employers addressing when sleep time constitutes hours worked and when sleep time may be excluded from hours worked. Therefore, employers still have the opportunity to exclude bona fide sleep hours; however, there would be no basis under the FLSA for treating sleep time hours differently for domestic service workers than for other employees. The Department's existing regulations already provide for the exclusion of sleep time from compensable hours worked under certain conditions. As previously discussed in the Hours Worked section of this preamble, under the Department's existing regulations, an employee who is required to be on duty for less than 24 hours is working even though he or she is permitted to sleep or engage in other personal activities when not busy. *See* § 785.21. Where an employee is required to be on duty for 24 hours or more, the employer and employee may agree to exclude a bona fide meal period or a bona fide regularly scheduled sleeping period of not more than eight hours from the employee's hours worked under certain conditions. *See* § 785.22. The conditions for the exclusion of such a sleeping period from hours worked are (1) that adequate sleeping facilities are furnished by the employer, and (2) that the employee's time spent sleeping is usually uninterrupted. When an employee must return to duty during a sleeping period, the length of the interruption must be counted as hours worked. If the interruptions are so frequent that the employee cannot get at least five hours of sleep during the scheduled sleeping period, the entire period must be counted as hours worked. *Id.; see also* Wage and Hour Opinion Letter, 1999 WL 1002352 (Jan. 7, 1999). Where no expressed or implied agreement exists between the employer and employee, the eight hours of sleeping time constitute compensable hours worked. This description of these longstanding rules in the Final Rule's preamble is provided to help to educate small business employers regarding their ability to exclude sleep time from hours worked. *See* § 785.22. However, because

there would be no basis under the FLSA for treating sleep time hours differently for domestic service workers than for other employees, the commenters' suggestion was not adopted.

Another approach suggested would be to calculate overtime compensation based on a different rate of pay than straight time; for example, under New York state law overtime hours are paid at one and a half times the minimum wage rather than the worker's regular rate of pay for some workers. Again, there is no legal basis in the FLSA for calculating overtime compensation at a rate other than one-and-one-half times the employee's regular rate of pay. Moreover, the Department does not believe that this supports the objective of the rule or the spread of employment under the Act. In terms of economic burden, this alternative could reduce the cost to employers of overtime by approximately 25 percent under OT Scenario 2; however, 15 states currently require payment of overtime at time and a half of regular pay with no evidence of significant economic burden. Quoting the Michigan Olmstead Coalition "we have seen no evidence that access to or the quality of home care services are diminished by the extension of minimum wage and overtime protection to home care aides in this state almost six years ago."

Another alternative discussed by commenters is to exclude travel time from hours worked in order to decrease the burden of overtime compensation. However, the comments provided little justification for a departure from the general FLSA principles applicable to all employers on the compensability of travel time set forth in 29 CFR 785.33-.41. Excluding travel time that is "all in the day's work" from compensable hours worked, for example, would be inconsistent with the Portal-to-Portal Act amendment to the FLSA and inconsistent with how such travel time is treated for all other employees. §§ 785.38; 790.6. Furthermore, the analysis above suggests that travel time adds a relatively small amount to the burden of this rulemaking.

The Department also considered several traditional alternatives. Those alternatives include:

• Informational measures rather than regulation. The Department has made a variety of informational and educational assistance materials related to this Final Rule available on its Web site and will add to those materials during the period in which employers are reviewing and revising their policies and practices to come into compliance with this Final Rule. In addition, WHD offices throughout the country are available to

provide compliance assistance at no charge to employers. The Department has planned robust outreach efforts and will make every effort to work with employers to ensure compliance.

• Differing requirements based on size of firm or geographic region. The FLSA sets a floor below which employers may not pay their employees. To establish differing compliance requirements for businesses based on size or geographic location would undermine this important purpose of the FLSA. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance. Therefore the Department declines to establish differing compliance requirements based on the size or location of a business.

• Use of performance rather than design standards. Under the Final Rule, the employer may achieve compliance through a variety of means. The employer may: hire additional workers and/or spread employment over the employer's existing workforce to ensure employees do not work more than 40 hours in a workweek, and/or pay employees time and one-half for time worked over 40 hours in a workweek. In addition, the FLSA recordkeeping provisions require no particular order or form of records to be maintained so employers may create and maintain records in the manner best fitting their situation. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance.

• Compliance periods of various lengths. The Department has set an effective date for this Final Rule of January 1, 2015. The Department believes this delayed effect date takes into account the complex federal and state systems that are a significant source of funding for home care work, and the needs of the diverse parties affected by this Final Rule (including consumers, their families, home care agencies, direct care workers, and local, state, and federal Medicaid programs) by providing such parties, programs and systems time to adjust. The Department considered application of a 60-day delayed effective date, the minimum legally permitted effective date for a major rule (Congressional Review Act, 8 U.S.C. 801(a)(3)). A 60-day delayed effective date would most expeditiously extend the FLSA's protections to workers affected by this rule; however, the Department was concerned that such an effective date would not be sufficient for Federal, state, and local agencies, as well as private entities, to implement new protocols, apply for

changes to their Medicaid programs, adjust funding streams, and legislatively address budgetary and programmatic changes. The Department also considered a delayed effective date of two years. While a two-year delayed effective date would, in the Department's view, provide more than ample time for Federal, state, and local entities to complete any necessary programmatic changes, the workforce affected by this rule would continue to be without the wage protections available to most other workers, contributing to high turnover rates which negatively impact continuity of care. The Department believes that the January 1, 2015 effective date for this rule appropriately balances the needs of workers and the consumers utilizing their services.

### B. State Law Requirements

There are numerous state laws pertaining to direct care workers; as the industry has grown and expanded over the past 38 years the laws have increased in number and complexity to match the demands placed on workers. The State Medicaid Manual requires states to develop qualifications or requirements (such as background checks, training, age, supervision, health, literacy, or education, or other requirements) for Medicaid-financed personal care attendants. These state programs can each have multiple delivery models, including agency-directed or consumer-directed with care given by agencies or independent providers. These delivery models are not necessarily mutually exclusive. In general, for the purposes of this analysis, we refer to independent providers as workers who are hired directly by the consumer, and therefore they are not counted in the statistics on home care providers used as the basis for this analysis, with the exception of independent providers who advertise their availability through state registries.

When Congress created the companionship services exemption in 1974, a "companion" was likely to be a family member or friend with the time for and interest in providing support to an elderly family member or friend or a family member or friend with a disability. A direct care worker today must meet a more extensive and expanding set of criteria—such as background checks and training—to provide services in most states. A 2006 report by the HHS Office of the Inspector General (OIG) found that states have established multiple sets of worker requirements that often vary among the programs within a state and among the delivery models within programs, resulting in 301 sets of requirements nationwide.[54] Four of the consumer-directed programs in the OIG review had no attendant requirements.

Furthermore, states define these requirements differently, and specify different combinations of requirements in different programs. The most common requirements include: background checks; training; supervision; minimum age; health; education/literacy; and other, such as meeting state motor vehicle and licensure requirements if providing transportation.

The number of states that included each requirement in at least one program and the number of state program sets that include each requirement are summarized in Table 2.

#### TABLE 2—SIX MOST COMMON ATTENDANT REQUIREMENTS

| Requirement | Number of States that utilized requirement in at least one program | Number of sets containing requirement (of 301 sets) |
| --- | --- | --- |
| Background Checks | 50 | 245 |
| Training | 46 | 227 |
| Age | 42 | 219 |
| Supervision | 43 | 198 |
| Health | 39 | 162 |
| Education/Literacy | 31 | 125 |

Source: DHSS OIG, 2006. p. 9.

States' laws also vary in whether they extend minimum wage and overtime provisions to direct care workers. In many states "companions" are not explicitly named in the regulations, but workers providing such services often fall under those regulations that apply to domestic service employees.

Fifteen states extend minimum wage to most, and overtime coverage to some, direct care workers who would otherwise be excluded under the current Federal regulations: Colorado, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New York, Pennsylvania, Washington, and Wisconsin. However, in some states certain types of these workers remain exempt, such as those employed directly by households or by non-profit organizations. In Illinois, 30,000 personal care and home health aide workers in the Home Services Program under the Illinois Department of Human Services do not receive overtime compensation. Additionally, New York's overtime law provides that workers who are exempt from the FLSA and employed by a third party agency need only be paid time and one-half the minimum wage (as opposed to time and one-half of the worker's regular wage).[55] Minnesota's overtime provision applies only after 48 hours of work.

Six states (Arizona, California, Nebraska, North Dakota, Ohio, and South Dakota) and the District of Columbia extend minimum wage, but not overtime, protection to direct care workers. There are again some exemptions for those workers employed directly by households or who live in the household. Per Wage Order 15 in California, some direct care workers in California receive overtime; others are exempt from overtime requirements as "personal attendants" based upon the duties they perform; all receive minimum wage.

Twenty-nine states do not include direct care workers in their minimum wage and overtime provisions: Alabama,

---

[54] U.S. Department of Health and Human Services (HHS) Office of the Inspector General (OIG). (2006). States' Requirements for Medicaid-Funded Personal Care Service Attendants, available at: *http://oig.hhs.gov/oei/reports/oei-07-05-00250.pdf.*

[55] Under the 2010 Domestic Workers Bill of Rights, most New York direct care workers employed directly by the household in which they work receive full time-and-a-half overtime protections. The law applies to third party employers if any household services, such as cleaning, are performed.

Alaska, Arkansas, Connecticut, Delaware, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, and Wyoming.[56]

Of the 21 states plus the District of Columbia that extend the minimum wage to at least some direct care workers, 12 have a state minimum wage that is higher than the current federal minimum wage of $7.25 an hour.[57] These state laws are summarized in Table 3.

TABLE 3—STATE MINIMUM WAGE AND OVERTIME COVERAGE OF NON-PUBLICLY EMPLOYED DIRECT CARE WORKERS

| State | State minimum wage [a] | MW | OT | Neither | Analysis and citations [b] |
|---|---|---|---|---|---|
| AL ........... | ..................................... | ........... | ............ | x | |
| AK ........... | $7.75 ................................ | ........... | ............ | x | |
| AZ ........... | $7.80 ................................ | x | ............ | ................ | Minimum wage but no overtime coverage for companions as defined in the FLSA. No state overtime law. See Ariz. Rev. Stat. Ann. §§ 23–362, 23–363; see also Office of the Attorney General of the State of Arizona, Opinion No. I07–002 (Feb. 7, 2007). |
| AR ........... | $6.25 ................................ | ........... | ............ | x | |
| CA ........... | $8.00 ................................ | x | ............ | ................ | All companions as defined in the FLSA are entitled to minimum wage. Privately employed direct care workers who are classified as "personal attendants" employed by either "a private householder or by any third party employer recognized in the healthcare industry to work in a private household" and paid family caregivers are exempt from overtime requirements. Whether home care employees are exempt "personal attendants" is fact-specific and based upon the duties performed by the workers. Generally home care employees who are part of California's In-Home Supportive Services program are not entitled to overtime. Industrial Welfare Commission Order No. 15–2001; *see also* State of California, Department of Industrial Relations, Opinion Ltr. "Interpretation of IWC Wage Order 15: Definition of 'personal attendant'" (Nov. 23, 2005). |
| CO ........... | $7.78 ................................ | x | x | ................ | Minimum wage and overtime coverage for third party-employed direct care workers who do work beyond Colorado's definition of "companion." Colorado's definition of "companion" is much narrower than the FLSA definition. Companions may not help to bathe and dress the person, do any amount of housekeeping, or remind the person to take medication. People who do those tasks are more than just "companions" they are "personal care" attendants. Personal care attendants are entitled to minimum wage and overtime. However, PCAs employed directly by private households are exempt from minimum wage and overtime. Colorado Minimum Wage Order No. 26 § 5; 7 Colo. Code Regs. § 1103–1:5. |
| CT ........... | $8.25 ................................ | ........... | ............ | x | |
| DE ........... | $7.25 ................................ | ........... | ............ | x | |
| DC ........... | $8.25 ................................ | x | ............ | ................ | Minimum wage for companions as defined in the FLSA. D.C. Mun. Regs. tit. 7, § 902.1, 902.3, 902.4 (West 2011). |
| FL ........... | $7.79 ................................ | ........... | ............ | x | |
| GA ........... | $5.15 ................................ | ........... | ............ | x | |
| HI ........... | $7.25 ................................ | x | x | ................ | Minimum wage and overtime coverage for companions as defined in the FLSA, but exemption for those employed directly by private households. Haw. Rev. Stat. § 387–1. |
| ID ........... | $7.25 ................................ | ........... | ............ | x | |
| IL ........... | $8.25 ................................ | x | x | ................ | Minimum wage and overtime coverage for any person whose primary duty is to be a companion for individual(s) who are aged or infirm or workers whose primary duty is to perform health care services in or about a private home. The 30,000 personal care and home health aide workers in the Home Services Program under the Illinois Department of Human Services do not receive overtime compensation. Those employed solely by private households may be exempt under a general exemption for employers with fewer than four employees. 820 Ill. Comp. Stat. § 105/3(d); Ill. Adm. Code § 210.110. |
| IN ........... | $7.25 ................................ | ........... | ............ | x | |
| IA ........... | $7.25 ................................ | ........... | ............ | x | |
| KS ........... | $7.25 ................................ | ........... | ............ | x | |
| KY ........... | $7.25 ................................ | ........... | ............ | x | |
| LA ........... | $7.25 ................................ | ........... | ............ | x | |
| ME ........... | $7.50 ................................ | x | x | ................ | Minimum wage and overtime coverage for all companions as defined in the FLSA. No relevant exemptions. Me. Rev. Stat. Ann. tit. 26, §§ 663, 664. |

[56] National Employment Law Project (NELP). 2012. WHD–2011–0003–9452, Fair Pay for Home Care Workers, available at: *http://www.nelp.org/ page/-/Justice/2011/ FairPayforHomeCareWorkers.pdf?nocdn=1.*

[57] U.S. Department of Labor (DOL). 2013. Minimum Wage, available at: *http://www.dol.gov/ whd/minwage/america.htm#Consolidated.*

TABLE 3—STATE MINIMUM WAGE AND OVERTIME COVERAGE OF NON-PUBLICLY EMPLOYED DIRECT CARE WORKERS—Continued

| State | State minimum wage [a] | MW | OT | Neither | Analysis and citations [b] |
|-------|------------------------|----|----|---------|----------------------------|
| MD ......... | $7.25 ......................... | x | x | ............... | Minimum wage coverage for all companions as defined in the FLSA. Overtime coverage for most direct care workers but exemption for workers employed by non-profit agencies that provide "temporary at-home care services". Md. Code Ann., Lab. & Empl. §3–415. |
| MA .......... | $8.00 ......................... | x | x | ............... | Minimum wage and overtime coverage for all companions as defined in the FLSA. No relevant exemptions. Mass. Gen. Laws Ch. 151, §1. |
| MI ........... | $7.40 ......................... | x | x | ............... | Minimum wage and overtime coverage for companions as defined in the FLSA, but exemption for live-in workers. Mich. Comp. Laws §408.394(2)(a). Exemption for workers employed solely by private household as a result of exemption for employer with fewer than two employees. Mich. Comp. Laws §408.382(c). |
| MN ......... | $6.15 or $5.25 for employers grossing under $625,000 per year. | x | x | ............... | Minimum wage and overtime coverage after 48 hours for all companions as defined in the FLSA, but nighttime hours where companion is available to provide services but does not actually do so need not be compensated. Minn. Stat. §177.23(11). |
| MS .......... | ................................. | ............... | ............... | x | |
| MO .......... | $7.35 ......................... | ............... | ............... | x | |
| MT .......... | $7.80 ......................... | x | x | ............... | Minimum wage and overtime coverage for companions as defined in the FLSA, but exemption for those employed directly by private households. Mont. Code. Ann. §39–3–406(p). |
| NE .......... | $7.25 ......................... | x | | ............... | Minimum wage but no overtime coverage for companions as defined in the FLSA. No state overtime law. De facto exemption for most households as a result of general exemption for employers with fewer than four employees. Neb. Rev. Stat. §§48–1202, 48–1203. |
| NV .......... | $8.25 [c] ..................... | x | x | ............... | Minimum wage and overtime coverage for companions as defined in the FLSA, but exemption for live-in workers. Also, business enterprises with less than $250,000 annually in gross sales volume need not pay overtime. Nev. Rev. Stat. §608.250(2)(b). |
| NH .......... | $7.25 ......................... | ............... | ............... | x | |
| NJ ........... | $7.25 ......................... | x | x | ............... | Minimum wage and overtime coverage for all companions as defined in the FLSA. No relevant exemptions. N.J. Stat. Ann.§34:11–56a et seq. |
| NM ......... | $7.50 ......................... | ............... | ............... | x | |
| NY .......... | $7.25 ......................... | x | x | ............... | Minimum wage coverage for all companions as defined in the FLSA. N.Y. Labor Law §651(5). There is overtime coverage for all companions but those employed by third party agencies receive overtime at a reduced rate of 150% of the minimum wage (rather than the usual 150% of their regular rate of pay). N.Y. Labor Law §§2(16), 170; N.Y. Comp. Codes R. & Regs. tit. 12, §142–2.2. Overtime coverage for live-in workers after 44 hours/week (rather than the usual 40 hours) at the same rates detailed above. *Id.* |
| NC .......... | $7.25 ......................... | ............... | ............... | x | |
| ND .......... | $7.25 ......................... | x | | ............... | Minimum wage but no overtime coverage for companions as defined in the FLSA. However, companions who are certain first or second-degree relatives of the person receiving care do not receive minimum wage. Additionally, nighttime hours where companion is available to provide services but does not actually do so need not be compensated. N.D. Cent. Code §34–06–03.1. |
| OH .......... | $7.85 ......................... | x | | ............... | Minimum wage but not overtime coverage for companions as defined in the FLSA. Ohio Rev. Code Ann. §4111.03(A), §4111.14 (West 2011). Additional overtime exemptions for live-in workers. *Id.* §4111.03(D)(3)(d). |
| OK .......... | $7.25 ......................... | ............... | ............... | x | |
| OR .......... | $8.95 ......................... | ............... | ............... | x | |
| PA .......... | $7.25 ......................... | x | x | ............... | Minimum wage and overtime coverage for companions as defined in the FLSA, but exemption for those employed solely by private households. Pa. Stat. Ann. tit. 43, §333.105(a)(2). *Bayada Nurses* v. *Commonwealth of Pennsylvania,* 8 A.3d 866 (Pa. 2010). |
| RI ........... | $7.75 ......................... | ............... | ............... | x | |
| SC .......... | ................................. | ............... | ............... | x | |
| SD .......... | $7.25 ......................... | x | | ............... | Minimum wage but no overtime coverage for companions as defined in the FLSA. No state overtime law. S.D. Codified Laws §§60–11–3, 60–11–5. |
| TN .......... | ................................. | ............... | ............... | x | |
| TX .......... | $7.25 ......................... | ............... | ............... | x | |
| UT .......... | $7.25 ......................... | ............... | ............... | x | |
| VT .......... | $8.60 ......................... | ............... | ............... | x | |
| VA .......... | $7.25 ......................... | ............... | ............... | x | |

Table 3—State Minimum Wage and Overtime Coverage of Non-Publicly Employed Direct Care Workers—Continued

| State | State minimum wage [a] | MW | OT | Neither | Analysis and citations [b] |
|-------|------------------------|----|----|---------|----------------------------|
| WA ......... | $9.19 ......................... | x | x | ............... | Washington minimum wage and overtime coverage for most companions as defined in the FLSA, but exemption for live-in workers. Wash. Rev. Code § 49.46.010(5)(j). |
| WV ......... | $7.25 ......................... | ............... | ............... | x | |
| WI ........... | $7.25 ......................... | x | x | ............... | Minimum wage and overtime coverage for most companions as defined in the FLSA, but overtime exemption for those employed directly by private households, Wis. Admin. Code § 274.015, and those employed by non-profit organizations. Wis. Admin. Code §§ 274.015, 274.01. Companions who spend less than 15 hours a week on general household work and reside in the home of the employer are also exempt from minimum wage. Wis. Admin. Code § 272.06(2). |
| WY ......... | $5.15 ......................... | ............... | ............... | x | |

Abbreviations: MW = Minimum Wage, OT = Overtime, FLSA = Fair Labor Standards Act.
Sources: [a] DOL, 2013; [b] NELP, 2011. [c] Nevada minimum wage is $7.25 per hour for employees to whom qualifying health benefits have been made available by the employer.

## C. Data Sources

The primary data services used by the Department to estimate the number of workers, establishments, and customers likely to be impacted by the rule include:

2011 Bureau of Labor Statistics (BLS) Occupational Employment Survey, employment and wages by state for SOC codes 39–9021 (Personal Care Aides) and 31–1011 (Home Health Aides);

2011 BLS Quarterly Census of Employment and Wages, for NAICS 6216 and 62412;

2010 BLS National Employment Matrix;

2007 Statistics of U.S. Businesses, for NAICS 6216 and 62412; and

2007 Economic Census, by state for NAICS 6216 and 62412.

BLS does not have a separate Standard Occupational Classification (SOC) code for "Companions;" instead, workers who provide companionship services are often classified as Personal Care Aides (PCAs; SOC 39–9021). However, considerable overlap exists between the duties of PCAs and Home Health Aides (HHAs; SOC 31–1011). While HHAs are trained to provide more medicalized care (e.g., wound care) than PCAs, they may also provide personal care services and assistance with ADLs.[58] The Seventh Circuit Court of Appeals has found home health aides to qualify for the companionship services exemption. *Cox* v. *Acme Health Servs., Inc.*, 55 F.3d 1304 (7th Cir. 1995). Therefore, the Department selected these two occupations to represent the universe of potentially affected direct care workers.

For the purposes of this analysis, the Department further assumed that all

HHAs and PCAs included in the analysis currently are treated as exempt under the companionship services exemption, but that none of them will qualify for the companionship services exemption under this Final Rule. Making these assumptions is likely to result in an overestimate of the projected costs and other impacts of the rule. First, although the Department is able to make some adjustments to the data to better identify the potentially affected worker population (e.g., including only HHAs and PCAs employed in states with no minimum wage and overtime compensation laws applicable to workers who provide companionship services to individuals in their homes rather than facilities and including only the percentage of HHAs and PCAs who likely work in private homes), it has insufficient data to determine how many direct care workers who are treated as exempt under the current companionship services exemption will qualify for exemption under the revised definition of companionship services. Because of this data limitation, and by assuming that 100 percent of HHAs and PCAs included in the analysis will no longer qualify for the exemption, the Department has overestimated the number of direct care workers who are currently not protected by the Act's minimum wage and overtime compensation provisions but who will receive these protections as a result of this rule.

An additional limitation of this set of data sources stems from the fact that the Department's best estimate of agency-employed direct care workers is based on the 2011 BLS Occupational Employment Statistics, and its best estimate of independent providers directly employed by families is based

on the 2010 BLS National Employment Matrix. The Occupational Employment Statistics (OES) is employer based, and does not collect data from the self-employed. The National Employment Matrix (NEM) obtains estimates on the self-employed from the Current Population Survey. However, it is not possible to match the OES estimates by subtracting the estimated number of self-employed workers from the NEM. Because these two estimates cannot be completely reconciled, the Department uses each source as the best estimate for one segment of the labor market and acknowledges there is some inconsistency between the two. In practice, the effect of that inconsistency on the analysis is likely to be quite small. In addition, the Congressional Research Service performed an analysis of the potential number of workers affected by the NPRM solely using data from the Current Population Survey Annual Social and Economic Supplement that resulted in comparable estimates of the numbers of workers affected by the minimum wage and overtime provisions.[59]

## D. Consumers and Demand for Services

Demand for home care services is anticipated to continue to grow in the next few decades with the aging of the "baby boomer generation." According to PHI:

Nearly one out of four U.S. households provides care to a relative or friend aged 50 or older and about 15 percent of adults care for a seriously ill or disabled family member. Over the next two decades the population

---

[58] See http://www.bls.gov/oes/current/oes399021.htm and http://www.bls.gov/oes/current/oes311011.htm; most recently accessed May 18, 2013.

[59] Congressional Research Service. Memorandum dated March 2, 2012, titled "The Fair Labor Standards Act: Proposed Changes to the Exemptions for Employees Who Provide Companionship Services and Live-In Domestic Workers," pgs. 11 and 13.WHD–2011–0003–7820.

over age 65 will grow to more than 70 million people [the U.S. population 65 years and older was estimated at 40 million in 2009[60]]. Additionally, with significant increases in life expectancy and medical advances that allow individuals with chronic conditions to live longer, the demand for caregiving is expected to grow exponentially. The growth in the demand for in-home services is further amplified by an increasing preference for receiving supports and services in the home as opposed to institutional settings. This emphasis has been supported by the increased availability of publicly funded in-home services under Medicaid and Medicare as an alternative to traditional and increasingly costly institutional care.[61]

While many consumers of home care services are elderly, about two-fifths of those in need of these services are under 65 and include those with varying degrees of mental, physical, or developmental disabilities. This group

of consumers is also anticipated to grow rapidly as more individuals opt for home-based care over institutional care.[62] It is estimated that the demand for direct care workers will grow to approximately 5.7 to 6.6 million workers in 2050, an increase in the current demand for workers of between 3.8 and 4.6 million (200 percent and 242 percent respectively).[63] The home care industry has grown significantly over the past decade and is projected to continue growing rapidly; for example:

The number of establishments in Home Health Care Services (HHCS) grew by 101 percent between 2001 and 2011; during that same period, the number of establishments in Services for the Elderly and Persons with Disabilities (SEPD) grew by 466 percent.[64]

Between 2010 and 2020 the number of home health aides is projected to increase by

69 percent and the number of personal care aides by 70 percent.[65]

Employers

This section focuses on the employers of workers who are currently classified as exempt under the companionship services exemption and common sources of funding for the services they provide; the next section describes the workers and the work they do. Services in the home care industry are provided through two general delivery models: Agencies and consumer-directed (which often use independent providers and family caregivers).

Figure 2 provides a visual overview of the home care industry and the two primary models for service provision, which are discussed in more detail in the sections that follow.

## Figure 2. Overview of the Home Care Industry and Funding Sources



Agency Model

Under the agency model a third party provider of home care services (usually

a home health care company) employs the direct care workers and is responsible for ensuring that services authorized by a public program or contracted for by a private party are in

[60] 2011 Statistical Abstract, U.S. Census Bureau.

[61] National Alliance for Caregiving and the American Association of Retired Persons. (1997). Family Caregiving in the U.S.: Findings from a National Study. Available at: *http://assets.aarp.org/ rgcenter/il/caregiving_97.pdf*. See also Center for Health Care Strategies, Inc. Medcaid-funded Long-term Care: Toward more Home- and Community-based Options. May 2010. Available at: *http:// www.chcs.org/usr_doc/LTSS_Policy_Brief_.pdf*.

[62] PHI, 2003. The Personal Assistance Services and Direct-Support Workforce: A Literature Review. Available at: *http://phinational.org/sites/ phinational.org/files/clearinghouse/CMS_Lit_Rev_ FINAL_6.12.03.pdf*.

[63] United States Department of Health and Human Services (2003). The Future Supply of Long-Term Care Workers in Relation to the Aging Baby Boom Generation: Report to Congress, p. v. Available at: *http://aspe.hhs.gov/daltcp/reports/ltcwork.pdf*.

[64] Bureau of Labor Statistics, U.S. Department of Labor, Quarterly Census of Employment and Wages (QCEW). NAICS 6216 and 62412. Available at *http://www.bls.gov/cew/*.

[65] Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, 2012–13 Edition, Home Health and Personal Care Aides. Available at: *http://www.bls.gov/ooh/healthcare/ home-health-and-personal-care-aides.htm* (visited February 15, 2013).

fact delivered.[66] There are currently about 89,400 establishments providing these services. These establishments also provide a variety of other health-related services, in addition to or concurrently with companionship services. In the following paragraphs we describe the industry as a whole since detailed information by the service provided is not available.

Agencies providing home care services are covered by two primary industries: Home Health Care Services (HHCS, NAICS 6216), and Services for the Elderly and Persons with Disabilities (SEPD, NAICS 62412).[67] HHCS is dominated by for-profit

agencies that are Medicare-certified and depend on public programs for three-quarters of its revenue.[68] SEPD is a rapidly growing industry that is dominated by small enterprises. Table 4 provides an overview of these two industries in terms of number of establishments and estimated revenues.

The services provided by HHCS and SEPD are paid for through either public programs such as Medicaid, Medicare, or state programs, or through private sources such as private health insurance or out-of-pocket payments. In 2009, public programs (Medicare, Medicaid, and other government spending) accounted for about 75 percent of the

annual revenue dispersed to the home health care services industry.[69][70] A review of funding sources by the CRS confirmed this finding but attributed a higher percentage of spending, 89 percent ($96.3 billion), to public payers (including Medicare, Medicaid, and other public programs such as the Veterans Health Administration and other state and local programs).[71] Due to data limitations we cannot identify funding sources for individual services provided (*e.g.*, companionship services only) and therefore the Department analyzes funding for the establishments as a whole.

TABLE 4—SUMMARY OF HHCS AND SEPD, 2011

| Industry | Establishments | Estimated revenue ($ mil.) |
|---|---|---|
| SEPD + HHCS | 89,400 | 90,800 |
| SEPD | 61,100 | 32,600 |
| HHCS | 28,300 | 58,000 |

Sources: BLS QCEW 2011; BLS NEM, 2010.

These two industries primarily employ workers as home health aides (HHAs) and personal care aides (PCAs) in addition to other occupations (e.g., nursing aides, orderlies, administrative personnel). However, not all of the HHAs and PCAs employed by these agencies perform companionship services as defined under the current exemption; these agencies provide a variety of health-related services that may be delivered in private homes (potentially companionship services) or in public or private facilities (not domestic service employment and therefore not companionship services). Additionally, the job duties of some HHAs and PCAs make them ineligible for the current companionship services exemption. Simply put, only a fraction of the workers employed by these establishments are currently performing companionship services and therefore may see changes in their wages and/or

work schedules as a result of this Final Rule.

Within these two industries there are two broad employer types: Home health care companies and private pay home care companies. Home health care companies provide medically-oriented home health care services and non-medical home care or personal assistance services. Some of these agencies are Medicare-certified; those that avoid obtaining certification do so because they do not provide the skilled nursing care required by Medicare. These companies also derive a significant portion of their revenue from the provision of medical devices to customers.[72]

Private pay agencies are smaller, emerging employers that primarily provide non-medical care for consumers and typically earn a large percentage of their revenues from private sources (e.g. out-of-pocket, long-term health

insurance).[73] Although some agencies characterized as private pay are Medicare-certified, many do not provide substantial skilled health care services but instead focus on paramedical services as well as support services such as personal care, homemaker services, and companionship services (as defined by the current regulations).[74] As of 2009, 28 states required private pay agencies to be licensed, but due to the variation in license requirements at least some of those agencies are likely to be Medicare-certified, or provide services to Medicaid beneficiaries, causing double-counting when identifying private pay agencies.[75] Based on a very limited sample, perhaps one-third of private pay agencies are not-for-profit.[76]

Private pay agencies comprise a small fraction of the total market. Some industry sources suggest the number of private pay agencies might range from 15,000 to 17,000, but admit it is difficult

---

[66] Seavey and Marquand, 2011, p. 26. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[67] These two industries are the primary employers of workers who currently perform companionship services; however, based on data reported by BLS in the National Employment Matrix there are approximately 33 other industries that also employ these workers. Since these other industries employ so few of the workers under consideration here, they will be minimally affected by this Final Rule.

[68] Seavey and Marquand, 2011, pgs 20–22. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[69] Seavey and Marquand, 2011, pgs 22, 23. WHD–2011–0003–3514. Also available at: *http://*

*phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[70] Data is not available for the Services for the Elderly and Persons with Disabilities industry.

[71] The figures are based on CRS analysis of CMS National Health Expenditure Account data for 2009. Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid," p. 4. WHD–2011–0003–5683.

[72] Seavey and Marquand, 2011, p. 15. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[73] Seavey and Marquand, 2011, p. 18, WHD–2011–0003–3514. Also available at: *http://*

*phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[74] Seavey and Marquand, 2011, page 18. BLS data also support this: 2011, Employment and Wages from Occupational Employment Statistics (OES) survey, Multiple occupations for one industry: Home Health Care Services (NAICS code 621600) and Services for the Elderly and Persons with Disabilities (NAICS code 624120). Available at: *http://data.bls.gov/oes/*. Accessed April 20, 2012.

[75] Leading Home Care. 2010. 2010 Private Pay in Home Health Care Benchmarking and State of the Industry Report, p. 17.

