IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTRA-NATIONAL HOME CARE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR, et al.,<br><br>Defendants. | ) | Consolidated at Civil Action No. 20-1545 |
| AGEWELL HOME HELPERS, INC. d/b/a AGEWELL CAREGIVER SERVICE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR, et al.,<br><br>Defendants. | ) | Civil Action No. 20-1773<br><br>Hon. W. Scott Hardy |

**<u>OPINION</u>**

W. SCOTT HARDY, United States District Judge

Plaintiffs Intra-National Home Care, LLC ("Intra-National") and Agewell Home Helpers, Inc. ("Agewell") are "third party employers" of domestic service workers who seek to set aside two parts of a particular United States Department of Labor ("DOL") regulation as arbitrary and capricious or otherwise contrary to law pursuant to the Administrative Procedure Act ("APA"). This regulation became effective in 2015 and carves out third party employers such as Plaintiffs from two separate statutory exemptions from the minimum wage and overtime pay requirements of the Fair Labor Standards Act ("FLSA"). The DOL is using this regulation as a predicate to

investigate and prosecute minimum wage and overtime claims against Plaintiffs despite being covered by these statutory exemptions. Plaintiffs' declaratory judgment actions challenge the legality of the DOL's regulation, and seek to set it aside universally through vacatur.

The Court must discern whether Congress delegated to the DOL the authority to promulgate the regulation at issue by following the Supreme Court's three clearly established instructions set forth in *Loper Bright.* In doing so, the Court concludes that the DOL exceeded the limited authority Congress delegated to it, that the DOL did not engage in reasonable decision-making by promulgating this unauthorized regulation, and that this regulation conflicts with the best reading of the FLSA. The Court consequently believes that this regulation is contrary to law and should be set aside. However, controlling pre-*Loper Bright* judicial precedent precludes this outcome for the part of the regulation applicable to workers providing companionship services. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). Nonetheless, such precedent does not salvage the part of the regulation applicable to live-in domestic service workers. The Court declares that portion of the regulation unlawful and sets it aside as to Plaintiffs but does not do so universally.

## I. BACKGROUND

### A. Parties, Claims, and Pending Motions

Plaintiff Intra-National processes service and payroll documents for direct care workers who provide in-home companionship and assistance services to elderly and disabled family or household members of low-income families. (Docket No. 25, ¶ 1). Plaintiff Agewell employs direct care workers. (*Id.*, ¶ 2). Defendants are the United States Secretary of Labor Keith

Sonderling, and Wage and Hour Administrator Andrew Rogers, in their official capacities (collectively, "DOL").[1]

In October 2020, Plaintiffs initiated the instant declaratory judgment actions in pre-enforcement challenges to the DOL's regulation, codified at 29 C.F.R. § 552.109(a) and (c), providing that third party employers may not avail themselves of two specific statutory exemptions from the FLSA's minimum wage and overtime requirements. *See* Consolidated Amended Complaint for Declaratory and Injunctive Relief ("Consolidated Amended Complaint") (Docket No. 25). Plaintiffs allege at Count One of their Consolidated Amended Complaint that 29 C.F.R. § 552.109 should be set aside in its entirety pursuant to the APA because it conflicts with the text of the FLSA and is contrary to law. (Docket No. 25, ¶¶ 156-60). At Count Two, Plaintiffs allege that 29 C.F.R. § 552.109(a) and (c) should be set aside for the separate and independent reason that the DOL did not provide adequate justification or explanation and thus was arbitrary and capricious when promulgating it. (*Id.*, ¶¶ 161-67).[2]

Presently pending before the Court are the parties' cross motions for summary judgment (Docket Nos. 109, 110), concise statements and counterstatements of material facts (Docket Nos. 112, 114, 121), supporting and opposing briefs (Docket Nos. 111, 113, 119, 120), and a notice of

---

[1] Secretary of Labor Keith Sonderling and Wage and Hour Administrator Andrew Rogers are substituted as Defendants in this matter pursuant to Fed. R. Civ. P. 25(d), replacing former Secretary Eugene Scalia and Wage and Hour Administrator Cheryl Stanton who were in office when the Plaintiffs filed their Consolidated Amended Complaint.

[2] Plaintiffs asserted additional claims at Counts Three and Four of the Consolidated Amended Complaint, but they voluntarily dismissed those claims pursuant to a stipulation filed on May 18, 2021. (Docket No. 34). Additionally, Plaintiffs' summary judgment briefing advances yet another putative claim challenging the regulatory definition of "Companionship Services" promulgated by the DOL and codified at 29 C.F.R. § 552.6 (2015). However, Plaintiffs admittedly had not included this claim in their Consolidated Amended Complaint (Docket No. 113, at 41-42) and never moved to amend their pleadings to include this claim pursuant to Fed. R. Civ. P. 15 or otherwise. Therefore, the Court declines to address this issue. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 n. 1 (3d Cir. 1997) (denying consideration of claims that were not pleaded in plaintiff's complaints but were raised on appeal of summary judgment as defendants did not have "fair notice" of the claims); *Commonwealth Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F. 2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

supplemental authority and a response thereto. (Docket Nos. 126, 127). The Court held oral argument on these motions on February 19, 2026. (Docket Nos. 124, 125). This controversy is fully briefed and ripe for decision. For the reasons set forth herein, the Court will grant the DOL's motion in part and declare 29 C.F.R. § 552.109(a) (pertaining to companionship services) to be "in accordance with law" but will also grant Plaintiffs' motion in part, declare 29 C.F.R. § 552.109(c) (pertaining to the live-in domestic service employment) unlawful, and set it aside as to them.

### B. The FLSA and DOL Regulations

#### 1. General Background

Congress enacted the FLSA in 1938 to establish federal standards for hourly wages, overtime pay, and child labor. *See* Fair Labor Standards Act of 1938 (generally, the "FLSA" or the "Act"), Pub. L. 75-718, 52 Stat. 1060 (1938) (Codified at 29 U.S.C. §§ 201 *et seq.*). In doing so, Congress created a "Wage and Hour Division" within the DOL under the direction of an "Administrator" appointed by the President with the advice and consent of the Senate. §4(a) of the Act (29 U.S.C. § 204(a)).[3] Principally, the FLSA establishes the federal minimum wage and maximum hours (*i.e.*, overtime pay) for certain employees, along with specified exemptions from those requirements. §§ 6, 7, 13 of the Act (29 U.S.C. §§ 206, 207, 213). The FLSA also defines certain key terms. For instance, it defines "employee" as "any individual employed by an employer"[4] and defines "employ" as "to suffer or permit to work." §§ 3(e) and (g) of the Act (29 U.S.C. § 203(e)(1)

---

[3] The Court cites interchangeably to specific sections of the Act and to the United States Code.

[4] Congress has amended the FLSA over the years to further define and, in some instances, exclude subcategories of employees from this primary statutory definition of "employee," such as certain federal and state government employees, certain agricultural employees, and certain volunteers. *See* 29 U.S.C. § 203(e)(2)-(5). *See also* 29 U.S.C. § 203(y) (defining "employee in fire protection activities").

and (g)). It defines "employer" to include: "any person[5] acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." § 3(d) of the Act (29 U.S.C. §§ 203(d)).

Ever since it was originally enacted in 1938, the FLSA's minimum wage provision has provided that "[e]very employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the [specified] rates . . ." § 6(a) of the Act (29 U.S.C. § 206(a)). Similarly, the FLSA's overtime pay provision has provided that "[n]o employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce – [beyond specified hourly limits] . . . [unless] paying the compensation for overtime employment prescribed . . .." §§ 7(a) and (b) of the Act (29 U.S.C. § 207(a) and (b)). However, the FLSA has expressly exempted certain specified categories of employees and employers from those requirements. Notably, § 13(a) of the Act originally exempted ten specified categories of employees from both the minimum wage and overtime pay provisions. Prime among these exemptions is what has become known as the "EAP" or "White Collar" Exemption, which exempts "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)." § 13(a)(1) of the Act (29 U.S.C. § 213(a)(1)). Similarly, § 13(b) of the Act originally exempted from the overtime pay provision certain employees who were then covered by the Interstate Commerce Act or Motor Carrier Act. § 13(b) of the Act (29 U.S.C. § 213(b)).

---

[5] The FLSA defines a "person" as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." § 3(a); 29 U.S.C. § 203(a).

Over the years, Congress has amended the FLSA on several occasions to expand the lists of those employees, and, at times, employers, covered by the minimum wage and overtime pay requirements of § 6(a) and § 7(a), a well as those who are exempt from those provisions pursuant to § 13(a) and § 13(b).[6] Currently, the statutory exemptions from the minimum wage and overtime pay requirements are codified at 29 U.S.C. §§ 213(a)(1)-(19). The statutory exemptions from the overtime pay requirements are codified at 29 U.S.C. §§ 213(b)(1)-(30).

Relevant here, Congress amended the FLSA in 1974. In doing so, Congress found that "the employment of persons in domestic service in households affects commerce" and amended § 6 and § 7 of the original Act to extend the minimum wage and overtime pay provisions to such employees employed in "domestic service." §§ 7(a), 7(b)(1) and (2) of the Fair Labor Standards Amendments of 1974 ("1974 Amendments"), Pub. L. 93-259, 88 Stat. 55 (adding § 6(f) and § 7(l) to the Act (codified at 29 U.S.C. §§ 206(f), 207(l)). At the same time, Congress also amended §§ 13(a) and (b) of the original Act to exempt specified employees "employed in domestic service employment" from the newly expanded minimum wage and overtime pay provisions. *See* §§ 7(b)(3) and (4) of the 1974 Amendments (adding § 13(a)(15) and 13(b)(21) to the Act) (codified at 29 U.S.C. §§ 213(a)(15) (the "Companionship Exemption") and 29 U.S.C. § 213(b)(21) (the "Live-in Exemption")).

The "Companionship Exemption" at § 13(a)(15) of the Act states that the minimum wage and overtime pay requirements of §§ 6 and 7 of the Act "shall not apply" to:

> Any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services

---

6 Congress amended the minimum wage, overtime, and exemption provisions of the FLSA in 1949, 1955, 1961, 1966, 1974, 1977, 1985, and 1989. Pub. L. 81-393, 63 Stat. 910 (1949); Pub. L. 84-381, 69 Stat. 711 (1955); Pub. L. 87-30, 75 Stat. 65 (1961); Pub. L. 89-601, 80 Stat. 830 (1966); Pub. L. 93-259, 88 Stat. 55 (1974); Pub. L. 95-151, 91 Stat. 1245 (1977); Pub. L. 99-150, 99 Stat. 787 (1985); Pub. L. 101-157, 103 Stat. 938 (1989).

> for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

§ 13(a)(15) of the Act (29 U.S.C. § 213(a)(15)). Similarly, the "Live-In Exemption" states that the overtime pay requirements of § 7 of the Act "shall not apply with respect to . . . any employee who is employed in domestic service in a household and who resides in such household[.]" § 13(b)(21) of the Act (29 U.S.C. § 213(b)(21)). Finally, § 29(b) of the 1974 Amendments authorizes the DOL to "prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." § 29(b) of the 1974 Amendments, 88 Stat. 55, 76, Pub. L. 93-259. This provision has not been codified.

### 2. The DOL's 1975 Third-Party Employer Regulation

The DOL promulgated regulations in 1975 pertaining to the newly added domestic service provisions of the 1974 Amendments. *See* Application of the Fair Labor Standards Act to Domestic Service ("1975 Final Rule"), 40 Fed. Reg. 7,404 (Feb. 20, 1975). In Subpart A of this 1975 Final Rule, entitled "General Regulations," the DOL defined and delimited the terms "domestic service employment" and "companionship services." 40 Fed. Reg. 7,405-7,406 (codified at 29 C.F.R. §§ 552.3, 552.6). The DOL defined and delimited "domestic service employment" to mean:

> . . . services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed. The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use. It also includes babysitters employed on other than a casual basis. This listing is illustrative and not exhaustive.

40 Fed. Reg. 7,405 (codified at 29 C.F.R. §§ 552.3 (1975)). The DOL defined and delimited "companionship services" to mean:

> . . . those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work; Provided however, That such work is incidental, *i.e.*, does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. While such trained personnel do not qualify as companions, this fact does not remove them from the category of covered domestic service employees when employed in or about a private household.

40 Fed. Reg. 7,405 (codified at 29 C.F.R. §§ 552.6 (1975)). Then, in Subpart B[7], entitled "Interpretations," the DOL "set out statements of general policy and interpretation" concerning the domestic service provisions of the 1974 Amendments, and, in part, confirmed that third party employers are covered by the Companionship and Live-In Exemptions, providing:

> (a) Employees who are engaged in providing companionship services, as defined in § 552.6, and who are employed by an employer or agency other than the family or household using their services, are exempt from the Act's minimum wage and overtime pay requirements by virtue of section 13(a) (15). Assigning such an employee to more than one household or family in the same workweek would not defeat the exemption for that workweek, provided that the services rendered during each assignment come within the definition of companionship services.
>
> (b) Employees who are engaged in providing babysitting services and who are employed by an employer or agency other than the family or household using their services are not employed on a "casual basis" for purposes of the section 13(a)(15) exemption. Such employees are engaged in this occupation as a vocation.
>
> (c) Live-in domestic service employees who are employed by an employer or agency other than the family or household using their

[7] This 1975 Final Rule explained that the DOL defined and delimited specified terms in Subpart A, and then in Subpart B it "set out statements of general policy and interpretation concerning the application of the [FLSA] to domestic service employees." 40 Fed. Reg. 7,404.

> services are exempt from the Act's overtime requirements by virtue of section 13(b)(21). This exemption, however, will not apply where the employee works only temporarily for any one family or household, since that employee would not be "residing" on the premises of such family or household.

40 Fed. Reg. 7,407 (codified at 29 C.F.R. § 552.109(a) (1975) ("the 1975 Third Party Employer Regulation")).

In 2002, nearly thirty years after being promulgated, this 1975 Third Party Employer Regulation was challenged in court, and in 2007 the Supreme Court ultimately deemed it valid in *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). There, Evelyn Coke, a domestic care worker, challenged the regulation on several grounds, including that it exceeded the authority Congress delegated to the DOL. *Id.* at 166-167. Even so, the Supreme Court upheld the 1975 Third Party Employer Regulation over her challenge, and in doing so, relied on *Chevron, U.S.A., Inc. v. Nat. Resources. Defense Council, Inc.*, 467 U.S. 837 (1984), deferring to the DOL's interpretation of the Companionship Exemption as embodied in that regulation codified at 29 C.F.R. § 552.109(a) (prior to 2015). The Supreme Court reasoned that the "'power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Coke*, 551 U.S. at 165 (citing *Chevron*, 467 U.S. at 843). Applying this *Chevron* principle to the 1975 Third Party Employer Regulation, the Supreme Court went on to say that "the FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services'" and that "[t]he subject matter of the [1975] regulation in question concerns a matter in respect to which the agency is expert." *Coke*, 551 U.S. at 165. The Supreme Court pointed to both § 13(a)(15) and § 29(b) as sources of "gap-filling authority," concluding that the Companionship Exemption, § 13(a)(15), "refers broadly to 'domestic service

employment' and to 'companionship services'" and that Congress "expressly instructs the agency to work out the details of those broad definitions" and to determine "whether to include workers paid by third parties within the scope of the definitions." *Id.* at 167. Notably, the Live-In Exemption, § 13(b)(21), was not at issue in *Coke* and the Supreme Court made no reference to it.

### 3. Legislative and Regulatory Efforts to Exclude Third Party Employers from the FLSA's Companionship and Live-In Exemptions.

The 1975 Third Party Employer Regulation, deemed valid by *Coke* in 2007, remained undisturbed for nearly 40 years despite the fact that Congress amended the FLSA's statutory exemptions over the years in other ways, *see, e.g.,* Act of Dec. 9, 1999, Pub.L. No. 106–151, § 1, 113 Stat. 1731; Small Business Job Protection Act of 1996, Pub.L No. 104–188, § 2105(a), 110 Stat. 1755, 1929,[8] but in all that time did not amend the Companionship or Live-In Exemptions. Then, in 2007, in response to *Coke*, several bills were introduced in Congress seeking to abolish the Companionship Exemption. *See* "Direct Care Job Quality Improvement Act of 2011," H.R. 2341 and S. 1273, 112th Cong. (2011); "Direct Care Workforce Empowerment Act," H.R. 5902 and S. 3696, 111th Cong. (2010); "Fair Home Health Care Act of 2007," H.R. 3582 and S. 2061, 110th Cong. (2007).[9] One of these bills, named the Fair Home Health Care Act of 2007 (s. 2061), was introduced by Senator Tom Harkin (D-IA) and co-sponsored by then-Senator Barack Obama

---

[8] "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (internal quotation marks omitted).

[9] The Supreme Court in *Coke* characterized this Third Party Employer Regulation as "controversial" and noted that the DOL "considered changing the regulation and narrowing the exemption" on at least three separate occasions between 1975 and 2007 (in 1993, 1005, and 2001) but it "ultimately decided not to make any change." *Coke*, 551 U.S. at 163-164; *see* Application of the Fair Labor Standards Act to Domestic Service, 66 Fed. Reg. 5,481 (Jan. 19, 2001); Application of the Fair Labor Standards Act to Domestic Service, 60 Fed. Reg. 46,797 (Sept. 8, 1995); Application of the Fair Labor Standards Act to Domestic Service, 58 Fed. Reg. 69,310 (Dec. 30, 1993).

(D-Ill) in the 110th Congress. This proposed legislation never made it out of committee, as was the case with five other such bills, but a few years later, President Obama's Administration pressed for a regulatory change to achieve the same policy objective despite Congress' unwillingness to enact such legislation on these six recent occasions, stating, "we can't wait for Congress to act." *See Home Care v. Weil*, 76 F.Supp.3d 138, 147 (D.D.C. 2014), rev'd, 799 F.3d 1084 (D.C. Cir. 2015). *See also* "We Can't Wait: President Obama Will Announce Administrative Action to Provide Minimum Wage and Overtime Protections for Nearly 2 Million In-Home Care Workers," The White House, Office of the Press Secretary, Dec. 15, 2011, https://obamawhitehouse.archives.gov/the-press-office/2011/12/15/we-can-t-wait-president-obama-will-announce-administrative-action-provid [https://perma.cc/H8EM-H3QS] (last visited Oct. 16, 2026). In furtherance of this Presidential announcement, the DOL published a Notice of Proposed Rule Making ("NPRM") on December 27, 2011, inviting public comments on proposed regulatory changes regarding the Companionship and Live-In Exemptions. *See* 76 Fed. Reg. 81,190. On February 24, 2012, the DOL extended the period for filing written comments and did so again on March 13, 2012. *See* 77 Fed. Reg. 11,021 and 77 Fed. Reg. 14,688. Ultimately, the DOL published its Final Rule on October 1, 2013. *See* Application of the Fair Labor Standards Act to Domestic Service ("2013 Final Rule"), 78 Fed. Reg. 60,454, (Oct. 1, 2013), becoming effective on January 1, 2015. This 2013 Final Rule contains the DOL's 2015 Third Party Employer Regulation, which remains in effect.[10]

---

[10] Most recently, on July 2, 2025, the DOL issued yet another NPRM to reverse the 2015 Third Party Employer Regulation and revert to the 1975 Third Party Employer Regulation. 90 Fed. Reg. 28,976-28,978 ("The Department proposes to rescind the 2013 rule in its entirety and return to the 1975 regulations which were promulgated soon after the [A]mendments to the FLSA and were in place for nearly 40 years. The Department has reviewed the 2013 regulations and now questions whether the 1975 regulations better comport with the statute and Congress's intent to exempt home care employees from FLSA coverage. Returning to the 1975 regulations would also significantly reduce regulatory burden for the consumers and providers of home care services, which in turn could help to expand access to home care services."). The public comment period for this NPRM expired on September 2, 2025, and a new Final Rule is anticipated to be forthcoming. (Plaintiffs' Brief in Support of Summary Judgment, Docket No. 113 at 8-9;

#### 4. The DOL's 2015 Regulations

The DOL's 2013 Final Rule defines and delimits certain key statutory terms while also reversing the DOL's 1975 Regulation that had affirmed the inclusion of employees of third-party employers in the Companionship and Live-In Exemptions, thus supplanting the 1975 Third Party Employer Regulation with a new version, also codified at 29 C.F.R. § 522.109 (2015) (referred to herein as the "2015 Regulations" or more specifically as the "2015 Third Party Employer Regulation"). *See Home Care Ass'n of America v. Weil*, 799 F.3d 1084, 1088-89 (D.C. Cir. 2015) (applying *Chevron* and *Coke* to uphold the validity of the DOL's 2015 Third Party Employer Regulation).

The 2015 Regulations include updated definitions of "domestic service employment" and "companionship services." 29 C.F.R. §§ 552.3, 552.6. The term "domestic service employment" is defined as ". . . services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use. This listing is illustrative and not exhaustive." 29 CFR § 552.3. The DOL further defines and delimits "domestic service employment" in a separate part of the 2015 Regulation, codified at 29 C.F.R. § 552.101, as follows:

> (a) The definition of domestic service employment contained in § 552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.1057) and from the "generally accepted meaning" of the term. Accordingly, the term includes persons who are frequently referred to as "private household workers." The domestic service must be performed in or about a private

---

Defendant's Brief in Opposition to Plaintiffs' Motion for Summary Judgment, Docket No. 119 at 13). Plaintiffs contend that yet another regulatory reversal of the third party employer rule would not render their claims moot because the DOL persists in pursuing enforcement claims against them for time periods during which the 2015 version of the regulation has been in effect. (*See also* Transcript of Oral Argument, Docket No. 125, at 35-36, 41).

> home whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation."
>
> (b) Employees employed in dwelling places which are primarily rooming or boarding houses are not considered domestic service employees. The places where they work are not private homes but commercial or business establishments. Likewise, employees employed in connection with a business or professional service which is conducted in a home (such as a real estate, doctor's, dentist's or lawyer's office) are not domestic service employees.
>
> (c) In determining the total hours worked, the employer must include all time the employee is required to be on the premises or on duty and all time the employee is suffered or permitted to work. Special rules for live-in domestic service employees are set forth in § 552.102.