[76] Leading Home Care. 2010. 2010 Private Pay in Home Health Care Benchmarking and State of the Industry Report, p. 22.

to determine the overlap with other types of home care agencies.[77] Since in some states private pay agencies do not need to be licensed, it is difficult to determine the exact size of this market. Of these private pay agencies, 4,100 to 4,700 are franchises; however, this segment of the market is growing quickly, and perhaps fewer than 150 started operating before 2000.[78] Therefore, the importance of this segment of the industry may grow over time.

Comments on the NPRM indicated many private pay agencies do not provide the types of skilled services that Medicare reimburses and rely on private pay for the majority of their revenues.[79] BLS data supports this contention that private pay agencies provide fewer skilled care services; however, it is difficult to determine the degree of specialization in non-skilled support care because data are unavailable to determine how many of these agencies are Medicare-certified or are associated with Medicare-certified agencies.[80] In addition, the Companionship Services Exemption Survey (CSES) showed that private pay agencies rely on private pay and in addition the survey showed over 50 percent of respondents provided services covered by public payers such as Medicare, Medicaid, and the Department of Veterans Affairs (VA). With a focus on less skilled home care services, agencies in the private pay sector generally appear to be more reliant on private payers than home health care companies are, but the degree of reliance is unclear.[81]

## Consumer-Directed Models

Under the consumer-directed models, the consumer or his/her representative has more control than in the agency-directed model over the services received, as well as when, how, and by whom the services are provided. Some consumer-directed services are purchased privately—that is, out-of-pocket or with private long-term care insurance; however, most consumer-directed services are paid with public funds, primarily Medicaid waiver and state plan programs.[82] The following discussion provides an overview of Medicaid-funded consumer-directed programs.

There are two distinct types of Medicaid-funded "consumer-directed services" programs: "employer authority" and "budget authority". The "employer authority" model gives consumers and their representatives choice and control only with respect to the employment of "independent providers" of direct care in the consumer's home. The "budget authority" model gives consumers a "budget" (usually a monthly allowance, but unspent funds may be carried month-to-month within the year) that may be used to purchase a range of goods and services of the consumer's choosing that include, but are not limited to, human assistance from directly hired workers, and other goods and services that may include, for example, assistive devices, home modifications, home-delivered meals, and transportation.[83]

Both models permit self-directing consumers and/or their representatives (usually family caregivers) to hire/fire, schedule, and supervise individual independent providers (direct care workers) to provide home care. The direct care workers are often recruited from among existing networks of the consumer's family, friends, and neighbors. In addition, consumers train or participate in training the direct care workers they employ. They also participate in paying their direct care workers, most typically by co-signing their direct care workers' timesheets before they are submitted to the public program for payment, certifying that the work was performed in accordance with the information on the timesheet, which serves as the direct care worker's bill or claim for reimbursement. The budget authority model differs from the employer authority model primarily in giving consumers more flexibility to determine how many hours of direct care service they wish to obtain and to make agreements directly with their direct care workers regarding hourly wages and benefits, so long as the cost of consumer-directed home care services does not exceed the amount of funds available in the consumer's budget.

The budget authority model of consumer direction is often referred to colloquially as "cash and counseling", based on the name of former, special, time-limited Medicaid research and demonstration ("1115") waiver programs. These and subsequent programs based on the cash and counseling model are now fully integrated into the Medicaid programs in their respective states and operate under ongoing state plan or HCBS waiver authority, and some states have incorporated elements of budget authority consumer direction in programs funded by CMS' Money Follows the Person grants to states. Other HCBS programs that rely exclusively or primarily on public funding sources other than Medicaid have also incorporated consumer-directed options patterned after original cash and counseling programs.

Although consumer-direction of HCBS is not new,[84] a number of developments greatly spurred growth in consumer-directed services programs in the 2000s. Medicaid-funded budget authority consumer-directed programs did not exist until the first three Cash & Counseling demonstration programs (in Arkansas, Florida, and New Jersey) began in the late 1990s. Favorable evaluation findings from these early demonstration programs led to changes to Medicaid law, regulation, and policy specifically designed to facilitate and encourage states to offer budget authority consumer-directed services

[77] Home Care Pulse. 2011. 2011 Annual Private Duty Home Care Benchmarking Study. Highlights Edition, p. 5; Leading Home Care. 2010. 2010 Private Pay in Home Health Care Benchmarking and State of the Industry Report, p. 17. In addition, the industry benchmark reports appear to double-count licensed agencies; thus the number might be significantly smaller.

[78] Home Care Pulse. 2011. 2011 Annual Private Duty Home Care Benchmarking Study. Highlights Edition, pp. 5 and 21.

[79] Private Duty Homecare Association. (2012). Companionship Services Exemption Survey (CSES), January 23. WHD–2011–0003–9175.

[80] Bureau of Labor Statistics. May 2011. Employment and Wages from Occupational Employment Statistics (OES) survey, Multiple occupations for one industry: Home Health Care Services (NAICS code 621600) and Services for the Elderly and Persons with Disabilities (NAICS code 624120). Available at: *http://data.bls.gov/oes/*. Accessed April 20, 2012. Leading Home Care. (2010). 2010 Private Pay in Home Health Care Benchmarking and State of the Industry Report.

[81] Comments on the NPRM indicated many private pay agencies do not provide the types of skilled services that are Medicare reimbursable and rely on private pay for the majority of their revenues (e.g., Private Duty Homecare Association. (2012). Companionship Services Exemption Survey (CSES), January 23, WHD–2011–0003–9175). BLS data supports this contention that fewer skilled care services are provided (*id.*). However, it is difficult

to determine the degree of specialization in non-skilled support care because data are unavailable to determine how many of these agencies are Medicare-certified or are associated with Medicare-certified agencies (Leading Home Care. 2010. 2010 Private Pay in Home Health Care Benchmarking and State of the Industry Report). In addition, the same survey that showed these agencies rely on private pay also showed over 50 percent of respondents provided services covered by public payers such as Medicare, Medicaid, and the Veterans Administration (CSES).

[82] "Growth and Prevalence of Participant-Direction: Findings from the National Survey of Publicly-Funded Participant-Directed Services Programs, by Mark Sciegaj and Isaac Selkow, available at *http://web.bc.edu/libtools/details.php?entryid=340.*

[83] Doty, P., Mahoney, K.J. & Sciegaj, M. 2010 (January). New State Strategies to Meeting Long-term Care Needs. *Health Affairs*, 29 (1) 49–56.

[84] California's In-Home Supportive Services program, which currently has 440,000 participants, began in 1973, and other sizable programs in Washington, Oregon, Michigan, and Massachusetts began in the late 1970s or early 1980s.

options.[85] In addition, Older Americans Act funding for the National Family Caregiver Support program provided an impetus to consumer-directed services that allow family caregivers more choice and control in accessing respite services.[86]

A major characteristic of consumer-directed services programs is that they permit public program participants to hire direct care workers who are family members, friends, and neighbors and research has found that most consumers choose to recruit direct care workers who are relatives or individuals with whom they were previously acquainted. A minority of consumers in consumer-directed programs locate individuals known to them who are seeking work as providers of home care services via referrals from worker registries, through newspaper ads, or through internet social media and advertising sites.

According to the comment from the California State Association of Counties (CSAC), County Welfare Directors Association of California (CWDA), California Association of Public Authorities for In-Home Supporting Services (CAPA) and California IHSS Consumers Alliance (CICA) on the NPRM, approximately 70 percent of all IHSS providers in California are family members of the consumer.[87] Research projects conducted by HHS also show that consumers often hire their family members as direct care workers. For example, in the original Cash & Counseling Demonstration programs, 58 percent of directly hired workers in Florida, 71 percent in New Jersey, and 78 percent in Arkansas were related to the consumer. About 80 percent of those directly hired workers had provided unpaid care to the consumer before the demonstration began and continued to provide additional unpaid care after becoming paid workers.[88] In addition, since the passage of the National Family Caregiver Support Program enacted

under the Older Americans Act Amendments of 2000, Medicaid and other state-funded programs have provided the bulk of public financing to support family caregiving.[89] A survey of state consumer-directed and family caregiving programs found that:

• Over one-half (86 out of 150, or 57 percent) of the programs in 44 states and the District of Columbia allow family members to be paid to provide care. Only six states (Alaska, Delaware, Mississippi, Nevada, Pennsylvania, and Tennessee) did not allow payments to family members in any of their programs at the time of the study.[90]

• Of the 86 programs that allow relatives to be paid providers, 73 percent allow family members to provide personal care, 70 percent allow family members to provide respite care, 20 percent allow family members to act as homemakers or do chores, and 6 percent allowed family members to provide any service needed.[91]

• Some programs place restrictions on what type of family members are allowed to be paid providers. Among these 86 programs, 61 percent do not permit spouses to be paid providers, while others do not permit parents/guardians (37 percent), primary caregivers (18 percent), legal guardians (8 percent), children 18 and under (6 percent), or other relatives (4 percent).[92]

As noted in the research, while many consumer-directed programs allow paid family caregivers, some consumer-directed programs place restrictions on the employment of relatives. Such restrictions are usually limited to prohibiting paid caregivers who are ''legally responsible'' relatives—that is, those who may have financial obligations to public program participants (consumers) under state laws, such as spouses, parents of minor children, and guardians, especially when their income could be counted in determining the program participant's future eligibility for means-tested public benefits.

Of those states that offer Medicaid-funded consumer-directed services, some have implemented a ''public authority'' design. The public authority design applies to both the employer

authority and budget authority models of consumer-directed programs. Under the public authority design, the public authority or some other governmental or quasi-governmental entity (often termed a ''home care quality commission'' or ''workforce council'') plays a role in setting compensation and providing other benefits of employment for the direct care worker, who is compensated by public funds. In an effort to connect participants in consumer-directed programs with direct care workers, some states and public authorities have created matching registries. While use of these registries is voluntary on the part of consumers and direct care workers, these systems provide some insight into how consumers identify care providers to meet their needs. Depending on the registry, consumers can either search the worker database online, or speak to trained staff who conduct the search and report the results to the consumer. Some registries may also offer worker screening and orientation, access to consumer and worker training, and recruitment and outreach to potential workers.[93] Others stipulate that providers in the database have not been pre-screened in any way and such responsibilities lie with the consumer. The Department also identified private sector registries that operate under a number of models. For example, one not-for-profit registry[94] recruits, screens, and checks the references of local care providers, but the care workers are self-employed and work as independent providers. Other private sector entities refer to themselves as registries,[95][96][97][98] but appear to be operated under an agency or quasi-agency model, with the consumer paying the company a weekly or bi-weekly registry fee in addition to paying the direct care worker, or with the company receiving some portion of the direct care worker's hourly rate.

The public authority or other governmental or quasi-governmental

[85] Doty, Mahoney and Sciegaj, Health Affairs, January 2010.

[86] Feinberg, L. & Newman, S. (2005). Consumer Direction and Family Caregiving: Results from a National Survey, State Policy in Practice. Available at: *http://www.hcbs.org/files/79/3926/Consumer Direction&FamilyCaregivingNWEB.pdf.* Feinberg, L. et al. (2004). The State of the States in Family Caregiver Support: A 50-State Study. San Francisco, CA: Family Caregiver Alliance. Available at: *http://www.caregiver.org/caregiver/jsp/content_node.jsp?nodeid=1276.*

[87] WHD–2011–0003–9420

[88] U.S. Department of Health and Human Services. (2005). Experiences of Workers Hired Under Cash and Counseling: Findings from Arkansas, Florida and New Jersey. Available at: *http://aspe.hhs.gov.daltcp/reports/workerexp.pdf.;* Foster, Leslie, Dale, Stacy B.& Brown, Randall S. 2007 (February). How Caregivers and Workers Fared in Cash and Counseling. Health Services Research 42(1) Part II: 510–532.

[89] Feinberg, L. & Newman, S. (2005). Consumer Direction and Family Caregiving: Results from a National Survey, State Policy in Practice. Available at: *http://www.hcbs.org/files/79/3926/Consumer Direction&FamilyCaregivingNWEB.pdf.* Feinberg, L. et al. (2004). The State of the States in Family Caregiver Support: A 50-State Study. San Francisco, CA: Family Caregiver Alliance. Available at: *http://www.caregiver.org/caregiver/jsp/content_node.jsp?nodeid=1276.*

[90] Feinberg & Newman, 2005. p. 8.

[91] Feinberg & Newman, 2005. p. 8.

[92] Feinberg & Newman, 2005. p. 9.

[93] PHI, 2011a. The PHI Matching Services Project. Available at: *http://phinational.org/policy/the-phi-matching-services-project/.*

[94] Meals on Wheels and Senior Outreach Services. (2011). Home Care Registry. Available at: *http://www.mowsos.org/about-us/.*

[95] Experienced Home Care Registry. (2011). About Us. Available at: *http://www.experiencedhomecare/about-experienced-home-care/.*

[96] Angelic Nursing & Home Care Registry, Inc. (2011). Home Care Services for Seniors in Tolland and Hartford Counties in Connecticut. Available at: *http://www.linkedin.com/company/angelic-nursing-&-home-health-care-services-registry-inc-.*

[97] Golden Care Co. Inc. 2011. Billing Policy. Available at: *http://www.goldencareco.com/.*

[98] American HealthCare Capital. (2011). $1.5 Million Oregon Private Pay Homecare Registry for Sale. Available at: *http://www.americanhealthcarecapital.com/listings/completed-listings/.*

entity acts as the "employer-of-record" of consumer-directed workers for the purpose of engaging in collective bargaining with a union representing consumer-directed workers. Direct care workers in this system have the option to select representatives for collective bargaining with the state. Direct care workers providing services to consumers through consumer-directed programs in states such as California, Washington, Oregon, Illinois, and Massachusetts have collective bargaining rights. In those states, unions may engage in collective bargaining with the state over wages and benefits

for workers whose wages and benefits are paid for with Medicaid funding. In other states, unionization of consumer-directed home care workers has been authorized by the legislature and the process is underway but collective bargaining over Medicaid provider rates has not yet been implemented.[99] In some states with consumer-directed programs, consumer-directed home care workers do not have collective bargaining rights.

Funding Sources

There are a variety of different funding sources for provision of home

care services of all types. Table 5 provides an overview of these funding sources, consumer eligibility requirements, and types of home care services covered. Public funding sources such as Medicare and Medicaid provide a majority of the reimbursement for services.[100] In 2009, Medicare and Medicaid accounted for 73 percent of home care services revenue, followed by 14 percent from private insurance coverage, 4 percent from consumers paying out-of-pocket, and the remaining 8 percent contributed by a mix of other sources.[101]

TABLE 5—SUMMARY OF HOME CARE SERVICE PAYERS AND SERVICE COVERAGE

| Payer | Description | Eligibility | Home care service coverage |
|-------|-------------|-------------|----------------------------|
| **Public** | | | |
| Medicare ................ | Federal government program to provide health insurance coverage, including home health care, to eligible individuals who are disabled or over age 65. | Individual is under the care of a doctor and receiving services under plan of care; has a certified need for intermittent skilled nursing care, physical therapy, speech-language pathology services, continued occupational therapy; and must be homebound. | Intermittent skilled nursing care, physical therapy, speech-language pathology services, continued occupational therapy. |
| | The program pays a certified home health agency for a 60 day episode of care during which the agency provides services to the beneficiary based on the physician approved plan of care. | HHA providing services is Medicare-certified; services needed are part-time or intermittent, and are required <7 days per week or <8 hours per day over 21 day period. | Does not cover 24 hr/day care at home; meals delivered to home; homemaker services when it is only service needed or when not related to plan of care; personal care given by home health aides when it is only care needed. |
| Medicaid ................ | A joint federal-state medical assistance program administered by each state to provide coverage for low income individuals.. | Eligibility and benefits vary by state. In general, states provide health care coverage to low income families with dependent children; pregnant women; children; and aged, blind and disabled individuals. Beginning in 2014, states have the option to extend coverage to additional non-elderly low-income individuals. | Coverage of home health services must include part-time nursing, home care aide services, medical supplies and equipment. Optional state coverage may include audiology; physical, occupational, and speech therapies; and medical social services. |
| | The program pays home health agencies and certified independent providers. | States also have the option to provide home and community-based services to individuals who meet eligibility for institutional care or meet state-defined criteria based on need. | Coverage is provided under: Medicaid Home Health, State Plan Personal Care Services benefit, and Home and Community-Based state plan services and waivers. |
| Older Americans Act. | Provides federal funding for state and local social service programs that provide services so that frail, disabled, older individuals may remain independent in their communities. | Must be 60 yrs of age or older ............. | Home care aides, personal care, chore, escort, meal delivery, and shopping services. |
| Department of Veterans Affairs. | Home health care services provided by VA employees and contractors. | All enrolled Veterans and Veterans who can receive outpatient care without enrollment. | Interdisciplinary Home Based Primary Care, Skilled home health care services, home hospice and palliative care, home respite, and homemaker and home health aide services. |
| Social Services Block Grant. | Federal block grants to states for state-identified service needs. | Varies by state ...................................... | Often includes program providing home care aide, homemaker, or chore worker services. |

[99] Seavey and Marquand, 2011, p. 28. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational/files/clearinghouse/caringinamerica-20111212.pdf.*

[100] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid," p. 4. WHD–2011–0003–5683.

[101] Seavey and Marquand, 2011, p. 23. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational/files/clearinghouse/caringinamerica-20111212.pdf.*

TABLE 5—SUMMARY OF HOME CARE SERVICE PAYERS AND SERVICE COVERAGE—Continued

| Payer | Description | Eligibility | Home care service coverage |
|---|---|---|---|
| Community organizations. | Some community organizations provide funds for home health and supportive care. | Varies by program ................................ | Covers all or a portion of needed services. Vary by program. |
| **Private** | | | |
| Commercial Health Insurance Companies. | Many policies cover home care services for acute, and less often, long-term needs. | Varies by policy ..................................... | Varies by insurance policy. |
| Supplemental Insurance. | May cover some personal care services when a Medicare beneficiary is receiving covered home health services. | Varies by policy; not required for standard Medigap insurance. | |
| Private pay ............. | The individual receiving the services pays "out of pocket." | Individuals who are not eligible for covered services under third party public or private payers. | Services that do not meet the eligibility criteria of other payers. |

Sources: National Association for Home Care. 1996. Who Pays for Home Care Services? Available at: *www.nahc.org/consumer/wpfhcs.html;* Centers for Medicare and Medicaid Services (CMS). Medicare and Home Health Care. Available at: *http://www.medicare.gov/publications/pubs/ pdf/10969.pdf.*

Industry commenters (NPDA, IFA) suggest that Medicare covers little provision of companionship services. However, the Department believes the key to understanding Medicare reimbursement of these types of services lies not in the "does not cover" statements in the Table 5 summaries, but rather in the qualifying clauses that clarify that Medicare does not reimburse: "homemaker services *when it is only service needed or when not related to plan of care;* personal care given by home health aides *when it is only care needed"* [emphasis added]. Analysis of the 2009 Medical Expenditure Panel Survey (MEPS) showed that of 14.4 million home care episodes paid for by Medicare (and no Medicaid), the consumer received care from an HHA, PCA, Companion or Homemaker in 6.1 million episodes (42.5 percent).[102] As noted above, the workers performing this work may be classified as exempt from the FLSA's minimum wage and overtime compensation requirements under the current companionship services exemption. Although the percent of care provided by these workers during each episode cannot be determined from MEPS, the Department believes these data are sufficient to show that services frequently provided by direct care workers commonly classified as "Companions" (who may meet the current companionship exemption) may be included in a Medicare-covered episode of care in certain circumstances

though provision of such services is not separately billed or paid by Medicare.

In 2012, HHS outlays for Medicare programs were projected to total $591 billion and HHS and state outlays in support of Medicaid totaled $459 billion. Under Medicare, an estimated $34.1 billion went to home health programs.[103] Medicaid expenditures on home care programs are concentrated in three types of programs: State Home Health, State Personal Care Services (PCS), and Home and Community-Based Services (HCBS) 1915(c) waiver programs. In 2009, Medicaid spent approximately $50.0 billion of $374 billion in total expenditures on these programs, including $5.3 billion on Home Health, $11 billion on PCS, and $33.7 billion on HCBS waiver programs.[104][105] Thus, payments for home care programs composed approximately 6 percent of Medicare spending, and about 13 percent of Medicaid spending.

Both Medicare and Medicaid pay the service provider directly. The Medicare program uses a prospective payment system (PPS) to reimburse home health

agencies a pre-determined base payment for an episode of care; this base payment is adjusted for the condition and needs of the beneficiary as well as geographic variation in wages.[106] Under Medicaid, the state agency implementing the program pays the service provider directly except under certain consumer-directed programs.

The Medicare and Medicaid programs also work together to provide services for a group of consumers referred to as "dual eligibles," that is, consumers that are eligible for both Medicare and Medicaid coverage. Studies have found that individuals covered by both Medicare and Medicaid are among the most expensive groups to cover and are more likely to use more Medicare-covered home care services than Medicare home care consumers not also covered by Medicaid. Also, states with low Medicaid spending appear to shift costs to the Medicare home care program spending.[107] Most of the public matching registries are funded by the state, with a few receiving federal dollars through reimbursement for Medicaid administrative costs or receiving initial funding through federal Medicaid Systems Transformation grants.[108]

Just focusing on raw percentages of services paid through public funding, however, obscures an important characteristic of private pay account

---

[102] For Medicare with no Medicaid, MEPS shows 5.04 of 8.71 million episodes (57.9 percent) of home care utilized an HHA, PCA, Companion or Homemaker; for consumers paying any out-of-pocket for home care, 1.05 of 4.19 million episodes (25 percent) used at least one of those categories of workers.

[103] Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011–2021. Available at: *http:// www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/National HealthExpendData/Downloads/Proj2011PDF.pdf.*

[104] Detailed Medicaid data by type of home care are not yet available past 2009.

[105] Kaiser commission on Medicaid and the Uninsured. 2012 Medicaid Home and Community-Based Services Programs: 2009 Data Update.

Note, not all of the HCBS goes to personal care services; a more detailed breakdown of this spending is not available. For additional data, see Kaiser Family Foundation, State Health Facts, p. 2: *http://kaiserfamilyfoundation.files.wordpress.com/ 2013/01/7720-06.pdf.* Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011–2021.

[106] For additional detail see Center for Medicare & Medicaid Services (CMS). 2011a. Home Health PPS. Available at: *http://www.cms.gov/ HomeHealthPPS/.*

[107] Center for Medicare & Medicaid Services (CMS). 2011b. Home Health Study Report: Literature Review, pg.16. Available at: *http:// www.cms.gov/HomeHealthPPS/Downloads/ HHPPS_LiteratureReview.pdf.*

[108] Seavey & Marquard, 2011.

home care, i.e., that any single episode of home care service utilization appears to be paid almost completely by a single payer. The Department found that data from MEPS provided insight into this issue. MEPS is a set of large-scale surveys of families and individuals, their medical providers, and employers across the United States published by AHRQ. MEPS collects data on the specific health services that Americans use, how frequently they use them, the cost of these services, and how they are paid for, as well as data on the cost, scope, and breadth of health insurance held by and available to consumers. The Home Health section of the survey asks whether: (1) The care was medical or non-medical; (2) the direct care worker was from an agency, an independent provider, or an informal direct care worker; (3) the care resulted from specific or general health problem (including "old age"); (4) the consumer received care associated with activities of daily living or personal care; and (5) the direct care worker provided companionship. The Department therefore believes that private pay home care services provided by private pay agencies are captured by this survey.

In MEPS the Department found that of 9.8 million episodes of care for which Medicaid paid any amount, Medicaid paid for almost 94 percent and Medicare paid for almost 6 percent of all expenditures; less than 1 percent of expenditures were paid for by other sources. Similarly, of the 14.4 million episodes of care for which Medicare paid some amount (after excluding those episodes for which Medicaid was paid), Medicare paid for over 97 percent of expenditures. Although only 3.2 million episodes of home care were paid for primarily out-of-pocket (after excluding episodes in which any part of expenditures were paid by Medicare or Medicaid), almost 99 percent of expenditures on those services were paid out-of-pocket.[109]

This pattern of payments affects the impact of increased costs resulting from this rule on the providers (e.g., agencies and independent providers) and consumers of home care services. To the extent that providers' costs increase, but Medicare and Medicaid reimbursement rates do not increase, part of the impact may be incurred by the providers in the form of a smaller profit margin for these services. Consumers paying out-of-pocket, however, might be more sensitive to a rate increase because the

individual pays the entire amount, and the provider risks inducing a reduction in demand for its services. The majority of the direct care workers documented in the MEPS data are agency-employed, and the agency would not be able to claim the exemption under the Final Rule; however, in the event that the consumer has selected an independent provider as the direct care worker, the worker would continue to be considered exempt, provided the direct care worker meets the duties requirements for the exemption, and therefore the consumer may not experience an increase in costs.

### E. Direct Care Workers

This section provides an estimate of the total number of direct care workers who may be impacted by the Final Rule as well as the characteristics of these workers, the services they provide, and the wages they receive for their work.

#### Number of Affected Workers

The workers who will be directly affected by the change to the companionship exemption are concentrated in two occupations: Home Health Aides (SOC 31–1011) and Personal Care Aides (39–9021). These workers are concentrated in two industries: Home Health Care Services (NAICS 6216) and Services for the Elderly and Persons with Disabilities (NAICS 62412).

These workers are predominantly women in their mid-forties or older, minorities, with a high school diploma or less education but this varies highly by region. A similar percentage of PCAs are Black and Hispanic (22 percent and 18 percent, respectively), but a much higher percentage of HHAs are Black (35 percent) than Hispanic (8 percent). One in four (23 percent) PCAs are foreign-born, with higher percentages (over 45 percent) in certain regions of the country, e.g., California and New York. California also has a high percentage of direct care workers who are paid family members.[110]

Direct care workers are called by a variety of titles, including: Home health aides, home care aides, personal care aides, personal assistants, home attendants, homemakers, companions, personal care staff, resident care aides, and direct support professionals. They are tracked by the following occupational titles.[111]

Personal Care Aides (SOC 39–9021): "Assist the elderly, convalescents, or persons with disabilities with daily living activities at the person's home or in a care facility. Duties performed at a place of residence may include keeping house (making beds, doing laundry, washing dishes) and preparing meals. May provide assistance at non-residential care facilities. May advise families, the elderly, convalescents, and persons with disabilities regarding such things as nutrition, cleanliness, and household activities." The BLS does not have a separate SOC for "Companions, elderly"; they are classified as PCAs.

Home Health Aides (SOC 31–1011): "Provide routine individualized healthcare such as changing bandages and dressing wounds, and applying topical medications to the elderly, convalescents, or persons with disabilities at the patient's home or in a care facility. May also provide personal care such as bathing, dressing, and grooming of patient."

Companionship services as defined in this Final Rule are separate from the services provided by home health and personal care aides as defined by BLS above and outlined in detail below. For the reasons described in the summary of public comments, throughout this analysis the Department refers to HHAs and PCAs when referring to the workers that fit the occupational definitions above, and uses the more general term "direct care workers" to refer to the broader group of workers (e.g., HHAs, PCAs, and companions) providing the types of services described above.

The Department uses BLS' employer-based OES estimates of the number of workers in the HHA and PCA occupational categories as its best estimate of the number of direct care workers employed by agencies that might be affected by the Final Rule. There were approximately 1.75 million direct care workers employed by agencies in 2011, composed of

- 924,700 HHAs, and
- 820,600 PCAs.[112]

These data do not include workers providing these services as independent providers who may be affected by the Final Rule. As described above, the Department determined that an estimated additional

- 24,000 HHAs, and
- 158,700 PCAs [113]

[109] ERG analysis of MEPS data. Agency for Healthcare Research and Quality (AHRQ). Medical Expenditures Panel Survey. 2009. Available at: *http://meps.ahrq.gov/mepsweb/data_stats/download_data_files.jsp.* Accessed March, 2012.

[110] Seavey and Marquand, 2011, pgs. 11 and 29. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf.*

[111] BLS. 2011. Standard Occupational Classification, available at: *http://www.bls.gov/soc/home.htm.*

[112] 2011 BLS Occupational Employment Survey, employment and wages for SOC codes 39–9021 and 31–1011.

[113] BLS, NEM 2010, adjusted to reflect 2011 values.

can be considered independent providers directly employed by families. Thus, we estimate

- 948,600 HHAs, and
- 979,300 PCAs

for a total of 1.93 million direct care workers who might be affected by the Final Rule.

However, not all 1.93 million of these HHAs and PCAs are employed as FLSA-exempt companions, and some of these workers are already covered by minimum wage and overtime provisions at the state level. Many of these workers are employed at agencies that provide a variety of health-related services that may or may not be provided in the home; HHAs and PCAs employed in facilities, such as nursing homes and hospitals, are not engaged in domestic service employment and cannot be classified as providing companionship services. Furthermore, HHAs and PCAs who work in the home might be employed to perform services that fall outside the definition of companionship services, and therefore, do not qualify for the companionship services exemption. As will be discussed in further detail below, direct care workers in these occupational classifications provide a similar range of services, but the services provided by any specific direct care worker vary in emphasis and intensity depending on the specific job or consumer. Thus, this category of direct care worker might best be thought of as providing a mix of services along a continuum ranging from one end of the spectrum that focuses more on medicalized care, to the opposite end that might consist primarily of providing fellowship and protection. Those direct care workers at the more medicalized end of the spectrum may not be performing services considered to be companionship services and might not currently be employed under the companionship services exemption (although the case law interpreting the current exemption allows for the performance of significant medical duties). Thus, the Department considers the category of direct care workers used as the basis for this analysis, composed of HHAs and PCAs employed in the home, as an upper-bound estimate of the number of direct care workers employed as companions. An unknown, but potentially significant, percentage of these workers are not currently employed under the existing companionship exemption and will not be affected by this rulemaking. The Department will estimate the number of workers directly affected by both the minimum wage and overtime compensation provisions of the Final Rule.

While many agency-employed direct care workers might work in various facilities that make them ineligible for the FLSA companionship services exemption, there is little information available concerning independent providers, particularly independent providers who provide services to consumers in consumer-directed programs. Because these sometimes informal arrangements are made directly between the consumer and the direct care worker/independent provider, there are limited data on the total number of consumers and limited information on the total number of providers. The Department estimated the number of independent providers in 2011 using BLS National Employment Matrix (NEM) data for 2010 and inflating the values to reflect 2011 (the base year in the model). Approximately 92,200 PCAs (10.3 percent) are employed in private households and 66,500 (7.4 percent) are self-employed, for a total of 158,700 workers (17.7 percent) who may provide services as independent providers.[114] Fewer HHAs are employed in this manner, with 3,600 (less than one percent) working for private households and 20,300 (about two percent) who are self-employed for a total of approximately 23,900 (2.2 percent) workers who may provide services as independent providers. Combining the data for HHAs and PCAs suggests that 182,600 of these workers (9.5 percent) may be either self-employed or employed in private households. The Department believes that these workers can reasonably be described as independent providers who provide direct care worker services to individuals or families.

However, it is likely that not all independent providers of home care are captured in the NEM. For example, in its comment on the proposed rule, the National Resource Center for Participant-Directed Services (NRCPDS) cited a study of 298 publicly funded participant-directed programs serving approximately 810,000 people.[115] The study found that California accounted for 59 percent of enrollments in participant-directed programs. The study did not provide information on the number of direct care workers, including independent providers, of

publicly-funded home care employed by these program participants; however, this number is undoubtedly larger than the BLS estimate of independent providers of home care employed in private homes, which was not restricted to those whose services were purchased with public funds. As discussed in detail below, to the extent that data on direct care workers, other than that included in the OES or NEM was made available to the Department, we have revised the analysis of the number of direct care workers in an attempt to better reflect direct care workers providing services through consumer-directed programs. The Department assumes that all HHAs and PCAs classified in the NEM as self-employed or employed by households are independent providers directly employed by the family, meet the requirements for exemption, and are thus by assumption currently exempt from the FLSA's minimum wage and overtime compensation requirements.

Tasks, Wages, Hours

The Final Rule defines companionship services to include fellowship, protection, and care, defined as a limited amount of assistance with activities of daily living and instrumental activities of daily living.

- Fellowship means "to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events." Fellowship services are typically not covered by public programs.
- Protection means "being present with the person in their home or to accompany the person when outside of the home to monitor the person's safety and well-being." Some states reimburse specific types of consumers (i.e., those living with mental disabilities) for protection services.
- Care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

Since enactment of the companionship services exemption, the spectrum of tasks performed by workers for whom the exemption is claimed has expanded to include: Activities of daily living (ADLs), instrumental activities of daily living (IADLs), and paramedical

---

[114] BLS, 2010, projected to reflect 2011 employment.

[115] WHD–2011–0003–9474; "Growth and Prevalence of Participant-Direction: Findings from the National Survey of Publicly-Funded Participant-Directed Services Programs, by Mark Sciegaj and Isaac Selkow, available at *http://web.bc.edu/libtools/details.php?entryid=340.*

("medicalized") tasks.[116] Paramedical tasks may include tasks such as changing of aseptic dressings, administration of non-injectable medications (e.g., blood pressure medication in tablet form);[117] and ostomy, catheter and bowel hygiene.