29 C.F.R. § 552.101. *See also* 29 C.F.R. § 552.102 (further defining and delimiting live-in domestic service employees). The term "companionship services" is defined as:

> (a) As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.
>
> (b) The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) and instrumental activities of daily living, which are tasks that enable a person to live independently at home (such as meal preparation, driving, light housework, managing finances, assistance with the physical taking of medications, and arranging medical care).

> (c) The term companionship services does not include domestic services performed primarily for the benefit of other members of the household.
>
> (d) The term companionship services does not include the performance of medically related services provided for the person. The determination of whether services are medically related is based on whether the services typically require and are performed by trained personnel, such as registered nurses, licensed practical nurses, or certified nursing assistants; the determination is not based on the actual training or occupational title of the individual performing the services.

29 C.F.R. § 552.6. The DOL further defines and delimits "companionship services" in 29 C.F.R. § 552.106 (stating that "[p]ersons who provide care and protection for babies and young children who do not have illnesses, injuries, or disabilities are considered babysitters, not companions. The companion must perform the services with respect to the elderly person or person with an illness, injury, or disability and not generally to other persons. The 'casual' limitation does not apply to companion services.").

Citing this new definition of "companionship services," the DOL's 2015 Third Party Employer Regulation replaces the 1975 version with the following:

> Third party employers of employees engaged in companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption provided by section 13(a)(15) of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption, if the employee meets all the requirements of § 552.6.

29 C.F.R. § 552.109(a) (2015). And another part of the 2015 Third Party Employer Regulation applies to the FLSA's Live-In Exemption, providing:

> Third party employers of employees engaged in live-in domestic service employment within the meaning of § 552.102 may not avail themselves of the overtime exemption provided by section 13(b)(21)

> of the Act, even if the employee is jointly employed by the individual or member of the family or household using the services. However, the individual or member of the family or household, even if considered a joint employer, is still entitled to assert the exemption.

29 C.F.R. § 552.109(c).[11]

The 2015 Third Party Employer Regulation, in essence, carves out companionship services workers and live-in domestic service workers employed by third parties from FLSA's minimum wage and overtime provisions, §§ 13(a)(15) and 13(b)(21), even if they otherwise would satisfy the requirements of these statutory exemptions. In doing so, this 2015 Third Party Employer Regulation replaced the 1975 Third Party Employer Regulation that explicitly affirmed that such workers were exempt.

### C. Factual Background

#### 1. The Parties' Participation in the Medicaid Waiver Program

As noted above, Plaintiffs employ or otherwise process service and payroll documents for direct care workers who provide in-home companionship and assistance services to elderly and disabled family or household members of low-income families through the Medicare Waiver Program in Pennsylvania, Ohio, Michigan, and Iowa. (Docket No. 25, ¶¶ 1-2, 9). Plaintiffs are considered "third party employers" of these direct care workers.

Plaintiffs describe the Medicaid Waiver Program as follows:

> Under the Medicaid Waiver Program, the federal government waives medical assistance rules intended for institutional care and allows States to use Medicaid reimbursement funds to provide care to elderly and disabled persons in their homes. State agencies administer the Medicaid Waiver Program by contracting with private intermediary entities, which determine the recipients' eligibility, create individual service plans, and approve Providers of in-home services. The Providers, which include third-party agencies such as

---

[11] A third subsection of the DOL's 2015 Third Party Employer Regulation similarly excludes from the Companionship Exemption those babysitters who are employed by a third party employer. 29 C.F.R. § 552.109(b). Plaintiffs do not challenge this subsection.

> Plaintiffs, then engage, coordinate training, and complete payroll services for the Direct Care Workers. The third party agencies receive Medicaid reimbursement funds from which the agencies pay the Direct Care Workers' wages, administrative costs, and FICA taxes.

(*Id.,* ¶ 10). States set the reimbursement rate for services provided through the Medicaid Waiver Program, which does not increase for overtime hours, and third party agencies such as Plaintiffs have no ability to obtain increases to the reimbursement rate in accord with any overtime hours used to deliver those services. (*Id.*, ¶¶ 10-11, 99). Stated differently, the Medicaid Waiver Program has provided a flat hourly rate of pay that does not afford any increased amount for the extra half-time for overtime hours worked by associated direct care workers. Plaintiffs and other third-party agencies have long-relied upon the FLSA's Companionship and Live-In Exemptions from the FLSA's minimum wage and overtime pay requirements which might otherwise be applicable. (*Id.*, at ¶¶ 11-12).

Because of the DOL's 2015 Third Party Employer Regulation, Plaintiffs contend that they restructured (meaning, lowered) the rates of pay applicable to their direct care workers to allow for overtime premium pay within the financial constraints of the Medicaid Waiver Program. (*Id.*, ¶¶ 98, 100). Plaintiffs contend that the DOL deems this restructured arrangement to be a "serious violation" of the FLSA. (*Id.,* ¶ 101). Plaintiffs further contend that the DOL's 2015 Third Party Employer Regulation and subsequent enforcement actions place a "crippling financial burden upon them" and "threatens their ability to continue to serve elderly and disabled care recipients." (*Id.,* ¶ 109). Furthermore, Plaintiffs contend that the DOL has targeted third party agencies such as themselves for investigation and civil prosecution under the 2015 Third Party Employer Regulation. (*Id.,* ¶¶ 90-94, 103-110). Plaintiffs also contend that the "DOL's targeting of [them] and

other third party agencies threatens [sic] to put them out of business and decimate the entire industry of home care providers." (*Id.*, ¶ 77).

### 2. Procedural History

Predicated upon the 2015 Third Party Employer Regulation, the DOL began investigating Plaintiffs by making "numerous requests for . . . payroll records and pay calculations" and by auditing their records. (Docket No. 25, ¶¶ 103-104). Then, the DOL began filing enforcement actions against them. On January 26, 2021, the DOL sued Agewell and its owners in the Western District of Pennsylvania at Civil Action No. 21-108 (W.D. Pa.) (Cercone, J.). On October 15, 2021, the DOL sued Intra-National and its CEO in the Western District of Pennsylvania at Civil Action No. 21-1391 (W.D. Pa.) (Cercone, J.). Currently, these enforcement actions are stayed and administratively closed. (Ord., *Chavez-Deremer v. Intra-National Home Care, LLC et al*, 2:21-cv-1391-DSC, (W.D. Pa., Dec. 3, 2024) (Docket No. 166)); (Ord., *Su v. Agewell Home Helpers, Inc. et al,* 2:21-cv-108-DSC, (W.D. Pa. Dec. 3, 2024) (Docket No. 166)).

Plaintiffs filed the instant declaratory judgment actions shortly before the DOL began filing its enforcement actions against them. The DOL responded by filing motions to dismiss these actions and this Court subsequently dismissed these cases as untimely, but the United States Court of Appeals for the Third Circuit vacated this Court's dismissal order and remanded these cases for further proceedings due to the United States Supreme Court's intervening decision in *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024). *See Intra-National Home Care, LLC v. DOL,* No. 22-2628, 2024 WL 4100245, at *3 (3d Cir. Sept. 6, 2024). Upon remand, this Court issued an Order to Show Cause to solicit the parties' positions on the Third Circuit panel's statement that this Court "may . . . in its discretion dismiss a declaratory judgment or injunctive suit if the same issue is pending in litigation elsewhere." *Intra-National Home Care,*

*LLC,* 2024 WL 4100245, at *3 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 155 (1967)). (Docket No. 81). Then, on December 4, 2025, this Court entered a Memorandum Opinion and Order exercising jurisdiction over the declaratory judgment actions filed by Intra-National and Agewell.[12] Shortly thereafter, on December 31, 2025, the parties filed cross-motions for summary judgment and the Court held oral argument on February 19, 2026. (Docket Nos. 109, 110, 124, 125). Those motions are now ripe for disposition.

## II. STANDARDS OF REVIEW

### A. Judicial Review of Regulations Under the Administrative Procedure Act (APA)

The APA directs a court reviewing a regulation or other agency action "to decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action" and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. §§ 706, 706(2)(A).[13] As the Supreme Court recently

---

12 Previously, Case No. 20-cv-1545 involving Intra-National included a second plaintiff, Americare Home Healthcare Services, LLC (Americare"). (Docket No. 1). But, unlike Plaintiffs Intra-National and Agewell, the enforcement action against Americare was filed in the Southern District of Ohio. At the time of decision on the timeliness question, the District Court in the Southern District of Ohio already had granted Summary Judgment for the DOL and ordered Americare to pay back pay wages and liquidated damages, and that decision was appealed to the Sixth Circuit. (Ord. and Op., *DOL v. Americare Healthcare Servs. LLC, et al*, 2:21-cv-5076 (S.D. Ohio Jan. 9, 2025) (Docket Nos. 121)); (Ord., *Americare Healthcare Servs. LLC,* 2:21-cv-5076 (S.D. Ohio March 3, 2025) Docket No. 126) (the "SD Ohio enforcement action")); (Notice of Appeal, *Americare Healthcare Services LLC, et al,* 2:21-cv-5076 (S.D. Ohio Mar 3, 2025) (Docket No. 128)); (25-318, *DOL v. American Healthcare Servs., et al*, 25-3128 (6th Cir.)). The Sixth Circuit ultimately affirmed this decision. *Dep't. of Lab. v. Americare Healthcare Services, LLC,* 171 F.4th 838 (6th Cir. 2026). Because that appeal was pending when this Court exercised jurisdiction over the cases filed by Intra-National and Agewell, this Court declined to exercise jurisdiction over Americare and dismissed it from these pending actions. *Intra-National Home Care, LLC, v. Department of Labor*, Civ. Action No. 20-1773, 2025 WL 3484650 (W.D. Pa. Dec. 4, 2025).

13 Other provisions of the APA similarly direct a reviewing court to hold unlawful and set aside agency action found to be "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2) (B) and (C). These provisions seem relevant to Plaintiffs' argument that the DOL exceeded its authority delegated to it by the FLSA when promulgating its 2015 Third Party Employer Regulation and presumably necessitates the same or substantially similar *Loper Bright* analysis. Both provisions require constitutional and statutory scrutiny. However, this Court does not undertake judicial review

affirmed in its seminal 2024 *Loper Bright* decision overturning *Chevron*, the APA adopts the "traditional understanding" that courts must exercise independent judgment in determining the meaning of statutory provisions. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024). Further, "[i]n exercising such judgment . . . courts may . . . seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly consult for guidance . . ." *Id.* (internal quotation marks omitted). Reviewing courts may consider an agency's regulation for guidance, but its weight "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . ." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

This interpretive framework was not always in place. For many years prior to *Loper Bright*, courts were required to ignore the APA and instead defer to agency interpretations of ambiguous statutes even if a reviewing court determined through its own independent judgment that there was a better reading of the statutory text. *Loper Bright*, 603 U.S. at 398-99 (stating that *Chevron* "require[ed] a court to *ignore*, not follow, 'the reading the court would have reached' had it exercised its independent judgment as required by the APA.") (emphasis in original). Under the now obsolete *Chevron* two-step test, courts first asked "whether Congress ha[d] directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If Congress had spoken to the question, courts were instructed to follow the clear meaning of the statute at issue. But, if the statute was "silent or ambiguous," step two of the *Chevron* test required the reviewing court to defer to the Executive Branch agency so long as its reading was a "permissible construction of the statute." *Id.* at 843.

pursuant to 5 U.S.C. §§ 706(2) (B) or (C) because Plaintiffs have not sought declaratory and injunctive relief pursuant to those subsections of the APA.

Ambiguity, under *Chevron* and its progeny, was viewed as an act of implied Congressional delegation to the agency to resolve, and courts were bound by these agency interpretations so long as they were "reasonable." *Loper Bright*, 603 U.S. at 372. Discerning ambiguity itself often proved elusive. "One judge might see ambiguity everywhere; another might never encounter it." *Id.* at 408.

In overruling this *Chevron* framework, *Loper Bright* found that "[t]he better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch." 603 U.S. at 403. And, if a court, "after applying all relevant interpretive tools," concludes that the best reading of the law differs from the agency's interpretation, it is incumbent on that court to follow the best reading. *Id.* at 400. "In the business of statutory interpretation, if it is not the best, it is not permissible." *Id.* However, while ambiguity itself is no longer viewed as an implied delegation, it may be the case that the best reading of a statute is that Congress did intentionally and explicitly delegate certain decisions to an administrative agency:

> For example, some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'

*Loper Bright*, 603 U.S. at 394-95 (internal citations omitted). Even then, when Congress delegates authority to an agency, *Loper Bright* instructs that the role of a reviewing court is to independently interpret the statute and effectuate the will of Congress subject to constitutional limits. *Id.* at 395. The APA "bars judges from disregarding that responsibility just because an Executive Branch agency views a statute differently." *Id.* at 412. This is also a constitutional responsibility. "Judges have always been expected to apply their 'judgment' *independent* of the political branches when

interpreting the laws those branches enact." *Id.* at 412 (emphasis in original) (citing THE FEDERALIST NO. 78 (Alexander Hamilton)). As *Loper Bright* instructs, "[t]he court fulfills that role by recognizing constitutional delegations, 'fix[ing] the boundaries of [the] delegated authority,' . . . and ensuring the agency has engaged in 'reasonable decisionmaking' within those boundaries." *Id.* (internal citations omitted). Stated differently, reviewing courts must "independently identify and respect such delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 404.

When fashioning this new three-part framework in *Loper Bright*, the Supreme Court gave further direction regarding prior precedent that upheld regulations under the substantially more deferential and now abrogated *Chevron* methodology. *Loper Bright* instructs that a prior judicial decision relying on *Chevron* alone does not automatically render that decision incorrect or not binding. Instead, "*Chevron* is, at best, 'just an argument that the precedent was wrongly decided'" and "[t]he holdings of . . . cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Id.* at 412 (internal citations omitted). This precept will need to be applied in this case.

Finally, in addition to the APA's provision for holding unlawful and setting aside a regulation for being "not in accordance with law" pursuant to the Supreme Court's three-part *Loper Bright* methodology, the same subsection of the APA separately empowers a reviewing court to hold unlawful and set aside a regulation that is arbitrary or capricious if it is not "'"reasonable and reasonably explained,'" because the agency must have "act[ed] within a zone of reasonableness and, in particular, [must have] reasonably considered the relevant issues and reasonably explained the decision." *Trenton Threatened Skies, Inc., v. Federal Aviation Administration*, 90 F.4th 122, 130 (3d. Cir. 2024) (quoting *Federal Communications Commission v. Prometheus Radio Project*,

592 U.S. 414, 423 (2021)). *See also* 5 U.S.C. § 706(2)(A). Even then, however, an agency may change a policy and no heighted standard is applied when reviewing the new policy. The agency must simply acknowledge the change and explain its reason for the new action. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-16 (2009).

**B. Principles of Statutory Interpretation**

*Loper Bright* instructs a reviewing court to independently interpret the statute at issue and effectuate the will of Congress subject to constitutional limits. *Loper Bright*, 603 U.S. at 395. Courts are to construe the law with "'[c]lear heads . . . and honest hearts,' not with an eye to policy preferences that had not made it into the statute." *Loper Bright*, 603 U.S. at 403-404 (citing 1 WORKS OF JAMES WILSON 363 (J. Andrews ed. 1896)). Courts "interpret statutes, no matter the context, based upon the traditional tools of statutory construction, not individual policy preferences. Indeed, the Framers crafted the Constitution to ensure that federal judges could exercise judgment free from the influence of the political branches." *Loper Bright*, 603 U.S. at 403-404. Faithful, text-based statutory interpretation surely keeps a reviewing court from veering beyond its judicial role.

Accordingly, "[w]hen interpreting [statutory] provisions, as always, we begin by analyzing the statutory language." *Rotkiske v. Klemm,* 589 U.S. 8, 13 (2019) (internal quotation marks omitted). The text is read "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020). "And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal citations omitted); *Lundeed v. 10 West Ferry Street Operations LLC d/b/a Logan Inn*, 156 F.4th 332, 337 (3d Cir. 2025) ("As always, we start with the statutory text") (citing *Garland v. Cargill*, 602 U.S. 406, 415 (2024)); *see also* 1 JOSEPH STORY,

COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 401, at 384 (1833) ("where the words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation."). The ultimate objective is to discern the best reading of the statute. *Loper Bright*, 603 U.S. at 400 ("Courts . . . understand that . . . statutes, no matter how impenetrable, do – in fact must – have a single, best meaning. That is the whole point of having written statutes; every statute's meaning is fixed at the time of enactment.") (internal quotation marks omitted).

A statute must be interpreted in light of its "text, context, and structure." *Soto v. United States*, 605 U.S. 360, 368 (2025); *see also Doe 1 v. United States*, 37 F.4th 84, 88 (3d. Cir. 2022). "Courts look to the statute as a whole and consider the entire text, in view of its structure and of the physical and logical relation of its many parts." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, at 167 (2012). The words of a statute cannot be read in isolation, and "reasonable statutory interpretation must account for both the 'specific context in which . . . language is used' and 'the broader context of the statute as a whole.'" *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Courts have many tools, or "canons," at their disposal when interpreting statutory text. Most importantly, "[w]ords are to be understood in their ordinary, everyday meanings – unless the context indicates that they bear a technical sense." SCALIA & GARNER, READING LAW § 6, at 69 Further, "[m]andatory words impose a duty; permissive words grant discretion." SCALIA & GARNER, READING LAW § 11, at 112. And each term must have its own distinct meaning, and "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009); SCALIA &

GARNER, READING LAW § 26, at 174 (the surplusage canon instructs that "words are to be taken as having an effect."). The absence of a term may also be meaningful. "Sometimes statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009) (citing *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 471 (2001)). Again, a court's duty when interpreting a statute is to discern its "best reading" because "if it not the best, it is not permissible." *Loper Bright*, 603 U.S. at 400; *see also Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85-89 (2018) (rejecting an argument that an FLSA exemption should be construed narrowly and holding that such statutory provisions must be given their "best reading" and to construe them narrowly in the absence of a "textual indication" is "anything but a fair reading").

**C. Cross Motions for Summary Judgment**

Under Federal Rule of Civil Procedure Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). This standard remains the same when parties file cross-motions for summary judgment. *See Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008). "When confronted with cross-motions for summary judgment, the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Anderson v. Franklin Inst.*, 185 F. Supp. 3d 628, 635 (E.D. Pa. 2016) (internal quotation marks and citation omitted).

Here, the parties filed concise statements of material facts in accordance with Rule 56 (c). *See* LCvR 56(B)(1) and (C)(1). (Docket Nos. 112, 121). Even so, the parties have not identified any disputed issues of material fact and instead rest on the administrative record. "Summary

judgment is an appropriate mechanism for resolving cases involving administrative rulemaking on the record, particularly where, as here, the case turns chiefly on issues of statutory construction." *Indiv. Reference Servs. Grp., Inc. v. FTC*, 22 (D.D.C. 2001) *aff'd sub nom. Trans Union LLC v. FTC*, 295 F.3d 42 (D.C. Cir. 2002); *see also Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997); *Frazier v. Mabus*, 901 F.Supp.2d 600, 613 (W.D. Pa. 2012) ("[S]ummary judgment is an appropriate mechanism for reviewing the final action of a government agency under the [APA].") (citing *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 693 (3d Cir.1999)).

## III. DISCUSSION

This Court must abide by the Supreme Court's instructions in *Loper Bright* and independently discern whether the DOL's 2015 Third Party Employer Regulation is in "accordance with law" by analyzing whether it conflicts with the best reading of the FLSA, particularly its Companionship and Live-In Exemptions, based upon the FLSA's text, context, and structure. In doing so, the Court recognizes that while *Loper Bright's* three-point methodology is clear, it also is relatively new and certain aspects of this methodology are not fully developed, leaving lower courts to resolve such unanswered questions. This Court endeavors to resolve those issues based upon statutory text and existing precedential case law, where applicable, and pursuant to well-established first principles grounded in controlling constitutional and statutory precepts. The text of the FLSA and APA each provide helpful direction. Separately, the Court must determine whether the DOL's promulgation of its 2015 Third Party Employer Regulation was "arbitrary, capricious, or an abuse of discretion." *See* 5 U.S.C. § 706(2)(A). Finally, this Court is also confronted with unsettled issues pertaining to severability and whether *vacatur* is required or otherwise permitted. Again, the Court endeavors to address those issues herein and takes much direction, once again, from the statutory text of the APA and other relevant statutes.

### A. Whether the DOL's 2015 Third Party Employer Regulation is "In Accordance with Law."

The main question presented in this case is whether the DOL's 2015 Third Party Employer Regulation, codified in relevant parts at 29 C.F.R. § 552.109(a) and (c) (2015), is or is not "in accordance with law." 5 U.S.C § 706(2)(A). So, following the three-step *Loper Bright* methodology, this Court must first interpret the text of the FLSA, particularly the Companionship Exemption and the Live-In Exemption, codified at 29 U.S.C. §§ 213(a)(15) and 213(b)(21), respectively, as well as § 29(b) of the 1974 Amendments, to discern the best reading of those statutory texts, including whether Congress enacted any specific delegations pertaining to them. Again, the Supreme Court instructs that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 395. In doing so, this Court discerns whether the DOL's 2015 Third Party Employer Regulation is in accordance with the text of the FLSA. The Court embarks on that independent review now, first for the Companionship Exemption and then for the Live-In Exemption.