As mentioned above, the Department believes the services provided by these direct care workers can best be thought of as existing along a continuum; the Department found data in MEPS which supports this view of the tasks currently classified as companionship services. MEPS shows that of the estimated 6.3 million individuals receiving home care services in 2009, 92 percent (5.8 million) received care from agency-provided direct care workers. Of these consumers, 37 percent received care from HHAs, 9.7 percent from PCAs, and 3.8 percent from "Companions" (MEPS uses job titles rather than SOCs for the survey). In describing the services provided by these direct care workers, it was difficult to distinguish major differences between types of workers. For example:

• 100 percent of those receiving care from Companions received "companionship services," about 53 percent of those receiving care from HHAs and PCAs also received such services from their HHA or PCA.

• 90 percent of those receiving care from PCAs received help with daily activities from their PCA; 71 percent receiving care from Companions also received help with daily activities from their Companion.

• 45 percent of those receiving care from HHAs received medical treatment from their HHA, 20 percent receiving care from Companions also received medical treatment from their Companion.

• 22 percent of those receiving care from a Companion received services such as homemaking from their Companion; 7 percent of those receiving care from a PCA also received such services from their PCA.

Therefore, the Department believes those employed under the job titles of HHA, PCA, and Companion (hereafter described as direct care workers for consistency with the remainder of the document) are best considered as providing a mix of services along a continuum ranging from more medicalized care at one end of the spectrum, to the opposite end that might consist primarily of providing fellowship and protection.

While HHAs and PCAs overlap in the type of services they provide, it is primarily HHAs who are employed by Medicare-certified agencies who may be asked to perform paramedical tasks. Those workers are required by Medicare to be trained and certified to perform these types of tasks.

Generally speaking, a home health aide or agency is authorized to provide a specific number of hours of service to consumers depending on their needs in the case of public funding, or agrees to provide a specific number of hours of service in the case of private pay. Agencies work to schedule direct care workers to cover the number of hours needed for the portfolio of cases they have, often taking into account continuity of service to each recipient, total number of hours each worker is scheduled per week, frequency of weekend services needed, and the distance between the direct care worker's home residence and the consumer's residence.

In the home care industry, agencies may offer to provide services seven days a week and 24 hours a day. One survey indicated private pay agencies provide 24-hour or live-in care to 10 percent of their consumers.[118] This type of schedule is frequently staffed using 12-hour shifts, 24-hour shifts, or by having the direct care worker live in the consumer's home. These cases are of particular concern with respect to overtime. A 12-hour case is a consumer who requires services to be provided by a direct care worker for a 12-hour block of time; a 24-hour case is a consumer who requires a direct care worker to be present to provide services around the clock. The key scheduling concerns that agencies contend exist with these cases are that:

• It is difficult to redistribute overtime hours to workers with fewer hours because workers are scheduled to work in lengthy shifts (up to 24 hours);

• Direct care workers are typically paid an hourly rate, and the employer would be required to pay an hourly overtime premium when applicable; however, Medicaid and other payers often reimburse agencies for these cases on a flat rate that does not account for overtime premiums or other costs;

• 24-hour shifts usually include a five- to eight-hour period to allow the worker to sleep while on site; however, the aide is not necessarily off-duty because s/he would be expected to assist the consumer if an urgent need arose. If the agency is required to count sleep hours toward the total number of hours worked per week then it may become costly to provide 24-hour care.

• Because of the intimate nature of providing such services in the consumer's home, consumers prefer having a single or a small number of direct care workers. This limits the ability of agencies to avoid paying overtime premiums by having more staff work fewer hours. In addition, having too many direct care workers can reduce continuity of care for the consumer; on the other hand, having too few direct care workers may also result in reduced continuity of care if one of those direct care workers becomes unavailable.

Private pay agencies have developed a two-tier pricing structure to make 24-hour private pay care cost competitive with nursing home care. Consumers may choose between paying for service on an hourly basis or pay a single flat rate for 24-hour care. According to the IHSGI survey, direct care workers are paid on average $9.87 per hour or $133 for 24 hours under the flat rate. The Department estimates that agencies charge consumers about $18.30 per hour for hourly service, and about $250 under the 24-hour flat rate.[119] According to the MetLife Market Survey of Long-Term Care Costs, the average private room nursing home rate in 2011 was about $240 per day.[120] Although it is reasonable to assume that consumers are willing to pay a premium to be able to stay in their homes, these results indicate that private pay agencies face constraints concerning how much they can increase their rates without having consumers choose to switch to a nursing home.[121] This affects a small minority of

---

[116] Seavey and Marquand, 2011, pg. 7. WHD–2011–0003–3514, *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf.*

[117] Administration of an injectable medication is a medical task generally performed by workers with additional training in medical tasks, such as Certified Nurse Assistants (CNAs).

[118] See, for example, IHS Global Insight (IHSGI). 2012. Economic Impact of Eliminating the FLSA Exemption for Companionship Services. WHD–2011–0003–8952. However, this analysis is based on a survey administered by IHSGI on behalf of the International Franchise Association in response to the NPRM; the survey was received by those private pay franchisees belonging to the 9 franchise chains that facilitated the survey, and response was voluntary. Therefore it is impossible to determine whether the responses are representative of the industry as a whole, or the degree of response bias. The survey represents the work patterns for at least one group of agencies in this industry; it simply cannot be determined how representative the responses are for the entire industry.

[119] The Department multiplied the reported pay rates by the ratio of revenues to wages from Home Care Pulse, 2011. We were able to confirm that the hourly rates were approximately the right magnitude from the MetLife Market Survey of Long-Term Care Costs (MetLife Mature Market Institute. October 2011).

[120] MetLife, 2011.

[121] Conversely, this does raise the question as to what percent of consumers need 24-hour care to remain in their homes. With the two-tier pricing structure, there is a discontinuity in the demand curve: for 13 hours of care or less, it is cheaper to
Continued

consumers. Based on the IHSGI survey, less than 10 percent of consumers cared for by survey respondents receive 24-hour home care. Indeed, 65 percent require less than 40 hours of care per week.

To add to the complexity of concerns about the size of potential overtime premiums when the consumer needs 24-hour care 7 days a week, industry publications and comments on the NPRM appear to use the terms "24-hour" and "live-in" synonymously. However, these terms have precise and separate meanings under the FLSA, and very different implications for overtime compensation. Under the general FLSA requirements:

• Employees on duty for periods of 24 hours or more may have bona fide scheduled sleeping periods of not more than 8 hours excluded from hours worked (with certain additional criteria concerning conditions, including that the employee must be able to get at least 5 hours of sleep). Thus, an employee on a shift of 24 hours or more might be eligible to be paid for 16 to 19 of the 24 hours, although additional uninterrupted meal time can reduce that. Since overtime is not incurred until after 40 hours of work in the workweek are accrued, a worker scheduled for 24-hour shifts (with sleep time) might start accruing the overtime compensation premium on their third shift in a week, or sooner if unable to get the minimum amount of sleep.

• To be considered "live-in," an employee must reside on the employer's premises permanently or for extended periods of time. The Department has allowed an employee who lives at the place of employment at least 5 consecutive days per week to be considered as residing on the employer's premises for extended periods of time. Live-in workers need only be paid for compensable hours worked. The Department's long-standing existing regulations recognize that an employee who resides on his or her employer's premises is not working all the time he or she is on the premises. Ordinarily, live-in workers may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when they may leave the premises for their own purposes. Live-in domestic service workers must be paid at least minimum wage for all hours worked, but are not required to be paid for overtime when more than 40 hours of work are

performed per week (unless employed by a third party employer). Thus, determining the potential impact of the revised rule on "24-hour live-in" care depends very much on whether the worker is "24-hour" or "live-in."

Similarly, the Department received comments on the application of overtime provisions to direct care workers who are essentially roommates of persons with disabilities. These direct care workers live with the consumer, assist the consumer in the morning and evening, but otherwise are free during the day to go to their own job or school. Thus, these direct care workers are likely "live-in" as described above, and are not entitled to overtime compensation under this Final Rule unless employed by a third party employer.

Some agencies take a proactive approach to scheduling these cases in order to manage the total number of hours on duty required from each worker. For example, an agency may split a 24-hour, seven days per week case between two direct care workers by having one aide provide services Sunday through half of the Wednesday shift (three 24-hour shifts and one 12-hour shift) when the second aide would take over and work through Saturday.[122] This reduces the total number of hours each aide must work, limits the work to one weekend day, and avoids overwhelming the consumer with too many different care providers.[123]

The direct care workers themselves report working an average of 31 to 34 hours per week and available data suggest that very few work overtime.[124] Based on an analysis of the 2007 National Home Health Aide Survey (NHHAS) and the 2009 Annual Social and Economic Supplement (ASEC) of the Current Population Survey, PHI reports that 92 percent of HHAs and 88 percent of PCAs work 40 hours or less per week for an average of 31 hours and 34 hours per week, respectively. By extension, only 8 percent of HHAs and

12 percent of PCAs reported working more than 40 hours per week.

However, this information may not fully capture the total number of hours worked by these individuals because some direct care workers work for multiple employers, many direct care workers work part-time jobs, and some employers do not compensate workers for travel time between consumers (because they are not reimbursed for this time). Furthermore, there is very limited information on hours worked by independent providers or those workers employed as live-in, on-call, or night shift workers. The Department assumes that in general independent providers directly employed by individuals, families, or households work similar hours as direct care workers employed by agencies.

The wages for these workers vary widely by occupation and geographic location. Based on detailed wage data from the BLS Occupational Employment Statistics Survey, the hourly wages of HHAs and PCAs range from about $7.55 to $19.84 (less than 10 percent earn below $7.55 and less than 10 percent earn more than $19.84) with the median wage for HHAs being approximately $9.94 and for PCAs $9.67 per hour.[125] As discussed above, wages for PCAs tend to be slightly lower on average than those for HHAs. The Department assumes that in general independent providers directly employed by families receive similar hourly wages as direct care workers employed by agencies. In approximately 90 percent of states (46 states), average hourly wages for PCAs were below 200 percent of the federal poverty level wage ($11.25) for individuals in one-person households working full-time.[126] Current research suggests that these workers find it difficult to support their households on these wages; approximately 50 percent of PCAs have to rely on public benefits (e.g., Medicaid, food and nutrition assistance, cash welfare, or assistance with housing, energy or transportation) and 37 percent of direct care workers employed by agencies in HHCS lack health insurance.[127]

## F. Costs and Transfers

This section describes the costs and transfers associated with the Final Rule

---

[122] Elsas, M. & Powell, A. 2011. Interview of Michael Elsas, President, and Adria Powell, Executive Vice President of Cooperative Health Care Associates by Calvin Franz and Lauren Jankovic of ERG. April, 2011.

[123] Elsas, M. & Powell, A. 2011. Some agencies have experimented with breaking a 24-hour case into two 12-hour cases that are staffed by four direct care workers; this reduces total number of hours worked and eliminates the need for the 8-hour rest period but also increases the number of direct care workers that the consumer must become comfortable with.

[124] Seavey and Marquand, 2011, pgs. 61–64. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*; HHS, 2011, p. 26.

[125] BLS, OES, 2011.

[126] Hourly federal poverty level calculated assuming full-time (40 hours per week) and full-year (52 weeks per year) employment. 2011 federal poverty levels provided by the U.S. Census Bureau. Available at: *http://www.census.gov/hhes/www/poverty/data/threshld/index.html*.

[127] Seavey and Marquand, 2011, pgs. 55–58. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*

and the Department's approach to estimating their magnitude. The Department estimates the first-year regulatory familiarization and hiring costs of the rule will vary between $18.6 and $20.6 million. In following years, costs are projected to increase from around $4 million in Year 2, to about $5 million in Year 10 as new firms enter the market and new individuals, families and households hire direct care workers.

Transfers result from the wage increases to comply with minimum wage and overtime compensation requirements. Total estimated transfers depend in part on the response of employers to the regulatory changes; in other words, will employers respond by paying overtime to current workers, changing scheduling practices to avoid paying overtime, hiring additional workers, or some combination of these approaches. Based on the methods described below, the Department estimates that first-year transfers from the rule will range from $103.7 to $281.3 million. In Years 2 through 10, total transfers using OT Scenario 1 are projected to increase from $322.3 million to $626.5 million while total transfers using OT Scenario 3 are projected to increase from $118.8 million to $230.9 million.

Regulatory Familiarization

When a new rule is promulgated, all the establishments affected by the rule will need to invest time to read and understand the components of the new rule; this is commonly referred to as regulatory familiarization. Each establishment will spend resources to familiarize itself with the requirements of the rule and ensure it is in compliance.

Each home care establishment will require about two hours of an HR staff person's time to read and review the new regulation, update employee handbooks and make any needed changes to the payroll systems. Based on our analysis of the industry and occupational data, the Department judges that each employer in HHCS and SEPD likely employs workers who will be affected by the Final Rule, and will therefore need to review the Final Rule. There are about 89,400 establishments in HHCS and SEPD;[128] assuming a mid-

level HR loaded wage of $38.44 per hour over two hours equals about $6.9 million for regulatory familiarization in the first year following promulgation of the rule.[129]

The Department received comments from industry groups such as NPDA and the U.S. Chamber of Commerce, arguing that the unit time estimates for regulatory familiarization are too small. However, the commenters provided no data to form a more appropriate estimate. After further consideration, the Department maintains its original estimate of two hours per establishment for regulatory familiarization. This rulemaking is a revision to an FLSA regulation that applies to a component of the home care industry workforce. The Department believes that most, if not all, affected firms are already covered by the FLSA, and employ other workers who are not exempt from its overtime and minimum wage provisions. For example, the BLS NEM data report that Home Health Care Services (6216) in 2010 includes over 200 occupations including nursing aides, therapists, and health practitioners that are not exempt from overtime and minimum wage provisions.[130] Therefore the Department believes that firms are already familiar with the relevant provisions of the FLSA and merely have to apply those provisions to one additional group of workers. The Final Rule is limited in scope and length, limiting the time required for familiarization. Furthermore, we believe that most firms will make use of guidance and educational materials from the Department, industry trade groups, franchisers and other organizations to help them review the regulations more efficiently. Finally, the Department believes that most, if not all, affected firms already use payroll systems with the capability of handling overtime calculations, and already employ workers for whom overtime might have to be calculated. Based on interviews with payroll and human resources professionals, the Department estimates that, in general, the vast majority of employers use payroll systems to distribute wage statements to their employees.[131] Thus, it is once again a

matter of extending activities they already perform for one group of their employees to another group of employees. Therefore, the additional time necessary to perform the types of tasks listed in this section should be relatively minimal.

For independent providers, the employer is considered to be the individual, family, or household that hires them. Therefore, families who directly employ these direct care workers will also have to review the regulatory revisions. Some commenters, including the Chamber of Commerce, stated that this estimate was too low because of the length of the preamble. Because the employer-employee relationship is less complex than for an agency that employs multiple workers caring for multiple consumers, the Department expects the burden of regulatory familiarization will be smaller. In addition, the regulatory text is quite short and the preamble discussion is intended simply as an aide to employers regarding a variety of FLSA issues. We believe that most individuals, families, and households will rely on guidance and educational materials from the Department and advocacy organizations. The Department therefore assumes that each individual, family, or household who directly hires a direct care worker will spend one hour on regulatory familiarization. The Department uses the national average hourly wage of $29.60 (loaded) to represent the opportunity cost of reviewing the regulatory revisions.[132]

The Department has found no data to support an estimate of the number of individuals, families, and households that directly hire independent providers. The Department assumes each independent provider is hired by a single individual, family, or household, and therefore, because it estimates there are 182,600 independent providers nationally, 182,600 individuals, families, and households will incur one hour of time at an opportunity cost of $29.60 per hour for a total of about $5.4 million for regulatory familiarization in the first year following promulgation of the rule.

---

[128] This includes the 58 counties in California to account for costs to the IHSS program at the county level to become familiar with the requirements. For the purposes of the analysis (and to capture potential transfers), the Department is assuming that the IHSS could be considered the employer and therefore become responsible for ensuring payment of minimum wage and overtime to the workers (in particular, the 50,000 workers who regularly report

more than 40 hours of worker per week). In practice, this determination would need to be made on a case by case basis based on the employment relationship between consumer, direct care worker, and IHSS.

[129] BLS, 2011, National Compensation Survey (Occupation 13–1078), Median Hourly Wage.

[130] BLS National Employment Matrix, Home Health Care Services (62–1600) 2010. Available at: *http://www.bls.gov/emp/ep_table_109.htm.*

[131] Lucy Key Price, 2010. Interview with Lucy Key Price of L.K. Price Associates, Calvin Franz and

Lauren Jankovic, both of ERG. Polly Wright, 2010. Interview with Polly Wright of HR Consultants, Inc., Calvin Franz and Lauren Jankovic, both of ERG. Jennifer Wise, 2010. Interview with Jennifer Wise of Wise Consulting, Calvin Franz and Lauren Jankovic, both of ERG.

[132] BLS, 2011, National Compensation Survey, Hourly mean wage for full-time Civilian Worker is $22.77; the Department estimates the fully loaded wage at the hourly wage × 1.3. Available at *http://www.bls.gov/eci/.*

### Wages and Overtime[133]

Many direct care workers are already protected by minimum wage and overtime provisions at the state level and will not drive additional costs related to the Final Rule. Fifteen states require minimum wage for all hours worked for most direct care workers and guarantee some type of overtime compensation for some direct care workers who would otherwise be excluded under the FLSA.[134] Six states and the District of Columbia require minimum wage for all hours worked but do not guarantee overtime to most direct care workers.[135] Twenty-nine states do not require minimum wage or overtime. Table 6 summarizes the wages for HHA and PCA occupations based on state level minimum wage and overtime coverage.

TABLE 6—SUMMARY OF WAGES BY STATE MINIMUM WAGE AND OVERTIME REQUIREMENTS FOR HHAS AND PCAS

| Area name | Employment | Minimum 10th percentile wage | Hourly wages weighted average median wage | Maximum 90th percentile wage |
|---|---|---|---|---|
| All States: | | | | |
| Total | 1,745,290 | | | |
| *PCA* | 820,630 | $7.55 | $9.67 | $19.84 |
| *HHA* | 924,660 | 7.60 | 9.94 | 18.23 |
| States with Minimum Wage and Overtime Requirements: | | | | |
| Total | 765,220 | | | |
| *PCA* | 343,280 | | 10.35 | |
| *HHA* | 421,940 | | 10.32 | |
| States with Minimum Wage but not Overtime Requirements: | | | | |
| Total | 240,630 | | | |
| *PCA* | 82,250 | | 10.15 | |
| *HHA* | 158,380 | | 9.97 | |
| States without Minimum Wage or Overtime Requirements: | | | | |
| Total | 739,440 | | | |
| *PCA* | 395,100 | | 8.98 | |
| *HHA* | 344,340 | | 9.47 | |

Source: BLS OES, 2011.

In order to estimate the number of workers from the table that will be directly affected by the minimum wage and overtime components of the Final Rule, the Department made three primary calculations: (1) Removed from the data set those workers not currently employed in private homes (those providing services in facilities); (2) added employees of tax exempt organizations in states with overtime requirements to the set of workers without state-level overtime requirements (as they are sometimes exempt from the state overtime laws); and (3) identified the number of workers currently receiving less than the federal minimum wage ($7.25 per hour).

The data presented in Table 6 do not differentiate the workers who provide services in the homes of consumers (engaged in domestic service employment) and those who provide services primarily in facility settings (not engaged in domestic service employment). To identify agency-employed HHAs and PCAs likely to be providing services in facilities and exclude them from the estimation of costs, the Department examined the BLS NEM of industries for each occupation and identified 32 industries that employ HHAs and PCAs. Based on the description of the industry employing the HHA or PCA, the Department made a judgment of whether the actual services were being provided in a facility or in a private home. This is then used to estimate the number of workers likely to be providing services in the home and the percent of that occupation providing services in the home. Table 7 summarizes the data as well as the determination of whether the industry would be home- or facility-based. This percentage, approximately 50 percent of HHAs and 76 percent of PCAs, is used in the detailed calculations described below. By definition, the Department assumes that 100 percent of the HHAs and PCAs working as independent providers are working in private homes.

TABLE 7—SUMMARY OF INDUSTRIES EMPLOYING HHAS AND PCAS IN 2010 AND LIKELIHOOD OF THE AIDE WORKING IN A HOME OR FACILITY

| Industry | HHA | | PCA | |
| | Percent of agency employment | Home or facility | Percent of agency employment | Home or facility |
|---|---|---|---|---|
| *Total, All workers*[a] | 100.0 | | 100.0 | |
| Home | 50 | | 76 | |

---

[133] These costs to employers are also transfer payments that will benefit employees. See Benefits, below.

[134] Colorado, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New York, Pennsylvania, Washington, and Wisconsin. NELP, 2012, WHD–2011–0003–9452.

[135] Arizona, California, Nebraska, North Dakota, Ohio, and South Dakota. NELP, 2012, WHD–2011–0003–9452.

TABLE 7—SUMMARY OF INDUSTRIES EMPLOYING HHAS AND PCAS IN 2010 AND LIKELIHOOD OF THE AIDE WORKING IN A HOME OR FACILITY—Continued

| Industry | HHA | | PCA | |
| --- | --- | --- | --- | --- |
| | Percent of agency employment | Home or facility | Percent of agency employment | Home or facility |
| *Facility* | *50* | | *24* | |
| By Industry | | | | |
| Accounting, tax preparation, bookkeeping, and payroll | 0.0 | Facility | 0.3 | Facility. |
| Activities related to real estate | NA | NA | 0.0 | Facility. |
| Child day care services | 0.1 | Facility | 0.1 | Facility. |
| Civic and social organizations | NA | NA | 0.1 | Facility. |
| Community food and housing, and emergency and other relief services | 0.0 | Facility | 0.3 | Facility. |
| Educational services, public and private | 0.1 | Facility | 0.1 | Facility. |
| Employment services | 3.1 | Facility | 3.1 | Facility. |
| Government, excluding education and hospitals | 2.9 | Facility | 2.3 | Facility. |
| Grantmaking and giving services | NA | NA | 0.4 | Facility. |
| HHCS | 35.5 | Home | 33.1 | Home. |
| Hospitals, public and private | 0.9 | Facility | 0.5 | Facility. |
| Lessors of real estate | NA | NA | 0.1 | Facility. |
| Management of companies and enterprises | 0.0 | Facility | 0.5 | Facility. |
| Management, scientific, and technical consulting | NA | NA | 0.1 | Facility. |
| Nursing and community care facilities | 19.1 | Facility | 2.8 | Facility. |
| Offices of all other health practitioners | 0.1 | Facility | 0.1 | Facility. |
| Offices of mental health practitioners (except physicians) | 0.0 | Facility | 0.1 | Facility. |
| Offices of physical, occupational, and speech therapists, and audiologists | 0.1 | Facility | 0.1 | Facility. |
| Offices of physicians | 0.1 | Facility | 0.3 | Facility. |
| Other ambulatory health care services | 0.0 | Home | 0.0 | Home. |
| Other financial investment activities | NA | NA | 0.1 | Facility. |
| Other investment pools and funds | NA | NA | 0.0 | Facility. |
| Other miscellaneous | 0.0 | Facility | 0.0 | Facility. |
| Other personal services | NA | NA | 0.3 | Home. |
| Other residential care facilities | 1.9 | Facility | 0.6 | Facility. |
| Outpatient mental health and substance abuse centers | 0.3 | Facility | 0.3 | Facility. |
| Residential mental health and substance abuse facilities | 2.2 | Facility | 0.3 | Facility. |
| Residential mental retardation facilities | 17.3 | Facility | 3.5 | Facility. |
| SEPD | 14.3 | Home | 42.5 | Home. |
| Social advocacy organizations | 0.0 | Facility | 1.2 | Facility. |
| Unpaid family workers | NA | NA | 0.3 | Home. |
| Vocational rehabilitation | 1.8 | Facility | 6.4 | Facility. |

Source: BLS 2010 NEM; note that the percent of the occupation employed in the home versus a facility is calculated based on the actual sum of the number appearing in the table. Values are rounded to the nearest 10th of a percent and columns may not sum to totals due to rounding.

ª This excludes self-employed workers and those employed in private households because they are considered independent providers and will be added to the population of affected workers separately.

It is important to note that the determination of whether the industry is home- or facility-based is an estimate; some industries that appear to provide services primarily in a nursing facility, for example, may employ a few direct care workers who provide services in the private homes of consumers to assist with transitioning of the consumers from the facility back to their homes. Some industries that appear to provide services primarily in the private home, HHCS for example, may also employ direct care workers who work primarily in facilities.

Next, the workers in the states with minimum wage and overtime compensation are, in general, already receiving at least the minimum wage and some form of overtime premium for hours worked beyond 40 hours. These workers do not need to be included when calculating the costs and transfers associated with additional wages

resulting from the application of the federal minimum wage or payment of an overtime premium. The exception is for workers employed by public agencies, non-profit organizations, and other tax exempt entities who are exempt from many of the applicable state laws (such as the employees of the Illinois Department of Human Services' Home Services Program). To account for these workers, the Department used the 2007 Economic Census to estimate the proportion of workers in those states who are employed in establishments exempt from Federal income tax. The proportion varies by state but is 42 percent on average. The proportion in each relevant state was multiplied by the number of HHA and PCA workers in each state to estimate the number of workers likely to be employed by an employer not covered by the state level laws related to minimum wage and

overtime.[136] These workers, about 302,500, were added to the total number of workers without overtime coverage in order to estimate the costs of providing overtime compensation to workers under the Final Rule. States vary widely in terms of exemptions from minimum wage and overtime rules and not all states have these types of exemptions; as a result, this approach results in an overestimate of the number of workers who will receive additional overtime wages as a result of the rule. The Department judges that this is the best

[136] The Department used a proportion of 100 percent for workers in New York to account for the fact that New York law establishes an overtime premium of one and one-half the FLSA minimum wage (rather than the workers' regular rate) for workers employed by a third party employer in a private. This produces an overestimate of the number of workers who will receive additional overtime compensation as a result of the rule.

available method to estimate these additional workers given available data.

For the NPRM, the Department analyzed the 2009 BLS OES data on HHA and PCA wages by percentile to identify those workers receiving less than the federal minimum wage (usually those in the 10th and 25th percentiles in states without minimum wage coverage). For example, in North Dakota, the 10th percentile wage was $7.20 in 2009, roughly equal to the federal minimum wage of $7.25; the Department therefore assumed 10 percent of HHAs and PCAs in North Dakota would be impacted by the extension of the FLSA's minimum wage provision. When newer data became available, the Department updated this analysis using 2011 BLS OES data on HHA and PCA wages. Using the 2011 data, the Department found no states in which workers in the 10th or 25th percentile received less than the Federal minimum wage, and therefore now assumes that a negligible number of workers will be affected by the minimum wage provision.

Due to lack of data, the Department selected the assumptions it would use to analyze independent providers directly employed by individuals, families, and households. The Department assumes that independent providers: (1) Generally will not be entitled to overtime wage premiums, and (2) earn less than the current federal minimum wage in the same proportion as agency-employed direct care workers. This rulemaking does not eliminate the companionship services exemption for direct care workers directly hired by individuals, families, and households. Therefore, since independent providers by definition do not work for a third party, we assume they will be directly hired by the individual, family, or household and will not be entitled to overtime compensation when they work more than 40 hours per week (provided, of course, that the direct care worker performs companionship services as defined in § 552.6 or is a live-in domestic service worker). The Department was unable to find data on the average number of hours worked per week by independent providers, but assumes that independent providers provide home care to multiple consumers and it is unlikely that an independent provider will work more than 40 hours per week for any single family. This assumption is based on available data which suggests that the majority of consumers receive less than 40 hours per week of services.

By assuming that the proportion of independent providers earning less than the federal minimum wage is identical to that for agency-employed direct care workers, the Department implicitly assumes independent providers work in similar patterns as agency-employed direct care workers. That is, independent providers are distributed across states in the same proportion as agency-employed direct care workers, and are as likely to earn less than minimum wage as those employed by agencies.

Finally, the Department must account for those who work in Illinois' Department of Human Services (DHS) and in California's IHSS program. These workers were excluded from the estimate of potentially affected workers in the NPRM because review of state law suggested that they were already eligible for minimum wage and overtime. Comments submitted by Illinois and California clarified the employment arrangement, their status with respect to minimum wage and overtime, and the number of workers affected.[137] [138]

For the NPRM, the Department erroneously determined that all direct care workers in Illinois are currently eligible for overtime and removed all such workers from the analysis to estimate transfer payments. In its comment on the NPRM, the Illinois DHS clarified that 30,000 direct care workers are jointly employed by the state and the consumer and, although they receive employment benefits such as subsidized health insurance, are not eligible for overtime pay under state statute. Based on this comment, the Department returned 30,000 workers to the OES data for Illinois, and assumes these workers will incur overtime hours at the same rate as other agency-employed workers.

California's IHSS workers share some attributes with independent providers but are considered employees of the county level public authority for some purposes. Under the IHSS program, county level public authorities provide home care services to qualifying residents. The services are paid for by a mix of federal, state and county funding. The county authority screens and refers direct care workers to consumers with the selection of the direct care worker as well as scheduling and supervision determined by the consumer. The county authority also acts as the employer of record for direct care workers. In addition, in California's system the county authority is responsible for collective bargaining with the union representing direct care workers to determine wage rates and benefits.[139]

There are approximately 380,000 direct care workers employed through IHSS caring for about 440,000 consumers. All IHSS direct care workers' pay exceeds the minimum wage, while about 50,000 direct care workers routinely work more than 40 hours per week.[140] In *Bonnette* v. *California Health & Welfare Agency,* 704 F.2d 1465 (9th Cir. 1983), the Ninth Circuit held that IHSS direct care workers were employees of the state and counties. For purposes of this analysis, the Department initially assumed that direct care workers for IHSS were considered employees of the county authority and were included in OES data. However, review of OES found a total of 105,000 PCAs and HHAs in California, including those that work in facilities. The Department concluded that the 380,000 direct care workers for IHSS were not included in the OES for California, and therefore added those workers to the pool of workers without overtime coverage. Furthermore, the comment concerning California's IHSS program indicates that 50,000 of the 380,000 IHSS direct care workers (13.2 percent) routinely work overtime, which is a somewhat higher proportion than the national average of 12 percent. Therefore the Department included 50,000 IHSS workers in projections of overtime compensation rather than apply the standard percentage used for other affected workers.[141] [142]

Table 8 summarizes the number of workers estimated to be directly impacted by the minimum wage and overtime provisions of this Final Rule. As explained in more detail above, to estimate the total number of workers potentially affected by the overtime provisions of this rule, the Department:

• Used OES data to identify agency employed workers in occupations that may provide companionship services under the current definition (i.e., 1,745,300 PCAs and HHAs). The OES is based on a nationally representative sample of private employers as well as state and local governments, and is a better measure of agency employment than the NEM.

---

[137] CSAC, CWDA, CAPA, and CICA, WHD–2011–0003–9420; State of Illinois DHS, Comments, WHD–2011–0003–7904.

[138] The Department received no other data suggesting that affected workers were not accurately represented in the OES or NEM, or appropriately considered in the Preliminary Regulatory Impact Analysis. Therefore, the Department had no basis for additional review of other states.

[139] CSAC, CWDA, CAPA, and CICA. WHD–2011–0003–9420.

[140] CSAC, CWDA, CAPA, and CICA. WHD–2011–0003–9420.

[141] Ibid.

[142] For the purposes of regulatory familiarization, we assumed that the 58 counties in California would incur familiarization costs.

• Estimated the percentage of agency-employed workers who are employed in homes rather than facilities from the NEM and applied those percentages to the workers identified in the OES to estimate 1,086,600 agency-employed PCAs and HHAs work in homes. Because the NEM is based on the Current Population Survey, it permits us to identify the industry in which the worker is employed.

• Subtracted 472,100 direct care workers from states that already require overtime pay using state-level OES data leaving 614,500 workers in states that do not currently require overtime coverage.

• Added 302,500 direct care workers back into the OES. These workers are employed in states that require overtime pay, but are not eligible for overtime for various reasons: They work for tax-exempt organizations; they work for the IL DHS; or they work in the state of New York.[143] This results in an estimated 917,000 agency-employed direct care workers who are not currently eligible for overtime pay.

• To this the Department added 380,000 IHSS workers not currently eligible for overtime to estimate a total of 1,297,000 direct care workers are without overtime coverage.

• Due to a lack of data concerning the prevalence of use of the companionship exemption, the Department assumes that all 1,297,000 direct care workers in states without overtime protection are currently paid as exempt companions, and are thus potentially eligible for overtime pay after the rule is promulgated. This assumption clearly leads to an overestimate of the magnitude of transfer payments resulting from the rule; this overestimate may be significant.