#### 1. Application of *Loper Bright* to the Companionship Exemption.

The Companionship Exemption is clear, direct, and unambiguous. It creates a nondiscretionary exemption from the minimum wage and overtime pay provisions of the FLSA (*i.e.*, ". . . provisions of [§§] 206 and 207 . . . shall not apply . . .") with respect to:

> [A]ny employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

§13(a)(15) (29 U.S.C. § 213(a)(15)). As noted above, interpreting this provision starts with its text, which plainly covers "any employee" to mark the outer boundary of those persons covered by it. *Id.*

Congress defines the term "employee" throughout the FLSA to mean "any individual employed by an employer." 29 U.S.C §203(e)(1). This statutory definition itself contains two additional terms that are also statutorily defined. The term "employer" is defined as ". . . any person acting directly or indirectly in the interest of an employer in relation to an employee . . ." 29 U.S.C. § 203(d). The term "employed" is a derivation or variant of "employ" which the FLSA defines as "to suffer or permit to work." 29 U.S.C. § 203(g). Then, when enacting the Companionship Exemption as part of the 1974 Amendments, codified in 29 U.S.C. §213(a)(15), Congress modified the statutorily defined term "employee" by adding the indefinite adjective "any" (thus, "any employee") for the purpose of identifying which employees qualify for the Companionship Exemption. The term "any" is "used to refer to a member of a particular group or class [here, employees] without distinction or limitation (hence implying every member of the class or group, since every one may in turn be taken as a representative." *Any*, OXFORD ENGLISH DICTIONARY, (Def. 1c), https://www.oed.com/dictionary/any_adj?tl=true (last visited October 19, 2026). *See also Encino Motorcars, LLC*, 584 U.S. at 88 (the word "any" has an "expansive" meaning that "bespeaks breadth") (citing *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (stating that when read naturally, the word "any" has an expansive meaning, that is, "one or some in indiscriminately of whatever kind") (internal quotation marks and citations omitted)). Consequently, for coverage under the Companionship Exemption, Congress legislatively infused its statutorily defined term "employee" with the broadest possible meaning by modifying it with the term "any" to mean every employee without distinction or limitation, except insofar as the remaining statutory text of this

provision also requires that "any employee" (as defined by 29 U.S.C. §203 (e)(1)) must: (i) be employed (meaning, "suffer[ed] or permit[ted] to work" by 29 U.S.C. §203(g)) in a specific kind of employment (*i.e.*, "domestic service employment")); (ii) provide a specific kind of services (*i.e.*, "companionship services")[14]; and (iii) provide those services for specific kinds of individuals (*i.e.*, "those unable to care for themselves" because of "age or infirmity")). *See* 29 U.S.C. §213(a)(15). Notably, the Companionship Exemption is mandatory and not discretionary, for its statutory text provides that the FLSA's minimum wage and overtime pay requirements "shall not apply" to "any employee" (meaning, without limitation) who satisfies these requirements. *Id.* Moreover, nowhere in the text of the Companionship Exemption does Congress qualify coverage based upon the identity or nature of the employee's *employer*. To do so would read into the statutory text words that are not there, such as "[a]ny employee *not employed by a third party employer* who is employed . . ." Instead, its text expressly focuses exclusively on employees, the services the employees provide, and the individuals who receive the employees' services.

This broad meaning of the statutory phrase "any employee," unencumbered in its scope by the identity or nature of an employee's employer, is bolstered by the FLSA's structure and the statutory context within which the Companionship Exemption is situated. The Companionship Exemption, codified at 29 U.S.C. § 213(a)(15), is but one of forty-nine statutory exemptions found in the many subsections of 29 U.S.C. §§ 213(a) and (b). *See* 29 U.S.C. §§ 213(a)(1)-(19) and 29 U.S.C. §§ 213(b)(1)-(30). Like the Companionship Exemption, several of these other statutory exemptions directly cover *employees* without reference to or mention of the identity or nature of an *employer*, while certain other exemptions do depend, at least in part, on the identity or nature

[14] The Court does not analyze the portion of 29 U.SC. § 213(a)(15) pertaining to "babysitting services" because Plaintiffs do not challenge that part of the 2015 Third Party Employer Regulation.

of an *employer*. The FLSA's Fisherman Exemption is one such example in which the identity or nature of the employer is immaterial. It is codified at 29 U.S.C. § 213(a)(5) and provides an exemption from the minimum wage and overtime pay requirements appliable to:

> [A]ny employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee.

29 U.S.C. § 213(a)(5). And, like the Companionship Exemption, this Fisherman Exemption is also outwardly bounded by the statutory phrase "any employee" and expressly focuses on employees' tasks (*i.e.*, "*employed in* the catching . . . fish . . . or *in* the first processing . . . of such marine products . . .") and covers any employee who performs such tasks regardless of the identity or nature of the employer. *Id.* (emphasis added). Other examples abound. *See e.g.*, 29 U.S.C. § 213(a)(1) ("any employee employed in a bona fide executive, administrative, or professional capacity . . ."); 29 U.S.C. § 213(a)(8) ("any employee employed in connection with the publication of any . . . newspaper"); 29 U.S.C. § 213(a)(12) ("any employee employed as a seaman on a vessel other than an American vessel"); 29 U.S.C. § 213(a)(17) ("any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker" who primarily performs one of an enumerated list of duties); 29 U.S.C. § 213(a)(18) ("any employee who is a border patrol agent"); 29 U.S.C. § 213(a)(19) ("any employee employed to play baseball" for compensation at or above a certain amount pursuant to a contract that provides for a weekly salary for services performed irrespective of the number of hours worked during the league's championship season but not for spring training or the offseason); 29 U.S.C. § 213(b)(5) ("any individual employed as an outside buyer of poultry, eggs, cream, or milk . . ."); 29 U.S.C. §

213(b)(6) ("any individual employed as a seaman); 29 U.S.C. § 213(b)(11) ("any individual employed as a driver or driver's helper making local deliveries . . ."); and 29 U.S.C. § 213(b)(15) ("any employee engaged in the processing of maple sap into sugar . . .").

In contrast, Congress did expressly include the identity or nature of an employee's employer as a qualifying component for coverage under certain other statutory exemptions. One such example that expressly includes the identity and nature of the *employer* is the Agricultural Exemption. This provision provides an exemption for:

> [A]ny employee employed in agriculture (A) if such employee is employed *by an employer who* did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor, (B) *if such employee is the parent, spouse, child, or other member of his employer's immediate family*, (C) if such employee (i) is employed as a hand harvest laborer and is paid on a piece rate basis in an operation which has been, and is customarily and generally recognized as having been, paid on a piece rate basis in the region of employment, (ii) commutes daily from his permanent residence to the farm on which he is so employed, and (iii) has been employed in agriculture less than thirteen weeks during the preceding calendar year...

29 U.S.C. § 213(a)(6) (emphasis added). As its text indicates, for this exemption to apply, Congress plainly requires that the exempt employee be employed in agriculture performing specified duties or tasks and be "*employed by*" a particular type of employer, namely, an employer who did not use more than a specified number of man-days of agricultural labor during a specified period, an employer that was an immediate family member of the employee, etc. *Id.* Again, other examples abound. *See e.g.*, 29 U.S.C. § 213(a)(3) ("any employee *employed by an establishment which is* an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center . . .") (emphasis added); 29 U.S.C. § 213(a)(10) ("any switchboard operator *employed by an independently owned public telephone company* which has not more than seven hundred and fifty stations") (emphasis added); 29 U.S.C. § 213(b)(2) ("any employee of an

*employer engaged in* the operation of a rail carrier . . .") (emphasis added); 29 U.S.C. § 213(b)(10)(A) ("any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles . . . if he is *employed by a nonmanufacturing establishment* . . .") (emphasis added); 29 U.S.C. § 213(b)(10)(B) ("any salesman primarily engaged in selling trailers, boards, or aircraft, if he is *employed by a nonmanufacturing establishment* . . .") (emphasis added); 29 U.S.C. § 213(b)(13) ("any employee with respect to his employment in agriculture *by a farmer* . . .") (emphasis added); 29 U.S.C. § 213(b)(14) ("any employed within the area of production . . . *by an establishment* commonly recognized as a country elevator . . .") (emphasis added); 29 U.S.C. § 213(b)(17) ("any driver employed *by an employer engaged in* the business of operating taxicabs") (emphasis added); 29 U.S.C. § 213(b)(27) ("any employee *employed by an establishment which is a motion picture theater*") (emphasis added); 29 U.S.C. § 213(b)(28) ("any employee employed in planting or tending trees . . . *if the number of employees employed by his employer in such . . . operations does not exceed eight*") (emphasis added).

This foregoing sampling of statutory exemptions in the many subsections surrounding the Companionship Exemption illustrates that Congress was specific and intentional when legislating who it deems exempt. In some instances, Congress expressly chose to exempt employees performing a certain task or set of duties regardless of the employer, as it did in the Fisherman Exemption codified at 29 U.S.C. § 213(a)(5). In such instances, Congress solely utilized prepositional phrases in the statutory text such as "employed in" or "employed as" to prescribe the qualifying employee's specific field, industry, or activity. *See e.g.*, 29 U.S.C. § 213(a)(8) ("any employee *employed in connection with* the publication of any . . . newspaper"); 29 U.S.C. § 213(a)(12) ("any employee *employed as* a seaman on a vessel other than an American vessel"). Or, in some instances, Congress used the word "is" as a linking verb that connects the subject, *i.e.*, the

exemption-qualifying employee, to a description, state of being, or action, such as being a computer systems analyst or border patrol agent. *See e.g.*, 29 U.S.C. § 213(a)(17) ("any employee who *is* a computer systems analyst . . .") (emphasis added) and 29 U.S.C. § 213(a)(18) ("any employee who *is* a border patrol agent") (emphasis added). Elsewhere, by contrast, Congress used the preposition "by" expressly to define certain exemptions at least partly based on the identity or nature of the employer. *See e.g.*, 29 U.S.C. § 213(a)(10) ("any switchboard operator employed *by* an independently owned public telephone company . . .") (emphasis added) and 29 U.S.C. § 213(b)(17) ("any driver employed *by* an employer engaged in the business of operating taxicabs") (emphasis added).

It is plainly evident from reviewing these forty-nine separate statutory exemptions that when Congress wants to exempt certain employees from the FLSA's minimum wage and/or overtime pay provisions based, at least in part, upon the identity or nature of an employee's employer, it does so explicitly. In accordance with the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," if Congress sought to exclude the employees of third party employers or otherwise limit coverage of the Companionship Exemption to employees of family members not otherwise employed by third party employers, Congress knew how to do so and simply would have done so. Yet it did not. *West Virginia v. E.P.A.,* 597 U.S. 697, 721 (2022) (quoting *David v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)). Here, Congress did not carve out third-party employers from the Companionship Exemption because it did not say anything about the identity or nature of the employer in its statutory text, even when it did include an employer's identity, nature, or specified attributes in certain other neighboring statutory exemptions. Instead, Congress limited its statutory text to the use of the preposition "in" to denote the employee's qualifying field,

industry, or activity, 29 U.S.C. § 213(a)(15) (". . . any employee *employed in* domestic service employment to provide companionship services . . .") (emphasis added), and without using an agent-identifying preposition such as "by" as it did for certain other exemptions. Congress chose to be silent on whether the identity or nature of an employee's employer matters for inclusion in the Companionship Exemption, even though it was not silent about employers when excluding employees of certain types of employers from other exemptions in neighboring subsections. "Statutory silences, like awkward silences, tempt speech. But courts must resist the urge to fill in words that Congress left out." *Sanofi Aventis U.S. LLC v. United States Dep't of Health and Human Services*, 58 F.4th 696, 699 (3d Cir. 2023). And "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardener*, 513 U.S. 115, 120 (1994) (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983)).

Based upon the foregoing, this Court concludes that the best reading of the Companionship Exemption is that it exempts from the FLSA's minimum wage and overtime pay requirements "any employee" meeting its other expressly stated requirements, namely, those employees "employed in domestic service employment to provide companionship services," for those individuals who are "unable to care for themselves because of age or infirmity" and regardless of their employer's identity or nature. *See* 29 U.S.C. § 213(a)(15). The identity of the employer simply is immaterial to the application of this Companionship Exemption, so the DOL's 2015 Third Party Employer Regulation that imposes this added qualifying requirement directly conflicts with the statutory text exacted by Congress.

However, the Court's review of the Companionship Exemption does not end here. As *Loper Bright* instructs, the best reading of a statute may be that Congress delegates some function

to an administrative agency. *Loper Bright*, 603 U.S. at 395. As such, the Court must follow *Loper Bright's* direction and continue its textual analysis of the FLSA by: (a) recognizing any constitutional delegations to the DOL, (b) fixing and policing their boundaries, and (c) ensuring the DOL has engaged in reasonable decision-making within those boundaries. *Loper Bright*, 603 U.S. at 395, 404. After doing so, the Court concludes that such delegations do not alter this foregoing best reading of the Companionship Exemption.

**(a) Recognizing Delegations**

The DOL proffers two statutory provisions as sources of legislative delegation to support promulgation of its 2015 Third Party Employer Regulation. First, the DOL points to text within the Companionship Exemption itself, stating ". . . (as such terms are defined and delimited by regulations of the [DOL])." 29 U.S.C. § 213(a)(15). Indeed, *Loper Bright* itself cited the Companionship Exemption as an example of an express statutory delegation. 603 U.S. at 395 n. 5.[15] The parties acknowledge this express delegation. (Def.'s Brief, Docket No. 111, at 19-22; Plaintiff's Brief, Docket No. 113, at 35-36). Second, the DOL contends that § 29(b) of the 1974 Amendments also serves as a statutory delegation authorizing it to "prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." § 29(b) of the 1974 Amendments, 88 Stat. 55, 76 Pub. L. 93-259. With some trepidation[16], this Court recognizes this uncodified provision as another statutory delegation potentially applicable here.

[15] *Loper Bright* specifically requires this Court to respect "*constitutional* delegations." *Loper Bright,* 603 U.S. at 494 (emphasis added). *See* U.S. Const., Art. I, § 1 ("All legislative Powers herein granted shall be vested in [Congress] . . ."). Because *Loper Bright* itself cites the Companionship Exemption, 29 U.S.C. §13(a)(15), as an example of a constitutional delegation, this Court need not evaluate its constitutionality here.

[16] Unlike 29 U.S.C. § 13(a)(15), § 29(b) of the 1974 Amendments has not been adjudicated a "constitutional delegation" or otherwise cited as an example of such by the Supreme Court. This Court has its doubts. As explained *infra*, the Court presumes § 29(b) is constitutional.

**(b) Fixing and Policing the Boundaries of the Delegations.**

Now that these delegations have been recognized, the Court must "fix" and "police [their] outer statutory boundaries" to determine whether the DOL's 2015 Third Party Employer Regulation falls within or outside of those boundaries. *Loper Bright*, 603 U.S. at 395, 404. Here, the parties dispute the meaning and scope of those delegations. Just as with any other exercise of statutory interpretation, when determining the boundary-line of a recognized statutory delegation, a reviewing court must interpret the statutory text in accord with its plain and ordinary meaning unless the context indicates that the statutory text bears a technical sense. *See* SCALIA & GARNER, READING LAW § 6, at 69. Once again, the starting point is the text of each delegation clause or provision. Having recognized the existence of two such provisions, the Court must now "fix" and "police" their respective boundaries. The Court addresses each in turn.

**(i) Defining and Delimiting the Terms Contained in the Companionship Exemption (§13(a)(15)).**

The delegation clause contained within the Companionship Exemption states: ". . . (as such terms are defined and delimited by regulations of the [DOL])." 29 U.S.C. § 213(a)(15). This delegation clause uses the words "define," "delimit," and "such terms." As with all statutory text, these words are ascribed their plain and ordinary meaning. The word "define" means "[t]o set forth or explain what (a word or expression) means; to declare the signification of (a word)." *Define*, OXFORD ENGLISH DICTIONARY, (Def. 6b), https://www.oed.com/dictionary/define_v?tab=meaning_and_use#7200064 (last visited Oct. 20, 2026); *Define*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/define (last visited Oct. 20, 2026) (meaning "to discover and set forth the meaning of (something, such as a word).") The word "delimit" means "to mark or determine the limits of (something); to mark off, separate, or

distinguish (something) from something else." *Delimit*, OXFORD ENGLISH DICTIONARY, (Def. 1), https://www.oed.com/dictionary/delimit_v?tab=meaning_and_use#7258248 (last visited Oct. 20, 2026); *see also Delimit*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/delimit (last visited Oct. 20, 2026) (meaning "to fix or define the limits of."). These dictionary definitions of "define" and "delimit" are similar, but the surplusage canon, while not absolute, instructs that Congress's choice to use both terms means that these words serve two separate functions. As the Sixth Circuit explained while analyzing this language, "define and delimit" means that Congress "gave the Secretary two powers, not one, in this instance." *Pickens v. Hamilton-Ryker IT Solutions, LLC*, 133 F.4th 575, 588 (6th Cir. 2025). Therefore, in the context of § 13(a)(15), "define" means to determine a term's meaning and "delimit" means the ability to restrict some aspect of that meaning.

With the conjunctive meanings of "define" and "delimit" established, the question then becomes *what* may the DOL define and delimit? Congress supplies the answer by its use of the phrase "such terms." 29 U.S.C. § 213(a)(15). The word "term" means "a word or phrase used in a precise sense in a particular subject or field, or by a particular group of people; a technical expression; a piece of jargon" and "any word or phrase expressing a particular idea or concept, or denoting a particular object; an expression (for something)." *Term*, OXFORD ENGLISH DICTIONARY, (Defs. IV.11.a and IV.11.b), https://www.oed.com/dictionary/term_n?tab=meaning_and_use#18953498 (last visited Oct. 20, 2026). The word "such" means "of a character, degree, or extent described, referred to, or implied in what has been said." *Such*, OXFORD ENGLISH DICTIONARY, (Def. I.1), https://www.oed.com/dictionary/such_adj?tl=true&hide-all-quotations=true#19821843 (last visited Oct. 20, 2026). So, when "such" is paired with the plural noun

"terms," the phrase "such terms" as used in the Companionship Exemption means the words or phrases referenced within it. 29 U.S.C. § 213(a)(15).

The Companionship Exemption contains a small universe of "such terms." As noted above, it contains the terms "employee," "employ," and "employment." Congress defined those terms for use throughout the FLSA in 29 U.S.C. § 203(d), (e), and (g). The Companionship Exemption also contains the terms "domestic service employment" and "companionship services." These terms are not defined elsewhere in the FLSA. Instead, Congress expressly delegated to the DOL the authority to issue regulations defining and delimiting "such terms." As *Loper Bright* instructs, the best reading of a statute may be that it delegates some regulatory role to an administrative agency. Here, Congress expressly delegated to the DOL the authority to define and delimit "such terms when enacting the 1974 Amendments," which expressly includes: "domestic service employment" and "companionship services," along with the terms "age" and "infirmity." 29 U.S.C. § 213(a)(15).

Several of the DOL's regulatory definitions unquestionably define and delimit "such terms." For instance, the DOL currently defines "domestic service employment" as "services of a household nature performed by an employee in or about a private home (permanent or temporary)" and then provides a list of illustrative examples. *See* 29 C.F.R. § 552.3 (2015).[17] The DOL currently defines "companionship services" to "mean[] the provision of fellowship and protection for

[17] The DOL's 1975 version of this definition provided that "domestic service employment" meant "services of a household nature performed by an employee in or about a private home . . . *of the person by whom he or she is employed*." 40 Fed. Reg. 7,405 (Feb. 20, 1975) (codified at 29 C.F.R. § 552.3 (1975) (emphasis added)). The DOL did not retain this portion of the definition when redefining it in 2015. Even so, for the reasons set forth above, this portion of the 1975 Regulation conflicts with the best reading of the Companionship Exemption and the FLSA generally. It also conflicts with the DOL's 1975 Third Party Employer Regulation that *Coke* deemed valid.

an elderly[18] person or persons with an illness, injury, or disability who requires assistance in caring for himself or herself." 29 C.F.R. § 552.6(a) (2015). The DOL also defines what is meant by its own terms "fellowship" and "protection" contained in this same regulatory provision[19], *id.*, and further explains in an adjacent regulatory subsection that the term "companionship services" also includes "the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection . . ." 29 C.F.R. § 552.6(b). These definitional provisions, in some respects, also delimit the meaning of these statutory terms by providing certain distinguishing limitations. For instance, this same subsection of the regulation that identifies the provision of certain types of "care" within the meaning of "companionship services," 29 C.F.R. § 552.6(b), also delimits that definition by further stating that such "care" only falls within the definition of "companionship services" if "it does not exceed 20 percent of the total hours worked per person and per workweek." *Id.* The term "companionship services" is also delimited by distinguishing it from "domestic services performed primarily for the benefit of other members of the household" and from "the performance of medically related services provided for the person," both of which are excluded from its operative regulatory definition. *See* 29 C.F.R. § 552.6 (c) and (d) (2015).

These regulatory definitions and delimitations set forth in 29 C.F.R. §§ 552.3, 552.6, and 552.106 directly relate to "such terms" contained in the text of the Companionship Exemption. They never stray from the Companionship Exemption's qualifying components because they faithfully pertain to the employee's field or kind of employment (*i.e.*, "domestic service employment"),

---

18 While the term "age" is contained in 29 U.S.C. § 213(a)(15) and ostensibly is within the DOL's delegated authority to define and delimit, the DOL seemingly has not done so beyond using the phrase "elderly person" in its other definitional regulations. *See* 29 C.F.R. § 552.6(a).

19 The meanings of these regulatory terms are not at issue. *See, generally, Kisor v. Wilkie*, 588 U.S. 558 (2019) (instructing courts on interpreting an agency's reasonable readings of its own genuinely ambiguous regulations).

the kinds of qualifying services within that field an exempt employee must perform (*i.e.*, "companionship services"), and the identity and nature of the individuals receiving those services (*i.e.*, those "unable to care for themselves" because of "age or infirmity"). Indeed, the DOL's definitional regulations pertaining to these matters fall squarely within the boundaries of the express delegation established by Congress in the Companionship Exemption itself. Yet, these definitions and delimitations of "domestic service employment" and "companionship services" sit apart from and stand in stark contrast to the 2015 Third Party Employer Regulation separately codified at 29 C.F.R. § 552.109(a) (2015).