• Finally, the Department identified those PCAs and HHAs in the NEM who reported themselves as self-employed or employed by private households; this results in an estimated 182,600 independent providers.

Since the data suggest that none of the agency-employed PCAs earn less than minimum wage, the Department also assumes that none of the 158,700 PCA independent providers earn less than minimum wage. Similarly, because no agency-employed HHAs earn less than minimum wage, the Department assumes that none of the 24,000 HHA independent providers earn less than minimum wage.

TABLE 8—SUMMARY OF WORKERS THAT ARE DIRECTLY IMPACTED BY FINAL RULE

| Affected workers | Number of workers | Source |
|---|---|---|
| Agency-employed PCA and HHA ................................................................ | 1,745,290 | 2011 OES; State-level occupational employment and wages for SOC 39–9021 and 31–1011 (see Table 6). |
| PCA ........................................................................................................ | 820,630 | |
| HHA ....................................................................................................... | 924,660 | |
| Agency-employees working in the home: | | |
| Percent PCA and HHA in homes: | | 2010 NEM for SOC 39–9021 and 31–1011 (see Table 7). |
| PCA ................................................................................................... | 76.2% | |
| HHA .................................................................................................. | 49.9% | |
| Number of PCA and HHA in homes: | | Total Workers multiplied by percent working in homes; 2011 OES and 2010 NEM. |
| PCA ................................................................................................... | 625,323 | |
| HHA .................................................................................................. | 461,236 | |
| Total .................................................................................. | 1,086,559 | |
| Workers without OT Coverage: | | |
| Number of PCA and HHA in States without OT Coverage ................. | 614,508 | Sum of employees working in homes in selected states; 2011 OES. |
| Number of PCA and HHA in public agencies and nonprofits in states with OT but who are ineligible; and NY, and IL DHS. | 302,531 | Total workers in states with OT laws multiplied by proportion of workers in state employed by tax-exempt organizations, plus workers in NY, and the 30,000 workers in the IL DHS Home Services Program; plus workers of CA IHSS; 2011 OES and 2007 Economic Census. |
| *Total number of PCAs and HHAs not currently entitled to OT coverage.* | a 917,039 | |
| Number of California IHSS workers .................................................... | b 380,000 | |
| *Total workers without OT coverage* ...................................... | 1,297,039 | |
| Workers below Minimum Wage ................................................................. | 0 | Number of workers with wage below $7.25; 2011 OES. |
| Family-employed Independent Providers ................................................. | 182,604 | Projections for 2011 based on the 2010 NEM for SOC 39–9021 and 31–1011. |
| PCA ........................................................................................................ | 158,651 | |
| HHA ....................................................................................................... | 23,953 | |
| Independent Providers below MW ............................................................ | 0 | Number of workers paid below minimum wage; 2011 OES. |

a Of the 917,039 total direct care workers not currently covered by overtime laws; 531,924 are PCAs and 385,115 HHAs. Estimated from state-level OES data with adjustments for tax-exempt employers, employees of IL DHS, and workers in NY state.

b Based on public comment, the Department assumes 50,000 of the 380,000 IHSS direct care workers (13.2 percent) work overtime; for the 917,039 agency-employed workers estimated from the OES, the Department assumes 12 percent work overtime based on an analysis of NHHAS data.

---

[143] Because conflicting information was available concerning overtime provisions for direct care workers in New York state, the Department included all New York direct care workers in the analysis to be conservative.

Minimum Wage

In the NPRM, the Department estimated the number of workers earning less than the minimum wage based on 2009 data. Using the 2009 BLS data on the wages of HHAs and PCAs by percentile, the Department estimated that approximately 14,200 HHAs and 30,700 PCAs in 13 states earned less than the federal minimum wage of $7.25. However, for this Final Rule the Department reviewed the 2011 BLS data, which suggests that no HHAs or PCAs are currently earning less than the minimum wage.[144][145] Therefore the Department estimates no increase in wages will result from application of the minimum wage provision of the FLSA to direct care workers employed by agencies. With no evidence to the contrary, we maintain our working assumption that wages for independent providers track those of agency-employed direct care workers, and therefore the same result is obtained for independent providers.

The Department will not attempt to estimate impacts of future increases in the minimum wage. Since Congress extended FLSA protections to domestic workers in 1974, it has acted four times to increase the Federal minimum wage. Congress passed amendments to the FLSA increasing the minimum wage in 1977 (Pub. L 95–151), 1989 (Pub. L 101–157), 1996 (Pub. L 104–188) and 2007 (Pub. L 110–28). In each case, the minimum wage was gradually increased over a series of steps. Given that the minimum wage has reached the maximum rate contained in the most recent amendments (Pub. L 110–28), any estimate of the cost of this rule accounting for increases in the minimum wage would be purely speculative.

Overtime

Limited data exist on the amount of overtime worked by this population. A PHI analysis of the 2007 NHHAS and U.S. Census Bureau's Current Population Survey, ASEC on direct care workers found 8 to 12 percent of HHAs and PCAs may work overtime. Among HHAs, 8 percent worked more than 40 hours per week, and 2 percent worked more than 50 hours per week; 12 percent of PCAs appeared to work more than 40 hours per week; however, PHI believes this may be an overestimate based on the 2010 ASEC supplement

which suggests approximately 42 percent of direct care workers in HHCS work full-time year round.[146]

A significant overtime compensation issue in this industry is associated with 24-hour care. Attending staff may be entitled to pay up to 16 of every 24 hours or even more (if the staff is not provided a bona fide sleep period). The City of New York and New York State Association of Counties filed an amicus brief with the U.S. Supreme Court in *Long Island Care at Home, Inc.* v. *Coke* on this issue.[147] The brief asserted that changing the FLSA companionship services exemption would significantly increase the cost to the City and State for providing home health services and included an estimate of the increased costs. The additional costs for direct care workers in New York City attending consumers requiring 24-hour care is by far the largest component of these costs, exceeding the Department's estimate of nationwide overtime for all workers in all states not currently covered by overtime.

Unfortunately, the brief does not adequately describe how it arrived at the cost estimates, nor does it provide estimates of the number of consumers requiring 24-hour care or the workers caring for them. The numbers presented in the brief suggest over 33.6 million hours of annual overtime are worked just to care for consumers requiring 24-hour care plus an additional 14.6 million hours of overtime hours are worked to care for other consumers.[148] This comprises 45.7 percent of the total amount of overtime the Department estimated for the 35 states and Washington, DC that do not currently require overtime compensation (73.5 million hours).[149] Furthermore, this sample, from the Current Population Survey ASEC, should reflect all hours worked, including that of direct care

workers providing services to consumers requiring 24-hour care. In addition, the need to provide a consumer with 24-hour care does not necessarily result in 72 hours of overtime per week. Maintaining continuity of care does not require a single direct care worker in attendance for the entire week; service can be provided with adequate continuity of care by two to four workers.[150] Therefore, because the brief does not explain the basis for the numbers, nor were the estimates in the brief clarified or explained in comments on the NPRM, the Department has not relied upon those estimates.

In addition, although industry commenters (IFA, NAHC, NPDA, PCA) stated that direct care workers work considerably more overtime than the impact analysis suggested, it was impossible to derive a reliable estimate of patterns of overtime from the provided data. While responses characterized the percent of direct care workers who might work more than 40 hours per week, or consumers who receive "live-in" or 24-hour service, not enough information was presented that would permit estimation of the number of direct care workers who have such schedules or their typical hours worked.[151] Furthermore, much of their claim that overtime hours were underestimated was based on the prevalence of "24-hour care" and "live-in care." Although commenters used these terms synonymously, these terms are not identical and have very significant implications for how hours worked are calculated, and it was highly problematic to interpret reported survey results in a meaningful way (see discussion of public comments on overtime scenarios for further explanation of this issue). Finally, the reported data were gathered in two industry surveys, as described above, that suffered from flawed sampling approaches and cannot be considered representative of the industry as a whole. Thus, the Department also could not estimate overtime hours based on industry data. Therefore, the Department has generally relied upon nation-wide data from BLS and the nationally representative NHHAS in developing the overtime analysis.

BLS data show there are about 614,500 total direct care workers in private homes in states without state-mandated overtime coverage, plus 302,500 workers employed in New York or by tax-exempt organizations in states

---

[144] BLS, OES, by state, 2000–2010. Available at: *http://stats/bls/gov/oes/*.

[145] Because the Department finds no evidence of HHAs and PCAs currently earning less than the FLSA minimum wage, estimates of costs and transfers from this point forward will not include mention of the minimum wage.

[146] Seavey and Marquand, 2011, pgs. 61–64. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*.

[147] 551 U.S. 158 (2007). Brief of Amici Curiae City of New York and New York State Association of Counties in Support of Petitioners.

[148] The incremental cost of requiring overtime compensation under this regulation is the difference between the current hourly rate paid for direct care workers, and the rate that would be paid if this regulation is promulgated (i.e., the overtime differential) applied to hours worked in excess of 40 hours per week. If straight time pay is currently about $10 per hour, the incremental cost will be $5 per hour. New York City projects the rule will cost $168 million per year for care of patients requiring 24-hour care; $168 million divided by $5 suggests that roughly 33.6 million overtime hours per year are worked in New York City alone to care for these consumers.

[149] See discussion later in this section for the methodology used to estimate the 73.5 million hours.

[150] Elsas & Powell, 2011.

[151] IHSS Global Insight 2012,. WHD–2011–0003–8952.

with overtime requirements who are not entitled to overtime compensation (including the 30,000 workers in the Illinois Department of Human Services Home Services Program) and 380,000 workers in the California IHSS program who are not entitled to overtime. In total, the Department estimates that there are 1.30 million agency-employed workers without overtime compensation protection who will be entitled to it as a result of the Final Rule (*See* Table 8).

For the NPRM, the Department calculated that 10 percent of affected direct care workers are employed 45 hours per week (5 hours of overtime), and an additional 2 percent are employed 52.5 hours per week (12.5 hours of overtime) based on the PHI analysis of NHHAS and ASEC data on overtime worked in this industry. As a result of public comment on these overtime estimates, the Department reviewed hours worked by direct care workers as reported in the 2007 NHHAS. When calculating overtime directly instead of using estimates based on the summary provided by PHI, the Department found that those direct care workers who work more than 40 hours, but no more than 50 hours per week, average 6.4 hours of overtime; those who work more than 50 hours per week average 21.0 hours of overtime per week. The Department calculates overtime hours worked assuming that 10 percent of these 917,000 direct care workers (excluding California's IHSS workers) are employed 46.4 hours per week (6.4 hours of overtime), and an additional 2 percent are employed 61.0 hours per week (21.0 hours of overtime). The joint comment from potentially affected groups in California [152] stated that 50,000 IHSS workers work more than 40 hours per week, but did not indicate how many additional hours they worked. Therefore, the Department assigned the same overtime work pattern to them: 83.3 percent of these workers (10 out of every 12) work 46.4 hours per week, and 16.7 percent (2 out of every 12) work 61 hours per week. In total, 73.5 million hours of overtime are worked per year. Using the weighted median HHA wage of $9.84 and the weighted median PCA wage of $9.54 per hour, these workers would earn an overtime premium of $4.92 and $4.77 per hour, respectively. Under these assumptions the additional cost of overtime compensation would be approximately $355.3 million per year, absent changes to employment practices

that could reduce or even eliminate overtime for these employees.

Industry Adjustments to Overtime Requirement

It is reasonable to anticipate that agencies will evaluate and potentially change operating and staffing policies in response to overtime. Commenters universally agreed, with many home care agencies suggesting that they would limit employees' hours rather than pay overtime. *See e.g.,* IFA, NPDA, Martin Hayes, Henri Chazaud, and Melina Cowan. Currently, agencies have little incentive to manage overtime because hours worked in excess of 40 per week are paid at the same rate as hours less than 40 per week. Because overtime hours will now cost agencies more, they will have an incentive to manage those hours so as to reduce costs.

The Department identified at least three possible agency responses to overtime compensation requirements. First, the agency might manage existing staff to reduce overtime hours while maintaining the same caseload and staffing levels. For example, two direct care employees—one previously scheduled to work 50 hours per week and another previously scheduled to work 30 hours per week—may be rescheduled so that they both work 40 hours every week, thus leaving caseload and number of employees unchanged while eliminating the need for overtime compensation. Henri Chazaud notes that "work schedules will be based on reduction and elimination of overtime." This sentiment is echoed by Martin Hayes who states that "[i]f our agency is required to pay overtime for these caregivers—their hours will be reduced. Our agency will not pay overtime because our clients cannot afford it and it would cost us more than we make to foot the bill our self." However, there is little evidence on which to predict how agencies might reorganize staff time to support the same caseload. It seems doubtful that many agencies can support their caseload without paying at least some overtime compensation, but it is unclear how much overtime could be reduced. In addition, the time spent reorganizing staffing plans is not costless. In this scenario agencies will also incur opportunity costs for managerial time even if management pay is unchanged. In addition, employees will experience adjustment costs as they adapt to new work schedules.

Second, as suggested in the City of New York's amicus brief, agencies might choose to hire new employees to avoid having current staff exceed 40 work

hours per week.[153] After the Court of Appeals for the Second Circuit concluded in *Coke* that direct care workers were entitled to overtime compensation, the experience of New York City indicates this might be a common response in some regions. Such an approach will require increased staffing to cover the existing caseload. The New York City experience suggests it became common for staff who worked more than 40 hours per week at a single agency to continue to work more than 40 hours per week, but for multiple agencies.[154] For example, a direct care worker might work 25 hours per week for each of two different agencies, and not be entitled to overtime compensation despite working 50 hours per week. Once again, agencies will incur additional managerial costs as they hire and manage additional staff. Employees who begin to work for more than one agency will also incur opportunity costs as they coordinate their schedules with multiple agencies. Finally, agencies might increase staffing by hiring workers who are new to the industry; depending on the tightness of the labor market, this might necessitate increasing hourly wages to attract new workers.

The third scenario comprises a mix of the first and second approaches. Neither of those approaches is costless to agencies. Under the FLSA, agencies will be required to pay their employees an additional 50 percent premium for each hour worked in excess of 40 per week. Conversely, managing workers to reduce or avoid working employees overtime hours will require additional time spent managing schedules. If agencies must hire additional workers to absorb the potential overtime hours, managerial time will be spent screening candidates and processing and training new hires. In addition to balancing overtime and managerial costs, agencies will have to consider potential impacts on consumer satisfaction; scheduling multiple workers for each consumer to avoid paying overtime might affect the agency's ability to retain existing consumers or attract new consumers. Therefore, the Department expects that agencies will weigh the cost of hiring additional workers with the cost of paying overtime to existing workers to determine the optimal mix of overtime and new hires appropriate to their circumstances. Agency caseload, consumer preferences, current staffing patterns, the cost of hiring new workers, and managerial preferences for staffing mix will affect the final decision.

---

[152] CSAC, CWDA, CAPA, and CICA. WHD–2011–0003–9420, p. 2.

[153] Brief of Amici Curiae City of New York. 2007.
[154] Elsas & Powell. 2011.

Because the potential magnitude of managerial time to handle more complex scheduling is unknown, the Department requested comments on this cost to agencies. Unfortunately, no estimates at this time were provided. The Department will discuss the cost of hiring new workers in detail below.

One factor that may help determine how many employees currently exceeding 40 hours of work per week would receive overtime compensation rather than have their hours reduced below 40 per week is the potential for existing workers to absorb additional hours without exceeding 40 hours per week. Available data suggest many employees are working significantly less than 40 hours per week and at least some of those workers are interested in working additional hours. As has been mentioned, studies show that direct care workers work, on average, approximately 34 hours per week, and many work part-time.[155] Seavey and Marquand, citing the 2010 CPS ASEC found that about 45.4 percent of workers report working part-time, and asked those part-time workers why they did not work full-time; 22 percent indicated they could only find part-time work and 18 percent stated they worked part-time due to business conditions. Thus, potentially 40 percent of part-time direct care workers might be interested in increasing their hours worked if more hours were available.

This suggests that of 917,000 agency-employed HHAs and PCAs not currently entitled to overtime protections, approximately 416,300 (45.4 percent) are part-time, and 166,500 (40 percent of part-time workers) might be interested in increasing their hours worked.[156] Employees in this industry currently average about 35 hours worked per week, and those who do not typically work overtime average about 28 hours per week.[157] If each of the 166,500 agency employed part-timers who might like to work additional hours increased their average hours worked by approximately seven hours per week, they could absorb the estimated 57.4 million hours of overtime currently

worked per year by agency employed workers and non-family IHSS workers without exceeding 40 hours per week themselves.[158] Not all employers will be able to redistribute hours to interested part-time workers in this way, and it may be difficult for agencies to adjust worker schedules to come close to, but not exceed, 40 hours due to the nature of the work; the types of services they provide do not necessarily fit into one-hour increments.

However, those employers who can adjust schedules and redistribute hours can be expected to decrease overtime costs significantly.

Hiring Costs

When agencies reduce the number of overtime hours worked, they must hire new workers or reallocate hours to under-employed workers to cover the hours that would have been overtime prior to the rule. The Department estimates cost per hire based on Seavey (2004), who concludes that $3,000 (inflated to 2011 dollars) is a conservative estimate of the direct cost of replacing a worker who quits (a turnover). About 75 percent of this cost is attributable to hiring the replacement worker (about $2,230), while the remainder is attributable to the costs of separation and vacancy.[159] The additional hiring costs agencies incur will depend on their allocation of the remaining overtime hours over new hires and current part-time workers.

As described in more detail below, the Department considers three scenarios for the reduction in overtime hours. OT Scenario 1 involves agencies paying for 60 percent of current overtime hours and allocating the remainder between current part-time employees and new hires. In OT Scenario 2, we assume agencies will pay for 40 percent of current overtime hours and allocate the remainder between current part-time employees and new hires. Under OT Scenario 3, agencies pay for 10 percent of current overtime

and allocate 90 percent to part-timers and new hires. Based on a review of relevant literature, the Department believes that, at the upper bound, employers will adjust so that 60 percent of the current overtime worked is paid at time and one-half the employee's regular rate of pay and that the remaining 40 percent of current overtime worked will be worked by new hires and current part-time workers. However, based on employer comments and the industry surveys, the Department believes that the actual response will most likely be OT Scenario 2.

Within each of the three overtime scenarios, the Department considers a range of potential allocations of the remaining overtime hours to new hires: 30 percent, 20 percent, and 10 percent. The Department chose 30 percent as the maximum hours allocated to new hires since hiring is costly, and converting less than 40 percent of the current part-time workers to full-time workers would be sufficient to cover the total estimated overtime hours. We expect most agencies would hire a smaller percent of new workers as it would result in unnecessary hiring costs if reallocation of hours to part-timers is feasible.

Table 9 lists the estimates of hiring costs in each of the overtime scenarios and the inputs used to calculate these estimates. In OT Scenario 1, agencies reallocate hours to the specified combinations of new and current part-time workers to cover the 40 percent of overtime hours they wish to avoid. This corresponds to converting from 43,700 to 56,200 part-time workers to full-time, hiring between 1,200 and 3,700 full-time workers, and incurring additional hiring costs of $2.8 to $8.4 million. In OT Scenario 2, agencies convert from 65,500 to 84,300 part-time workers to full-time, hire between 1,900 and 5,600 full-time workers, and incur additional hiring costs of $4.2 to $12.5 million.[160]

---

[155] Seavey and Marquand, 2011, p. 62–63. WHD–2011–0003–3514. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf. HHS, 2011. p.26.*

[156] The analysis of the availability of part-time workers to absorb additional work hours does not include IHSS workers because they differ from agency workers. In particular, many IHSS workers provide services to only one client, often a family member, and therefore seem unlikely to be interested in adding additional work hours to their schedule by adding an additional client.

[157] This hours estimate, 28 hours, was estimated by the Department based on the 2007 NHHAS data.

[158] Note: The total number of overtime hours available to the 166,500 agency employed part-time workers (57.4 million per year) differs from the total number of overtime hours worked by all workers without overtime coverage (73.5 million per year) used elsewhere in the analysis. The total number of overtime hours available to agency employed part-time workers is based on the number of overtime hours worked by agency employed workers plus the subset of IHSS workers who both work overtime and are not likely to be employed by a family member.

[159] Seavey, D. 2004. The Cost of Frontline Turnover in Long-Term Care. Washington, DC: IFAS/AAHSa. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/TOCostReport.pdf.* The Department attributes 75 percent of the cost to hiring replacement workers based on the compilation of findings reported by Seavey.

[160] Hiring costs are identical under OT Scenario 1 with 30 percent of reallocated overtime hours used for new hires and OT Scenario 2 with 20 percent of reallocated overtime hours used for new hires because both result in 12 percent of overtime hours going to new hires. Under OT Scenario 1, 60 percent of current overtime hours are paid to current employees and 40 percent are reallocated to new hires and current part-timers; 30 percent of the reallocated hours are used for new hires, resulting in 12 percent of overtime hours going to new hires (i.e., 40 percent of hours reallocated multiplied by the 30 percent of reallocated hours going to new hires). Under OT Scenario 2, 40 percent of current overtime hours are paid to current employees and 60 percent are reallocated to new hires and current part-timers; 20 percent of the reallocated hours are used for new hires, resulting in 12 percent of overtime hours going to new hires (i.e., 60 percent of hours reallocated multiplied by the 20 percent of reallocated hours going to new hires). This only occurs in Year 1.

OT Scenario 3 involves converting 98,300 to 126,400 part-time workers to full-time, hiring 2,800 to 8,400 new full-time workers, and incurring additional hiring costs of $6.3 to $18.8 million. These are direct costs incurred by agencies, not a transfer of income from agencies or payers to employees (like overtime compensation).

TABLE 9—YEAR 1 IMPACT ON HIRING COSTS

| | New hires[a] | Part-time workers to full-time | Additional hiring costs ($ mil.) |
|---|---|---|---|
| **OT Scenario 1 (60 Percent of Overtime Paid)** | | | |
| Hiring full-time workers to cover: | | | |
| 30% of remaining OT hours | 3,746 | 43,699 | 8.4 |
| 20% of remaining OT hours | 2,497 | 49,941 | 5.6 |
| 10% of remaining OT hours | 1,249 | 56,184 | 2.8 |
| **OT Scenario 2 (40 Percent of Overtime Paid)** | | | |
| Hiring full-time workers to cover: | | | |
| 30% of remaining OT hours | 5,618 | 65,548 | 12.5 |
| 20% of remaining OT hours | 3,746 | 74,912 | 8.4 |
| 10% of remaining OT hours | 1,873 | 84,276 | 4.2 |
| **OT Scenario 3 (10 Percent of Overtime Paid)** | | | |
| Hiring full-time workers to cover: | | | |
| 30% of remaining OT hours | 8,428 | 98,322 | 18.8 |
| 20% of remaining OT hours | 5,618 | 112,368 | 12.5 |
| 10% of remaining OT hours | 2,809 | 126,414 | 6.3 |

[a] The number of new hires is the number of full-time (35 hours per week) workers needed to cover the specified proportion of the total estimated 1.1 million overtime hours per week currently available to part-time workers (i.e., overtime hours worked by agency-employed workers and non-family IHSS workers). The number of part-time workers converted to full-time is calculated as the number of workers whose hours are increased from 28 to 35 per week needed to cover the specified proportion of current overtime hours per week. The hiring costs are based on an estimated cost of $2,230 per hire.

Travel Time

The FLSA requires that employees who, in the normal course of work, travel to more than one worksite during the workday be paid for travel time between each worksite. If the direct care worker travels to the first consumer directly from home, and returns directly home from the final consumer, travel time for the first trip and last trip generally are not considered to be compensable hours worked. It is clear that at least some direct care workers travel between consumers for the same employer and are thus entitled to be paid for that time. However, the Department has been unable to find evidence concerning how many workers routinely travel as part of the job, the number of hours spent on travel, or what percentage of that travel time currently is compensated.

New York City's amicus brief does suggest, however, that projected travel time pay would be about 19.2 percent of the size of overtime costs.[161] As discussed in the summary of public comments, the Department received no comments providing additional data or alternative methods to revise this calculation; an alternative method using data on travel time in the NHHAS suffered from too many limitations to produce a suitable estimate. With no other data available, the 19.2 percent figure seems reasonable to estimate potential travel time pay. A number of qualifications apply to the use of this ratio. First, there is anecdotal evidence that agencies that operate in the city make little effort to minimize travel on the part of their workers; since travel is "free" to the agency, there is little incentive to manage travel time. Second, because there is no examination of how either overtime or travel time estimates were generated, a closer examination of the data might change either or both estimates.[162] Third, it is unclear how work and travel patterns in New York City apply to the rest of the country. For example, anecdotal evidence suggests that direct care workers in rural areas might have to travel further between consumers, but their typical caseload patterns and total travel time are unknown. A survey of 261 direct care workers in Maine found workers traveled between 0 and 438 miles per week for an average unreimbursed mileage of 45 miles per week. One survey participant's comment was compelling: "I had to give up my other clients because the price of gas and low wages I wasn't making ends meet." [163] However, it is not possible to estimate whether travel would involve longer or shorter periods of time than travel in New York City, which presumably often involves travel by public transportation or by car in heavily congested road conditions.

The Department expects few independent providers will be affected by the travel time provision. Although the FLSA requires that employees who travel to more than one worksite during the workday for one employer be paid for travel time between each worksite, in the case of independent providers, any travel between work sites most likely represents travel from one employer to another, not travel between sites for the same employer. Therefore the Department anticipates that few independent providers will be entitled to travel time pay, and included no independent providers in the cost model (because they would be traveling between separate employers and thus the time is not considered work time).

[161] Brief of Amici Curiae City of New York. 2007.

[162] Thus, it is plausible that a modification in the assumptions used to generate one estimate might also affect the second estimate. The ratio of travel time to overtime might remain relatively stable even if the absolute values of the estimates change.

[163] Ashley, A., Butler, S., Fishwick, N. (2010). Home Care Aide's Voices from the Field: Job Experiences of Personal Support Specialists. The Maine Home Care Worker Retention Study. *Home Healthcare Nurse*, 28(7), 399–405. Available at: *http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2946202/*.

Subject to the qualifications described above, applying New York City's 19.2 percent figure to the total overtime cost with no adjustments to direct care worker schedules and pay for 100 percent of current overtime hours, the Department estimates that the requirement to pay travel time under the FLSA might add approximately $104.3 million per year to employer costs (7 percent annualization rate).[164] In estimating travel time pay, the Department assumes that agencies will make no scheduling adjustments to overtime hours (thereby paying 100 percent of overtime costs) and that travel time pay will maintain a constant proportion to overtime hours.

Industry groups suggest that a significant portion of agencies already pay for overtime, including agencies that voluntarily pay for travel and overtime in states that do not require overtime compensation. The IHS Global Insight comment reports that 50 percent of its survey respondents pay travel time, including 39 percent of those in states that do not require it. Because this survey is not a random sample it is unknown how representative the results are of the industry in general. However, given the uncertainty concerning the travel estimate, the Department did not adjust it downwards to reflect these comments. Furthermore, because the Department's estimate of travel time pay assumes agencies pay 100 percent of overtime costs, the travel time pay figures presented in this analysis overestimate travel time pay costs resulting from the Final Rule.

### Industry Adjustments Response to Travel Time Requirement

As a result of this provision, agencies should have significant incentive to reduce travel between consumers for their employees, and therefore reduce costs. It is difficult, however, to predict the potential magnitude of the cost reduction. It might be difficult to reduce travel due to consumer preferences for specific direct care workers, or the geographical dispersion of consumers (especially in rural areas).

Therefore, although the Department anticipates travel will be reduced as a result of the Final Rule, it cannot

predict the magnitude of this reduction. First, there may be some minimum level of necessary travel that is irreducible. Second, although agencies have incentive to more carefully manage costs associated with employee travel, they might be able to do so in such a way that agencies avoid increased costs, but results in little reduction in travel by their employees. For example, employees currently working overtime may have their hours reduced and obtain a second job in order to work more hours. This would likely increase the uncompensated travel time of such workers.

### Live-in Domestic Service Employees

The Final Rule limits the application of the overtime exemption contained in § 13(b)(21) of the Act to the individual, family or household employing the live-in domestic worker. Third party employers would no longer be entitled to claim the exemption. In addition, the rule requires employers of live-in domestic workers to maintain an accurate record of hours worked, rather than simply keeping a copy of the agreement made by the employer and employee covering hours of work. The cost to employers of the recordkeeping requirement, discussed more fully in the Paperwork Reduction Act (PRA) section of this preamble, is estimated to be $29.7 million (which reflects the amount for the entire information collection–approximately $8.95 million of which stems from this Final Rule). These figures reflect year 1 only. Following year 1, the regulatory familiarization burden associated with this Final Rule will drop substantially. The Department utilized a 1979 study of Domestic Service Employees which incorporated 1974 data on the number of live-in domestic service workers and assumed for purposes of the PRA that a similar percentage of the current domestic service worker population is employed in live-in domestic service work today. The Department has been unable, however, to identify current data to estimate the number of live-in domestic service workers employed by third party agencies, but based on the 1979 data, we do not expect the impact of the change concerning third party employment to be substantial. Although the Department has estimated the number of live-in domestic service workers for purposes of the PRA, we have not included the 1979 data in the economic analysis because the data does not provide information to estimate the number of hours worked by live-in domestic service workers per week (and whether the hours exceed 40), or information to estimate the percentage

of live-in domestic service workers employed by third party entities. The Department also received no relevant comments providing such information.

### G. Total Transfers

Due to the continuum of different responses to the regulation, the Department analyzed three possible scenarios with respect to overtime. As previously discussed, in view of the comments received, the Department believes that paying for 100 percent or 0 percent of overtime are highly unlikely scenarios. Therefore, in the Final Rule the Department assumes 60 percent of current overtime will be paid in OT Scenario 1, 40 percent of current overtime will be paid in OT Scenario 2, and 10 percent will be paid in OT Scenario 3. Based on the combination of two industry surveys, empirical research, and employer comments, the Department believes that OT Scenario 2 reflects the most likely impacts of the Final Rule. Scenario 1 assumes the agency pays employees the overtime premium for over half of overtime hours worked. Conversely, the employer might change scheduling practices to avoid the majority of overtime costs to the extent practicable and hire additional workers as necessary to work the extra hours. In addition, it is assumed that additional staff can be hired at the current going wage rate under all three of these scenarios. As described above, additional managerial costs to agencies might occur as a result of changes in staffing; the Department has no basis for estimating these costs, but believes they are relatively small. Therefore, they are not included in the three scenarios.

The three scenarios in rank order from highest to lowest amount of overtime that will be paid by employers are:

- *OT Scenario 1:* The Department assumes agencies pay 60 percent of the overtime currently worked. Agencies use a combination of hiring additional direct care workers and increasing hours of current part-time workers to cover the remaining 40 percent of current overtime hours.
- *OT Scenario 2:* The Department assumes agencies make a partial adjustment to staffing; overtime compensation is reduced, but not eliminated, by hiring some additional staff or increasing hours to part-time workers. OT Scenario 2 assumes employers will pay the direct care workers for 40 percent of the overtime currently worked and hire additional direct care workers or increase hours for part-time workers to cover the remaining hours.
- *OT Scenario 3:* The Department assumes agencies ban overtime to the

---

[164] It is unknown whether travel hours will be paid at straight time or overtime rates; this will vary according to the circumstances of the individual worker. If we assume all travel hours are overtime hours, and are paid at approximately $14.50 per hour, then the $68.1 million in incremental travel time pay in Year 1 suggests about 4.7 million hours per year are spent in travel. If we assume all travel hours are straight time hours, and are paid at approximately $9.67 per hour, then the $68.1 million in incremental travel time pay suggests about 7.0 million hours per year are spent in travel.

extent possible and increase staffing to ensure few employees work more than 40 hours per week. The Department assumes that because of rigidities in staff and consumer preferences and schedules it will not be possible to reduce overtime to zero. Furthermore,

some agencies already pay overtime voluntarily. Thus, the Department believes 10 percent of the overtime currently worked is a reasonable expectation for the level of overtime achieved under this scenario.

Table 10 presents an overview of the total estimated transfers of this rule where the scenarios represent a range of potential outcomes; actual transfers will depend on the response of employers to the Final Rule.

### TABLE 10—SUMMARY OF YEAR 1 TRANSFERS

| Transfer components | Total transfers ($ mil.) | Comments |
| --- | --- | --- |
| Travel Time Compensation ........................................... | $68.1 | |
| Overtime Scenarios: | | |
| OT 1 [a] ....................................................................... | 213.2 | 60% of $355.3 million. |
| OT 2 [b] ....................................................................... | 142.1 | 40% of $355.3 million. |
| OT 3 [c] ....................................................................... | 35.5 | 10% of $355.3 million. |
| Total Transfers by Scenario ........................................ | | Employers of workers not currently entitled to overtime protections: |
| Travel + OT Scenario 1 ......................................... | 281.3 | Allocate all but 60 percent of overtime to non-overtime workers. |
| Travel + OT Scenario 2 ......................................... | 210.2 | Allocate all but 40 percent of overtime to non-overtime workers. |
| Travel + OT Scenario 3 ......................................... | 103.7 | Allocate all but 10 percent of overtime to non-overtime workers. |

[a] The Department estimates that 50,000 IHSS workers currently work overtime and about 110,000 (12% of 917,000) non-IHSS workers currently work overtime. Therefore, of the total estimated transfer, about 31 percent (e.g., $66.6 million in Year 1) is attributable to IHSS direct care workers.