The 2015 Third Party Employer Regulation does not define or delimit any "such terms" that Congress placed in the Companionship Exemption, and instead operates as a free-standing substantive policy pronouncement completely untethered from those statutory terms. It states, in pertinent part:

> Third party employers of employees engaged in companionship services *within the meaning of § 552.6* may not avail themselves of the . . . exemption provided by section 13(a)(15) . . . *even if the employee is jointly employed by the individual or member of the family or household using the services.*

29 C.F.R. § 552.109(a) (2015) (emphasis added). This portion of the regulation pertaining to companionship services plainly does not even mention "domestic service employment" nor does it provide a definition of "companionship services" or delimit its meaning in any way.[20] *Id.*

---

[20] Other courts have weighed in on the question of exactly what the DOL purportedly defined in its 2015 Third Party Employer Regulation. In *Americare*, the Sixth Circuit upheld its validity by stating that the DOL "defined and delimited" the scope of the exemption by resting primarily on the rationale of *Coke* and not identifying any one precise term. *Dept. of Lab. v. Americare Healthcare Solutions,* 171 F.4th 838 (6th Cir. 2026). Concurring, Circuit Judge Bush posits that the precise term being defined is "domestic service employment." *Id.* at 851-52. However, the DOL separately defined and delimited "domestic service employment" at 29 C.F.R. § 552.3 without any reference to "any employee's" "employer." As explained elsewhere in this Opinion, the term "employer" has already been defined by Congress and is not among "such terms" that Congress delegated to the DOL to define and delimit.

Rather, this provision *incorporates* the full and unmodified regulatory definition of "companionship services" found at 29 C.F.R. § 552.6, and then it *pronounces* that those employees engaged in such companionship services, as defined and delimited in 29 C.F.R. § 552.6, will nonetheless not be covered by the Companionship Exemption if employed by a third party employer. 29 C.F.R. § 552.109(a). This regulation is the DOL's substantive policy pronouncement reflective of the Obama Administration's policy position as announced by the White House Office of the Press Secretary on December 15, 2011. It is disconnected from any definitional authority Congress delegated to it.

Plaintiffs contend that the statutorily specific delegation contained in the Companionship Exemption cannot be used as a conduit for such a substantial policy pronouncement. Further, Plaintiffs argue that "[e]ven if DOL could in theory delimit an actual statutory term to exclude employees of [third-party] employers [from the minimum wage and overtime provisions], DOL has never even explained what term it is delimiting." (Docket No. 113, at 37). The DOL, for its part, focuses not on what statutory terms it has defined specifically but instead argues in its briefing that Congress delegated to it a "broad grant of definitional authority" to shape the contours of the exemption, thus permitting it to include or exclude third party employers from the coverage of the Companionship Exemption.[21] The DOL's 2013 Final Rule promulgating its 2015 Third Party Employer Regulation offered its "official" explanation long before the present litigation, stating:

> The [DOL] observes that it is exercising its expressly delegated rule-making authority in promulgating this rule. In creating the [Companionship Exemption], Congress "*left a gap for the agency to fill*" as to the meaning and scope of the exemption at section 13(a)(15), *explicitly giving the Secretary [of Labor] authority to define and*

[21] At oral argument, counsel for the DOL asserted that the terms being delimited are not "such terms" contained in 29 U.S.C. § 213(a)(15) but instead are "Companionship Services Exemption" and "Domestic Service Employment" in their entirely. (Transcript of Oral Argument, Docket No. 125, at 21).

> *delimit the boundaries of the exemption* . . . Accordingly, the [DOL] is now adopting a revised regulation that is, as many commenters agreed, consistent with Congress's intent to provide the protections of the FLSA to domestic workers while providing narrow exemptions for workers performing companionship services and live-in domestic service workers . . .

78 Fed. Reg. 60,481 (emphasis added).[22]

Clearly, the DOL knew it was not defining and delimiting "such terms" contained in the Companionship Exemption when it promulgated its 2015 Third Party Employer Regulation but instead took it upon itself to fill some unidentified or unarticulated "gap" as to the meaning and scope of the Companionship Exemption in its entirety. In doing so, the DOL went beyond its limited delegated authority to define and delimit "such terms" contained within the Companionship Exemption itself and instead made a statutorily unauthorized policy decision to construe the Companionship Exemption as "narrow" and to exclude those employees from its coverage based upon the identity and nature of an otherwise exempt employee's employer. However, even before *Loper Bright*, the Supreme Court held that the FLSA's exemptions should not be construed narrowly, stating that "the FLSA gives no 'textual indication' that its exemptions should be construed narrowly . . . [and] 'there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation . . . Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement . . . [w]e thus have no license to give the exemption anything but a fair reading." *Encino Motorcars, LLC*, 584 U.S. at 88-89.

The invalidity of DOL's *ultra vires* agency action is not cured even if the 2015 Third Party Employer Regulation impliedly seeks to delimit the statutory term "employer" by excluding (*i.e.*,

---

22 This portion of the 2013 Final Rule also contains direct citations to *Chevron*, *Coke*, and other pre-*Loper Bright* authorities, including *Nat'l Cable & Telecomm Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005), with the following parenthetical: "Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts." 78 Fed. Reg. 60,481.

delimiting) from its meaning third party employers. First, the term "employer" is not a term contained in the Companionship Exemption and thus is not one of "such terms" Congress authorized the DOL to define and delimit. *See* 29 U.S.C. § 213(a)(15). Rather, and as explained above, Congress separately defined "employer" statutorily at 29 U.S.C. § 203(d) for use throughout the FLSA as "any person acting directly or indirectly in the interest of an employer . . ." 29 U.S.C. § 203(d). The term "employ," used here in its nominalized form, "employment," is also a statutorily defined term. *See* 29 U.S.C. § 203(g) ("to suffer or permit to work"). These definitions are to be applied across all provisions of the FLSA. *See* 29 U.S.C. § 203 ("As used in this chapter –"). Congress enacted these definitions for use throughout the FLSA and did so without delegating to the DOL any authority to define or delimit them. Nothing in the plain text of these statutory definitions of "employee," "employ," or "employer" indicates that the identity or nature of an employee's employer matters for determining whether the Companionship Exemption applies. This point is even more pronounced when considering that Congress modified "employee" by the indefinite adjective "any" when enacting the Companionship Exemption ("any employee") that "bespeaks breadth" to mean every employee without distinction or limitation – certainly not limited by the identity or nature of the covered employee's employer.

Looking to the FLSA's structure and broader context provides further confirmation as to this point once again. The Companionship Exemption is one of only a few of the forty-nine statutory exemptions set forth in the subsections of 29 U.S.C §§ 213(a) and (b) that contain an express delegation to define and delimit specified terms. A review of those other examples reveals that the DOL did not similarly use its delegated authority in relation to those other neighboring exemptions in the same way it does for the Companionship Exemption. Further illustrating this

contextual point is the first and most widely utilized of these statutory exemptions known as the "EAP" or "White Collar" Exemption. *See* 29 U.S.C. § 213(a)(1). Here, Congress exempts:

> [A]ny employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (*as such terms are defined and delimited from time to time by regulations of the [DOL]*...)

29 U.S.C. § 213(a)(1) (emphasis added). Like the Companionship Exemption, Congress anchored the outer boundary of this White Collar Exemption based on the identity and nature of the *employees* covered by it (but not *employers*), and, like the Companionship Exemption, Congress delegated authority to the DOL to define and delimit "such terms" contained in the statutory provision itself, including the expansive terms contained in the clause "bona fide executive, administrative, and professional capacity." 29 U.S.C. § 213(a)(1). And, since the enactment of this statutory provision in 1938 as part of the original Act, the DOL has promulgated an extensive set of regulations doing so. Three tests must be satisfied pursuant to these regulatory definitions and delimitations for determining whether an employee is covered by the White Collar Exemption: the salary basis test, the salary level test, and the duties test. *See, e.g.*, 29 C.F.R. Part 541. In other words, the DOL defined and delimited the terms expressly contained in the White Collar Exemption at 29 U.S.C. § 213(a)(1) to require that an employee be paid on a salary basis at or above a certain amount and that the employee perform specified duties to be exempt from the FLSA's minimum wage and overtime provisions. Yet, none of these qualifying regulatory tests depend on *who* employs the employee and for good reason: the actual statutory text enacted by Congress does not require that the exempt employee be employed by an employer of a certain identity, type, or nature and thus

such text does not delegate to the DOL the authority to impose such an unlegislated, policy-based requirement under the guise of supplying definitions.

Although the text of the delegation clause contained in the Companionship Exemption is essentially identical to the text of the delegation clause contained in the White Collar Exemption, *compare* 29 U.S.C. § 213(a)(1) with § 213(a)(15) (both stating, "as such terms are defined and delimited"), the terms Congress authorizes the DOL to define and delimit in each are vastly different. The terms "executive, administrative, and professional capacity" contained in 29 U.S.C. § 213(a)(1) are quite capacious and afford the DOL substantial room to define and delimit them. Even so, the DOL did not interject definitions and delimitations on the nature and identity of an employer when it promulgated a voluminous set of regulations when doing so. Yet the DOL did exactly the opposite in its 2013 Final Rule with respect to the Companionship Exemption despite being tasked to define and delimit more autological terms such as "domestic service employment" and "companionship services." By doing so, the DOL went far afield of its delegated authority to define and delimit specific terms contained in the Companionship Exemption.

Based upon the foregoing, this Court concludes that Congress did not delegate to the DOL the authority to make legally enforceable policy pronouncements expressed in its 2015 Third Party Employer Regulations when it enacted the Companionship Exemption in 1974.

**(ii) Prescribing Necessary Regulations with Regard to the 1974 Amendments (§ 29(b)).**

The DOL's second stated source of purported delegated authority for its 2015 Third Party Employer Regulation at 29 C.F.R. § 552.109(a) (relating to the Companionship Exemption) is §29(b) of the 1974 Amendments. On its face, this uncodified provision authorizes the DOL to "prescribe necessary rules, regulations, and orders with regard to the amendments made by this

Act" which would include both § 13(a)(15) (Companionship Exemption) and § 13(b)(21) (Live-In Exemption) of the 1974 Amendments. *See* § 29(b) of the 1974 Amendments. Once again, *Loper Bright* instructs the Court to fix and police the boundaries of this delegation by interpreting its text to determine whether it authorized the DOL to promulgate the companionship provision of its 2015 Third Party Employer Regulation. In other words, the Court must ask what § 29(b) empowers the DOL to do and how far does it extend? Does the DOL's 2015 Third Party Employer Regulation fall within the authorized perimeter of such authority?

The DOL argues that § 29(b) is a broad and substantive legislative grant of delegated authority permitting it to issue the 2015 Third Party Employer Regulation to fill "[statutory] gaps" and define the "scope and definition of statutory terms." (Docket No. 111, at 20). In the 2013 Final Rule, the DOL states that it is exercising its expressly delegated rulemaking authority . . . to define and delimit the boundaries of the exemption." 78 Fed Reg. 60,481. Plaintiffs counter that § 29(b) is a narrow "housekeeping" measure authorizing the DOL to implement internal and administrative measures that facilitate implementation of the 1974 Amendments, not a wide grant of authority to make substantive policy changes to the FLSA itself. (Docket No. 113, at 25-31). Plaintiffs also contend that the word "necessary" used by Congress in § 29(b) limits the scope of the delegation to actions truly required to administer the 1974 Amendments. *Id.* Finally, Plaintiffs assert that if § 29(b) were to provide an open-ended grant of substantive rule-making authority for all provisions contained in the 1974 Amendments, there would be no need to provide a specific grant of delegated authority to "define and delimit" as found separately in the Companionship Exemption.

The Court fixes and polices the boundaries of this delegation by interpreting its text. Located at the very end of 1974 Amendments in a subsection below § 29(a) (providing for the

"effective date" of May 1, 1974), and distinct from any specific and substantive provision, § 29(b) contains clear limiting language in two respects: first, any regulations promulgated pursuant to this delegation must be "necessary"; and second, such regulations must be "with regard to the [A]mendments made by this Act." § 29(b). The inclusion of the word "necessary" cannot be disregarded as superfluous and must be analyzed and given meaning within the context of the 1974 Amendments and the FLSA as a whole. The term "necessary" means "indispensable, vital, essential; requisite." *Necessary,* OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/necessary_adj?tab=meaning_and_use#34991174 (last visited Oct. 20, 2026); *see also Necessary,* MERRIAM WEBSTER, https://www.merriam-webster.com/dictionary/necessary (last visited Oct. 20, 2026) (meaning "absolutely needed"). As such, any valid DOL regulation pertaining to the Companionship Exemption issued pursuant to the delegation of authority provided by § 29(b) must be "indispensable," "vital," "essential," or "absolutely needed."

Is the 2015 Third Party Employer Regulation "indispensable" or "absolutely needed" for the Companionship Exemption? The answer is no. Congress clearly expressed the elements needed to qualify for coverage under the Companionship Exemption and in certain respects expressly delegated authority to the DOL to define and delimit specified terms contained therein. Yet, in doing so, Congress did not include the identity or characteristics of the covered employees' employers as a requisite element for the Companionship Exemption to apply. Several other exemptions contained in other subsections of § 13(a) and § 13(b) likewise do not depend upon the identity or characteristics of the covered employees' employers. The statutory text of each exemption, including that of the Companionship Exemption, embodies policy choices that reflect the will of Congress and made into law pursuant to the Constitution. The DOL's 2015 Regulations are not indispensable or absolutely needed to effectuate the will of Congress as conveyed in the duly

enacted Companionship Exemption. Indeed, the Companionship Exemption functioned for forty years without any such need. Its statutory text is enough. Moreover, the fact that the Companionship Exemption does not mention the identity or nature of an employer does not generate an ambiguity that converts the DOL's otherwise dispensable policy pronouncement into that of a necessity.

As explained above, Congress enacted the Companionship Exemption to exempt from the FLSA's minimum wage and overtime pay provisions "any employee" who is "employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves . . .." § 13(a)(15); 29 U.S.C, § 213(a)(15). And, as already noted, Congress separately defined such terms as "employee," "employer," and "employ," and it is not necessary to define or delimit those terms. Moreover, Congress did expressly delegate to the DOL the authority to "define and delimit" those terms contained within the Companionship Exemption itself such as "domestic service employment" and "companionship services." The DOL exercised its delegated authority in this regard when it promulgated regulations at 29 C.F.R. §§ 552.3, 552.6, and 552.106 (2015). Again, these regulatory definitions and delimitations properly apply directly to the statutory terms pertaining to the identity and characteristics of *employees*, the nature of their *services*, and the characteristics of the *individuals receiving* the employees' services. It was not necessary for the DOL to go where it was not invited.

Indeed, Congress did not include within the Companionship Exemption any such statutory requirements pertaining to the identity or characteristics of employers as requisite for its application. Under *Loper Bright*, that silence and any purported ambiguity inferred from it can no longer be deemed an implied legislative delegation to the DOL to resolve. *Loper Bright*, 603 U.S. at 403. Rather, *Loper Bright* instructs this Court to "to do [its] ordinary job of interpreting statutes" and

to follow the best reading of the statute "after applying all relevant interpretive tools" even if that best reading of the law differs from the DOL's interpretation. *Id.* at 403, 401. In doing so, this Court studied the text of the Companionship Exemption and its context within the overall structure of the FLSA, and concludes, as explained above, that it is not ambiguous and that its best reading compels the interpretation that coverage thereunder does not depend on the identity or nature of an employee's employer.

Could § 29(b) be a legislative delegation nonetheless? *Loper Bright* acknowledges two kinds of delegations. The first type of delegation is found in statutes that "'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term.'" *Loper Bright*, 603 U.S. at 394-95 (citing *Batterton v. Francis*, 432 U.S. 416 (1977)). That type of delegation is exemplified by the "define and delimit" clause in § 13(a)(15) itself, yet § 29(b) does no such thing.

*Loper Bright* also identifies a second type of delegation found in statutes that "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme, or regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Id.* at 395 (citing *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed.2d 448 (1825) and *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). This type of delegation is what the DOL seemingly claims here. 78 Fed Reg. 60,481. This type of delegation often confers some discretion upon the agency. *Id.* at 395 n. 6 (citing 33 U.S.C. § 1312(a) (requiring establishment of effluent limitations "[w]henever, *in the judgment of the [EPA] Administrator* . . ., discharges of pollutants from a point source or group of point sources . . . would interfere with the attainment or maintenance of that water quality . . ." (emphasis added) and 42 U.S.C. § 7412(n)(1)(A) (directing EPA to undertake a study of the hazards to public health from emissions by electric utility steam generating units, report the results of this study to Congress, and to regulate electric utility steam generating units

"if the Administrator finds such regulation is appropriate and necessary after considering the results of the study")). *See also Pickens*, 133 F. 4th at 587 (words such as "reasonable," "appropriate," feasible," and "practicable," are "incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion") (quoting *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019)) (Kavanaugh, J., concurring)). § 29(b) does not resemble this second category of delegation either. Nothing in the text of § 29(b) conveys discretion to the DOL or otherwise expressly empowers it to make certain policy decisions or otherwise exercise judgment in some prescribed way. Notably, the Companionship Exemption mandates that those who satisfy its terms are exempt from minimum wage and overtime provisions of the FLSA. 29 U.S.C. § 213(a) and (a)(15) ("The provisions of sections 206 . . . and 207 of this title *shall not apply* with respect to –" (emphasis added)). Neither § 29(b) nor any other provision of the 1974 Amendments changes this mandate or otherwise conveys to the DOL any discretionary authority to apply the Companionship Exemption differently. It certainly cannot empower the DOL to promulgate a legislative regulation pronouncing an extratextual carve-out from a statutory provision that essentially re-writes a law duly enacted by Congress.

Still, this seemingly opaque delegation must mean *something*, and the Court must discern what it means if there is any hope of fixing and policing its outer boundaries. Plaintiffs contend that § 29(b) is a so called "general" or "housekeeping" provision[23] that is afforded less weight than

---

[23] To make sense of these varied delegations, some of the scholarship involving these issues have grouped such delegations into three categories, using terms "general" or "housekeeping" delegations, hybrid delegations, and "specific" delegations. Many statutes include a general "necessary" or "needful" catchall delegation that gives an administrating agency the authority to issue regulations directed internally toward the agency itself to fulfil the obligations of the statute. Kristin E. Hickman & Amy J. Wildermuth, *Harmonizing Delegation and Deference after Loper Bright*, 100 N.Y.U. L. Rev. 1924, 1939 (2025). These catchall provisions are often located at the beginning or end of a statute, and under a heading such as "General Provisions," and are not tied to any specific section of a given statute. *Id.*; Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 485 (2002). However, unlike specific delegations, these housekeeping delegations may not "authorize legislative rules." Merrill & Watts, *supra*, at 485. As Thomas Merrill and Kathryn Tongue Watts explain:

given to more specific delegations, such as the delegation to "define and delimit" terms contained in the Companionship Exemption. Judge Bush of the Sixth Circuit grappled with this distinction when analyzing § 29(b) and the 2015 Third Party Employer Regulation in *Americare*:

> As part of determining the scope of the delegation under the *Loper Bright* framework, we must also determine whether that delegation included the authority to promulgate legislative rules or only the power to promulgate housekeeping rules. Using the historical distinction, this case is easy as it relates to § 29(b)—it is a housekeeping delegation, so it carries with it the limited authority to promulgate interpretive and procedural rules and issue statements of policy. The [DOL] could not have issued the third-party employment exclusion pursuant to § 29(b) because this section does not allow the [DOL] to engage in legislative rulemaking.

*Americare*, 171 F.4th at 857 (J. Bush, concurring).[24] The Supreme Court historically has given less weight to more generalized delegatory regulations than specific ones. In *Rowan Cos., Inc. v.*

---

> The most compelling example is a statute that includes both general and more specific rulemaking grants that overlap. For instance, a statute may contain both a general rulemaking grant that authorizes the promulgation of all rules and regulations necessary to carry out the administration of "this subchapter," and one or more narrower rulemaking grants that authorize rules necessary to carry out 'this section.' . . . Although both the general grant and the specific grants are often ambiguous on their face, given the overlap it is reasonable to argue that the general grant confers only housekeeping powers, while the narrower grants confer legislative powers. After all, if both the general grant and the specific grants conferred the same type of power (either legislative or housekeeping), then the statute would include a significant redundancy. By construing the general grant to confer the more generally available housekeeping powers–the power to issue procedural or interpretive rules–and construing the specific grants to confer the more jealously guarded power–the power to issue legislative rules–the redundancy disappears.

*Id.* at 484-485.

[24] Judge Bush further noted:

> Not only is this the more faithful reading of *Loper Bright*, but also … has the beneficial effect of diminishing the damage of the flip-flopping . . . When narrow delegations are treated narrowly, the agency needs some express congressional authority before it sets out on a path of flipping back and forth in its regulation of an industry. Interpreting every grant of rulemaking power as a grant of legislative rulemaking power gives the agencies a power that Congress never intended and lets them regulate industry in ways that lack the consistency we expect from rules that carry the force of legislation.

171 F.4th at 857.

*U.S.*, a general grant to "prescribe all needful rules" did not authorize the IRS to define the word "wages" in a manner in tension with the definition of wages that Congress itself provided. 452 U.S. 247, 253 (1981) (stating, "such a regulation is "owe[d] . . . less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision"). Similarly, in *U.S. v. Vogel Fertilizer Co.*, the Supreme Court gave less deference to a regulation implemented pursuant to a delegation to "prescribe all needful rules and regulations." 455 U.S. 16, 24 (1982).