[b] Of the total, about 31 percent (e.g., $44.4 million in Year 1) is attributable to IHSS direct care workers.

[c] Of the total, about 31 percent (e.g., $11.1 million in Year 1) is attributable to IHSS direct care workers.

The Department examined three scenarios representing varying agencies' potential responses to the overtime compensation requirement. There is little hard evidence concerning which scenario is most likely to occur based upon employer comments.[165] However, agencies have reasonable alternatives to paying the overtime premium: Spreading existing overtime hours to other workers, either new employees or current employees who want more hours. The Department expects that OT Scenario 1 is the least likely to occur; there is no reason to believe agencies will pay workers for significant amounts of overtime if they can avoid it. OT Scenario 1 represents an upper estimate that projected transfer effects will probably not exceed. OT Scenario 3 represents a lower estimate below which projected transfers are unlikely to fall. Based on the combination of two industry surveys, empirical research, and employer comments, the Department believes that OT Scenario 2 reflects the most likely impacts of the Final Rule and thus, believes that OT

Scenario 2 best represents the true transfer effects resulting from the overtime requirement.

There are multiple channels through which hours can be spread to additional workers without significantly increasing non-overtime wages. For example, the Department examined scheduling patterns for consumers who require 24-hour care 7 days per week. With 2 direct care workers overtime might range from 18 to 46 hours per week depending on scheduling (assuming an average of 6.25 hours of sleep and 1.5 hours for mealtime for each 24 hour shift). By adding one more direct care worker, overtime can be reduced to perhaps 15 hours or less per week with similar assumptions concerning sleep and meal time.

The extent to which current employees work more than 40 hours per week provides little evidence of a potential labor shortage in this industry; because most agencies are not required to comply with overtime compensation requirements for these workers, they have had little incentive to manage workers in a way to avoid overtime. Furthermore, the existence of a significant pool of part-time workers who would prefer to work more hours suggests that a general labor shortage does not exist (although there might be some localized shortages).

### Projected Future Costs and Transfer Effects Due to Industry Growth

As documented above in this analysis, the demand for direct care workers has grown significantly over the past decade

and is projected to continue growing rapidly. One researcher has projected at least a 200 percent increase in demand for direct care workers over the next 40 years.[166] Therefore, the Department examined how the provisions in the Final Rule might impact a rapidly growing industry.

To project regulatory familiarization costs, the Department first estimated both the number of agencies and the number of independent providers likely to enter the market. The Department used U.S. Census' Business Dynamics Statistics to estimate an average annual firm "birth" rate of 8.6 percent of existing firms.[167] With 89,400 affected agencies in the baseline, this projects to 7,700 new agencies per year that will incur incremental regulatory familiarization costs.

The projected number of families expected to hire independent providers was calculated using U.S. Census population projections by age. Census projected that the number of individuals age 65 and older will increase from 40.3 million in 2010 to 56.0 million in 2020 (39 percent), while those age 85 and older will increase from 5.5 million to 6.7 million (22 percent) over the same time period.[168] The Department selected

---

[165] National-level quantitative analyses have produced results consistent with the Department's qualitative analysis of this labor market:

Barkume, Anthony. (2010). The Structure of Labor Costs with Overtime Work in U.S. Jobs, *Industrial and Labor Relations Review*, 64(1): 128–142.

Trejo, Stephen. (1991). The Effects of Overtime Pay Regulation on Worker Compensation, *American Economic Review*, 81(4): 719–40.

Trejo, Stephen. (2003). Does the Statutory Overtime Premium Discourage Long Workweeks? *Industrial and Labor Relations Review*, 56(3): 530–551.

[166] HHS, 2001. pgs. 4, 5, and 7.

[167] U.S. Census Bureau, Center for Economic Studies. Business Dynamics Statistics: Firm Age by Firm Size. Available at: *http://www.census.gov/ces/dataproducts/bds/data_firm.html*. Accessed April 10, 2013.

[168] U.S. Census Bureau, Population Division. Table 1: Intercensal Estimates of the Resident

Continued

the weighted midpoint of these two age groups to estimate the growth rate of the population most likely requiring assistance. This growth rate over 10 years (37 percent) was applied to the number of home care providers in the baseline year (182,600) to estimate that 250,000 independent providers would be supplying services to 250,000 families by 2021, an average of 6,744 new workers per year from 2012 to 2021.[169]

However, this estimate does not account for turnover among individuals, families, and households hiring independent home care providers; the Department accounted for this by assuming that 50 percent of the previous year's independent home care providers

would gain a new consumer, and that consumer or consumer's family would require regulatory familiarization. Thus, on average, regulatory familiarization costs among families hiring independent providers each year was calculated at 50 percent of the previous year's providers plus 6,744.

Consistent with the baseline estimate, new agencies projected to incur regulatory familiarization costs are assumed to require two incremental hours at a rate $38.44 per hour. Families hiring independent providers are assumed to require one hour of regulatory familiarization at a rate of $29.60. Table 11 summarizes the estimation of projected regulatory familiarization costs. The analytic

baseline for projecting the costs of this rule is 2011 due to data availability, and therefore the projected first and second year costs of the rule appear to be in the past. This approach is necessary because the projections rely on and are later compared to year-specific estimates from other sources (e.g., projected home health expenditures). For Table 11, 2011 data should be interpreted as the pre-rule baseline, with 2012 representing projected costs for Year 1 following promulgation of the rule, 2013 representing Year 2, and so on. When comparing numbers projected by other agencies (e.g., BLS Occupational Outlook, CMS Office of the Actuary), the actual year label is appropriate.

### TABLE 11—PROJECTED REGULATORY FAMILIARIZATION COSTS

| Year | Agencies requiring regulatory familiarization | | Families requiring regulatory familiarization | | | | Costs ($ mil.) |
|---|---|---|---|---|---|---|---|
| | Number | Costs ($ mil.) | Total IPs | New IPs | Turnover | Costs ($ mil.) | |
| 2011 | 89,446 | 6.88 | 182,604 | .................. | .................. | 5.41 | 12.28 |
| 2012 | 7,718 | 0.59 | 189,348 | 6,744 | 94,794 | 2.80 | 3.39 |
| 2013 | 7,718 | 0.59 | 196,092 | 6,744 | 98,046 | 2.90 | 3.50 |
| 2014 | 7,718 | 0.59 | 202,836 | 6,744 | 101,418 | 3.00 | 3.60 |
| 2015 | 7,718 | 0.59 | 209,581 | 6,744 | 104,790 | 3.10 | 3.70 |
| 2016 | 7,718 | 0.59 | 216,325 | 6,744 | 108,162 | 3.20 | 3.80 |
| 2017 | 7,718 | 0.59 | 223,069 | 6,744 | 111,534 | 3.30 | 3.89 |
| 2018 | 7,718 | 0.59 | 229,813 | 6,744 | 114,906 | 3.40 | 3.99 |
| 2019 | 7,718 | 0.59 | 236,557 | 6,744 | 118,279 | 3.50 | 4.09 |
| 2020 | 7,718 | 0.59 | 243,301 | 6,744 | 121,651 | 3.60 | 4.19 |
| 2021 | 7,718 | 0.59 | 250,045 | 6,744 | 125,023 | 3.70 | 4.29 |

Projected hiring costs under the three overtime scenarios are based on the projected growth in overtime hours. Projections of employment growth and projections of future overtime hours worked and overtime compensation are explained and quantified below. Only those new hires and their associated hiring costs that can be considered to be caused by this rule are considered (*see* Table 12). That is, the vast majority of new employees represented by job growth occur regardless of the rule and therefore the costs of hiring those workers are not attributable to the rule. It is only when an agency has to hire an additional worker as a result of the rule (i.e., a worker the agency would not have otherwise hired in the absence of the rule) that regulatory costs are attributed to this Final Rule.

The number of new hires attributable to the rule is a small fraction of the projected growth in employment in this industry. First, since we assume future overtime work patterns resemble current patterns, only 12 percent of each year's new employees are expected to work overtime. Second, because on average they work 8.8 hours of overtime per week, total overtime hours per 100 new hires is analogous to 2.6 full-time equivalent (FTE) positions. Third, the Department expects agencies will pay the overtime premium for some of those hours (10 to 60 percent): Thus, of the potential 2.6 FTE overtime hours, only 1.0 to 2.3 FTE overtime hours are necessary to cover reallocated overtime. Finally, the Department believes that (70 to 90 percent) of those 1.0 to 2.3 FTE overtime hours are likely to be

reallocated to current part-time workers, and only 10 percent to 30 percent of those hours are allocated to new hires. Thus, the projected number of new hires that can be attributed to the rule is a very small percentage of the total number of new workers the industry is expected to hire over the next 10 years.

Table 12 shows the estimated number of new hires attributable to this rule and their associated costs. The Department projects that the average number of new hires caused by this rule ranges from 228 to 1,542, depending on the overtime and hiring scenario. Using a 7 percent real rate, the average annualized costs associated with hiring these workers range from $0.6 to $1.8 million in OT Scenario 1, $0.9 to $2.7 million in OT Scenario 2 and from $1.3 to $4.0 million in OT Scenario 3.

---

Population by Sex and Age for the United State: April 1, 2000 to July 1, 2010. Available at: *http://www.census.gov/popest/data/intercensal/national/nat2010.html.* Accessed April 10, 2013; U.S. Census

Bureau. 2012. National Population Projections. Table 2: Projections of the Population by Selected Age Groups and Sex for the United States: 2015 to 2060. Available at: *http://www.census.gov/*

*population/projections/data/national/2012/summarytables.html.* Accessed April 10, 2013.

[169] These do not include families that are using the services of IHSS direct care workers.

TABLE 12—PROJECTED HIRING COSTS [a]

| Hiring full-time workers to cover: | Year 1 ($ mil.) | Future years ($ mil.) [b] | | Average annualized value ($ mil.) | | Number of hires | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Year 2 | Year 10 | 3% Real rate | 7% Real rate | Year 1 | Average [c] |
| **OT Scenario 1**. | | | | | | | |
| 30% of remaining OT hours | 8.4 | $0.8 | $0.8 | $1.6 | $1.8 | 3,746 | 685 |
| 20% of remaining OT hours | 5.6 | 0.5 | 0.5 | 1.1 | 1.2 | 2,497 | 457 |
| 10% of remaining OT hours | 2.8 | 0.3 | 0.3 | 0.5 | 0.6 | 1,249 | 228 |
| **OT Scenario 2**. | | | | | | | |
| 30% of remaining OT hours | 12.5 | 1.2 | 1.2 | 2.5 | 2.7 | 5,618 | 1,028 |
| 20% of remaining OT hours | 8.4 | 0.8 | 0.8 | 1.6 | 1.8 | 3,746 | 685 |
| 10% of remaining OT hours | 4.2 | 0.4 | 0.4 | 0.8 | 0.9 | 1,873 | 343 |
| **OT Scenario 3**. | | | | | | | |
| 30% of remaining OT hours | 18.8 | 1.7 | 1.7 | 3.7 | 4.0 | 8,428 | 1,542 |
| 20% of remaining OT hours | 12.5 | 1.2 | 1.2 | 2.5 | 2.7 | 5,618 | 1,028 |
| 10% of remaining OT hours | 6.3 | 0.6 | 0.6 | 1.2 | 1.3 | 2,809 | 514 |

[a] Projected number of hires and hiring costs are based on the projected growth in the number of overtime hours in Table 16.
[b] These costs represent a range over the nine-year span. Costs are lowest in Year 2 and highest in Year 10 so these two values are reported.
[c] Simple average over 10 years.

To estimate the number of incremental direct care workers who might earn overtime compensation or travel time compensation under the revisions, the Department utilized BLS Occupational Outlook employment projections for 2020.[170] The Department interpolated employment data for 2012 through 2019, and extrapolated the time series through 2021 using a constant rate of growth assumption. Wage data were directly extrapolated through 2021 using the time trend from 2000 through 2011. Based on these time series:

• Home Health Aide employment will increase by an average of 8.7 percent per year;[171] their median nominal wage will increase by an average of 2.72 percent per year while median real wage will increase by an average of 1.53 percent per year.[172]

• Personal Care Aide employment will increase by an average of 8.0 percent per year; their median nominal wage will increase by an average of 3.88 percent per year, and the median real wage will increase by an average of 2.70 percent per year.

Table 13 summarizes the projections of HHA and PCA employment and wages developed for this analysis.

TABLE 13—PROJECTED EMPLOYMENT AND HOURLY WAGE, HHAs AND PCAs, 2011–2021 [a]

| Year | Home health aides | | | Personal care aides | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Total employment (mil.) | Median wage | | Total employment (mil.) | Median wage | |
| | | Nominal | Inflation-adjusted [b] | | Nominal | Inflation-adjusted [b] |
| 2011 | 0.92 | $9.91 | $9.91 | 0.82 | $9.49 | $9.49 |
| 2012 | 1.01 | 10.16 | 10.05 | 0.89 | 10.34 | 10.23 |
| 2013 | 1.10 | 10.47 | 10.23 | 0.96 | 10.73 | 10.50 |
| 2014 | 1.19 | 10.78 | 10.42 | 1.04 | 11.13 | 10.75 |
| 2015 | 1.28 | 11.09 | 10.59 | 1.11 | 11.52 | 11.01 |
| 2016 | 1.37 | 11.40 | 10.76 | 1.18 | 11.91 | 11.25 |
| 2017 | 1.46 | 11.71 | 10.93 | 1.25 | 12.30 | 11.49 |
| 2018 | 1.55 | 12.03 | 11.09 | 1.32 | 12.69 | 11.72 |
| 2019 | 1.64 | 12.34 | 11.24 | 1.40 | 13.08 | 11.94 |
| 2020 | 1.72 | 12.65 | 11.39 | 1.47 | 13.48 | 12.16 |
| 2021 | 1.81 | 12.96 | 11.54 | 1.54 | 13.87 | 12.37 |

[a] Derived from BLS Occupational Outlook.
[b] Estimates based on 10 year average change in PPI for Home Health Services.

The Department did not project future (Year 2 and beyond) transfer effects associated with minimum wage provisions of the FLSA being extended to these occupations. BLS Occupational Employment Statistics on HHA and PCA wages for 2010 indicate that few, if any, workers are currently paid below minimum wage. BLS found no state in which the tenth percentile wage was below $7.25 per hour.[173] As previously discussed, Congress passed amendments to the FLSA increasing the Federal minimum wage only four times since it extended FLSA protections to Home Health Services over the last 10 years (1.2 percent).

---

[170] Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2010–11 Edition*, Home Health Aides and Home Care Aides. Available at: *http://www.bls.gov/oco/ocos326.htm*. Accessed September 20, 2011.

[171] Total hours worked and overtime hours worked will increase at the same rate in this model.

[172] The Department adjusted nominal wages for inflation using the average increase in the PPI for Home Health Services.

[173] BLS Occupational Employment Statistics, 2010 state estimates. Available at: *http://stats.bls.gov/oes/*.

domestic workers in 1974. Given that the minimum wage has reached the maximum rate contained in the most recent amendments, any estimate of the cost of this rule accounting for increases in the minimum wage would be purely speculative.

Projected Cost Impacts

This section draws on the estimates of costs to determine the anticipated impact of this Final Rule in terms of total cost across all industries as well as estimated cost per firm and per employee.

Table 14 presents the impact of regulatory direct costs on existing agencies and individuals, families, and households in the first year. First year regulatory familiarization costs total $12.3 million; when annualized at a 7 percent discount rate over 10 years, total annualized costs are $4.9 million per year. Cost per agency is $77, while families employing independent

providers will incur costs of $30 per individual, family, or household. Hiring costs annualized at a 7 percent real discount rate over 10 years range from $0.6 to $1.8 million in OT Scenario 1, from $0.9 million to $2.7 million in OT Scenario 2, and from $1.3 million to $4.0 million in OT Scenario 3. These correspond to Year 1 costs per establishment of $31 to $94 in OT Scenario 1, $47 to $140 in OT Scenario 2, and $70 to $211 in OT Scenario 3.

### TABLE 14—IMPACT OF REGULATORY DIRECT COSTS

| Component | Total projected compliance costs ($mil.) [b] | | | | Year 1 cost per establishment component [a] |
|---|---|---|---|---|---|
| | Year 1 | Future years | | Annualized at 7% | |
| | | Year 2 | Year 10 | | |
| **Regulatory familiarization costs** | | | | | |
| Home Healthcare Agencies | $6.9 | $0.6 | $0.6 | $1.4 | $77 |
| Families Employing IPs | 5.4 | 2.8 | 3.6 | 3.5 | 30 |
| **Hiring Costs** | | | | | |
| OT Scenario 1: | | | | | |
| 30% of OT hours | $8.4 | $0.8 | $0.8 | $1.8 | $94 |
| 20% of OT hours | 5.6 | 0.5 | 0.5 | 1.2 | 62 |
| 10% of OT hours | 2.8 | 0.3 | 0.3 | 0.6 | 31 |
| OT Scenario 2: | | | | | |
| 30% of OT hours | 12.5 | 1.2 | 1.2 | 2.7 | 140 |
| 20% of OT hours | 8.4 | 0.8 | 0.8 | 1.8 | 94 |
| 10% of OT hours | 4.2 | 0.4 | 0.4 | 0.9 | 47 |
| OT Scenario 3: | | | | | |
| 30% of OT hours | 18.8 | 1.7 | 1.7 | 4.0 | 211 |
| 20% of OT hours | 12.5 | 1.2 | 1.2 | 2.7 | 140 |
| 10% of OT hours | 6.3 | 0.6 | 0.6 | 1.3 | 70 |

[a] Regulatory familiarization applies to 89,446 establishments; independent provider regulatory familiarization will impact 182,604 entities.
[b] Excludes paperwork burden, estimated in Section V.

Market Impacts

There are almost no data, such as price elasticities of supply or demand, that can directly be used to model the market for companionship services. Furthermore, because approximately 75 percent of expenditures on home care services are reimbursed by public payers, the effect of the rule depends on how the public payers respond to the increase in the cost of providing home care services. However, despite these limitations, the Department used available data combined with best professional judgment concerning appropriate parameter values, to project deadweight loss and disemployment effects of the Final Rule. The selection of specific values and the rationale for those decisions are explained in further detail below.

In this section, the Department first presents estimated transfer effects for each provision of the rule, along with qualitative discussion of potential market adjustments and impacts of that

provision. The Department then presents the projected deadweight loss and disemployment effects of the Final Rule using a market model framework.

The Department estimates:

• Projected travel time pay represents a transfer of $68.1 million per year from agencies to employees (Table 10, although this might decline as agencies will now have incentive to more closely manage travel time). If these payments are spread equally over all agencies in this industry, they represent about a 0.15 percent increase in wages to employees. It is more likely that these payments will be distributed less uniformly; employees of some agencies might receive significant travel transfer effects, while others receive less.

• Transfer effects associated with overtime are most difficult to project. In Scenario 2 the $142.1 million in additional wages compose about 0.31 percent of annual wages if overtime is spread over all workers, or about 0.16 percent of average industry annual revenues if spread over all

establishments. Again, it is likely that overtime compensation will be distributed less uniformly in a way that is difficult to predict.

However, changes in wages are not the only determinant of how the market might tend to respond to the Final Rule; the demand for home care services, and therefore the demand for workers in this industry, also affects the market response. Conceptually, the demand for companionship services has two distinct components: Consumers covered by public payers, and out-of-pocket payers. Multiple sources estimate that the percent of home care expenditures accounted for by Medicare and Medicaid range from about 75 percent to 90 percent.[174][175][176][177][178] The

[174] Seavey and Marquand, 2011, pgs 22, 23. WHD–2011–0003–3514. Available at: *http:// phinational.org/sites/phinational.org/files/clearing house/caringinamerica-20111212.pdf*.

[175] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair

remaining expenditures are accounted for by out-of-pocket payers, private insurance, and a mix of other governmental sources.

Currently, Medicare will cover, without a copayment requirement, all—or almost all—of the allowed payment for home health care services for consumers eligible for Medicare payments. Thus, the demand for services by these consumers is likely to be highly inelastic, and the purchase of these services is dependent primarily on need and eligibility rather than price.[179] The increase in the payment rate resulting from an increase in costs may vary depending on the type of cost increase. Because an increase in the minimum wage is an unavoidable cost of providing these services, it seems reasonable to assume that it will eventually be reflected in payment rates. The impact of overtime and travel on reimbursement rates is more uncertain.

Several commenters stated that Medicare/Medicaid only pay for services and not travel or overtime. For example, Daniel Berland of the National Association of State Directors of Disabilities Services observed that "Medicaid doesn't pay for time that is spent not working directly for the consumer." The CRS observed that "payments by Medicare or Medicaid to an agency to provide home health aide services or Medicaid personal care services are not the same as the wage that that the agency pays to the worker" and stated that over time the payments under both Medicare and Medicaid could be adjusted to reflect additional costs to agencies providing these services.[180]

Consumers who pay all, or a significant share, of costs out-of-pocket might have a significantly different price elasticity of demand for home care services. Little information is known about this market segment, including the percent of home care consumers actually pay out-of-pocket, as opposed to having private insurance to cover costs. Because public payers account for about 75 percent of total payments for home care services, it is likely that the private pay market segment is significantly smaller than the public pay market. To the extent that these consumers are not covered by private insurance and pay out-of-pocket, they are likely to have a more elastic demand for services; if the prices for home care services increase, these consumers are more likely to search for lower cost alternatives. However, the size of such an effect is difficult to predict on the basis of extant information.

The Department expects the impact of this Final Rule on the market for home care services to be relatively small because incremental transfers are projected to be small relative to industry wages and revenues, and because the market for these services is dominated by government payers. However, to the extent that some transfers are not reimbursed by government payers, and that agencies might therefore increase the price to consumers, they might result in some consumers seeking alternatives to the organized market for home care services.

Deadweight Loss

Deadweight loss from a regulation results from a wedge driven between the price consumers pay for a product or service, and the price received by the suppliers of those services. In this case, the transfer of income from agency owners to agency employees through overtime provisions reduces agencies' willingness to provide home care services. Because consumers and their families must now pay more to receive the same hours of service, they may reduce the number of hours of services they purchase; it is this potential reduction in services that causes the allocative inefficiency (deadweight loss) of the rule.

To estimate deadweight loss, the Department must estimate the reduction in services agencies are willing to provide at the current market price, the resulting increase in market price paid by consumers and families, and their reduced purchases of home care services. To do this, the Department uses: (1) The current market wage and hours of home care services; (2) the estimated income transfers resulting

from the rule; and (3) the price elasticity of demand for and supply of home care services.

PCA criticized the deadweight loss analysis in the NPRM because it used an incorrect price elasticity of demand for direct care workers.[181] Upon further investigation, the Department determined that the comment was accurate, although the commenter's suggested alternative value was also flawed. Issues associated with the estimation of the price elasticity of demand and deadweight loss are discussed in the Summary of Public Comments on the Preliminary Regulatory Impact Analysis Section.

In addition, the Department accepts the commenter's point that the market for direct care workers contains a private pay sector and a public-funds-reimbursed sector that might differ substantially in terms of consumer response to price changes. Therefore, the Department now evaluates deadweight loss projections by explicitly modeling the two distinct market sectors; the larger public pay market segment (75 percent of the market) is characterized by a highly inelastic price elasticity of demand ($-0.17$), while the smaller private pay segment (25 percent of the market) has more elastic demand ($-1.0$).

The Department has estimated approximately 385,000 HHAs and 532,000 PCAs currently work without overtime protection. An additional 50,000 of 380,000 IHSS direct care workers routinely work more than 40 hours per week but do not receive overtime compensation. These direct care workers are potentially affected by the overtime provisions of the Final Rule. The median hourly wage in these states is $9.91 for HHAs and $9.49 for PCAs. The Department used the number of employees affected by overtime provisions in its calculation of deadweight loss because: (1) The populations of affected workers in states without minimum wage and overtime provisions are largely overlapping (i.e., states without minimum wage protection also do not have overtime protection) because the same worker might be paid less than the minimum wage and also be working overtime, including both counts creates a double-counting problem; (2) minimum wage impacts of the Final Rule are estimated to be zero; and (3) spreading transfers over a smaller worker population results in a more conservative estimate of deadweight loss (that is, the Department is more likely to overestimate, than underestimate, deadweight loss).

Labor Standards Act: Impact on Medicare and Medicaid," p. 4. WHD–2011–0003–5683.

[176] U.S. Census Bureau: Health Care and Social Assistance, Estimated Year-to-Year Change in Revenue for Employer Firms by Source, Table 8.10. Available at: *http://www.census.gov/services/sas_data.html.*

[177] Home Health Care Services Payment System. The Medicare Payment Advisory Commission (MedPAC). October 2010. Available at: *http://www.medpac.gov/documents/MedPAC_Payment_Basics_08_HHA.pdf.*

[178] ERG analysis of MEPS data. Agency for Healthcare Research and Quality (AHRQ). Medical Expenditures Panel Survey. 2009. Available at: *http://meps.ahrq.gov/mepsweb/data_stats/download_data_files.jsp.* Accessed March, 2012.

[179] Home Health Care Services Payment System. The Medicare Payment Advisory Commission (MedPAC). October 2010. Available at: *http://www.medpac.gov/documents/MedPAC_Payment_Basics_08_HHA.pdf.* Medicare, for example, does not require copayment for eligible patients.

[180] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid." WHD–2011–0003–5683.

[181] William Dombi, WHD–2011–0003–9595.

The Department included 30 percent of California IHSS direct care workers in the deadweight loss analysis. Comments from the California State Association of Counties, et al., indicate that perhaps 70 percent of IHSS direct care workers are family members. This suggests they are different from other agency-employed direct care workers. For example, IHSS workers may not consider direct care to be their vocation (outside of caring for their family members), and thus might be more likely to quit than care for a non-family member after their family member no longer needs care.[182] Therefore, the Department believes most IHSS direct care workers are likely to respond to market forces in different ways than agency-employed direct care workers, and should not be included in the deadweight loss analysis. The Department assumed that those IHSS workers who exceed 40 hours of work per week are evenly distributed among family and nonfamily direct care workers, and therefore also included 30 percent of overtime premiums for IHSS workers in the deadweight loss analysis.

The Department estimated a range of income transfers depending on the assumptions made concerning business response to the regulation. The Department assumes a split of overtime costs between agencies, who pay at least some limited amount of overtime, and direct care workers, whose hours of work are reduced by that agency (although the direct care workers might seek additional hours to work at other agencies). Combining the $142.1 million estimated overtime compensation costs under OT Scenario 2 (expected by the Department to be the most probable of the three scenarios), with the amounts due based upon the travel time compensation provisions, the Department estimated the deadweight loss of the rule based on first year transfer costs of $210.2 million; this excludes 70 percent of overtime payments to IHSS workers. Thus, the rule might cost $159 per potentially affected worker, or approximately $0.09 per hour assuming workers average 35 hours per week, about 0.89 percent of the current hourly wage for HHAs and 0.92 percent for PCAs.

There are no econometric estimates of the price elasticity of demand or supply for home care services. The Department reviewed econometric literature to identify alternatives to use as proxies for a direct estimate of the price elasticity of demand for home care services. For the price elasticity of demand for home care services that are largely reimbursed by third party payers (e.g., public payers, private insurance), the Department chose the price elasticity of demand for "health care services" to use as a proxy for this analysis. The primary consideration in selecting this value is that the demand for home care should be largely inelastic due to the high degree of reimbursement; this characteristic is similar to the demand for health care services. A literature review shows that the price elasticity of demand for health care services is generally in the −0.10 to −0.20 range. As discussed earlier in the analysis, the Department will use a value of −0.17 in the deadweight loss model.

The price elasticity of demand for private pay care is expected to be more elastic because this type of demand is often for long-term chronic care, and is typically not reimbursed by third party payers. Therefore the Department selected the price elasticity of demand for nursing home care to use as a proxy: nursing home care appears to be a close substitute for long-term private pay home care because consumers frequently must choose between living at home with assistance, or entering a nursing home or assisted living facility if that assistance is unavailable or too expensive. Literature shows price elasticities of demand for nursing care in the −0.7 to about −4.0 range. For the reasons previously discussed, the Department will use a value of −1.0 in the deadweight loss model.[183]

For the purpose of estimating deadweight loss, the Department will assume that the private pay sector composes perhaps 25 percent of the home care services market; the private pay market segment will be assumed to employ 25 percent of direct care workers and incur 25 percent of transfers in the form of overtime and travel time compensation. This judgment is based primarily on the percentage of home care services paid by public payers. Although private pay industry commenters on the NPRM asserted the private pay market is large, they provided little data to document this assertion. The only portion of the private pay market that could be documented (e.g., private pay franchisees) was a fraction of the number of agencies claimed to operate in the private pay market.

In addition, the Department could find no corroboration to support the claim of a large private pay segment in other databases. The Department examined alternative data sources such as the nationally-representative MEPS database, which captures the use of long-term non-medical care (e.g., companionship and homemaker services) in addition to short-term acute medical home care. The MEPS data offered little support for the existence of a large private pay market for home care services. Private pay appears to be more frequently used with independent providers, whereas payment for agency services was dominated by Medicare and Medicaid with a relatively small percentage of consumers paying out-of-pocket for agency care.

The price elasticity of supply for hourly labor has been estimated at 0.1 (a 1 percent increase in wages will cause a 0.1 percent increase in hours supplied). However, among women, that price elasticity of supply is estimated to be about 0.14; because hours worked in this labor market are primarily supplied by women, the Department selected a value of 0.14 to use as the price elasticity of supply of home care services in this analysis.

Based on these price elasticities of supply and demand, the estimated cost per direct care worker hour, and baseline employment and wages, the Department projects that for:

- HHAs, hourly wage will increase by $0.03 to $9.94, and employment will decrease by about 332 (less than 0.1 percent of affected HHAs), or about 604,900 hours of home care services annually; deadweight loss will be $26,400 annually (less than 0.0001 percent of industry revenues).
- PCAs, hourly wage will increase by $0.03 to $9.52, and employment will decrease by 479 (less than 0.1 percent of affected PCAs), or about 872,500 hours of home care services annually; deadweight loss will be $38,100 annually (less than 0.0001 percent of industry revenues).

In addition, transfers to direct care workers will be borne by the consumers and their families in the form of higher prices, and by agencies and their owners in the form of reduced profit. The determination of who pays these transfers is a function of the relative price elasticities of supply and demand; the weighted average results for the two market sectors shows that about 38 percent of transfers will be borne by consumers, their families, and public payers, with the remainder borne by agencies (about 62 percent). For:

- HHAs, about $26.1 million is estimated to be paid by consumers, their families, and public payers; while $42.8 million is estimated to be paid by agencies and their owners in the form of reduced income.

---

[182] CSAC, CWDA, CAPA, and CICA, WHD–2011–0003–9420.

[183] Rechovsky, J. (1998). The Roles of Medicaid and Economic Factors in the Demand for Nursing Home Care, *Health Services Research,* 33(4 Pt 1): 787–813.

• PCAs, consumers, their families, and public payers are estimated to pay about $36.1 million, and $59.1 million is estimated to be paid by agencies and their owners in the form of reduced income.

Table 15 summarizes both the values of the parameters used in the deadweight loss analysis and the results of the analysis.