While this Court finds these pre-*Chevron* distinctions somewhat helpful, it is unclear how they fit into the methodology that *Loper Bright* now directs courts to use when fixing and policing the boundaries of a statutory delegation. This Court is directed to honor such a delegation and declare a regulation lawful pursuant to the APA upon finding that the DOL acted reasonably and within the boundaries of the delegation. But this Court must set aside a regulation if it strays beyond the boundaries of its delegated authority and contravenes the statutory text. *Id.* The notion of "deference" used in *Rowan Cos.* and *Vogel Fertilizer*, both pre-*Chevron* cases, emanates from the Supreme Court's then-developing *Chevron* jurisprudence and no longer seems germane to the task at hand after *Loper Bright*. Perhaps post-*Loper Bright*, such "deference" simply means honoring and respecting (*i.e.*, deferring to) an agency's regulatory action taken pursuant to constitutional, statutory text expressing an explicit legislative delegation. Otherwise, a regulation promulgated beyond an agency's delegated authority cannot, standing alone, have the force of law, though it still may be considered by a reviewing court. Instead, its weight "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . ." *Skidmore*, 323 U.S. at 140.

To harmonize these concepts when seeking to fix and police boundaries involving a general or housekeeping delegation as opposed to a specific delegation, this Court concludes that any delegation of legislative authority must be specific enough to be subject to judicial review in accordance with the APA. A statutory delegation provision cannot properly convey authority to an agency to promulgate legally enforceable legislative rules if the parameters of the purported delegation are not judicially discernable. Such a delegation may still permit an agency to issue a so-called "housekeeping" rule or regulation that empowers an agency to fashion its own internal procedures and policy statements, sometimes characterized as an internal procedural rule or as "sub-regulatory guidance," but those administrative mechanisms are merely part of the machinery of the Executive Branch and not afforded the force of law. Here, not only is the 2015 Third Party Employer Regulation not vital or essential, *i.e.*, necessary, with regard to the Companionship Exemption, but § 29(b) is also not specific enough for the Court to undertake judicial review of its putative boundaries.

This Court finds the statutory text of § 29(b) itself to be so vague as to be devoid of a legislative delegation authorizing the DOL to promulgate a regulation that permissibly excludes employees otherwise covered by the FLSA's Companionship and Live-In Exemptions if they are employed by a third-party employer. This unhelpfully vague putative delegation raises the question of whether it is constitutional. As noted above, *Loper Bright* instructs that this Court recognize "constitutional delegations[,]" but the Supreme Court in that case did not reach the question of whether such broad delegations are in fact "constitutional delegations." *Loper Bright*, 603 U.S. at 395. *See also Gundy v. United States*, 588 U.S. 128, 166 (2019) (J. Gorsuch, dissenting) ("[W]e must ask: . . . did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the

Constitution demands."). This Court acknowledges the confluence of the Major Questions Doctrine and Nondelegation Doctrine and related clear-statement rules as it endeavors to interpret § 29(b) as required by *Loper Bright*. Plaintiffs do not explicitly challenge the constitutionality of the delegation expressed in § 29(b), but seemingly argue that § 29(b) violates both the Major Questions Doctrine and the Nondelegation Doctrine.

Administrative agencies must be able to point to clear congressional authorization when they claim the power to make decisions of vast economic and political significance pursuant to a "colorable textual basis" but where "common sense as to the manner in which Congress [would have been] likely to delegate such power to the agency at issue made it very unlikely that Congress had actually done so." *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 722-723 (2022) (internal quotation marks and citations omitted). Under the Major Questions Doctrine, courts are to "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (internal quotation marks omitted). Such "[e]xtraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices. Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.* at 723 (internal quotation marks and citations omitted). "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* (internal quotation marks and citations omitted) (cleaned up). Rather, the Major Questions Doctrine requires an agency to "point to clear congressional authorization to regulate in that manner." *Id.* (internal quotation marks and citation omitted).

Here, Plaintiffs assert that the 2015 Third Party Employer Regulation may impact two million workers and ten thousand businesses, agencies, states, and individuals. (Docket No. 113, at

16). They argue that "[c]ourts should not lightly infer that Congress, in an 'ancillary provision of the Act,' without substantive content, gave DOL discretion to reshape a statute affecting significant slices of the U.S. economy." (Docket No 113, at 29) (citing *West Virginia*, 597 U.S. at 724). Even so, the 2015 Third Party Employer Regulation does not implicate broad-based societal questions identified by the Supreme Court in other Major Questions Doctrine cases, such as physician-assisted suicide or COVID vaccine mandates, and instead is narrowly focused on specified employees within a particular industry, *i.e.*, domestic service workers. *See West Virginia,* at 743 (J. Gorsuch concurring) (citing *NFIB v. OSHA*, 595 U.S. 109 (2022) (COVID-vaccine mandates) and *Gonzales v. Oregon*, 546 U.S. 243 (2006) (physician-assisted suicide)). Nor does the monetary impact of this DOL regulation implicate "billions" in spending or seek to regulate a significant portion of the American economy. *West Virginia,* at 744. *See also Alabama Assn of Realtors v. Department of Health and Human Services*, 594 U.S. 758, 761, 765 (2021) (holding that a statutory provision in the Public Health Service Act authorizing the Surgeon General and HHS to make and enforce regulations "necessary to prevent the introduction, transmission, or spread of communicable diseases . . ." did not give it such a "breathtaking amount of authority" to impose a nationwide moratorium on evictions of tenants experiencing substantial COVID-19 transmission.). Consequently, the DOL does not appear to overstep constitutionally under these formulations of the Major Questions Doctrine because the present case does not rise to the level of a comparable "major" economic or societal question. More so, this Court finds no "colorable" or "plausible" textual basis to discover a delegation in § 29(b) that authorizes the DOL to promulgate its Third Party Employer Regulation. Accordingly, the Major Questions Doctrine seems inapplicable.

Much of this Court's Opinion focuses on the text and context of the FLSA's statutory delegations and whether the 2015 Third Party Regulation falls within the boundaries of those

delegations.[25] Plaintiffs subtly press a bit further with a single glancing reference to the Nondelegation Doctrine, asserting that § 29(b) lacks an intelligible principle and suggesting that it is unconstitutional. (Docket No. 113, at 29). This Court also questions what, if any, intelligible principal § 29(b) might convey to the DOL.

A statutory delegation is constitutional if Congress "lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy*, 588 U.S. 128, 135 (2019) (cleaned up). In other words, "a nondelegation inquiry always begins (and often almost ends) with statutory interpretation. The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Id.* A delegation "is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" *Id.*, at 146.

Here, § 29(b) states that the DOL may "prescribe necessary rules, regulations, and orders with regard to the amendments made by this Act." 88 Stat. 55, 76 Pub. L. 93-259. These statutory amendments enacted in 1974 both expand the FLSA to cover domestic service employees but also exempt certain domestic service employees from its coverage. In a very clear and particularized way, Congress separately delegated authority to the DOL to define and delimit specified terms concerning one of these statutory exemptions. *See* 13(a)(15). Beyond that, there seems to be no intelligible principle contained in § 29(b) to discern what general policy § 29(b) permits DOL's

---

25 If the Major Questions Doctrine were to apply here, then such application is more akin to the Supreme Court's use of it in *Biden v. Nebraska* where it concluded that the HEROES Act did not authorize the Department of Education to rewrite the Education Act to cancel $430 billion of student loan principle, erasing the debts of 20 million borrowers and lowering the median amount owed by another 23 million borrowers. *Biden v. Nebraska*, 600 U.S. 477 (2023). There, the Major Questions Doctrine "reinforce[d] that conclusion but [was] not necessary to it." *Id.*, at 507 (Barrett, concurring). It "situates text in context" and "serves as an interpretive tool reflecting 'common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" *Id.*, at 511 (citing *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Such context may supply added clarity to the task of textually discerning the existence and scope of statutory delegations. *Id.*, at 514. Here, regardless of the magnitude of the underlying policy debate, it is apparent that such extratextual "common sense" might be helpful but is not necessary to complete the textual analysis of § 29(b) as required by *Loper Bright*.

regulations to pursue or what boundaries the term "necessary" authorizes for those regulations. Necessary for what? Congress does not meaningfully say.

Ultimately, this Court is tasked with applying *Loper Bright* to fix and police the outer boundaries of recognized legislative delegations. 603 U.S. at 404. To do so, this Court must examine the text of § 29(b) and, by necessity, discern whether it delegates any legislative authority to the DOL and if so, how much. Frankly, another way of framing this judicial duty is to determine whether Congress has supplied an intelligible principle to guide the delegee's use of discretion. Or, as Justice Kagen put it, the nondelegation inquiry requires "construing the challenged statute to figure out what task it delegates and what instructions it provides." *Gundy*, 588 U.S. at 136 (citing *Whitman v. American Trucking Assns.*, 531 U.S. 457, 473 (2001)). Perhaps *Loper Bright* simply tasks courts with applying the Nondelegation Doctrine in every such case. However, recognizing that this issue was not meaningfully ventilated by the parties and noting that the Supreme Court has not found a delegation lacking an intelligible principle since 1935, *Gundy*, 588 U.S. at 146, 160-162 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)), this Court will assume without deciding that § 29(b) is constitutional.

Even so, this Court must fulfill its judicial duty as set forth in *Loper Bright* and in doing so concludes that the text of § 29(b) does not authorize the delegation that the DOL claims for itself. This Court reaches this conclusion based solely on its interpretation of the relevant statutory text, not constitutional grounds, but this conclusion is further reinforced by additional interpretive considerations.[26] For instance, § 29(b) is too vague. "A vague law . . . impermissibly delegates basic

---

[26] Justice Gorsuch observed in his dissent in *Gundy* that "[w]hen one legal doctrine becomes unavailable to do its intended work, the hydraulic pressures of our constitutional system sometimes shift the responsibility to different doctrines . . . We just call what we're doing by different names." *Gundy*, 588 U.S. at 166-167 (Gorsuch, J., dissenting).

policy matters to policemen, judges, and juries for resolution on an *ad hoc* basis." *Gundy*, 588 U.S. at 167 and n. 74 (Gorsuch, J., dissenting) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108-109 (1972)). Justice Gorsuch further commented that "[i]t's easy to see, too, how most any challenge to a legislative delegation can be reframed as a vagueness complaint: A statute that does not contain sufficiently definite and precise standards to enable Congress, the courts, and the public to ascertain whether Congress's guidance has been followed at once presents a delegation problem and provides impermissibly vague guidance to affected citizens." *Id.*, at 168 (internal quotation marks omitted). § 29(b) also seems to fail general clear-statement rules. *See Learning Resources, Inc. v. Trump*, 607 U.S. 229, 283 (2026) (Gorsuch, J., concurring) ("[C]lear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation") (internal quotation marks omitted) (citing *Sossamon v.* Texas, 563 U.S. 277, 291 (2011)); *but see* discussion *supra* concerning Major Questions Doctrine in *West Virginia*, 597 U.S. at 735-753 (Gorsuch, J., concurring). Finally, courts are to give "narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *West Virginia*, 597 U.S. at 741 (Gorsuch, J. concurring) (citing *Mistretta v. United States*, 488 U.S. 361, 373, n. 7 (1989)). Here, such a narrow construction presumably would focus on the term "necessary" contained in § 29(b) though doing so is not needed for the textual reasons set forth above.

Ultimately, because the text of § 29(b) delegates no legislative territory to the DOL, at least concerning the creation of a carve-out to the Companionship Exemption, the companionship services provision of the DOL's 2015 Third Party Employer Regulation is plainly out-of-bounds.

**(c) Ensuring that the DOL Engaged in Reasoned Decision-making within Its Delegated Boundaries.**

The third *Loper Bright* step instructs the Court to ensure that the DOL engaged in "reasoned decision-making" within the boundaries of its delegated authority. *Loper Bright,* 603 U.S. at 395

(citing *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 374 (1998) and *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). *Loper Bright* also describes this step as "ensur[ing] that agencies exercise their discretion consistent with the APA." *Id.* at 404. Accordingly, "[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Michigan*, 576 U.S. at 750 (internal quotation marks and citations omitted). Here, the Court has already determined that the DOL exceeded its legislatively delegated authority, so there is no agency decision-making to be found within the DOL's delegated authority for the Court to evaluate. The Court nonetheless assesses the reasonableness of the DOL's decision-making in this regard to complete the *Loper Bright* analysis. In doing so, the Court concludes that the DOL did not engage in reasoned decision-making within the boundaries of its delegated authority.

Unlike the scope of judicial review applicable under the APA's "arbitrary and capricious" standard, addressed separately below, where a court is not to substitute its judgment for that of the agency, the Court here focuses on the reasonableness of the DOL's decision-making in relation to the existence and boundaries of its statutory delegations. That evaluation is a legal one and requires this Court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706; *Loper Bright*, 603 U.S. at 391-392 (stating that the APA "prescribes no deferential standard for courts to employ in answering those legal questions . . . Under the APA, it thus remains the responsibility of the court to decide whether the law means what the agency says") (internal quotations and citations omitted).

As explained above, the companionship services provision of the DOL's 2015 Third Party Employer Regulation exceeds the authority delegated to it by §§ 13(a)(15) and 29(b) but the DOL obfuscates that reality by mischaracterizing the actual legislative delegation conferred upon it. Yet, a court cannot adequately fulfill its judicial function under Article III of the Constitution and pursuant to the APA as instructed by *Loper Bright* if an Executive Branch agency does not explain accurately and earnestly the reasoning underlying its regulatory decisions to effectuate the legislative authority delegated to it. *See Allentown Mack Sales and Service, Inc. v. N.L.R.B.*, 522 U.S. 359, 375 (1998) ("Reasoned decisionmaking, in which the rule announced is the rule applied, promotes sound results, and unreasoned decisionmaking the opposite. The evil of a decision that applies a standard other than the one it enunciates spreads in both directions, *preventing* both consistent application of the law by subordinate agency personnel . . ., and *effective review of the law by the courts*") (emphasis added).

At a minimum, this Court believes that to demonstrate the reasonableness of its decision-making in relation to its legislative delegation, the DOL's 2013 Final Rule should have identified and described accurately the delegations the DOL relied upon for promulgating its Third Party Employer Regulation (*i.e.*, recognize the delegation), and it should have identified with specificity the terms contained in § 13(a)(15) that it was defining and delimiting pursuant to such delegation. The DOL did neither. It ignored the actual statutory text empowering a true legislative delegation, § 13(a)(15) ("as such terms are defined and delimited by regulations of the [DOL]"), and it disregarded other statutory terms, *id.* (such as "any employee"), that were beyond its authority to define and delimit. The DOL sought to justify promulgating its *ultra vires* 2015 Third Party Employer Regulation by disregarding the statutory text and instead focusing on "the purpose and objectives behind the 1974 [A]mendments" and by mischaracterizing the narrow delegation to define and

delimit specified terms as a much broader legislative grant of authority to re-write the boundaries of the Companionship Exemption in its entirety. 78 Fed. Reg. 60,482.

The DOL's decision-making here is also unreasonable because it ignored or disregarded the best reading of the FLSA's text in favor of its own curated portions of the FLSA's legislative history. According to the 2013 Final Rule, the DOL reports that supporting commenters agreed with its "assertion that the proposed changes were consistent with Congressional intent, noting in particular a comment received from Senator Harkin and 18 other Senators stating that "[a] a close look at the legislative history of the 1974 changes establishes that Congress clearly intended to include today's home care workforce within the FLSA's protections." 78 Fed. Reg. 60,480. Also noted was an opposing comment received from Senator Alexander and 13 other Senators stating that the "statute and history clearly demonstrate that Congress intended to provide a broad exemption from the FLSA minimum wage and overtime requirements for all domestic workers providing companionship services." *Id.* Ultimately, the DOL's view of the FLSA's legislative history figured prominently among its reasons for promulgating its 2015 Third Party Employer Regulation:

> [T]he [DOL] is now adopting a revised regulation that is, as many commenters agreed, consistent with Congress's intent to provide the protections of the FLSA to domestic workers while providing narrow exemptions for workers performing companionship services and live-in domestic service workers.
>
> ***
>
> The legislative history makes clear that in passing of the 1974 [A]mendments to the Act, Congress intended to extend FLSA coverage to all employees whose 'vocation' was domestic service, but to exempt from coverage casual babysitters and companions who were not regular breadwinners or responsible for their families' support. Indeed, it is apparent from the legislative history that the 1974 [A]mendments were intended only to expand coverage to include more workers, and were not intended to roll back coverage for employees of third parties who already had FLSA protections (as employees of covered enterprises).

78 Fed. Reg. 60,481 (internal citations omitted). Using select portions of the FLSA's legislative history to justify its 2015 Third Party Employer Regulation, the DOL posited that this regulatory change "is not only permissible, but also reasonable[,]" explaining:

> In the past, however, the [DOL] erroneously focused on the phrase "any employee," instead of focusing on the purpose and objective behind the 1974 amendments, which was to expand minimum wage and overtime protections to workers employed in private households that did not otherwise meet the FLSA coverage requirements.

78 Fed. Reg. 60,482. The DOL further explained its own regulatory rationale as follows:

> [T]he [DOL] observes that it is exercising its expressly delegated rulemaking authority in promulgating this rule. In creating the companionship services exemption, *Congress 'left a gap for the agency to fill' as to the meaning and scope of the exemption* at section 13(a)(15), explicitly giving the [DOL] *authority to define and delimit the boundaries of the exemption.* [Internal citations omitted].
>
> ***
>
> Accordingly, the [DOL] is now adopting a revised regulation that is, as many commentators agreed, consistent with *Congress' intent to provide protections of the FLSA to domestic workers while providing narrow exemptions* for workers performing companionship services and live-in domestic services workers . . .

78 Fed. Reg. 60,481 (emphasis added).

The DOL's explanations speak volumes about its disregard for the law and its self-appointed (and potentially unconstitutional) role in "legislating" public policy. First, who is the DOL to blatantly disregard the express words of a duly enacted statute? As quoted above, the DOL's 2013 Final Rule states, "In the past, however, the [DOL] erroneously focused on the phrase 'any employee,' instead of focusing on the purpose and objective behind the 1974 [A]mendments." 78 Fed. Reg. 60,482. The phrase "any employee" are words contained in a duly enacted statute. 29

U.S.C. § 213(a)(15). The DOL says it was "erroneous" to focus on those words. So much for the rule of law. Indeed, it is unreasonable for an agency to simply disregard the law.

Second, Congress did not explicitly (or implicitly) give the DOL authority to "define and delimit the boundaries of the exemption" *writ large*. To the contrary, and as explained in detail above, Congress did not delegate to the DOL the authority to define and delimit all terms contained in the FLSA nor the discretion to redraw the entire scope of the Companionship Exemption to its liking.[27] Rather, Congress explicitly delegated to the DOL the narrow authority to define and delimit "such terms" contained in the Companionship Exemption itself. The DOL exercised its delegated authority in this regard by defining and delimiting "domestic service employment" and "companionship services." 29 U.S.C. § 213(a)(15). It did so comprehensively yet independently

[27] Even if the DOL could have promulgated its 2015 Third Party Employer Regulation by defining or delimiting a term within its delegated boundaries, it still may not define or delimit such a term out of existence for to do so would be unreasonable and thus not "in accordance with law." Perhaps this concern is the whole point of the third step of the *Loper Bright* analysis – to ensure that the DOL exercised its legislatively delegated discretion in a reasoned way consistent with both the APA and the FLSA itself. *Loper Bright*, 603 U.S. at 404. The Supreme Court has made clear that even when Congress grants an agency the express authority to define terms, such definitions must be "consistent with" the governing statute . . . and courts have a duty to "independently interpret the statute and effectuate the will of Congress." *Rutherford v. United States*, 608 U.S. 454, __, 146 S. Ct. 1320, 1334 (2026). Courts "are not bound to follow [an agency's regulation] when it 'exceed[s] [its] statutory authority' by adopting a definition of a term that is inconsistent with the statute." *Id.* (citing *Batterton*, 432 U.S. at 426). So, when Congress enacts a legislative delegation authorizing an agency to define and delimit specified terms, the agency's exercise of that delegation still must comport with the text of the statutory provision at issue as well as the text, context, and structure of the statute as a whole. In other words, the authority to define and delimit is not boundless and must be reasonable. By way of example, 29 U.S.C. § 213(a)(15) contains the term "age" that Congress ostensibly authorized the DOL to define and delimit. *But see* 29 C.F.R. § 552.6(a) (using the term "elderly" as a synonymous descriptor for "age" without defining it). If the DOL were to supply a mere generalized definition of age (*e.g.*, the length of time a person has lived) it would not help to discern whether someone is unable to take care of themselves "due to age." Defining "age" as such and then delimiting it to mean someone who has lived at least sixty-five, seventy, or eighty years, for instance, might (or might not) be more helpful. But, raising the delimited age beyond some extreme point, say 100 years of age, while technically within the bounds of delegated authority to define and delimit, would effectively delimit "age" to the point that it would practically and effectively nullify the portion of the Companionship Exemption that requires an exempt employee to "provide companionship services for individuals who (*because of age* . . .) are unable to care for themselves . . ." 29 U.S.C. § 213(a)(15) (emphasis added). In that instance, there would be few if any such individuals existing in the populace to receive companionship services, thereby delimiting this aspect of the statutory exemption out of existence. Such a delimitation would be unreasonable and thus not be in accordance with law. The DOL acknowledged this point at oral argument, stating "obviously, probably *there are limits in terms of whether it frustrates the purpose of the statute*." (Transcript of Oral Argument, Docket No. 125, at 22) (emphasis added). Further, when asked whether the DOL can "define or delimit a term to the point where the statutory term is rendered meaningless," DOL's counsel stated, "[p]robably not. But I don't think that's what's happening here." (*Id.*)

from its 2015 Third Party Employer Regulation. To the extent the DOL impliedly conflated such terms and inserted the term "employer" where it did not exist, ignored the statutorily supplied definition of "employer," and then delimited its meaning in a separate regulation that it itself qualified as being a "statement of general policy and interpretation" is not reasoned. Moreover, such a delimitation, even if it would have been statutorily authorized, is disconnected from "such terms" contained within the Companionship Exemption and, indeed, contradicts the best reading of the Companionship Exemption and the FLSA as a whole. Similarly, to the extent the DOL delimited an otherwise statutorily defined term *not* contained in the Companionship Exemption, such as "employer," doing so is also beyond its authority and is likewise unreasonable.