TABLE 15—SUMMARY OF DEADWEIGHT LOSS ESTIMATION

| | Medicare/Medicaid reimbursed | | | Private pay | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | HHA | PCA | Total | HHA | PCA | Total | HHA | PCA | Total |
| **Values Used in Deadweight Loss Analysis** | | | | | | | | | |
| Price Elasticity of Demand ...... | 0.17 | 0.17 | .......... | 1.00 | 1.00 | .......... | N/A | N/A | .......... |
| Price Elasticity of Supply ...... | 0.14 | 0.14 | .......... | 0.14 | 0.14 | .......... | 0.14 | 0.14 | .......... |
| Baseline Hourly Wage ...... | $9.91 | $9.49 | .......... | $9.91 | $9.49 | .......... | $9.91 | $9.49 | .......... |
| Baseline Employment [a] ...... | 336,709 | 465,052 | 801,761 | 96,278 | 132,976 | 229,254 | 432,987 | 598,028 | 1,031,015 |
| Compliance Costs ($ mil.) [b] ...... | .......... | .......... | $128.1 | .......... | .......... | $36.1 | .......... | $164.3 | .......... |
| Compliance Costs per Hour [c] ...... | .......... | .......... | $0.0878 | .......... | .......... | $0.0866 | .......... | .......... | $0.0875 |
| **Results of Deadweight Loss Analysis** | | | | | | | | | |
| Post-Rule Hourly Wage ...... | $9.95 | $9.53 | .......... | $9.92 | $9.50 | .......... | $9.94 | $9.52 | .......... |
| Change in Hourly Wage ...... | $0.040 | $0.040 | .......... | $0.011 | $0.011 | .......... | $0.033 | $0.033 | .......... |
| Post-Rule Total Employment ...... | 336,480 | 464,722 | 801,202 | 96,174 | 132,827 | 229,001 | 432,654 | 597,549 | 1,030,203 |
| Change in Employment ...... | 229 | 330 | 559 | 103 | 149 | 252 | 332 | 479 | 812 |
| Deadweight Loss ...... | $18,300 | $26,394 | $44,694 | $8,145 | $11,748 | $19,893 | $26,445 | $38,142 | $64,587 |
| % Paid by Purchasers [d] ...... | 45.2% | 45.2% | 45.2% | 12.3% | 12.3% | 12.3% | 37.9% | 37.9% | 37.9% |
| Amount Paid by Purchasers ($ mil.) ...... | $24.3 | $33.5 | $57.8 | $1.9 | $2.6 | $4.4 | $26.1 | $36.1 | $62.3 |
| % Paid by Employers [e] ...... | 54.8% | 54.8% | 54.8% | 87.7% | 87.7% | 87.7% | 62.1% | 62.1% | 62.1% |
| Amount Paid by Employers ($ mil.) ...... | $29.5 | $40.7 | $70.2 | $13.3 | $18.4 | $31.7 | $42.8 | $59.1 | $101.9 |

[a] Agency employment in states without minimum wage and/or overtime laws and tax-exempt employers plus independent providers in states without minimum wage laws.
[b] Estimated sum of transfers and costs from overtime Scenario 2, travel, minimum wage, and regulatory familiarization costs. Values do not include independent providers.
[c] Assumes each direct care worker works 35 hours per week 52 weeks per year.
[d] Costs and transfers paid by purchasers in the form of higher prices; includes direct purchase of home care services and services purchased through public payers.
[e] Costs and transfers paid by employers in the form of lower profits.

## Impact to Medicare and Medicaid Budgets

In 2012, HHS outlays for Medicare programs totaled $591 billion, and an estimated $34.1 billion went to home health programs.[184] In 2009, HHS and state outlays in support of Medicaid totaled $374 billion and approximately $50 billion went to home health services.[185][186] In 2009, Medicare and Medicaid accounted for nearly 75 percent of home care services revenue; thus, the impact of the Final Rule on home care will depend on how Medicare and Medicaid respond to increased labor costs.

Although increased compensation to workers under this Final Rule associated with travel and overtime hours are considered transfer effects from a societal perspective, the Department expects agencies will try to pass these transfers through to Medicare and Medicaid to the extent they are able. As described in the comment summary, several commenters expressed concern that public funding does not pay for travel and overtime; however, CRS notes that federal regulations do not explicitly regulate direct care worker wage or benefit levels with respect to service reimbursements. Agencies already pay workers only a portion of the reimbursement as wages, and the remainder presumably covers other costs of doing business. The CRS report also notes that although initially the costs may be passed through to consumers, over time Medicare and Medicaid reimbursements may be adjusted to reflect the added costs to agencies.[187]

Under the three overtime scenarios examined, average first year transfer payments range from $103.7 to $281.3 million depending on how home care agencies respond to overtime requirements. Assuming transfer payments are incurred proportionately to the percentage of baseline home care costs, then services funded by public payers might account for approximately 75 percent of these overtime and travel payments, about $77.7 million to $211.0 million in the first year. These payments compose 0.13 to 0.35 percent of total HHS and state outlays for home care services ($60.4 billion in 2011).[188]

## Projected Future Transfer Effects Due to Industry Growth

This section projects transfer effects and other impacts over 10 years. The Department used several key assumptions to develop these projections. First, the Department assumed that the number of home care workers directly employed in the homes and employed in states without current overtime premium requirements will remain a constant percentage of total employment in those occupations between 2012 and 2021 (about 41.6 percent of HHAs and 64.8 percent of PCAs).[189] We also assume that IHSS

[184] Center for Medicare and Medicaid Studies, Office of the Actuary. National Health Expenditure Accounts 2011–2021. Available at: *http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf*.

[185] Detailed Medicaid data by type of home healthcare is not yet available for 2012.

[186] Kaiser Commission on Medicaid and the Uninsured. 2012 Medicaid Home and Community-Based Services Programs: 2009 Data Update.

Note, not all of the HCBS goes to personal care services; a more detailed breakdown of this spending is not available. For additional data, see Kaiser Family Foundation, State Health Facts: *http://statehealthfacts.org/comparetable.jsp?ind=242&cat=4*.

[187] Congressional Research Service. Memorandum dated February 21, 2012, titled "Extending Federal Minimum Wage and Overtime Protections to Home Care Workers under the Fair Labor Standards Act: Impact on Medicare and Medicaid." WHD–2011–0003–5683.

[188] Center for Medicare and Medicaid Studies, Office of the Actuary. National Health Expenditures by type of service and source of funds, CY 1960–2011. Available at: *http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html*.

[189] These percentages are derived by dividing the number of workers without overtime coverage

Continued

employment grows at the same rate as HHA and PCA employment, and that 70 percent of IHSS workers care for family members.

Second, the Department also maintained the assumptions that 12 percent of HHAs and PCAs exceed 40 hours worked per week and that 10 percent of these direct care workers work 6.4 hours of overtime per week while 2 percent work 21.0 hours of overtime per week. We assume IHSS workers exceeding 40 hours per week remain a constant percent of total IHSS workers. These overtime assumptions are identical to those used to estimate costs and transfers for the Year 1 baseline analysis.

Third, consistent with the baseline analysis, we project three overtime scenarios. In these scenarios, employers adjust schedules as follows:

• OT Scenario 1: Employers adjust the hours worked and pay workers an overtime premium for 60 percent of the overtime hours worked prior to the rule.

• OT Scenario 2: Employers adjust the hours worked and pay workers an overtime premium for 40 percent of the overtime hours worked prior to the rule.

• OT Scenario 3: Employers adjust the hours worked and limit overtime hours to 10 percent of the overtime hours worked prior to the rule.

Finally, we continue to estimate travel time pay as 19.2 percent of overtime evaluated at 100 percent of baseline overtime hours worked.

The Department excluded potential transfer effects associated with the minimum wage provision from the projections because the number of workers earning less than the minimum wage has declined steadily, to the point of being at or near zero, as nominal wages have increased: thus, the Department estimates that the minimum wage provisions of this Final Rule will have negligible impact if the federal

minimum wage stays at its current level. As previously discussed, based on the infrequency with which Congress historically has enacted updates to the minimum wage, the Department did not assume any minimum wage increase in the analysis. Although the Department expects that the parameters used in this analysis will not remain constant through 2021, it has insufficient information on which to base estimates of how these key variables might change over time. Therefore, maintaining the assumptions used in the Year 1 analysis provide the best basis for projecting future costs and transfer effects.

Based on the data and assumptions described in this section, and the employment and wage projections in Table 13, Table 16 presents the Department's projections through 2021 of overtime and travel time compensation attributable to the revisions to the companionship regulations in this Final Rule.

TABLE 16—PROJECTED HHA AND PCA OVERTIME HOURS, OVERTIME COMPENSATION AND TRAVEL TIME COMPENSATION ATTRIBUTABLE TO FINAL RULE, 2012–2021 [a]

| Year | Overtime hours worked (millions) | | | Overtime and travel time compensation (millions) | | | |
|---|---|---|---|---|---|---|---|
| | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 1 | Scenario 2 | Scenario 3 | Travel |
| | Nominal Dollars | | | | | | |
| 2012 | 48.1 | 32.1 | 8.0 | $247.0 | $164.6 | $41.2 | $78.9 |
| 2013 | 52.1 | 34.8 | 8.7 | 276.9 | 184.6 | 46.1 | 88.5 |
| 2014 | 56.2 | 37.4 | 9.4 | 308.3 | 205.5 | 51.4 | 98.5 |
| 2015 | 60.2 | 40.1 | 10.0 | 341.1 | 227.4 | 56.8 | 109.0 |
| 2016 | 64.2 | 42.8 | 10.7 | 375.3 | 250.2 | 62.6 | 120.0 |
| 2017 | 68.2 | 45.5 | 11.4 | 411.0 | 274.0 | 68.5 | 131.4 |
| 2018 | 72.2 | 48.2 | 12.0 | 448.1 | 298.7 | 74.7 | 143.2 |
| 2019 | 76.3 | 50.8 | 12.7 | 486.6 | 324.4 | 81.1 | 155.5 |
| 2020 | 80.3 | 53.5 | 13.4 | 526.6 | 351.0 | 87.8 | 168.3 |
| 2021 | 84.3 | 56.2 | 14.0 | 568.0 | 378.6 | 94.7 | 181.5 |
| | Inflation-Adjusted Dollars [b] | | | | | | |
| 2012 | 48.1 | 32.1 | 8.0 | $244.2 | $162.8 | $40.7 | $78.1 |
| 2013 | 52.1 | 34.8 | 8.7 | 270.7 | 180.5 | 45.1 | 86.5 |
| 2014 | 56.2 | 37.4 | 9.4 | 297.9 | 198.6 | 49.7 | 95.2 |
| 2015 | 60.2 | 40.1 | 10.0 | 325.8 | 217.2 | 54.3 | 104.1 |
| 2016 | 64.2 | 42.8 | 10.7 | 354.4 | 236.3 | 59.1 | 113.3 |
| 2017 | 68.2 | 45.5 | 11.4 | 383.6 | 255.8 | 63.9 | 122.6 |
| 2018 | 72.2 | 48.2 | 12.0 | 413.5 | 275.6 | 68.9 | 132.2 |
| 2019 | 76.3 | 50.8 | 12.7 | 443.9 | 295.9 | 74.0 | 141.9 |
| 2020 | 80.3 | 53.5 | 13.4 | 474.8 | 316.5 | 79.1 | 151.8 |
| 2021 | 84.3 | 56.2 | 14.0 | 506.2 | 337.5 | 84.4 | 161.8 |

[a] Calculations based on employment and wage data in Table 13 and specified assumptions.
[b] Inflation estimates based on 10-year average change in PPI for Home Health Services.

The Department projects that paid overtime hours will increase from 48.1 million to 84.3 million between 2012 and 2021 with a consequent increase in overtime compensation from $247.0

million to $568.0 million (OT Scenario 1). This corresponds to a $244.2 to $506.2 million increase in inflation-adjusted overtime compensation. In OT Scenario 2, overtime compensation is

projected to increase from $162.8 million to $337.5 million in inflation-adjusted dollars. Assuming employers only cover 10 percent of overtime, and the other 90 percent of overtime hours

(917,039 total; 385,115 HHAs plus 531,924 PCAs) by the total employment (1.75 million; 924,660

HHAs plus 820,630 PCAs). Specifically, for HHAs, it is 385,115/924,660 and for PCAs, it is 531,923/820,630 (see Table 8).

the source of the percentage is 385,115/924,660 and for PCAs, it is 531,923/820,630 (see Table 8).

are eliminated through scheduling changes and/or hiring additional workers (OT Scenario 3), the projected increase ranges from $40.7 million to $84.4 million in inflation-adjusted dollars. Travel time compensation is projected to increase from $78.1 million to $161.8 million in inflation-adjusted dollars over that same period.

To place these projected future transfer effects resulting from the Final Rule in context, the Department compared nominal transfer effects to projected Medicare and Medicaid spending over the same period. The Centers for Medicare & Medicaid Services report that in 2012 Medicare

expenditures totaled $590.8 billion, while Medicaid expenditures were $458.9 billion; $34.1 billion of Medicare and $29.7 billion of Medicaid expenditures were spent on the provision of home care services.[190] By 2021, annual Medicare and Medicaid expenditures are projected to total $1,964 billion of which annual home care expenditures under both programs might increase to $126 billion .

After adjusting projected overtime and travel transfer effects, the Department expects that these incremental transfers will compose 0.40 percent of projected Medicare and Medicaid Home Health Care

expenditures under OT Scenario 1, 0.30 percent under Scenario 2, and 0.154 percent of those expenditures under OT Scenario 3. Table 17 summarizes the projected National Health Care budgets, incremental payments attributable to the Final Rule, and those payments as a percent of National Health Care expenditures from 2012 through 2021. Projected overtime and travel payments resulting from the rule account for a similar, but slightly larger, percentage of National Home Health Care (i.e., all U.S. public and private home health care spending) than they do for public spending programs on home care.

TABLE 17—PROJECTED OVERTIME AND TRAVEL TIME COMPENSATION AS PERCENT OF PROJECTED NATIONAL HOME HEALTH CARE EXPENDITURES

| Year | Projected expenditures (billions) [a][b] | | Adjusted overtime & travel time compensation in nominal dollars (millions) | | | OT & Travel as % projected home health care | | |
|---|---|---|---|---|---|---|---|---|
| | Total | Home health care | OT 1 + Travel | OT 2 + Travel | OT 3 + Travel | OT 1 + Travel | OT 2 + Travel | OT 3 + Travel |
| 2012 | $2,809 | $77.5 | $326.5 | $244.2 | $120.7 | 0.42 | 0.31 | 0.16 |
| 2013 | 2,915 | 81.9 | 366.0 | 273.7 | 135.3 | 0.45 | 0.33 | 0.17 |
| 2014 | 3,130 | 88.3 | 407.4 | 304.7 | 150.5 | 0.46 | 0.34 | 0.17 |
| 2015 | 3,308 | 94.5 | 450.7 | 337.0 | 166.5 | 0.48 | 0.36 | 0.18 |
| 2016 | 3,514 | 101.2 | 495.9 | 370.8 | 183.1 | 0.49 | 0.37 | 0.18 |
| 2017 | 3,723 | 108.4 | 543.0 | 406.0 | 200.5 | 0.50 | 0.37 | 0.19 |
| 2018 | 3,952 | 117.1 | 591.9 | 442.6 | 218.5 | 0.51 | 0.38 | 0.19 |
| 2019 | 4,207 | 126.6 | 642.8 | 480.6 | 237.3 | 0.51 | 0.38 | 0.19 |
| 2020 | 4,487 | 137.0 | 695.5 | 520.0 | 256.7 | 0.51 | 0.38 | 0.19 |
| 2021 | 4,781 | 148.3 | 750.2 | 560.8 | 276.9 | 0.51 | 0.38 | 0.19 |

[a] Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011–2021. Available at: *http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf*.
[b] "National Health Care" indicates all U.S. public and private health care spending, as tabulated by the CMS Office of the Actuary.

The Department also projected deadweight loss and employment impacts over 10 years. These projections are calculated maintaining the assumptions concerning the market

shares and the price elasticities of supply and demand discussed in the first year deadweight loss analysis and projected overtime and travel time compensation presented in Table 16.

The Department's calculated deadweight loss and employment impacts over 10 years are summarized in Table 18.

TABLE 18—PROJECTED DEADWEIGHT LOSS AND EMPLOYMENT IMPACTS

| | Year 1 ($ mil.) | Other Years ($ mil.) [a] | | Average Annualized Value ($ mil.) | |
|---|---|---|---|---|---|
| | | Year 2 | Year 10 | 3% Real Rate | 7% Real Rate |
| **Costs** [h] | | | | | |
| Regulatory Familiarization: | | | | | |
| Agencies | | $6.9 | $0.6 | $0.6 | $1.3 | $1.4 |
| Families Hiring Self-Employed Workers | | $5.4 | $2.8 | $3.6 | $3.4 | $3.5 |
| Hiring Costs [b]: | | | | | |
| 30% OT remaining in OT 1 | | $8.4 | $0.8 | $0.8 | $1.6 | $1.8 |

[190] The 2009 Medicaid home care expenditures of $50 billion cited earlier in the report is composed of three types of programs: Home Health, Personal Care Services, and HCBS 1915 waiver programs. These data are compiled retrospectively by the Kaiser Commission on Medicaid and the Uninsured, and the Department believes that spending in these three types of programs best

characterizes Medicaid home health expenditures. CMS Office of the Actuary classifies home health care expenditures somewhat differently in its National Health Expenditures Projections; in 2009 the NHE value for home health care was about half the Kaiser value at $24.3 billion. The Department chose to use the official CMS projections for home health care for consistency in methodology with all

other expenditure projections used in this section and presented in Table 17. The Department believes these projections underestimate future Medicaid home health expenditures; however, note that if larger projected values were used in the analysis, the impacts presented in Table 17 would be proportionately smaller.

TABLE 18—PROJECTED DEADWEIGHT LOSS AND EMPLOYMENT IMPACTS—Continued

| | Year 1 ($ mil.) | Other Years ($ mil.) [a] | | Average Annualized Value ($ mil.) | |
| --- | --- | --- | --- | --- | --- |
| | | Year 2 | Year 10 | 3% Real Rate | 7% Real Rate |
| 20% OT remaining in OT 2 | $8.4 | $0.8 | $0.8 | $1.6 | $1.8 |
| 10% OT remaining in OT 3 | $6.3 | $0.6 | $0.6 | $1.2 | $1.3 |
| Total costs (30% of OT 1) | $20.6 | $4.2 | $5.0 | $6.4 | $6.7 |
| Total costs (20% of OT 2) | $20.6 | $4.2 | $5.0 | $6.4 | $6.7 |
| Total costs (10% of OT 3) | $18.6 | $4.0 | $4.8 | $6.0 | $6.2 |
| **Transfers** | | | | | |
| Travel Wages | $68.1 | $78.1 | $151.8 | $107.1 | $104.3 |
| Overtime Scenarios: | | | | | |
| OT 1 [c] | $213.2 | $244.2 | $474.8 | $335.2 | $326.3 |
| OT 2 [d] | $142.1 | $162.8 | $316.5 | $223.5 | $217.5 |
| OT 3 [e] | $35.5 | $40.7 | $79.1 | $55.9 | $54.4 |
| **Total Transfers by Scenario** | | | | | |
| Travel + OT 1 | $281.3 | $322.3 | $626.5 | $442.3 | $430.5 |
| Travel + OT 2 | $210.2 | $240.9 | $468.3 | $330.6 | $321.8 |
| Travel + OT 3 | $103.7 | $118.8 | $230.9 | $163.0 | $158.7 |
| **Deadweight Loss ($ millions)** | | | | | |
| Travel + OT 1 | $0.116 | $0.132 | $0.257 | $0.182 | $0.177 |
| Travel + OT 2 | $0.065 | $0.074 | $0.144 | $0.101 | $0.099 |
| Travel + OT 3 | $0.016 | $0.018 | $0.035 | $0.025 | $0.024 |
| **Total Cost of Regulations** [f] | | | | | |
| RF + HC + DWL (OT 1) | $20.8 | $4.3 | $5.2 | $6.6 | $6.8 |
| RF + HC + DWL (OT 2) | $20.7 | $4.2 | $5.1 | $6.5 | $6.8 |
| RF + HC + DWL (OT 3) | $18.6 | $4.0 | $4.8 | $6.0 | $6.2 |
| **Disemployment (number of workers)** | | | | | |
| Travel + OT 1 | 1,086 | 1,184 | 1,976 | 1,531 | (9) |
| Travel + OT 2 | 812 | 885 | 1,477 | 1,144 | (9) |
| Travel + OT 3 | 400 | 436 | 728 | 564 | (9) |
| **Benefits from Reduced Turnover** [b][f] | | | | | |
| OT 1 | $40.3 | $34.9 | $30.9 | $33.8 | $34.1 |
| OT 2 | $30.2 | $24.7 | $20.7 | $23.6 | $23.9 |
| OT 3 | $14.9 | $10.7 | $7.7 | $9.9 | $10.1 |
| **Net Benefits** [f] | | | | | |
| OT 1 | $19.6 | $30.6 | $25.7 | $27.3 | $27.3 |
| OT 2 | $9.4 | $20.5 | $15.5 | $17.1 | $17.1 |
| OT 3 | − $3.7 | $6.7 | $2.9 | $3.9 | $3.9 |

[a] These costs represent a range over the nine-year span. Costs are lowest in Year 2 and highest in Year 10 so these two values are reported.
[b] We use three scenarios under which agencies redistribute overtime hours to either current part-time workers or new hires to manage overtime costs: 40 percent of overtime hours are redistributed under OT Scenario 1, 60 percent under OT Scenario 2, and 90 percent under OT Scenario 3. Of this redistributed overtime, various percentages are redistributed to part-time workers and new hires: New hires constitute 30 percent of redistributed hours under OT Scenario 1 (12 percent of total overtime), 20 percent under OT Scenario 2 (12 percent of total), and 10 percent under OT Scenario 3 (9 percent of total).
[c] Of the total, about 31 percent (e.g., $66.6 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $20.0 million in Year 1) are included in the turnover and deadweight loss analyses.
[d] Of the total, about 31 percent (e.g., $44.4 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $13.3 million in Year 1) are included in the turnover and deadweight loss analyses.
[e] Of the total, about 31 percent (e.g., $11.1 million in Year 1) is attributable to IHSS direct care workers; 30 percent of IHSS costs (e.g., $3.3 million in Year 1) are included in the turnover and deadweight loss analyses.
[f] Results based on the combination of overtime scenario and hiring costs presented under Hiring Costs.
[g] Simple average over 10 years.
[h] Excludes paperwork burden, estimated in Section V.

Average annualized minimum wage, overtime premium, and travel time compensation range from $158.7 million to $430.5 million per year based on how employers adjust to the requirement to pay overtime wage premiums using a 7 percent discount rate. These transfers are projected to cause average annualized deadweight loss ranging

from $24,000 to $177,000 per year. These transfers are also projected to cause disemployment impacts ranging from 564 to 1,531 workers per year. In general, approximately 70 percent of deadweight loss and disemployment occurs in the publicly funded market and 30 percent in the private pay market.

Non-Monetized Projected Impacts

Two additional aspects of home care services might be affected by the rule. The rule might result in increased purchases of home care services through informal arrangements with independent providers and, although the hours of care received by consumers might be unaffected by the increased costs of care, additional caregivers may be required to provide the same number of hours of services. These additional aspects are discussed in turn below.

Independent Providers

An unknown number of consumers receive home care services through more informal arrangements with care provided by independent providers. Here, informal agreements are reached between the consumer (or consumer's family) and the direct care worker regarding hours of care and hourly pay rates. Services can be provided at lower cost than when provided through agencies because the independent provider does not incur administrative and overhead costs and may have more flexibility to negotiate on prices and scheduling.

The Final Rule will increase costs to home care agencies that offer services in states where they are not currently required to pay the minimum wage and/ or overtime compensation and an unknown percentage of those costs might be reimbursed by public payers. If the costs are not fully reimbursed, home care agencies might increase the rates they charge consumers, have their profit margin squeezed, or both. If costs are passed through to consumers and their families, they will have incentive to look for lower cost alternatives, such as informal arrangements with independent providers. In addition, workers who desire to work more than 40 hours per week might have opportunities to provide services as independent providers rather than work for multiple agencies. Although the rule might increase incentives on both sides to use informal arrangements with independent providers, there is no information available to project potential changes to that market.

Continuity of Care

Continuity of care "is commonly framed as being composed of provider continuity (a relationship between a consumer and provider over time), information continuity (availability and use of data from prior events during current consumer encounters) and management continuity (coherent delivery of care from different doctors)." [191] In the home care scenario, concerns have been raised that continuity of care, specifically provider continuity, may suffer if employers opt not to pay overtime for direct care workers who, for example, work more than 40 hours per week for a single consumer and the employers instead schedule other direct care workers to provide home care services to that consumer in the same workweek. Some are concerned that a break in the continuity of care may result in a reduction in the quality of care.

The Department understands that home care involves more than the provision of impersonal services; when a direct care worker spends significant time with a consumer in the consumer's home, the personal relationship between direct care worker and consumer can be very important. Certain consumers may prefer to have the same direct care worker(s), rather than a sequence of different direct care workers. The extent to which home care agencies choose to spread employment (hire more direct care workers) rather than pay overtime may cause an increase in the number of direct care workers for a consumer; the consumer may be less satisfied with that care, and communication between direct care workers might suffer, affecting the quality of care for the consumer.[192] Alternatively, having additional direct care workers may improve continuity of care by minimizing disruption of care when the primary direct care worker is unavailable due to vacation or being sick.

Continuity of care may suffer from the provision of too few direct care workers. This may occur currently because, as discussed below, an agency can schedule direct care workers without regard for the number of hours worked each week, which may cause increased turnover rates. Although matching consumer and direct care worker in a long-term personal relationship is the ideal for many consumers, it may not be

the norm. Low wages and long, irregular hours may contribute to the high turnover rate in the industry, resulting in low continuity of care. For instance, the turnover rate (those leaving and entering home care work) for workers in the home care industry has been estimated to range from 44 to 65 percent per year.[193] Other studies have found turnover rates to be much higher, up to 95 percent[194] and, in some cases, 100 percent annually.[195] Thus, many consumers already experience a sequence of different direct care workers, and it is not apparent that the Final Rule will necessarily exacerbate that experience.

Application of the FLSA's minimum wage and overtime compensation protections may reduce turnover rates. Frequent turnover is costly for employers in terms of recruitment costs and training of new direct care workers and also in terms of the likelihood of a reduction of quality care or not being able to provide care at all. The employee turnover rate in this industry is high because of low wages, poor or nonexistent benefits, and erratic and unpredictable hours. Job satisfaction, and the desire to remain in a given position, is highly correlated with wages, workload, and working conditions. Increased pay for the same amount of work and overtime compensation likely would aid in employee retention and attracting new hires. Those employers who choose not to pay overtime would need to spread the hours among their employees, resulting in more consistent work hours for many direct care workers. As one study found, for this low-income workforce, "higher wages, more hours, and travel cost reimbursement are found to be significantly associated with reduced turnover." [196] Another report determined that "increases in the federal or state minimum wage can make home care employment more

[191] Van Walraven, C., Oake, N., Jennings, A., et al. (2009). The Association Between Continuity of Care and Outcomes: A Systematic and Critical Review. *Journal of Evaluation in Clinical Practice,* 16(5): 947–956.

[192] Brief of Amici Curiae City of New York. 2007.

[193] Seavey and Marquand, 2011, p. 70. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf.*

[194] Zontek, T., Isernhagen, J., Ogle, B. (2009). Psychosocial Factors Contributing to Occupational Injuries Among Direct Care Workers. *American Association of Occupational Health Nurses Journal,* 338–347.

[195] Ashley, A., Butler, S., Fishwick, N. (2010). Home Care Aide's Voices from the Field: Job Experiences of Personal Support Specialists. The Maine Home Care Worker Retention Study. *Home Healthcare Nurse,* 28(7), 399–405.

[196] Morris, L. (2009). Quits and Job Changes Among Home Care Workers in Maine: The Role of Wages, Hours and Benefits. *The Gerontologist,* 49(5), 635–650.

desirable.'' [197] This finding was echoed in comments submitted by Steven Edelstein of PHI and the Women's Employment Rights Clinic.

For the estimated 8 to 12 percent of direct care workers who work more than 40 hours per week, only a portion of that percentage likely provides services for the same consumer. Many who work overtime accrue long hours in the service of at least a few consumers, traveling between consumer homes during the workweek. For example, the 2011 Private Duty Homecare Benchmarking Study found that firms with annual revenue greater than $2 million attribute about 23 percent of weekly billable hours to live-in care (which presumably exceeds 120 hours of paid work per week per consumer), yet the average consumer only receives 25 hours of service per week.[198] Thus, if the average consumer receives 25 hours of care per week, yet a disproportionate number of service hours are accrued by the minority of patients receiving 24-hour care, then most consumers must be receiving substantially less than 25 hours of care per week and their direct care workers must be responsible for multiple consumers. Such consumers should probably not lose any continuity of care as a result of agencies spreading some overtime hours to other workers. It is also conceivable that, in a minority of cases, the direct care worker provides home care services around the clock for a stretch of a few days.

Analysis of the NHHAS shows that those direct care workers who typically work overtime work 49 hours per week on average, not including travel time between consumer homes. Provider continuity that results in overtime work has drawbacks. From the aide's perspective, the long work hours can be a burden. For instance, "shifts beyond the traditional 8 hours have been associated with increased risk of errors, incidents, and accidents." [199]

Many regard having the same direct care worker for long hours as a cornerstone of "continuity of care" and having more direct care workers to cover the same number of direct care worker hours for a consumer as negatively impacting quality of care. As discussed above, however, the opposite may be true. Working extended hours may affect the quality of care that the aide is able to provide and even the aide's own health and well-being.

Furthermore, paying employees below minimum wages, not paying for all hours worked or overtime, and providing no training or benefits is not the only path to financial success for employers in the home care industry. Another business model, in which employees receive training, an overtime wage differential, and health care benefits, has been successful. Cooperative Home Care Associates (CHCA), based in New York, for example, has always paid workers overtime. Although overtime at CHCA is carefully managed, it can still be substantial (e.g., 30 percent or more of employees exceed 40 work hours per week); allowing, even expecting overtime, permits CHCA, however, to use a staffing plan that maintains continuity of care. These policies have driven CHCA's turnover rate far below the industry average, a major factor in its financial success.[200] In terms of employee coverage, CHCA cases requiring weekday and weekend coverage are assigned permanent direct care workers who work on alternate weekends. Also, cases requiring 24-hour coverage, seven days per week, are shared among four direct care workers, requiring only some overtime hours.[201]

Other agencies such as Community Care Systems, Inc., in Springfield, Illinois, have reduced overtime costs by distributing extra hours more evenly among workers through better tracking of work hours. Close monitoring of employee workloads and spreading of work hours also curbed overtime use for Illinois-based Addus HealthCare, one of the nation's largest home care employers. These employers pay overtime even in those states that do not require it, demonstrating that "wage and hour protections are economically realistic for the industry, and can be achieved without excessive use of costly overtime hours." [202] These examples suggest that requiring overtime compensation in this industry does not inevitably cause disruption of employer-employee relationships and direct care worker-consumer relationships leading to higher turnover, discontinuity of consumer care, and increased use of independent providers.

Transfer Effects

Perhaps the most visible effect of the Final Rule is the transfer of income from businesses and their owners to workers, and potentially, from one group of workers to another group of workers. In economics, a transfer payment is broadly defined as a redistribution of income in the market system that does not affect total output.

Transfer Effects Associated With Travel Provisions

The Final Rule leads to an unambiguous transfer from employers to employees in those states that currently do not require compensation for travel time—approximately $68.1 million in Year 1.

Two factors could change the dynamics of this transfer scenario. First, increased wages for compensating travel time might be passed through to consumers in the form of higher prices for home care services. If those higher prices result in consumers finding alternatives to home care services (e.g., accessing independent providers for services), then the income transfer from travel compensation is partially mitigated because the provision of home care services is reduced, resulting in reduced revenues to agencies, and a deadweight loss to the economy. This reduction in demand by households will be less pronounced if the demand for home care services is inelastic (i.e., the hours of home care services purchased does not change significantly when price increases, as in the public pay market). However, the Department's deadweight loss analysis did not show significant reductions in the private pay market for which the price elasticity of demand is much larger than the market for publicly funded care.

Second, the Department expects that over time some of these costs may be reimbursed. To the extent that public payers increase reimbursement rates to cover these costs, the transfer is from the federal and state agencies to workers.

Transfer Effects Associated With Overtime Provisions

The transfer of income associated with the payment of the overtime differential is more ambiguous. Employers are likely to respond to overtime compensation requirements along a spectrum ranging from (1) reducing overtime work to the extent possible and spreading hours to other workers or hiring new workers to fill the available hours, to (2) maintaining current staffing patterns and paying overtime for all work hours exceeding

---

[197] Burbridge, L. (1993). The Labor Market for Home Care Workers: Demand, Supply, and Institutional Barriers. *The Gerontologist*, 33(1), 41–46.

[198] Home Care Pulse. 2011. 2011 Annual Private Duty Home Care Benchmarking Study. Highlights Edition, p. 24.

[199] Keller, S. (2009). Effects of extended work shifts and shift work on patient safety, productivity, and employee health. *American Association of Occupational Health Nurses Journal*, 57(12), 497–502.

[200] Elsas & Powell, 2011.
[201] NELP report, p. 26.
[202] NELP report, pgs 25–26.

40 per week. To the extent that employers choose to pay overtime, the income transfer is from businesses and their owners to workers. However, to the extent that employers eliminate overtime and spread the now available hours to other employees or new hires, the transfer is from worker to worker. Employees who used to exceed 40 hours of work per week will work fewer hours, transferring income to fellow workers who will absorb the extra hours. It is also possible that those employees working more than forty hours per week may distribute those hours among multiple employers.