Third, nowhere in the text of either § 13(a)(15) or § 29(b) did Congress leave a "gap" for the DOL to fill. Congress separately defined the terms "employee" and "employer," and then as part of the 1974 Amendments spelled out the requirements of the Companionship Exemption in its text, solely leaving certain terms such as "domestic service employment" and "companionship services" for the DOL to define and delimit. No statutory gaps exist, especially regarding the relevance of an employer's identity or nature for coverage under the Companionship Exemption.

Fourth, contrary to what the DOL says about the FLSA's legislative history, there is nothing in the text of §§ 13(a)(15) or 29(b) stating that the Companionship Exemption was intended to be construed narrowly. The Supreme Court has held the opposite, stating there is no "textual indication" that the FLSA's exemptions should be construed narrowly. *Encino*, 584 U.S. at 88-89.

Finally, the DOL's general decisional reliance on legislative history is also unjustified and unreasonable. The 2013 Final Rule itself references comments received from competing groups of Senators advocating for and against adoption of the DOL's 2015 Third Party Employer

Regulation, based upon the same legislative record, as if each group were "entering a crowded cocktail party and looking over the heads of the guests for [their] friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (J. Scalia, concurring) (attributing the metaphor to Judge Harold Leventhal). It is unreasonable for the DOL to rely upon curated selections of legislative history to justify its agency action here because "[l]egislative history is not the law. 'It is the business of Congress to sum up its own debates in its legislation,' and once it enacts a statute '[courts] do not inquire what the legislature meant; [courts] ask only what the statute means.'" *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quoting *Schwegmann Brothers v. Calvert Distillers Corp.*, 341 U.S. 384, 396, (1951) (Jackson, J., concurring) (quoting Justice Holmes)). *See also Eaves v. County of Cape May,* 239 F.3d 527, 532 (3d Cir. 2001) (finding unpersuasive the reasoning of courts that ignore a textual analysis of a statute and, instead, base their result on underlying policies, stating that "the correct answer is dictated by the text").

The Court concludes, based upon the foregoing, that the DOL's decisional reliance on selective portions of the FLSA's legislative history while disregarding its statutory text, and the DOL's slight-of-hand in mischaracterizing the actual delegations enacted by Congress, exhibit an act of unreasoned agency decision-making used to justify promulgating a regulation with the force of law that contains a policy pronouncement contrary to the long-standing will of Congress.

#### (d) Applying *Skidmore* to Determine if the 2015 Third Party Employer Regulation Provides a Persuasive Interpretation of the FLSA's Companionship Exemption.

While nothing in the text of the FLSA, particularly at § 13(a)(15) or § 29(b), requires the Court to accept or defer to the DOL's 2015 Third Party Employer Regulation as a legally enforceable pronouncement for interpreting the Companionship Exemption, the Court may consider the

possible persuasiveness of that regulation when independently interpreting the best meaning of the statute. *Skidmore*, 323 U.S. at 140. The weight, if any, that may be given to the interpretation contained in the DOL's nondelegated sub-regulatory interpretive guidance "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Id.* Under these *Skidmore* considerations, the companionship services provision of the DOL's 2015 Third Party Employer Regulation, codified at 29 C.F.R. § 552.109(a) (2015), is not a persuasive interpretation of who is covered by the Companionship Exemption.

First, and as discussed above, the Court is unpersuaded that this agency action is consistent with the best reading of the FLSA generally and its Companionship Exemption in particular. The plain text of § 13(a)(15) requires that "all employees" who satisfy its other requirements be exempt from the FLSA's minimum wage and overtime pay provisions and does not condition the application of this statutory exemption upon the identity or nature of the employer. Being employed directly or by a third party is immaterial to the express terms of § 13(a)(15). Both the context and structure of the FLSA, notably the many other statutory exemptions set forth at §§ 13(a)(1)-(19) and §§ 13(b)(1)-(30), also make clear that Congress expressly conditioned application of certain exemptions partly based upon the identity or nature of the employer when it wanted to do so but did not do so for the Companionship Exemption in § 13(a)(15).

Second, the DOL also articulated other flawed and unworthy explanations in its 2013 Final Rule for excluding third party employers from application of the Companionship Exemption. For instance, Congress did not expressly delegate to the DOL the authority to define and delimit the entire scope of the Companionship Exemption as the DOL's 2013 Final Rule speciously portrays. Rather, § 13(a)(15) merely authorized the DOL to define and delimit specific terms, none of which

bear upon the identity or nature of the employer. Then, the DOL incorrectly relies on *Chevron* to construct an implied delegation contrary to *Loper Bright* even though the plain text of the statute demonstrates that Congress did not enact an express legislative delegation empowering it to do what it did. Next, the DOL misrelies upon its own self-serving formulation of the FLSA's "legislative history" and its incorrect view that the FLSA's exemptions, such as § 13(a)(15), are to be construed "narrowly." These foundational propositions are wrong as a matter of law and the DOL's decisional reasoning based upon these flawed bases is not valid.

Finally, the Court notes that the DOL leveraged its invalid reasoning to promulgate its 2015 Third Party Employer Regulation forty years after the Companionship Exemption was enacted in 1974 and its nearly contemporaneous regulation promulgated in 1975, which affirmed the inclusion of third party employers within its coverage. *Skidmore* counsels that the weight of regulatory guidance depends in part on its consistency with earlier pronouncements, especially those made at or near the time the statute was enacted. *Skidmore*, 323 U.S. at 140; *see also Loper Bright*, 603 U.S. at 386 (stating, "respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time" and "the longstanding practice of the government – like any other interpretive aid – can inform a [court's] determination of what the law is.") (internal quotation marks and citations omitted). The DOL's 2015 Regulation reversing the 1975 Regulation was promulgated four decades later in defiance of the law-making process required by the Constitution.

For the foregoing reasons, the DOL's 2015 Third Party Employer Regulation lacks the power to persuade this Court that the best reading of the Companionship Exemption excludes third party employers from its coverage. This Court's independent interpretation of the Companionship Exemption reaches the opposite conclusion.

### 2. Application of *Loper Bright* to the Live-In Exemption (§ 13(b)(21)).

The Court now turns to the Live-In Exemption at § 13(b)(21). Here, Congress provides that the overtime pay provisions of the FLSA "shall not apply with respect to - any employee who is employed in domestic service in a household and who resides in such household[.]" § 13(b)(21); 29 U.S.C §§ 213(b) and (b)(21). Once again, the Court must first determine the best reading of the statute based upon its text, context, and structure.

Like the Companionship Exemption, the text of the Live-In Exemption is clear, direct, and unambiguous. It covers "any employee" to mark the outer boundary of those persons covered by it. As explained above, the phrase "any employee" is very broad and includes every employee without distinction or limitation, except as otherwise limited by other requisite elements of the remaining text of § 13(b)(21). Accordingly, the best reading of this Live-In Exemption plainly covers: (i) "any employee"; (ii) "who is employed in domestic service in a household;" and (iii) "who resides in such household." § 13(b)(21).

The text of the Live-In Exemption contains a few terms and phrases that are not expressly defined in the FLSA itself. For instance, the phrase "employed in domestic service" is an iteration of the term "domestic service employment" that also appears in § 6(f), § 7(l), and § 13(a)(15). And, as noted above, Congress expressly delegated authority to the DOL pursuant to § 13(a)(15) to define and delimit "domestic service employment," which it did as follows:

> The term domestic service employment means services of a household nature performed by an employee in or about a private home (permanent or temporary). The term includes services performed by employees such as companions, babysitters, cooks, waiters, butlers, valets, maids, housekeepers, nannies, nurses, janitors, laundresses, caretakers, handymen, gardeners, home health aides, personal care aides, and chauffeurs of automobiles for family use. This listing is illustrative and not exhaustive.

29 C.F.R. § 552.3 (2013); *see also* 29 C.F.R. § 552.101 (2013) (providing additional delimitations, stating that the definition of "domestic service employment" is derived from regulations issued under the Social Security Act (20 C.F.R. § 404.1057) and from its "generally accepted meaning"); § 552.102 (2013) (addressing hours worked and excludable time for live-in domestic service employees). The terms "household" and "resides" are also not defined by the FLSA itself nor by the DOL but easily can be understood by their plain and ordinary meanings. *Household*, OXFORD ENGLISH DICTIONARY, (Def. 1.a), https://www.oed.com/dictionary/household_n?tab=meaning_and_use#1356564 (last visited Oct. 20, 2026) (meaning "[t]he inhabitants of a house considered collectively; a group of people (esp. a family) living together as a unit; a domestic establishment (including any servants, attendants, etc."). *Reside*, OXFORD ENGLISH DICTIONARY, (Def. 2.b), https://www.oed.com/dictionary/reside_v1?tab=meaning_and_use#25944831 (last visited Oct. 20, 2026) (meaning "[t]o dwell permanently or for a considerable time, to have one's settled or usual home in or at a particular place. Also in extended use."). By integrating and restating the meanings of these terms, the Live-In Exemption plainly exempts from the FLSA's overtime pay provisions "any employee" who provides services of a household nature in or about a private home in which the employee resides.

As with the Companionship Exemption, there is no text in the Live-In Exemption that would exclude employees of third party employers from its coverage. Instead, this statutory provision uses the prepositional phrases "employed *in*" and "*in* a household" to prescribe the exemption-qualifying employee's specific field, industry, or activity (*i.e.*, domestic service), along with the location where the employee provides such service. § 13(b)(21) ("any employee *employed in* domestic service *in* a household") (emphasis added). The text also uses the verb phrase "resides *in* such household" as an additional qualifying residency characteristic of an exempt employee.

*Id.* (emphasis added). Here, once again, Congress was specific and intentional when legislating who it deems exempt by exclusively focusing on the characteristics and actions of an employee. There is no mention of an employer in the Live-In Exemption, § 13(b)(21), unlike several other provisions of §§ 13(a) and (b) cataloged above. *See, e.g.*, 29 U.S.C. § 213(a)(3) ("any employee *employed by an establishment* which is an amusement or recreational establishment . . .") (emphasis added); 29 U.S.C. § 213(b)(10)(B) ("any salesman . . . *employed by* a nonmanufacturing establishment . . .") (emphasis added). Based upon the text of the Live-In Exemption, its context, and the overall structure of the FLSA, had Congress wanted to exclude from its coverage employees of third party employers, it would have enacted this provision with words like it did elsewhere in §§ 13(a) and (b) through use of the preposition "by" rather than "in" (*e.g.*, "employed in domestic service *by a member of* a household . . .") to make coverage depend, at least in part, on the identity or nature of the employer. Yet, Congress did not do so.

Accordingly, this Court concludes that the best reading of the Live-In Exemption is that it exempts from the FLSA's overtime pay requirements "any employee" meeting its other expressly stated requirements, namely, those employees who are employed in "domestic service in a household" and "who resides in such household." § 13(b)(21). As with the Companionship Exemption, the identity or nature of the covered employee's employer is immaterial to the application of the Live-In Exemption. Consequently, the portion of the DOL's 2015 Third Party Employer Regulation pertaining to live-in domestic service employment directly conflicts with the statutory text enacted by Congress.

Notwithstanding the foregoing, this Court must also discern whether the best reading of the Live-In Exemption contains a legislative delegation authorizing the DOL to impose this additional employer-based qualifying requirement contained in its 2015 Third Party Employer

Regulation. So, once again, the Court must follow *Loper Bright's* instructions and continue its textual analysis of the FLSA by: (a) recognizing any constitutional delegations to the DOL, (b) fixing and policing their boundaries, and (c) ensuring the DOL has engaged in reasonable decision-making within those boundaries. *Loper Bright*, 603 U.S. at 395, 404.

**(a) Recognizing Delegations**

Here, the DOL proffers § 13(a)(15), § 13(b)(21), and § 29(b) as sources of legislative delegation to support its promulgation the portion of its 2015 Third Party Employer Regulation applicable to the Live-In Exemption. As explained above, the Court recognizes § 13(a)(15) as an express delegation and § 29(b) as a general or "housekeeping" delegation. Here, the Court must also discern whether the Live-In Exemption, § 13(b)(21), contains any such delegation. It does not. The Live-In Exemption states, in its entirety: "The provisions of 207 of this title shall not apply with respect to – any employee who is employed in domestic service in a household and who resides in such household[.]" 29 U.S.C. § 213(b)(21). There is nothing in the Live-In Exemption delegating any authority to the DOL.

**(b) Fixing and Policing the Boundaries of Recognized Delegations**

Next, the Court must fix the boundaries of any recognized delegations in relation to the live-in domestic service provision of the DOL's 2015 Third Party Employer Regulation and police whether that part of the regulation falls within its boundaries. *Loper Bright*, 603 U.S. at 396, 404. Once again, the Court makes these determinations based upon the text of each applicable delegation. As noted, however, the only recognized delegations potentially applicable are §§ 13(a)(15) and 29(b). The Court examined these putative delegations elsewhere in this Opinion in relation to the Companionship Exemption and that discussion also applies here in relation to the Live-In Exemption. Each will be addressed again briefly.

**(i) Defining and Delimiting the Terms Contained in the Companionship Exemption (§ 13(a)(15)).**

Although the Live-In Exemption lacks any semblance of a delegation, it does contain the term "domestic service" that the DOL defined and delimited pursuant to an express delegation separately contained in the Companionship Exemption. *See* § 13(a)(15). The text of that delegation clause in § 13(a)(15) does not restrict the application of this regulatory definition solely to use of that the term in § 13(a)(15). Rather, the best reading of this delegation clause is that the DOL may define and delimit this and other "such terms" contained in § 13(a)(15) which may then apply wherever those terms appear elsewhere throughout the 1974 Amendments absent contrary statutory text. *See Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 141 (3d Cir. 2022) ("[W]e presume that Congress uses words consistently throughout a statute"). Accordingly, the DOL's authority to define and delimit "domestic service employment" for purposes of § 13(a)(15) is also applicable when used in § 13(b)(21).

In furtherance of this express delegation, the DOL defined "domestic service employment" to mean "services of a household nature performed by an employee in or about a private home (permanent or temporary)." 29 C.F.R. § 552.3 (2015); 29 C.F.R. §§ 552.101 and 552.102 (2015). As noted above, nothing here indicates that the DOL itself considers such domestic services to depend, in whole or in part, on the identity or nature of an employee's employer. And again, that makes sense because nothing in the text of either the Companionship Exemption or the Live-In Exemption qualifies coverage thereunder based upon the identity or nature of the employee's employer. To include this added element in its definition or delimitations of "domestic service employment" would be contrary to the plain text of these specific statutory exemptions. Consequently, it is plainly evident that Congress never authorized the DOL to restrict application of the

Live-In Exemption based upon the identity and nature of an employee's employer. The DOL went out-of-bounds when it promulgated the portion of its 2015 Third Party Employer Regulation to impose an additional requirement that to be exempt from the FLSA's overtime pay provisions, live-in domestic service workers may only be employed by the individual or member of the family or household using the domestic services and not by a third party employer. *See* 29 C.F.R. § 552.109(c).

**(ii) Prescribing Necessary Regulations Regarding the 1974 Amendments (§29(b)).**

The Live-In Exemption is a nondiscretionary exemption from the FLSA's overtime pay requirements for those employees satisfying its express terms. § 13(b)(21) ("The provisions of [§] 207 . . . shall not apply . . ."). This statutory mandate leaves no room for agency discretion to narrow the exemption by way of regulation pursuant to the groundless view that § 29(b) somehow authorizes a redrafting of the statutory text. Nor does DOL receive the benefit of an implied delegation conferred by virtue of § 29(b) based upon any suggestion that the text of either the Companionship Exemption or Live-In Exemption is ambiguous. *Loper Bright* prohibits recognizing any such implied delegation. And, by its own text, any regulation promulgated pursuant to § 29(b) must be "necessary" yet there is no rational basis for concluding that the live-in domestic service provision of the 2015 Third Party Employer Regulation is essential, vital, or indispensable, *i.e.*, necessary. Indeed, § 29(b) is so general and vague that the parameters of its legislative delegation, if any, are not judicially discernable. Given these defects, this Court concludes that the portion of the DOL's 2015 Third Party Employer Regulation pertaining to live-in domestic service employees, 29 C.F.R. § 552.109(c), falls outside of the perimeter of any permissible legislative delegation.

**(c) Ensuring that the DOL Engaged in Reasonable Decision-making within Its Delegated Boundaries.**

As with the companionship services provision, the live-in domestic service provision contained within the DOL's 2015 Third Party Employer Regulation, codified at 29 C.F.R. § 552.109(c), also exceeds the authority delegated to it by §§ 13(a)(15) and 29(b) and is based unjustifiably and unreasonably on the DOL's curated view of the FLSA's legislative history. And, unlike the companionship services provision, codified at 29 C.F.R. § 552.109(a), for which the DOL articulated (albeit incorrectly) a delegation it was purporting to effectuate, the DOL's 2013 Final Rule makes no attempt to do so for the live-in domestic service provision codified at 29 C.F.R. § 552.109(c). 78 Fed. Reg. 60,481.

In the 2013 Final Rule, the DOL readily admits that its NPRM for the 2015 Regulations "did not propose any changes to the definition of live-in domestic service employee or otherwise discuss the requirements for meeting the live-in domestic service exemption." 78 Fed. Reg. 60,474. The DOL went on to say that "[i]t is [its] intention to continue to apply its existing definition of live-in domestic service employees." *Id.* Yet, an examination of the 2013 Final Rule reveals that the DOL mischaracterized its limited statutory delegation in § 13(a)(15) to define and delimit certain terms as a broad grant of legislative power to impose its own policy-based revision to constrict substantially the scope of the Companionship Exemption in its entirety. The DOL then grafted that mischaracterized version of its delegated authority from § 13(a)(15) onto the Live-In Exemption even though § 13(b)(21) is clear, direct, and devoid of any delegation in its own text.

The DOL's own articulation of its decision-making that led it to promulgate the live-in domestic service provision contained in the 2015 Third Party Employer Regulation is devoid of any explanation as to what statutory provision(s) delegate authority to it for doing so. As noted

above, a reviewing court cannot adequately fulfill its judicial function under Article III of the Constitution and pursuant to the APA as instructed by *Loper Bright* if an Executive Branch agency does not explain the reasoning underlying its regulatory decisions to effectuate a legislative delegation. Here, the DOL did not denote the textual source of its purported statutory delegation and instead seems to imply that its delegated authority emanates from "legislative history" and its baseless assertion that the narrow delegation to define and delimit certain terms contained in the Companionship Exemption somehow empower it to rewrite the Live-In Exemption as it wishes. Its decision-making in this regard is unreasonable.

#### (d) Applying *Skidmore* to Determine if the 2015 Third Party Employer Regulation Provides a Persuasive Interpretation of the FLSA's Live-In Exemption.

For the same reasons described above regarding the companionship services provision, the live-in domestic service provision of the DOL's 2015 Third Party Employer Regulation also lacks the power to persuade this Court that the best reading of the Live-In Exemption excludes third party employers from its coverage. *Skidmore*, 323 U.S. at 140.

### 3. Was the DOL's Promulgation of the 2015 Third Party Employer Regulation Arbitrary and Capricious.

In addition to challenging the 2015 Third Party Employer Regulation as not being "in accordance with law," Plaintiffs assert in Count II of their Consolidated Amended Complaint that this 2015 Regulation was promulgated "arbitrarily and capriciously" and must be held "unlawful and set aside" pursuant to the APA because the DOL "disregarded the decades of reliance upon the exemptions for the success of the Medicaid Waiver Program and the establishment of third party agency employers to facilitate these services" and because "[t]he DOL did not provide adequate justification or explanation for these drastic changes to the regulations . . ." (Docket No. 25 at ¶ 165).

Judicial review under the "arbitrary and capricious" standard is deferential. *Federal Communications Commission v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Courts are instructed to discern whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). This narrow standard "requires that agency action 'be reasonable and reasonably explained,' meaning that the agency 'has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.'" *Trenton Threatened Skies, Inc., v. Federal Aviation Administration*, 90 F.4th 122, 130 (3d. Cir. 2024) (citing *Prometheus Radio Project*, 592 U.S. at 423). In applying this standard, courts shall review the whole administrative record or those parts of it cited by a party "to ascertain that the agency has made a reasonable decision based on reasonable extrapolations from some reliable evidence, to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.*, at 130-131; 5 U.S.C. § 706.

When undertaking this review, courts must also recognize that an administrative agency may change a policy and there is no heightened standard for reviewing the new policy. *Fox Television Stations, Inc.*, 556 U.S. at 514-16. The agency must simply acknowledge the change and explain its reasons for the new action, though it need not demonstrate to the reviewing court's satisfaction that the agency believes the new policy to be better, which "a conscious change of course adequately indicates." *Id.*, at 515. Though an agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate[,]" sometimes it must do so "when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance

interests that must be taken into account." *Id.* Indeed, "it would be arbitrary or capricious to ignore such matters" because "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.*, at 515-516.

Here, the 2013 Final Rule promulgating the 2015 Third Party Employer Regulation includes over 100 pages of the DOL's analysis and explanation in the Congressional Record. (Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454-60,557 (Oct. 1, 2013)). As noted therein, the DOL received and considered comments from more than 26,000 individuals from a "broad array of constituencies, including direct care workers, consumers of home care services, small business owners and employers, worker advocacy groups and unions, employer and industry advocacy groups, law firms, Members of Congress, state government agencies, federal government agencies, professional associations, the disability community, and other interested members of the public." 78 Fed. Reg. 60,460. The DOL represents that it "carefully considered comments submitted regarding the proposed revisions to § 552.109(a) and § 552.109(c) and has decided to adopt the [new] regulation as proposed." 78 Fed. Reg. 60,481. The comments received were in response to the DOL's proposed 2015 Regulation generally, including comments specific to the DOL's proposed Third Party Employer Regulation that it ultimately promulgated (and codified at 29 C.F.R. § 552.109 (2015)) to replace its 1975 Third Party Employer Regulation (also codified at 29 C.F.R. § 552.109 (1975)). This rulemaking record "includes views from a broad and comprehensive array of interested parties: academics studying this issue, advocates for the individuals who need home care services, home care agencies that currently claim the companionship services exemption, labor unions, associations representing direct care workers, and representatives of the disability community." 78 Fed. Reg. 60,481. The DOL explained in the Congressional Record that "[m]any commenters . . . expressed strong support for the proposed

change to § 552.109[,] while other commenters "generally opposed the proposed revision[.]" 78 Fed. Reg. 60,480.