Reduced Reliance on Public Assistance

An increase in wages might reduce direct care worker reliance on public assistance programs to meet the needs of their own households. Recent research finds that approximately 50 percent of personal care aides rely on public assistance.[203] Almost 90 percent of these workers are women.[204]

Assuming these workers are in a family consisting of themselves and two children, the average amount of public assistance for such families is about $10,300.[205] In addition, many minimum wage workers also receive food stamps. The federally-assisted Supplemental Nutrition Assistance Program (SNAP, previously referred to as the Food Stamp Program) provided aid to 44.7 million participants in an average month in 2011 with total annual expenditures of $71.8 billion, an average of $1,600 in food stamps expenditures per participant.[206] This would entail $4,800 per family for an assumed family of three. In total, the average direct care worker might receive $15,100 in public assistance and food stamps to provide for her/his family.

Increased wages should reduce demand for public assistance services resulting in a savings to these programs; however, the Department is unable to quantify the savings due to the lack of data on how the benefits of these programs vary with income. The savings associated with the minimum wage provisions under the Final Rule might

be negligible since the Department estimates that no workers currently earn less than the minimum wage. To the extent that the employees' work requires significant travel time and overtime, or added hours of work due to employer schedule adjustments, they will also receive additional income (note that some workers may lose hours or pay as a result of employer schedule adjustments, which may actually increase their reliance on public assistance). The Department did not estimate this portion of the potential economic impact due to uncertainty about the number of workers who would receive compensation for travel time or additional hours of work.

*H. Benefits*

This section describes the expected benefits of the changes to the companionship services exemption made by this Final Rule. Potential benefits of this revision to the "companionship services exemption" flow from the transfer of regular and overtime wages to workers from their employers, and include: Reduced worker turnover and potentially reduced worker injury rates.

Reduction in Employee Turnover Rates

Researchers have found that lower wages are associated with higher turnover and lower quality of care, and that increases in wages for direct care workers result in decreased turnover rates.[207] Frequent turnover is costly for employers in terms of recruitment costs and training of new direct care workers and also in terms of the likelihood of a reduction in the quality of care or not being able to provide care at all. The employee turnover rate in this industry is high because of low wages, poor or nonexistent benefits, and erratic and unpredictable hours. Job satisfaction, and the desire to remain in a given position, is highly correlated with wages, workload, and working conditions. Increased pay for the same amount of work and overtime compensation likely would aid in employee retention.

Studies estimating the relationship between wage rate and turnover rate often express that relationship as an elasticity—the percentage change in turnover rate associated with a one percent change in the wage rate. Studies have found turnover rates in the home care industry that range from 44 to 95 percent per year, and even approach 100

percent per year.[208] Based on the study most relevant to our analysis, the Department judges that the elasticity of the turnover rate with respect to a change in the wage rate is −2.17.[209] However, the Department acknowledges that when many agencies are simultaneously increasing wages, the overall impact on turnover might be smaller. Therefore the Department also presents a sensitivity analysis using a smaller turnover elasticity of −0.844. For the purpose of estimating the impact of the rule on turnover costs, we assume the initial turnover rate is 50 percent. The Department estimates the value of the excess cost to the business of employee turnover as about $3,000 in 2011 dollars based on Seavey (2004). About 75 percent of this cost is attributable to hiring the replacement worker, while the remainder is attributable to the costs of separation and vacancy.[210]

The Department estimated the impact of applying the minimum wage and overtime provisions of the FLSA on turnover costs. The Department believes few, if any, direct care workers currently earn less than the minimum wage. Therefore, we project no decline in turnover rates as a result of the minimum wage requirement.

Table 19 also shows the estimated change in turnover costs due to travel reimbursement and overtime compensation in the three overtime scenarios. The Department estimates that the turnover rate will decrease by 1.3 percentage points due to an average increase in compensation of 1.21 percent in OT Scenario 1. This corresponds to a $40.3 million decrease in turnover costs in Year 1. In OT Scenario 2, the Department calculates that the turnover rate will decrease by 1.0 percentage point due to an average increase in the hourly wage of 0.91 percent, corresponding to a reduction in turnover costs of $30.2 million. When agencies pay only 10 percent of the current overtime hours (OT Scenario 3), the turnover rate will decrease by 0.5 percentage points due to an average increase in the hourly wage of 0.45 percent; this corresponds to a $14.9 million reduction in Year 1 turnover costs.

[203] Seavey and Marquand, 2011, p. 58. WHD–2011–0003–3514. Also available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/caringamerica-20111212.pdf*.

[204] Seavey and Marquand, 2011, p. 10. WHD–2011–0003–3514. *http://phinational.org/sites/phinational.org/files/clearinghouse/caringinamerica-20111212.pdf*

[205] TANF Eighth Annual Report to Congress.

[206] Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2011, U.S. Department of Agriculture, Food and Nutrition Service, November 2012. Available at: *http://www.fns.usda.gov/ora/MENU/Published/snap?FILES/Participation/2011Characteristics.pdf*.

[207] Powers, E., Powers, N. (2010). Causes of Caregiver Turnover and the Potential Effectiveness of Wage Subsidies for Solving the Long-Term Care Workforce 'Crisis.' *The B.E. Journal of Economic Analysis & Policy* 10(1): Article 5.

[208] PHI 2010a; Zontek, T., Isernhagen, J., Ogle, B., (2009); Ashley, A., Butler, S., Fishwick, N., (2010).

[209] The study most comparable used data from the San Francisco County home care workers (Howes, C. (2005). Living Wages and Retention of Homecare Workers in San Francisco. *Industrial Relations: A Journal of Economy and Society.* 44(1): 139–163).

[210] Seavey, D. 2004. The Cost of Frontline Turnover in Long-Term Care. Washington, DC: IFAS/AAHSa, p. 11. Available at: *http://phinational.org/sites/phinational.org/files/clearinghouse/TOCostReport.pdf*.

TABLE 19—YEAR 1 IMPACT ON TURNOVER COSTS

| | Initial values | Resulting values |
|---|---|---|
| **Application of the minimum wage provision** | | |
| Turnover Rate | 50.0% | 45.6% |
| Workers Impacted | 0 | |
| Annual Turnover Cost (in millions) | $0.0 | $0.0 |
| Change in Year 1 Turnover Cost (in millions) [a] | | $0.0 |
| **Application of the overtime provision** | | |
| OT Scenario 1 [b]: | | |
| Turnover Rate | 50.0% | 48.7% |
| Workers Impacted | 1,031,015 | |
| Annual Turnover Cost (in millions) | $1,534.6 | $1,494.3 |
| Change in Year 1 Turnover Cost (in millions) [c] | | −$40.3 |
| OT Scenario 2 [b]: | | |
| Turnover Rate | 50.0% | 49.0% |
| Workers Impacted | 1,031,015 | |
| Annual Turnover Cost (in millions) | $1,534.6 | $1,504.5 |
| Change in Year 1 Turnover Cost (in millions) [d] | | −$30.2 |
| OT Scenario 3 [b]: | | |
| Turnover Rate | 50.0% | 49.5% |
| Workers Impacted | 1,031,015 | |
| Annual Turnover Cost (in millions) | $1,534.6 | $1,519.8 |
| Change in Year 1 Turnover Cost (in millions) [e] | | −$14.9 |

[a] Because no workers are currently believed to be paid less than minimum wage, no reduction in turnover costs is attributed to the minimum wage provision.

[b] This analysis is performed on the same basis as the deadweight loss analysis (e.g., the same pool of workers, and overtime and travel time compensation).

[c] The change in annual turnover cost is the reduction in turnovers (13,552) multiplied by the estimate of the cost per turnover.

[d] The change in annual turnover cost is the reduction in turnovers (10,129) multiplied by the estimate of the cost per turnover.

[e] The change in annual turnover cost is the reduction in turnovers (4,994) multiplied by the estimate of the cost per turnover.

The first column in Table 20 presents the estimated net impact on turnover in Year 1 due to travel and overtime in each of the overtime scenarios. For OT Scenario 1, combining the impacts on turnover costs due to the application of overtime regulations shown in Table 19 above yields an estimated reduction in turnover costs of $40.3 million. The Department estimates that OT Scenario 2 corresponds to a $30.2 million decrease in costs, while OT Scenario 3 corresponds to a $14.9 million decrease in costs.

Table 20 also summarizes the total impact on turnover costs for Years 1 and 10. Based on the Department's estimation of the growth in overtime hours, agencies will need to continue to hire workers to cover these additional hours in subsequent years. The annual turnover rate will remain at the lower rate, while the total number of

employees is larger in each subsequent year due to the hiring of additional workers to cover some of the overtime hours; these additional workers would not have been hired in the absence of the overtime requirement. Thus, the absolute number of turnovers per year is increasing because the lower turnover rate is partly offset by the larger number of workers to whom it is applied. This reduces the annual savings attributable to the reduced turnover rate. Employers will continue to accrue cost savings due to reduced turnover, but those savings will be diminishing over time due to the increased employment. The Department calculates the net impact on annual turnover costs by subtracting the turnover cost associated with the initial 1.03 million positions and 50 percent turnover rate from the turnover costs based on the increased number of positions but decreased turnover rate as

estimated in Year 1. The growth in the number of workers depends on agencies' allocation of the additional overtime hours among paying the overtime premium, hiring new workers, and distributing the hours over existing workers. Within the three overtime scenarios, the Department considers three proportions of the remaining overtime hours covered by new hires as discussed in the hiring costs section— 30 percent, 20 percent, and 10 percent. Using a 7 percent real discount rate, the annualized decrease in turnover costs will range from $34.1 to $38.3 million per year in OT Scenario 1. In OT Scenario 2, the annualized decrease in turnover costs will range from $20.7 to $27.0 million each year. In OT Scenario 3, the annualized decrease in turnover costs will range from $0.6 to $10.1 million each year.

TABLE 20—SUMMARY OF IMPACT OF CHANGES TO FLSA ON TURNOVER COSTS

| Hiring full-time workers to cover | Year 1 ($ mil.) [a] | Future years ($ mil.) [b] | | Average annualized value ($ mil.) | |
|---|---|---|---|---|---|
| | | Year 2 | Year 10 | 3% Real rate | 7% Real rate |
| **OT Scenario 1** | | | | | |
| 30% of remaining OT hours | −$40.3 | −$34.9 | −$30.9 | −$33.8 | −$34.1 |
| 20% of remaining OT hours | −40.3 | −36.7 | −34.1 | −36.0 | −36.2 |

TABLE 20—SUMMARY OF IMPACT OF CHANGES TO FLSA ON TURNOVER COSTS—Continued

| Hiring full-time workers to cover | Year 1 ($ mil.) [a] | Future years ($ mil.) [b] | | Average annualized value ($ mil.) | |
|---|---|---|---|---|---|
| | | Year 2 | Year 10 | 3% Real rate | 7% Real rate |
| 10% of remaining OT hours ........................... | −40.3 | −38.5 | −37.2 | −38.2 | −38.3 |
| **OT Scenario 2** | | | | | |
| 30% of remaining OT hours ........................... | −30.2 | −22.0 | −15.9 | −20.3 | −20.7 |
| 20% of remaining OT hours ........................... | −30.2 | −24.7 | −20.7 | −23.6 | −23.9 |
| 10% of remaining OT hours ........................... | −30.2 | −27.4 | −25.4 | −26.9 | −27.0 |
| **OT Scenario 3** | | | | | |
| 30% of remaining OT hours ........................... | −14.9 | −2.4 | .7 | 0.0 | −0.6 |
| 20% of remaining OT hours ........................... | −14.9 | −6.6 | −0.5 | −5.0 | −5.3 |
| 10% of remaining OT hours ........................... | −14.9 | −10.7 | −7.7 | −9.9 | −10.1 |

[a] Year 1 estimates are the sum of the impacts on turnover costs due to the application of the overtime provision.
[b] These costs represent a range over the nine-year span. Costs are lowest in Year 2 and highest in Year 10 so these two values are reported.

The Department also performed a sensitivity analysis by repeating the calculations using a turnover elasticity of −0.844.[211] With a 7 percent real discount rate, the annualized decrease in turnover costs ranges from $9.4 to $13.6 million per year in OT Scenario 1. In OT Scenario 2, average annualized turnover costs are decreased by $2.2 to $8.6 million. Under OT Scenario 3, average annualized turnover costs range from a $1.0 million decrease to an increase of $8.6 million per year.

The Department notes that the estimates above do not reflect possible offsetting effects related to employees who previously worked overtime and who, as a result of the rule, experience a reduction in their scheduled hours and thus in their compensation. To compensate for their lower earnings, these workers may accept a second job, although this would not affect the turnover rate in a meaningful way. However, if some agencies continue to pay overtime, while a worker's current employer does not, the employee with reduced hours may be more likely to leave, thus resulting in increased turnover in the short-run, although turnover may still decrease in the long run since the worker may be more likely to remain longer with the employer that pays overtime.

Reduction in Worker Injuries and Illnesses

Many studies have shown that extended work hours result in increased fatigue, decreased alertness, and decreased productivity, negatively affecting employee health and well-being. Long work hours in the health care field "have adverse effects on patient outcomes and increase health care errors and patient injuries." [212] For example, nurses working more than 8 hours report more medication errors, falling asleep at work, a decrease in productivity, and impaired critical thinking abilities. The error rates double when nurses work 12.5 or more consecutive hours. A 2004 National Institute for Occupational Safety and Health report evaluated the literature and found studies "examining 12-hour shifts combined with more than 40 hours of work per week reported increases in health complaints, deterioration in performance, or slower pace of work." [213] One study that analyzed 13 years' worth of data and nearly 100,000 job records notes that "long working hours indirectly precipitate workplace accidents through a causal process, for instance, by inducing fatigue or stress in affected workers." [214] It is therefore telling that "[d]irect care workers have the highest injury rate in the United States, primarily due to work-related musculoskeletal disorders." [215] The rate of days away from work (work days missed due to on-the-job injuries) for nursing aides, orderlies, and attendants was almost four times greater than the all-worker rate, 449 per 10,000 compared to 113 per 10,000 for all workers.[216] One of the results of the FLSA's overtime compensation requirement is that employers may hire more people to work fewer hours each. Doing so in those circumstances where excessive overtime hours are worked may therefore result in fewer injuries and illnesses incurred. On the other hand, a possible effect of this rule is that direct care employees currently working more than 40 hours per week for one employer will spread those hours over multiple employers, which may increase fatigue due to, for example, increased travel time as a result of working for multiple employers; these conflicting theoretical possibilities make the rule's likely impact on injuries and illnesses an empirical question.

The Department looked at total injury numbers and injury rates from the Survey of Occupational Injuries and Illnesses (SOII) of the Bureau of Labor Statistics. To the best of our knowledge, this is the only available database providing data simultaneously on the state and industry level for multiple years. The goal was to determine whether it was possible to perform a "difference-in-differences" analysis of injuries; this type of analysis can determine whether there is a statistically significant difference in injuries before and after minimum wage and overtime regulations were passed in some states.

Only four states had adopted direct care worker minimum wage and/or overtime provisions during the period

[211] Clabby II, Robert T. 2002. Report to the Joint Appropriations Committee on the Impact of Funding for Direct Staff Salary Increases in Adult Developmental Disabilities Community-Based Programs. Wyoming Department of Health, Cheyenne, WY.

[212] Keller, S. 2009. pg. 498. Available at: http://www.healio.com/~/media/Journals/AAOHN/2009/12_December/Effects%20of%20Extended%20Work%20Shifts%20and%20Shift%20Work%20on%20Patient%20Safety%20Productivity%20and%20Employ%2059601/Effects%20of%20Extended%20Work%20Shifts%20and%20Shift%20Work%20on%20Patient%20Safety%20Productivity%20and%20Employ%2059601.ashx.

[213] Caruso, C., Hitchcock, E., Dick, R., et al. (2004). Overtime and Extended Work Shifts: Recent Findings on Illnesses, Injuries, and Health Behaviors. National Institute for Occupational Safety and Health, U.S. Department of Health and Human Services. Available at: http://www.cdc.gov/niosh/docs/2004-143/pdfs/2004-143.pdf.

[214] Dembe, A., Erickson J., Delbos, R., et al. 2005.

[215] Zontek, Isernhagen, and Ogle, 2009.

[216] NELP report (p. 27, FN45).

for which industry-specific data are available (2003–2011): Arizona (minimum wage, January 2007), Maine (minimum wage and overtime, September 2007), Ohio (minimum wage, April 2007), and Colorado (minimum wage and overtime, January 2010). Of these, only Arizona and Maine had usable data (for a total of 6 observations), which was not sufficient to perform conclusive analysis.

Improved Quality of Care

As has been stated previously, one of the main benefits of this Final Rule is that the professionals who are entrusted to care for consumers in their homes will have the same protections in the labor market as almost all other employees. Guaranteed minimum wage and overtime compensation for home care jobs, comparable to similar occupations, will attract more workers to the home care industry. The increased availability of direct care workers will allow employers to meet the growing demand for home care services without requiring workers to perform services for excessive hours. Additionally, this may improve the quality of care since workers may be less fatigued and have more energy to devote to the consumers to whom they provide home care services. However, the Department understands that the continuity of care for some individuals may be affected, such as by having more care providers as a result of this rule. In addition, with the standard of pay raised, more highly trained and certified workers will seek out and remain in the HHA and PCA occupations, and a higher quality of service may be provided to the consumer. While a monetary value cannot be placed on increased professionalism and improved care, those expected benefits are noteworthy.

**VII. Final Regulatory Flexibility Analysis**

The Regulatory Flexibility Act of 1980 (RFA) as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), hereafter jointly referred to as the RFA, requires agencies to evaluate the potential effects of their proposed and Final Rules on small businesses, small organizations and small governmental jurisdictions. *See* 5 U.S.C. 604.

The RFA requires agencies to prepare and make available for public comment a final regulatory flexibility analysis (FRFA) evaluating the impact of Final Rules on small entities. The RFA specifies the content of a FRFA. Each FRFA must contain:

• A succinct statement of the need for, and objectives of the Final Rule;
• A summary of the significant issues raised by the public comments in response to the NPRM, a summary of the agency assessment of the issues, and a statement of any changes made as a result of such comments;
• The agency's response to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration;
• A description of an estimate of the number of small entities to which the Final Rule will apply;
• A description of the projected reporting, recordkeeping and other compliance requirements of the Final Rule including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
• Description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the Final Rule and why other alternatives were rejected.

*1. Objectives of, and need for, the Final Rule*

Section 13(a)(15) of the FLSA exempts from its minimum wage and overtime compensation provisions domestic service employees employed "to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." Due to significant changes in the home care industry over the last 38 years, workers who today provide home care services to individuals are performing duties and working in circumstances that were not envisioned when the companionship services regulations were promulgated. Section 13(b)(21) provides an exemption from the Act's overtime compensation requirements for live-in domestic service workers. The current regulations allow an employer of a live-in domestic worker to maintain a copy of the agreement of hours to be worked and to indicate that the employee's work time generally coincides with that agreement, instead of requiring the employer to maintain an accurate record of hours actually worked by the live-in domestic worker. The Department is concerned that not all hours worked are actually captured by such agreement and paid, which may result in a minimum wage violation. The current

regulations do not provide a sufficient basis to determine whether the employee has in fact received at least the minimum wage for all hours worked.

The Department has re-examined the regulations and determined that the regulations, as currently written, have expanded the scope of the companionship services exemption beyond those employees whom Congress intended to exempt when it enacted § 13(a)(15) of the Act, and do not provide a sufficient basis for determining whether live-in workers subject to § 13(b)(21) of the Act have been paid at least the minimum wage for all hours worked. Therefore, this document revises the definitions of "domestic service employment" and "companionship services," and requires employers of live-in domestic service workers to maintain accurate records of hours worked by such employees. In addition, the regulation limits the scope of duties a direct care worker may perform and still be considered to perform companionship services, and prohibits employees of third party employers from claiming either exemption.

There has been an increase in the employment of home health aides and personal care aides in the private homes of individuals in need of assistance with basic daily living or health maintenance activities. BLS's national occupational employment and wage estimates from the OES survey show that the number of workers in these jobs tripled during the decade between 1988 and 1998, and by 1998 there were 430,440 workers employed as home health aides and 255,960 workers employed as personal care aides. The combined occupations of personal care and home health aides continue to constitute a rapidly growing occupational group. BLS statistics demonstrate that between 1998 and 2009, this occupational group again more than doubled with home health aides increasing to 955,220 and personal care aides increasing to 630,740.[217]

The growth in demand, however, has not resulted in growth in earnings for workers providing home care services. The earnings of employees in the home health aide and personal care aide categories remain among the lowest in the service industry. Studies have shown that the low income of direct care workers continues to impede efforts to improve both jobs and care.[218]

---

[217] See 1998 and 2009 Occupational Employment and Wage Estimates, National Cross-Industry Estimates, Available at: *http://www.bls.gov/oes/oes_dl.htm.*

[218] *See* Brannon, Diane, et al. (2007). Job Perceptions and Intent to Leave Among Direct Care

Protecting domestic service workers under the Act is an important step in ensuring that the home care industry attracts and retains qualified workers that the sector will need in the future. Moreover, the workers that are employed by home care staffing agencies are not the workers that Congress envisioned when it enacted the companionship exemption (i.e., neighbors performing elder sitting) but are instead professional direct care workers entitled to FLSA protection based on the expanded nature of the duties many of them perform. In view of the dramatic changes in the home care sector in the 38 years since these regulations were first promulgated and the growing concern about the proper application of the FLSA minimum wage and overtime protections to domestic service employees, the Department believes it is appropriate to narrow the scope of the definition of "companionship services" and limit the companion and live-in exemptions to the individual, household, or family using the services to more accurately reflect Congressional intent.

*2. Summary of Significant Issues Raised by Public Comments, Assessment of the Agency and Response*

*3. The Agency's Response to the Comment Filed by the Chief Counsel for Advocacy of the Small Business Administration*

The Small Business Administration's Office of Advocacy (Advocacy) submitted a comment summarizing key issues raised by small business representatives during a roundtable and in subsequent conversations; the small business representatives focused on three key issues with the IRFA and also suggested several alternatives for consideration (the alternatives are addressed under number 5, below).[219]

Specifically, small businesses suggested that the Department re-evaluate the private pay sector of the companion services market, the incidence of overtime among these workers because it may be underestimated, and account for the costs of restricting hours and hiring additional workers to avoid the cost of overtime compensation.

The Department appreciates this feedback from small businesses and endeavored to refine the final economic analysis to include it. First, the Department analyzed available data on the private pay sector and incorporated this sector into the discussion of the

market and the analysis of deadweight loss and disemployment resulting from the Final Rule. The available data did not support the assertion of the significant size of the private pay market, as discussed in the Executive Orders 12866 and 13563 analysis. As stated earlier in this final rule, limited data exists regarding the private pay sector and overtime utilization within that sector. However, based on the analysis, it is clear that this sector behaves differently than the publicly funded market and should be analyzed differently.

Second, the Department reviewed the references used to estimate the incidence of overtime among these workers in addition to any other available data on this issue and determined that, in the absence of new statistically reliable data sources, the two national surveys of direct care workers provide the best source of information on the amount of overtime worked. However, the estimated total number of overtime hours worked and the associated overtime compensation transfers have increased due to the addition approximately 80,000 workers who were previously unaccounted for (30,000 in Illinois, 50,000 in California). The estimated total number of overtime hours worked also increased because, after further evaluation of the data in the NHHAS, the Department determined that the estimated 12 percent of workers who work overtime average 8.8 hours of overtime per week instead of the 6.3 hours estimated in the proposed rule.

Third, the Department agrees with commenters that adjusting worker schedules and hiring additional workers in order to eliminate overtime hours is not costless. This cost has been incorporated into the analysis by adjusting the assumption on OT Scenario 3 to account for administrative costs and local rigidities in the availability of additional workers; specifically, the NPRM assumed that employers could adjust to absorb all of the overtime hours currently worked, and the final analysis assumes that employers could adjust to absorb all but 10 percent of overtime hours due to the costs associated with administration.

The U.S. Chamber of Commerce also submitted a comment expressing serious concerns with the impact of the rule on small entities, stating that the Department underestimated the costs of regulatory familiarization, especially to families, and inappropriately labeled some costs of the rule as transfers. The comment references data from the Chamber of Commerce's members, but does not provide any additional detail. Thus, as explained in some detail in the

section describing the estimation of regulatory familiarization costs, the Department maintains its assumptions concerning regulatory familiarization. As stated previously, most third party employers are already covered by the FLSA and employ other workers who are not exempt, so they are familiar with the FLSA's minimum wage and overtime compensation requirements. Therefore, they simply need to apply the FLSA to an additional category of workers. The Department will provide guidance and educational materials that individuals and families who employ direct care workers can rely on to learn about the rule's requirements. With respect to the Chamber of Commerce's comment relating to whether transfers are costs, the Department describes the estimated transfers due to payment of travel time and overtime compensation as transfers in the economic analysis because those payments are not a loss to the larger economy; however, the transfers are treated as compliance costs to employers for the purpose of estimating the deadweight loss and disemployment effects of the Final Rule in recognition of the fact that it will impact the behavior of employers.

Advocacy also suggested that the Department clarify that registries are not third party employers. The employment relationship was not addressed by the proposed rule and the Department proposed no changes to its longstanding test of what constitutes an employment relationship under the FLSA. However, in response to Advocacy's suggestion, the Department has included in the preamble to this Final Rule a lengthy description of the employment relationship test and how it applies in various factual scenarios including registries. This discussion is found in the Joint Employment section of this preamble.

*4. Description and Estimate of the Number of Small Entities To Which the Final Rule Will Apply*

The RFA defines a "small entity" as a (1) small not-for-profit organization, (2) small governmental jurisdiction, or (3) small business. The Department used standards defined by SBA to classify entities as small for the purpose of this analysis. For the two industries that are the focus of this analysis, the SBA defines a small business as one that has average annual receipts of less than $14 million for HHCS and $10 million for SEPD.[220]

---

Workers: Evidence From the Better Jobs Better Care Demonstrations. *The Gerontologist,* 47(6): 820–829.

[219] Winslow Sargeant, WHD–2011–0003–7756.

[220] These thresholds were updated in 2012 from $13.5 and $7 million, respectively. See: *http://www.fns.usda.gov/ora/MENU/Published/snap/FILES/Participation/2011Characteristics.pdf.*

Based on the estimated average annual revenues per establishment in each employment size category derived from Statistics of U.S. Businesses (SUSB) data and attributed to the establishments in the HHCS and SEPD industries, it appears that no employers exceed the SBA size standards of $14 million in annual revenues for HHCS and $10 million in annual revenues for SEPD. Thus, for the purposes of this analysis, the entire HHCS and SEPD industries (89,400 establishments) are composed of small businesses.

Although in reality it is possible that there are some firms in the 100–499 and 500+ employee categories that earn revenues in excess of the SBA standard for their industry, we include all establishments in order to not underestimate the number of small firms affected by the rule. We also believe we have not mischaracterized this sector in any meaningful way: We believe these industries are primarily, if not completely, composed of small businesses by SBA standards.

In order to better understand the impact of the rule on businesses of different sizes, the Department analyzed small business impacts using establishment size as a proxy for firm size. The Department combined Quarterly Census of Employment and Wages data for the HHCS and SEPD industries and then used the SUSB, 2007, data set to distribute establishments and employees to the following size categories: 0–4, 5–9, 10–19, 20–99, 100–499, and 500+ employees.

Although basing this analysis on establishment size will bias results, the bias will tend to overestimate the number of small businesses affected by the rule and the impacts to those small businesses. First, the analysis overestimates the number of small entities; a firm composed of multiple establishments might earn aggregate revenues that exceed the threshold the SBA used to define "small" in these industries. Second, costs are in part a function of the number of firms in the industry due to the need for each firm to become familiar with the Final Rule. Our cost model thus assigns those familiarization costs to each establishment. Again, to the extent that firms own multiple establishments, compliance costs associated with regulatory familiarization will be smaller than estimated here. Third, compliance costs are also a function of the number of establishment employees.

Because there are no data linking the use of the companionship services exemption to establishment size, there is no direct way to measure the impact of this rule's minimum wage and overtime requirements by size categories. The Department thus assumed compliance costs associated with meeting those requirements would be proportionate to the number of establishment employees. Therefore, these costs increase in proportion to establishment size (as measured by the number of employees), and smaller establishments are not unduly impacted relative to larger establishments. This proportionate approach may not capture the full impact of the regulatory requirements on smaller establishments given the lack of available data.

Table 21 presents the estimated number of establishments, employees, and revenue by establishment size. The table shows that the 500+ employee category employs 42 percent of workers, and accounts for 20 percent of establishments and 43 percent of revenue for the combined industries. Conversely, establishments with fewer than 20 employees account for only six percent of employment but more than 44 percent of establishments.

TABLE 21—AFFECTED ESTABLISHMENTS, WORKERS, AND REVENUE BY EMPLOYMENT SIZE[a]

| Number of employees | Total employees (1,000) | Percent of total employment | Workers without MW | Workers without OT | Total establishments | Percent of establishments | Revenue ($ mil.) | Percent industry revenue | Average revenue per establishment ($1,000) |
|---|---|---|---|---|---|---|---|---|---|
| 0–4 | 22 | 1.1 | 0 | 10,426 | 24,548 | 27.5 | $1,954 | 2.2 | $80 |
| 5–9 | 29 | 1.5 | 0 | 14,080 | 7,262 | 8.1 | 1,779 | 2.0 | 245 |
| 10–19 | 64 | 3.3 | 0 | 30,471 | 7,685 | 8.6 | 3,752 | 4.1 | 488 |
| 20–99 | 421 | 22.0 | 0 | 201,744 | 18,495 | 20.7 | 18,422 | 20.3 | 996 |
| 100–499 | 573 | 29.9 | 0 | 274,541 | 13,287 | 14.9 | 25,860 | 28.5 | 1,946 |
| 500 + | 804 | 42.1 | 0 | 385,776 | 18,111 | 20.3 | 39,079 | 43.0 | 2,158 |
| Total | 1,912 | 100.0 | 0 | 917,039 | 89,388 | 100.0 | 90,846 | 100.0 | 1,016 |

[a] Data in this Table are distributed across categories using percentages from SUSB, 2007.

*5. Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities*

The FLSA sets minimum wage, overtime compensation, and recordkeeping requirements for employment subject to its provisions. All non-exempt covered employees must be paid at least the minimum wage and not less than one and one-half times their regular rates of pay for overtime hours worked. Workers performing domestic service but not meeting the definition of companionship services and live-in domestic service workers employed by third parties will need to be paid in accordance with the FLSA's minimum wage and overtime compensation provisions.

This Final Rule provides no differing compliance requirements and reporting requirements for small entities. The Department has strived to minimize respondent recordkeeping burden by requiring no order or specific form of records under the FLSA and its corresponding regulations. Moreover, employers would normally maintain the records under usual or customary business practices.

Every covered employer must keep certain records for each non-exempt worker. The regulations at 29 CFR part 516 require employers to maintain records for employees subject to the minimum wage and overtime compensation provisions of the FLSA. The recordkeeping requirements under 29 CFR part 516 are not new requirements; however, some additional employees will be included in the universe of covered employees under the Final Rule. As indicated in this analysis, the Final Rule expands minimum wage and overtime compensation coverage to approximately 1.30 million workers. This results in an increase in employer burden and is estimated in the Paperwork Reduction Act (PRA) section of this Final Rule. Note that the burdens reported for the PRA section of this Final Rule include the entire

information collection and not merely the additional burden estimated as a result of this Final Rule.

Cost to Small Entities

Table 22 presents the results of the first year, recurring years, and annualized cost and impact analyses as distributed by establishment size. The figures in the table include the costs of regulatory familiarization, hiring costs, complying with minimum wage requirements, travel time compensation, and overtime compensation, assuming employers respond by adjusting work schedules so that overtime hours are reduced to 60 percent of the current value (Scenario 1; in addition, we assume 30 percent of reallocated overtime hours are assigned to new hires). This scenario is the most costly of the three examined, and thus the results presented here show the anticipated upper bound.