Plaintiffs contend that despite the DOL's extensive review of public comments, it nonetheless unreasonably disregarded decades of reliance upon the Companionship and Live-In Exemptions for the success of the Medicaid Waiver Program and the establishment of third-party employers to facilitate these services. (Docket No. 125, ¶ 165). However, an agency is permitted to change its policy, *Fox Television Stations, Inc.*, 556 U.S. at 514-16, and must simply acknowledge the change and explain its reasons for the new action. *Id.*, at 515. Here, the DOL expressly acknowledged that it was "changing its position as to the proper treatment of third party employers," explaining that the change was warranted considering the purpose and objectives of the 1974 Amendments, its "legislative history," and the "state of the home care industry" as it has "undergone dramatic transformation" since 1974 in which there has been growth in demand for home care services and an increased professionalization of its personnel but without growth of earnings. 78 Fed. Reg. 60,458, 60,482.

Upon the Court's independent review of the 2013 Final Rule, it is evident that the DOL has fulfilled its duty to "conside[r] the relevant issues and reasonably explain[n] [its] decision." *Trenton Threatened Skies, Inc. v. Federal Aviation Administration*, 90 F.4th 122, 130 (3d. Cir. 2024). As detailed elsewhere in this Opinion, the Court believes that the DOL went beyond the statutory boundaries of legislative delegation when it promulgated the 2015 Third Party Employer Regulation in disregard of the FLSA's text and today finds that a portion of it, 29 C.F.R. § 552.109(c), is "not in accordance with law." *See* 5 U.S.C. §§ 706, 706(2)(A). However, the Court concludes that, procedurally, the DOL thoroughly summarized the comments it received pertaining to its proposal to promulgate the 2015 Third Party Employer Rule, though ultimately rejecting

them. Here, the DOL considered the relevant issues and reasonably explained its decision. Whether the Court would agree or disagree with the DOL's explanations is not germane to the question at hand. The DOL clearly implemented a policy preference that is beyond this Court's province to criticize. It is enough that the DOL acknowledged that it was changing its regulation and that it supplied explanations for doing so. Accordingly, the Court finds that the DOL fulfilled its procedural obligations and is satisfied that it did not promulgate the substance of its 2015 Third Party Employer Regulation arbitrarily or capriciously.

### B. Does Earlier Supreme Court Precedent Override the Court's *Loper Bright* Analysis?

The DOL contends that the Supreme Court's nearly 20-year-old 2007 decision in *Coke* forecloses this Court's finding that the DOL exceeded its delegated authority to promulgate its 2015 Third Party Employer Regulation. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007). This Court partially agrees insofar as *Coke* precludes such a finding concerning the companionship provision of the 2015 Regulation but not as to its live-in domestic services provision.

*Coke* involved a *Chevron*-era challenge to the DOL's 1975 Third Party Employer Regulation, codified at 29 C.F.R. § 552.109(a) (prior to 2015). Forty years before being replaced by the 2015 Regulation, and only one year after Congress enacted the FLSA's Companionship Exemption contained in the 1974 Amendments, the DOL promulgated the 1975 Regulation affirming the inclusion of companionship workers employed by third party employers within the coverage of the Companionship Exemption, § 13(a)(15). *Coke* validated the 1975 Regulation, holding that "the text of the FLSA does not expressly answer the third-party-employment question[,]" and that "the FLSA explicitly leaves gaps, for example, as to the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services[,]' 29 U.S.C. § 213(a)(15).

*Coke*, 551 U.S. at 165, 168. It provides the [DOL] with the power to fill these gaps through rules and regulations[,]" citing § 29(b) of the 1974 Amendments. *Coke*, 551 U.S. at 165, 167 (stating, "whether to include workers paid by third parties within the scope of the definitions is one of those details"). Finally, *Coke* leaned on *Chevron* to defer to the DOL's determination in this regard, opining that "[t]he subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a broader definition, the details of which . . . Congress entrusted the agency to work out." *Id.*, at 165.

This Court agrees with Plaintiffs that *Coke* is flawed. First, while *Coke* anticipated and then "answered *Loper Bright's* question about . . . delegation[s], it did not engage in a thorough consideration of it." *Americare,* 171 F.4th at 853 (Bush, J., concurring). *Coke* says that the question before it was whether the DOL's 1975 Regulation was valid "in light of the statute's text and history . . .", 551 U.S. at 162, but then undertook no particularized analysis of the statutory text beyond superficially stating that the statute "leaves gaps, for example, as to the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services' [contained in the Companionship Exemption.]" 551 U.S. at 165. While *Coke* referenced § 29(b) of the 1974 Amendments, it completely ignored the statutory text in § 13(a)(15) that actually delegates authority to the DOL to define and delimit those exact terms. *See* 29 U.S.C. § 213(a)(15) (". . . as such terms are defined and delimited by regulations of the [DOL]"). Completely absent from *Coke* is any analysis of the text, context, and structure of the FLSA and its Companionship Exemption, including any ostensible statutory delegations, with the precision and rigor current precedents require of courts when interpreting statutes.

Even so, Plaintiffs wrongly contend that *Coke* is not controlling here. Plaintiffs argue that *Coke's* core holding, that the 1975 Regulation is valid, does not apply to the DOL's 2015

Regulation because this subsequent regulation is a separate agency action that was not adjudicated in *Coke* and indeed was not subsumed by the narrow question presented, which asked if the 1975 Regulation was entitled to *Chevron* deference. (Docket No. 113, at 33). It is true that the specific agency action upheld in *Coke* was not the 2015 Regulation, but a prior, *opposite* regulation that expressed an interpretation of the Companionship Exemption consistent with this Court's best reading of it by affirming the inclusion of *any* otherwise covered employee regardless of who employed them. Plaintiffs also contend that *Coke* is no longer binding because its reasoning is based on *Chevron* and lower courts must not follow prior cases applying a test that the Supreme Court has abandoned. (Docket No. 113, at 23) (citing *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534-36 (2022) and BRYAN GARNER *ET AL.*, THE LAW OF JUDICIAL PRECEDENT 31 (2016)). While technically correct, these arguments ignore the reality that *Coke* interpreted the FLSA and determined that it contained a statutory delegation authorizing the DOL to regulate the third party employer question regarding the Companionship Exemption. Even assuming that *Coke* truly is a *Chevron* case, it still remains "subject to statutory *stare decisis* despite [the] change in interpretive methodology." *Loper Bright*, 603 U.S. at 412.

Although operating within the then-applicable *Chevron* framework, a close reading of *Coke* reveals that it applied some semblance of the interpretive methodology now required by *Loper Bright*. *Coke* says that it interpreted the FLSA's text, determining that it "does not expressly answer the third-party-employment question" and that the statute "explicitly leaves gaps" and "expressly instructs" the DOL to work out the details[.]" 551 U.S. at 165, 167-68. Indeed, *Coke* found a purported "gap-filling" delegation in § 29(a) of the 1974 Amendments and then deferred to the DOL to fill that gap.

As discussed above, this Court has endeavored to undertake such a textual analysis to discern the best reading of the FLSA and any express delegations contained therein, concluding that the identity or nature of a companionship worker's employer is immaterial to deciding whether such companionship worker is covered by the Companionship Exemption. In doing so, this Court also concludes that the DOL exceeded its statutorily delegated authority to define and delimit certain terms contained in the Companionship Exemption by promulgating its 2015 Third Party Employer Regulation. By contrast, *Coke* did not accurately recognize the applicable delegations and it certainly did not fix and police the boundaries as *Loper Bright* now requires. Instead, *Coke* relied upon the then-existing *Chevron* regime which licensed an abdication of the judicial role to "independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Loper Bright*, 603 U.S. at 395. This abdication led to the Executive Branch overreach that brings today's controversy to the fore.[28] Now that there is a new methodological sheriff in town, both agencies and courts should know better going forward. *Americare Healthcare Services, Inc.*, 171 F.4th at 857 (Bush, J., concurring) ("Courts now have the obligation to police the lines that the Supreme Court so long ignored.").

---

[28] Notably, the DOL specifically cited *Chevron* and *Coke* in its 2013 Final Rule as justification that it could fill the purported gap "as to the meaning and scope of the exemption at [§] 13(a)(15), explicitly giving the [DOL] authority to define and delimit the boundaries of the exemption." *See* 78 Fed. Reg. 60,481. Yet, as explained above, Congress did no such thing for there is no explicit delegation to redefine the legislatively defined scope of the Companionship Exemption. It appears that neither *Coke* nor the DOL used the term "explicitly" with its plainly understood meaning in mind. *Explicitly*, OXFORD ENGLISH DICTIONARY, (Def. 2), https://www.oed.com/dictionary/explicitly_adv?tab=meaning_and_use#5071390 (last visited Oct. 21, 2026) ("In a definite and unambiguous matter, unequivocally; expressly, clearly, plainly"). When the Sixth Circuit similarly determined that *Coke* remains binding precedent insofar as it interprets the statutory language of the FLSA, it also said that "nothing in *Loper Bright* suggests the 1975 agency action *Coke* upheld was to be preserved in amber." *Americare Healthcare Services, Inc.*, 171 F.4th at 848. True enough, but if the judiciary's duty to "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" means anything, then prior flawed precedents such as *Coke* should be revisited to correct both their interpretive errors and to scrutinize them for more fundamental constitutional defects reflecting encroachments of our separation of constitutional powers. *Loper Bright*, 603 U.S. at 395; *see, e.g., id.*,. at 413-416 (Thomas, J. concurring); 603 U.S. at 416-448 (Gorsuch, J., concurring). Otherwise, the judiciary's prior abdications will be what gets "preserved in amber."

Notwithstanding the foregoing, *Loper Bright* itself cautions that "[m]ere reliance on *Chevron* cannot constitute a special justification for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided. That is not enough to justify overruling a statutory precedent." 603 US. at 412 (internal quotations and citations omitted). *Coke* still controls even though this Court disagrees with it. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). Consequently, *Coke* prevents this Court from holding unlawful and setting aside the companionship provision of the 2015 Third Party Employer Regulation notwithstanding its analysis and conclusions set forth above. As such, this Court is constrained to uphold as lawful and valid the DOL's regulation codified at 29 C.F.R. § 552.109(a) (pertaining to third party employers of employees performing companionship services) unless or until the Supreme Court or Third Circuit[29] overrule or distinguish *Coke*.

---

[29] The Third Circuit recently upheld the validity of the third-party employer carve-out in the 2015 Regulation as applied to the Companionship Exemption in its non-precedential opinion *Walsh v. WiCare Home Care Agency, LLC*, 2026 WL 36153 (3d. Cir. Jan. 6, 2026). Notably, *WiCare* only considered the companionship provision of the 2015 Third Party Employer Regulation codified at 29 C.F.R. § 552.109(a) and did not consider the validity of the live-in domestic service provision codified at 29 C.F.R. § 552.109(c). Without citing *Coke*, and without applying *Loper Bright's* three-part methodology, the Third Circuit briefly explained: "the [DOL] chose to 'delimit[ ]' the scope of the companionship services exemption by excluding third-party employers from its reach. The Secretary's decision to do so was a lawful exercise of its expressly delegated authority under the FLSA. We therefore decline to vacate the Third-Party Regulation as inconsistent with the Act." *WiCare*, 2026 WL 36153 at *2. In concluding as such, the Third Circuit panel did not identify a specific term that the DOL defined or delimited, but instead concluded that the DOL permissibly exercised its "expressly delegated authority" to delimit the scope of § 13(a)(15) in its entirety. *WiCare's* decisional method seemingly mirrors *Coke*. Plaintiffs contend that "*WiCare's* cursory conclusion conflicts with *Loper Bright* and *Pickens* [*v. Hamilton-Tyker IT Sols., LLC*, 133 F. 4th 575 (6th Cir. 2025)]. The panel never independently set the boundaries of the delegation to 'delimit,' as *Loper Bright* requires, nor does the panel explain how the third-party employer rule actually delimits terms in the statute . . . The panel simply leaps from the (correct) conclusion that DOL has a delegation to delimit terms, to the (erroneous) conclusion that DOL has acted within the boundaries of that delegation, failing to apply the second step analysis that *Loper Bright* requires. That leap in logic is perhaps excusable given the quality of the briefing the [sic] Third Circuit received. *WiCare's* principal (and only) brief appears to have largely copy-pasted pre-*Loper Bright* summary judgment briefing before the district, arguing principally (as the lead argument) that the third-party employer was unlawful at '*Chevron* Step one' even through [sic] the principal brief was filed well after *Loper Bright* had overruled the *Chevron* framework." (Docket No. 120, at 21-

However, *Coke* does not demand the same conclusion for the live-in domestic service provision of the 2015 Third Party Employer Regulation codified at 29 C.F.R. § 552.109(c). *Loper Bright*'s instruction that prior cases relying upon the *Chevron* framework "are still subject to statutory *stare decisis* despite our change in interpretive methodology" only applies to holdings that "*specific* agency actions are lawful." 603 U.S. at 412 (emphasis added). *Coke* only examined the companionship provision of the 2015 Regulation related to the FLSA's Companionship Exemption. *Coke* never evaluated the validity of the live-in domestic service provision of the 2015 Third Party Regulation and its application to the Live-In Exemption, a separate statutory provision, so *Coke* does not apply to it. As set forth at length above, the live-in domestic service provision is not in accordance with law and should be held unlawful and set aside.

### C. What Does the APA Mean By "Hold Unlawful and Set Aside Agency Action"?

Having determined that the live-in domestic service provision of the DOL's 2015 Third Party Employer Regulation, codified at 29 C.F.R. § 552.109(c), is "not in accordance with law," the APA instructs that this Court "shall – hold unlawful and set aside" such agency action.[30] 5 U.S.C. § 706(2). The principal controversy here is whether declaring an agency's regulation unlawful and setting it aside has that effect solely as to the Plaintiffs or extends further, so the main interpretive question focuses on the meaning of the statutory phrase "hold unlawful and set aside agency action" and how far such effects may be felt.

---

22). This Court expresses no opinion on the reasoning of *WiCare* or the quality of the briefing that led to it, other than to note that *WiCare* is a nonprecedential opinion and therefore does not constitute binding precedent. 3d Cir. I.O.P. 5.3 and 5.7 (2023). *See also Watcher v. Pottsville Area Emergency Medical Servs., Inc.*, 248 F. App'x 274, 275 n. 5 (3d Cir. 2007).

30 The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551 (13). The APA separately defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4). Notably, too, the terms "sanction" and "relief" as used in the definition of "agency action" are also defined statutorily. *See* 5 U.S.C. §§ 551(10) and (11). The DOL's 2015 Third Party Employer Regulation falls within this definition of an agency "rule" and thus is an "agency action."

What does the statutory phrase "hold unlawful and set aside agency action" mean? Plaintiffs assert that this provision requires the Court to enter judgment declaring the DOL's 2015 Third Party Employer Regulation unlawful and vacate all its provisions entirely and universally. (Docket Nos. 113, at 40; 120, at 22-23). On the other hand, the DOL contends that such remedies are overly broad and instead must be limited to Plaintiffs, tailored to their specific redressable injuries, and relate only to those severed portions of the regulation found to be unlawful in accordance with "ordinary equitable principles." (Docket Nos. 111, at 30-32; 119, at 29-33). Some Supreme Court's justices themselves recently mused that this matter is "not open and shut [as] [t]houghtful arguments and scholarship[31] exist on both sides of the debate." *United States v. Texas*, 599 U.S. 670, 701 (2023) (Gorsuch, J. concurring). Justices Gorsuch, Thomas, and Barrett anticipate that this controversy eventually will need to be addressed by the Supreme Court, but, in the meantime, commented that it "would greatly benefit from the considered views of our lower court colleagues." *Id.*, at 702. The case *sub judice* necessitates this Court to wade into these uncharted waters.

The starting point of this inquiry is the source or sources of this Court's authority to exercise judicial review over an agency action. Here, Plaintiffs invoke this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (granting jurisdiction for federal questions) and 28 U.S.C. § 2201(a) (authorizing declaratory judgments) seeking declaratory and injunctive relief pursuant to the APA. (Docket No. 25, ¶¶ 21-22). Of course, judicial review has always been a constitutional duty. *Marbury v. Madison*, 1 Cranch 137, 177, 2 L. Ed. 60 (1803). Accordingly, the Court starts with the APA's pertinent text and interprets it within its context and overall

---

[31] *See generally* Mila Sohoni, *The Past and Future of Universal Vacatur*, 133 Yale L.J. 2304 (2024); Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997 (2023)

statutory structure to discern its best reading. *Loper Bright*, 603 U.S. at 395; *Bostock*, 590 U.S. at 654; *Lundeed*, 156 F.4th at 337.

As exhaustively explained above, the Court has determined that the live-in domestic service provision of the DOL's 2015 Third Party Employer Regulation is "not in accordance with law," so the APA itself directs that this Court "shall – hold unlawful and set aside [this] agency action." 5 U.S.C. § 706(2). Examining this specific statutory text reveals that the helping verb "shall" conveys a command, the verb phrase "hold unlawful and set aside" describes the actions being commanded, and the conjunction "and" conjoins these verb phrases to connote the statutory command that a reviewing court shall undertake both actions together. The term "agency action" is the direct object of these verb phrases and itself is a statutorily defined term.

The Supreme Court has made clear that "[t]he text of the APA means what it says." *Loper Bright*, 603 U.S. at 393. Yet, there remains an unresolved dispute as to what the phrase "hold unlawful and set aside agency action" actually means, and two competing textual interpretations of that statutory phrase have emerged. Most recently, Justice Kavanaugh opined in his *Corner Post* concurrence that it authorizes vacatur of unlawful agency actions, including agency regulations. *Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring). There, he wrote that "[w]hen Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'" *Corner Post, Inc.*, 603 U.S. at 829 (Kavanaugh, J., concurring) (citing BLACK'S LAW DICTIONARY 1612 (3d ed. 1933); BLACK'S LAW DICTIONARY 1537 (4th ed. 1951) (same); BOUVIER'S LAW DICTIONARY 1103 (W. Baldwin ed. 1926) ("[t]o annul; to make void; as, to set aside an award")); *see also id.*, at 829-830 (Kavanaugh, J., concurring) (stating that Congress used the phrase "set aside" in many pre-APA statutes that "plainly contemplated the vacatur of agency actions; and, further stating that at that time, "it was

common for an appellate court that reversed the decision of a lower court to direct that the lower court's 'judgment' be 'set aside,' meaning vacated") (citing *Shawkee Mfg. Co. v. Hartford-Empire Co.*, 322 U.S. 271, 274 (1944) and *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952)). Justice Kavanaugh posits that the APA "incorporated that common and contemporaneous meaning of 'set aside.'" *Id.,* at 830. He also points out that within its broader statutory context, the APA "prescribes the same 'set aside' remedy for all categories of 'agency action,' including agency adjudicative orders and agency rules." *Id.,* at 830 (citing 5 U.S.C. § 706(2) (A)-(F)). Finally, Justice Kavanaugh identifies "longstanding precedent reinforc[ing] the text." *Id.*, at 830-831 (collecting and citing decisions vacating "challenged agency rules rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs."). *C.f.*, *Comite' de Apoyo A Los Trabajadores Agricolas v. Perez ("CATA")*, 774 F.3d 173, 191 (3d Cir. 2014) (granting vacatur and remanding the case to the agency for further review and rulemaking); *Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 642-644 (E.D. Pa. 2025) (vacating arbitrary and capricious rulemaking and remanding to agency for further review).

Taking a different view, Justice Gorsuch, joined by Justice Thomas and Justice Barrett, recently opined in their concurrence in *United States v. Texas* that "set aside" does not authorize vacatur but more narrowly directs a reviewing court to "disregard" or "refuse to apply" an unlawful agency action. *Texas*, 599 U.S. at 695-696 (Gorsuch, J. concurring). In reaching this conclusion, Justice Gorsuch began with the words "set aside" in isolation and examined the common usage of that phrase both at the time the APA was enacted and as understood today. *Id.,* at 696 (citing WEBSTER'S NEW INTERNATIONAL DICTIONARY 2291 (2d ed. 1954) (defining "set aside" as "to put to one side; discard; dismiss" and "to reject from consideration; overrule"); WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1329 (5th ed. 2016) (defining "set aside" as "to set apart" and "to

discard; dismiss; reject")). This Court notes that other contemporary meanings of "set aside" are, "[s]o as to be no longer the focus of one's attention, consideration, or activity . . . to give up, dismiss, reject" and "to declare (a legal decision or process) to be invalid; to quash." *Set Aside*, OXFORD ENGLISH DICTIONARY, (Defs. A.I.4 and A.I.5), https://www.oed.com/dictionary/aside_adv?tab=meaning_and_use&hide-all-quotations=true#37774764 (last visited Oct. 22, 2026).

Justice Gorsuch also looked to the context of § 706 within which the phrase "set aside" is placed and the permissive indicator of meaning associated with its heading. He notes that the phrase "set aside" appears in § 706 under the title "Scope of review" which relates more to a reviewing court's "decisional process leading up to a judgment" as opposed to "the remedies the court may authorize after reaching its judgment on the merits." *Texas*, 599 U.S. at 696. Justice Gorsuch also observed that the prefatory language of § 706 "appears to confirm the point[,]" providing that, "*[t]o the extent necessary to decision* and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.*, at 697 (quoting 5 U.S.C. § 706) (emphasis added). In this context, an agency action can be disregarded as part of a reviewing court's decisional process, or scope of review. Justice Gorsuch concludes that "[u]nderstanding 'set aside' as a command to disregard an unlawful rule in the decisional process fits perfectly within this design. Understanding the phrase as authorizing a remedy does not." *Id.*, at 696. Placing the phrase "set aside" in this context, Justice Gorsuch opines:

> [W]e see further evidence that it governs a court's scope of review or decisional process. The statute tells judges to resolve the cases that come to them without regard to deficient agency action, findings, or conclusions – an instruction entirely consistent with the usual 'negative power' of courts 'to disregard' that which is unlawful.