TABLE 22—FIRST YEAR, RECURRING, AND ANNUALIZED COMPLIANCE COSTS BY EMPLOYMENT SIZE[a]

| Number of employees | Cost ($1,000) | Percent of total cost | Cost per establishment | Cost per establishment as a percent of average revenue |
|---|---|---|---|---|
| **First Year** | | | | |
| 0–4 | $4,423 | 1.9 | $180 | 0.23 |
| 5–9 | 3,983 | 1.7 | 548 | 0.22 |
| 10–19 | 8,003 | 3.5 | 1,041 | 0.21 |
| 20–99 | 50,494 | 22.0 | 2,730 | 0.27 |
| 100–499 | 67,801 | 29.5 | 5,103 | 0.26 |
| 500 + | 95,228 | 41.4 | 5,258 | 0.24 |
| Total | 229,933 | 100.0 | 2,572 | 0.25 |
| **Recurring Costs** | | | | |
| 0–4 | 2,450 | 1.1 | 100 | 0.13 |
| 5–9 | 3,308 | 1.5 | 456 | 0.19 |
| 10–19 | 7,159 | 3.3 | 932 | 0.19 |
| 20–99 | 47,402 | 22.0 | 2,563 | 0.26 |
| 100–499 | 64,506 | 29.9 | 4,855 | 0.25 |
| 500 + | 90,642 | 42.1 | 5,005 | 0.23 |
| Total | 215,468 | 100.0 | 2,410 | 0.24 |
| **Annualized Costs, at 7% Real Rate** | | | | |
| 0–4 | 2,712 | 1.2 | 110 | 0.14 |
| 5–9 | 3,398 | 1.6 | 468 | 0.19 |
| 10–19 | 7,272 | 3.3 | 946 | 0.19 |
| 20–99 | 47,813 | 22.0 | 2,585 | 0.26 |
| 100–499 | 64,945 | 29.9 | 4,888 | 0.25 |
| > 500 | 91,252 | 42.0 | 5,038 | 0.23 |
| Total | 217,393 | 100.0 | 2,432 | 0.24 |

[a] Totals in this Table exclude costs related to California's IHSS workers because these workers are not employed by private small establishments and therefore the employer will not incur costs associated with IHSS workers.

First year costs range from $180 for entities where the owner has fewer than five employees in addition to him- or herself (a 0–4 employee establishment), to $5,258 per establishment for entities with more than 500 employees (Table 22). Annual recurring costs are somewhat smaller, ranging from $100 per year per establishment in the 1 to 4 employee class, to $5,005 in the 500 employee or more size class. Over ten years, the rule is projected to cost establishments an annual average ranging from $110 for establishments with fewer than five employees to $5,038 for 500+ employee establishments per year when cost are annualized using a 7 percent real interest rate.

Total costs and cost per establishment are consistently proportionate to establishment size as measured by either revenues or employment regardless of cost type (first year, recurring, or annualized). For example, employers with more than 500 employees are projected to incur 41.4 percent of total first year costs, which is proportionate to their share of the industry employment and revenues (see Table 21 and Table 22). In addition, the ratio of compliance costs to average establishment revenue is relatively similar regardless of establishment size. For example, the table shows that average annualized compliance costs vary between 0.14 and 0.26 percent of average annual revenues for all establishments ranging from the 0 to 4 employee class to the 500+ employee class.

In summary, first year compliance costs do not exceed $2,730 for establishments with fewer than 100 employees, and do not exceed $5,258 for those with more than 100 employees; first-year compliance costs do not exceed 0.27 percent of establishment revenue for all establishment size classes; average annualized compliance costs do not exceed $2,585 for establishments with fewer than 100 employees, and do not exceed $5,038 for those with more than 100 employees; and average annualized compliance costs do not exceed 0.26 percent of establishment revenue regardless of establishments size.

Impacts to small businesses are unlikely to vary significantly over time. Existing firms incur regulatory familiarization costs once, and these costs do not impose a significant economic burden. It is possible, however, that the actual cost burdens to small entities may differ from the Department's estimates. The Department estimates that recurring costs such as overtime and travel time compensation (transfer payments in the EO 12866 analysis) are proportionate to firm size. These costs will increase if the firm grows, but in proportion to the firm's ability to bear them. As new firms enter the market, they will bear the same costs: One-time regulatory familiarization costs, and recurring payments for overtime and travel. Again, recurring costs will be proportionate to firm size. Therefore, based on these assumptions, if the revisions to the companionship services regulations are affordable for existing firms, they will be affordable to new market entrants as well.

There are limitations to this analysis. It is assumed that the distribution of employees by establishment size has not changed significantly since 2007 (although the number of employees has increased significantly). We also assume that the occupations of HHA and PCA are distributed by establishment size similarly to other occupations in the HHCS and SEPD industries. With the exponential growth in these industries, it is possible that the distribution of workers by employment size class has shifted. In addition, the cost analysis conducted in this report is unable to capture the difference in costs for urban versus rural home care agencies.

*6. Description of the Steps the Agency Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Other Alternatives Were Rejected*

As previously discussed, the Department believes it has chosen the most effective option that updates and clarifies the rule. Based on the commenters' suggestions, among the options considered by the Department but not described in the NPRM, the least restrictive option was taking no regulatory action. A more restrictive option was to add to the provisions being finalized a limit on the personal care services that can be performed. NELP and the National Council on Aging among others suggested that the

Department require an initial assessment be conducted to determine if a direct care worker is performing primarily fellowship and protection for the consumer. If it is found that the direct care worker is not engaged primarily in fellowship and protection, then the subsequent list of personal care services should not be considered at all and the worker should not be considered exempt. The National Council on Aging further expressed the view that toileting, bathing, driving, and tasks involving positioning and/or transfers be excluded from the list of permissible duties. ANCOR suggested that the list be made exclusive and include fewer tasks. The commenter added that the Department should consider providing an allowance for household work defined as no more than one hour in a seven day period. AFSCME expressed the view that those workers who regularly engage in mobility tasks should not be considered companions. The Department carefully considered such views in development of the Final Rule. The Department ultimately settled on a less restrictive list of permissible care services (assistance with ADLs and IADLs) than initially proposed as well as less restrictive than options suggested by some of these commenters. The Department views the resulting list as a compromise that allows for some delivery of care services by the exempt companion while at the same time recognizing and making an effort to address the health and safety concerns of direct care workers and consumers. Taking no regulatory action does not address the Department's concerns discussed above under Need for Regulation. The Department found the most restrictive option to be overly burdensome on business in general and specifically small business.

Pursuant to the RFA, the Department considered several other approaches to accomplish the objectives of the rule and minimize the economic impact on small entities including those suggested in comments on the NPRM as well as more traditional approaches.

In its comment, Advocacy noted that small businesses are most concerned with the cost of overtime compensation and less so the minimum wage provision. One suggested alternative was to maintain the exemption from overtime compensation for third party employers of live-in workers, consistent with the laws in at least three states (Michigan, Nevada, and Washington). The Department recognizes that this approach would represent incremental progress towards narrowing the exemption for this set of workers and

result in a very small economic impact on the industry from the Final Rule.

However, the Department believes this approach is inconsistent with Congress's intent to provide FLSA protections to domestic service workers, while providing a narrow exemption for live-in domestic service workers. It is apparent from the legislative history that the 1974 amendments were intended to expand coverage to include more workers, and were not intended to roll back coverage for employees of third parties who already had FLSA protections as employees of covered enterprises. Moreover, this approach does not support the objectives of the rule or the purposes of the overtime requirements of the FLSA, one of which is to spread employment.

Another alternative suggested by Advocacy and the participants at the Small Business Roundtable hosted by Advocacy was to allow employers to exclude some nighttime hours from ''hours worked'' to reduce the potential burden of overtime compensation to workers providing care on higher hour cases (12- or 24-hour shifts). For example, Minnesota and North Dakota state laws exclude up to eight hours from the overnight hours (from 10:00 p.m. to 9:00 a.m.) from the ''hours worked'' for purposes of minimum wage and overtime calculations. This Final Rule does not include revisions to the longstanding regulations applicable to all FLSA-covered employers addressing when sleep time constitutes hours worked and when sleep time may be excluded from hours worked. Therefore, employers still have the opportunity to exclude bona fide sleep hours; however, there would be no basis under the FLSA for treating sleep time hours differently for domestic service workers than for other employees. The Department's existing regulations already provide for the exclusion of sleep time from compensable hours worked under certain conditions. As previously discussed in the Hours Worked section of this preamble, under the Department's existing regulations, an employee who is required to be on duty for less than 24 hours is working even though he or she is permitted to sleep or engage in other personal activities when not busy. *See* § 785.21. Where an employee is required to be on duty for 24 hours or more, the employer and employee may agree to exclude a bona fide meal period or a bona fide regularly scheduled sleeping period of not more than eight hours from the employee's hours worked under certain conditions. *See* § 785.22. The conditions for the exclusion of such a sleeping period from hours worked are (1) that adequate

sleeping facilities are furnished by the employer, and (2) that the employee's time spent sleeping is usually uninterrupted. When an employee must return to duty during a sleeping period, the length of the interruption must be counted as hours worked. If the interruptions are so frequent that the employee cannot get at least five hours of sleep during the scheduled sleeping period, the entire period must be counted as hours worked. *Id.; see also* Wage and Hour Opinion Letter, 1999 WL 1002352 (Jan. 7, 1999). Where no expressed or implied agreement exists between the employer and employee, the eight hours of sleeping time constitute compensable hours worked. This description of these longstanding rules in the Final Rule's preamble is provided to help to educate small business employers regarding their ability to exclude sleep time from hours worked. *See* § 785.22. However, because there would be no basis under the FLSA for treating sleep time hours differently for domestic service workers than for other employees, the commenters' suggestion was not adopted.

Another approach suggested by small business representatives at the Small Business Roundtable and in subsequent conversations between small businesses and Advocacy would be to calculate overtime compensation based on a different rate of pay than straight time; for example, under New York state law overtime hours are paid at one and a half times the minimum wage rather than the worker's regular rate of pay for some workers. Again, there is no legal basis in the FLSA for calculating overtime compensation at a rate other than one-and-one-half times the employee's regular rate of pay. Moreover, the Department does not believe that this supports the objective of the rule or the spread of employment under the Act. In terms of economic burden, this alternative could reduce the cost to employers of overtime by approximately 25 percent under OT Scenario 2; however, 15 states currently require payment of overtime at time and a half of regular pay with no evidence of significant economic burden. Quoting the Michigan Olmstead Coalition "we have seen no evidence that access to or the quality of home care services are diminished by the extension of minimum wage and overtime protection to home care aides in this state almost six years ago."

Another alternative discussed by commenters was to exclude travel time from hours worked in order to decrease the burden of overtime compensation. However, the comments provided little justification for a departure from the general FLSA principles applicable to all employers on the compensability of travel time set forth in 29 CFR 785.33– 785.41. Excluding travel time that is "all in the day's work" from compensable hours worked, for example, would be inconsistent with the Portal-to-Portal Act amendment to the FLSA and inconsistent with how such travel time is treated for all other employees. §§ 785.38; 790.6. Furthermore, the analysis above suggests that the economic impacts of combined overtime and travel time pay are not significant, and travel time is merely a fraction of overtime cost. Thus, travel time adds a relatively small amount to the burden of this rulemaking.

The Department also considered several traditional alternatives suggested in the SBA guide "How to Comply with the Regulatory Flexibility Act." [221] Those alternatives include:

• Compliance Assistance. The Department has made a variety of educational assistance materials related to this Final Rule available on its Web site, and WHD offices throughout the country are available to provide compliance assistance at no charge to employers. The Department intends to engage in robust outreach efforts and make every effort to work with employers to ensure compliance. As mentioned elsewhere in this preamble, the Department will work closely with stakeholders and the Department of Health and Human Services to provide additional guidance and technical assistance so that stakeholders, including employee and employer advocacy groups, as well as state agencies, understand their rights and responsibilities under the FLSA and this Final Rule.

• Differing compliance or reporting requirements that take into account the resources available to small entities. The FLSA sets a floor below which employers may not pay their employees. As shown above, nearly all employers affected by the rule meet the criteria for small entities and the costs to the smallest of these employers are not overly burdensome; for example, the annualized cost of the rule is estimated to be $110 for an employer with 0–4 employees and $5,038 for an employer with 500 or more employees. *See* Table 22. To establish differing compliance or reporting requirements for small businesses would undermine this important purpose of the FLSA and appears to not be necessary given the small annualized cost of the rule. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance. Therefore the Department declines to establish differing compliance or reporting requirements for small businesses.

• Clarification, consolidation, or simplification of compliance and reporting requirements for small entities. This rule simplifies and clarifies compliance requirements for employers of workers performing companionship services. The rule imposes no reporting requirements. The recordkeeping requirements imposed by this rule are necessary for the employer to determine their compliance with the rule as well as for the Department and domestic service employees to determine the employer's compliance with the law. The recordkeeping provisions apply generally to all businesses—large and small—covered by the FLSA; no rational basis exists for creating an exemption from compliance and recordkeeping requirements for small businesses in the HHCS and SEPD industries. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance.

• Use of performance rather than design standards. Under the Final Rule, the employer may achieve compliance through a variety of means. The employer may: hire additional workers and/or spread employment over the employer's existing workforce to ensure employees do not work more than 40 hours in a workweek, and/or pay employees time and one-half for time worked over 40 hours in a workweek. In addition, the FLSA recordkeeping provisions require no particular order or form of records to be maintained so employers may create and maintain records in the manner best fitting their situation. The Department makes available a variety of resources to employers for understanding their obligations and achieving compliance.

• An exemption from coverage of the rule, or any part thereof, for such small entities. The FLSA contains no authority to allow the Department to create an exemption for certain employers based on size of their workforce. Furthermore, creating an exemption from coverage of this rule for businesses with as many as 500 employees, those defined as small businesses under SBA's size standards, is inconsistent with Congressional intent in expanding FLSA coverage to workers providing domestic services in private households and its creation of a

---

[221] SBA, A Guide for Government Agencies: How to Comply with the Regulatory Familiarization Flexibility Act, Implementing the President's Small Business Agenda and Executive Order 13272. June 2010. pgs 47–58. Available at: *www.sba.gov/advo.*

narrow companionship services exemption.

The Department notes that while it is not appropriate to employ all of these traditional alternatives to lessen the impact of this Final Rule on small entities, the delayed effective date of this Final Rule creates a transition period during which all entities potentially impacted by this rule, including small entities, have the opportunity to review existing policies and practices and make necessary adjustments for compliance with this Final Rule. This transition period coupled with the Department's compliance assistance efforts lessens the impacts of complying with this Final Rule, relative to a regulatory alternative in which compliance is required immediately upon finalization.

## VIII. Unfunded Mandates Reform Act

The Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1501, requires agencies to prepare a written statement that identifies the: (1) Authorizing legislation; (2) cost-benefit analysis; (3) macro-economic effects; (4) summary of state, local, and tribal government input; and (5) identification of reasonable alternatives and selection, or explanation of non-selection, of the least costly, most cost-effective or least burdensome alternative; for rules for which a general notice of proposed rulemaking was published and that include any federal mandate that may result in increased expenditures by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million ($141 million in 2012 dollars, using the Gross Domestic Product deflator) or more in any one year.

### Authorizing Legislation

This rule is issued pursuant to Sections 13(a)(15), 13(b)(21), and 11(c) of the Fair Labor Standards Act (FLSA), 29 U.S.C. 213(a)(15), 213(b)(21), 211(c). Section 13(a)(15) of the FLSA exempts from its minimum wage and overtime provisions domestic service employees employed "to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." Section 13(b)(21) of the FLSA exempts from the overtime provision any employee employed "in domestic service in a household and who resides in such household." The requirements to maintain the exemptions provided by these sections are contained in this Final Rule, 29 CFR part 552. Section 3(e) of the FLSA defines "employee" to include an individual employed by the government of a state or political subdivision of a state, or interstate governmental agency. Section 3(x) of the FLSA, also defines public agencies to include the government of a state or political subdivision thereof, or any interstate governmental agency. Section 11(c) of the FLSA indicates that employers subject to minimum wage and/or overtime requirements must make, keep, and preserve records as the Administrator prescribes by regulation.

### Cost-Benefit Analysis

For purposes of the Unfunded Mandates Reform Act of 1995, this rule includes a Federal mandate that might result in increased expenditures by the private sector or state, local, and tribal governments of more than $100 million in any one year. The primary impact on state, local, and tribal governments may be through increased Medicaid reimbursement rates. The magnitude of that impact will depend on two factors: (1) How home care agencies adjust scheduling to reduce or eliminate overtime hours; and (2) how states adjust Medicaid budgets in response to the rule.

On average, Medicaid expenditures are one of the most significant components of state budgets, second only to primary and secondary education as a source of expenditures from state general revenues. In fiscal year 2011, the National Association of State Budget Officers estimated that the state share of Medicaid expenditures accounted for 17.4 percent of state general revenues.[222] Although some direct care workers are employed, or jointly employed, by state or county agencies (e.g., California, Illinois), these state or county agencies primarily serve the states' Medicaid population. Impacts to these agencies and direct care workers are thus a subset of the impact of the rule on the state share of Medicaid expenditures; to analyze these impacts separately would constitute double-counting. Therefore the Department will focus this section on the potential impact of the rule on the state share of Medicaid expenditures.

The Department estimated a range of total transfers of overtime and travel wages based on three adjustment scenarios, depending upon the percentage of current overtime hours worked that employers continue to provide to employees (10 percent, 40 percent or 60 percent); the middle scenario (described in the Regulatory Impact Analysis as OT Scenario 2) results in payment of 40 percent of current overtime hours worked (average annualized value of $321.8 million per year). For the reasons discussed in the Regulatory Impact Analysis, the Department believes OT Scenario 2 represents the most likely impact of the Final Rule.

As described in the regulatory impact analysis (with respect to the Agency Model in Section VI.D), home health care expenditures accounted for by Medicare and Medicaid range from about 75 to 90 percent of total home health care expenditures. However, as previously described, not all Medicaid expenditures on home care services are included in the standard Medicaid accounting classification; in 2009 the sum of State Home Health, PCS, and HCBS 1915(c) waiver programs[223] ($50.0 billion) was about twice the size of the NHE line item for Medicaid home health care expenditures ($24.3 billion).[224]

To avoid underestimating the Medicaid share of home care expenditures, the Department added these additional sources of home care spending to the NHE values and calculated that as much as 55 percent of home care expenditures may be accounted for by Medicaid.[225] Thus, perhaps $175.3 million of the $321.8 million in additional average annualized transfers under OT Scenario 2 might be attributed to Medicaid programs. It is unlikely that the entire amount will be expenditures from state budgets because the federal government also contributes to Medicaid expenditures. The CMS Office of the

---

[222] Office of the Actuary, Centers for Medicare & Medicaid Services, U.S. Department of Health & Human Services. 2012 Actuarial Report on the Financial Outlook for Medicaid. Available at: *http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/medicaid-actuarial-report-2012.pdf.* Accessed April 17, 2013.

[223] Kaiser Commission on Medicaid and the Uninsured. 2012 Medicaid Home and Community-Based Services Programs: 2009 Data Update. *http://statehealthfacts.org/comparetable.jsp?ind=242&cat=4.*

[224] Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011–2021. Available at: *http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf.*

[225] In 2009, the NHE listed total home health care expenditures as $66.1 billion, $29.9 billion (45 percent) of which were accounted for by Medicare, $24.3 billion by Medicaid (37 percent), with the remainder attributed to a mix of other government programs, private insurance, and private out-of-pocket spending. The Department calculated its adjusted Medicaid percent of expenditures by adding $25.7 billion ($50.0 billion minus $24.3 billion) to both total and Medicaid expenditures, then dividing $50.0 billion by $91.8 billion ($66.1 billion plus $25.7 billion) to estimate that roughly 54.5 percent of home care expenditures may be attributable to Medicaid.

Actuary projects that the federal share of Medicaid expenditures will average 60.2 percent through 2020; thus, the state share of additional wages under this scenario may be about 39.8 percent of the $175.3 million, or $69.8 million in average annualized wages.[226] Based on data from the CMS, we calculated that in 2011 state Medicaid expenditures totaled $158.6 billion and the average annualized value of projected state Medicaid expenditures is $232.5 billion per year from 2011 through 2020 (after adjusting for inflation).[227] Thus, if state Medicaid programs reimburse agencies for the entire amount of additional wages expected under OT Scenario 2, it will increase state Medicaid budgets by approximately 0.03 percent per year over that time horizon. This estimate represents an average across states; some will experience impacts greater than 0.03 percent and other less than 0.03 percent depending on whether state-level laws already require overtime or travel time payments for direct care workers. Information about state-level requirements appears in Table 3.

*Macro-Economic Effects*

Agencies are expected to estimate the effect of a regulation on the national economy, such as the effect on productivity, economic growth, full employment, creation of productive jobs, and international competitiveness of United States goods and services, if accurate estimates are reasonably feasible and the effect is relevant and material. 5 U.S.C. 1532(a)(4). However, OMB guidance on this requirement notes that such macro-economic effects tend to be measurable in nationwide econometric models only if the economic impact of the regulation reaches 0.25 percent to 0.5 percent of the Gross Domestic Product,[228] or in the range of $39 to $77 billion. A regulation with smaller aggregate effect, such as

this one, is not likely to have a measurable impact in macro-economic terms unless it is highly focused on a particular geographic region or economic sector.

This regulation is focused on two sub-industries (HHCS and SEPD) within the Health Care and Social Assistance industry (NAICS 62), which account for just over 10 percent of total employment in this industry.[229] The Department's RIA estimates that the total first-year impacts of the rule on employers of workers providing home health care services will be approximately $20.7 million, with additional transfers of approximately $210.2 million, depending on the approach employers choose to manage overtime hours. However, given OMB's guidance, the Department has determined that a full macro-economic analysis is not likely to show any measurable impact on the economy.

The total first-year costs of $20.7 million comprise 0.04 percent of payroll in the two industries nationwide, and total first-year costs as a percent of revenues are 0.02 percent nationwide. The total first-year transfers of $210.2 million as a percent of HHCS and SEPD payrolls are 0.5 percent, and the total first-year transfers as a percent of revenues are about 0.2 percent.

*Summary of State, Local, and Tribal Government Input*

Several state employers commented on specific aspects of the proposed rule. These comments have been addressed above in the preamble and Paperwork Reduction Act sections of the Final Rule. During the public comment period, representatives of the state of Washington, Tennessee, Arkansas, California, Virginia, and Oregon submitted written comments to the agency for review. Additionally, organizations such as the National Association of Medicaid Directors and the California State Association of Counties submitted written comments for review. While such associations are not representatives of specific states, many of their members are representatives of state and local government.

Representatives of individual states expressed concern about cost (and income transfers). For example, the State of California Health and Human Services Agency referenced the state's budget issues and requested that the

Department postpone acting on the requirement of overtime wages to be paid to home care workers who are employed by third parties, such as home care staffing agencies.[230] The State of Washington, Aging and Disability Services Administration, stated that the proposed rule's discussion concerning costs requires further research. *See* State of Washington.[231] The Arkansas Department of Human Services expressed the view that implementing these changes without also identifying additional funding sources is "ill advised." *See* Arkansas Department of Human Services.[232] In the same general category of cost, some representatives of individual states expressed concern over the requirement to pay overtime compensation to direct care workers. The Department also held a listening session with state Medicaid directors or their representatives where the state participants reiterated these concerns.

The Department notes that there was little objection among commenters that individuals providing companionship services be paid the minimum wage. Indeed, many commenters indicated that such employees are already receiving at least the federal minimum wage for hours worked. Additionally, as noted in the Department's Final Rule Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees (April 23, 2004) (69 FR 22122), Congress amended the FLSA in 1985 following the *Garcia* decision to readjust how the FLSA would apply to public sector employers by allowing compensatory time off in lieu of cash overtime compensation. Pursuant to the definition section of the Unfunded Mandates Reform Act, the term "direct costs" shall be determined on the assumption that state, local, and tribal governments and the private sector will take all reasonable steps necessary to mitigate the costs resulting from a Federal mandate. *See* 2 U.S.C. 658; Public Law 104–4, (March 22, 1995). Further, nothing in the Final Rule requires that employers schedule employees for more than 40 hours per workweek. Employers can avoid the overtime premium payment (or in the case of the public sector, compensatory time off) merely by limiting the employee to 40 hours of work in a workweek. Limiting workers to 40 hours per week should affect very few consumers. The Department's analysis of overtime hours worked showed 88 percent of direct care workers do not

---

[226] Office of the Actuary, Centers for Medicare & Medicaid Services, United States Department of Health & Human Services. 2012 Actuarial Report on the Financial Outlook for Medicaid. Available at: *http://medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Financing-and-Reimbursement/Downloads/medicaid-actuarial-report-2012.pdf.* Accessed April 17, 2013.

[227] Centers for Medicare and Medicaid Studies, Office of the Actuary, National Health Expenditure Projections, 2011–2021. Available at: *http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/Downloads/Proj2011PDF.pdf.*

[228] Real Gross Domestic Product for the first quarter of 2012 was $15.454 trillion. Bureau of Economic Analysis, News Release: National Income and Product Accounts Gross Domestic Product, 1st quarter 2012 (second estimate); Corporate Profits, 1st quarter 2012 (preliminary estimate). Available at: *http://www.bea.gov/newsreleases/national/gdp/gdpnewsrelease.htm.*

[229] BLS Quarterly Census of Employment and Wages: 2011 Annual employment for NAICS 62 (18,368,506). Total annual employment in 2011 for NAICS 6216 (HHCS) and 62412 (SEPD) was 1,912,306. Available at: *http://www.bls.gov/cew/#databases.*

[230] WHD–2011–0003–9531.

[231] WHD–2011–0003–6166.

[232] WHD–2011–0003–9232.

typically work more than 40 hours per week, and consumers served by those workers should not be affected by the rule. Although consumers served by those direct care workers who exceed 40 hours per week are likely to be affected, not all such workers will have their hours adjusted (*e.g.*, agencies that voluntarily pay overtime compensation are less likely to adjust worker schedules, and other agencies may not completely eliminate overtime hours). Thus, only some subset of consumers cared for by direct care workers currently working overtime hours are likely to be affected by the rule.

*Least Burdensome Option or Explanation Required*

The Department's consideration of various options has been described throughout the preamble and the Regulatory Flexibility Analysis. The Department believes it has chosen the most effective option that updates and clarifies the rule and which, given the changes made in the Final Rule in response to comments received, minimizes the burden to the extent possible. Based on the commenters' suggestions, among the options considered by the Department but not described in the NPRM, the least restrictive option was taking no regulatory action. A more restrictive option was to add to the provisions being finalized a limit on the personal care services that can be performed. NELP and the National Council on Aging among others suggested that the Department require an initial assessment be conducted to determine if a direct care worker is performing primarily fellowship and protection for the consumer. If it is found that the direct care worker is not engaged primarily in fellowship and protection, then the subsequent list of personal care services should not be considered at all and the worker should not be considered exempt. The National Council on Aging further expressed the view that toileting, bathing, driving, and tasks involving positioning and/or transfers be excluded from the list of permissible duties. ANCOR suggested that the list be made exclusive and include fewer tasks. The commenter added that the Department should consider providing an allowance for household work defined as no more than one hour in a seven day period. AFSCME expressed the view that those workers who regularly engage in mobility tasks should not be considered companions. The Department carefully considered such views in development of the Final Rule. The Department ultimately settled on a broader set of

permissible care services than initially proposed as well as less restrictive than options suggested by some of these commenters. The Department views the inclusion of assistance with activities of daily living and instrumental activities of daily living as a compromise that allows for some delivery of care services under the companionship services exemption while at the same time recognizing and making an effort to tailor the types of permissible duties to Congress' original intent and to address the health and safety concerns of direct care workers and consumers. Taking no regulatory action does not address the Department's concerns discussed above under Need for Regulation. The Department found the most restrictive option to be overly burdensome on business in general and specifically small business.

## IX. Executive Order 13132 (Federalism)

The Final Rule does not have federalism implications as outlined in Executive Order 13132 regarding federalism. The Final Rule does not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

## X. Executive Order 13175, Indian Tribal Governments

This Final Rule was reviewed under the terms of Executive Order 13175 and determined not to have "tribal implications." The Final Rule does not have "substantial direct effects on one or more Indian tribes, on the relationship between the federal government and Indian tribes, or on the distribution of power and responsibilities between the federal government and Indian tribes." As a result, no tribal summary impact statement has been prepared.

## XI. Effects on Families

The undersigned hereby certifies that this Final Rule will not adversely affect the well-being of families, as discussed under section 654 of the Treasury and General Government Appropriations Act, 1999.

## XII. Executive Order 13045, Protection of Children

Executive Order 13045, dated April 23, 1997 (62 FR 19885), applies to any rule that (1) is determined to be "economically significant" as defined in Executive Order 12866, and (2) concerns an environmental health or safety risk that the promulgating agency has reason to believe may have a disproportionate

effect on children. This Final Rule is not subject to Executive Order 13045 because it has no environmental health or safety risks that may disproportionately affect children.

## XIII. Environmental Impact Assessment

A review of this Final Rule in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 et seq.; the regulations of the Council on Environmental Quality, 40 CFR 1500 et seq.; and the Departmental NEPA procedures, 29 CFR part 11, indicates that the Final Rule will not have a significant impact on the quality of the human environment. As a result, there is no corresponding environmental assessment or an environmental impact statement.

## XIV. Executive Order 13211, Energy Supply

This Final Rule is not subject to Executive Order 13211. It will not have a significant adverse effect on the supply, distribution, or use of energy.

## XV. Executive Order 12630, Constitutionally Protected Property Rights

This Final Rule is not subject to Executive Order 12630, because it does not involve implementation of a policy "that has takings implications" or that could impose limitations on private property use.

## XVI. Executive Order 12988, Civil Justice Reform Analysis

This Final Rule was drafted and reviewed in accordance with Executive Order 12988 and will not unduly burden the federal court system. The Final Rule was: (1) Reviewed to eliminate drafting errors and ambiguities; (2) written to minimize litigation; and (3) written to provide a clear legal standard for affected conduct and to promote burden reduction.

## List of Subjects in 29 CFR Part 552

Companionship, Domestic service workers, Employment, Labor, Minimum wages, Overtime pay, Wages.

**Laura A. Fortman,**
*Principal Deputy Administrator, Wage and Hour Division.*

For the reasons discussed in the preamble, 29 CFR part 552 is amended as follows:

## PART 552—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO DOMESTIC SERVICE

■ 1. The authority citation for part 552 continues to read as follows:

**Authority:** 29 U.S.C. 213(a)(15), (b)(21), 88 stat. 62; Sec. 29(b) of the Fair Labor Standards Act Amendments of 1974 (Pub. L. 93–259, 88 Stat. 76).

■ 2. Revise § 552.3 to read as follows:

### § 552.3 Domestic service employment.

The term *domestic service employment* means services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use. This listing is illustrative and not exhaustive.

■ 3. Revise § 552.6 to read as follows:

### § 552.6 Companionship services.

(a) As used in section 13(a)(15) of the Act, the term *companionship services* means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of *fellowship* means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of *protection* means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.

(b) The term *companionship services* also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of *care* means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

(c) The term *companionship services* does not include domestic services performed primarily for the benefit of other members of the household.

(d) The term *companionship services* does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

■ 4. Amend § 552.101 by revising the first three sentences of paragraph (a) to read as follows:

### § 552.101 Domestic service employment.

(a) The definition of *domestic service employment* contained in § 552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.1057) and from ''the generally accepted meaning'' of the term. Accordingly, the term includes persons who are frequently referred to as ''private household workers.'' See. S. Rep. 93–690, p. 20. The domestic service must be performed in or about a private home whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation. * * *

*　　*　　*　　*　　*

■ 5. Amend § 552.102 by revising paragraph (b) to read as follows:

### § 552.102 Live-in domestic service employees.

*　　*　　*　　*　　*

(b) If it is found by the parties that there is a significant deviation from the initial agreement, the parties should reach a new agreement that reflects the actual facts of the hours worked by the employee.

■ 6. Revise § 552.106 to read as follows:

### § 552.106 Companionship services.

The term ''companionship services'' is defined in § 552.6. Persons who provide care and protection for babies and young children who do not have illnesses, injuries, or disabilities are considered babysitters, not companions. The companion must perform the services with respect to the elderly person or person with an illness, injury, or disability and not generally to other persons. The ''casual'' limitation does not apply to companion services.

■ 7. Amend § 552.109 by revising paragraphs (a) and (c) to read as follows:

### § 552.109 Third party employment.

(a) Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all of the requirements of § 552.6.

*　　*　　*　　*　　*

(c) Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.

■ 8. Amend § 552.110 by revising paragraphs (b), (c), and (d) and adding new paragraph (e) to read as follows:

### § 552.110 Recordkeeping requirements.

*　　*　　*　　*　　*

(b) In the case of an employee who resides on the premises, the employer shall keep a copy of the agreement specified by § 552.102 and make, keep, and preserve a record showing the exact number of hours worked by the live-in domestic service employee. The provisions of § 516.2(c) of this chapter shall not apply to live-in domestic service employees.

(c) With the exception of live-in domestic service employees, where a domestic service employee works on a fixed schedule, the employer may use a schedule of daily and weekly hours that the employee normally works and either the employer or the employee may:

(1) Indicate by check marks, statement or other method that such hours were actually worked; and

(2) When more or less than the scheduled hours are worked, show the exact number of hours worked.

(d) The employer is required to maintain records of hours worked by each covered domestic service employee. However, the employer may require the domestic service employee to record the hours worked and submit such record to the employer.

(e) No records are required for casual babysitters.

[FR Doc. 2013–22799 Filed 9–30–13; 8:45 am]

**BILLING CODE 4510–27–P**