599 U.S. at 697 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

Finally, Justice Gorsuch considered § 706 in relation to the larger statutory context within which it is situated. *Texas,* 599 U.S. at 698. For instance, while the "set aside" language is contained in § 706 which addresses a reviewing court's scope of review, another provision, § 702 (entitled "Right of review"), restricts such judicial review to "person[s]" who have "suffer[ed] legal wrong because of agency action, or [been] adversely affected or aggrieved by agency action." 5 U.S.C. § 702. Then, yet another provision, § 703 (entitled "Form and venue of proceeding"), authorizes judicial review in the form of "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Texas,* 5 U.S.C. § 703. Justice Gorsuch observes that "[c]onspicuously missing from the list is vacatur" and that it is not "apparent why Congress would have listed most remedies in § 703 only to bury another (and arguably the most powerful one) in a later section [*i.e.*, § 706] addressed to the scope of review." *Id.,* at 698. And, since § 706 governs all proceedings under the APA, "[a]ny interpretation of 'set aside' therefore must make sense in the context of an enforcement proceeding, an action for a declaratory judgment, a suit for an injunction, or habeas." *Id.,* at 698-699 (citing § 703). Justice Gorsuch concludes by opining that it makes sense to read § 706(2) as "instructing courts about when they must disregard agency action in the process of deciding a case." *Id.*, at 699.

Here, this Court's task is to discern the best reading of the statutory phrase "hold unlawful and set aside" within the context and overall structure of the APA. The competing analyses of the second half of that phrase, "set aside," offered by Justice Kavanaugh and Justice Gorsuch aids this Court but does not fully answer the question presented. Accordingly, this Court must dive more deeply into its statutory and constitutional authority to fully understand what it means to "hold unlawful and set aside agency action." While the parties do not go beyond the APA in their

briefing, three non-APA sources come to mind: the Judiciary Act of 1789, the Declaratory Judgment Act, and Article III of the Constitution.

The Judiciary Act of 1789 "endowed federal courts with jurisdiction over 'all suits ... in equity,'" § 11, 1 Stat. 78, and still today, this statute "is what authorizes the federal courts to issue equitable remedies." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (quoting S. Bray & E. Sherwin, Remedies 442 (4th ed. 2024)). *See also* 28 U.S.C. § 1651(a) (". . . all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"). "Though flexible, this equitable authority is not freewheeling . . . the statutory grant encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *CASA*, 606 U.S. at 841 (citing *Grupo Mexicano de Desarrollo, S. A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). In one such important and relevant limitation, the Supreme Court recently held that the Judiciary Act does not confer upon a district court the statutory authority to issue universal injunctions[32] or other analogous forms of relief that extend beyond restraining the actions of particular officers against particular plaintiffs. *Id.,* at 842. In reaching this decision, the Supreme Court instructs that "federal courts do not exercise general oversight of the Executive Branch; they resolve cases and controversies consistent with the authority Congress has given them. When a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too." *Id.* at 861.

Though, in determining that district courts lack statutory authority to issue universal injunctions, the Supreme Court cautiously noted that its holding in this respect does not extend to the "distinct question whether the [APA] authorizes federal courts to vacate federal agency action"

---

[32] A "universal injunction" is an injunction issued by a single district judge prohibiting the Government from enforcing the law against anyone, anywhere. *Trump v. CASA, Inc.*, 606 U.S. at 837 n. 1.

pursuant to 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action"). *CASA, Inc.*, 606 U.S. at 847 n. 10; *see also United States v. Texas*, 599 U.S. 670, 701-702 (2023). So, once again, this Court revisits the text of the APA in search of additional clues. As noted above, the APA provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof . . ." 5 U.S.C. § 702, and the "form of proceeding for [such] judicial review" may include "any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. Then, § 706 supplies the "scope of review" to be used by a court reviewing an agency action. 5 U.S.C. § 706 (2) ("shall hold unlawful and set aside").

Here, Plaintiffs seek judicial review of the DOL's 2015 Third Party Employer Regulation through the form of an action for declaratory judgment. (Docket No. 25)[33]. As noted above, a district court may not dispense universal injunctive relief, *Trump v. CASA, Inc.*, 606 U.S. at 841, so the Court turns its attention to the scope of its authority to issue a declaratory judgment. The Declaratory Judgment Act itself provides, in pertinent part:

> In a *case of actual controversy within its jurisdiction* . . . any court of the United States, upon the filing of an appropriate pleading, *may declare the rights and other legal relations of any interested party seeking such declaration*, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

[33] Plaintiffs' Consolidated Amended Complaint is entitled "Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief" and each cause of action is styled as a claim for "Declaratory Relief" requesting that the Court declare the DOL's 2015 Third Party Employer Regulation "to be invalid and unenforceable." (Docket No. 25, ¶¶ 6, 7, 8, 22, 160, 167). On closer reading, the Consolidated Amended Complaint also requests an order enjoining the DOL from pursuing back pay claims against Plaintiffs pursuant to 5 U.S.C. §§ 705, 706, and 28 U.S.C. § 2202 (providing that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted . . . against any adverse party whose rights have been determined by such judgment"). (*Id.*, at ¶¶ 6, 22).

28 U.S.C. § 2201(a) (emphasis added). Thus, the Declaratory Judgment Act constrains a court's authority to its own jurisdiction, the parties before it, and the limitations inherent in the judicial act of making a "declaration." First, there must be a "case of actual controversy" that is "within [the court's] jurisdiction." Second, the court's judgment or decree, *i.e.*, its declaration, must flow from a pleading filed by an "interested party seeking such declaration." Third, a court's judgment or decree is limited to "declar[ing]" "rights and other legal relations." The terms "declare" and "declaration" are consonant with the statutory phrase "hold unlawful" as used in § 706(2) of the APA.[34]

The text of the APA, like the Declaratory Judgment Act itself, empowers this Court to "hold" or declare "unlawful" an "agency action" such as the DOL's 2015 Third Party Employer Regulation. *Compare* 5 U.S.C. § 706 *with* 28 U.S.C. § 2201. Moreover, both the APA and the Declaratory Judgment Act tie the resultant judicial declaration to the rights of a particular party with a justiciable claim. For instance, the APA limits judicial review to "a *person suffering legal wrong* because of agency action, or *adversely affected* or *aggrieved by* agency action." 5 U.S.C. § 702 (emphasis added). The Declaratory Judgment Act limits declaratory relief to an "*interested party seeking such declaration*[.]" 28 U.S.C. § 2201 (emphasis added). And, finally, the APA confines a court's judicial review "to the extent necessary to decision and when presented[,]" 5

---

[34] The meanings of these terms seem self-evident as affirmed by their plainly understood definitions. *Compare* "declare" with "hold." The term "declare" as used in the Declaratory Judgment Act means "[t]o make a legal declaration." *Declare*, OXFORD ENGLISH DICTIONARY, (Def. 6.a), https://www.oed.com/dictionary/declare_v?tab=meaning_and_use#7336918 (last visited Oct. 21, 2026). *See also Declare*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("In common parlance, to state; to assert; to publish; to utter; to announce; to announce clearly some opinion or resolution . . . in pleading, to allege or set forth in a declaration or other affirmative pleading."). *See also Declaration,* OXFORD ENGLISH DICTIONARY, (Defs. 2.a and 5.a), https://www.oed.com/dictionary/declaration_n?tl=true (last visited Oct. 21, 2026) ("The action of setting forth, stating, or announcing openly, formally, or explicitly; an act or instance of this; a positive statement, an emphatic or solemn assertion.") and ("A ruling by a court which simply declares the rights of the parties according to the law, or the opinion of the court as to what the law is; a declaratory judgment."). Similarly, the word "hold" as used in the APA means: "[to] adjudge or decide as a matter of law (as opposed to fact)." *Hold*, BLACK'S LAW DICTIONARY (Def. 2) (11th ed. 2019); BLACK'S LAW DICTIONARY (Def. 3) (6th ed. 1990) ("[t]o adjudge or decide, spoke of a court, particularly to declare the conclusion of law reached by the court as to the legal effect of the facts disclosed."). *See also Hold,* BOUVIER'S LAW DICTIONARY (Def. 3) (William Edward Baldwin ed.) (appx. 1940) ("To decide, to adjudge, to decree . . .").

U.S.C. § 706, while the Declaratory Judgment Act confines itself to "a case of actual controversy[.]" 28 U.S.C. § 2201(a). Indeed, the APA references the Declaratory Judgment Act as an applicable form of legal action, 5 U.S.C. § 702, and these statutes seem to be *in pari materia* and should be interpreted harmoniously. Notably, too, the APA provides that "[n]othing herein affects . . . the power or duty of the court to . . . deny relief on any other appropriate legal or equitable ground[.]"). 5 U.S.C. § 702(1). *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (stating that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law" and that the Supreme Court "does not lightly assume that Congress has intended to depart from established [equitable] principles."); *Gill v. Whitford*, 585 U.S. 48, 66, 72 (2018) ("a plaintiff's remedy must be 'limited to the inadequacy that produced [his] injury in fact'" because [t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it[.]") (internal citation omitted)).

Consequently, the Court concludes that any judgment issued in this case declaring unlawful and setting aside part of the DOL's 2015 Third Party Employer Regulation must relate to the Plaintiffs who are seeking judicial review of that regulation after having been adversely affected or aggrieved by it. Neither the Declaratory Judgment Act nor the "hold unlawful" language of the APA authorizes this Court to extend such a declaration beyond Plaintiffs here and related injunctive relief to the full universe of employers potentially excluded from the FLSA's Live-In Exemptions pursuant to the DOL's 2015 Third Party Employer Regulation.

The next question is whether these foregoing limitations similarly apply to the phrase "set aside." The Court believes it does. When read in its totality, the relevant portion of the APA states, "[t]he reviewing court shall – hold unlawful and set aside agency action . . . found to be . . . not in accordance with law[.]" 5 U.S.C. § 706(2)(A). As noted above, the phrases "hold

unlawful" and "set aside" are conjoined by "and" which triggers the conjunctive canon to mean a reviewing court shall *both* hold unlawful and set aside an agency action upon determining it to be not in accordance with law. The conjunctive canon suggests that those same statutory requirements applicable for declaring an agency action unlawful also apply when setting aside such agency action, such that only a "person suffering a legal wrong . . . or adversely affected or aggrieved by agency action" may seek judicial review and that a reviewing court "shall determine the . . . applicability of the terms of an agency action" "[t]o the extent necessary to decision and when presented[.]" 5 U.S.C. § 706. The Declaratory Judgment Act also authorizes a court to grant "[f]urther necessary or proper relief based on [such] declaratory judgment" "against any adverse party whose rights have been determined by such judgment" but only "after reasonable notice and hearing." 28 U.S.C. § 2202. Again, reading the APA and Declaratory Judgment Act *in pari materia* and harmonizing their meanings leads this Court to conclude that the best reading of the applicable statutory text "set aside" means to disregard it in relation to the aggrieved parties seeking judicial review and does not mean to vacate such agency action universally.

Finally, this Court is ever-mindful that Article III of the Constitution confines the federal judicial power to "Cases" and "Controversies." *Texas*, 599 U.S. at 675. A case or controversy "can exist only if a plaintiff has standing to sue – a bedrock constitutional requirement . . . applied [by the Supreme Court] to all manner of important disputes." *Id.* This "[s]tanding doctrine helps safeguard the Judiciary's proper – and properly limited – role in our constitutional system. By ensuring that a plaintiff has standing to sue, federal courts prevent the judicial process from being used to usurp the powers of the political branches." *Id.*, at 675-676 (internal quotation marks and citations omitted). Apropos here, when concurring in *United States v. Texas*, Justice Gorsuch remarked:

> In our system of government, federal courts play an important but limited role by resolving cases and controversies. Standing doctrine honors this limitation at the front end of every lawsuit. It preserves a forum for plaintiffs seeking relief for concrete and personal harms while filtering out those with generalized grievances that belong to a legislature to address. *Traditional remedial rules do similar work at the back end of a case. They ensure successful plaintiffs obtain meaningful relief. But they also restrain courts from altering rights and obligations more broadly in ways that would interfere with the power reserved to the people's elected representatives.* In this case, standing and remedies intersect.

*Id.*, at 703-704 (Gorsuch, J., concurring) (emphasis added).

Textually, the seemingly best reading of the phrase "set aside," when read in its broader statutory context and *in pari materia* with the Declaratory Judgment Act, is that it means to "disregard" or "refuse to apply" an unlawful agency action, *see id.,* at 695-696 (Gorsuch, J. concurring), to "a person suffering legal wrong because of [such] agency action [. . ..]" 5 U.S.C. § 702. Should there be any doubt that "set aside" does not mean to vacate universally, the constitutional limitations noted above provide an additional cautionary that contributes to this Court's narrower textual interpretation, thus avoiding the possibility that a contrary interpretation would implicate a constitutional defect. *Clark v. Martinez*, 543 U.S. 371, 380-82 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail . . .").

Based upon the foregoing, the Court concludes that the best reading of "hold unlawful and set aside an agency action" as used in 5 U.S.C. § 706 is to declare or hold such agency action unlawful and to set it aside by disregarding or refusing to apply it to Plaintiffs rather than vacate or nullify application of the regulation universally and set it aside for everyone, everywhere.

**D. Can the Court Sever and Solely Set Aside the Live-In Domestic Service Portion of the DOL's 2015 Third Party Employer Regulation?**

The final issue is whether the Court should set aside, *i.e.* disregard, the live-in domestic service portion of the DOL's 2015 Third Party Employer Regulation or must it be set aside in its entirety. Once again, the parties disagree. Plaintiffs contend that the 2015 Regulation should be set aside in its entirety because it lacks a severability clause. (Docket No. 113, at 40). The DOL contends that its subparts are severable and thus only the live-in domestic service provision, codified at 29 C.F.R. § 552.109(c), may be set aside.

The parties offer no controlling precedent from the Supreme Court or Third Circuit to support their respective positions and instead cite decisions from the United States Court of Appeals for the District of Columbia Circuit. *See, e.g., Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 187 (D.C. Cir. 2022) (upholding all but one component of a Federal Energy Regulatory Commission decision to approve certain tariff revisions implementing the Inventoried Energy Program) and *Am. Petroleum Inst, v. EPA*, 862 F.3d 50, 71, 75 (D.C. Cir. 2017) ("[t]he Final Rule is upheld in part"). This Court's independent research similarly reveals no controlling Third Circuit authority but did find one decision from a district court within the Third Circuit applying the severance standard used by the District of Columbia Circuit. *See Pennsylvania v. Trump*, 795 F. Supp. 3d 607, 644-645 (E.D. Pa. 2025). These cases state that severability "turns on the agency's intent," that a court "will 'sever and leave in place a portion of an administrative regulation only when it can say without any substantial doubt that the agency would have adopted the severed portion on its own[,]" and that provisions may be severed when they "operate entirely independently of one another." *Am. Petroleum Inst.*, 862 F.3d at 71 (internal quotations and citations omitted) (cleaned up); *see also Belmont*, 38 F.4th at 187-188. To determine the agency's intent, these cases instruct a reviewing court to consider: (1) whether "there is substantial doubt that the agency would have

adopted the same disposition . . . if the challenged portion were subtracted," *Belmont,* 38 F.4th, at 187 (internal citation omitted); and (2) "whether the remainder of the regulation could function sensibly without the stricken provision," *id*., at 188. These cases also instruct that "the ultimate determination of severability will rarely turn on the presence or absence of a severability clause." *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022) (internal quotation marks omitted) (cited by *Pennsylvania v. Trump*, 795 F. Supp. 3d at 645 (ignoring an express severability provision contained in an agency's Final Rules to "vacate" them in their entirety)).

This Court examined these D.C. Circuit decisions and cannot find any underlying authoritative sources upon which these stated severance standards are derived. There certainly is no evidence in these cases that a reviewing court's authority to severe wheat from chaff is based on the APA itself. Even so, this Court will endeavor to discern whether portions of the 2025 Third Party Employer Regulation and the 2013 Final Rule from whence it came were intended to be severable. First, the Court notes that the DOL's 2013 Final Rule and 2015 Regulation are devoid of any express severability provision. But, following D.C. Circuit precedent, that fact does not seem to matter. Second, a close examination of the three subsections of the 2015 Third Party Employer Regulation reveal three independent, separately workable, stand-alone provisions. *See* 29 C.F.R. § 552.109 (a), (b), and (c). Importantly, subsection (b) was promulgated in 1975 pursuant to separate rulemaking and relates to certain babysitting employees. *See* Final Rule, *Extension to Domestic Service Employees*, 40 Fed. Reg. 7,404, 7,407 (Feb. 20, 1975). *See also* 2013 Final Rule ("Section 552.109(b) . . . is not a topic of this rulemaking"), 78 Fed. Reg. 60,480. There is no doubt that the DOL would have promulgated subsection (b) "on its own" because it actually did, so subsection (b) is undoubtedly severable under this standard. However, subsections (a) and (c), relating to companionship services and live-in domestic service employment, respectively, are

derived from the same rulemaking set forth in the 2013 Final Rule and are based on the same justifications and reasons as set forth therein. Importantly, however, these separate provisions relate to different types of workers, they apply to separate statutory exemptions, and they independently "function sensibly" without the other. *Belmont*, 38 F.4th at 187-188. Under such circumstances, courts applying D.C. Circuit precedents on this issue likely would conclude that these subsections of the 2015 Third Party Employer Regulation are severable. *Id.* This Court agrees.

However, this Court has its doubts about the applicability of the D.C. Circuit's severability standard in the case *sub judice*. First, these decisions involve pre-*Loper Bright* judicial review of agency actions that courts have deemed arbitrary and capricious. Here, this Court has determined that certain provisions of the DOL's 2015 Regulation are unlawful because they exceed the DOL's *statutory* authority. That seems to be a meaningful difference with respect to the reviewing court's scope or range of judicial review. Second, these decisions seem to trace back to the Supreme Court's decision in *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 293-294 (1988). But *K Mart* does not exactly formulate the standard now used by the D.C. Circuit. Rather, *K Mart* held that "the [unlawful] subsection of the regulation . . . is severable . . . [because] the severance and invalidation of this subsection will not impair the function of the *statute* as a whole, and there is no indication that the regulation would not have been passed [sic] but for its inclusion . . . Accordingly, [the unlawful subsection of the] regulation must be invalidated for its *conflict with the unequivocal language of the statute*." 486 U.S. at 294 (emphasis added). This rationale in *K Mart* is much more faithful to a court's authority to undertake judicial review of agency action pursuant to the APA.

Once again, the Court looks to its statutory authority contained in the APA for "holding unlawful and setting aside agency action." 5 U.S.C. § 706(2). The statutory term "agency action"

provides an obvious answer. Congress defined it to mean "*the whole or a part of an agency rule*, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13) (emphasis added). Congress separately defined a "rule" as "*the whole or a part of an agency statement* of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4) (emphasis added). Clearly, the DOL's 2015 Third Party Employer Regulation is contained within its 2013 Final Rule, both of which contain an agency "statement" "designed to . . . interpret[] or prescribe law or policy," so it falls squarely within the APA's definition of an agency "rule" and thus is an "agency action." Importantly, here, these statutory definitions also contain the phrase "the whole or part of" any agency statement or rule, so when the APA directs a reviewing court that it "shall hold unlawful and set aside agency action," the use of the statutorily defined term "agency action" in that provision expressly contemplates the reviewing court's authority to sever such rule or statement and only hold unlawful and set aside the "part" it finds not in accordance with law. The text of the APA itself supplies the answer.

Here, the Court concludes that the Supreme Court's decision in *Coke* precludes a finding that the companionship services provision of the 2015 Third Party Employer Regulation codified at 29 C.F.R. §552.109(a) is "not in accordance with law" but that *Coke* does not save the live-in domestic service provision of that regulation, codified at 29 C.F.R. § 552.109(c), from being held unlawful. In other words, the APA permits this Court to sever portions of an agency action and set aside those parts that exceed its legislatively delegated authority or otherwise conflict with the governing statute. *See* 5 U.S.C. §§ 551(4), 551(13), and 706; *K Mart Corp.*, 486 U.S. at 293-294. Accordingly, this Court concludes that the text of the APA permits – in fact, requires – it to hold

unlawful and set aside the *part* of the 2015 Third Party Employer Regulation pertaining to employees engaged in live-in domestic service employment codified at 29 C.F.R. § 552.109(c).

## IV. CONCLUSION

Based upon a textual analysis of the FLSA conducted pursuant to *Loper Bright*, this Court holds that the DOL exceeded its authority delegated to it by Congress when it promulgated its 2015 Third Party Employer Regulation. This Court further concludes that this regulation is contrary to law because it conflicts with the best reading of the FLSA and its Companionship and Live-In Exemptions. Consequently, this Court declares that the part of the 2015 Third Party Employer Regulation pertaining to employees engaged in live-in domestic service employment, codified at 29 C.F.R. § 552.109(c) (2015), is held unlawful and set aside as to Plaintiffs. However, the Supreme Court's decision in *Coke* precludes declaring unlawful and setting aside the part of this same regulation pertaining to employees providing companionship services that is codified at 29 C.F.R. §552.109(a) (2015). Accordingly, the parties' respective motions for summary judgment are each granted in part and denied in part.

A separate Order follows.

BY THE COURT:

W. Scott Hardy

W. SCOTT HARDY
UNITED STATES DISTRICT JUDGE

Dated: October 29, 2026